# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                    No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a.
"Huero Troup," LEONARD LUJAN,
BILLY GARCIA, a.k.a. "Wild Bill,"
EUGENE MARTINEZ, a.k.a. "Little
Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo,"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun," BENJAMIN CLARK, a.k.a.
"Cyclone," RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper,"
JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue,"
TIMOTHY MARTINEZ, a.k.a. "Red,"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts," DANIEL SANCHEZ,
a.k.a. "Dan Dan," GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma," CONRAD
VILLEGAS, a.k.a. "Chitmon," ANTHONY
RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY
PAUL MARTINEZ, a.k.a. "Shadow,"
CHRISTOPHER GARCIA, CARLOS
HERRERA, a.k.a. "Lazy," RUDY PEREZ,
a.k.a. "Ru Dog," ANDREW GALLEGOS,
a.k.a. "Smiley," SANTOS GONZALEZ;
PAUL RIVERA, SHAUNA GUTIERREZ,
and BRANDY RODRIGUEZ,

      Defendants.

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on: (i) Defendant Daniel Sanchez's Motion to Dismiss Case for Government's Outrageous Misconduct and Irreparable Violation of Brady v. Maryland, filed March 1, 2018 (Doc. 1841)("Sanchez MTD"); (ii) Defendant Carlos Herrera's Motion to Dismiss, or in the Alternative, for Mistrail [sic] Based on Repeated Brady and Giglio Violations, filed March 1, 2018 (Doc. 1842)("Herrera MTD"); (iii) Defendant Rudy Perez's Motion to Dismiss, filed March 1, 2018 (Doc. 1844)("Perez MTD");[2] (iv) Defendant Daniel Sanchez's Motion for Judgment of Acquittal (FRCP Rule 29) or, in the Alternative, a New Trial (FRCP Rule 33), filed October 9, 2018 (Doc. 2408)("Sanchez NTM"); (v) Defendant Carlos Herrera's Motion for New Trial and Notice of Joinder, filed October 15, 2018 (Doc. 2413)("Herrera NTM"); and (vi) Defendant Anthony Ray Baca's Motion for New Trial and Notice of Joinder, filed October 15, 2018 (Doc. 2421)("Baca NTM"). The Court held a hearing on the motions to dismiss in the middle of trial, from February 28, 2018 to March 2, 2018, and an evidentiary hearing on December 17-18, 2018, in which the motions for new trial were also heard. The primary issues are: (i) whether Plaintiff United States of America violated its discovery

---

[1]The Court intended to issue this Memorandum Opinion before it entered the Judgment and Commitment ("J&C") for Daniel Sanchez and Carlos Herrera. The support staff mistakenly filed the J&Cs, not understanding that the Court still owed this opinion. This explains the timing of the opinion.

[2]The jury found R. Perez not guilty on all charges, which renders moot the Perez MTD's request for a mistrial or judgement of acquittal, but the Perez MTD's arguments relating to prejudice resulting from the United States' late disclosure of hundreds of pages of documents that he alleges are material, exculpatory, and contain impeachment material remain relevant as to his co-Defendants Sanchez, Anthony Ray Baca, and Herrera. Further, Baca joined in the Perez MTD. See Defendant Anthony Ray Baca's Notice of Joinder to Defendant Rudy Perez's Motion to Dismiss [Doc. 1844], filed March 2, 2018 (Doc. 1860). Accordingly, the Court addresses the Perez MTD's argument.

obligations under Brady v. Maryland, 373 U.S. 83 (1963)("Brady"), and Giglio v. United States, 405 U.S. 150 (1972)("Giglio"),[3] by belatedly disclosing information to the Defendants; (ii) whether the United States' belated disclosures constitute outrageous government conduct such that dismissing the charges against the Defendants is appropriate; (iii) whether no reasonable factfinder could believe the United States' story and find D. Sanchez, Herrera, and Baca guilty beyond a reasonable doubt, requiring a judgment of acquittal for these three men; and (iv) whether D. Sanchez, Herrera, and Baca suffered a miscarriage of justice during trial such that they are entitled to a new trial. The Court concludes that no Brady or Giglio violation occurred, and it also concludes that the United States' belated disclosures are not outrageous government conduct warranting dismissal. The Court further concludes that a rational factfinder could find D. Sanchez, Herrera, and Baca guilty beyond a reasonable doubt, that they had a fair trial, and that no miscarriage of justice occurred. The Court therefore denies the Sanchez MTD, the Herrera MTD, the Perez MTD, the Sanchez NTM, the Herrera NTM, and the Baca NTM.

## FACTUAL BACKGROUND

The Court takes its background facts from the Second Superseding Indictment, filed March 9, 2017 (Doc. 947)("Indictment"). The background facts are largely unchanged from those facts that the Court provided in its Memorandum Opinion and Order, 323 F.R.D. 672, filed December 18, 2017 (Doc. 1585). The Court does not set forth these facts as findings or the truth. The Court recognizes that the factual background largely reflects the United States' version of events.

This case deals with crimes that the Syndicato de Nuevo Mexico ("SNM") allegedly

---

[3]In Giglio, the Supreme Court of the United States held that prosecutors must disclose evidence that impeaches the credibility of government witnesses. See Giglio, 405 U.S. at 154-55. Giglio extended the Supreme Court's holding in Brady requiring prosecutors to disclose all material exculpatory evidence to the defendant. See Brady, 373 U.S. at 93.

committed through its members.  Indictment at 2.  SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking."  Indictment at 2.  SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce."  Indictment at 2-3.

SNM is a prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates assaulted and raped twelve correctional officers after taking them hostage.  Indictment at 3.  During the riot, thirty-three inmates were killed, and over 200 inmates were injured.  See Indictment at 3.  After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members.  See Indictment at 3.  SNM now has approximately 250 members, including "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members."  Indictment at 3. SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders to members outside the prison system.  See Indictment at 3.  Members who rejoin their communities after completing their sentences are expected to further the gang's goals: primarily the control and profit of narcotics trafficking.  See Indictment at 3-4.  Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults."  Indictment at 4.  SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its power.  See Indictment at 4.  If another gang does not follow SNM's demands, SNM will assault or kill one of the other gang's members to show its power.  See Indictment at 4.  SNM's rivalry with other gangs also manifests itself in beatings and stabbings

within the prison system. <u>See</u> Indictment at 4. SNM engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others." Indictment at 4. To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders. <u>See</u> Indictment at 5. To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder. <u>See</u> Indictment at 7. SNM generates income by having its members and associates traffic drugs and extort narcotic traffickers. <u>See</u> Indictment at 8. SNM members' recent conspiracy to murder high-ranking New Mexico Corrections Department ("NM Corrections Department") Officials inspired the Federal Bureau of Investigation's ("FBI") present investigation. <u>See</u> <u>United States v. Garcia</u>, No. CR 15-4275, Memorandum Opinion and Order at 2, 221 F. Supp. 3d 1275, 1277, filed November 16, 2016 (Doc. 133). The other relevant facts giving rise to this case are as follows.

In March, 2014, a Doña Ana County, New Mexico grand jury indicted Defendants Jerry Montoya and Jerry Armenta on charges of first-degree murder and four other felonies related to the death of Javier Enrique Molina. <u>See</u> Memorandum Opinion and Order at 6, 2016 WL 7242579, at *3, filed October 28, 2016 (Doc. 753)("MOO"). Molina was J. Montoya and Armenta's fellow inmate during their incarceration at the Southern New Mexico Correctional Facility ("Southern New Mexico"). <u>See</u> MOO at 6, 2016 WL 7242579, at *3. The New Mexico Third Judicial District Attorney's Office accused J. Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack. <u>See</u> MOO at 6, 2016 WL 7242579, at *3. That New Mexico indictment charged J. Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy. <u>See</u> MOO at 6-7, 2016 WL

7242579, at *3.  In November, 2015, the state District Attorney dismissed the charges against J. Montoya and Armenta -- as well as separate charges against their alleged accomplice, Defendant Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy.  See MOO at 7, 2016 WL 7242579, at *3.  "A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to be prosecuted at the federal court level."  MOO at 7, 2016 WL 7242579, at *3.

The United States now brings this case, which it initiated in Las Cruces, New Mexico, against thirty-one Defendants, charging them with a total of sixteen counts.  See Indictment at 1, 9-18.  All Defendants are accused of participating in the SNM enterprise's operation and management, and of committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity."  Indictment at 9-18.  Defendant Arturo Arnulfo Garcia, Defendant Gerald Archuleta,[4] Defendant Benjamin Clark, M. Rodriguez, Defendant

---

[4]Archuleta pled guilty on June 16, 2016, stipulating:

> In 1990, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang.  The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture / distribute narcotics.  The SNM operates in the District of New Mexico and elsewhere.  The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

> In 2003, I was an active member of the SNM.  The person listed as J.R. in Count 8 of the Superseding Indictment was also a member of the SNM, and we were both engaged in racketeering activities for the SNM.  J.R. and I had a falling out in 2003 and as a result, I put a "green-light" on J. R.  Based upon my status in the SNM, this "green-light" was well known to members of the SNM.  The "green-light" resulted in other members of the SNM shooting J.R. in 2003;

Anthony Ray Baca, Defendant Robert Martinez, Defendant Roy Paul Martinez,[5] and D. Sanchez

are the enterprise's alleged leaders.  See Indictment at 6.  The other Defendants are allegedly

members or associates who acted under the direction of the enterprise's leaders.  See Indictment

---

however, J.R. survived the shooting.  The "green-light" remained in effect in 2015;
consequently, another member or associate of the SNM acted on the "hit," and J.R.
was assaulted while incarcerated at the Southern New Mexico Correctional Facility
in Dona Ana County, New Mexico.  This attack and "hit" had been approved of by
leaders of the SNM gang, including Anthony Ray Baca.  As leader of the SNM
gang in 2015, Baca was aware of the outstanding "green-light" and sanctioned it.

Thus, from 2003 to July, 2015, I conspired with members and associates of
the SNM gang to commit assault resulting in serious bodily injury to J.R.  This
conspiracy was for the purpose of maintaining and increasing my position in the
SNM, as well as the other people who were involved with the assault.

Plea Agreement at 4-5, filed June 16, 2016 (Doc. 586).

[5]R.P. Martinez plead guilty on September 15, 2016, stipulating:

In 1995, while incarcerated at the Penitentiary of New Mexico, I became a
member of the Syndicato Nuevo Mexico (SNM) prison gang.  The SNM is an
ongoing criminal organization whose members, prospects and associates engage in
acts of violence and other criminal activities, including murder, kidnapping,
attempted murder, and conspiracy to manufacture / distribute narcotics.  The SNM
operates in the District of New Mexico and elsewhere.  The SNM constitutes an
enterprise (individuals associated in fact that engaged in, or the activities of which,
affected interstate commerce) that is engaged in racketeering activity.

In 2013, I was an active member of the SNM.  On or before 2013, I
conspired with Robert Martinez, a.k.a. "Baby Rob," Anthony Baca, a.k.a. "Pup,"
and others to murder G.M. and D.S.  Specifically, Anthony Baca was angry at the
New Mexico Corrections Department (NMCD) for moving him out of State.  Baca,
as the purported leader of the SNM at the time, ordered the murders of G.M. and
D.S.  As a result, in 2015, I agreed to write letters to SNM gang members ordering
the murders and in fact, did write letters ordering the members to kill G.M. and
D.S.  I did this by virtue of my membership in the SNM and to maintain and
increase my position in the SNM.

Thus, from 2013 to continuing into 2015, I conspired with members of the
SNM gang to murder G.M and D.S.

Plea Agreement at 4-5, filed September 15, 2016 (Doc. 686).

at 6.  The SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) defines that term; (ii) murder and robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512, and 1513, "involving obstruction of justice, tampering with or retaliating against a witness, victim, or an informant"; and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841 and 846.  Indictment at 9.

Specifically, the Indictment alleges that, on March 26, 2001, Defendants Angel DeLeon, Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia murdered "F.C."  Indictment at 9 (Count 1).  On the same day, Lujan, B. Garcia, and Defendants Eugene Martinez, Allen Patterson, and Christopher Chavez allegedly murdered "R.G."  Indictment at 10 (Count 2).  On June 17, 2007, Defendant Javier Alonso, Troup, A.A. Garcia, Clark, and Defendant Ruben Hernandez allegedly murdered "F.S."  Indictment at 10-11 (Count 3).  On November 12, 2012, J. Gallegos and Defendant Andrew Gallegos allegedly conspired to murder "A.B."  Indictment at 11 (Count 4).  On the same day, J. Gallegos and A. Gallegos allegedly murdered A.B.  See Indictment at 11-12 (Count 5).  In March 2014, Armenta, Montoya, M. Rodriguez, Defendant Timothy Martinez, Baca, Defendant Mauricio Varela, D. Sanchez, Defendant Carlos Herrera, and Defendant Rudy Perez allegedly conspired to murder "J.M."  Indictment at 12 (Count 6).  On March 7, 2014, Armenta, Montoya, M. Rodriguez, T. Martinez, Baca, Varela, D. Sanchez, Herrera, and R. Perez allegedly murdered J.M.  See Indictment at 13 (Count 7).

Further, starting in or around 2003 -- and until about July 13, 2015 -- Baca, Archuleta, and Defendant Conrad Villegas allegedly conspired to commit assault resulting in serious bodily injury to "J.R."  Indictment at 13-14 (Count 8).  Starting "on a date uncertain, but no later than 2013," and until the date of the Indictment -- April 21, 2014 -- Baca, R.P. Martinez, and R. Martinez

allegedly conspired to murder "D.S."  Indictment at 14 (Count 9).  During the same time period, Baca, R.P. Martinez, R. Martinez, and Defendant Christopher Garcia allegedly conspired to murder "G.M."  Indictment at 15 (Count 10).  On November 29, 2015, C. Garcia, a convicted felon, allegedly unlawfully possessed a firearm.  See Indictment at 15-16 (Count 11).  On the same day, C. Garcia, a convicted felon, allegedly knowingly used and carried a firearm in relation to a conspiracy to murder charge.  See Indictment at 16 (Count 12).

On March 17, 2015, J. Gallegos allegedly committed assault with a dangerous weapon against "J.G."  Indictment at 16 (Count 13).  From February 1, 2016, until February 27, 2016, J. Gallegos and Defendants Santos Gonzales, Paul Rivera, Shauna Gutierrez, and Brandy Rodriguez allegedly conspired to murder "J.G."  Indictment at 17 (Count 14).  Also, on February 27, 2016, J. Gallegos, B. Rodriguez, Gonzales, Rivera, and Gutierrez allegedly attempted to murder J.G., and committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G. See Indictment at 17-18 (Count 15).  The same Defendants also allegedly tampered with a witness, J.G.  See Indictment at 18 (Count 16).

For fuller factual context, there are four cases before the Court related to SNM's alleged criminal activity.  In a related case -- United States v. Baca, No. CR 16-1613 (D.N.M.)(Browning, J.)[6] -- the United States names twelve defendants, all alleged SNM members or associates, who

---

[6]The Court granted a conditional severance to one Defendant in that case.  See United States v. Baca, 2016 WL 6404772 (D.N.M. 2016)(Browning, J.).  The Court severed Defendant Richard Gallegos, because R. Gallegos -- unlike his co-Defendants -- asserted his Speedy Trial Act, 18 U.S.C. §§ 3161-74, rights.  The Court concluded that, given R. Gallegos' assertion of those rights, there was sufficient prejudice to warrant a conditional severance of R. Gallegos from the joint-trial grouping.  Further, the Court was convinced that R. Gallegos was in a wholly unique position, distinct from his co-Defendants, because:

> Gallegos is ready for trial, because his counsel prepared his state court defense and he "[is] basically being tried for the same thing here. . . ." in federal court. . . .  If the Court does not sever, Gallegos will have to wait for discovery to be complete

have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d).[7]  There is also a

separate prosecution of C. Garcia for drug crimes, see United States of America v. Garcia, No. CR

15-4275 (D.N.M.)(Browning, J.), and a four-defendant prosecution for alleged violent crimes in

aid of racketeering, under 18 U.S.C. § 1959.  See United States v. Varela, No. CR 15-4269

(D.N.M.)(Browning, J.).

## PROCEDURAL BACKGROUND

On October 4, 2016, in a pretrial hearing, the Court outlined its general approach regarding

discovery in this case.  See Transcript of Hearing (held October 4, 2016), filed October 18, 2016

(Doc. 743)("Oct. 2016 Tr.").  The United States agreed to produce Jencks Act material, 18 U.S.C.

§ 3500, fourteen days before trial even though the Jencks Act does not require the United States

to produce a witness' statements until after the witness testifies, see Oct. 2016 Tr. at 19:2-12

(Beck), and the Court indicated that it was "not going to require any Jencks material to be produced

before the 14 days," Oct. 2016 Tr. at 23:10-12 (Court).  On the other hand, the Court indicated that

the United States "needs to go in and look at these files and do a Brady review," and "produce the

Brady material promptly, immediately."  Oct. 2016 Tr. at 23:16-19 (Court).  The Court later

memorialized its discovery determinations in its Sealed Memorandum Opinion and Order at 106-

---

as to all Defendants, pre-trial motions as to all Defendants, and then, ultimately, the
trial against him and all eleven of his co-Defendants.

United States v. Baca, 2016 WL 6404772, at *30-32.  Ultimately, it was clearly the speedy trial
concerns which tipped the scale of prejudice in R. Gallegos' favor.  See 2016 WL 6404772, at *32
(setting a new trial date to ensure his speedy trial rights were upheld).  On March 22, 2017, R.
Gallegos pled guilty in his severed case.  See United States v. Gallegos, No. CR 16-4299, Plea
Agreement at 1, filed March 22, 2017 (Doc. 24).

[7]The Court has also declared that case complex under the Speedy Trial Act.  See United
States v. Baca, No. CR 16-1613, Memorandum Opinion and Order, filed October 20, 2016
(Doc. 238).

11, 2017 WL 2271430, at *50-52, filed January 3, 2017 (Doc. 809).

On June 30, 2017, the Court severed for trial the Indictment's Counts 6-12 from its Counts 1-5 and Counts 13-16.  See Memorandum Opinion and Order at 3, 2017 WL 3054511, at *1, filed June 30, 2017 (Doc. 1204)("Severance MOO").  The result of this severance is one trial for the Indictment's Counts 6-12 ("Trial 1"), and another, separate trial for the Indictment's Counts 1-5 and 13-16 ("Trial 2").  See Severance MOO at 3, 2017 WL 3054511, at *1.  At the time of severance, nineteen Defendants remained in the case.  See Severance MOO at 175, 2017 WL 3054511, at *102.  The trial of the Indictment's Counts 1-5 and 13-16 "would then involve the prosecution of eleven Defendants, none of whom are named in Counts 6-12."  Severance MOO at 175, 2017 WL 3054511, at *102.  Further, the trial of the Indictment's Counts 6-12 "would involve the prosecution of eight Defendants, none of whom are named in Counts 1-5 or 13-16."  Severance MOO at 175, 2017 WL 3054511, at *102.

1.    **Media Coverage of the Case.**

This case garnered media coverage, from the filing of the first indictment until after the verdict's issue in the second trial.  The Court summarizes the media coverage in the following table.  The Court's table is drawn from the table D. Sanchez attaches to the Sanchez NTM, which provides a list of articles and television shows, with links to find them on the internet.  See Summary of Media Coverage at 1-13, filed October 19, 2018 (Doc. 2408-19).[8]

| Citation | Summary |
| --- | --- |
| Scott Sandlin, 25 Prison Gang Members Indicted, Albuquerque J. (Dec. 3, 2015, 11:25 PM), https://www.abqjournal.com/6858 | Names the twenty-five indicted "members of an infamous and powerful prison gang," and provides background information on SNM's formation, SNM's alleged leaders, and SNM's expectation that members attack rival gang |

---

[8]The Court summarizes only those articles that appeared before or during the Trial 1, as these are the articles which could have influenced the jury members in forming their verdict. Further, the Court does not include duplicate articles in its table, or articles which are no longer available on the internet as the Court could not read those articles.

| 37/25-prison-gang-members-indicted.html | members, "suspected informers, cooperating witnesses, gays[,] or sex offenders." Outlines the crimes charged. |
|---|---|
| Chelo Rivera, 25 Members of Prison Gang Indicted on Federal Charges, KRQE (Dec. 4, 2015, 10:35 AM), https://www.krqe.com/news/25-members-of-prison-gang-indicted-on-federal-charges/1019592730 | States that twenty-five SNM members "have been named in two indictments that accuse them of a host of crimes including murder, drugs and kidnapping." Provides that SNM formed after the 1980 riot at the PNM and that SNM coerces members who are outside of prison to commit crimes. |
| 25 Charged in Prison Gang Racketeering Case, KOAT (Dec. 4, 2015, 3:53 PM), https://www.koat.com/article/25-charged-in-prison-gang-racketeering-case/5068554 | States that two indictments charge twenty-five accused SNM members "with four murders, three assaults and conspiring to murder others," which, according to United States Attorney Damon P. Martinez, "are being prosecuted as part of a federal anti-violence initiative that targets the worst of the worst offenders for federal prosecution." Gives background on the gang's formation and expectations. States that DeLeon and A.A. Garcia have not been arrested and are considered fugitives. Reminds the public that the charges "are merely accusations, and defendants are presumed innocent unless found guilty beyond a reasonable doubt." |
| U.S. Att'ys Office, Dep't of Justice, Federal Indictments Charge 25 Alleged Members of Syndicato De Nuevo Mexico (SNM) Prison Gang with Participation in Violent Racketeering Enterprise (Dec. 4, 2015), https://www.justice.gov/usao-nm/pr/federal-indictments-charge-25-alleged-members-syndicato-de-nuevo-mexico-snm-prison-gang | Notes that the cases are "being prosecuted as part of a federal anti-violence initiative that targets 'the worst of the worst' offenders for federal prosecution," in which the United States Attorney's Office ("U.S. Attorney's Office") and federal law enforcement "work with New Mexico's District Attorneys and state, local and tribal law enforcement agencies to target violent or repeat offenders for federal prosecution with the goal of removing repeat offenders from communities in New Mexico for as long as possible." Pete Kassetas, then-New Mexico State Police Chief, said that "[t]he citizens of New Mexico are safer today because of the collaborative effort between law enforcement agencies," and Bernalillo County Sheriff Manuel Gonzales, III stated that the collaboration "has proven to be highly effective in proactively preventing crime and making our community a safer place to live, work, and visit." Provides a summary of the charges, including their death-penalty eligibility, and the Defendants' names, ages, cities of residence, and counts in which they are charged. States that all Defendants have been arrested except DeLeon and A.A. Garcia, who are fugitives, and provides the fugitives' pictures. |
| Frank Fisher, Fugitive Arrested in New Mexico Prison Gang Investigation, FBI (Dec. 16, 2015), | States that "[t]he U.S. Marshals Service's South West Investigative Fugitive Team and Colorado Violent Offender Task Force arrested Arturo Arnulfo Garcia, 48, |

- 12 -

| | |
|---|---|
| https://www.fbi.gov/contact-us/field-offices/albuquerque/news/press-releases/fugitive-arrested-in-new-mexico-prison-gang-investigation | at a residence" in Denver, Colorado, on December 15, 2015. Provides that A.A. Garcia "was allegedly involved in a murder on June 17, 2007, in service of the" SNM and that DeLeon, who "was allegedly involved in the murder of two people on March 26, 2001, in service of the gang," "is still at large." Reminds the public that the charges "are merely accusations and defendants are presumed innocent unless found guilty beyond a reasonable doubt." |
| Colleen Heild, Notorious Prison Gang Targets New Mexico Corrections Officials, Albuquerque J. (Feb. 20, 2016, 11:50 PM), https://www.abqjournal.com/727548/notorious-prison-gang-targets-nm-corrections-officials.html | Begins: "The reigning leader of the prison gang Syndicato de Nuevo Mexico is serving a life sentence for killing another inmate in a dispute over a bottle of vitamins." Includes mugshots of Baca, R.P. Martinez, R. Martinez, and C. Garcia, and states that they are accused of planning to kill NM Corrections Department Secretary Gregg Marcantel and the head of the NM Corrections Department Security Threat Intelligence Unit ("STIU"), Dwayne Santistevan. Provides a photograph of an example SNM tattoo and describes SNM as "New Mexico's largest and most violent prison gang," which the FBI now "links to more than 20 homicides in New Mexico," including cold cases, resulting from its unprecedented "sweeping, concerted federally led effort to disrupt" SNM. Notes that the state charges for Molina's murder, in which J. Montoya and "Armenta were charged with stabling Molina more than 40 times around his heart," were dismissed because of the anticipated federal case. Describes Archuleta as a "familiar SNM face" and "three-time convicted killer" who "made headlines in 2009 after allegedly offering $20,000 to anyone who would kill then-Bernalillo County Sheriff Darren White," who had used him "as a poster boy for a tougher three-strikes law in New Mexico." States that SNM was "recently" featured in two reality television shows, including A&E's "Behind Bars: Rookie Year," in which some "members have boasted that they run the state's prisons." Reiterates that SNM formed "in the aftermath of the deadly" PNM riot and that nineteen Defendants "are charged with death penalty-eligible offenses." States that the "SNM's grip extends beyond prison walls. Continued allegiance and contact with the gang is required even after SNM members are released from prison." |
| Sandra Ramirez, 3 Charged Will [sic] Plotting to Kill NM Prison Boss, KOAT (Feb. 22, 2016, 3:10 PM), https://www.koat.com/ | Provides mugshots of Baca, R.P. Martinez, and R. Martinez. States that "Marcantel's and Santiestevan's [sic] lives were in danger," because three SNM members "were counting on a gang member to carry out the hit" on |

| | |
|---|---|
| article/3-charged-will-plotting-to-kill-nm-prison-boss/5070061 | them. States that three inmates are indicted for this plot and that they have all pleaded not guilty. |
| KRQE Media, Feds Believe New Mexico Prison Gang Behind Killings, KRQE (Feb. 22, 2016, 8:36 PM), https://www.krqe.com/news/feds-believe-new-mexico-prison-gang-behind-killings/1019718876 | States that a search warrant provides that federal investigators began investigating SNM in 2015 and "uncovered a plot to murder several prison officials." Provides that "[i]nvestigators have targeted several SNM members they say are responsible for killings, in and out of prison, armed robberies, and drug trafficking." Includes a photograph of a tattooed torso and arms. |
| Albuquerque Journal Editorial Bd., Editorial: Death Penalty Repeal Puts Guards', Cops' Lives on Line, Albuquerque J. (March 1, 2016, 12:02 PM), https://www.abqjournal.com/732504/deathpenalty-repeal-put-guards-cops-lives-on-line.html | The Albuquerque Journal uses the Marcantel and Santistevan murder plots to "harken[] back to New Mexico's repeal of the death penalty." Argues that, in repealing the death penalty, the New Mexico Legislature and then-Governor Bill Richardson "abandoned the likes of" Marcantel and Santistevan, whom SNM plotted to kill, the Albuquerque Journal posits, "likely because state law no longer differentiates between the murder of an incarcerated killer and a law-abiding citizen entrusted with keeping society safe from killers." |
| Phaedra Haywood, Widow Claims Negligence in Husband's Jail Death, Santa Fe New Mexican (March 7, 2016), https://www.santafenewmexican.com/news/local_news/widow-claims-negligence-in-husband-s-jail-death/article_0731901f-dc75-5422-8c3c-8e4d5557c823.html | Discusses a lawsuit that Cynthia Molina, Molina's widow, filed in federal court alleging that the NM Corrections Department's negligence led to her husband's death. Mrs. Molina argues that her husband was three years into a thirteen-year sentence when SNM killed him, because he had dissociated himself from the gang and was "falsely label[ed] as a 'snitch,'" and that prison officials should have known he would thus be a target and negligently failed to "hav[e] any guards in the common area of the pod at the time of the attack." |
| Frank Fisher, FBI, Law Enforcement Partners Target Prison Gang in New Mexico, FBI (April 28, 2016), https://www.fbi.gov/contact-us/field-offices/albuquerque/news/press-releases/fbi-law-enforcement-partners-target-prison-gang-in-new-mexico | States that "federal, state, and local law enforcement officers on Thursday executed 22 arrest warrants (21 federal, one state) and search warrants on eight residences in connection with an operation targeting the" SNM, arresting nine people and transferring another ten from the NM Corrections Department's custody to the United States Marshals Service ("U.S. Marshal"). States that Gutierrez, Rivera, and Leroy Torrez are fugitives, and gives their charges, cities of residence, and ages. Includes Gutierrez' photograph. States that the arrestees "are scheduled to appear in U.S. District Court in Albuquerque on Friday at 1:30 p.m.," and reminds the public "that defendants are presumed innocent unless convicted in a court of law." |
| Elise Kaplan, Roundup Nets 19 Members of Syndicato, Albuquerque J. (April 28, 2016, | States that nine suspected SNM members "appeared before a federal judge on Friday afternoon and were told they will not be released before trial." Describes that they |

| | |
|---|---|
| 8:42 PM), https://www.abqjournal. com/765335/fbi-authorities-arrest-22-prison-gang-members-thursday. html | are "charged with playing a role in a 'mission to kill' the secretary of the [NM Corrections Department] -- as well as a mix of other crimes," and that "many of them sport[ed] tattoos on their necks and faces."  Provides the names, ages, and charges of those men who appeared, and the names, ages, cities of residence, charges, and photographs of three people whom "[a]uthorities are still looking for": Gutierrez, Rivera, and Torrez.  Features a photograph taken outside the federal courthouse in Albuquerque of two prison transport vans, and men wearing bullet-proof vests with guns holstered on their hips.  Discusses how forty SNM members were arrested in December, 2015, and that the NM Corrections Department "locked down three of its facilities to conduct cell searches of SNM members in custody." |
| Carlos Andres López, Sweeping Charges Filed Against Prison Gang Members, Las Cruces Sun News (April 28, 2016, 8:55 PM), https://www.lcsun-news.com/ story/news/crime/2016/04/28/swee ping-charges-filed-against-prison-gang-members/83683256/ | Discusses that two recently unsealed indictments charge "[t]hirty-nine members and associates of a powerful New Mexico prison gang," SNM, "with racketeering and committing violent crimes, including murder and kidnapping," and that law enforcement officers served twenty-two arrest warrants, arresting nineteen suspects as part of "Operation Atonement."   States that three Defendants are named in both indictments: Baca, C. Garcia, and D. Sanchez.  Summarizes the charges and names the Defendants involved in each count.  Reiterates that DeLeon is still a fugitive and includes his photograph; states that Gutierrez, Rivero, and Torrez are fugitives, and gives their photographs, ages, and cities of residence. |
| Colleen Heild, Syndicato Was on "Mission to Kill" Corrections Chief, Albuquerque J. (April 28, 2016, 11:42 PM), https://www.abqjournal.com/7656 41 | Describes the new indictment as "chilling," alleging that SNM's "mission to kill" Marcantel "was supposed to involve a hit man who would himself end up dead after the murder."  Summarizes the alleged plans to kill Marcantel and Santistevan, including that C. Garcia did not trust the hitman, so he instructed another member to give the hitman a lethal dose of heroin after murdering Marcantel. Notes that the new indictments charge SNM members in six cold case homicides and outline 244 "'overt' acts committed by members since the gang was formed in the aftermath of the deadly prison riot in Santa Fe in 1980." States that the charged crimes make the Defendants "eligible for the federal death penalty" and includes mugshots of Baca, identified as SNM's leader, and C. Garcia, identified as involved in the Marcantel conspiracy and a drive-by shooting in which a "stray bullet . . . struck a two-year-old girl in the face." |

| | |
|---|---|
| Victoria Velarde, <u>Multiple Arrests Made in Operation Targeting Prison Gang</u>, KRQE (April 29, 2016, 9:33 AM), https://www.krqe.com/news/multiple-arrests-made-in-operation-targeting-prison-gang/1019709805 | Provides that "[f]ederal state and local authorities" made multiple arrests in "a roundup that was the second phase of an operation targeting" SNM, arresting nine members and moving ten inmates from state to federal custody. States that the first phase "netted the arrests of over 40 people." Identifies Gutierrez, Rivera, and Torrez as "remain[ing] at large," and provides their ages and cities of residence. |
| Nancy Laflin, <u>Multiple Arrests Made in Operation Targeting Prison Gang</u>, KOAT (April 30, 2016, 2:21 PM), https://www.koat.com/article/multiple-arrests-made-in-operation-targeting-prison-gang/5071185 | Provides that the FBI arrested nine people in an operation targeting SNM and that ten others were transferred from state to federal custody. States that Gutierrez, Rivera, and Torrez "remain at large," and provides their ages and cities of residence. Includes mugshots of Baca and C. Garcia. |
| Andrew Oxford, <u>Prison Gang Plotted to Kill Corrections Secretary, Indictment Says</u>, Santa Fe New Mexican (May 2, 2016), https://www.santafenewmexican.com/news/local_news/prison-gang-plotted-to-kill-corrections-secretary-indictment-says/article_a32922d0-3b83-5436-92c9-52cba11291ad.html | Discusses the indictment's charges and its suggestion of mistrust among co-conspirators in the plan to kill Marcantel -- citing C. Garcia's order to give the hitman a lethal dose of heroin. Provides that Baca is SNM's alleged leader and includes his mugshot. Names SNM members charged in the <u>United States v. Baca</u> case and discusses those charges. Gives background on the formation of SNM, and states that SNM "claims all of New Mexico as its territory and is locked in a fierce, violent war with rival gangs." |
| Sun-News Report, <u>Prison Gang Members Arraigned in Las Cruces Federal Court</u>, Las Cruces Sun News (May 4, 2016, 6:18 PM), https://www.lcsun-news.com/story/news/crime/2016/05/04/prison-gang-members-arraigned-las-cruces-federal-court/83944650/ | Reports that "[s]ecurity at the federal courthouse in Las Cruces was heighted significantly on Wednesday as 13 members and associates of a violent New Mexico prison gang appeared in court." Provides the names of these men, including Baca and D. Sanchez, who "are facing charges in a superseding indictment that alleges they carried out various acts of violence in aid of racketeering, including murder, conspiracy and assault with a deadly weapon, among other crimes." States that after the men pleaded not guilty, they were "taken into custody," and, as they "were transported out of the courthouse," "[p]olice officers, some armed with rifles, blocked part of" the street. |
| Scott Sandlin, <u>Suspects in Murder Plot Deny Charges</u>, Albuquerque J. (May 6, 2016, 12:05 AM), https://www.abqjournal.com/769313/suspects-in-murder-plot-deny-charges.html | States that Marcantel "was in federal court Thursday watching as a succession of men accused of involvement in the conspiracy entered not guilty pleas before a federal magistrate judge." Provides that fourteen Defendants, "[s]ome in yellow jumpsuits, others in Metropolitan Detention Center orange, were escorted one at a time into |

| | the courtroom by deputy marshals from holding cells outside the courtroom." Notes that none were released. |
|---|---|
| Katy Barnitz, FBI: Police Arrest Suspected Syndicato Prison Gang Member, Albuquerque J. (May 8, 2016, 10:27 PM), https://www.abqjournal.com/770666/fbi-police-arrest-suspected-syndicato-prison-gang-member.html | Provides that Albuquerque police arrested Rivera, one of three people remaining at large following the April operation targeting SNM members. States that Rivera is "charged as part of a Violent Crimes in Aid of Racketeering and Racketeer Influenced and Corrupt Organizations Act indictment," "for a conspiracy to murder or attempt to commit murder." |
| Frank Fisher, Albuquerque Police Arrest Fugitive Wanted in Syndicato de Nuevo Mexico Prison Gang Investigation, FBI (May 9, 2016), https://www.fbi.gov/contact-us/field-offices/albuquerque/news/press-releases/albuquerque-police-arrest-fugitive-wanted-in-syndicato-de-nuevo-mexico-prison-gang-investigation | States that Albuquerque arrested Rivera "on Sunday, May 8, 2016," and that he "is expected to appear in U.S. District Court in Albuquerque on Monday." Provides that Gutierrez is still wanted on a "VICAR-conspiracy to murder/attempt murder" charge, Torrez "is wanted on a federal felon in possession of a firearm charge," and that DeLeon "is still a fugitive from an earlier operation involving the SNM gang." Gives contact information so people can provide information on the whereabouts of the fugitives. |
| Gangers Inc. Eds., Fugitive Syndicato de Nuevo Mexico Prison Gang Member Arrested, Gangsters Inc. (May 10, 2016, 12:27 PM), http://gangstersinc.ning.com/profiles/blogs/fugitive-syndicato-de-nuevo-mexico-prison-gang-member-arrested | Provides a photograph of Torrez. States that Albuquerque police arrested Rivera on Sunday "on a charge of violent crimes in aid of racketeering and murder conspiracy." Provides that this arrest was "in connection with a multi-agency targeting" SNM during Phase II of Operation Atonement. States that "[t]wo other fugitives are still at large" and provides contact information so people can give information on the whereabouts of the fugitives. |
| Elise Kaplan, Suspect in Syndicato Gang Dies When Motorcycle Crashes, Albuquerque J. (May 16, 2016, 4:46 PM), https://www.abqjournal.com/775088/fbi-fugitive-prison-gang-member-died-in-motorcycle-crash.html?TB_iframe=true&width=921.6&height=921.6 | States that Torrez, "[o]ne of the three remaining members of the [SNM] gang wanted by federal authorities died in a motorcycle crash Friday morning" and provides his photograph. Notes that the Albuquerque Police Department spokesman said that Torrez was driving fast and lost control of the motorcycle, which was stolen, went through a fence, and died at the scene. Reiterates that authorities arrested nineteen SNM members in April "on various charges related to the 'mission to kill'" Marcantel. States that "Gutierrez is still on the loose" and that DeLeon "is still wanted from the first phase" of Operation Atonement. |
| Scott Sandlin, Prison Gang Defendants to Get Tablet Computers, Albuquerque J. (June 4, 2016, 12:02 AM), https://www.abqjournal.com/7857 | Reports on the decision to give the Defendants tablets to review the discovery at the prosecution's suggestion "out of concern about having tons of paper floating around prisons, and available to prisoners with too much time on their hands and axes to grind." States that "discovery |

| | |
|---|---|
| 34/dozens-pack-courtroom-as-sindicato-prison-gang-case-gets-underway.html | issues consumed half a day Thursday in federal court for dozens of lawyers, law enforcement and security officials, court staff and 27 inmates in four different colors of jumpsuit -- red, orange, yellow and green striped." Reiterates the background of SNM's formation.  Notes that, "[e]xcept for one defendant undergoing psychiatric testing out of state, all those who had been arrested thus far were brought from various corners of New Mexico, along with their impressive security contingents." Provides that "[c]ooperators were in the courtroom with others not cooperating.  And additional threats have been made, the lead prosecutor said without offering specifics." Notes that, in addition to "regular shackles, inmates had a black box over their handcuffs," to "prevent[] any manipulation of the cuffs."  Comments that U.S. Marshals, NM Corrections Department officers, STIU members in bulletproof vests, and at least one K-9 officer were present at the hearing, and that "the lineup illustrated the difficulties of having a multidefendant case in which the death penalty is on the table." |
| Scott Sandlin, Prosecutors Won't Request Death Penalty in SNM Case, Albuquerque J. (June 6, 2016, 11:44 PM), https://www.abq journal.com/787041/prosecutors-wont-request-death-penalty-in-snm-case.html | Reports on the United States' decision not to seek the death penalty in this case.  Includes the names of the Defendants "charged with capital-eligible offenses," including D. Sanchez, Baca, Herrera, and R. Perez.  Notes that "[t]here are three or four separate but related indictments, all of them assigned to U.S. District Judge James O. Browning." |
| Colleen Heild, SNM Prison Gang Member Enters Guilty Plea, Albuquerque J. (June 17, 2016, 11:41 PM), https://www.abq journal.com/794077/snm-gang-member-enters-guilty-plea.html | Provides that "[t]hree-time convicted killer Gerald 'Stix' Archuleta, 49," "[t]he former leader of the notorious Syndicato de Nuevo Mexico prison gang pleaded guilty Thursday to one count of conspiring to seriously injure another gang member in a plea deal in which he implicated the current gang boss for sanctioning the hit."  Quotes from the plea agreement, in which Archuleta states he "put a 'green light' on" Julian Romero after a falling out in 2003 and, because of Archuleta's "status in the SNM, this 'green-light' was well known to members of SNM." States that Archuleta faces "up to three years in federal prison under the plea agreement," and includes Archuleta's mugshot.  States that, after then-Bernalillo County Sheriff Darren White used Archuleta as "a 'poster boy' to push for a tougher three-strikes law," Archuleta offered $20,000.00 for White's murder.  Reiterates that the indictment charges Baca with conspiring with three other SNM members "to murder the chief of the New Mexico |

| | |
|---|---|
| | Corrections Department and another top prison official last year." |
| Sun-News Report, <u>SNM Gang Member Pleads Guilty to Assault</u>, Las Cruces Sun News (June 17, 11:07 AM), https://www.lcsun-news.com/story/news/local/courts/2016/06/17/snm-gang-member-pleads-guilty-assault/86039680/ | States that Archuleta, also known as "Grandma" or "Styx," "pleaded guilty to conspiracy to commit assault resulting in great bodily harm." Notes that the plea agreement provides that Archuleta joined SNM in 1990, and conspired with Villegas and Baca to assault Romero after Romero and Archuleta "had a falling out in 2003." Archuleta stated that he "put a 'green-light' on (Romero)," which "resulted in other members of the SNM shooting (Romero) in 2003; however, (Romero) survived the shooting" and "the 'green-light' remained in effect until 2015," when another SNM member or associate acted on it. Notes that Archuleta "faces a maximum of three years in prison . . . plus a year of supervised release," and includes his mugshot. |
| Nancy Laflin, <u>Feds: SNM Prison Gang Tied to Cold Case Murders In-and-Out of Prison</u>, KOAT (July 15, 2016, 8:11 AM), https://www.koat.com/article/feds-snm-prison-gang-tied-to-cold-case-murders-in-and-out-of-prison/5072214 | States that SNM members lead lives that "are anything but glamorous," and that federal authorities say SNM is "New Mexico's largest gang and the most violent, with members who are expected to remain loyal even when they get out." Provides that SNM "formed after the bloody state prison riot in 1980" and spurred the current "massive investigation" by putting "a hit on Marcantel as a show of power, believing it would give them national recognition." Describes that J. Montoya was on A&E's show "Behind Bars," filmed at PNM, and is now suspected of killing Molina: "Stabbed him over 40 times in the type pattern right around his heart." Provides Marcantel's comment: "That doesn't surprise me when I see gangs killing their own . . . because there is no loyalty in gangs." Underscores that the indictment also charges for murders outside prison, such as "the 2005 murder of Shane Dix" and that J. Gallegos is "a suspect in a 2012 homicide in Socorro county, where a man was shot to death and his car set on fire." States that "investigators believe this new crackdown on the SNM gang is critical to keeping the public safe, because many of the prison gang members currently behind bars will eventually be walking free." |
| Frank Fisher, <u>Woman Wanted by FBI for Alleged Involvement with New Mexico Prison Gang Arrested</u>, FBI (Aug. 3, 2016), https://www.fbi.gov/contact-us/field-offices/albuquerque/news/press-releases/woman-wanted-by- | Provides that "Gutierrez, 36, of Belen, New Mexico," who has been wanted since April for her alleged involvement with SNM, "was arrested on Wednesday, August 3, 2016," and is expected in Albuquerque's federal courthouse on Thursday. States that she "was charged federally with violent crimes in aid of racketeering (conspiracy to murder), violent crimes in aid of racketeering (attempted murder, assault resulting in |

| | |
|---|---|
| fbi-for-alleged-involvement-with-new-mexico-prison-gang-arrested | serious bodily injury, and assault with dangerous weapon), and aiding and abetting." |
| Albuquerque Journal Editorial Bd., Editorial: It's Time to Bring Back Death Penalty for Cop Killers and Child Molesters, Albuquerque J. (Aug. 23, 2016, 12:02 AM), https://www.abqjournal.com/831000/its-time-to-bring-back-death-penalty-for-cop-killers-and-child-murderers.html | Lists the names of three officers and one eleven-year-old child who were murdered, stating that "all of their accused killers are safe from facing the death penalty in New Mexico." Their killers were not believed to be SNM members. Advocates for lawmakers to change the law and "reinstate the death penalty in New Mexico for murderers of police officers and children." States that this change "could send a deadly serious message to violent criminals who think nothing of taking the life of law enforcement officers dedicated to protecting the rest of us," such as SNM members "who allegedly conspired to kill" Marcantel and Santistevan. |
| Adrian Gomez, "Behind the Bars" Expands Look at Prisons, Albuquerque J. (Aug. 25, 2016, 12:05 AM), https://www.abqjournal.com/832779/behind-the-bars-expands-look-at-prisons.html | Opens with a line that cadets hear while training to become New Mexico correctional officers: "This is prison. Given the right circumstances, these inmates will kill you." Notes that A&E's "Behind Bars: Rookie Year" is returning to New Mexico for a second year; the first year focused on the PNM and the second year expands to Southern New Mexico in Las Cruces, and the Western New Mexico Correctional Facility in Grants, New Mexico.[9] Notes that Southern New Mexico "has seen two murders in the last 18 month among its inmates, 85 percent of whom are involved in gangs within the compound." States that the NM Corrections Department is "considered by some as one of the most notoriously dangerous prison systems in the country," which is intensified by SNM's, "war on law enforcement." Provides that the rookies have to "confront hit plans on the Secretary of Corrections Gregg Marcantel and an attack on rookie officer Aaron Purto." Quotes Marcantel: "Organized prison gangs have wreaked havoc on New Mexico prison systems. We cannot let that influence continue to grow." |
| Carlos Andres López, Gang Leader Pleads Guilty to Conspiring to Murder Prison Officials, Las Cruces Sun-News (Sept. 15, 2016, 5:06 PM), https://www.lcsun-news.com/story/news/crime/2016/09/15/gang-leader-pleads-guilty- | States that R.P. Martinez, "[a] leader of a powerful New Mexico gang . . . pleaded guilty to two counts of conspiracy to murder in aid of racketeering." States that R.P. Martinez "admitted Thursday that he joined the prison gang known as [SNM] in 1995"; that, "between 2013 and 2015, he conspired with the gang's other leaders, [Baca] and [R. Martinez], to kill Marcantel and Dwayne |

---

[9]Many of the Season 2 episode descriptions include SNM. For example, the description for episode one "A New Threat" provides that "the notorious SNM gang has declared war on all COs." Behind Bars: Rookie Year, A&E, https://www.aetv.com/shows/behind-bars-rookie-year/season-2 (last visited May 8, 2019). These episodes are nearly one hour long.

| | |
|---|---|
| conspiring-murder-prison-officials/90433640/ | Santistevan"; and that "he wrote letters instructing the gang's 'foot soldiers' to carry out the planned killings." States that the threat against Marcantel and Santistevan "'culminated' late last year" when Baca directed C. Garcia, who was not incarcerated at the time, to get firearms and complete the murders. Includes R.P. Martinez' mugshot and a brief history of SNM's formation and the "Operation Atonement" investigation. States that R.P. Martinez "faces up to 20 years in prison." |
| Colleen Heild, Syndicato Prison Gang Targets Witnesses, FBI Agents, Albuquerque J. (Sept. 18, 2016, 12:05 AM), https://www.abqjournal.com/847504/prison-gang-targets-witnesses-fbi-agents.html | Includes a photograph of an "'SNM house' frequented at all times of the day and night" by SNM members, "on Valley Gardens Circle in the South Valley" of Albuquerque, which law enforcement has "searched three times this year," while "investigating different crimes." States that "newly released court documents" show that SNM "has fought back in recent months by marking victims, witnesses, informants and even perceived informants for death." Provides examples: <br><br> A victim scheduled to testify in an aggravated battery case against an SNM member was beaten with clubs and hit in the head with a machete until he lost consciousness and was left for dead. <br><br> Another was shot several times just days after trying to order heroin from the mother of an SNM member who got suspicious and refused to make the sale. <br><br> A woman whose husband was considered a "snitch" has resorted to wearing a bullet-resistant vest, which she uses to cover her young child when they travel in the car. <br><br> SNM even discussed a plot for a gang member to get arrested on a federal parole violation so he could go to federal prison and kill a former SNM leader, the first defendant to plead guilty in an agreement that implicated a top gang boss. <br><br> Just recently, discovery material in the ongoing federal criminal racketeering prosecutions of incarcerated SNM members was secretly passed around by the defendants to try to identify cooperators and witnesses for possible hits. |

| | |
|---|---|
| | Includes excerpts of an affidavit in which "lead FBI agent Bryan Acee said" that "SNM members are forbidden to speak with law enforcement officials and to do so may result in the SNM member's violent death."  Acee also wrote: "I believe the mere execution of the requested search warrants, combined with subject interviews, will likely dissuade the arget subjects and mitigate the threats," and that "SNM-generated crimes are not random, SNM members do not act alone, SNM affairs are widespread within the prison system and on the streets."  The affidavit also provides examples of SNM threats against informants.  States that a "defense team motion" notes that SNM's violent crimes and racketeering case is "perhaps the single largest and most complicated prosecution this district has ever seen."  Briefly describes Operation Atonement's "crackdown" and how it implicates seventy-nine defendants.  Notes that all but two defendants -- Archuleta, who "will receive no more than three years in prison" under a plea deal, and R.P. Martinez -- have pleaded not guilty in the racketeering case.  States that a "search of an SNM pod at the Torrance County Detention Center that holds 18 SNM defendants awaiting trial turned up three 'shanks[.]'"  States that SNM has spread to the federal prison system, with "Frankie Gallegos, a 'validated member of the SNM,' . . . believed to be the highest ranking member of the SNM within the U.S. Bureau of Prisons"; two of F. Gallegos' brothers "are charged in the New Mexico SNM prosecution." |
| Colleen Heild, _Accused Cop Killer Joined Syndicato Gang While Awaiting Trial_, Albuquerque J. (Sept. 18, 2016), _available at_ https://www.pressreader.com/usa/albuquerque-journal/20160918/281651074574209 | Opens: "The murderous Syndicato de Nuevo Mexico prison gang added a new member to its ranks sometime after the May 25 fatal shooting of Rio Rancho police officer Gregg Benner -- the alleged killer himself."  Provides that "Andrew Romero, currently standing trial on a first-degree murder charge in Benner's death," "asked to join SNM after being transferred to the state prison system," because "he had assaulted staff at the Bernalillo County Metropolitan Detention Center" while awaiting trial.  States that Romero joined the gang and worked to make "homemade knives" and to plan "a prison escape from the Central New Mexico Correctional Facility"; the escape allegedly "was to occur when Romero and the other SNM member were to be transported to court."  States that Romero escaped his cell at night to "pass knives and other contraband between SNM members," but once state correctional officers found a knife in his cell, he was moved to the PNM. |

| | |
|---|---|
| Albuquerque Journal Editorial Bd., Editorial: NM Prison Gang Revelations Raise Death Penalty Questions, Albuquerque J. (Sept. 21, 2016, 12:02 AM), https://www.abqjournal.com/84951 6/nm-prison-gang-revelations-raise-death-penalty-questions.html | Provides that revelations into SNM "show the shocking extent of its resolve to defend its criminal enterprise by any means possible."  States that, according to court documents, SNM members have: <br><br> Plotted to have a gang member violate his parole so he could go to federal prison, and kill a former gang leader who had pleaded guilty in an agreement that implicated a top Syndicato boss. <br><br> Discussed killing FBI agents and blowing up a federal building. <br><br> Targeted for death several victims, witnesses, informants and perceived informants. <br><br> Beat and left for dead a man who was scheduled to testify against a gang member. <br><br> Secretly passed around discovery material from their federal case in an attempt to identify for possible hits people who were cooperating with prosecutors or who were witnesses. <br><br> States that the SNM investigation underscores "the difficulty in dealing with such violent and dedicated career criminals who are willing to do anything to further their organization's agenda and seem to know every prisoner protection in the book."  Provides that SNM members have killed dozens of people to further gang purposes and that "[t]hese kinds of ultraviolent criminals make a case for bringing back the death penalty in New Mexico for certain crimes, including killing a corrections or other law enforcement officer." |
| Colleen Heild, Release of IDs on Gang Informants Requested, Albuquerque J. (Dec. 3, 2016, 11:44 PM), https://www.abq journal.com/901428/release-of-info-on-informants-requested.html | Provides that "heavily guarded defendants" wearing red and yellow prison jumpsuits, members of "a notoriously violent prison gang known for ordering hits on suspected law enforcement informants," requested that the government release informants' names and addresses. States that "the judge denied all but one of the defendants' requests for such information" -- "Browning is still deciding whether to release an informant's identity to Anthony Ray Baca, an alleged SNM leader who is charged with ordering Molina's murder."  Describes such release of information as "protected," meaning it is "not to be released to third parties."  Reports that seven of the FBI's |

| | |
|---|---|
| | nine confidential sources are SNM members, and that the "lead FBI case agent" is "certain that all nine informants, once their identities are revealed, will be marked for death by the gang." States that the case agent also said that "one informant was shot twice and lived," while "[a]nother was beaten and left for dead[.]" Notes that "[m]ost, if not all, of the 30 defendants in the primary federal racketeering case are repeat violent offenders." Briefly details SNM's formation and Operation Atonement's progress. States that three defendants -- Archuleta, R.P. Martinez, and Frederico Munoz -- have pleaded guilty but have not been sentenced, while "trial for the others is set for next summer." Describes "the spectacle this week of two dozen SNM gang members seated in Browning's Downtown Albuquerque courtroom," with each defendant "secured in a belly chain, leg irons, and handcuffs enclosed by a special U.S. Marshals Service black security box that Browning himself tried out." States that, "[b]efore the hearing, Browning denied a U.S. Marshals Service Request to erect a partition around alleged SNM leader Baca so he couldn't see or signal his SNM co-defendants in the courtroom." Describes how Adrian Burns "was found dead in a burned-out car outside Socorro in 2012," and how R. Perez is alleged "to have made shanks out of his prison-issued walker to help SNM murder Molina," who "was stabbed about 40 times with three shanks." States that "Browning inquired about whether defendant Jerry Montoya was alleged to have helped physically carry out the murder of Molina." |
| Colleen Heild, Ex-Gang Members Help Break Grip of Massive Prison Gang SNM, Albuquerque J. (Sept. 10, 2017, 4:45 PM), https://www.abqjournal.com/1061446/ex-gang-members-help-break-grip-of-massive-snm.html | Includes a mugshot of Lupe Urquizo, an example SNM tattoo, and the photograph discussed in Kaplan, Roundup Nets 19 Members of Syndicato, supra. States that "[l]oyalty is prized within the notorious [SNM] prison gang[,]" but that "it only goes so far[.]" Provides that "[m]ore than 30 former members and leaders of SNM have been secretly cooperating with law enforcement to break the decades-old grip of the allegedly murderous New Mexico gang," leading to "about 114 suspected members and associates of the gang" being arrested "[o]ver the past two years." Describes Urquizo as "the latest suspect charged" and states that he "is accused of assaulting inmates, correctional officers, committing arson, and acting as a messenger within the prison system to help communicate planned hits on other inmates." Details Urquizo's alleged discussions on killing another member and agreeing to bring the "paperwork for the hit" |

| | |
|---|---|
| | to Southern New Mexico, and his noting that D. Sanchez "had failed to cover a security camera" during Molina's stabbing and had failed "to dispose of the shank used in the stabbing." States that "less than 15 defendants are awaiting trial," because the majority of those charged federally have pleaded guilty. Provides that, while "[t]he prosecution contends that SNM is a violent and powerful racketeering enterprise," "at least one defense attorney has claimed that some people have been threatened by law enforcement with 'inclusion' in the racketeering prosecution if they didn't agree to cooperate and give statements." Describes SNM's formation in the PNM's "deadly riot" and how members are "expected to remain loyal to the SNM Gang" after release from prison, while those who fail to remain loyal can be murdered or assaulted. Notes that Judge Browning ordered the discovery tablets seized after discovering that their security controls could be bypassed, allowing the Defendants to access the Internet and camera functions. |
| Associated Press, Ex-Gang Members Helping to Dismantle New Mexico Prison Gang, AZ Central (Sept. 11, 2017, 6:11 PM), https://www.azcentral.com/story/news/local/new-mexico/2017/09/11/ex-gang-members-helping-dismantle-new-mexico-prison-gang/656270001/ | Reports that an FBI document provides that "[n]early 114 suspected members and associates of an infamous New Mexico prison gang have been arrested over the past two years with the help of over 30 former members and leaders, who have been secretly working with authorities." Identifies the gang as SNM, which formed at "the 1980 deadly riot" at the PNM "and has about 500 members." States that the FBI began the investigation after discovering the Marcantel murder plot, which has led to about eighty defendants being "charged with federal crimes," with fewer than fifteen awaiting trial. Includes the allegation by Amy Sirignano, counsel for C. Garcia, that the government's threats to charge those who do not cooperate risks "involuntary statements." |
| Angela Kocherga, Prison Gang at Pretrial Hearing for Racketeering, Albuquerque J. (Dec. 14, 2017, 11:30 PM), https://www.abqjournal.com/1107093/prison-gang-at-pretrial-hearing-for-racketeering.html | Provides an SNM tattoo photograph. States that nine suspected SNM members "filled a heavily guarded federal courtroom this week for a pretrial hearing about evidence in a federal racketeering case." Describes a hearing which "included testimony about secret recordings of inmates discussing the gang's violent crimes in and outside prison walls." Notes that R. Perez "denied in court knowing details about the murder of SNM gang member" Molina, and that he repeatedly responding to Assistant United States Attorney Randy Castellano's questions with, "I lied." Describes the defendants as having "shaved heads and tattoos on their necks, faces and back of their heads, and wearing prison jumpsuits." States that the defendants |

| | |
|---|---|
| | "were strategically spaced out in the courtroom" with "[a] dozen guards," some of whom "were heavily armed." Provides that "some of the best-known criminal defense attorneys in Albuquerque" are representing the defendants, and names Ms. Sirignano as representing C. Garcia, and Billy R. Blackburn as representing A.A. Garcia. Reiterates Ms. Sirignano's concern that cooperators gave "involuntary statements" because of "coercive police tactics." States that the prosecutors do not want to provide "a week's notice of witnesses before they testify," because this "would jeopardize the safety of the witnesses." Notes that the first trial is set to begin in January, 2018. |
| Christine Steele, <u>State Murder Case Dismissed in Favor of Federal RICO Prosecution</u>, Silver City Daily Press (Jan. 23, 2018), http://www.scdailypress.com/site/2018/01/23/state-murder-case-dismissed-in-favor-of-federal-rico-prosecution/ | Describes that "Steven 'Syklon' Morales, 39, was set to go to trial this week for the murder of Estevan Ortega, 22, who was found shot to death in his car on Radio Tower Road in Pinos Altos," New Mexico, but that "state prosecutors have dismissed their case against Morales in favor of federal prosecution, where Morales is being charged under the [Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961-68 ('RICO Act'),] Conspiracy, which could see him serving a lot more time if he is convicted." States that "Morales is a career criminal" who, during the past twenty years, has spent over fourteen years in the NM Corrections Department -- either serving time for many crimes, such as burglary and battery, or awaiting trial. Describes a federal complaint filed last week alleging Morales is an SNM member, with an SNM tattoo, who stabbed another inmate and killed Ortega, a rival gang member, for the gang. Briefly notes SNM's formation, and states that "Morales is facing a minimum of 20 years on the RICO charge," and, if the sentencing "court determines that he is an armed career criminal," "could face an enhanced sentence of a statutory mandatory minimal of 15 years to life." |
| Associated Press, <u>Man Charged in Plot to Kill State Officials Pleads Guilty</u>, KVIA (Jan. 26, 2018, 10:58 AM), https://www.kvia.com/news/newmexico/man-charged-in-plot-to-kill-stateofficials-pleadsguilty/691645478 | Provides C. Garcia's mugshot and that he pleaded guilty "to violent crimes in aid of racketeering conspiracy to murder, felon in possession of a firearm and racketeering conspiracy." States that he is "charged in a thwarted plot to kill two top New Mexico corrections officials," and "is expected to be sentenced to 30 years in federal prison under the [plea] agreement." Describes that C. Garcia provided the gun to an assassin to kill Marcantel and that he "planned to have the assassin killed after Marcantel's death." |

| | |
|---|---|
| Colleen Heild, <u>Guilty Plea in Plot to Kill Corrections Officials</u>, Albuquerque J. (Jan. 26, 2018, 12:02 AM), https://www.abq journal.com/1124545/guilty-plea-in-plot-to-kill-official.html | Provides that C. Garcia, "[o]ne of the primary defendants charged in a foiled plot to murder two top New Mexico corrections officials[,] pleaded guilty Thursday" and "is to receive 30 years in federal prison under a plea agreement with federal prosecutors."  Reports that, in the plea agreement, C. Garcia admits to being an SNM member "for more than 20 years," to trafficking drugs to SNM members in prison, and "to paying someone in 2005 to kill a rival gang member who had previously shot him." Describes that C. Garcia also admits to providing the gun to kill Marcantel and to not trusting the member recruited to kill Marcantel; "he instructed that the killer be given a lethal dose of heroin, after Marcantel was killed." |
| Colleen Heild, <u>Syndicato Trial Set to Begin Amid Security Concern</u>, Albuquerque J. (Jan. 27, 2018, 10:42 PM), https://www.abq journal.com/1125394/syndicato-trial-set-to-begin-amid-security-concern.html | Begins:

> For the U.S. Marshals Service, it's a "High Threat Trial."  For the FBI, the next four weeks in a Las Cruces courtroom will be the culmination of nearly three years of investigating an entrenched New Mexico prison gang accused of drug dealing, violence and even murder inside and out of prison walls.

States that "[c]ome Monday, four members of [SNM], including its purported leader, will have their day in federal court in the first of three planned trials involving some two dozen defendants."  Provides that jurors from across New Mexico will decide whether the alleged SNM boss Baca and alleged members D. Sanchez, Herrera, and R. Perez "are part of a criminal racketeering enterprise by virtue of alleged crimes involving the fatal stabbing in 2014 of an SNM gang member, the attempted murder of another, and, in the case of Baca only, a conspiracy to kill two top New Mexico Corrections officials."  Includes mugshots of Baca, D. Sanchez, R. Perez, and Herrera. States that federal prosecutors may call key witness and former SNM leader Archuleta, "who pleaded guilty in 2016 of conspiracy to commit assault resulting in great bodily injury."  Indicates that the defense may call former Bernalillo County Sheriff White as a witness and that "a 2016 prison documentary mentioning SNM might be entered into evidence during the trial."  Describes that C. Garcia opted to plead guilty last week rather than stand trial, and that "he will be sentenced to 30 years in prison" under his plea deal, whereas he faced life had he gone to |

| | |
|---|---|
| | trial. Notes that the other four members face life, if convicted. States that, "[o]n Friday, Judge Browning was considering how safe the Marshals Service can make the courtroom while still permitting the defendants their due process and other constitutional rights[,]" as the defense attorneys argued that the defendants should be allowed to stand trial without shackles, "like any other person," and that if the jury saw security restraints it would be prejudicial. Cites a January 18, 2018, email from the Marshals Office to the Court arguing "there exists 'High Threat Trial' circumstances," and noting a 2014 federal trial in Salt Lake City, Utah, where the defendant -- a known gang member -- was unrestrained, "attempted to stab an 'in custody' witness," and died because of the Marshals' attempt to stop the stabbing. States that the email suggests that bunting on the counsel tables could keep security devices out of the jury's sight, that leg restraints housed in duct tape could be used to remove sounds, and that they could use stun belts -- although this type of restraint would require more Marshals in the courtroom and risks false activation. Cites the email's "attachment for the judge, not made public, that reportedly shows 'each defendant's criminal history (all of which is very lengthy and violent especially given the number of years the defendants have served in prison.)." Notes the email detailing that two people brought shanks into court, that Baca wants to kill D. Sanchez, and that Defendants have come to court under the influence. Details how "a defense attorney unwittingly brought mail to his client that contained" Suboxone; the defense attorney has left the case, and the SNM member and his ex-wife, who allegedly asked the attorney to deliver the mail, have been charged. |
| Samantha Lewis, <u>Members of Syndicato de Nuevo Mexico to Be Tried in Las Cruces Federal Court</u>, KFOX 14 (Jan. 29, 2018), https://kfoxtv.com/news/local/me mbers-of-syndicato-de-nuevo-mexico-to-be-tried-in-las-cruces-federal-court | Provides that four SNM members, including the leader, will be tried Monday in federal court in what U.S. Marshals are calling "a high-threat trial." States that the "trial has already sparked tension and fear[,]" because SNM members "are known for taking shanks into the courtroom. Reports that "KFOX 14 spoke with people in Las Cruces who didn't wish to appear on camera in fear of retaliation." Describes the gang as targeting "entire families, because that's the old school way of doing things[.]" Notes that, according to the Las Cruces Sun News, one Defendant wanted another Defendant killed and, while the attorneys want the Defendants to be tried without shackles to avoid prejudicing the jury, "a U.S. district judge was considering a U.S. Marshals' request to |

| | keep all four defendants in shackles during the trial based on their criminal history." |
|---|---|
| Samantha Lewis, <u>Jury Selection Takes Eight Hours for the Syndicato de Nuevo Mexico Trial in Las Cruces</u>, KFOX 14 (Jan. 29, 2018), https://kfoxtv.com/ news/local/jury-selection-takes-eight-hours-for-the-syndicato-de-nuevo-mexico-trial-in-las-cruces | States that Baca, D. Sanchez, Herrera, and R. Perez -- members of the "notorious" SNM -- are "accused of drug dealing, violence, and murder inside and outside of prison walls" in what the "U.S. Marshals are calling . . . a high threat trial." States that the "trial with be tightly secured," and that SNM members "took weapons inside the courtroom during a pre-trial hearing." Notes that there will "be three more trials taking place after this one" and that jury selection "went on for more than eight hours on Monday." States that twelve jurors and three alternates will be selected, and that "opening statements could start tomorrow." Includes mugshots of Baca, D. Sanchez, Herrera, and R. Perez. |
| Samantha Lewis, <u>FBI Agent Says Prison Cellphones Helped Track Syndicato de Nuevo Mexico Gang Members</u>, KFOX 14 (Jan. 31, 2018), https://kfoxtv.com/news/ local/fbi-agent-says-prison-cellphones-helped-track-syndicato-de-nuevo-mexico-gang-members | Reiterates the charges that Baca, D. Sanchez, Herrera, and R. Perez face, and includes their mugshots. Provides that, after sixteen hours of jury selection, opening statements for the SNM trial began "in a federal courthouse in Las Cruces." States that Acee testified on the third day of trial, and said that "[c]ellphones inside prison walls helped track gang activity by members of the [SNM.]" Acee said "the cellphones were given to informants inside the jail to record drug deals and murder plots. Tablets were also given to the informants but had to be taken away from them because they used them to access the internet, send emails and create Facebook accounts." Notes that Acee also discussed how undercover agents would buy and sell guns to SNM members and then arrest them, and how one informant "was given $45,000 to relocate his family when he got out of prison," because he became a top SNM target for "ratting." |
| Angela Kocherga, <u>Investigator Gets Prison Gang Trial Started</u>, Albuquerque J. (Jan. 31, 2018, 11:45 PM), https://www.abq journal.com/1127450/investigator-gets-prison-gang-trial-started.html | Provides that Acee, "who led the investigation of the racketeering investigation of the" SNM, "was the government's first witness," and "testified most of Wednesday about techniques to infiltrate the gang in and outside the prison, using members turned confidential informants." States that Acee discussed accompanying "parole officers to get access to gang members' cases 'looking for their vulnerabilities' or violations that might lead them to cooperate," and visiting prisons. Acee said he "learned of gang member Eric Duran's willingness to be an informant at the penitentiary in northern New Mexico," and that Duran, whose cell was next to alleged leader Baca's, would dial and hold "the cellphone up to the cell vent so Baca could talk to gang members outside |

| | |
|---|---|
| | the prison." This communication, Acee stated, helped build the case. Reports that, in his opening statement, "Baca's attorney Marc Lowry told jurors his client was not the leader of the [SNM] anymore, that . . . when he was sent to a prison out of state, [he] fell out of favor with the gang," and that Duran "controlled when the recording device was on and when it was shut off. . . . [T]he conversation about killing two top New Mexico prison officials was instigated by Duran after the device had been off for several days." States that Mr. Castellano had Acee explain the four Defendants' tattoos -- such as the "Zia symbol tattooed in strategic places." Notes that most of Baca's tattoos "were not visible since he wore a dark grey suit and tie," that there were "[a]t least half a dozen U.S. Marshalls [sic] . . . strategically seated near the doorway and defendants," and that the trial "is expected to last four weeks." |
| Associated Press, New Mexico Prison Gang Trial Begins with Agent's Testimony, AP News (Feb. 1, 2018), https://www.apnews.com/c9299a9 6861649d583b9d3a9326e490f | Provides that Acee -- "the FBI agent who used confidential informants to build a racketeering investigation against" the four SNM members standing trial -- was the first witness to testify. Describes Acee's testimony about finding "violations to convince the members to cooperate in the investigation," and equipping an informant housed next to Baca "with a cellphone and a recording device." States that the informant, Duran, "would dial the phone and hold it up to the cell vent so Baca could make calls," the recordings of which "helped build the criminal case that involves drug deals, firearms trafficking, carjacking, armed robbery and intimidation of witnesses." Notes that Baca's attorney, Mr. Lowry, "told jurors during opening arguments that his client was no longer a gang leader[,]" because "Baca had fallen out of favor with the gang when he was sent to prison out of state." |
| Las Cruces Sun-News, Testimony Begins in Syndicato de Nuevo Mexico Trial, Tarrent Cares (Feb. 2, 2018), http://tarrant.tx. networkofcare.org/ps/news-article-detail.aspx?id=91609 | States that, after two days of jury selection, an eighteen-member jury "of residents from around the state was empaneled," and "began hearing testimony Wednesday in a high-profile trial that promises to shed light on the distributing culture of a notorious New Mexico prison gang." Notes that the four Defendants -- the purported leader Baca, Herrera, D. Sanchez, and R. Perez -- are allegedly members of SNM, which "formed after the deadly 1980 riot at the" PNM, and "were among dozens of known SNM members and associates who were indicted by a federal grand jury" as part of Operation Atonement. Describes the alleged crimes as including a |

| | |
|---|---|
| | plot "to kill two top state prison officials" -- with which only Baca is charged -- and the March, 2014, murder of alleged SNM member Molina, "who was stabbed more than 40 times while incarcerated at the Southern New Mexico." States that the defense "cautioned the jury to be wary of the government's case against their clients, suggesting that many of the prosecution's key witnesses have checkered pasts and have entered into deals in exchange for testimony." Notes that Acee, "who led the nearly three-year-long investigation into SNM," was the first witness and testified that the investigation began after prison officials in Santa Fe intercepted letters detailing a plot to kill Marcantel and the head of the prison's STIU. Provides that Acee also testified about using wiretaps, "undercover drug transactions," and giving cellular telephones to "at least two SNM members" in prison, who were "cooperating with the FBI." Acee said that Baca was transferred to the PNM from a Colorado prison, to a cell next to an informant -- Duran, "a key witness for the prosecution" -- who would make calls for Baca on his FBI-provided cellular telephone. Provides that "Baca's defense team pinned the entire plot [to kill the prison officials] on Duran" and "insisted that Baca did not order the killing of Molina." Notes that Molina "was serving a 13-year sentence" at the Southern New Mexico, and "was found unresponsive near the doorway to a pod" at the prison after being "stabbed 43 times in his chest and abdomen, including his heart and lungs[.]" Notes that Armenta and J. Montoya were initially charged for Molina's death in state court, but that the FBI took over the "case as part of the SNM investigation," and indicted "nine known and purported members of SNM, including Montoya and Armenta, . . . on charges in connection to the murder." Reports that defense attorneys assert that the Defendants who pleaded guilty did so "in exchange for the possibility of lenient sentences" and that they also received "hundreds of dollars from the FBI in exchange for their cooperation[,]" and, in one case, an incarcerated informant "was given contact visits with his family, but that privilege was revoked after he was caught having sex with his wife in the presence of his children[.]" |
| Angela Kocherga, Informant Testifies Against SNM, Albuquerque J. (Feb. 7, 2018, 12:05 AM), https://www.abq | States that Guadalupe Urquizo, "gang member turned government informant," testified "about the inner workings of the [SNM]," such as "delivering the 'paperwork,' or orders, to kill an inmate in 2014 with a shank created from a piece of inmate Rudy Perez's |

| | |
|---|---|
| journal.com/1130256/informant-testifies-against-snm.html | walker." Notes Urquizo said that "he agreed to help the FBI because he was 'tired of the backstabbing[,]'" and that "his plea included having him serve a state and federal sentence concurrently, which would cut years off his time behind bars." States that jurors heard "part of a prison phone call taped in March 2017 in which Urquizo talks about knowing another gang member was 'wired' and secretly recording inmates for the FBI inside the prison." Provides that Tuesday morning's testimony was interrupted when "Perez began coughing uncontrollably and paramedics were called to the courtroom. Perez suffers from epilepsy and other chronic health problems and had been sent to the hospital Monday after reporting he had a seizure. He returned to court Tuesday with a surgical face mask." Notes that R. Perez' attorney, Justine Fox-Young, moved for a mistrial -- which the Court denied -- because R. Perez "was 'very vulnerable and frail' as well as 'spacing out' and not able to assist with his defense." States that, "[w]hen testimony resumed, Urquizo testified about his criminal history in and outside prison. Urquizo said it began in 1998 when he went to prison for stabbing a man in Clovis. That same year he joined the [SNM] and assaulted a corrections officer for 'disrespecting the gang.'" |
| Sun-News Reports, Syndicato Nuevo Mexico Trial: Member Details Murder of Fellow Prisoner, Las Cruces Sun News (Feb. 13, 2018, 8:00 AM), https://www.lcsun-news.com/story/news/crime/2018/02/13/syndicato-nuevo-mexico-trial-member-details-murder-prisoner/331417002/ | States that J. Montoya, "[c]onvicted murderer and member of the" SNM, testified that "he had no 'beef' with fellow SNM member Javier Molina but still ended up killing him." Provides that J. Montoya and Molina "had been handball partners while they were prisoners at the Southern New Mexico." Notes that the testimony "came as Montoya testified in the federal government's case against four alleged SNM members" in a trial "stemming from a nearly three-year investigation," a trial which "entered its third week on Monday." Includes J. Montoya's mugshot. |
| Angela Kocherga, Prison Gang Leader Says He Ordered Hit on Two Officials, Albuquerque J. (Feb. 18, 2018, 12:05 AM), https://www.abqjournal.com/1135114/prison-gang-leader-says-he-ordered-hit-on-two-officials.html | States that R. Martinez, "FBI informant and high level 'shot caller'" in SNM, took the stand midway through trial, and testified "about how and why he ordered a 'hit' on top prison officials from behind bars." Provides that R. Martinez testified that he wrote a letter telling SNM members on the street that "it was 'time to step up' and ordering them to kill two prison officials[,]" "because gang members were tired of being 'in lockdown for a year.'" Notes that they targeted Santistevan "for making comments about Baca," the alleged leader, and that Baca's attorney Theresa Duncan asked R. Martinez "whether he |

<table>
<tr>
<td></td>
<td>really believed gang members would carry out the murder or if the threat was merely a way to ensure prison officials moved him out of state." Reports that R. Martinez doubted whether the members on the street "would carry out his orders," because the willing ones were incarcerated. States that R. Martinez has been an SNM member for thirty years, but "no longer trusts fellow gang members and was disillusioned with the younger generation of new recruits who had not 'earned their bones' but were allowed to join because they could provide drugs or had a relative in the gang." R. Martinez said he told prison officials he wanted out of the gang and, "as proof, he handed over a shank, a crude weapon made in prison." Describes F. Munoz' testimony that "he was a loyal 'soldier' for the SNM who killed for the gang in and out of prison[,]" such as his murder of a rival gang member "he didn't know, who happened to walk into a barbershop." States that F. Munoz said it was "a full blown war[,]" and that Archuleta, an SNM "leader in prison," ordered him to kill SNM member Romero, who had been released, because Romero had a romantic relationship with Archuleta's wife; Romero survived. F. Munoz also testified about using a sheet to strangle an SNM member in prison, who was "suspected of being disloyal." Notes that defense attorneys asked F. Munoz "whether he was getting a lighter sentence in return for his testimony." States that "[a]t least a dozen gang members turned informants are government witnesses in the first of three trials in federal court stemming from a massive FBI racketeering investigation."</td>
</tr>
<tr>
<td>Sun-News Reports, <u>Jury Hears Closing Arguments in Syndicato de Nuevo Mexico Trial</u>, Las Cruces Sun News (March 5, 2018, 6:47 PM), https://www.lcsun-news.com/story/news/crime/2018/03/05/jury-hears-closing-arguments-syndicato-de-nuevo-mexico-trial/396877002/</td>
<td>States that the jury heard closing arguments as the trial centered on the violent SNM's "inner-prison activities" entered its sixth week. Provides that Baca, Herrera, D. Sanchez, and R. Perez have been on trial since January 29, 2018, "charged with conspiracy and murder in the brutal March 7, 2014, stabbing death of 34-year-old Javier Molina at the Southern New Mexico." Provides that Baca, the alleged leader, is also "charged in a failed conspiracy to murder" Marcantel "and another top prison official -- a plot that was reportedly uncovered by the FBI and prompted the expansive investigation into SNM." States that the four Defendants "aided and abetted the hit" on Molina, using "'paperwork' to communicate and direct 'hits,' and that if members failed to act on orders, they would become targets of the gang." Provides that most of the prosecution's evidence was "disputed testimony from</td>
</tr>
</table>

- 33 -

|  | cooperating SNM members," whom the defense team argued were "'untruthful' and 'lying witnesses.'"  States that "[o]ne defense also suggested that the cooperators had 'colluded' with one another," and another "suggested that the plot to kill Marcantel had been 'manufactured' by one of the government's cooperators during the investigation[.]"  Notes that deliberations "are expected to begin this week." |
|---|---|

## 2.    **The Trial.**

The Court scheduled the first trial in this case, on Counts 6-12, to begin on January 29, 2018, at 9:00 a.m. at the federal courthouse in Las Cruces.  See Fourth Scheduling Order at 2, filed July 7, 2017 (Doc. 1205).  Most of the Defendants charged in Counts 6-12 pleaded guilty, leaving D. Sanchez, Baca, Herrera, and R. Perez (collectively, "First Trial Defendants") as the only Defendants in the first trial.  Clerk's Minutes at 1-2, filed January 29, 2018 (Doc. 1746)("Trial Minutes").  On January 29, 2018, the Court called this case for trial and, before the voir dire panel entered the courtroom, put on the record some developments that occurred over that weekend.  See Transcript of Jury Trial Volume 1 at 2:6-7 (taken January 29, 2018)(Court), filed February 28, 2019 (Doc. 2548)("Jan. 29 Tr."); id. at 4:1-3 (Court).  First, the Court put on the record some information about the shackles on the First Trial Defendants' feet, stating:

> Yesterday afternoon Ms. Wild[10] came in with the marshals.  She put the shackles on her feet, and then we listened to make sure that there was no sound.  Ms. Wild requested more duct tape.  So there has been more duct tape put on the shackles yesterday.  So I think we're in good shape as far as there not being any sound.

Jan. 29 Tr. at 4:5-11 (Court).  The Court underscored that the First Trial Defendants should be standing whenever the jury enters the courtroom and during introductions, and that "as long as everybody doesn't do anything out of . . . position, it looks like the jury will not see any of the

---

[10]K'Aun Wild is the Court's former courtroom deputy, who had worked with the Court for decades and helped in preparing for Trial 1, but did not serve as the Court's courtroom deputy during Trial 1.

shackles." Jan. 29 Tr. at 4:17-20 (Court).  See id. at 4:12-17 (Court).  The Court said that its staff placed more briefcases at the back to prevent the venire panel from seeing the shackles, and that the First Trial Defendants should "keep their feet under the table when they stand."  Jan. 29 Tr. at 5:9-10 (Court).  See id. at 4:21-5:8 (Court).

The Court then addressed the First Trial Defendants' two motions to continue, one of which raised the Albuquerque Journal article "Syndicato Trial Set to Begin Amid Security Concern," which came out on the Sunday before the trial started.  See Jan. 29 Tr. at 11:12-22 (Beck, Court). See also Motion to Continue the January 29, 2018 Trial Setting, filed January 25, 2018 (Doc. 1707); *Sealed* Second Motion to Continue the January 29, 2018 Trial and for an Order Imposing Sanctions Against the Government for Violation of the Court's Order Regarding Discussion with the Press: Request for Hearing, filed January 28, 2018 (Doc. 1720).  The Court provided its recollection that the parties never agreed to an enforceable gag order about talking to the press.  See Jan. 29 Tr. at 11:23-12:12 (Court).  The United States said that it had the same recollection, but that it had not been talking to the press.  See Jan. 29 Tr. at 12:13-20 (Beck).  The United States and the First Trial Defendants then all agreed that nobody would talk to the press until the trial's verdict, and the Court stated that it would not "enter a traditional gag order, but . . . will enforce the agreement so that we don't infringe anybody's First Amendment rights." Jan. 29 Tr. at 15:19-22 (Court).  See id. at 14:24-15:22 (Court, Beck, Duncan).

D. Sanchez harkened back to the Albuquerque Journal article, referring to it as "a worst-case scenario for the defendants because of the nature of the information[,]" i.e., "communications between the United States Marshal Service and the Court about particularly high-security concerns related to these particular defendants that were named and pictured in the article."  Jan. 29 Tr. at 16:8-10, 23-16 (Jacks).  The Court stated, however, that it never received the attachments to which

D. Sanchez referred -- documents that supposedly delineate the First Trial Defendants' criminal records -- and stated that, to its knowledge, these records were never provided to the Court. See Jan. 29 Tr. at 16:22-17:8 (Court). D. Sanchez underscored that the issue is that the article "reported the content of the supposed attachment which contained . . . the lengthy and violent criminal histories of all the defendants who have been in prison for an extremely long time," Jan. 29 Tr. at 17:12-16 (Jacks), and that "this theme was picked up by TV news last night, and they had people . . . talking to the news broadcasters with their identities blocked out because if they were identified, they would be killed by the SNM," Jan. 29 Tr. at 18:3-7 (Jacks). D. Sanchez argued that "this is a carnival-like atmosphere that the jurors would have to be almost super-human to not have seen some piece of it. And it's extremely prejudicial." Jan. 29 Tr. at 18:8-11 (Jacks). The Court reminded the First Trial Defendants that, when R. Perez filed a motion requesting that shackles be removed for trial, the Court asked the U.S. Marshal for advice, and requested a memorandum, so that the Defendants could see this advice. The Court also requested that somebody from the U.S. Marshals be in the courtroom on Friday to answer questions, so the Court could make a record. See Jan. 29 Tr. at 18:13-19:6 (Court). The Court underscored that everything in the article was publicly discussed in the courtroom Friday, and that the proceeding was likely "more robust" than the article, "given the fact that more information came out on Friday." Jan. 29 Tr. at 19:19-20 (Court). See id. at 19:7-22 (Court). D. Sanchez countered that no "defense counsel could have anticipated that the U.S. Marshals would write an extremely inflammatory email that would then be filed publicly." Jan. 29 Tr. at 20:6-8 (Jacks). The Court reiterated that, had the Albuquerque Journal article's author been in the courtroom on Friday, "she would have gotten more information about the men's criminal history, because of the motion to remove shackles, than she would have by reading that memo, because it would have been more robust" because

"Mr. Castellano [and] the deputy marshal . . . stood at the podium and went in detail through the defendants' criminal history." Jan. 29 Tr. at 23:11-18 (Court). Herrera requested that the Court poll the potential jurors as to whether any of the jurors had seen the case's media coverage over the last month and then individually talking to those potential jurors who raised their hands as to not taint the entire jury pool. See Jan. 29 Tr. at 39:19-40:4 (Bhalla). The Court stated that it "was planning on doing that." Jan. 29 Tr. at 40:5 (Court).

The parties also discussed the United States' production of Baca's, Herrera's, and R. Perez' statements with proposed redactions to comply with United States v. Bruton, 391 U.S. 123 (1968)("Bruton"), despite the Court's conclusion that these statements do not fall within Bruton's ambit.[11] Jan. 29 Tr. at 7:19-8:5 (Court). The Court underscored that "[t]he jury will not know that there are redactions," Jan. 29 Tr. at 8:4-5 (Court), and that, even with the redactions, there likely would be a number of limiting instructions, see Jan. 29 Tr. at 8:6-16 (Court). Herrera requested that the United States provide the redacted transcripts at least seventy-two hours before the witness takes the stand. See Jan. 29 Tr. at 38:22-39:6 (Bhalla). The Court suggested that the United States provide the redacted transcripts within the next seventy-two hours, and the United States agreed that would be more reasonable. See Jan. 29 Tr. at 42:24-43:1 (Court); id. at 43:12-17 (Beck).

### a.    The Jury Voir Dire.

The venire panel entered the courtroom later in the morning on Monday, January 29, 2018. See Trial Minutes at 3; Jan. 29 Tr. at 50:2. The venire panel hailed from all over the state, and many arrived in Las Cruces on Sunday, January 28, 2018. See Jan. 29 Tr. at 50:10-14 (Court). The Court thanked everyone for coming to Las Cruces and providing their services for the federal

---

[11]United States v. Bruton prevents the admission of a non-testifying defendant's statement that implicates a co-defendant. See 391 U.S. at 128-29.

court.  See Jan. 29 Tr. at 51:21-24 (Court).  The Court introduced itself and all its staff -- its former

courtroom deputy, its new courtroom deputy, its court reporter, and three of its four law clerks --

to the venire panel.  See Jan. 29 Tr. at 51:5-54:8 (Court).  After the courtroom deputy swore in the

venire panel, the Court noted that the evidence and jury deliberations were expected to take six to

eight weeks, and asked whether this length of time posed any problems to the panel members.  See

Jan. 29 Tr. at 57:16-58:9 (Court).  Norah Harris stated that she had a vacation planned to visit

friends but that she could change her reservation.[12]  See Jan. 29 Tr. at 61:9, 12-14, 17-18 (Harris).

Then the Court briefly described the case to the panel and introduced the Assistant United States

Attorneys, the First Trial Defendants, and the defense counsel.  See Jan. 29 Tr. at 74:2-76:21

(Court, Jewkes).  The Court then asked if "any member of the panel [had] heard or read anything

about the case," and requested that those individuals who had approach the bench "because I don't

want to have you talking about what you know about the case in front of everybody."  Jan. 29 Tr.

at 76:21-25 (Court).  The prospective jurors who had heard of the case came up to the bench to

discuss what each of them had heard or read, outside the hearing of the rest of the panel, with the

Court and the lawyers.  See Jan. 29 Tr. at 77:4-8 (Court).  None of the eighteen people picked for

the jury came to the bench to disclose hearing or reading anything about the case.  Compare Jan.

29 Tr. at 77:9-153:11 (discussing with Mr. Oldknow, Mr. Compton, Ms. Tighe, Mr. Besson, Mr.

Hassell, Mr. Eiffert, Mr. Billings, Mr. Rodriguez, and Ms. Moore what they heard or read about

the case), with Transcript of Jury Trial Volume 2 at 309:5-16 (taken January 30, 2018)(Clerk,

Court), filed February 28, 2019 (Doc. 2549)("Jan. 30 Tr.")(calling as jurors "Ms. Taylor, Ms.

Quinones, Mr. Laroche, Ms. Harris, Ms. Sauer, Ms. McAdams, Mr. Dixon, Ms. Wojcik, Mr.

---

[12]In discussing the venire process, the Court focuses on the eighteen members of the panel who were ultimately picked as jurors or alternates in this case.  Accordingly, the Court discusses specific answers only for those eighteen people.

Moore, Mr. Schoonover, Mr. Becerra, Ms. Murphy, Ms. May, Mr. Johnston, Ms. Courtier, Ms.

Becker, Ms. Wolfe, and Ms. Bush"). During these discussions, the Court took a break and gave

an instruction:

> We're going to be taking the first break. The trial hasn't started, but we are taking kind of the first break during the voir dire. And I want to tell you a few things that are especially important, and I'll be reminding you as we go throughout the day on these. You'll probably get tired of me saying them. It shows how important they are.
>
> Until the trial is completed -- it hasn't even started -- you're not to discuss the case with anyone, whether it's members of your family, people involved in the trial, or anyone else. And that includes your fellow jurors. So when you leave here, talk about something else, like who is going to win the Super Bowl this week, or how cool the judge is, or something like that. But don't talk about this case. Okay? We really don't need you to do that.
>
> If anyone approaches you and tries to discuss the trial with you, please let me know about it immediately. Also, you must not read or listen to any news reports of the trial. Don't walk out of here and get on the internet or your phone and do research for purposes of this case. Don't do that, please.
>
> And finally, remember that you must not talk about anything with any person who is at the table. I know we haven't gotten to the point of introducing them, but take a look at them right now and make sure that you kind of look at them, and then don't talk to them. So if you see them in the hall or in the elevator or something like that and they don't look at you and they don't speak to you, they're not being rude. They're doing what I told them to do, and that's not have contact with the jurors. So just respect that, and they're just doing what they're told.
>
> If you need to speak with me about anything, simply give a note to one of the court security officers, the men and women that have the blue jackets on, or Ms. Wild or Ms. Standridge here, and they'll get it to me. Again, I'll try not to repeat these every time we take a break, but do keep them in mind because they're very important as we try to get this trial together.
>
> Everyone has to leave the courtroom. So it's not that you can stay. Everyone has to leave the courtroom, and we'll let you know when to come back in. So when you're done walking around a little bit or using the restroom, line up outside. Don't come in until we come get you. When you come back in, please go back to the seat you're in now. Because of the seating chart, that's very important, because it will help me and help the lawyers in a little bit in asking you questions.

Jan. 29 Tr. at 134:24-137:1 (Court).

The Court then had the United States' "attorneys introduce themselves and the witnesses they intend to call in the trial." Jan. 29 Tr. at 153:21-22 (Court). After the United States complied, the Court asked that panel members approach the bench if they know any of the prospective witnesses or Assistant United States Attorneys on the case, or if they have connections with the FBI or the U.S. Attorney's Office. See Jan. 29 Tr. at 156:9-21 (Court). A few members approached and discussed whom they knew, and then the Court "ask[ed] counsel for the defendants to introduce themselves and to indicate any witnesses that the defendant may choose to call." Jan. 29 Tr. at 188:13-15 (Court). First, Theresa Duncan and Marc Lowry, Baca's attorneys, introduced themselves and their client. See Jan. 29 Tr. at 189:4-11 (Duncan). Harris told the Court that she thought she "went to high school with one of the Rothstein children," referencing Mr. Lowry's firm Rothstein Donatelli LLP, but was not sure. See Jan. 29 Tr. at 191:14-16 (Harris). Harris maintained that her relationship with the Rothstein children would not prevent her fairness and impartiality. See Jan. 29 Tr. at 191:21 (Harris). Carey Bhalla and William Maynard, Herrera's attorneys, then introduced themselves and their client. See Jan. 29 Tr. at 192:11-17 (Bhalla). Anastasia Wolfe told the Court that she had "stayed in the same motel as this table last evening, and [she] saw them at breakfast," but that this fact would not interfere with her fairness or impartiality. Jan. 29 Tr. 193:4-5, 15 (Wolfe). Next, Ryan Villa and Justine Fox-Young, R. Perez' attorneys, introduced themselves and provided their prospective witnesses' names. See Jan. 29 Tr. at 201:2-23 (Villa). Sylvia Sauer approached the bench to discuss whether she knew one prospective witness -- Jesse Sedillo -- but Mr. Villa did not believe that the Sedillo whom Sauer knows is the prospective witness. See Jan. 29 Tr. at 204:12-19 (Court, Sauer); id. at 205:25-206:1 (Villa). Sauer verified, however, that if she knew the witness Sedillo and he testified, she would remain fair and impartial. See Jan. 29 Tr. at 206:4-17 (Court, Sauer). Richard Jewkes and Amy

Jacks, D. Sanchez' attorneys, then introduced themselves and provided their prospective witnesses' names. See Jan. 29 Tr. at 208:23-209:4 (Jewkes); id. at 209:13-17 (Jewkes).

The Court then moved to polling the panel on whether any panel member had previously served as a juror in a criminal or civil case in state or federal court, or as a grand jury member in state or federal court. See Jan. 29 Tr. at 211:4-7 (Court). Bridget Murphy responded that she served as a juror in "a solicitation case in California" around thirty-five years ago, in which the defendant was found guilty, and that she was called in as an alternate on a grand jury -- for a drug case and credit card theft. Jan. 29 Tr. at 2-3 (Murphy). See id. at 219:1-7 (Murphy). Murphy stated that she was not the foreperson in the solicitation case, that nothing about her prior service would prevent her from being fair and impartial, and that the use of juries in the United States' criminal justice system is "the best system in the world." Jan. 29 Tr. at 219:24-25 (Murphy). See id. at 219:12-21 (Court, Murphy). Ellen Wojcik stated that she served on two juries in DeKalb County, Georgia -- once in a civil case twenty years ago, and then as an alternate in a driving-under-the-influence case which settled. See Jan. 29 Tr. at 221:6-12 (Wojcik). Wojcik could not remember the verdict in the civil case, but said that she was not the foreperson. See Jan. 29 Tr. at 221:13-19 (Court, Wojcik). Wojcik indicated that nothing about her service would prevent her fairness and impartiality, and that she believes the use of juries in the criminal justice system is "essential." Jan. 29 Tr. at 222:15 (Wojcik). See id. at 222:9-15 (Court, Wojcik). Willis Schoonover stated that he had served on one jury in a theft case where the defendant was found innocent. See Jan. 29 Tr. at 222:19-20 (Schoonover). Schoonover stated that he was not the foreperson, that nothing about his experience would prevent his fairness and impartiality, and that the jury system is "the way to go." Jan. 29 Tr. at 223:5 (Schoonover). See id. at 222:21-223:5 (Court, Schoonover). Stanley Dixon provided that he served as a juror on a murder trial in El Paso,

Texas, in which the defendant was found guilty.  See Jan. 29 Tr. 223:9-13 (Dixon, Court).  Dixon stated that he was not the foreperson, that the experience would not prevent him from being fair and impartial, and that he finds the use of juries "[a]ppropriate."  Jan. 29 Tr. at 223:23 (Dixon). See id. at 223:14-23 (Court, Dixon).  Bridget Bush stated that she served as a juror, but not the foreperson, in a district court drug charge case, in which the defendant was found guilty, and as an alternate in a civil magistrate case.  See Jan. 29 Tr. at 228:14-229:4 (Bush, Court).  Bush indicated that she believed juries worked well, and that her experience would not impede her fairness and impartiality.  See Jan. 29 Tr. at 229:14-21 (Court, Bush).

The Court released the venire panel for lunch, reiterating the instructions it gave before the first break.  See Jan. 29 Tr. at 230:5-231:17 (Court).  When the venire panel was outside of the courtroom, Mr. Castellano stated that he knew Dixon from high school, that Dixon did not appear to recognize or remember him, and that they went to different high schools, but that they "had friends in common."  Jan. 29 Tr. at 231:25 (Castellano).  See id. at 231:21-25 (Castellano).  When the venire panel returned from lunch and entered the courtroom, Sauer shared that she had been called to district court in Estancia, New Mexico, for a criminal case, but had been dismissed, because she "knew the fellow's family."  Jan. 29 Tr. at 236:11-12 (Sauer).  See id. at 236:9-16 (Sauer).  Sauer indicated that the experience would not prevent her from being fair and impartial, and that she thinks the use of juries in the criminal justice system is "good."  Jan. 29 Tr. at 237:1 (Sauer).  See id. at 236:20-237:1 (Court, Sauer).  Jesus Becerra stated that he served as a juror on a civil case, was not the foreperson, and agreed with the verdict.  See Jan. 29 Tr. at 237:7-21 (Becerra, Court).  Becerra did not believe that experience would impede his ability to be fair and impartial.  See Jan. 29 Tr. at 237:22-25 (Court, Becerra).  Ramona Becker provided that she served as a juror in magistrate court in a civil case, that the jury did not find the defendant guilty, and that

she did not serve as the foreperson.  See Jan. 29 Tr. at 238:2-14 (Court, Becker).  Becker stated that nothing about the experience would prevent her from being fair and impartial, and that she believes the use of juries is valuable.  See Jan. 29 Tr. at 238:15-21 (Court, Becker).

The Court then asked whether any member of the panel would not be able to listen to a law enforcement officer witness, "judge the credibility, look at them and make a determination as to whether they're credible or not based on that individual law enforcement [officer] testifying," or whether any member of the panel would presume that law enforcement would tell the truth and give them "more weight, more credibility, than others[.]"  Jan. 29 Tr. at 240:3-6, 10-11 (Court). See id. at 239:25-240:13 (Court).  The Court then asked whether a law enforcement agency ever employed any panel member, or a family member, or a close friend.  See Jan. 29 Tr. at 243:11-14 (Court).  Koreena Taylor stated that her father was a deputy sheriff in both Harrison County, Mississippi, and Cedar Rapids, Iowa, as well as somewhere else that she could not recall.  See Jan. 29 Tr. at 243:19-24 (Taylor, Court).  Taylor maintained that this relationship would not prevent her from being fair and impartial.  See Jan. 29 Tr. at 244:7 (Taylor).  Cameron Johnston provided that he has friends serving as guards in the detention center in Delta, Colorado, and that his "wife's ex-husband is a state trooper there," Jan. 29 Tr. at 249:3-4 (Johnston), but that those relationships would not prevent him from being fair and impartial, see Jan. 29 Tr. at 249:1-9 (Johnston, Court). Becerra stated that he has a cousin who is a Texas state trooper, other cousins who are Hobbs, New Mexico, and Carlsbad, New Mexico, police officer, and a brother-in-law who is an El Paso, Texas, police officer.   See Jan. 29 Tr. at 249:14-15, 17-19 (Becerra).   Becerra stated that these relationships would not prevent him from being fair and impartial, and that he could be fair in this case.  See Jan. 29 Tr. at 249:23-250:4 (Court, Becerra).  Bush said that she has "a cousin who is a retired deputy sheriff in Wichita Falls, Texas," but stated that this relationship would not impede

her fairness and impartiality.  Jan. 29 Tr. at 254:13-14 (Bush).  See id. at 254:11-19 (Court, Bush).

Britney Courtier stated that she has an uncle who is a retired police officer, but stated that this

relationship would not prevent her from being fair and impartial.  See Jan. 29 Tr. at 255:16-22

(Courtier, Court).

The Court then asked the venire panel: "Have you ever been involved in any court in a

criminal matter that concerned yourself, any member of your family, or a close friend, either as a

defendant, a witness, or a victim?"  Jan. 29 Tr. at 256:10-14 (Court).  Harris stated that, a year and

a half ago, a friend in Idaho was convicted of possession of cocaine and is currently serving

probation.  See Jan. 29 Tr. at 261:13-16 (Harris).  Harris said that this relationship would not

prevent her from being fair and impartial.  See Jan. 29 Tr. at 261:17-21 (Harris).  Johnston

responded that, in 1994, he was a defendant in a civil case regarding his "dog's barking, excessive

noise, and we pled that out and I did some community service and paid a fine."  Jan. 29 Tr. at

262:3-5 (Johnston).  Johnston stated that nothing about this experience, however, would prevent

him from being fair and impartial.  See Jan. 29 Tr. at 262:8-11 (Court, Johnston).  Carolyn

McAdams stated that, thirty years ago, her nephew was convicted of murder, see Jan. 29 Tr. at

263:21-22 (McAdams), but that she could be fair to the parties here, see Jan. 29 Tr. at 264:2-3

(Court, McAdams).

Next, the Court asked whether the panel members have "had any experience involving

yourself, any member of your family, or a close friend that relates to the use or possession of illegal

drugs or narcotics?"  Jan. 29 Tr. at 271:22-25 (Court).  Dora Quinones shared that her "her brother

was in prison in Illinois for drugs."  Jan. 29 Tr. at 273:4 (Quinones).  Quinones stated that nothing

about this experience would prevent her from being fair and impartial.  See Jan. 29 Tr. at 273:11-

15 (Court, Quinones).    Harris mentioned that, besides her friend "serving probation for

possession," she has a cousin who "died from an overdose of fentanyl." Jan. 29 Tr. at 275:5-7 (Harris). Harris stated that this experience would not keep her from being fair and impartial. See Jan. 29 Tr. at 275:8-11 (Court, Harris). Becker noted that her sister had been "a dealer for methamphetamines for about eight years." Jan. 29 Tr. at 275:18-19 (Becker). Becker stated that this relationship would not prevent her from being fair and impartial. See Jan. 29 Tr. at 275:25-276:4 (Court, Becker). Daedalus Laroche shared that many of his "friends and acquaintances have sold drugs or been charged with selling drugs." Jan. 29 Tr. at 277:24-278:1 (Laroche). Laroche said that he did not believe these relationships would prevent him from being fair and impartial. See Jan. 29 Tr. at 278:2-7 (Court, Laroche).

The Court asked whether any panel member would be unable to put aside notions or beliefs about the law to "just focus on the evidence in this courtroom, the instructions I give you, and only use those things to reach your verdict[.]" Jan. 29 Tr. at 282:16-19 (Court). See id. at 282:7-25 (Court). No juror or alternate responded. The Court then asked again whether any panel member "has any special disability or problem that would make serving as a member of this jury difficult or impossible." Jan. 29 Tr. at 283:25-284:2 (Court). The Court individually questioned some venire panel members about their jury questionnaires to clarify some of their answers, including about where they lived and worked, and the Court took a break in the middle of its questioning, reminding the panel of the instruction given before the first break. See Jan. 29 Tr. at 324:2-24 (Court). When the venire panel returned, the Court continued its questioning, but, at the end of the day, the Court noted that it had a few more questions to ask in the morning and then released the panel for the evening with the same instruction provided before the first break. See Jan. 29 Tr. at 378:17-379:23 (Court).

- 45 -

After the venire panel left the courtroom, the Defendants noted that Russ Aoki -- the Defendants' coordinating discovery attorney -- delivered to them over 1,000 pages of discovery, and requested that, to prevent delays, the United States start delivering discovery to them when it delivers discovery to Mr. Aoki.  See Jan. 29 Tr. at 380:15-22 (Duncan).  Ms. Duncan proposed that the Court order the United States to deliver documents to Mr. Aoki and Ms. Duncan at the same time, so she could disseminate the documents to the trial attorneys.  See Jan. 29 Tr. at 380:23-381:6 (Duncan).  Ms. Jacks underscored that the Jencks Act disclosure "deadline was January 16.  It's January 29 and the Government is only now getting around to turning over grand jury testimony of witnesses it expects to call." Jan. 29 Tr. at 385:1-4 (Jacks).  The Court instructed the United States to provide its scheduling order and turn over testimony transcripts "immediately." Jan. 29 Tr. at 385:17 (Court).

The next morning, the Court finished asking some individual questions from the questionnaires and then allowed the United States to conduct its direct voir dire examination.  See Jan. 30 Tr. at 35:15-18 (Court).  Baca's attorneys then conducted their direct examination, see, e.g., Jan. 30 Tr. at 65:12-67:19 (Duncan), as did Herrera's, see, e.g., Jan. 30 Tr. at 100:19-22 (Bhalla).  Ms. Bhalla asked the venire panel whether, after "what you've heard so far in voir dire and from the judge and from the government, is anybody afraid to sit on this jury?  Is anybody afraid to render a fair verdict?" Jan. 30 Tr. at 128:15-18 (Bhalla).  One member stated that "[t]he thought of retaliation is pretty scary," and that member was not picked for the jury.  Jan. 30 Tr. at 128:22-23 (Apodaca).  Another member, who was not picked for the jury, noted her worry that "with four people being defendants, I'm concerned that I would be able to separate the different charge[s] against each one, and between or among all four, and be fair to each one about each charge." Jan. 30 Tr. at 130:11-15 (Hournbuckle).  Ms. Bhalla asked whether others feel that way,

see Jan. 30 Tr. at 130:25-131:1 (Bhalla), and one other member, who was not picked for the jury, raised her hand and provided that "I'm really scared for me to make a mistake, because we're talking about four people's lives[,]" Jan. 30 Tr. at 131:8-10 (Montes).  Another member who was not selected for the jury harkened back to the fear of retaliation, stating that, while it would not "impair me to the point where I can't go through the process[,]" "it's definitely a real thought that you consider."  Jan. 30 Tr. at 133:18-19, 21-22 (Benavidez).  Ms. Bhalla then asked: "Does anybody else think that a fear of this case is going to affect how they make decisions?"  Jan. 30 Tr. at 134:21-23 (Bhalla).  A member who did not make the jury stated: "So yes, I do have a concern.  My name has been said."  Jan. 30 Tr. at 134:24-25 (Gonzales).  He continued:

> [M]y name's been said.  My place where I live has been said.  I mean, I own a company, you know.  I don't know.  I just kind of -- it is concerning, you know, if I were to be a juror, whatever, you know, and these guys were convicted and they -- you know, if it is true about, you know, what they did, how do I know they're not going to come after me, or something like that is going to happen?  You know, I just want to throw it in there.  You know, I don't feel comfortable and I really don't want no part of this.

Jan. 30 Tr. at 135:6-16 (Gonzales).  Ms. Bhalla asked him whether "that concern [would] influence how you make a decision in this case," Jan. 30 Tr. at 135:20-21 (Bhalla), and he responded, "Yes," Jan. 30 Tr. at 135:22 (Gonzales).  Ms. Bhalla inquired if any other panel members felt that way, and another member who was not selected for the jury raised his hand.  See Jan. 30 Tr. at 135:25-136:2 (Bhalla).  The panel member stated:

> You know, I guess my concern is that -- about the retaliation, about the fact that when we were in orientation we were given a number to protect our anonymity, and as soon as we walked in here, we're talking about our spouse, where we work, and we can easily identify the fact that -- and I reflect, cool, I'm number 59.  Kind of impress that a few times.  I'm number 59.  And I don't know what happened to that, but I talked to the clerks, and they said that's unusual, you know.  They're using your names?  I have anxiety about this, for sure.

Jan. 30 Tr. at 136:3-14 (Fink).  Ms. Bhalla asked him whether "someone in the clerk's office [said] it was unusual for us to be using your names," Jan. 30 Tr. at 136:16-17 (Bhalla), and he responded, "Yes." Jan. 30 Tr. at 136:18 (Fink).  Ms. Bhalla then asked the panel: "Did someone in the clerk's office tell that to more than one person in the jury pool?"  Jan. 30 Tr. at 136:19-21 (Bhalla).  A panel member responded that, "[d]uring orientation[,]" "[t]hey said identify yourself by your number."  Jan. 30 Tr. at 136:22-24 (Venire Panel Member).  Ms. Bhalla inquired whether the clerk's office "specifically [told] you not to identify yourself by your name."  Jan. 30 Tr. at 137:1-2 (Bhalla).  One panel member said "[y]es," Jan. 30 Tr. at 137:3 (Venire Panel Member), but another panel member did not remember that, see Jan. 30 Tr. at 137:4-5 (Fink).  Another panel member stated that the clerk's office said to use their juror numbers, see Jan. 30 Tr. at 137:6-8 (Burton).  Ms. Bhalla then requested that those panel members who "thought that your name was supposed to remain anonymous, can you please raise your hand?"  Jan. 30 Tr. at 137:12-13 (Bhalla).  Most panel members raised their hands.  See Jan. 30 Tr. at 137:15 (Jacks)("For the record, every juror.").  To get a more accurate count, Ms. Bhalla next asked: "If you were not told this information that your name wasn't supposed to be used, can you raise your hand?"  Jan. 30 Tr. at 138:5-7 (Bhalla).  Ten panel members raised their hands, although those who did not remember did not have to answer.  See Jan. 30 Tr. at 138:7 (Bhalla); id. at 138:9-10 (Bhalla).

R. Perez' attorneys then conducted their direct voir dire.  See, e.g., Jan. 30 Tr. at 139:10-15 (Villa).  Before breaking for lunch, the Court addressed the venire panel and stated that, while "maybe the judges down here in Las Cruces use numbers" to pick a jury, for "[e]very jury" the Court has picked, even as a trial lawyer, it has "always used names."  Jan. 30 Tr. at 161:3-4, 7 (Court).  See id. at 160:25-161:7 (Court).  The Court went on: "So I'm the sole reason that we've used names.  I think it helps us with familiarity, it helps the lawyers, helps me, helps us all get to

know each other. . . . You got some information from the clerk's office that may be the way the judges down here do it." Jan. 30 Tr. at 161:13-19 (Court). After lunch, Mr. Villa continued with his voir dire and asked one of the panel members who mentioned a fear of retaliation, whether this fear would "come into play" while she determines guilt. Jan. 30 Tr. at 169:15-16 (Villa). She responded: "I don't want to say that it's going to skew my decision, but I'm scared of the ramifications of my decision." Jan. 30 Tr. at 169:17-19 (Apodaca). Mr. Villa questioned this panel member some more, asking whether knowing that the Court's standard practice is to use names changes her feelings about the use of her name, see Jan. 30 Tr. at 170:5-11 (Villa), and she responded in the negative, see Jan. 30 Tr. at 170:12-14 (Apodaca). She provided that the "anxiety roller coaster I'm on" started when the clerk's office told the venire panel members that they "were given a number because it was for safety and that way, others wouldn't know our names." Jan. 30 Tr. at 170:19-21, 24-25 (Apodaca). Another panel member who was not picked for the jury provided that, while she does not "necessarily have a fear[,]" she has "some anxiety in the fact that these men's lives are in my hands, in our hands." Jan. 30 Tr. at 173:2-5 (Gothard). A panel member who did not make the jury stated that she "didn't realize that the people that were on trial were going to be here hearing our personal information and gain personal identifiable information about each and every one of us, where we live and what we do[,]" and so she has anxiety about that realization. Jan. 30 Tr. at 174:21-25 (Winston). She provided that, in making a decision about guilt, "the retaliation fears are very real in there," and, thus, those fears would likely affect her decisionmaking. Jan. 30 Tr. at 175:8-9 (Winston). See id. at 175:2-20 (Villa, Winston). Mr. Villa asked the panel if "anybody else share[s] those same feelings?" Jan. 30 Tr. at 175:23-24 (Villa). A panel member who did not make the jury stated that, while he "believe[s] these men to be innocent[, "if I were selected on the jury and we were coming to the decision that we believed

they're guilty, I would feel anxiety over the fact that there may be repercussions, they may retaliate." Jan. 30 Tr. at 176:4-8 (Baxa). He went on to say: "I put my information out here and now the people in this room know my thoughts and they know my name and they know what I look like and that's something that I would prefer not to have done." Jan. 30 Tr. at 176:21-25 (Baxa). Another panel member who did not make the jury stated that she feels the same way. See Jan. 30 Tr. at 178:16-19 (Villa, Tighe). Wojcik concurred, stating: "I don't think it would affect that choice [as to guilt], but I definitely have anxiety." Jan. 30 Tr. at 179:23-25 (Wojcik). Wojcik elaborated that the anxiety is both about the fear of retaliation and the fear of making the wrong decision. See Jan. 30 Tr. at 180:9-16 (Villa, Wojcik). Harris volunteered that she has anxiety about "the thoughts of any kind of coercion, you know, being approached by anyone not in this room, but maybe involved, you know, finding me and coercing me in a decision." Jan. 30 Tr. at 181:8-11 (Harris). A panel member who did not make the jury asked whether the First Trial Defendants have the juror questionnaires that they completed, and Mr. Villa clarified that those questionnaires were given to the attorneys and the Court, but "we've all sat here in court, and so that's the extent of knowledge that everybody has." Jan. 30 Tr. at 183:18-20 (Villa). See id. at 183:7-184:4 (Liebhart, Villa).

After Mr. Villa finished, D. Sanchez' attorneys conducted their direct voir dire. See, e.g., Jan. 30 Tr. at 190:1-10 (Jewkes). Then the Court thanked the venire panel members for their patience, reiterated that the Court could not function without them and that they should not read news on the trial, and then excused them so the attorneys could pick their jury. See Jan. 30 Tr. at 223:1-225:3 (Court). The Court struck twenty-five panel members for cause, leaving forty members on which to do peremptory challenges. See Jan. 30 Tr. at 283:16-284:10 (Court). The Defendants requested five additional peremptory challenges "given the negative publicity and the

comments made to the jurors in the jury room about the anonymous jury and to not let their identity be known because of safety concerns[.]"  Jan. 30 Tr. at 287:6-10 (Jacks).  See id. at 287:6-11 (Jacks).  The Court denied this request.  See Jan. 30 Tr. at 287:12 (Court).  In the evening of January 30, 2018, after the parties exercised their peremptory challenges, the Court swore in the jury, consisting of twelve jurors and six alternates.  See Trial Minutes at 7; Jan. 30 Tr. at 309:5-9, 13-16 (Clerk); id. at 310:19-24 (Court).  The Court instructed the jurors that they "should not attempt to gather any information or do research on [their] own[,]" should "not attempt to visit any places mentioned in the case, either actually or on the internet, and do not in any other way try to learn about the case outside the courtroom[,]" Jan. 30 Tr. at 318:17-22 (Court), and "must not read or listen to any news reports of the trial," Jan. 30 Tr. at 320:2-3 (Court).  See id. at 311:7-323:21 (Court).

After the jury left the courtroom, the United States requested that the Court review any presentence reports prepared for the case's witnesses, and determine what the United States must disclose for Giglio or Jencks Act purposes, because the First Trial Defendants have requested disclosure of such presentence reports.  See Jan. 30 Tr. at 324:3-11 (Castellano).  The Court ordered that the United States make the first cut, and, if the parties cannot agree, it will make the determination.  See Jan. 30 Tr. at 324:15-22 (Court).

### b.    The Opening Statements.

The next morning, the Defendants put on the record "that when the jurors were brought in and seated, two of the jurors were visibly emotional and crying."  Transcript of Jury Trial Volume 3 at 3:10-12 (taken January 31, 2018)(Jacks), filed February 22, 2019 (Doc. 2519)("Jan. 31 Tr.").  Ms. Jacks stated that both her and Mr. Lowry observed Quinones and Harris "visibly crying and emotional when they were informed that they were actually on the jury."  Jan. 31 Tr. at 3:24-4:1

(Jacks). See id. at 3:23-4:4 (Jacks). The Court stated that it had confirmed with Ms. Wild that the jurors consisted of "a good bunch" and "were doing well." Jan. 31 Tr. at 4:8-9 (Court). See id. at 4:5-5:10 (Court).

The jury entered the courtroom, and the Court thanked everyone "for being back and ready to go," and explained that "[t]he rule has been invoked in this case[,]" meaning "that witnesses may be excluded from the courtroom so that they cannot hear the testimony of other witnesses." Jan. 31 Tr. at 12:19, 22-25 (Court). The Court explained that, with the exception of parties and expert witnesses, all witnesses "will be required to remain outside the courtroom until they are called to testify," and "should not discuss with other witnesses their testimony before they or the other witnesses testify, but they may discuss their testimony with the lawyers." Jan. 31 Tr. at 13:4-9 (Court). See id. at 13:1-9 (Court). The United States then proceeded with its opening statement. See Jan. 31 Tr. at 13:14-15 (Armijo).[13] The United States provided a brief history of SNM's origins from the PNM riot and its rise to become "the largest prison gang in New Mexico." Jan. 31 Tr. at 14:1-2 (Armijo). See id. at 13:17-14:5 (Armijo). The United States described the tension between SNM and the NM Corrections Department. See Jan. 31 Tr. at 14:6-15:8 (Armijo). The United States said that the First Trial Defendants are all SNM members. See Jan. 31 Tr. at 16:16-16:23 (Armijo). The United States stated that the trial will examine the 2014 murder of fellow SNM member Molina, who "was stabbed 43 times with shanks" "at the direction of Anthony Baca as leader." Jan. 31 Tr. at 17:4, 11-12 (Armijo). See id. at 16:24-17:12 (Armijo). The United States touched on the motive for Molina's murder -- his statement to law enforcement

---

[13]With the exception of R. Perez' opening statement, which is the only opening statement with which any of the First Trial Defendants have an issue, see Sanchez NTM at 46, the Court provides a short summary of each opening statement. The Court provides a more in-depth summary of R. Perez' opening statement to which Sanchez objects, specifically focusing on where R. Perez' counsel references R. Perez' testimonial statements. See Sanchez NTM at 46.

-- the layout at Southern New Mexico, and how the First Trial Defendants worked with other SNM members to murder Molina and send a message to the NM Corrections Department.  See Jan. 31 Tr. at 17:12-21:24 (Armijo).  The United States said that the murder resulted in the NM Corrections Department putting SNM in lockdown, which SNM did not like, and that on the first day that SNM was let out of lockdown, "Julian Romero, a validated, long-standing SNM gang member, was brutally attacked."  Jan. 31 Tr. at 23:3-4 (Armijo).  See id. at 21:24-23:4 (Armijo).  The United States explained why Romero was killed -- because he became romantically involved with Archuleta's wife -- and that the NM Corrections Department put SNM back on lockdown after this murder, which, combined with Baca's forced move out of the state, resulted in SNM's plan to kill Marcantel and Santistevan to make a statement and regain respect.  See Jan. 31 Tr. at 23:5-24:19 (Armijo).  The United States stated that SNM cooperators, who wanted to leave the violence, would testify at the trial and shed light on SNM and prison life, and that, at the end of the trial, the United States will ask that the jury find them guilty.  See Jan. 31 Tr. at 24:20-27:14 (Armijo).  The United States referenced statements made by Baca -- stating, "If they would have let me out, Javier wouldn't be dead.  That man would still be alive.  But they didn't, and what's done is done.  They called my bluff, and now they have a dead man on their hands." -- and Herrera -- stating, "They fear us because they don't have it in them to kill.  They ain't killers.  That's the difference between them and us."  Jan. 31 Tr. at 26:11-15, 32-23 (Armijo).

Then, D. Sanchez gave his opening statement, which began with a request that everyone embrace the spirit of a jury trial and "try this case based on what's presented here in court and the evidence that you're going to hear through the course of this trial."  Jan. 31 Tr. at 31:19-22 (Jacks).  See id. at 30:7-32:6 (Jacks).  D. Sanchez showed the jury a map of where Southern New Mexico is located, and photographs of a pod and a cell in the facility, and he stated that the evidence will

show Molina was murdered in an austere, unpleasant environment under constant video and human surveillance. See Jan. 31 Tr. at 32:7-35:3 (Jacks). D. Sanchez noted that the two individuals who stabbed Molina -- Armenta and J. Montoya -- will testify as the United States' witnesses, as will T. Martinez, who incapacitated Molina, and M. Rodriguez, who supervised the murder and supplied weapons. See Jan. 31 Tr. at 35:4-36:16 (Jacks). D. Sanchez stated that "a lot of people in prison have a moral compass that's broken," Jan. 31 Tr. at 37:4-5 (Jacks,) and, when facing increased punishment, will try to find a way out, doing anything to help themselves -- such as Billy Cordova, who the evidence will show "made a deal to become a Government witness in part to avoid being charged as a defendant in this case," Jan. 31 Tr. at 37:18-20 (Jacks). See Jan. 31 Tr. at 36:22-38:10 (Jacks). D. Sanchez underscored that, because Armenta, Montoya, and M. Rodriguez were charged for Molina's murder in state court, they had access to discovery and each other, and had "plenty of time to talk and think about how they're going to exploit the situation." Jan. 31 Tr. at 38:24-25 (Jacks). See id. at 38:11-25 (Jacks). D. Sanchez stated that the investigating law enforcement officers offered witnesses benefits to encourage them to testify for the United States, creating a "parade of bought-and-paid-for criminals" whose testimony is uncorroborated "on many important points." Jan. 31 Tr. at 41:6, 10-11 (Jacks). See id. at 39:1-41:12 (Jacks). D. Sanchez stated that he will establish his defense through cross-examination of the United States' witnesses and through presentation of his own witnesses, and he believes the evidence will show that he did not order Molina killed, that no "paperwork," or orders to kill, were sent to Southern New Mexico, and, therefore, that he is not guilty. Jan. 31 Tr. at 41:13-43:3 (Jacks).

Herrera then gave his opening statement, admitting that he is a gang member and a drug user, but contending that the United States will not be able to prove that he murdered or conspired to murder Molina. See Jan. 31 Tr. at 43:10-44:7 (Bhalla). Herrera showed a picture of the door

separating the blue pod from the yellow pod at Southern New Mexico, noting that there is no window, that he lived in the yellow pod, and that Molina was murdered in the blue pod.  See Jan. 31 Tr. at 44:8-22 (Bhalla).  Herrera asked the jury to consider how inmates could communicate between the pods, and noted that each pod has its own structure, that Herrera was "in the yellow pod for a pretty long time before the Molina murder," and yet Molina was not murdered despite the outstanding "hit," or order to kill, and that, while "the leaders got shipped out to PNM North," Herrera did not.  Jan. 31 Tr. at 44:23-45:19 (Bhalla).  Herrera noted that he is not in the video that the United States will show of the murder -- only the United States' witnesses are -- and that he is not charged in or involved with the conspiracy to kill Santistevan and Marcantel, so the jury should keep that evidence separate from Herrera.  See Jan. 31 Tr. at 45:20-46:10 (Bhalla).  Herrera stated that the United States threatened some of its witnesses with the death penalty and threatened some of its witnesses' families with prosecutions, so the witnesses felt increased pressure to cooperate and implicate more people to get a better deal -- which Herrera posited is "tainted testimony" and that "there is nothing, outside of these Government witnesses, to corroborate their testimony."  Jan. 31 Tr. at 47:21-23 (Bhalla).  See id. at 46:11-47:23 (Bhalla).  Herrera requested that the jury keep this pressure to cooperate in mind when listening to the evidence and weighing credibility.  See Jan. 31 Tr. at 47:24-48:4 (Bhalla).

        R. Perez gave his opening statement next, outlining the medical issues with which he had struggled, and stating that he was very sick when Molina was murdered and spent most of his time in bed.  See Jan. 31 Tr. at 48:11-49:16 (Fox-Young).  R. Perez noted that he used a walker, so he did not leave his cell much and that his biggest concern was staying alive.  See Jan. 31 Tr. at 49:17-50:22 (Fox-Young).  R. Perez maintained that there will be no evidence that he was an SNM leader, or that he was involved in the Marcantel or Santistevan "hits"; rather, the only evidence of his

involvement will come from M. Rodriguez, who will say that he saw D. Sanchez enter and leave R. Perez' cell, and that when M. Rodriguez entered the cell, he found R. Perez looking scared. Jan. 31 Tr. at 50:10-51:25 (Fox-Young). R. Perez stated that M. Rodriguez will not testify that R. Perez "gave him a piece to use to kill anybody, but that he himself took a piece off" R. Perez' walker and "put it in his pants, and that he returned to his own cell to make shanks out of that piece for a murder." Jan. 31 Tr. at 51:25-52:2, 4-6 (Fox-Young). R. Perez provided that he and M. Rodriguez were the only people in that cell, and that M. Rodriguez "is going to tell you that Rudy was scared. He's also going to tell you that Rudy said that he was down for whatever, as long as it wasn't him. [R. Perez] didn't know if this [weapon] was going to be used on him." Jan. 31 Tr. at 52:12-16 (Fox-Young). See id. at 52:7-16 (Fox-Young). R. Perez told the jury that it will see that R. Perez cared only about was not getting hurt, that he was "not somebody who is making an agreement" or "who wanted to help kill another person; not somebody who intended to carry out a murder, to assist in carrying out a murder, or to send a message. [He] was just trying to stay alive." Jan. 31 Tr. at 52:20-25 (Fox-Young). See id. at 52:17-25 (Fox-Young). R. Perez explained that, when the defense "ask[s] questions of the Government's witnesses, we're putting on our case as well, so pay close attention to what we ask and how those questions are answered." Jan. 31 Tr. at 53:4-7 (Fox-Young). R. Perez told the jury that it would hear from the United States' witnesses that R. Perez "had been threatened and that he would have been killed if he had tried to stop this from happening" and that, because he was so sick, he was physically unable to defend himself so he "had no choice." Jan. 31 Tr. at 53:20 (Fox-Young). See id. at 53:9-22 (Fox-Young). R. Perez maintained that the evidence will show that he was in bed while Molina was murdered, and that, after the murder, he was moved to Santa Fe with other SNM members and housed in solitary confinement for two years "for doing nothing." Jan. 31 Tr. at 55:8 (Fox-Young). See id. at 54:11-

55:12 (Fox-Young). R. Perez stated that, while in solitary confinement, he could communicate with others through cell vents, and that rumors started spreading after Montoya, Armenta, and M. Rodriguez were charged for the murder that R. Perez was cooperating, because he was not charged. See Jan. 31 Tr. at 55:13-56:22 (Fox-Young). R. Perez said that FBI Agent Acee went to B. Cordova and threatened him with prosecution, so B. Cordova -- who "knew that everyone thought Rudy was a rat, and he knew that he could take advantage of that and try to make a deal for himself by capitalizing on Rudy's fears," Jan. 31 Tr. at 57:14-17 (Fox-Young); see id.at 57:3-17 (Fox-Young) -- decided to "save his own hide and try to get information[,]" so the United States moved B. Cordova next to R. Perez in segregation, where R. Perez "was alone, paranoid, scared, hearing all these rumors," Jan. 31 Tr. at 57:19-20, 23-24 (Fox-Young). See Jan. 31 Tr. at 57:18-25 (Fox-Young). R. Perez said that he could talk only to B. Cordova at this time and, knowing B. Cordova's reputation for having a big mouth, R. Perez "said nobody deserves a free pass on a violation, and that everybody has to do their part" to Cordova in an attempt to survive, because R. Perez knew he was in danger as people believed him to be a "rat," or a person cooperating with the government against SNM. Jan. 31 Tr. at 58:12-13 (Fox-Young). See id. at 58:3-20 (Fox-Young). R. Perez maintained that Molina's murderers and B. Cordova "have incentives to say anything in order to get a deal" when they testify, and underscored that the jury must view his case independently and that it will decide there is no evidence to hold him guilty in this case. See Jan. 31 Tr. at 58:21-59:17 (Fox-Young).

Last, Baca gave his opening statement. See Jan. 31 Tr. at 59:23 (Lowry). Baca underscored that the jury must remember that, if "the evidence hasn't been recorded, it hasn't happened," and that "almost the entirety of this case rests upon the shoulders of men who are murderers, thieves, drug dealers, and wife-beaters" whose credibility "leaves something to be

desired." Jan. 31 Tr. at 60:3, 8-10, 12 (Lowry).  See id. at 59:25-60:12 (Lowry).  Baca noted that

the United States' witnesses know that "they need to have a compelling story to avoid the

consequences of their actions," and so he requested that the jury "listen carefully to the evidence

and watch these witnesses testify," to decide if they are telling the truth and determine if their

stories are corroborated.  Jan. 31 Tr. at 60:19-21, 23-25 (Lowry).  See id. at 60:13-61:4 (Lowry).

Baca highlighted one particular cooperator, Eric Duran, who wanted out of prison, so he went to

the FBI, lied and said he was not an SNM member, but said he would "be a great undercover

agent" and do whatever the FBI wanted, because he wanted to give back to his community, if the

FBI would get him out of prison.  See Jan. 31 Tr. at 61:5-66:6 (Lowry).  Baca posited that Duran

"needed to create information to make sure the doors to that facility opened," so Duran collected

evidence in the prison.  Jan. 31 Tr. at 66:13-14 (Lowry).  See id. at 66:7-67:16 (Lowry).  Baca

noted that, after the indictment in this case, Duran received many benefits, including thousands of

dollars and early release from prison, but that, after being released and relocated to Washington,

Duran kept having interactions with police, which Baca posited does not sound like a person who

wants to give back to his community.  See Jan. 31 Tr. at 67:17-71:23 (Lowry).  Baca told the jury

that the New Mexico Parole Division arrested Duran and brought him to New Mexico, and Baca

emphasized that although all of Duran's interactions with law enforcement are recorded, "Duran

will tell you stories that you cannot corroborate," so the jury must determine whether he is telling

the truth.  Jan. 31 Tr. at 73:4-5 (Lowry).  See id. at 71:24-73:12 (Lowry).  Baca described how he

joined SNM "as a very young man," Jan. 31 Tr. at 73:23-24 (Lowry), because "he needed the

protection and the bonds of friendship that that gang had to offer[,]" Jan. 31 Tr. at 74:21-22

(Lowry).  See Jan. 31 Tr. at 73:13-74:22 (Lowry).  Baca noted that the prison administration moved

him to Nevada for about ten years and that, when he returned to Southern New Mexico in 2008,

SNM "was in disarray," so he tried to unite them. Jan. 31 Tr. at 75:14-15 (Lowry). SNM did not like his plans, so they told the prison administration that he would be killed if he was not moved, so he was moved to solitary confinement at the PNM in 2011. See Jan. 31 Tr. at 74:4-76:16 (Lowry). Baca stated that he returned to Southern New Mexico in 2013 and, within a few months, he was moved back to the PNM, because SNM again rejected him -- in contravention of the United States' theory that Baca is SNM's leader -- and was living at PNM when Molina was killed. See Jan. 31 Tr. at a76:17-77:18 (Lowry). Baca maintained that the jury will not see any "paperwork" on Molina and will not hear Baca confess to ordering a "hit" on Molina in Duran's recordings. Jan. 31 Tr. at 77:19-78:8 (Lowry). Further, Baca stated that the only evidence regarding his alleged assault on Romero's wife will be provided by people trying to avoid prison, and that the evidence will establish that Archuleta ordered Romero's murder. See Jan. 31 Tr. at 78:9-79:23 (Lowry). Last, as to the conspiracy to murder Marcantel, Baca stated that the FBI asked Duran if there was a "hit" on the Secretary of Corrections and then, "miraculously," Duran intercepted a number of letters -- letters he talked people into writing -- discussing a "hit" on Santistevan. Jan. 31 Tr. at 79:24-83:3 (Lowry). Baca suggested that he did not actually want Marcantel killed, and asked the jury not to hold him guilty for his past mistakes and to find him not guilty. See Jan. 31 Tr. at 83:4-25 (Lowry).

While the jury was taking a break outside the courtroom, D. Sanchez made two objections to the opening statements and moved for a mistrial. See Jan. 31 Tr. at 85:19-21 (Jacks). D. Sanchez first objected to the United States' reference to Baca's statement about ordering the Molina murder, because this statement is inadmissible hearsay as to D. Sanchez and is prejudicial. See Jan. 31 Tr. at 85:21-86:14 (Jacks). The Court stated that it would give a limiting instruction when D. Sanchez requested one. See Jan. 31 Tr. at 86:15-21 (Court, Jacks). D. Sanchez then

objected to R. Perez' opening statement that D. Sanchez "threatened [him] to give up a piece of his walker, and that he was scared[,]" Jan. 31 Tr. at 88:19-20 (Jacks),  noting the "tension and conflicting defenses," Jan. 31 Tr. at 88:16-17 (Jacks).  See Jan. 31 Tr. at 88:13-22 (Jacks).  The Court told D. Sanchez to send his arguments to the Court in a letter, and denied the motion for mistrial and to sever.  See Jan. 31 Tr. at 89:3-5, 7-8 (Court).  The United States noted that R. Perez' statement about being threatened is inadmissible hearsay and will not come in as evidence.  See Jan. 31 Tr. at 90:8-17 (Castellano).  The United States then called its first witness.  See Jan. 31 Tr. at 91:1-3 (Court, Castellano).

<b>c.      <u>Bryan Acee's Testimony -- January 31, 2018, and February 1, 2018</u>.</b>

The United States called Acee as its first witness.  See Jan. 31 Tr. at 91:10 (Castellano).  Acee stated that he began his law enforcement career as a police officer in 1997, then a detective, and then, in 2009, he became an FBI special agent.  See Jan. 31 Tr. at 92:14-25 (Acee).  Acee said that he "worked gangs and drug violations and organized crime," Jan. 31 Tr. at 21-22 (Acee), and now "work[s] gang and organized crime investigations[,]" Jan. 31 Tr. at 93:8-9 (Acee).  Acee stated that he also trains new FBI agents, has taught FBI and university classes on gangs, drugs, and the Juárez Cartel, and that the FBI considers him an expert on SNM and the Juárez Cartel.  See Jan. 31 Tr. at 93:16-21 (Acee); id. at 94:16-21, 24-25 (Acee).  Acee said he completed the Bureau of Alcohol, Tobacco, Firearms and Explosives' Firearm Specialist Academy, which trains agents how to determine and investigate whether a firearm traveled over state lines to establish an interstate nexus.  See Jan. 31 Tr. at 95:13-20 (Acee).

Acee provided that he was the lead case agent for the SNM investigation -- which focused on racketeering activities -- and that his involvement in the case began in 2015 when the Security Threat Intelligence Unit ("STIU") at the PNM approached him with eight letters, written by SNM

members, calling for Marcantel's and Santistevan's murders.  See Jan. 31 Tr. at 95:21-97:13

(Castellano, Acee).  Upon receiving these letters, Acee formed a task force that was comprised of

the FBI, the New Mexico Corrections Department, and the Bernalillo County Sheriff's Department

with part-time participation from all of New Mexico's jails, detention centers, and some cold-case

homicide units.  See Jan. 31 Tr. at 97:18, 21-23 (Acee).  See id. at 97:14-98:5 (Castellano, Acee).

Acee stated that the task force collaborated with cold-case homicide units, because the task force

"discovered that there were at least a dozen cold-case homicides[14] around the state [in which]

there was suspected involvement with the SNM prison gang or SNM members who were on the

street." Jan. 31 Tr. at 99:21-25 (Acee).  Acee conducted the investigation by "interviewing former

members of the gang, associates of the gang, family members, [and] witnesses," Jan. 31 Tr. at

100:21-22 (Acee), and attempting "to develop informants within the gang[,]" Jan. 31 Tr. at 100:25-

101:1 (Acee).  Acee said that he was looking for the gang's "vulnerabilities" and, after collecting

evidence, focused on "firearms and drug trafficking."  Jan. 31 Tr. at 101:13, 18-19 (Acee).  See id.

at 101:9-19 (Acee, Castellano).  To collect evidence of drug trafficking, Acee used controlled

buys[15] and undercover buys[16] targeting SNM members and associates on the streets.  See Jan. 31

Tr. at 104:13-107:3 (Acee, Castellano).  Acee testified that these procedures led to the arrests of

Mario Montoya and C. Garcia -- one of the investigation's "immediate targets" whom Acee

---

[14]A "cold-case homicide" is an unsolved murder in which "[t]he trail has gone cold."  Jan. 31 Tr. at 100:7 (Acee).  See id. at 100:7-10 (Acee).

[15]A "controlled buy" is a drug deal in which an informant, equipped with a recorder and a live wire, makes the purchase in a surveilled area, listened to and watched by the FBI, and then the FBI debriefs the informant and collects the evidence.  See Jan. 31 Tr. at 104:24-106:10 (Acee).

[16]An "undercover buy" is conducted after an informant makes initial purchases and introduces the undercover agent to the drug dealer as a family member or friend, allowing the undercover agent to form a relationship with the dealer and conduct buys in the same manner as a controlled buy.  See Jan. 31 Tr. at 106:18-107:3 (Acee).

described as "an SNM [member] that lived on the streets in Albuquerque, [and] was a pretty prolific heroin and crack dealer for many years." Jan. 31 Tr. at 108:8-10 (Acee). Acee stated that he had the NM Corrections Department "conduct parole searches on all SNM members on the street," which revealed a firearm in Robert Lovato's house, and led to his charge for "being a felon in possession of a firearm." Jan. 31 Tr. at 109:3-4, 15-16 (Acee). See id. at 108:20-109:16 (Castellano, Acee).

Acee also described PNM's architectural layout as comprising of two similar-looking facilities: one to the north known as the "North" or the "Level 6," the most secure facility in New Mexico, and a facility immediately south called "South," which, in 2015, was a Level 5 facility housing many of the state's gang members. Jan. 31 Tr. at 98:21-99:6 (Acee). Acee noted that PNM South is different from Southern New Mexico, which is the prison in Las Cruces. Jan. 31 Tr. at 99:12-15 (Acee). Acee stated that, after obtaining court orders to use wiretaps, they introduced two wiretapped cellular telephones into prison with the Deputy Secretary's permission; Acee communicated only with Deputy Secretary Mark Myers, because he felt it inappropriate to communicate with the Cabinet Secretary Marcantel, because he is an alleged victim in the case and Acee did not think he should be involved in the investigation. See Jan. 31 Tr. at 109:22-112:24 (Acee). Acee noted that "[a] prison environment is a tough place to do any kind of undercover work" and is "not a trustworthy environment." Jan. 31 Tr. at 113:15-16, 21-22 (Acee). Acee said that, after charging M. Montoya with drug offenses, the court placed him on pretrial supervised release under the FBI's supervision, and the FBI gave him with a wiretapped cellular telephone to use in controlled buys. See Jan. 31 Tr. at 114:4-115:9 (Castellano, Acee). Acee said that the FBI had Baca moved from a Colorado prison to a cell next to Duran at PNM North in October, 2015, and Baca learned of Duran's cellular telephone so Duran would make phone calls for Baca by

putting his telephone "on speaker and hold[ing] it next to the vent and Baca would talk into it." Jan. 31 Tr. at 116:9-11 (Acee). See id. at 116:2-11 (Acee); id. at 119:16-22 (Castellano, Acee); id. at 122:14-22 (Acee). Acee stated that, when Baca asked C. Garcia who should complete the "hit" on Marcantel, Acee told Duran to suggest M. Montoya and told M. Montoya to present himself to C. Garcia as a viable candidate for the job. Jan. 31 Tr. at 116:12-117:5 (Acee). Duran made "a lot of recordings" of Baca while they were housed next to each other. See Jan. 31 Tr. at 123:20-24 (Castellano, Acee).

Acee stated that the U.S. Attorney's Office charged the Defendants and presented the case to a grand jury at the beginning of December, 2015, which resulted in the issuance and serving of "dozens of search and arrest warrants," Jan. 31 Tr. at 125:22-23 (Acee), the NM Corrections Department's lockdown[17] of five prisons to search SNM members' cells, and "about 45 parole searches around the state of SNM members," Jan. 31 Tr. at 126:5-6 (Acee). Acee described collecting the arrestees at a centralized facility and taking their fingerprints, DNA, and photographs of their street- and prison-gang tattoos, and also attempting to interview them. See Jan. 31 Tr. at 127:4-15, 18-25 (Acee). Acee recognized photographs of D. Sanchez taken at that time, and the United States published them to the jury. See Jan. 31 Tr. at 130:2-11 (Castellano, Acee); id. at 130:21-23 (Castellano, Court). Acee noted various tattoos of interest on D. Sanchez visible in the photographs: (i) the letters "N" and "M" for New Mexico on his right and left forearms, respectively; (ii) the Zia symbol on both elbows and his right knee; (iii) a "chata," which is a female wearing a sombrero, on his left shoulder; (iv) his name on his back and the left side of his leg; (v) his hometown, Belen, New Mexico, on his neck; (vi) an outline of the State of New Mexico

---

[17]Acee described a "lockdown" as: "no movement by the inmates. Everyone stays in their cell, and all programming and movement is suspended until the lockdown is lifted." Jan. 31 Tr. at 126:10-13 (Acee).

with the words "Valencia County"; and (vii) a man wearing a headband behind prison bars.  See Jan. 31 Tr. at 132:11-134:19 (Acee, Castellano).  Acee stated that they arrested D. Sanchez for committing a "violent crime in aid of racketeering, specifically for the murder of Javier Molina that occurred in 2014 down here in Las Cruces, at the Southern New Mexico."  Jan. 31 Tr. at 135:9-12 (Acee).  Acee explained that the Molina murder was a case he took from the state system to prosecute in the federal system, "because we had evidence that fell within the federal racketeering guidelines."  Jan. 31 Tr. at 135:23-24 (Acee).  See id. at 135:13-24 (Castellano, Acee).  He noted that initially only J. Montoya and Armenta were charged with the murder, and M. Rodriguez "was charged with tampering with evidence," but because of the FBI investigation more people were charged.  Jan. 31 Tr. at 136:15-16 (Acee).  See id. at 136:3-22 (Castellano, Acee).

The United States then published photographs of Baca to the jury, taken the same day as D. Sanchez', and Acee noted tattoos of interest on Baca's body: (i) a Zia symbol with the letter "S"[18] in its center, near his left eye; (ii) his name on his neck; (iii)  the phrase "Duke City," which refers to Albuquerque, New Mexico, on his neck; (iv) an outline of buildings in Albuquerque, including the Hyatt building, on his upper back; (v) currency, on his left shoulder; (vi) a ball cap or hoodie with the letter "S," on his right shoulder; (vii) a prison tower with the words "Nuevo Mexico Sindicato" in the center of his torso; (viii) Mayan or Aztec style artwork, which Acee identified as a theme among SNM members, on his shoulders and upper back; and (ix) a man with a handlebar mustache wearing a hat and sunglasses, on his right hand.  Jan. 31 Tr. at 138:5-141:9 (Castellano, Acee); id. at 141:13-142:25 (Acee, Castellano).  Acee identified Baca as another

---

[18]Acee stated that the SNM sometimes refers to itself as "the S."  See Jan. 31 Tr. at 139:20-23 (Castellano, Acee).

person charged in Molina's murder once it became a federal case.  See Jan. 31 Tr. at 143:1-9 (Castellano, Acee).

The United States also showed the jury photographs of Armenta, and Acee described his tattoos: (i) the letters "NSL," which Acee believed stood for the North Side Locos street gang, with "114%" and "Norteno,"[19] on his stomach; (ii) guns, money, and naked women, which Acee identified as another theme, on his left arm; (iii) a prison tower and three scrolls[20] with "01," "02," and "05," on his right arm; (iv) his moniker "Creeper," on the back of his neck; (v) "Disavowed" behind his right ear; (vi) "Misunderstood" behind his left ear; (vii) a Zia symbol and an outline of New Mexico, which Acee identified as another theme, on the top of his head; (viii) "NSL 14," which Acee identified as a street gang, on his right middle finger; (ix) a Zia symbol on his right knee; (x)  "NOR," for north, and "14," which Acee identified as referencing the street gang, on his right leg; and (xi) "SIDE" on Armenta's left leg, so both legs together reference "north side."  Jan. 31 Tr. at 145:1-148:18 (Acee, Castellano).

The United States also introduced photographs of J. Montoya, with Acee again noting his tattoos: (i) "JR," referencing his nickname "Junior," on his chest; (ii) a peacock and the phrase "San Jo," which Acee identified as referencing the San Jose street gang, on his left forearm; (iii) "east" on the back of his left forearm and "side" on his right forearm, forming "east side" which Acee identified as referencing the east side San Jose street gang; (iv) "San Jose" on his neck and lower back; and (v) a Zia with an "S" in its center on his back.  Jan. 31 Tr. at 149:24-151:22 (Acee, Castellano).  The United States then showed photographs of M. Rodriguez and Acee noted

---

[19]Acee testified that these are all street gang tattoos, that Norteno is a California gang offshoot and that Armenta is claiming pride in it with the "114%." Jan. 31 Tr. at 145:11-17 (Acee).

[20]Acee identified the scrolls as "years that the person wearing them fell or . . . years they did time in prison." Jan. 31 Tr. at 146:12-13 (Acee).

his tattoos of interest: (i) "Blue," his moniker, across his abdomen; (ii) an outline of New Mexico with "Silver City," his hometown and the location of the street gang in which he belongs, between the "L" and the "U" in the previous tattoo; (iii) on his left wrist, "ES," meaning "east side," which Acee identified as the street gang in which M. Rodriguez belongs; (iv) prison bars on his inner left forearm; (v) "SC" and what Acee believed was "Silver City," on the back of his head; and (vi) a large Zia, on his left thigh.  See Jan. 31 Tr. at 158:1-160:19 (Castellano, Acee).

Acee then identified T. Martinez' tattoos as the United States showed his photographs: (i) "Silver City," his hometown, on T. Martinez' upper back; (ii) an outline of New Mexico and "Nuevo Mexico" on his back; (iii) Mayan or Aztec style tattoos extending from his right arm and shoulder down the right side of his back; (iv) a Zia containing the letter "M" and "575," the area code for southern New Mexico, on his left knee; (v) below that, an outline of New Mexico; (vi) a bird on his left calf, which is either a peacock -- a bird that some SNM members maintain is identified with SNM -- or a roadrunner[21]; (vii) on his right knee, a Zia containing the letter "N," for New Mexico when combined with the Zia on the other knee; and (viii) below that, what could be a prison tower or an Asian style building.  Jan. 31 Tr. at 161:24-163:24 (Acee, Castellano).

The United States then introduced photographs of David Calbert, who is not charged in Molina's murder but is charged with "with different racketeering activity" in the United States v. Varela case.  Jan. 31 Tr. at 165:12-13 (Acee).  See id. at 164:25-165:18 (Castellano, Acee).  Acee noted Calbert's tattoos of interest: (i) an "S" on his chin; (ii) an "S" inside a Zia on his lower throat; (iii) "Spider," his moniker, across his stomach; (iv) spider webs[22] on his left bicep; (v) his name

---

[21]From the Court's review of the exhibit in question, the tattoo appears to be a roadrunner. See Government's Trial Exhibit 566, admitted at trial on January 29, 2018.

[22]Acee testified that spider webs used to be identified with people who have spent time incarcerated but that this significance has been lost, because people are getting them in tattoo shops

and NM Corrections Department identification number on the back of his neck; and (vi) the phrase "Trust no bitch" across his shoulder blades.  Jan. 31 Tr. at 165:21-167:6 (Acee, Castellano).

The United States then turned to R.P. Martinez, who was charged in the conspiracy to kill Marcantel and Santistevan, and Acee stated that he read the letters intercepted by corrections officials, some of which "claim to be written by someone named Roy Martinez[.]"  Jan. 31 Tr. at 167:24-25 (Castellano).  See id. at 168:3-11 (Castellano, Acee); id. at 168:21-169:1 (Castellano, Acee).  The United States published to the jury photographs of R.P. Martinez' tattoos, and Acee described the ones of interest: (i) a Zia with "SNM"[23] on the right of his stomach; (ii) the letters "WSL," which Acee identified as standing for the West Side Locos street gang, and a "16" on the left of his stomach; (iii) a Zia on his left arm; and (iv) "home boy" with "Shadow," one of his monikers, above it on his back right shoulder.  Jan. 31 Tr. at 169:2-171:1 (Castellano, Acee).

The United States then showed photographs of R. Martinez and Acee noted R. Martinez' one tattoo of "significance" -- "SNM" on his left tricep.  Jan. 31 Tr. at 172:10, 17-18 (Acee).  See id. at 172:6-18 (Castellano, Acee).  Acee explained that R. Martinez is "charged in the Marcantel-Santistevan conspiracy," for writing letters urging the "hits," "as well as another violent-crime-in-aid-of-racketeering assault," on an SNM member who had disrespected R. Martinez.  Jan. 31 Tr. at 173:6-9 (Acee).  See id. at 173:10-18 (Castellano, Acee).

The United States next turned to Archuleta, noting that his photographs were taken on a different date than the rest, which Acee explained occurred because they arrested Archuleta in

---

now.  See Jan. 31 Tr. at 166:13-17 (Acee).  Acee also noted that it makes sense Calbert would have spider webs, because of his moniker.  See Jan. 31 Tr. at 166:12-13 (Acee).

[23]Acee testified that "SNM" stands for "the New Mexico syndicate, or Sindicato de Nuevo Mexico" and that he has seen various spellings: "syndicate," "sindicato," and "syndicato."  Jan. 31 Tr. at 169:7-8 (Acee).  See id. at 169:15-21 (Acee).

Tennessee as part of the investigation's Phase 2.  See Jan. 31 Tr. at 174:7-175:4 (Castellano, Acee).

Acee stated that Archuleta had been an SNM leader at one time, and then noted Archuleta's tattoos

of interest: (i) "Nuevo Mexico" just above his waist; (ii) a peacock on the back of each shoulder;

and (iii) "Lilly" on his neck and "Lilly S.," who Acee identified as the woman who caused the

"civil war in the SNM," on his right shoulder.  Jan. 31 Tr. at 176:17 (Acee).  See id. at 175:16-

176:18 (Castellano, Acee).  Acee said that the civil war "was a point of contention between"

Archuleta and Romero, "and they politicked to make it a point of contention in the gang."  Jan. 31

Tr. at 176:17, 22-24 (Acee).  It resulted in Archuleta being charged with a "violent-crime-in-aid-

of-racketeering attempt to commit assault resulting in great bodily injury" on Romero.  See Jan.

31 Tr. at 176:19-177:12 (Castellano, Acee).

The United States then showed photographs of Manuel Jacob Armijo, who also was

arrested in Phase 2, and Acee noted his tattoos of interest: (i) a prison tower, gate, and barbed wire

on his right arm; (ii) below that, a Zia with an "S"; (iii) a wolf print with "Mex" underneath, which

Acee believed to reference the Albuquerque Lobos, on the inside of Armijo's right arm near his

armpit; (iv) the term "Barelas," which Acee recognized as an older Albuquerque neighborhood[24]

and street gang, across his stomach; and (v) a Zia with an "S," on the inside of his left wrist.  See

Jan. 31 Tr. at 178:22-180:10 (Castellano, Acee).  Acee said that Armijo is charged in a separate

indictment[25] with a RICO Act conspiracy in which "[t]wo of the gentlemen in court were charged

with . . . as well."  Jan. 31 Tr. at 180:18-19 (Acee).  See id. at 180:11-19 (Castellano, Acee).  Acee

indicated that this separate indictment contained allegations against Armijo for SNM member

---

[24]Acee testified that Armijo and many "of the founding members of the SNM" are from
the Barelas neighborhood.  Jan. 31 Tr. at 179: 19-20 (Acee).  See id. at 179:17-21 (Acee).

[25]Armijo is charged in United States v. Baca, No. CR 16-1613.

Michael Giron's murder in the indictment's "overt acts" section, but that these overt acts were dropped, because the FBI found evidence showing Armijo was not involved in that murder. See Jan. 31 Tr. at 180:20-181:6 (Castellano, Acee); id. at 196:11-197:3 (Castellano, Acee).

At the bench, outside the hearing of the jury, Baca's counsel "move[d] for a mistrial based on Bryan Acee announcing to the jury that two of the defendants are being charged in another case not before the jury." Jan. 31 Tr. at 182:6-9 (Duncan). R. Perez' attorneys joined, because the testimony was not clear who the two Defendants were, which "leaves the impression that it could be Mr. Perez." Jan. 31 Tr. at 182:21-22 (Villa). See id. at 182:18-22 (Villa). The Court suggested that the United States "come back to it and clear up that none of the men in this case are charged in other cases," Jan. 31 Tr. at 183:6-7 (Court), at which point D. Sanchez' attorneys joined the objection and noted that "it's probably inappropriate for Mr. Castellano to tell Agent Acee to come back to court and testify to something that's not true," Jan. 31 Tr. at 183:10-13 (Jacks). D. Sanchez' counsel determined that they did not want further testimony on the topic and the Court denied the motion for mistrial, so the proceedings continued. See Jan. 31 Tr. at 184:11-19 (Jacks, Court).

Acee told the jury that, because of informants, Herrera and R. Perez were charged for the Molina murder. See Jan. 31 Tr. at 184:22-185:2 (Castellano, Acee). Acee stated that he was surprised that one informant, B. Cordova, started cooperating with the FBI; Acee did not want to charge B. Cordova, because Acee "was looking to utilize him as a tool to continue to collect the information on the SNM," although Acee noted that the U.S. Attorney's Office makes charging decisions and Acee makes only recommendations. See Jan. 31 Tr. at 186:8-190:8 (Castellano, Acee). Acee testified that B. Cordova was a "good-standing member of the S, a popular well-known one," and so the FBI placed him in prison wearing a wire, housed next to R. Perez and

Herrera. Jan. 31 Tr. at 190:17-18 (Acee). See id. at 190:16-23 (Acee, Castellano). Acee stated that B. Cordova recorded R. Perez and Herrera, which led to their charges in this case. See Jan. 31 Tr. at 190:24-191:2 (Castellano, Acee).

The United States then showed photographs of R. Perez and Acee noted his tattoos of interest: (i) R. Perez' name on his lower stomach; (ii) "Mi Vida Loca," which means "my crazy life" and which law enforcement attributes to gangs, although many non-gang members also get this tattoo, on his neck; (iii) "New" on the backside of one wrist and "Mexico" on the other side; (iv) "Brown Pride" on his upper back; and (v) a peacock on his left shoulder. See Jan. 31 Tr. at 191:14-192:17 (Castellano, Acee). Acee then discussed Herrera's significant tattoos as the United States showed photographs: (i) a Zia with an "S," above Herrera's belly button; (ii) an "18" on his left middle and ring fingers, which Acee identified as a reference to Albuquerque's 18th Street Gang; (iii) "Eighteen" on the back of his neck, again referencing the street gang; and (iv) his nickname, "Lazy," below three dots in a triangular shape[26] on his left hand. See Jan. 31 Tr. at 193:19-22 (Castellano, Acee); id. at 195:3- (Castellano, Acee).

Acee described some of the benefits that the cooperators in the case received, such as putting about $50.00 a month in their NM Corrections Department accounts, extra telephone calls, and the ability to "buy extra stamps, envelopes, drawing pencils, chips, snacks." Jan. 31 Tr. at 198:24-25 (Acee). See id. at 197:14-199:3 (Castellano, Acee); id. at 199:13-15 (Acee). Acee stated that the FBI would try to accommodate the cooperators' requests to send this extra account money to their wives or girlfriends. See Jan. 31 Tr. at 199:3-10 (Acee). If the cooperators broke FBI rules, Acee said he confronted them, "closed them as an informant," and stopped payments.

---

[26]Acee testified that these dots can signify "mi vida loca," although "kids in high school get these now sometimes." Jan. 31 Tr. at 195:22-23 (Acee). See id. at 195:20-23 (Acee).

Jan. 31 Tr. at 199:23-200:6 (Acee).  Acee testified that he would open people as informants, which is the official documentation process recognizing their cooperation with the FBI, so they could wear wires, and obtain compensation, which he noted made it easier to dole out benefits and keep track of them.  See Jan. 31 Tr. at 200:9-201:11 (Acee, Castellano).  Acee described moving M. Montoya and Duran out of state for safety, offering to move other cooperators, and helping a cooperator's wife, who "felt threatened," move.  Jan. 31 Tr. at 202:14 (Acee).  See id. at 202:2-16 (Acee).  Acee noted that the NM Corrections Department reduced Duran's sentence under its policy allowing the award of time off a sentence for saving lives, because it credited Duran with saving two lives.  See Jan. 31 Tr. at 204:2-15 (Castellano, Acee).  Acee stated that the FBI paid Duran about $45,000.00 in total, including a deposit $25,000.00 in Duran's prison account, but stated that no other cooperator was paid "anywhere near that."  Jan. 31 Tr. at 205:5 (Acee).  See id. at 204:19-205:5 (Castellano, Acee); id. at 207:12-14 (Acee).  Acee stated that this money helped cover Duran's expenses in moving out of state, and that includes money paid to Duran for his FBI involvement in his new state.  See Jan. 31 Tr. at 206:1-24 (Castellano, Acee); id. at 207:6-17 (Acee).  Acee described that, with this other FBI office, it was important that Duran not have outstanding charges and warrants, so, when a warrant in El Paso, Texas, surfaced for Duran for charges nearly twenty years old, Acee offered to arrest Duran and fly him to the El Paso District Attorney's office.  See Jan. 31 Tr. at 208:11-209:12 (Castellano, Acee).  Acee maintained that he did not ask the District Attorney's office to dismiss those charges, and that, after looking at the case, the District Attorney's office dismissed the case.  See Jan. 31 Tr. at 209:13-19 (Castellano, Acee).  When Duran was found with a firearm in a vehicle, Acee stated he had the NM Corrections Department issue a warrant, asked the FBI to charge Duran with being a felon in possession of a

firearm, and obtained and executed a search warrant for Duran's DNA when he arrived back in New Mexico. See Jan. 31 Tr. at 209:24-210:17 (Castellano, Acee).

As to the incarcerated cooperators, Acee said that they were, at one point, housed together away from other inmates for their safety, and that this housing came with additional privileges. See Jan. 31 Tr. at 211:3-15 (Castellano, Acee). These privileges included having more time outside their cells in the tier, extra telephone calls for friends and family, and more visits with family. See Jan. 31 Tr. at 211:17-24 (Acee). Acee stated that, during contact visits with their family, some of the cooperators broke the rules by having more contact than allowed -- which included sexual contact -- and so Acee closed them as informants and terminated payments. See Jan. 31 Tr. at 212:2-213:6 (Castellano, Acee). After this inappropriate contact, the informants were transferred from North PNM, which is where they were housed at the time. See Jan. 31 Tr. at 214:11-20 (Castellano, Acee).

Acee testified that the investigation's Phase 3 addressed threats to cooperators and witnesses and resulted in twelve search warrants and four parole searches that uncovered money, eleven firearms, and drugs. See Jan. 31 Tr. at 214:21-215:10 (Castellano, Acee); id. at 215:15-18 (Acee). The FBI also searched a federal inmate's cell -- F. Gallegos -- who "has two brothers who are also SNM members that we've arrested" and who are facing charges in the second trial. Jan. 31 Tr. at 216:6-7 (Acee). See id. at 215:20-216:21 (Castellano, Acee). Acee described conducting three "reversal operations" in this case, in which the FBI sells contraband to someone -- here, guns -- and once the delivery is made, the FBI SWAT team goes in and makes the arrest. See Jan. 31 Tr. at 216:22-217:19 (Castellano, Acee). Acee also testified that, for every SNM member released from prison, an FBI agent is the initial check-in at the parole office to introduce themselves to the SNM members, gauge whether they will stay members, and let them know that "if they're going

- 72 -

to continue to be gang members in New Mexico, we're going to keep an eye on them and we're going to be after them." Jan. 31 Tr. at 219:5-8 (Acee). See id. at 218:18-219:8 (Acee, Castellano).

Acee stated that using undercover agents placed in the prisons was not an option, because not only is it against protocol, but SNM likely would not open up to the agents. See Jan. 31 Tr. at 219:19-220:9 (Acee). Acee said that this inability to use agents necessitated the FBI's reliance on informants to obtain evidence. See Jan. 31 Tr. at 220:22-221:2 (Castellano, Acee). Acee stated that he was concerned about "paperwork" being provided to the Defendants, because any reports on cooperators could be distributed throughout the prisons and jails. Jan. 31 Tr. at 221:14-23 (Castellano, Acee). Acee stated that the Defendants received discovery on tablets, but that some of his cooperators told him that they could access the internet via these tablets -- a function which was supposed to be disabled. See Jan. 31 Tr. at 221:24-222:19 (Castellano, Acee). Acee stated that, without authorization, Defendants used the tablets "to send emails, access Facebook, make accounts, and surf the internet, and access pornography," so the FBI confiscated their tablets. Jan. 31 Tr. at 223:1-3 (Acee). See id. at 223:12-14 (Castellano, Acee).

While the Court waited for the jury to return from a break, R. Perez requested that the Court strike B. Cordova as a witness, because an FBI 302 report[27] on B. Cordova from 2016 "has clearly exculpatory information about Mr. Cordova committing a murder, at least Giglio information, that wasn't produced until late January, mid-January," that "is part of a pattern by the United States that we've been pointing out in which they have not produced Giglio material, and this Court ordered it to be produced back in the spring." Jan. 31 Tr. at 226:12-15, 17-20 (Villa). See id. at 226:7-20 (Villa). The Court requested that R. Perez point to "some prejudice in a more concrete

---

[27]FBI agents use a 302 report to summarize the interviews they conduct. See List of FBI Forms, Wikipedia, https://en.wikipedia.org/wiki/List_of_FBI_forms (last visited Dec. 22, 2018).

way," because as it stands, "it's too academic for me to impose such a drastic remedy." Jan. 31 Tr. at 227:1-3 (Court). R. Perez stated he would "submit a letter to the Court." Jan. 31 Tr. at 228:4 (Fox-Young).

When the jury returned, the United States finished its direct examination of Acee. See Jan. 31 Tr. at 228:25-229:1 (Castellano, Acee). Baca conducted the first cross-examination. See Jan. 31 Tr. at 230:10-13 (Court, Lowry). Baca returned to the benefits that the FBI gave to cooperators, and showed Acee an FBI document that allowed Acee to recall that, as of November 1, 2017, the FBI had paid Duran $46,297.00. See Jan. 31 Tr. at 231:4-12, 18-23 (Lowry, Acee). Acee described the process by which the FBI determined payment amounts, noting that the incarcerated cooperators received, on average, $50.00 per month, while special circumstances, such as car issues, warranted some larger payouts -- such as the $1,601.50 payment to M. Montoya, to repair a recreational vehicle he was using to leave New Mexico. See Jan. 31 Tr. at 232:8-233:12 (Lowry, Acee). Acee noted that Alonso received only $400.00, because "[h]e started cooperating much later." Jan. 31 Tr. at 233:16 (Acee). See id. at 233:13-16 (Lowry, Acee). Acee agreed that another benefit for the cooperators is that they are not prosecuted, and Baca underscored that this benefit would not appear on the FBI's financial reports and that Archuleta was not prosecuted for his admitted desire to kill Romero. See Jan. 31 Tr. at 233:21-234:25 (Lowry, Acee). Baca inquired whether Archuleta had the opportunity to kill Romero, because of Archuleta's status as a leader of SNM, but Acee noted that, in Baca's absence, leadership changed so "there has been certainly more than one leader in the gang," Jan. 31 Tr. at 235:22-23 (Acee), and that Archuleta "was one of the leaders," Jan. 31 Tr. at 235:13 (Acee). See Jan. 31 Tr. at 235:1-23 (Lowry, Acee). Baca elicited that Acee asked each SNM member which faction they are in -- the Archuleta camp or the Romero camp -- although, today, Acee said that he believes that there is a state faction and a federal

faction.  See Jan. 31 Tr. at 235:24-237:3 (Lowry, Acee).  Acee stated that he told the grand jury

that Archuleta and Romero were SNM's two leaders, and Acee clarified that he discussed the split

in SNM over these men because of the fight over a woman.  See Jan. 31 Tr. at 238:11-14 (Lowry,

Acee); id. at 238:23-239:1 (Acee).  Acee stated that the "SNM is a blood in, blood out gang," but

noted that there are many contradictions within the gang, so just some members believe that death

is the only way out.  Jan. 31 Tr. at 239:13 (Lowry).  See id. at 239:12-24 (Lowry, Acee).

Baca inquired whether Acee was "aware of any calls made on [Duran's] behalf when it got

in trouble with the law," Jan. 31 Tr. at 240:11-12 (Lowry), and Acee said that the New Mexico

U.S. Attorney's Office contacted prosecuting agencies for the warrant in El Paso and the charges

Duran picked up in Multnomah County, Oregon, see Jan. 31 Tr. at 240:9-241:21 (Lowry, Acee).

Acee noted that the Oregon district attorney dismissed the charges against Duran once it learned

that the FBI would pick them up, and that the Oregon U.S. Attorney's Office wants the "results of

fingerprints or DNA[,]" Jan. 31 Tr. at 243:7-8(Acee), so Duran has not "been charged yet, but it's

pending[,]" Jan. 31 Tr. at 243:11-12 (Acee).  See Jan. 31 Tr. at 241:17-23 (Lowry, Acee); id. at

243:2-12 (Lowry, Acee).  Acee said that he contacted the Oregon district attorney, because he was

concerned that Duran had been released and "wanted to know why he had been released."  Jan. 31

Tr. at 243:23 (Acee).  See id. at 243:20-23 (Acee).  Acee said that, in March, 2015, the local FBI

office signed up Duran as a confidential human source ("CHS") under agent Katie Brusuelas, and

that Duran was transferred to Acee that fall.  See Jan. 31 Tr. at 244:4-245:13 (Lowry, Acee).  Acee

shared Brusuelas' feedback on Duran's CHS performance, that "he had phenomenal access to the

SNM, was housed up at the Level 6 with some of the leaders, and that he was willing to testify and

make recordings."  Jan. 31 Tr. at 245:1-3 (Acee).  Acee stated that Duran sounded promising, so

when Duran was transferred to Acee, Acee "deployed a different recording device or devices with

him[,]" because there were issues with the first device.  Jan. 31 Tr. at 245:12-13 (Acee).  See id. at 245:7-16 (Lowry, Acee).  Acee testified that he told his informants that "there needs to be a recording" so that he can "corroborate what they're telling me[,]" Jan. 31 Tr. at 246:1, 4-5 (Acee), and Baca underscored that in a pretrial hearing, Acee testified: "Well, if it's not recorded, the conversation, in my mind, didn't happen[,]" Jan. 31 Tr. at 246:18-19 (Lowry).  See Jan. 31 Tr. at 245:21-246:20 (Lowry, Acee).  Acee testified that his desire for recordings sometimes stems from his concern about the incarcerated informants' honesty and integrity.  See Jan. 31 Tr. at 246:21-247:5 (Lowry, Acee).

Herrera then began his cross-examination.  See Jan. 31 Tr. at 247:22 (Maynard).  Herrera first had Acee clarify that Herrera is not charged in the "other accusations of other murders involved in SNM," Jan. 31 Tr. at 248:4-5 (Maynard), or in the state case involving Armenta, J. Montoya, and M. Rodriguez, see Jan. 31 Tr. at 248:3-18 (Maynard, Acee).  Acee said that, after Molina's murder in 2014, three people were sent from Southern New Mexico out of state and "several were sent to the North facility in Santa Fe," and although Acee could not recall who was moved, he stated that Herrera was not sent out of state.  Jan. 31 Tr. at 249:1 (Acee).  See id. at 248:19-249:13 (Maynard, Acee).  Herrera harkened back to the rivalry between Archuleta and Romero, noting that there are many disagreements between inmates.  See Jan. 31 Tr. at 249:14 (Maynard, Acee).  Acee admitted that determining whether a disagreement is personal or an SNM issue "depends on a lot of facts" and rumors  Jan. 31 Tr. at 250:8 (Maynard).  Jan. 31 Tr. at 249:15 (Maynard, Acee).  Acee said that he interviewed many people, incarcerated and free, who "by all appearances, appear to be, at one time or another, members of SNM," Jan. 31 Tr. at 251:10-11 (Maynard), encountered different opinions on issues, and interviewed some people more than once, see Jan. 31 Tr. at 251:3-252:19 (Maynard, Acee).  Acee noted that some witnesses "received

benefits for some of the time," Jan. 31 Tr. at 253:7 (Acee), and that, as time has passed since 2014 -- when the charged conduct occurred -- some of the witnesses would come back for "a second or third interview with more details, something that they remembered when they went back and thought about it more," Jan. 31 Tr. at 253:15-17 (Acee). See Jan. 31 Tr. at 252:20-23 (Maynard, Acee). Herrera elicited that some of the witnesses were housed together and, "[i]f they had tier time together," could have exchanged stories about what happened, despite the FBI's instruction. Jan. 31 Tr. at 253:18-254:12 (Maynard, Acee). Regarding wires in the prisons, Acee explained that B. Cordova and Archuleta were housed adjacent to Herrera for "[a]t least a few weeks" in 2016 to elicit conversations about the Molina murder, and that B. Cordova and Archuleta had full control over when to record, with no way for Acee to determine when the recording devices were off. Jan. 31 Tr. at 255:18 (Acee). See id. at 255:5-256:17 (Maynard, Acee).

R. Perez then conducted his cross-examination, clarifying with Acee that this is the only case in which R. Perez is charged, that he is charged only with the alleged conspiracy to murder and the murder of Molina, and that he was not charged until phase 2 of the investigation -- after B. Cordova recorded conversations with R. Perez in February, 2016. See Jan. 31 Tr. at 257:5-258:11 (Villa, Acee). R. Perez noted that Acee testified on direct that B. Cordova walked into the initial interview with a "big smile on his face," Jan. 31 Tr. at 259:7 (Villa), but that Acee testified to the grand jury: "I'll spare you a long story, but basically I said, 'I'm with the FBI and we're going to target you,'" Jan. 31 Tr. at 259:15-17 (Villa). See Jan. 31 Tr. at 259:6-18 (Villa, Acee); id. at 260:9-261:1 (Villa, Acee). Acee stated that he told B. Cordova that they were preparing to charge him with racketeering and had another agent with him at the initial interview whose job was to write up the overt acts against B. Cordova, but that, either at that meeting or a later one, Acee told B. Cordova that in exchange for B. Cordova's cooperation, Acee would not recommend

charges again.  See Jan. 31 Tr. at 261:12-262:25 (Villa, Acee).  Acee said that, around January, 2016, he made it clear to B. Cordova that they would not pursue charges against him if he cooperated and that, within a few weeks, B. Cordova was moved to PNM North.  See Jan. 31 Tr. at 263:14-264:12 (Villa, Acee).  Acee stated that R. Perez was in a corner cell at PNM North and B. Cordova was placed in the cell next to him -- the only cell R. Perez could communicate with through the vent underneath his bed -- and that they spoke to each other, while B. Cordova had a recording device which he fully controlled.  See Jan. 31 Tr. at 265:14-267:7 (Villa, Acee).  Acee clarified that the recording device did not have live, real-time capabilities -- so he had to get the device back to listen to what was recorded.  See Jan. 31 Tr. at 267:8-15 (Villa, Acee).

Acee said that people were talking about the Molina murder, as he had received information about it from people with no firsthand knowledge.  See Jan. 31 Tr. at 268:17-269:1 (Villa, Acee). R. Perez questioned Acee's characterization of B. Cordova as "popular," and Acee stated that he was "a rising star, well-liked, willing to put in work."  Jan. 31 Tr. at 269:8-9 (Acee).  Acee believed that a lot of people knew B. Cordova, and assumed that R. Perez knew that B. Cordova was well-known and liked.  See Jan. 31 Tr. at 269:10-17 (Villa, Acee).  Acee said that, by the time R. Perez was charged for the Molina murder in April, 2016, J. Montoya and Armenta had already been charged.  See Jan. 31 Tr. at 269:23-273:17 (Villa, Acee).  J. Montoya and Armenta admitted to stabbing Molina, showed Acee how they did it, and stated how many times they stabbed Molina. See Jan. 31 Tr. at 273:24-274:10 (Acee, Villa).  Acee stated that M. Rodriguez had also already been charged, for the Molina murder and an assault at the PNM, and that, in Acee's opinion, M. Rodriguez was one of SNM's "more fierce soldiers" and "a dangerous man."  Jan. 31 Tr. at 276:6-7, 10 (Acee).  See id. at 274:11-275:9 (Villa, Acee).  Acee stated that M. Rodriguez was significant in orchestrating Molina's murder.  See Jan. 31 Tr. at 277:5-8 (Villa, Acee).  Acee said that

T. Martinez had also been charged in Phase 1 for Molina's murder, and that T. Martinez' job was to incapacitate Molina, so J. Montoya and Armenta could stab him. See Jan. 31 Tr. at 277:9-278:4 (Villa, Acee). Acee stated that these four men -- J. Montoya, Armenta, M. Rodriguez, and T. Martinez -- entered plea deals and that, if they cooperate and testify, the judge could reduce their sentences from life imprisonment. See Jan. 31 Tr. at 278:5-279:9 (Villa, Acee).

Acee agreed with R. Perez that B. Cordova was never charged as part of the investigation. See Jan. 31 Tr. at 279:10-23 (Villa, Acee). R. Perez questioned whether, before B. Cordova recorded R. Perez, Acee knew there were rumors that R. Perez was cooperating. See Jan. 31 Tr. at 279:24-280:3 (Villa Acee). Acee recalled that, because R. Perez was not charged for Molina's murder in Phase 1, there were rumors that R. Perez may have cooperated, and agreed that R. Perez' life could have been in jeopardy because of the rumors. See Jan. 31 Tr. at 280:4-25 (Villa, Acee); id. at 281:7-11 (Villa, Acee). Acee stated that sometimes SNM members would take responsibility for crimes they did not commit, and he opined that, while this practice was foolish, people could do it so others would not think they cooperated or to look tough. See Jan. 31 Tr. at 281:19-282:13 (Villa, Acee). Acee said that an SNM member may tell a popular member that he did something that he did not do, so that the popular member spreads this information and precludes rumors of cooperation. See Jan. 31 Tr. at 282:16-283:1 (Villa, Acee).

Acee stated that SNM was divided on killing Molina, and he believed that some people decided to act on killing him. See Jan. 31 Tr. at 283:14-24 (Villa, Acee). Acee said that he was investigating mostly cold cases, and that he was investigating B. Cordova for three homicides, and that, although B. Cordova was not charged federally for any of these murders, he is currently serving a state sentence for one of them. See Jan. 31 Tr. at 284:3-285:2 (Villa, Acee). Acee stated that B. Cordova was also involved in drug trafficking, but that B. Cordova was not charged for

this involvement. See Jan. 31 Tr. at 285:25-286:16 (Villa, Acee). Acee testified that B. Cordova believed Molina should be killed for being an informant, because he believed all informants should be killed. See Jan. 31 Tr. at 285:25-286:16 (Villa, Acee). Acee stated that the FBI put $650.00 into B. Cordova's prison account, at $50.00 per month, for his services as an informant, paid B. Cordova an additional $100.00 for food, and spent $200.00 on procuring a cellular telephone and plan, although Acee stated they did not end up deploying a telephone in B. Cordova's case. See Jan. 31 Tr. at 287:19-25 (Villa, Acee); id. at 289:7-23 (Villa, Acee). Acee stated that B. Cordova could use prison account money to purchase whatever the prison sold at the commissary, although he recognized that prison account money could be used to purchase something at the commissary in exchange for contraband. See Jan. 31 Tr. at 291:2-23 (Villa, Acee). Acee testified that he did not know what B. Cordova purchased, and then the United States stipulated that, a month-and-a-half ago, B. Cordova used "Suboxone,[28] methamphetamine, heroin, spice,[29] and prescription medicines, while incarcerated in Clayton." Jan. 31 Tr. at 293:17-19 (Villa). See Jan. 31 Tr. at 292:3-4 (Acee); id. at 293:20-21 (Castellano). R. Perez then asked Acee whether he attended a "party at PNM for some of the informants," Jan. 31 Tr. at 294:9-10 (Villa), and Acee

---

[28]Acee described Suboxone as "a prescription narcotic to help heroin users." Jan. 31 Tr. at 300:13-14 (Acee). Suboxone is the brand name for a prescription medication containing buprenorphine and naloxone, which is used to treat opioid addiction. See Suboxone, https://www.suboxone.com/ (last visited May 24, 2019). Suboxone has its own dependency and abuse issues, as it "can be abused in a manner similar to other opioids, legal or illicit." Suboxone, supra.

[29]"Spice" is a term used to refer to the synthetic cannabinoid class of drugs, which is produced by spraying dried plant matter with a laboratory-made, mind-altering chemical. See Stephanie Watson, K2/Spice: What to Know About These Dangerous Drugs, WebMD, https://www.webmd.com/mental-health/addiction/news/20180910/k2-spice-what-to-know-about-these-dangerous-drugs (last visited May 24, 2019). Spice binds to the same cannabinoid receptors as marijuana in the brain, but Spice binds "much more strongly and produce[s] more intense effects." Watson, supra.

stated that he attended "some kind of social engagement," with other agents, informants, and informants' family at the PNM, see Jan. 31 Tr. at 294:17 (Acee); id. at 294:8-24 (Villa, Acee); id. at 297:14-15, 23-24 (Villa, Acee).  Acee could not recall which informants attended the gathering, but thought Clark, R. Martinez, Armenta, B. Cordova, Javier Rubio, and Rivera  may have been there.  See Jan. 31 Tr. at 295:2-16 (Villa, Acee); id. at 297:3-6 (Villa, Acee).  Acee stated that he also attended T. Martinez' graduation from college -- he graduated while incarcerated at the Sandoval County Detention Center ("Sandoval County Detention").  See Jan. 31 Tr. at 298:9-12, 18 (Acee).  Acee described Sandoval County Detention as one of the detention centers that houses individuals pending federal charges, and stated that T. Martinez was housed there in the same area as other cooperating witnesses.  See Jan. 31 Tr. at 299:16-300:5 (Villa, Acee).  R. Perez questioned whether Acee knew that T. Martinez was selling Suboxone in Sandoval County Detention, and Acee responded that there was "Suboxone all over that facility."  Jan. 31 Tr. at 300:6-11 (Villa, Acee).  Acee stated that he socialized at these two gatherings "[v]ery minimally," that he arrived, said "Hello," did not eat, and left.  Jan. 31 Tr. at 302:3, 5 (Acee).  See id. at 302:1-6 (Villa, Acee).  Acee said that he did not ask investigative questions and that he stayed for the shortest amount of time that he could, attending to show the men respect.  See Jan. 31 Tr. at 302:12-25 (Villa, Acee).

The Court then took a fifteen-minute break and, while waiting for the jury to return, the United States stated that it would submit to the Court a letter or motion, because it believed "that Mr. Lowry's opening statement has created an issue regarding the conflict of interest."  Jan. 31 Tr. at 304:6-8 (Armijo).  Mr. Lowry maintained that everything he said in opening was part of the public record.  See Jan. 31 Tr. at 304:19-21 (Court, Lowry).  The Court provided that, assuming that Mr. Lowry "rel[ied] on public record information, I wouldn't be inclined to change my ruling."  Jan. 31 Tr. at 305:5-6 (Court).

The jury entered the courtroom, and R. Perez continued his cross-examination, repeating that the FBI paid Molina's killers -- J. Montoya, Armenta, T. Martinez, and M. Rodriguez -- after their cooperation, and that these men will be able to argue for a lesser-than-life sentence. See Jan. 31 Tr. at 306:12-308:4 (Villa, Acee). Acee stated that he outlined the rules the informants would have to follow, and chose to close informants if they did not follow Acee's instructions, because it is hard to trust or control them. See Jan. 31 Tr. at 308:14-309:14 (Villa, Acee). Acee said that he closed B. Cordova for breaking rules, stating: "I don't have trust issues with him. I'm differentiating there. I just closed him because I didn't want to give him any more benefits, and I was no longer interested in keeping him open." Jan. 31 Tr. at 310:11-14 (Acee). See id. at 310:2-8 (Villa, Acee). Acee stated that B. Cordova broke the prison's rules for contact visits. See Jan. 31 Tr. at 311:11-312:2 (Villa, Acee). Acee explained his understanding that, beginning at level 5, inmates do not get contact visits, which are visits where inmates could visit with and touch their family members, although he recognized that each facility has different rules. See Jan. 31 Tr. at 312:19-313:20 (Villa, Acee). Acee provided that, unlike others housed at a level 6, B. Cordova was provided contact visits with his wife and children and, on more than one occasion, had sex with his wife while his children were in the room. See Jan. 31 Tr. at 314:16-24 (Villa, Acee). Acee subsequently closed B. Cordova as an informant. See Jan. 31 Tr. at 316:6-8 (Villa, Acee).

D. Sanchez conducted his cross-examination and inquired whether Acee knew he was turning to the jury to answer the United States' questions and whether he was trained to do so; Acee stated that he thought it was polite, but that he was trained how to testify. See Jan. 31 Tr. at 316:22-317:10 (Jacks, Acee). Acee agreed that, when he testified about the tattoos, that meant the tattoos have some significance. Jan. 31 Tr. at 318:13 (Acee). See id. at 318:8-12 (Jacks). Acee admitted that tattoos are popular in and out of prison, and that New Mexico state prisons are mostly

filled with New Mexicans.  See Jan. 31 Tr. at 318:16-25 (Jacks, Acee).  Acee said that tattoos are

popular in prison, because they display things such as gang membership or pride in things, and

that getting tattooed in prison is common but against the rules.  See Jan. 31 Tr. at 319:11-320:4

(Jacks, Acee).  Acee said that tattoos of partially nude or fully nude women are popular in prison,

because "prison is full of men."  Jan. 31 Tr. at 320:23 (Acee).  See id. at 320:19-22 (Jacks, Acee).

Acee disputed that he said tattoos of guns were popular, believing he merely noted a gun tattoo,

but allowed that such a tattoo would convey violence, power, and toughness.  See Jan. 31 Tr. at

320:23-321:8 (Jacks, Acee).  Acee stated that he believed that tattoos of dollar signs or currency

convey that the bearer values wealth, which is not unique to the prison system.  See Jan. 31 Tr. at

321:16-322:2 (Jacks, Acee).  Acee stated that tattoos of guns, women, and money alone do not

mean more than described, and that they do not mean the bearer is in a gang.  See Jan. 31 Tr. at

322:7-12 (Jacks, Acee).  D. Sanchez put up his tattoo photographs again, noting that Acee did not

discuss the tattoo on D. Sanchez' stomach -- which Acee believed to be a religious tattoo, "a

depiction of The Last Supper."  Jan. 31 Tr. at 323:19-20 (Acee).  See id. at 323:21-22 (Jacks,

Acee).  Acee agreed with D. Sanchez that D. Sanchez' "NM" tattoo is not uncommon among

inmates from New Mexico, noting that D. Sanchez is from Belen, and that the initials, alone, do

not signify gang membership.  Jan. 31 Tr. at 323:23-324:18 (Jacks, Acee).  Acee admitted that the

Zia symbol is on New Mexico's flag and is displayed on many things throughout the state as a

symbol of pride.  See Jan. 31 Tr. at 325:5-22 (Jacks, Acee).  Acee stated that the fact that D.

Sanchez has a Zia tattoo may or may not indicate that D. Sanchez is a member of a prison gang,

because although the Zia symbol has been historically identified with SNM, it is more common

now to see SNM's tattoo as a Zia with an "S."  See Jan. 31 Tr. at 325:23-326:16 (Jacks, Acee).

Baca then showed a photograph of J. Montoya and Acee noted the Zia with an "S" behind J.

Montoya's ear, which tattoo Acee identified as unique to SNM and said that if a non-SNM member displays this tattoo in prison, he would face problems.  See Jan. 31 Tr. at 326:19-327:12 (Jacks, Acee).  Acee identified the same tattoo in a photograph of Calbert on his neck, noting that the "S" on Calbert's chin is another tattoo associated with SNM and that the tattoos' locations are significant, because of their visibility.  See Jan. 31 Tr. at 327:21-328:25 (Jacks, Acee).  D. Sanchez then showed a photograph of R.P. Martinez, and Acee noted the Zia symbol with an "S" over "NM," another tattoo "uniquely associated with the SNM."  Jan. 31 Tr. at 329:6-16 (Jacks, Acee).  Looking at photographs of D. Sanchez again, Acee noted nothing that he believed to be gang-specific.  See Jan. 31 Tr. at 330:1-333:4 (Jacks, Acee).  Acee did not know where D. Sanchez got his tattoos.  See Jan. 31 Tr. at 333:19-23 (Jacks, Acee).

D. Sanchez then asked Acee about Duran, and Acee clarified that Duran assisted with the case by way of an FBI-provided cellular telephone, was released from prison early, relocated with the FBI's help, and worked with a different FBI division until shortly before his arrest in the fall of 2017.  See Jan. 31 Tr. at 334:16-335:18 (Jacks, Acee).  Acee provided that Duran used the cellular telephone to assist the FBI's investigation but also used it to play fantasy football; Acee was not sure if Duran had gambled.  See Jan. 31 Tr. at 336:1-22 (Jacks, Acee).  Acee stated that he did not think Duran used the telephone to have telephone sex with his girlfriend or wife, or to solicit money from women, but Acee admitted that Duran used the telephone to text his family and contact women, including a stripper.  See Jan. 31 Tr. at 337:11-338:9 (Jacks, Acee).  Regarding B. Cordova, Acee said that, before he started cooperating, B. Cordova "would have had contact with at least one" cooperator housed in the same pod, Jan. 31 Tr. at 339:3-4 (Acee), but would not have known about what types of benefits cooperators received, because the cooperator B. Cordova was housed with was a "County informant," Jan. 31 Tr. at 339:13-14 (Acee).  See Jan. 31 Tr. at

338:24-339:14 (Jacks, Acee).  Acee said that he threatened B. Cordova with racketeering charges, but not for a death-penalty eligible offense, and Acee maintained that he did not threaten to charge B. Cordova's brother or promise B. Cordova money or a job upon release.  See Jan. 31 Tr. at 340:5-25 (Jacks, Acee).  Acee stated that B. Cordova asked him whether he could "work on the streets after his cooperation," but Acee did not know where B. Cordova got the idea from and that it was not for him.  Jan. 31 Tr. at 341:13-14 (Acee).  See Jan. 31 Tr. at 340:23-341:25 (Jacks, Acee).

On the subject of witnesses who gave multiple statements, Acee clarified that the details did not change, but, rather, the witnesses expounded on their original statements.  See Jan. 31 Tr. at 342:1-22 (Jacks, Acee).  Acee stated that, for some time, the witnesses had access to the discovery tablets, which contain everything the FBI uncovered in its investigation, including police reports, prison reports, victim statements, witness statements, and recordings.  See Jan. 31 Tr. at 343:3-23 (Jacks, Acee).  Acee agreed that some of the witnesses were housed together and were granted more time together on the tier where they could talk and interact.  See Jan. 31 Tr. at 344:2-345:2 (Jacks, Acee).  Acee said that there were occasions in which he would set up meetings between two inmates -- one cooperating, one not -- to gauge whether the noncooperator would cooperate, but that he did not discuss any benefits with the cooperator about bringing in another cooperator, besides saying that he would make known to prosecutors the extent of any help.  See Jan. 31 Tr. at 345:3-346:24 (Jacks, Acee).

The Court then took the first overnight break, repeating its instructions to the jury not to discuss the trial, not to read or listen to news about the trial, not to do research, and not to talk to anybody involved in the trial.  See Jan. 31 Tr. at 347:15-348:17 (Court).  The next day, February 1, 2018, before the jury entered the courtroom, the Court read a note from Sauer that said, in

substance: "Your Honor, my maiden name is Rodriguez.  Is that a problem?  No relationship."

Transcript of Jury Trial Volume 4 at 4:18-20 (taken February 1, 2018)(Court), filed February 22,

2019 (Doc. 2520)("Feb. 1 Tr.").  The Court stated that it would have its courtroom deputy confirm

with Sauer that she is not related to any of the Rodriguezes mentioned and, if so, tell her that there

is no issue; the parties indicated this procedure was acceptable.  See Feb. 1 Tr. at 4:21-5:4 (Court,

Armijo, Jacks, Villa).  The United States then raised the issue of Mr. Lowry's representation again,

arguing that when Baca began using the prior lawsuit as part of his defense, Mr. Lowry's partner's

representation of Duran became "substantially related and [] materially adverse to" Baca, and that

this conflict cannot be waived.  Feb. 1 Tr. at 7:10-11 (Armijo).  See id. at 6:8-7:15 (Armijo).  The

United States also requested that the First Trial Defendants avoid asking personal questions, such

as where witnesses live.  See Feb. 1 Tr. at 9:15-23 (Castellano).  D. Sanchez requested that, to cure

Acee's comment having pending charges against two First Trial Defendants in another case, the

U.S. Attorney's Office or the Court dismiss these pending charges against D. Sanchez and Baca

so "the Court can truthfully tell the jury that nobody has pending charges."  Feb. 1 Tr. at 11:15-16

(Jacks).  See id. at 11:11-16 (Jacks).  The Court said it would not do that, but told Acee not to

"squeeze anything in" that is not called for by the question.  Feb. 1 Tr. at 11:22-23 (Court).  See

id. at 11:20-25 (Court).  The Court commented that it did not see Acee's comment as creating "a

serious problem," because "there are just so many discussions of cases and charges that are being

thrown at the jury at the very beginning."  Feb. 1 Tr. at 12:9-12 (Court).

The jury entered the courtroom, and D. Sanchez continued his cross-examination.  See Feb.

1 Tr. at 12:15-13:5 (Court).  Acee admitted that whether witnesses' statements changed over time

because they had more time to think about what happened was his conclusion, and Acee admitted

that he did not know what witnesses were actually thinking.  See Feb. 1 Tr. at 13:17-14:14:17

(Jacks, Acee).  D. Sanchez questioned whether people "jazzed up" their statements to get "more from" Acee, Feb. 1 Tr. at 14:19-20 (Jacks), but Acee said that he does not give the witnesses anything, and that they get benefits from the federal government that "don't have anything to do with their statements," Feb. 1 Tr. at 15:2-3.  See Feb. 1 Tr. at 14:18-15:7 (Jacks, Acee).  D. Sanchez asked about terminating FBI informants for abusing their visitation privileges, and Acee explained that he terminated four informants, because they had sexual contact with their girlfriends or wives during the visits in the visiting room at the North PNM.  See Feb. 1 Tr. at 15:23-17:9 (Jacks, Acee).  Acee described the visiting room as being small, with two glass windows, a door, a camera, a table, and two chairs.  See Feb. 1 Tr. at 16:17 (Acee); id. at 17:13-17 (Acee).  Acee believed that B. Cordova had the first inappropriate contact in early 2017 and had at least four incidents, that Clark had one incident of inappropriate contact, and that he believed the visiting room was used for such inappropriate conduct for about a month.  See Feb. 1 Tr. at 19:25-20:6 (Acee); id. at 21:7-10 (Jacks, Acee).

The United States then conducted its redirect examination, eliciting that the FBI does not control the NM Corrections Department, does not house the inmates, and does not oversee the contact visits.  See Feb. 1 Tr. at 21:25-22:12 (Castellano, Acee).  Acee stated that he investigated the inappropriate contact that occurred during the contact visits, and asked New Mexico State Police and Child Protective Services to investigate as well.  See Feb. 1 Tr. at 22:13-21 (Castellano, Acee).  As to interviewing witnesses, Acee said that at subsequent interviews he asks additional questions "to dig deeper into" the witnesses' statements.  Feb. 1 Tr. at 23:20 (Castellano).  See id. at 23:17-21 (Castellano, Acee).  Regarding the division in SNM because Archuleta and Romero, Acee stated that it "eventually rose to the level of the SNM leadership, to Anthony Ray Baca, and he kind of held court over it and determined that the hit on Julian Romero was a good hit."  Feb. 1

Tr. at 25:10-13 (Acee).  See id. at 25:5-21 (Castellano, Acee).  As to the tablet tampering, Acee stated that the tablets were seized and those who had tampered with them no longer had access to discovery.  See Feb. 1 Tr. at 25:22-26:4 (Castellano, Acee).  Acee stated that the FBI moved cooperators for their safety, and that the FBI provided $1,600.00 to M. Montoya to repair his recreational vehicle so that M. Montoya could drive out of New Mexico and relocate.  See Feb. 1 Tr. at 26:11-19 (Castellano, Acee).  As to the cooperator pod, Acee said he believed that at first four cooperators were housed together, and but the number later grew to ten or twelve.  See Feb. 1 Tr. at 27:21-28:3 (Castellano, Acee).

Acee also maintained that he did not threaten witnesses with the death penalty, explaining that all the Defendants charged in this case for murder faced the death penalty, before they were deemed not eligible.  See Feb. 1 Tr. at 26:20-27:9 (Castellano, Acee).  Acee said that he investigated, but did not threaten, Defendants' family for "[w]itness intimidation, threatening informants, and smuggling drugs into the jails and prisons."  Feb. 1 Tr. at 27:18-20 (Acee).  See id. at 27:10-20 (Castellano, Acee).  Acee stated that across all the SNM cases there were about eighty cooperators and they could not be housed in a pod with people they were cooperating against for safety reasons, so the cooperator pod was one of the solutions to that problem.  See Feb. 1 Tr. at 28:149-30:2 (Castellano, Acee).  Acee said that many cooperators had lawyers -- specifically M. Montoya, B. Cordova, G. Urquizo, and R. Martinez -- and that those who were not charged were provided a Kastigar letter[30] before Acee spoke with them.  See Feb. 1 Tr. at 30:10-22

---

[30]Both the United States and the Defendants repeatedly referred to the letters immunizing the United States' witnesses as Kastigar letters, named from Kastigar v. United States, 406 U.S. 441 (1972)("Kastigar").  That term is apparently a misnomer, because, if the Letter from Maria Armijo to John Samore (dated June 9, 2016), filed May 10, 2018 (Doc. 2246)(Clerk's Exhibit 15)("B. Cordova Letter"), is representative, Kastigar letters do not afford the United States' witnesses the immunity that Kastigar requires.  Calling those documents Kastigar letters is accurate, however, in a limited sense.  Those documents explain that permitting the United States

(Castellano, Acee); id. at 31:2-10 (Castellano, Acee); id. at 32:13-17 (Castellano, Acee). Acee then described meeting R. Martinez at the North PNM, after R. Martinez "told the STIU he was done with the gang and he wanted out[,]" Feb. 1 Tr. at 31:13-14 (Acee), and had surrendered a shank upon leaving the pod that he had been carrying in his rectum whenever he left his cell, see Feb. 1 Tr. at 32:9-12 (Acee); id. at 31:11-32:12 (Castellano, Acee).

Acee said that he contacted the district attorney's office that had pending charges against Duran, because Duran needed to be in New Mexico for pretrial hearings and testimony, not ask the office to dismiss the charges. See Feb. 1 Tr. at 33:15-34:4 (Castellano, Acee). Acee also explained that he told informants "if it wasn't recorded, it didn't happen," Feb. 1 Tr. at 34:5-6 (Castellano), "[t]o stress the importance of them wearing a wire or a recording device, and taking that step to make sure they're wearing a wire and turning on a recorder[,]" Feb. 1 Tr. at 34:15-18 (Acee). In Duran's case, Acee stated that the cellular telephone provided did not record everything as Acee told Duran it would, because photographs and internet activity were not captured by the court order. See Feb. 1 Tr. at 34:19-35:14 (Castellano, Acee). Acee said that the recording devices given to informants had no capability to delete recordings, and that he told the informants that he wanted conversations only about homicides and that they needed to conserve battery power, due to the limited ability to provide more batteries . See Feb. 1 Tr. at 36:13-37:25 (Castellano, Acee).

---

to make derivative use of information and to pursue investigative leads is necessary "to eliminate the necessity for a Kastigar hearing at which the government would have to prove that the evidence it would introduce at trial is not tainted." B. Cordova Letter ¶ 2, at 1. See Kastigar Hearing, Black's Law Dictionary (10th ed. 2014)("A hearing at which the prosecution must establish by a preponderance of the evidence that the government's evidence derives from proper, nonimmunized sources.").

Acee described the Kastigar letter's purpose as providing the witnesses with "extra protections so they could go on the record and give us a statement that we would then not use against them," Feb. 1 Tr. at 32:20-22 (Acee), and said it promotes truthfulness, because the Defendant can "speak honestly and freely without those statements being used against him in the Government's case[,]" Feb. 1 Tr. at 33:9-10 (Acee).

Acee also underscored the need to conserve battery power due to a prior incident in which Duran stated he recorded great admissions -- from T. Martinez, M. Rodriguez, Varela, and Armenta -- but when Acee went to download the recordings there were none, because the device's batteries were dead. See Feb. 1 Tr. at 38:2-12 (Castellano, Acee); id. at 39:7-23 (Castellano, Acee). Acee stated that at times he made arrangements with STIU officers he trusted to provide batteries or a new device, and that he was concerned the devices would be found and compromise the investigation. See Feb. 1 Tr. at 40:17-41:18 (Castellano, Acee). Acee characterized the cooperation as staggered over years, with Armenta cooperating early while the Molina murder was still a state case, whereas M. Rodriguez started cooperating "within the last few weeks." Feb. 1 Tr. at 42:12 (Acee). See id. at 41:23-42:13 (Castellano, Acee).

Regarding the Molina murder, Acee said that T. Martinez and Molina were friends. See Feb. 1 Tr. at 42:13-22 (Castellano, Acee). Acee stated that Herrera was not charged in the state case for Molina's murder, and that Herrera was not on video from the blue pod -- where Molina was killed -- because Herrera was housed in the yellow pod. See Feb. 1 Tr. at 35:15-36:12 (Castellano, Acee). Acee testified that seven people admitted to participating in Molina's murder -- Calbert, Urquizo, M. Rodriguez, T. Martinez, Armenta, J. Montoya, and Varela -- and that the United States is accusing four people in the courtroom of murdering Molina. See Feb. 1 Tr. at 48:4-16 (Castellano, Acee); id. at 49:23-50:4 (Court, Castellano, Acee). Acee noted that the cooperators who pled guilty to murder would likely receive life in prison, but are hoping to be sentenced to less than life by testifying. See Feb. 1 Tr. at 43:12-18 (Castellano, Acee). Acee also noted that there could be consequences within SNM for members who claim to have done something they did not. See Feb. 1 Tr. at 43:19-44:6 (Castellano, Acee). As to the three homicides B. Cordova to which B. Cordova is linked, Acee stated that two of the homicides appeared to be

SNM-related: Sammy Chavez' murder and an unnamed Los Carnales prison gang member's murder.  See Feb. 1 Tr. at 44:7-19 (Castellano, Acee).  Regarding the pizza party, Acee said that it was planned by the NM Corrections Department to recognize the cooperators' renunciation of the gang and that it was emotional because family was allowed to attend; Acee said that it lasted an hour, although he was not sure, because he stayed for about fifteen minutes.  See Feb. 1 Tr. at 44:20-45:24 (Castellano, Acee).  Acee thought that T. Martinez' graduation ceremony had cake and ice cream.  See Feb. 1 Tr. at 46:4-13(Castellano, Acee).

Baca then recross-examined Acee, and Acee stated that he was concerned about the safety of cooperators who were not well-behaved.  See Feb. 1 Tr. at 52:5-11 (Lowry, Acee).  Acee admitted that, while some of the cooperators tampered with the discovery tablets to access the internet and he was concerned that they used the tablets nefariously or criminally, he did not obtain a court order to examine the tablets.  See Feb. 1 Tr. at 52:16-53:13 (Lowry, Acee).  Acee said that the U.S. Attorney's Office obtained a court order, but that the tablets are still being evaluated and that he does not know what is on them or whether there was a security threat.  See Feb. 1 Tr. at 53:14-54:7 (Lowry, Acee).  Acee maintained that nobody from the FBI or U.S. Attorney's Office suggested to Urquizo that he faced the death penalty.  See Feb. 1 Tr. at 54:12-19 (Lowry, Acee).  As to inmate telephone call monitoring, Acee testified that the SNM task force monitored the calls, focusing on the noncooperators' calls.  See Feb. 1 Tr. at 54:20-55:9 (Lowry, Acee).  Acee admitted to knowing that J. Montoya had an unauthorized cellular telephone in his cell, but Acee said that he was letting the local drug task force analyze the telephone before he asks to see the contents.  See Feb. 1 Tr. at 55:10-12, 20 (Lowry, Acee); id. at 55:22-56:11 (Lowry, Acee).  Acee also admitted that, even with the use of Kastigar letters, he never knows if somebody is being honest.  See Feb. 1 Tr. at 56:12-21 (Lowry, Acee).  Acee stated that the FBI-provided cellular telephones

could take and receive photographs, which were not covered in the wiretap court order, and agreed with Baca that one could photograph a message written on a piece of paper and send that out, and that the FBI would have no idea what this communication contained. See Feb. 1 Tr. at 56:22-57:22 (Lowry, Acee). Acee testified that he assigned an agent to review the communications, but Acee stated that he did not ask to see the photographs, did not know how many were transferred, and did not know if the photographs contained messages. See Feb. 1 Tr. at 58:2-59:16 (Lowry, Acee).

Acee stated that he asked individuals whether criminal activity was SNM business or personal business, but noted that he was asking for their opinion -- whether the U.S. Attorney's Office or the FBI believes the activity is gang-related is a different matter. See Feb. 1 Tr. at 59:17-60:13 (Lowry, Acee). Acee said that the cooperators may have suggested the pizza party idea, but that he was not aware that the cooperators offered to fund it. See Feb. 1 Tr. at 60:22-61:2 (Lowry, Acee); id. at 61:24-62:16 (Lowry, Acee). Acee did not recall asking the NM Corrections Department to pay for the party, stating that he told Deputy Secretary Myers that he would not pay for it. See Feb. 1 Tr. at 62:17-21 (Lowry, Acee). Acee also stated that, from his observations, the pizza party appeared to be "very emotional and seemed like a big deal for the inmates and their family members." Feb. 1 Tr. at 63:5-6 (Acee). Acee clarified that Duran did not actually get recordings of Varela, and that Acee told Duran to record only conversations on murders and bodies. See Feb. 1 Tr. at 63:14-64:8 (Lowry, Acee). After Acee stated he was not sure if Duran told Acee at their first meeting that Baca wanted Marcantel and Santistevan killed, Baca showed Acee a document that Acee had drafted that says: "Baca was eager to kill the Secretary of Corrections." Feb. 1 Tr. at 65:3 (Lowry). See id. at 64:9-18 (Lowry, Baca); id. at 64:23-65:4 (Lowry, Baca).

Herrera then conducted his recross-examination, and Acee elaborated on the potential penalties of a racketeering conviction, ranging from the death penalty at the highest -- which is unavailable in this case -- to mandatory life imprisonment for various statutory maximums of terms of years. See Feb. 1 Tr. at 66:17-67:13 (Maynard, Acee). Acee said that he ensured that many of the cooperators had attorneys early in the case. See Feb. 1 Tr. at 67:14-20 (Maynard, Acee). Acee also elaborated on his understanding of the Kastigar letters, stating that the U.S. Attorney's Office provides them to immunize a defendant's truthful statements and encourage such truthfulness, and that earlier or future crimes will not necessarily be immunized. See Feb. 1 Tr. at 67:21-68:18 (Maynard, Acee). Acee said that some of the cooperators admitted involvement in prior murders and conspiracies to murder. See Feb. 1 Tr. at 68:19-24 (Maynard, Acee). Acee admitted that there is video of cooperators Armenta and J. Montoya stabbing Molina, but Acee was hesitant to agree that whatever Armenta and J. Montoya said in their Kastigar interviews could not be used against them, because Acee believes that they are not immunized if they lied. See Feb. 1 Tr. at 69:20-70:2 (Maynard, Acee). Acee stated that the U.S. Attorney's Office does not know what is truthful, and that the jury's role is to determine the truth. See Feb. 1 Tr. at 70:3-15 (Maynard, Acee). Acee said that he did not care what witnesses told him, and that he is "searching for the truth." Feb. 1 Tr. at 70:25-71:1 (Acee). See id. at 70:23-71:1 (Maynard, Acee). Acee stated that most cooperators have not yet been sentenced, and that he did not know whether their testimony would affect the sentence. See Feb. 1 Tr. at 71:19-23 (Maynard, Acee).

R. Perez conducted his recross-examination; Acee first discussed how Urquizo entered into a plea, was given a lawyer, and admitted involvement in the Molina murder. See Feb. 1 Tr. at 72:8-24 (Villa, Acee). Acee stated that, when B. Cordova decided to cooperate, B. Cordova did not have a federal attorney and thus had no attorney to defend him against potential racketeering

charges -- although the U.S. Attorney's Office decided not to pursue such charges against him. See Feb. 1 Tr. at 73:5-25 (Villa, Acee). Acee testified that, within a month of B. Cordova's decision to cooperate, B. Cordova recorded R. Perez. See Feb. 1 Tr. at 74:1-4 (Villa, Acee). R. Perez was charged for the first time in this case, and B. Cordova has not had to plead guilty to any federal charges. See Feb. 1 Tr. at 74:5-11 (Villa, Acee). Acee stated that R. Perez was not charged in the state Molina-murder case. See Feb. 1 Tr. at 74:12-18 (Villa, Acee).

During D. Sanchez' recross-examination, Acee said that, while he is not responsible for the NM Corrections Department and does not control it, the NM Corrections Department is working with the FBI to investigate this case. See Feb. 1 Tr. at 75:3-13 (Jacks, Acee). Acee said that R. Martinez became a government informant after R. Martinez told the PNM's STIU he wanted out of the gang life and turned in a shank. See Feb. 1 Tr. at 75:14-76:5 (Jacks, Acee). D. Sanchez underscored that the STIU officers are employees of the NM Corrections Department, that some officers were at the PNM where the inappropriate contact visits occurred, and that Acee has email addresses of and is in telephonic contact with some STIU officers and other NM Corrections Department employees. See Feb. 1 Tr. at 76:6-77:4 (Jacks, Acee). Acee clarified that the U.S. Marshals ordered the discovery tablets' seizure the day after Acee received an email from a cooperator, sometime in early 2017. See Feb. 1 Tr. at 77:5-20 (Jacks, Acee). Acee confirmed that he did not investigate D. Sanchez' family for smuggling drugs into prison or for witness intimidation. See Feb. 1 Tr. at 78:1-4 (Jacks, Acee). Acee did not believe he had arranged a meeting between a cooperator and a Defendant, and testified that he arranged a meeting between Calbert and another cooperator after meeting with Calbert and Calbert agreed to cooperate. See Feb. 1 Tr. at 78:22-80:7 (Jacks, Acee).

The jury left the courtroom for the morning break, and the Court clarified that his courtroom deputy spoke with Sauer, and Sauer confirmed she has no relationship with the witnesses. See Feb. 1 Tr. at 81:16-19 (Court). Herrera raised the issue of late disclosures, noting a 2015 report with Giglio material, and moved to strike the testimony of B. Cordova. See Feb. 1 Tr. at 82:19-23 (Bhalla). See id. at 82:3-23 (Bhalla). Herrera noted that the report contains "a letter from a confidential informant who gives Giglio material on almost every single cooperating witness in this case, which has been redacted and it's completely illegible," Feb. 1 Tr. at 82:13-16 (Bhalla), and the United States responded that the letter was provided in the form received, but it would try to find the original, unredacted letter to produce, see Feb. 1 Tr. at 84:4-9 (Beck). The jury then entered the courtroom. See Feb. 1 Tr. at 84:18-85:8 (Court).

D. Sanchez continued his recross-examination; Acee first agreed that it was important for his informants to get recordings because the recordings would corroborate the informants' claims of what was said. See Feb. 1 Tr. at 86:7 (Acee). See id. at 86:3-6 (Jacks). Acee testified that the door between the yellow and blue pods at Southern New Mexico has to be opened by the monitoring station guards, so inmates cannot use it unless the guards open it. See Feb. 1 Tr. at 86:8-87:5 (Jacks, Acee). Acee said that there is constant video surveillance in the blue pod, which is stored for some period of time unknown to Acee, and that there should be similar video surveillance in the yellow pod. See Feb. 1 Tr. at 87:6-88:14 (Jacks, Acee). Acee reiterated his recollection that Armenta began cooperating during the state prosecution, but he said he did not know the circumstances or terms under which Armenta agreed to cooperate or whether Armenta was offered a reduced 18-month sentence. See Feb. 1 Tr. at 88:15-89:9 (Jacks, Acee). Acee said how he suspected that Varela participated in the Molina murder, and said that while Duran claimed Varela made an admission, Acee was not able to corroborate this with a recording. See Feb. 1 Tr.

at 89:10-90:11 (Jacks, Acee). Acee reiterated that, to his recollection, nobody from the FBI or the

U.S. Attorney's Office mentioned the death penalty to Urquizo. See Feb. 1 Tr. at 91:13-14 (Acee).

See id. at 90:17-91:14 (Jacks, Acee). Acee then stepped down, with the United States noting that

he "is subject to re-call." Feb. 1 Tr. at 91:22-23 (Castellano). See id. at 91:20-21 (Court).

###             d.        **Jerry Roark's Testimony.**

The United States then called Jerry Roark, the Deputy Secretary of the NM Corrections

Department. See Feb. 1 Tr. at 92:20-93:6 (Armijo, Roark). Roark stated that there are eleven

prisons within the NM Corrections Department: six public facilities, two of which are female

facilities, and five private facilities. See Feb. 1 Tr. at 94:10-16 (Armijo, Roark). Roark described

the PNM as primarily housing higher-risk inmates at the PNM North, previously called Level 6,

now called "the Predatory Behavior Management Unit Facility," Feb. 1 Tr. at 95:8-9 (Roark), and

the PNM South, previously called Level 5, now a Level 4 housing "special management

population," Feb. 1 Tr. at 95:15 (Roark), but stated that there is also a Level 2, "work-camp type

facility" there, Feb. 1 Tr. at 95:20 (Roark). See Feb. 1 Tr. at 94:17-95:20 (Armijo, Roark). Roark

stated that "[t]here is a vacated prison called the Old Main," "the original Penitentiary of New

Mexico" which "closed in 1999." Feb. 1 Tr. at 96:2-4 (Roark). This facility is where the

February 2, 1980, Santa Fe prison riot occurred. See Feb. 1 Tr. at 96:16 (Armijo); Feb. 1 Tr. at

96:13-18 (Armijo, Roark). Roark said that the Southern New Mexico is located near Las Cruces,

which is sometimes referred to as "SNMCF" or "Southern." Feb. 1 Tr. at 97:16-98:4 (Armijo,

Roark).

The United States then called Jerry Roark, the Deputy Secretary of the NM Corrections

Roark described how, in the late 1990s, the NM Corrections Department formed a

specialized unit to "gain control" of the prison gangs, because "there was a lot of gang-related

violence" and, from his "own experience[,] the gangs were running the prisons, and we wanted to

get control over that." Feb. 1 Tr. at 98:17-22 (Roark). See id. at 98:8-15 (Armijo, Roark). Roark stated that the NM Corrections Department went through a validation process, which he explained as looking at a group of inmates' "behavior" and "cohesion as a group" so as "to gain enough information on these inmates that we could definitely say that this group of inmates was a threat to our facilities." Feb. 1 Tr. at 99:11-16 (Roark). See id. at 99:3-8 (Armijo, Roark). Roark testified that, as to SNM, the NM Corrections Department conducted "a threat assessment," "identif[ied] members," and took "actions to control their behaviors." Feb. 1 Tr. at 100:23-101:1 (Roark). See id. at 101:2-3 (Armijo, Roark). The controlling actions included validation and then isolation at Level 6, and Roark stated that the inmates could work their way down Level 4, which is the lowest level in which a validated gang member could live. See Feb. 1 Tr. at 101:4-14 (Armijo, Roark). Roark said that the NM Corrections Department created the level system to control inmates' behavior around the same time period as the gang unit. See Feb. 1 Tr. at 101:15-23 (Armijo, Roark). Roark said that Level 6 "was our maximum security," so the inmates that the NM Corrections Department "believed . . . were a threat to commit acts of violence or acts of extortion or anything like that, or inmates who we believe would be victimized by acts of violence" were housed there until around 2014. Feb. 1 Tr. at 102:10-14 (Roark). See id. at 101:24-102:15 (Armijo, Roark). Roark described Level 5 as a step-down from Level 6, as a preparatory stage for Level 4, which is a restricted general population with more privileges than Level 5 or 6, but with isolation from other inmates for their protection. See Feb. 1 Tr. at 102:16-103:7 (Armijo, Roark). In the 1990s, Roark said that the NM Corrections Department was only validating two gangs, SNM and Los Carnales. See Feb. 1 Tr. at 103:8-19 (Armijo, SNM).

Roark described the Southern New Mexico as housing Levels 2 through 4, but never Levels 5 or 6, and that, because it houses Level 4, it has housed gang members. See Feb. 1 Tr. at 103:20-

104:4 (Armijo, Roark).  The United States showed a photograph of "an aerial view of Southern New Mexico." Feb. 1 Tr. at 105:10-11 (Roark).  See id. at 105:8-11 (Armijo, Roark).  Roark noted that most of the buildings marked in red in the photograph are the pods where the inmates are housed.  See Feb. 1 Tr. at 105:18-106:5 (Armijo, Roark).  The United States then showed a diagram of a housing unit at Southern New Mexico, see Feb. 1 Tr. at 106:16-17 (Roark), with "three separate day rooms," called "pods," which are "separated unit[s] within the housing unit," Feb. 1 Tr. at 106:23-107:1 (Armijo, Roark).  Roark noted that each housing unit is split into three pods, with doors connecting the pods to each other.  See Feb. 1 Tr. at 107:6-17 (Armijo, Roark).  Roark explained that there is "an outside door to get into the housing unit[,]" which opens into "a foyer-type area, and then in the foyer you have the three housing unit doors and the control center door." Feb. 1 Tr. at 108:6-9 (Roark).  Roark stated that the housing units at the Southern New Mexico are color-coded, so each pod has an official name provided by letters and an unofficial name provided by the color -- such as the B pod in Unit 1-A being known as blue pod, because it is blue.  See Feb. 1 Tr. at 107:25-109:4 (Armijo, Roark).  The United States showed another diagram, which Roark described as portraying an individual pod, and explained that pods have a top level and a bottom level with eight cells each.  See Feb. 1 Tr. at 109:5-23 (Armijo, Roark).

Roark then discussed privileges at each level, explaining that "the privileges are based on visitation, property, telephone calls, . . . [and] access to programming," and that Level 6 is the most restrictive, with increased privileges as the level number decreases. Feb. 1 Tr. at 110:5-7 (Roark).  See id. at 109:24-110:10 (Armijo, Roark).  Roark defined "tier time" as "allowing inmates out of their cells to congregate with each other," Feb. 1 Tr. at 110:16-17 (Roark), and explained that "they congregate in the day room[,]" Feb. 1 Tr. at 110:24 (Roark).  Roark said that, "[a]t the time that we're talking about, Level 6 inmates did not have tier time," Level 5 inmates had one hour, five

days a week, and Level 4 inmates had between two to four hours, five days a week.  Feb. 1 Tr. at

111:4-5 (Roark).  See id. at 111:6-11 (Armijo, Roark).  Roark explained that "count" means that

inmates "have to stand up," and an "officer walks by and makes sure that they're there, and they're

alive."  Feb. 1 Tr. at 111:16-19 (Roark).  Roark stated that the NM Corrections Department does

six counts a day: (i) 12:00 a.m.; (ii) around 2:00 a.m. or 2:30 a.m.; (iii) 5:00 a.m.; (iv) 11:00 a.m.;

(v) 4:00 p.m.; and (vi) 10:30 p.m.  See Feb. 1 Tr. at 112:1-6 (Roark).  Roark explained that, in

some cases, inmates are not locked in their cells during count, "because we have to feed inmates,"

and "they have to get their clothing washed," and some "inmates [are] out during work during

these counts, too."  Feb. 1 Tr. at 113:14-16 (Roark).  Roark defined "lockdown" as meaning

"inmates are locked in their cells."  Feb. 1 Tr. at 113:12-13 (Roark).

Roark expanded on the NM Corrections Department's gang unit, and explained that its

name now is the STIU and that, in addition to controlling gangs, it is "also doing intelligence

information to gain information on drug trafficking and other types of criminal activity inside the

prison."  Feb. 1 Tr. at 114:11-14 (Roark).  See id. at 114:3-14 (Armijo, Roark).  Roark explained

that drugs enter prison through visitation, staff, the mail, and even "over fences."  Feb. 1 Tr. at

114:22 (Roark).  See id. at 114:20-23 (Roark).  Roark explained that, in 2013, he served as the

Director of Adult Prisons overseeing the eleven facilities, and there was a directive from then-

Secretary Marcantel to reduce the number of inmates in segregation, increase privileges, and

provide more access to programming.  See Feb. 1 Tr. at 113:17-23 (Armijo, Roark); id. at 115:7-

23 (Armijo, Roark).  Roark stated that part of his job included managing the prison gangs and that,

because of his experience working in prison, he knew Baca and that Baca was moved from the

Southern New Mexico to the PNM North in 2013," because of some concerns they had at

Southern."  Feb. 1 Tr. at 116:22-23 (Armijo, Roark); id. at 117:7-13 (Armijo, Roark).  Roark stated

that, in 2013, SNM and Los Carnales were housed at the Southern New Mexico, in separate units, and that in January, 2014, Roark met with Baca -- who Roark knew was an SNM leader -- because Roark wanted to increase SNM's privileges and available programming, and "wanted to engage the interest on them cooperating." Feb. 1 Tr. at 117:24-25 (Roark). See id. at 116:24-117:6 (Armijo, Roark); id. at 117:14-118:7 (Armijo, Roark). Roark explained that he and Baca discussed gang politics, recruitment, and violence, and that Roark had success with Los Carnales in increasing privileges and programming and wanted to do the same with SNM. See Feb. 1 Tr. at 118:12-119:4 (Armijo, Roark). With the Court's limiting instruction,[31] Roark stated that, in response to Roark's proposal, "Baca seemed to be willing to concede that he could control the members of the SNM; that -- that he would be able to control the violence. The only thing that concerned me is that when I asked him about recruiting, he was noncommittal and wouldn't -- actually wouldn't answer that question at all." Feb. 1 Tr. at 120:7-13 (Roark). Roark gave his impression that Baca was not willing to stop recruiting, and so Roark decided to "take a slower path" in increasing SNM's privileges and to keep it "on Tier 1 of Level 4 privileges," whereas Roark "had already begun the process of giving Los Carnales the Level 3 privileges." Feb. 1 Tr.

---

[31]The Court instructed the jury, because the United States offered Baca's statement for its truth, see Feb. 1 Tr. at 119:9-11 (Court, Armijo):

> In this situation where you're going to hear the testimony of Mr. Roark about what Mr. Baca said, it can only be used against Mr. Baca. It can't be used against the other three defendants.

> So I told you in my preliminary instructions to you that there would be times like this. There will be more times, so if in your notes -- if you are taking notes, this might be a good thing to put on your notes, but make certain that this testimony that we're about to receive which is going to be statements by Mr. Baca is only used in reference to him, not against the other three defendants.

Feb. 1 Tr. at 119:14-120:1 (Court).

at 121:13-16 (Roark).  See id. at 120:19-21 (Roark); id. at 121:18-20 (Armijo, Roark).  Roark said

that he believed Baca "would be the most influential member of the SNM," Feb. 1 Tr. at 121:6-7

(Roark), and that Baca said that he wanted to be housed at the Southern New Mexico, see Feb. 1

Tr. at 120:12-121:1 (Armijo, Roark).  With the Court's limiting instruction,[32] the United States

admitted a letter that Baca wrote on February 7, 2014, after the meeting and gave to his

caseworker[33] to give to Roark.  See Feb. 1 Tr. at 123:10-16 (Armijo, Roark); id. at 124:10-12

(Armijo, Roark).  Roark explained that he thought the letter was Baca's attempt to negotiate and

an offer to "maintain a peaceful environment at SNMCF, Level 4" -- to "call a ceasefire between

SNM members" and other gang members housed at the Southern New Mexico, to "put a sudden

halt to the SNM recruiting process if or when SNM members are released to general population,"

and to "prevent SNM members from targeting any and all suspected/validated SNM members who

have or wish to subject themselves to the RPP Program[34]" upon Baca's release from Level 6.

Feb. 1 Tr. at 125:6-7, 9-11, 17-20 (Armijo).  See id. at 124:22-125:1 (Roark); id. at 125:2-21

(Armijo, Roark).  Baca provided a postscript, noting his concern: "The SNMCF and STIU staffs'

negative attitude toward me.  They don't seem to understand me, nor the way I approach various

issues to resolve other problems with no violence.  There is a rush to judgment on their part."  Feb.

---

[32]"But again, it's only -- as well as the testimony that Mr. Roark made about the statements
Mr. Baca made and this letter.  You can't use it against the other three defendants.  You can only
use it in your consideration of the charges against Mr. Baca."  Feb. 1 Tr. at 123:1-6 (Court).

[33]Roark explained that a caseworker is "a classification officer," an employee "who meets
with the inmate regularly" to "assist the inmate, . . . help with the inmate's good time, make sure
the inmate's programming, all those kind of things."  Feb. 1 Tr. at 123:18-23 (Roark).

[34]Roark explained that the RPP Program is the Restoration to Population Program in
Clayton, New Mexico, at the Northeast New Mexican Detention Facility.  Through the RPP, the
NM Corrections Department houses inmates who want to renounce their gang affiliations or are
inactive and do not want to participate in gang life.  See Feb. 1 Tr. at 125:24-126:5 (Roark).

1 Tr. at 126:17-22 (Armijo).   In response to this letter, Roark obtained wardens' and STIU coordinators' advice, and did not change his mind about negotiating with SNM.  See Feb. 1 Tr. at 127:1-8 (Armijo, Roark).   Roark stated that Baca was not moved, SNM's privileges and programming did not change, and, on March 7, 2014, a month after the letter's receipt, Molina was murdered at the Southern New Mexico.  See Feb. 1 Tr. at 127:9-21 (Armijo, Roark).   Roark stated that, after Molina's murder, "all active SNM members [were] placed on lockdown," and that, the next day, the NM Corrections Department moved D. Sanchez, M. Rodriguez, and Varela from the Southern New Mexico to North PNM.  Feb. 1 Tr. at 128:7-8 (Roark).  See id. at 127:22-24 (Armijo); id. at 128:22-129:9 (Armijo, Roark).  A week or two afterwards, Roark testified that the NM Corrections Department moved Baca, D. Sanchez, and Varela out of state "to limit their communications with other inmates inside the system" and "to avoid further acts of violence." Feb. 1 Tr. at 129:14-16 (Roark).  See id. at 129:10-24 (Armijo, Roark).  According to Roark, SNM stayed on lockdown during the investigation, and the NM Corrections Department decided to move SNM from the Southern New Mexico to the PNM, because it is "closer to Central Office, easier to monitor," and more convenient for the Albuquerque-based investigators.  Feb. 1 Tr. at 130:14-15 (Roark).  See id. at 130:3-18 (Armijo, Roark).  The NM Corrections Department made individual determinations to send certain people to the North PNM and others to the South PNM. See Feb. 1 Tr. at 131:6-9 (Armijo, Roark).

The NM Corrections Department slowly granted SNM more privileges -- Roark noted that the visits and telephone calls were cut off "for a significant amount of time," because of worries that SNM "would use these communications to arrange other violent acts."  Feb. 1 Tr. at 132:16-18 (Roark).  See id. at 131:10-22 (Armijo, Roark).  "[W]ithin a couple of hours" of lifting SNM's lockdown at the Southern New Mexico in July, 2015, Villegas assaulted Romero.  Feb. 1 Tr. at

134:11-12 (Roark).  See id. at 134:8-135:1 (Armijo, Roark).  This assault resulted in the NM

Corrections Department placing SNM back on lockdown, statewide.  See Feb. 1 Tr. at 135:2-6

(Armijo, Roark).

Roark stated that the Central New Mexico Correctional Facility ("Central New Mexico")

in Los Lunas, New Mexico, had several missions, including maintaining a "long-term care unit"

for "inmates who need specialized health care." Feb. 1 Tr. at 136:25-137:1 (Roark).  Roark said

that the NM Corrections Department has "transitioned it into a geriatric facility right now."  Feb. 1

Tr. at 137:7 (Roark).  R. Perez elicited from Roark that R. Perez spent time in various hospitals,

including Central New Mexico's long-term care unit, from September 6, 2012, through October 3,

2013, until he moved to Southern New Mexico.  See Feb. 1 Tr. at 139:3-141:21 (Fox-Young,

Roark).  R. Perez questioned Roark whether he recalled communicating to Marcantel the results

of the STIU's investigation into Molina's murder and whether he recalled investigating a threat

against R. Perez.  See Feb. 1 Tr. at 142:23-143:11 (Fox-Young, Roark); id. at 143:25-4 (Fox-

Young, Roark).  Roark recalled forwarding preliminary results of the investigation to Marcantel

and that STIU investigated a threat against R. Perez, because they investigated everything

surrounding the Molina incident.[35]  See Feb. 1 Tr. at 143:4-11 (Fox-Young, Roark); id. at 144:13-

19 (Roark).

------

[35]During a break, outside the presence of the jury and of Roark, Sanchez made a record
about this line of questioning, noting that the Court ruled as testimonial R. Perez' statement about
being threatened, and, therefore, that the statement is inadmissible against Sanchez, Baca, and
Herrera.  See Feb. 1 Tr. at 148:24-149:8 (Jacks).  Sanchez underscored that, if the threat came in
to show Roark's state of mind during Molina's investigation -- which may deal with the hearsay
issue -- the statement is still testimonial, and would violate Sanchez' Sixth Amendment right to
confront and cross-examine R. Perez.  See Feb. 1 Tr. at 149:14-23 (Jacks).  The Court suggested
cautioning Roark not to testify to R. Perez' statement.  See Feb. 1 Tr. at 149:24-150:4 (Court).
The United States said that it had no issue with admonishing Roark, but noted that R. Perez is
"trying to back-door" his hearsay statements, Feb. 1 Tr. at 14 (Castellano), and that R. Perez stated
in his opening statement "that there would be information about a threat to Rudy Perez,"  Feb. 1

Roark testified that M. Rodriguez has a reputation of being fierce, difficult to control, and violent.  See Feb. 1 Tr. at 155:4-10 (Fox-Young, Roark).  Roark stated that R. Perez was in segregation or solitary confinement from March 8, 2014, until April 18, 2016.  See Feb. 1 Tr. at 158:12-14 (Fox-Young, Roark).  Roark could not recall the NM Corrections Department moving R. Perez out of state or ever meeting with R. Perez, and stated that he does not consider R. Perez an SNM leader.  See Feb. 1 Tr. at 158:24-159:9 (Fox-Young, Roark); id. at 159:13-14 (Roark).

Baca reiterated during his cross-examination that the NM Corrections Department moved him from Southern New Mexico to segregation at PNM, because of concerns for Baca's safety. See Feb. 1 Tr. at 162:1-16 (Duncan, Roark).  Roark described the process through which an inmate placed in segregation may request a review of that placement.  See Feb. 1 Tr. at 167:2-169:23 (Duncan, Roark).  Roark stated that he did not document his decision not to return Baca to Southern New Mexico and that Baca did not receive any of the appeal forms from Roark's decision.  See 170:14-23 (Duncan, Roark).  Baca said that, a few weeks after Baca sent Roark the letter, SNM members received an additional contact visit.  See Feb. 1 Tr. at 163:25-164:9 (Duncan, Roark).

Roark stated that there are many criteria for validating someone as an SNM member, and that files are kept on each inmate regarding validation.  See Feb. 1 Tr. at 172:14-22 (Jacks, Roark); id. at 173:2-9 (Jacks, Roark).  Roark conceded that D. Sanchez has not admitted to membership in SNM, and that he was unaware of what D. Sanchez' file said about his validation status as of March 7, 2014.  See Feb. 1 Tr. at 172:23-173:1 (Jacks, Roark); id. at 173:10-19 (Jacks, Roark).  Roark stated that, to prevent further acts of violence after Molina's murder, he moved inmates

---

Tr. at 150:25-151:1 (Castellano).  See Feb. 1 Tr. at 150:11-17, 23-24 (Castellano).  The Court instructed R. Perez' counsel that, if they want to get into the threats against R. Perez, they would need to approach the bench first, because the Court had definitively ruled that the statements are testimonial and hearsay.  See Feb. 1 Tr. at 151:16-19 (Court); id. at 152:1-5 (Court).

whom he believed were "the most necessary to move," including D. Sanchez, although he did not think he had moved "enough people." Feb. 1 Tr. at 175:9, 15 (Roark). See id. at 174:15-175:15 (Jacks, Roark). Roark said that housing suspected and validated SNM members together to try to ensure that the inmates would not have issues with each other. See Feb. 1 Tr. at 176:2-177:4 (Jacks, Roark).

On redirect, Roark stated that the NM Corrections Department, as a matter of policy, routinely segregates inmates when there is a possible threat to their safety, despite the possibility that the threat could be false. See Feb. 1 Tr. at 182:12-183:4 (Armijo, Roark). Roark clarified that he would not have filled out any of the forms on which Baca questioned Roark, because his meeting with Baca was not a formal appeal hearing, but, rather, part of Roark's individual determination to see whether he would work with SNM as he had worked with Los Carnales. See Feb. 1 Tr. at 183:5-19 (Armijo, Roark). Roark maintained that the NM Corrections Department's validation process does not catch every gang member and that there could be gang members who are not validated. See Feb. 1 Tr. at 183:24-184:10 (Armijo, Roark).

As to the pods, Roark testified that concrete walls separate the three pods, but that there are fire exit doors on the bottom and top levels of each pod, connecting the blue pod to the yellow pod, and the yellow pod to the green pod. See Feb. 1 Tr. at 185:6-186:1 (Armijo, Roark). Roark stated that he has seen inmates passing notes under these doors. See Feb. 1 Tr. at 186:2-6 (Armijo, Roark). Roark said that constantly-recording security cameras capture the doors and that this footage is kept in a computer storage system for roughly a month. See Feb. 1 Tr. at 187:5-189:1 (Jacks, Roark). Roark did not know whether these cameras were working on March 7, 2014, but he stated that the NM Corrections Department has since significantly improved the security camera system. See Feb. 1 Tr. at 189:23-9 (Armijo, Roark).

e.    **Gregory Marcantel's Testimony.**

The United States next called Marcantel, who stated that he temporarily took over as Secretary for the NM Corrections Department around September, 2011, was officially appointed in November, 2011, was confirmed in January, 2012, was reconfirmed in 2015, and that he retired in October, 2016.  See Feb. 1 Tr. at 192:4-193:3 (Beck, Marcantel); id. at 218:20-24 (Marcantel). Before he was appointed Secretary, Marcantel worked with the Bernalillo County Sheriff's Office, where he first encountered SNM.  See Feb. 1 Tr. at 193:4-196:10 (Beck, Marcantel).  Marcantel stated that, as Secretary, his responsibility was to the Governor and that he served as executive manager for the entire NM Corrections Department -- consisting of between 2,000 and 2,500 staff, and 7,000 to 7,400 inmates in eleven prisons across the state.  See Feb. 1 Tr. at 197:6-198:6 (Beck, Marcantel).

Marcantel said he realized the need to examine the programming to ensure that inmates rehabilitated and did not reoffend upon release, and that he noticed early in his tenure that New Mexico segregated inmates.  See Feb. 1 Tr. at 190:24-22 (Marcantel, Beck).  Marcantel described segregation as holding an inmate in his or her cell for twenty-three hours a day without social contact.  See Feb. 1 Tr. at 200:24-201:5 (Marcantel).  Marcantel believed that NM Correction Department's use of segregation, and its subsequent focus on keeping the prisons riot-free, stemmed from the 1980 riot.  See Feb. 1 Tr. at 201:9-18 (Marcantel).  Marcantel described increasing the number of family visits, and speaking with the inmates to let them know the expectations from such visits and that, if the inmates broke the rules, the privilege would be taken away.  See Feb. 1 Tr. at 208:8-209:3 (Beck, Marcantel).

Marcantel clarified that Suboxone had come into a prison through a family visit with an SNM member, so he spoke with SNM members to make it clear that, if such smuggling happened

again, they would lose privileges.  See Feb. 1 Tr. at 243:2- 244:1 (Marcantel, Jewkes).  Marcantel explained that Suboxone is used as a substitute for heroin, and is much easier to conceal and transport into prisons than heroin.  See Feb. 1 Tr. at 244:11-245:8 (Marcantel, Jewkes).  He said that narcotics may be smuggled into prisons through family, staff, and the mail.  See Feb. 1 Tr. at 245:17-25 (Jewkes, Marcantel).

Marcantel described the NM Corrections Departments Security Threat Group ("STG") label, which classifies groups, such as different gangs, that are "a direct threat to the prison system." Feb. 1 Tr. at 204:16-17 (Marcantel).  See id. at 204:10-17 (Marcantel).  When Marcantel served as Secretary, the NM Corrections Department had identified two STGs: SNM and Los Carnales.  See Feb. 1 Tr. at 218:9-15 (Beck, Marcantel).  After Molina's murder, Marcantel spoke to Baca, because the murder risked Marcantel's reform efforts and instilled fear into the prison system.  See Feb. 1 Tr. at 210:5-211:4 (Beck, Marcantel).  Marcantel wanted Baca to know that "[y]ou can't kill people in the prison system." Feb. 1 Tr. at 212:9-10 (Marcantel).  Marcantel also spoke to D. Sanchez for the same reason.  See Feb. 1 Tr. at 213:13-15 (Marcantel).  Marcantel testified that neither Baca nor D. Sanchez said anything when he spoke to them.  See Feb. 1 Tr. at 210:12-13 (Beck, Marcantel); id. at 213:10-12 (Beck, Marcantel).

After the lunch break, before the jury entered the courtroom, Herrera elaborated on the Giglio issue, confirming that the Baca letter had not been disclosed previously and maintained that "this is a letter with Giglio material that, at this point, is going on three years old." Feb. 1 Tr. at 228:10-11 (Bhalla).  See id. at 228:3-11 (Court, Bhalla).  Herrera accordingly renewed his request to strike B. Cordova's testimony.  See Feb. 1 Tr. at 230:1-3 (Bhalla).  The United States explained that it had just received the letter within the last week as part of a large file, because of issues with

the NM Corrections Department showing up with new documents, and that a legible copy of the letter would be disclosed.  See Feb. 1 Tr. at 230:6-18 (Beck).

With the jury in the courtroom, Marcantel admitted that, toward the end of his tenure as Secretary, the majority of correctional officers voted that they had no confidence in Marcantel. See Feb. 1 Tr. at 221:14-24 (Lowry, Marcantel).  Marcantel stated that, in 2015, he invited a television show into the prisons so that the corrections staff would be better appreciated, to fuel his push for more funding to provide the staff with raises and to increase staffing levels, and to provide the public with an idea of what prison is like.  See Feb. 1 Tr. at 209:11-210:4 (Beck, Marcantel).  Marcantel believed filming occurred in 2015, and said that, for the most part, the television series' production team had access to the entire facility and filmed everything that happened.  See Feb. 1 Tr. at 222:4-223:2 (Lowry, Marcantel).  The show's season two finale included the arrests in this case, and Marcantel testified that he recommended that Acee and Ms. Armijo review the episode before it aired.  See Feb. 1 Tr. at 225:8-226:21 (Lowry, Marcantel). Marcantel said that he spoke with Acee fifteen times over the course of the investigation and with Ms. Armijo about five times.  See Feb. 1 Tr. at 232:5-13 (Lowry, Marcantel).  Marcantel did not recall attending a pizza party with the cooperators.  See Feb. 1 Tr. at 255:4-7 (Lowry, Marcantel).

### f.    Manuel Jacob Armijo's Testimony -- February 1, 2018.

At the bench, outside the hearing of the jury, Baca requested that the Court exclude the additional James statements from Armijo,[36] which the United States disclosed for the first time on

---

[36]A "James statement" is an out-of-court statement made by a co-conspirator.  See United States v. James, 590 F.2d 575, 577 (5th Cir. 1979).  To admit out-of-court statements by co-conspirators under rule 801(d)(2)(E) of the Federal Rules of Evidence, "the United States must demonstrate by a preponderance of the evidence that: (i) a conspiracy existed; (ii) the declarant and the defendant were members of that conspiracy; and (iii) the statements that the United States seeks to admit were made during the course and in furtherance of the conspiracy." United States

January 28, 2018.  See Feb. 1 Tr. at 256:16-22 (Duncan).  The United States explained that it had

overlooked these statements, which is why they were disclosed late.  See Feb. 1 Tr. at 258:4-9

(Castellano).  Baca said that his primary objection is the late disclosure, and noted that the defense

learned that Armijo would be a witness only two days ago, because he was on the "may call" --

not the "will call" -- witness list.  Feb. 1 Tr. at 259:2-11 (Duncan).  Baca maintained that the

additional statement, which goes to the Marcantel murder conspiracy, is unfair and prejudicial.

See Feb. 1 Tr. at 259:21-260:6 (Lowry).  The Court said that it would allow Armijo to testify to

the additional statements, subject to recall in a week to give Baca time to adjust to the new

information.  See Feb. 1 Tr. at 263:5-20 (Court); id. at 263:24-264:7 (Court, Lowry, Castellano).

In open court, Armijo -- who is out of prison on conditions of release and wore an ankle bracelet

-- stated that the United States charged him with racketeering and conspiracy, and that he pled

guilty and agreed to cooperate.  See Feb. 1 Tr. at 265:14-24 (Castellano, Armijo); id. at 321:20-

322:7 (Castellano, Armijo).  Armijo stated that he is currently forty-four years old, and has spent,

in total, twenty-seven to twenty-eight years incarcerated.  See Feb. 1 Tr. at 284:19-25 (Castellano,

Armijo).  Armijo later said, however, that he spent twenty-two years in prison.  See Feb. 1 Tr. at

340:20-22 (Jewkes, Armijo).  Armijo stated that the United States has not provided him money in

exchange for his cooperation and that, while out on conditions of release, he violated with a dirty

urinalysis for heroin three times.  See Feb. 1 Tr. at 322:12-323:9 (Castellano, Armijo).  Armijo

said that he used the heroin when the hydrocodone prescribed for the arthritis in his back, hands,

and feet did not sufficiently remove the pain.  See Feb. 1 Tr. at 323:10-15 (Castellano, Armijo).

Besides his arrest for the conditions violation and his arrest during the racketeering roundup,

---

v. Vigil, No. CR 05-2051, 2006 WL 4109681, at *3 (D.N.M. Aug. 31, 2006)(Browning, J.)(citing
United States v. Sinclair, 109 F.3d 1527, 1533 (10th Cir. 1997)).

Armijo has not been in prison since 2012. See Feb. 1 Tr. at 323:22-324:18 (Castellano, Armijo). Armijo started cooperating about four months after the roundup, because he was tired of the backstabbing and disloyalty in SNM, and he pled guilty in March, 2017, pursuant to a plea agreement through which Armijo expects to receive a reduced sentence of under twenty years. See Feb. 1 Tr. at 348:1-20 (Armijo, Jewkes); id. at 370:7-9 (Duncan, Armijo). Under the plea agreement's addendum, Armijo acknowledged that he agreed to give truthful, complete information, and so if he exaggerated or minimized somebody's involvement, it would violate his plea agreement. See Feb. 1 Tr. at 373:11-374:7 (Castellano, Armijo).

Armijo decided to join the gang in 1993, because the gang looked out for each other, and, to do so, he had to "move on" -- meaning "assault, stab, or kill" -- a Los Carnales gang member. Feb. 1 Tr. at 268:20, 24 (Armijo). See id. at 266:10-15 (Castellano, Armijo); id. at 268:16-25 (Castellano, Armijo); id. at 353:14-354:12 (Maynard, Armijo). Armijo explained that he never had the chance to "move on" a Los Carnales member, because he got in an altercation with a correction officer, was transferred to a different prison, and thus was only a prospect for SNM membership. Feb. 1 Tr. at 269:9-14 (Castellano, Armijo); id. at 272:1-4 (Castellano, Armijo). Armijo was eventually moved to a pod in Southern New Mexico and housed with Angel Munoz, SNM's leader at the time, whom Armijo was responsible for protecting, because Armijo was big and a good fighter. See Feb. 1 Tr. at 270:6-271:15 (Castellano, Armijo). Armijo testified that he would have assaulted on the spot anybody who disrespected A. Munoz. See Feb. 1 Tr. at 271:23-25 (Castellano, Armijo). In 1994-1995, Armijo also collected heroin, marijuana, and money from inmates and SNM members for A. Munoz, because the members were expected to share with their leader, and SNM was a powerful gang in the prison drug trade. See Feb. 1 Tr. at 272:5-273:9 (Castellano, Armijo). Sometime in 1996, while out of prison, Armijo became an official SNM

member after stabbing two Los Carnales members with a knife.  See Feb. 1 Tr. at 273:10-275:19

(Castellano, Armijo).   Sometime after these assaults, Armijo and A. Munoz attended a party

together, and a man started disrespecting A. Munoz, so Armijo stabbed him -- which Armijo

testified was expected of him as an SNM member.  See Feb. 1 Tr. at 276:6-24 (Castellano, Armijo).

        Armijo described how, to join SNM, three members first have to approve of a prospect.

See Feb. 1 Tr. at 275:20-24 (Castellano, Armijo).  Armijo stated that it was SNM policy to "hit on

sight any rival gang members," even outside of prison.  Feb. 1 Tr. at 274:21-22 (Armijo); id. at

274:23-24 (Castellano, Armijo).  Besides Los Carnales, SNM also disliked the Burquenos gang.

See Feb. 1 Tr. at 286:12-16 (Castellano, Armijo).  SNM would attack its own members, "[i]f they

were no good, if they had paperwork on them, [or if they were] child molesters."  Feb. 1 Tr. at

278:2-3 (Armijo).  "Paperwork," Armijo said, showed that a member was a "rat."  Feb. 1 Tr. at

278:4-6 (Castellano, Armijo).  Armijo stated that, while often members wanted to see "paperwork"

establishing that a person "snitched," or cooperated with the government against SNM, before

moving on that person, there was a faction within SNM willing to move on somebody without the

"paperwork."  Feb. 1 Tr. at 332:7-20 (Villa, Armijo).  SNM also did not tolerate sex offenders,

homosexual behavior, or members who did not follow orders.  See Feb. 1 Tr. at 278:17-23

(Castellano, Armijo).  Further, people who entered protective custody[37] were considered "no

good" and going into protective custody would create problems for those people, even after

moving to a new pod or facility.  Feb. 1 Tr. at 290:24-291:10 (Castellano, Armijo).  Armijo stated

that disobeying an order to move on a rival gang member likely meant being stabbed or killed.

See Feb. 1 Tr. at 280:1-7 (Castellano, Armijo).  Further, SNM would kill a member who reported

---

[37]Armijo stated that, when somebody does not "want to be in the pod or facility, [he will] either go to a CO [(correctional officer)] or write a note to the CO saying that [his] life is in danger and [he] can't be in there."  Feb. 1 Tr. at 290:20-23 (Armijo).

a planned murder or physically attempted to stop it.  See Feb. 1 Tr. at 328:20-329:7 (Villa, Armijo).

Armijo said that SNM was the largest, toughest, most violent gang in the prison system during his

stints of incarceration.  See Feb. 1 Tr. at 297:4-10 (Castellano, Armijo).  He testified that

correctional officers who insulted SNM members were assaulted.  See Feb. 1 Tr. at 375:11-21

(Castellano, Armijo).

Armijo testified that he was "very close" with A. Munoz and, through that relationship,

learned about SNM's history.  Feb. 1 Tr. at 219:16 (Armijo).  See id. at 319:17-19 (Castellano,

Armijo).  Armijo said that SNM "was born after the riots, the '80 riots, that happened in the main,"

Feb. 1 Tr. at 319:22-23 (Armijo), and that it was originally "a group of guys that took care of each

other and that tried to represent the inmates," Feb. 1 Tr. at 319:25-320:2 (Armijo), in an attempt

to get "better living conditions, better food, better everything," Feb. 1 Tr. at 320:4-5 (Armijo).  It

eventually grew from this brotherhood against the administration, although Armijo believed that

drugs caused issues within the gang, and cited bickering and taking sides as a problem which he

had with SNM.  See Feb. 1 Tr. at 320:6-321:11 (Castellano, Armijo).  Over the years, as the old-

timers died, SNM members wanted to make their own rules and started putting "hits" on each other

for personal reasons, which Armijo said he did not like.  Feb. 1 Tr. at 352:17-353:13 (Maynard,

Armijo).

As to drugs, Armijo stated that C. Garcia supplied SNM members with drugs, and that

Armijo himself had used heroin, methamphetamines, and cocaine.  See Feb. 1 Tr. at 280:8-281:3

(Castellano, Armijo).  Armijo admitted to using drugs while in prison.  See Feb. 1 Tr. at 282:4-7

(Castellano, Armijo).  Armijo said that SNM would get prison guards to bring in drugs for them.

See Feb. 1 Tr. at 292:18-23 (Castellano, Armijo).  Further, sometime in 2014 or 2015, Armijo sent,

three or four times, Suboxone strips through the mail to Archuleta in Tennessee.  See Feb. 1 Tr. at

309:6-24 (Castellano, Armijo).    Next, Armijo was asked whether he was aware of any disagreements between Archuleta and Romero.    Armijo stated that, when Romero got out of prison, he visited Archuleta's wife to pick up drugs for his own use and to send into prison, but Romero "hook[ed] up" with Archuleta's wife, which caused a split within SNM, although it remains one gang.  Feb. 1 Tr. at 312:1-313:9 (Castellano, Armijo).

Armijo provided that, from 2011 to 2012, Armijo was in Southern New Mexico with Baca, whom Armijo described as "t[aking] the keys over."  Feb. 1 Tr. at 293:16-17 (Armijo).  See id. at 293:4-10 (Castellano, Armijo).  This term means "[t]aking over leadership," as does "llavero," meaning "[s]omeone who has the keys, who is driving the car, which is the leader."[38]  Feb. 1 Tr. at 294:1, 5-6 (Armijo).  The member with the keys in the pod has "to keep everybody in line and to make decisions."  Feb. 1 Tr. at 295:1-2 (Armijo).  From 2010-2012, Armijo was in charge of a pod at Southern New Mexico.  See Feb. 1 Tr. at 295:3-9 (Castellano, Armijo).  Armijo named SNM members who have been higher in command: A. Munoz, Marty Barros, Juan Baca, Jacobo Armijo, Archuleta, Razor Ramon, and Baca.  See Feb. 1 Tr. at 294:7-22 (Castellano, Armijo).  Armijo believed A. Munoz was "one of the founding fathers that founded the SNM."  Feb. 1 Tr. at 319:12-13 (Armijo).  Armijo knew Barros, J. Baca, and Jacobo Armijo as the other founding fathers.  See Feb. 1 Tr. at 321:15-17 (Armijo).  Armijo named Herrera, Baca, and D. Sanchez as SNM members, but he did not know whether R. Perez is an SNM member.  See Feb. 1 Tr. at

---

[38]"Llavero" is the Spanish word for keyring, see Llavero, http://www.spanishdict.com/translate/el%20llavero (last visited Jan. 4, 2019), or as SNM uses it, a key-holder, see M. Rodriguez Tr. at 353:2-3 (Villa, M. Rodriguez).  The United States' witnesses explained that, in the SNM, "it was the llavero's job to enforce orders to assault and murder people."  United States' Response to Daniel Sanchez's Motion for Judgement of Acquittal or, in the Alternative, a New Trial at 4 (Doc. 2408), filed November 26, 2018 (Doc. 2451).

302:16-303:19 (Castellano, Armijo).  Armijo verified that one could be an SNM member without the NM Corrections Department's validation.  See Feb. 1 Tr. at 315:1-3 (Castellano, Armijo).

Armijo said the SNM pod structure at Southern New Mexico had three pods -- blue, yellow, and green -- in the same building, separated by walls, with doors connecting each pod.  See Feb. 1 Tr. at 299:7-15 (Castellano, Armijo).  These doors fostered communication with people in the next pod, because the inmates could speak through the crack in the door or pass things under the door -- such as drugs, shanks, or letters -- through the inch-high crack at the bottom, by knocking and calling someone over.  See Feb. 1 Tr. at 299:16-300:20 (Castellano, Armijo).

Armijo provided that, until his release in 2012, he was housed in the blue pod at Southern New Mexico with R. Perez, whom Armijo recalled had health problems and slept a lot in his room.  See Feb. 1 Tr. at 325:8-326:14 (Villa, Armijo).  Armijo said M. Rodriguez was not at Southern New Mexico at that time, but that they had met at the PNM North facility sometime before 2012, and that M. Rodriguez had a reputation within SNM for being crazy, handling his business, and being scary.  See Feb. 1 Tr. at 326:17-327:15 (Villa, Armijo).  Molina was housed, however, in the blue pod in 2012.  See Feb. 1 Tr. at 330:22-24 (Villa, Armijo).  Armijo stated that news and rumors spread fast within prison, and that a rumor that somebody "snitched" could get that person killed.  Feb. 1 Tr. at 331:20-332:1 (Villa, Armijo).  See id. at 332:21-25 (Villa, Armijo).  Further, sometimes SNM members would take responsibility for doing something that they did not do.  See Feb. 1 Tr. at 333:1-7 (Villa, Armijo).  This lying could also get the members in trouble with the gang.  See Feb. 1 Tr. at 340:6-14 (Jewkes, Armijo).

Armijo testified that correctional officers rarely pay attention to what occurs in the pods and play on their telephones as long as the inmates do what they were supposed to do and behave.  See Feb. 1 Tr. at 341:10-25 (Jewkes, Armijo).  Armijo maintained that drugs were constantly in

prison -- with heroin and marijuana most prevalent in "the old days," and Suboxone prevalent now. Feb. 1 Tr. at 343:2-9 (Jewkes, Armijo).   Armijo admitted to some parts of his criminal history -- including assault, burglary, and escape from jail -- but contended that he did not commit battery upon a police officer, because the description of the offender was much smaller than himself.  See Feb. 1 Tr. at 349:11-351:21 (Jewkes, Armijo); id. at 352:3-5 (Armijo).  Duncan also went through Armijo's criminal history, to underscore why the Court initially detained Armijo pending trial.   See Feb. 1 Tr. at 363:13-365:16 (Duncan, Armijo).   Then, after Armijo began cooperating, the Court released Armijo, with the United States' withdrawing its opposition, and the Court imposed conditions of release -- which Armijo broke by using heroin.  See Feb. 1 Tr. at 367:17-368:19 (Duncan, Armijo).

Upon the completion of the United States' redirect, Baca had a few more questions, but the Court decided to break for the evening and excused the jury.  See Feb. 1 Tr. at 378:1-17 (Court, Duncan, Castellano).   Baca briefly conducted his re-cross examination, obtaining Armijo's understanding that, to get a reduced sentence, the United States first has to file a motion for a downward departure, which is a decision entirely within the Assistant United States Attorneys' control.  See Transcript of Jury Trial Volume 5 at 14:11-18 (taken February 2, 2018)(Duncan, Armijo), filed February 22, 2019 (Doc. 2521)("Feb. 2 Tr.").   The Court then excused Armijo, subject to recall.  See Feb. 2 Tr. at 15:15-19 (Court).

g.    **Antonio Palomares' Testimony.**

The United States next called Palomares, a sergeant with the New Mexico State Police ("NM State Police") Investigations Bureau.  Feb. 2 Tr. at 16:5-6 (Armijo); id. at 16:22-17:2 (Armijo, Palomares).  Palomares testified that the NM State Police handle investigations out of Southern New Mexico, because it is a state facility.   See Feb. 2 Tr. at 18:11-21 (Armijo,

Palomares).  On March 7, 2014, Palomares' supervisor appointed him case agent -- the person who oversees the investigation -- on a homicide that occurred at Southern New Mexico.  See Feb. 2 Tr. at 18:22-19:9 (Armijo, Palomares).  Palomares arrived at Southern New Mexico with other NM State Police agents, and learned that Molina had been stabbed and transported to Memorial Medical Center in Las Cruces.  See Feb. 2 Tr. at 19:16-23 (Palomares).  The agents planned to process the scene for evidence, get statements from inmates, and talk to correctional officers.  See Feb. 2 Tr. at 20:18-21:3 (Palomares).  Upon arriving at the scene around 6:40 p.m., Palomares received a call from the agent who responded to the hospital, who told him that Molina had died. See Feb. 2 Tr. at 21:23-22:2 (Palomares); id. at 23:4-7 (Palomares).  Around 2:00 a.m. or 3:00 a.m. the next morning, the agents started interviewing inmates; they interviewed about ten inmates and two or three correctional officers.  See Feb. 2 Tr. at 23:14-24:2 (Armijo, Palomares).  The inmate interviews lasted between two and five minutes, and Palomares stated that nobody provided any helpful information.  See Feb. 2 Tr. at 25:11-20 (Armijo, Palomares).  Palomares stated that, after this, he had suspects but did not make immediate arrests.  See Feb. 2 Tr. at 24:3-10 (Armijo, Palomares).  Palomares had been advised that Molina was an SNM member, but did not look at the homicide from a gang angle.  See Feb. 2 Tr. at 26:4-15 (Armijo, Palomares).

At some point, New Mexico charged M. Rodriguez with conspiracy and having a weapon in a correctional facility, and charged Armenta and J. Montoya with first-degree murder.  See Feb. 2 Tr. at 26:16-27:4 (Armijo, Palomares).  Palomares continued his investigation after filing charges, and served these three inmates and T. Martinez with DNA search warrants, based on Palomares' ability to identify them in a video of the incident that correctional officers had given him.  See Feb. 2 Tr. at 27:5-19 (Armijo, Palomares).  In October, 2015, Palomares interviewed Armenta at Armenta's request, but M. Rodriguez and J. Montoya did not cooperate.  See Feb. 2

Tr. at 28:2-29:9 (Armijo, Palomares).  Eventually, these charges were dismissed, because the charges were brought at the federal level.  See Feb. 2 Tr. at 29:10-18 (Armijo, Palomares).

Palomares stated that the homicide occurred in the blue pod -- or 1-A B pod.  See Feb. 2 Tr. at 34:2-10 (Villa, Palomares).  R. Perez then began playing the video of the incident, and Palomares noted that the video was dated March 7, 2014, and time stamped 17:14:59 -- or 5:14 p.m.  See Feb. 2 Tr. at 35:5-17 (Villa, Palomares).  R. Perez paused the video at time stamp 17:15:53, and noted a nurse coming from R. Perez' cell, whom Palomares stated was giving R. Perez medication.  See Feb. 2 Tr. at 37:22-38:9 (Villa, Palomares).  At 17:16:32, Palomares identified M. Rodriguez and Molina as they entered Molina's cell.  See Feb. 2 Tr. at 39:12-13 (Villa, Palomares).  At 17:16:39, Palomares identified Armenta walking up the stairs.  See Feb. 2 Tr. at 40:18-25 (Villa, Palomares).  At 17:17:38, Palomares identified J. Montoya walking up the stairs.  See Feb. 2 Tr. at 41:20-25 (Villa, Palomares).  At 17:18:24, Palomares identified Molina standing outside his cell and M. Rodriguez on the upper level, and, at 17:18:36, both entered Molina's cell to join T. Martinez, who was already there.  See Feb. 2 Tr. at 42:16-43:23 (Villa, Palomares).  At 17:18:54, Palomares identified Armenta as the person sitting down after walking up the stairs, and, at 17:19:09, J. Montoya as the person walking up the stairs and sitting next to Armenta.  See Feb. 2 Tr. at 44:4-17 (Villa, Palomares).  Palomares verified that, at 17:20:04, Armenta and J. Montoya stood and walked toward Molina's cell, and then, at 17:20:18, entered the cell and, at 17:20:31, T. Martinez walked from the cell's direction toward the stairs.  See Feb. 2 Tr. at 45:6-46:4 (Villa, Palomares).  At 17:20:56, Molina appears at the top of the stairs with something on his chest, which Palomares identified as blood, with J. Montoya coming up behind him and M. Rodriguez standing near the railing.  See Feb. 2 Tr. at 48:6-24 (Villa, Palomares).  At 17:21:02, Palomares identified J. Montoya attacking Molina, and at 17:21:19, Armenta heads back

toward Molina and M. Rodriguez walked into the shower area.  See Feb. 2 Tr. at 49:4-18 (Villa, Palomares); id. at 50:17-25 (Villa, Palomares).  Palomares said that the investigation of the scene uncovered a shank in the shower drain, which Palomares believes was used to stab Molina.  See Feb. 2 Tr. at 51:5-15 (Villa, Palomares).  Palomares confirmed that R. Perez is not seen at any point in this video or the video from another angle.  See Feb. 2 Tr. at 52:4-11 (Villa, Palomares).

R. Perez then walked Palomares through the video taken from a different angle.  See Feb. 2 Tr. at 53:8-54:5 (Villa, Palomares).  R. Perez again stopped the video at various times to have Palomares identify who was on the screen and what was occurring, noting the same conduct from the first video.  See Feb. 2 Tr. at 54:9-63:6 (Villa, Palomares); id. at 63:16-66:2 (Villa, Palomares).  Palomares clarified that, at 17:18:22, Molina's cell door closes, and that a correctional officer controls this action the opposite side of the pod.  See Feb. 2 Tr. at 59:12-22 (Villa, Palomares).  Palomares also noted that, from the video's angle, M. Rodriguez, Molina, and T. Martinez are seen entering Molina's cell.  See Feb. 2 Tr. at 60:16-61:5 (Villa, Palomares).  Palomares stated that the initial investigation uncovered three weapons -- one from the shower and two from the downstairs trashcan -- and that, on March 10, 2014, investigators collected an additional two weapons in the wall connecting the top and bottom tiers near Molina's cell.  See Feb. 2 Tr. at 68:2-69:6 (Villa, Palomares).  Palomares said that he had not heard anything about threats against R. Perez.  See Feb. 2 Tr. at 70:4-8 (Villa, Palomares).

During the first break, with the jury outside the courtroom, the Court cautioned Marcantel not to talk while in the galley, because it distracts the jury.  See Feb. 2 Tr. at 72:2-9 (Marcantel, Court).  D. Sanchez then conducted his cross-examination, and Palomares clarified that the crime scene team, and not he, was responsible for collecting the physical evidence and that the crime scene supervisor in this case was Norman Rhoades -- who was present at Southern New Mexico

on March 7, 2014,  see Feb. 2 Tr. at 76:9-77:11 (Jewkes, Palomares).  Palomares stated that, within an hour and a half after his arrival at Southern Correctional on March 7, 2014, he watched the video shown to the jury.  See Feb. 2 Tr. at 77:17-23 (Jewkes, Palomares).  Palomares explained that two cameras were operating that day, one on the right side of the pod and one on the left, and that they produced the same video from different angles.  See Feb. 2 Tr. at 78:5-22 (Jewkes, Palomares).  D. Sanchez questioned why, with security cameras operating constantly, Palomares did not collect video from before or after the assault, and Palomares explained that he was focused on solving the homicide and that there was no need to get additional recordings.  See Feb. 2 Tr. at 79:12-24 (Jewkes, Palomares).  Palomares stated that he initially had no reason to believe that "paperwork" had passed before the assault, but, a year later, when he learned of this fact, he did not attempt to secure video from before the assault, because the FBI was already assisting with the investigation.  Feb. 2 Tr. at 79:25-80:15 (Jewkes, Palomares).  Palomares noted that D. Sanchez is in the common area standing next to a table in the video, but that the video does not show D. Sanchez entering Molina's cell.  See Feb. 2 Tr. at 85:9-86:4 (Jewkes, Palomares).  Herrera showed Palomares a letter that Armenta wrote to J. Montoya's lawyer, which Palomares did not recall seeing before his trial testimony, and which Palomares admitted would have been important to his investigation.  See Feb. 2 Tr. at 89:22-90:3 (Bhalla, Palomares); id. at 90:11-19 (Bhalla, Palomares).

During its re-direct examination, the United States pulled up the video from the second camera view at 17:21:02 and circled an individual, whom Palomares identified as D. Sanchez.  See Feb. 2 Tr. at 91:10-21 (Armijo, Palomares).  Palomares indicated that he interviewed R. Perez on March 10, 2014, and that R. Perez said he was an SNM member and was in his cell during the Molina incident.  See Feb. 2 Tr. at 93:24-95:9 (Armijo, Palomares).  R. Perez told Palomares

during this interview that the STIU took away his walker because a piece was missing, explaining

that he was in the shower when somebody took the piece and that "he had an idea who took" the

piece, but did not give Palomares a name, and that he would "handle it on his own." Feb. 2 Tr. at

96:1-2 (Palomares). See id. at 95:10-96:4 (Armijo, Palomares). At this point, D. Sanchez objected

on Sixth Amendment to the Constitution of the United States of America grounds and hearsay

grounds, and the Court provided a limiting instruction.[39] See Feb. 2 Tr. at 96:9-20 (Jacks, Court).

R. Perez conducted his re-cross examination, and asked about R. Perez' statements to Palomares

in this interview, and the Court provided the same instruction. See Feb. 2 Tr. at 97:7-16 (Villa,

Jacks, Court). Palomares admitted that, if R. Perez had given him a name as to whom he believed

took the piece from his walker, Palomares would have included this information in his police

report, which possibly could have put R. Perez in danger. See Feb. 2 Tr. at 98:18-22 (Villa); id.

at 99:2-10 (Palomares, Villa). Palomares stated that he believed the STIU also spoke with R. Perez

about his walker, which caused R. Perez to ask whether Palomares knew R. Perez told the STIU

that he was threatened. See Feb. 2 Tr. at 99:11-17 (Villa, Palomares). This question drew

objections from the United States and D. Sanchez, so the parties approached the bench. See Feb.

2 Tr. at 99:18-23 (Armijo, Villa, Jacks, Court).

Outside the jury hearing, R. Perez maintained that he was attempting to introduce his

statement to the STIU to impeach R. Perez' statement to Palomares and that, before he can admit

the statement through a STIU agent, he must ask Palomares whether he knows about the statement.

See Feb. 2 Tr. at 100:17-101:22 (Villa, Court). Palomares came to the bench and stated that he

---

[39] The Court advised the jury: "Ladies and gentlemen, these statements that Mr. Palomares is reciting that Mr. Perez made can only be used against Mr. Perez. They can't be used against any of the other three gentlemen in the courtroom. So it can only be used in your deliberations about Mr. Perez." Feb. 2 Tr. at 96:15-20 (Court).

does not know if R. Perez made a statement to STIU about being threatened when the piece was taken from his walker.  See Feb. 2 Tr. at 102:7-11 (Villa, Palomares).  D. Sanchez noted that R. Perez elicited a statement that the Court had already ruled was testimonial and excluded from the trial.  See Feb. 2 Tr. at 105:14-21 (Jacks).  The Court advised R. Perez that, before asking any questions about this statement of any witness, R. Perez would need to approach the bench, because the statement is not admissible.  See Feb. 2 Tr. at 106:8-25 (Court, Villa).  D. Sanchez requested that the Court strike R. Perez' question and instruct the jury to disregard it, and moved for a mistrial, noting that the United States' questioning on R. Perez' statements also elicited statements that may be admissible under a hearsay exception, but are testimonial -- and the United States has no exception to the Sixth Amendment.  See Feb. 2 Tr. at 107:6-17 (Jacks).

> The parties left the bench, and, in open court, the Court instructed the jury that it is
>
> not going to permit the answer to the question that Mr. Villa started.  If you caught any of it before all the objections were made, I strike the question as well.  So don't even consider the question, which is not what you should be doing anyway.  You should be considering the answer.  But in this case, I want you to strike the question and not even consider it.

Feb. 2 Tr. at 108:10-17 (Court).  R. Perez continued with his re-cross, and Palomares admitted that he did not believe R. Perez' walker was evidence, did not attempt to get the walker to preserve it for trial, but that he was not sure whether the jury would see the walker.  See Feb. 2 Tr. at 109:10-110:2 (Villa, Palomares).  Upon D. Sanchez' request, the Court clarified that the testimony R. Perez solicited about his statements before the bench conference can be considered only against R. Perez, whereas the testimony following the bench conference can be considered against everyone.  See Feb. 2 Tr. at 110:6-18 (Jacks, Court).  The Court then excused Palomares, subject to recall.  See Feb. 2 Tr. at 110:22-111:8 (Court, Armijo, Villa).

h.    **Javier Rubio's Testimony.**

The United States called its next witness, Rubio, who was in custody, in a prison jumpsuit, and had uniformed correctional officers escort him and stand next to him in the witness box.  See Feb. 2 Tr. at 111:11-12 (Beck); id. at 117:18-25 (Armijo); id. at 118:22-2 (Court).  Rubio described the benefits he received for his cooperation, such as Acee's testimony at his state parole hearing if Rubio tells the truth, and noted that he was not indicted in the case.  See Feb. 2 Tr. at 132:25-133:16 (Bec, Rubio).  Rubio also received more telephone calls, tier time, and contact visits, and he attended the pizza party, but Rubio noted that these benefits terminated, he lost his good time,[40] and he was sent to solitary confinement for nine months when he was caught having sex with his wife in January, 2017.  See Feb. 2 Tr. at 133:17-134:22 (Beck, Rubio).  Rubio knew that having sex with his wife violated the rules and admitted that his one-year-old granddaughter was in the room when it occurred.  See Feb. 2 Tr. at 152:18-153:6 (Beck, Rubio).

Rubio joined SNM in 1994 at age eighteen at the PNM South, where he was serving a sentence for a murder he committed during a burglary.  See Feb. 2 Tr. at 121:10-122:12 (Beck, Rubio).  Rubio defined the term "earning your bones," which is murdering or assaulting somebody, and said that he "earned his bones" by stabbing someone in 1994 to join the gang, which, at that time, A. Munoz led.  Feb. 2 Tr. at 123:12-124:5 (Beck, Rubio); id. at 130:9-14 (Beck, Rubio).  Rubio also stabbed an SNM enemy in 1997.  See Feb. 2 Tr. at 130:15-21 (Beck, Rubio).  Rubio identified B. Garcia, Archuleta -- whom he knew only by his nickname "Styx" -- Barros, and Romero as other leaders below A. Munoz, and stated that Baca became the leader in 1999 or

---

[40]Rubio described that inmates earn a day of good time credit every day spent in prison, which allows them to only spend about half their sentence in prison; so Rubio lost about twenty years of good time credit, because he had been incarcerated for twenty-four years.  See Feb. 2 Tr. at 134:25-135:3 (Rubio).

2000 -- a role he still holds. Feb. 2 Tr. at 125:20 (Rubio). See id. at 125:3-23 (Beck, Rubio). Rubio said that SNM's "tabla" is its board of leaders, which includes leaders of pods within correctional facilities and that Rubio was a member of the "tabla." Feb. 2 Tr. at 129:11-25 (Beck, Rubio).

Rubio believed that SNM's purpose is to "[c]ontrol the prison system," which it does "[t]hrough violence and extortion." Feb. 2 Tr. at 126:1, 2 (Rubio). He stated that SNM members sell and do drugs in prison, and that if anybody -- member or not -- brings drugs into a pod with SNM members, that person has to share the drugs with SNM. See Feb. 2 Tr. at 126:4-15(Beck, Rubio). Rubio said that, to be admitted to SNM, a recruit must "commit an act of violence," and have two or three SNM members vouch for admittance. Feb. 2 Tr. at 127:1 (Rubio). See id. at 127:2-6 (Beck, Rubio). People who have committed a sex offense are not admitted. See Feb. 2 Tr. at 127:10-11, 14 (Beck, Rubio). SNM members cannot cooperate with law enforcement, "snitch" to prison officials, refuse to commit violence when ordered, or enter protective custody. Feb. 2 Tr. at 126:21-24 (Beck, Rubio). See id. at 128:5-14 (Beck, Rubio); id. at 143:14-17 (Beck, Rubio). A member who violates a rule could get killed or beat up, depending on the violation's severity. See Feb. 2 Tr. at 127:20-128:4 (Beck, Rubio). For example, if a "tabla" member orders a member to perform a "hit" and that member does not do what he is told, the member will be murdered; likewise, if the "tabla" member gets an order to order a "hit" and does not do what he is told, the "tabla" member will be murdered. Feb. 2 Tr. at 130:1-8 (Beck, Rubio).

Rubio said that "verified hits" are ordered by SNM's leaders and are not issued for personal reasons. Feb. 2 Tr. at 130:22-131:5 (Beck, Rubio). Rubio described calling a "hit" on SNM member Frankie Gonzalez in 2002, because F. Gonzalez had failed to "hit" the man who had caused problems for another member in the same facility in which F. Gonzalez was housed. Feb.

2 Tr. at 131:6-25 (Beck, Rubio).  Rubio stated that he verified the "hit" before calling it by ensuring that F. Gonzalez was in the facility and did not do what he should have done.  Feb. 2 Tr. at 132:1-6 (Beck, Rubio).  Later, this man that F. Gonzalez failed to "hit" ended up in the same pod as Rubio, so Rubio had him "hit" with a shank which Rubio had made from a wooden Scrabble piece.  Feb. 2 Tr. at132:7-24 (Beck, Rubio).

Rubio described a conversation that he had with Baca in 2008 at Southern New Mexico, in which Baca stated his plan for people to vote for certain members to run pods to ensure people followed the rules, and how these leaders would report to Baca.  See Feb. 2 Tr. at 135:19-136:2 (Beck, Rubio); id. at 136:23-24 (Rubio).  Upon D. Sanchez' request, the Court provided a limiting instruction.[41]  See Feb. 2 Tr. at 137:1-11 (Jacks, Court).  In 2008, Rubio and Sedillo were voted leaders of the green pod and Rubio remained the leader in March, 2014.  See Feb. 2 Tr. at 137:23-138:7 (Beck, Rubio).  Baca provided Rubio a sheet of paper with rules that Baca wanted Rubio to write down and pass around,[42] so everybody would know them: "snitches" would be murdered, people who do not carry out an ordered "hit" would be murdered, exercise every day, be prepared to "earn your bones" if you have not, and "be ready to fight or go to war with anybody."  Feb. 2 Tr. at 139:18-19 (Rubio).  See id. at 138:8-139:2 (Beck, Rubio); id. at 139:12-19 (Beck, Rubio);

---

[41]The Court instructed:

> Mr. Rubio is going to make some -- in his testimony, he's going to relate to you some statements that he is testifying Mr. Baca made.  Again, you can use these statements only in your deliberations regarding the charges against Mr. Baca.  You can't use them in any way against the other three gentlemen in the courtroom.

Feb. 2 Tr. at 137:5-11 (Court).

[42]At this point, the Court reminded the jury of the instruction.  See Feb. 2 Tr. at 139:10 (Court).

id. at 140:2-4 (Beck, Rubio).  A member who violated a rule would be murdered or assaulted.  See Feb. 2 Tr. at 140:7-12 (Beck, Rubio).

Rubio stated that, in July or August, 2013, while at Southern New Mexico as one of green pod's leaders, Sedillo, green pod's other leader, provided Rubio "paperwork" on Molina containing a statement Molina had made to police.  Feb. 2 Tr. at 140:19-141:19 (Beck, Rubio).  At this point, Rubio "didn't want anything to do with SNM," because he did not agree with Baca's self-serving politics or his lack of loyalty, and so he told Sedillo that he did not want anything to do with the "paperwork."  Feb. 2 Tr. at 141:23-142:9 (Beck, Rubio).  Rubio believed that Baca "would make enemies of his own people," Feb. 2 Tr. at 142:11-12 (Rubio), and that Baca had violated SNM rules, see Feb. 2 Tr. at 143:8-10 (Rubio).  Rubio confronted Baca at some point, and Baca accused Rubio of wanting his position and threatened him.[43]  See Feb. 2 Tr. at 143:21-2 (Beck, Rubio).

Rubio said that, in March, 2014, at Southern New Mexico, D. Sanchez was the blue pod leader; Juan Mendez, Alex Munoz, and Herrera were the yellow pod leaders; and Sedillo and Rubio still led the green pod.  See Feb. 2 Tr. at 144:20-24 (Beck, Rubio); id. at 145:9-12 (Beck, Rubio); id. at 145:23-25 (Beck, Rubio).  Rubio stated that, before SNM could murder a "snitch," these six people had to verify the "hit" -- who sent it and how it got to these leaders  -- and verify that the "paperwork" was real.  Feb. 2 Tr. at 146:7-21 (Beck, Rubio).

During the next break, with the jury outside the courtroom, D. Sanchez elaborated on his objection to the admission of co-Defendants' statements under the due process clause of the Fifth Amendment to the United States Constitution and the confrontation clause of the Sixth

---

[43]At this point, the Court gave another limiting instruction: "So these statements that Mr. Rubio is testifying that Mr. Baca made can only be used in regard to Mr. Baca and not the other three gentlemen."  Feb. 2 Tr. at 144:7-10 (Court).

Amendment.  See Feb. 2 Tr. at 150:7-12 (Jacks).  D. Sanchez noted that his case hinges on the informants' credibility, so he argued that the jury will struggle with ignoring a co-Defendant's statement -- inadmissible as to D. Sanchez -- that corroborates an informant's testimony when evaluating that informant's credibility.  See Feb. 2 Tr. at 150:13-151:1 (Jacks).  The jury entered the courtroom, and the United States continued its examination of Rubio.  See Feb. 2 Tr. at 152:14-16 (Court).  Rubio explained that, after the Molina murder, Rubio and Herrera were placed in adjacent recreational cages, and Herrera told Rubio that he had ordered the murder.[44]  See Feb. 2 Tr. at 154:4-10 (Beck, Rubio); id. at 155:10-12 (Beck, Rubio).

Rubio verified that, there is always a chance in prison that people will fight for personal reasons and that, fights among SNM members for personal reasons violate the rules, so they are sometimes disguised as an SNM-sanctioned "hit."  Feb. 2 Tr. at 157:1-15 (Maynard, Rubio).  Rubio said that Molina's murder occurred in the blue pod and communications occurred between the pods' leaders via word of mouth.  See Feb. 2 Tr. at 158:4-25 (Maynard, Rubio).  Rubio clarified that his expectation for cooperating is that the United States provides a statement at his state parole hearing in 2024, to help persuade the parole board to release him on that date.  See Feb. 2 Tr. at 161:12-162:9 (Maynard, Rubio).  Rubio maintained that the United States told him that he was not the investigation's target, and did not threaten him with pressing federal charges.  See Feb. 2 Tr. at 162:13-23 (Maynard, Rubio).  Rubio admitted that, for about two weeks, while waiting to go to a facility for people who renounced gang membership, he was housed with others who were contemplating cooperating with the investigation, and that he is in the process of renouncing his

---

[44]Before the United States elicited Herrera's statement to Rubio, the Court instructed the jury: "And these statements can only be used against Mr. Herrera, not against the other three defendants.  So if you're taking notes, you might want to indicate that.  But these statements can only be used against Mr. Herrera."  Feb. 2 Tr. at 155:4-8 (Court).

SNM membership.  See Feb. 2 Tr. at 164:17-165:5 (Maynard, Rubio).  Rubio also admitted that the federal government has not prosecuted him for his SNM gang activity and that he does not expect to be prosecuted.  See Feb. 2 Tr. at 165:13-20 (Maynard, Rubio).

Upon D. Sanchez' questioning, Rubio explained that shanks could be made from razor blades, plastic, wood, or metal, but that he preferred steel, because of its strength, and would usually make the shank by sharpening the material on concrete.  See Feb. 2 Tr. at 169:6-22 (Jewkes, Rubio).  Rubio stated that he could make a shank within an hour.  See Feb. 2 Tr. at 170:10 (Rubio).  Rubio stated that he decided to cooperate about a year after the indictments issued, was never housed with any of the Defendants after their indictment, and has not seen any of the discovery.  See Feb. 2 Tr. at 174:2-175:2 (Jewkes, Rubio).  Rubio expressed concern whether the Molina "paperwork" he saw was legitimate, because another inmate provided it.  Feb. 2 Tr. at 178:4-12 (Jewkes, Rubio).  Rubio said this inmate, Ronald Sanchez, handed him "paperwork" which had nothing to do with Molina, and that Sedillo handed him "paperwork" on Molina in 2013, which consisted of about fifteen to twenty sheets of regular-sized paper, containing a statement Molina made to the Las Cruces Police Department.  Feb. 2 Tr. at 179:2-180:3 (Jewkes, Rubio).  Rubio stated that he skimmed through the typewritten "paperwork," that it had a case number on it but no logos, that it looked like a police report containing interviews, and that Sedillo supposedly flushed it.  Feb. 2 Tr. at 180:4-25 (Jewkes, Rubio).

Baca elicited that Rubio was not happy with Baca, because he did not follow the rules and gave passes to people who entered protective custody, but Rubio was not aware that inmates at Southern New Mexico had "kited" Baca out.[45]  Feb. 2 Tr. at 105:24 (Lowry).  See Feb. 2 Tr. at

---

[45]Rubio did not explain this term, but a later witness -- Calbert -- did.  Calbert described "kiting out" as sending a message through the mail to the STIU that a person "is going to get hit or something," and then the STIU will "take action and take" that person out of the pod.  Transcript

185:23-186:10 (Lowry, Rubio).  Rubio said that Baca favored certain people and would let them

enter protective custody if it benefitted him, rather than imposing the same rules on everybody.

See Feb. 2 Tr. at 188:17-23 (Lowry, Rubio).  Rubio admitted to being a heroin addict in the 1990s,

but stated that he has since stopped doing drugs.  See Feb. 2 Tr. at 186:15-24 (Lowry, Rubio).

Rubio noted that, even if he does get paroled in 2024, he still will have to serve an additional

eighteen years, because he was sentenced to life plus eighteen years.  See Feb. 2 Tr. at 189:21-7

(Lowry, Rubio).  The Court then admitted, over the United States' objection under rule 403 of the

Federal Rules of Evidence, a video clip of Rubio having sex with his wife during a contact visit,

and Rubio identified that the people in the video are Rubio, his wife, and their granddaughter.  See

Feb. 2 Tr. at 193:4-194:9 (Lowry, Rubio, Court, Beck).  R. Perez clarified that a different person

with the surname "Perez" brought Rubio into the gang and asked Rubio to describe solitary

confinement: being locked in an about ten-by-eight-foot room for twenty-three hours a day, no

contact with other inmates, recreation time alone, and no human communication except possibly

through the vent.  See Feb. 2 Tr. at 194:21-195:13 (Fox-Young, Rubio).  The Court then excused

Rubio, subject to recall.  See Feb. 2 Tr. at 197:8-10, 20-22 (Court).

### i.    William Price's Testimony.

The United States next called Price, who has been a correctional officer for eighteen years

and works at Southern New Mexico.  See Feb. 2 Tr. at 197:25-198:1 (Castellano); id. at 198:21-

199:2 (Castellano, Price).  Price said that inmates will pass "kites" -- or messages -- by attaching

the kite to a string and throwing it to another cell, like a fishing line, and that inmates can slide

things under the doors to each pod, and that the correctional officers usually do not get to intercept

---

of Jury Trial Volume 6 at 38:13-16 (taken February 5, 2018)(Calbert), filed February 22, 2019
(Doc. 2522).

such communications.  Feb. 2 Tr. at 211:4-212:22 (Castellano, Price).  Price stated that inmates

will talk at the inter-pod doors, but the officers in the control room cannot hear what is said, and

normally the officers cannot see if the inmates slide anything underneath the doors.  See Feb. 2 Tr.

at 212:23-213:9 (Castellano, Price).  Price contended, however, that the control room is designed

for maximum visibility into the housing unit, so the officers could watch the inmates below in the

pods.  See Feb. 2 Tr. at 237:25-238:8 (Jacks, Price).  The control center's windows overlooking

the pods contain a hole, to allow a shotgun to go through "to shoot less lethal ammunition," which

is now larger than it was on March 7, 2014, because of the Molina incident.  Feb. 2 Tr. at 262:6

(Price).  See id. at 262:3-10 (Jacks, Price); id. at 277:17-23 (Castellano, Price).  Price stated that,

per NM Corrections Department policy, inmates are allowed to possess legal materials -- such as

legal paperwork -- and believed that inmates could possess legal materials related only to active

cases.  See Feb. 2 Tr. at 269:8-19 (Jacks, Price); id. at 270:10-271:18 (Jacks, Price).  Because the

correctional officers cannot read the inmates' personal property, and can thumb through it only to

look for contraband, Price stated that he would not know if other documents are inserted into the

legal paperwork.  See Feb. 2 Tr. at 281:8-16 (Castellano, Price).  Price said that there is a standard

form used to inventory inmates' property: the property is inventoried, placed in a plastic bag, and

then transported to the facility, without being accessible to the inmate  See Feb. 2 Tr. at 272:10-

275:1 (Jacks, Price).  The inventory process does not always happen; with a big incident, like a

murder, there is not time to properly inventory inmate property before transport.  See Feb. 2 Tr. at

280:13-21 (Castellano, Price).

Price stated that, on March 7, 2014, at about 5:18 p.m., he was on duty at Southern New Mexico and was roving[46] SNM housing unit from green, to blue, to yellow pod, escorting a nurse to give out medication. See Feb. 2 Tr. at 200:22-201:16 (Castellano, Price). Price described the environment in blue pod as "[c]alm, no tension; everyday, normal activity," and stated that he did not suspect that something was about to happen. Feb. 2 Tr. at 202:10-11 (Price). See id. at 202:8-20 (Castellano, Price). Price stated that green pod was also "normal," but that the yellow pod was "a little bit more rowdy, loud." Feb. 2 Tr. at 203:5, 8 (Price). Price indicated that the yellow pod had three new intakes from the day before, who were on orientation status, meaning that they are locked in their cell for a week, so they cannot interact with other inmates to ensure that they all will get along. See Feb. 2 Tr. at 203:9-204:9 (Castellano, Price). Price stated that, after exiting blue pod, the nurse was handing out medication in yellow pod "when the control officer knocked on the [upstairs] window[47] and told us something was going on in blue pod," and Price testified that he "walked out of yellow pod, went over to the door of blue pod, and [] could see Molina with a bloody chest and two other inmates attacking him" through the little window on the closed door to blue pod. Feb. 2 Tr. at 204:21-25 (Price). See id. at 205:1-7 (Castellano, Price).

At first, Price believed Molina was horse-playing with the inmates, so Price yelled at them to stop, but noticed blood on Molina's chest when he turned around, so Price told the pod to lock

---

[46]Price described "roving" as being "down on the floor interacting with the inmates, doing shakedowns, serving chow, just normal everyday things." Feb. 2 Tr. at 200:5-6 (Price). A "shakedown" is where the correctional officer "go[es] in the inmate's cell and search[es] for contraband." Feb. 2 Tr. at 200:8-9 (Price). The rovers also go through the "unit every hour to make sure everybody is living breathing flesh," pass out the mail, take the inmates to recreation, and escort religious staff. Feb. 2 Tr. at 234:18-19 (Price). See id. at 234:13-24 (Price, Jacks).

[47]Price clarified that there are control windows upstairs that look down into the pods from the control room, allowing the officers to look in the pods and watch the inmates, and that computers in the control room open and close the pods' doors. See Feb. 2 Tr. at 205:15-25 (Castellano, Price).

down.  See Feb. 2 Tr. at 206:14-23 (Castellano, Price).  Price testified that he could not enter the cell right away, because he had to wait for backup so that there would be enough staff to ensure their safety, and that backup probably took a minute to a minute and a half to arrive.  See Feb. 2 Tr. at 207:11-208:12 (Castellano, Price).  Price stated that, when backup arrived and the control officer opened the door, "Molina fell to the ground, and you could see his hands were -- fists clenched closed, his eyes rolled back in his head, and his hands just opened up, and he never moved again."  Feb. 2 Tr. at 209:2-6 (Price).  See id. at 208:25-209:2 (Price).  Price and the other officers secured the pod by putting each inmate in his assigned cell, and then the nurse attempted to stop Molina's bleeding.  See Feb. 2 Tr. at 209:7-24 (Castellano, Price).  Price stated that first responders arrived and performed CPR on Molina as they removed him on a gurney, and that he gave a witness statement and spoke with the NM State Police.  See Feb. 2 Tr. at 210:4-22 (Castellano, Price).

R. Perez played the video of Molina's homicide and, pausing it at 17:15:52, had Price verify that the nurse pictured was the nurse Price was escorting and that the person standing behind her in the video is Price.  See Feb. 2 Tr. at 216:9-18 (Villa, Price).  Price verified that R. Perez received medication that day, as R. Perez did every day -- more than once a day -- and that R. Perez used a walker, and mostly stayed in his cell.  See Feb. 2 Tr. at 217:2-218:1 (Villa, Price). Price stated that the window through which he saw Molina's attack was on the door that leads into the pod, noting that the doors connecting the pods do not have windows, and that, at that time, he was unable to identify the men attacking Molina, but that, by looking at the video, he identified them as Armenta and J. Montoya.  See Feb. 2 Tr. at 218:12-219:9 (Villa, Price).  Price said that it appeared that whatever Armenta and J. Montoya did to Molina had killed him quickly.  See Feb. 2 Tr. at 220:10-15 (Villa, Price).  Price stated that the policy at the time was to keep the cell doors closed and open them all at once only for about ten minutes every hour for a bathroom break,

because the pods do not have bathrooms. See Feb. 2 Tr. at 221:11-223:2 (Villa, Price). Price reiterated that the control officers control the doors and that they are not supposed to open a cell door unless there is an officer in the pod. See Feb. 2 Tr. at 223:5-25 (Villa, Price). Price did not know who opened Molina's door before his assault. See Feb. 2 Tr. at 224:9-11 (Villa, Price).

Price stated that there were two other correctional officers in housing unit 1-A on March 7, 2014, one officer who stays in the control room all day, and two rovers. See Feb. 2 Tr. at 233:18-234:20 (Jacks, Price). Price stated that he was working a sixteen-hour shift that day and could not remember whether he observed activity at the door between the blue and yellow pods. See Feb. 2 Tr. at 235:22-24 (Jacks, Price); id. at 238:18-25 (Jacks, Price). Price testified that the control officer keeps a handwritten log on "[a]ny activity that goes on in the housing unit, like when inmates come out of their cells, when chow comes in, when we take them out to rec, when we return them to rec, when an officer goes to each pod, when nurses come in, do the rounds, education." Feb. 2 Tr. at 239:13-18 (Price). See id. at 239:1-10 (Jacks, Price). Price stated that fights or major disturbances get logged, but petty violations do not. See Feb. 2 Tr. at 240: 3-12 (Jacks, Price). Price explained that, when a major incident occurs as with Molina's homicide, the normal log for the day is pulled and a new one is started at the time of the incident. See Feb. 2 Tr. at 246:10-19 (Jacks, Price). The Court let Price step down, subject to recall. See Feb. 2 Tr. at 287:19-22 (Court).

### j.     David Calbert's Testimony.

The United States next called Calbert, who joined SNM in 1998, and stabbed an SNM enemy with a piece of metal from a mop to enter the gang. See Feb. 2 Tr. at 287:25-288:1 (Beck); id. at 306:12-307:10 (Beck, Calbert). Calbert was on parole, but was detained and awaiting sentencing. See Feb. 2 Tr. at 363:5-10 (Duncan, Calbert). Calbert stated that he assaulted

somebody named Nick Olivas in 1998 or 1999, because SNM ordered him to attack Olivas, and assaulted somebody he knows only as "Bandit" in 2004, because Bandit owed SNM drug money and Arturo Arnulfo Garcia ordered the assault.  See Feb. 2 Tr. at 322:19-324:4 (Beck, Calbert). Calbert also assaulted three correctional officers with SNM's permission, and noted that SNM members generally have to get SNM's permission before assaulting anybody.  See Feb. 2 Tr. at 327:2-16 (Beck, Calbert).  Calbert stated that he assaulted these correctional officers, because he was sticking up for Urquizo.  See Feb. 2 Tr. at 353:14-19 (Duncan, Calbert).  Calbert testified that, in 2011, he and Varela attacked Paul Silva at PNM South over SNM politics.  See Feb. 2 Tr. at 329:11-330:13 (Beck, Calbert); id. at 332:18-19 (Beck, Calbert).  Calbert maintained that SNM did not sanction the Silva assault, but nonetheless he did it for SNM.  See Feb. 2 Tr. at 364:5-18 (Fox-Young, Calbert).  Calbert stated that he stabbed Silva multiple times, and that Varela kicked Silva in the head.  See Feb. 2 Tr. at 356:8-11 (Duncan, Calbert).  Calbert said that Silva attempted to lead the pod, with which Calbert disagreed, because he wanted Baca to get everything in order and fix the mess A.A. Garcia had caused.  See Feb. 2 Tr. at 330:14-331:8 (Beck, Calbert); id. at 331:23-332:9 (Beck, Calbert).

Calbert admitted that there are documents in his prison file in which he denies being SNM member, because SNM prohibits its members from talking to correctional officers.  See Feb. 2 Tr. at 332:20-333:5 (Beck, Calbert).  Calbert testified that he pled guilty on September 28, 2017, to all the charges that the United States filed against him -- conspiracy to murder Silva and assaulting Silva with a dangerous weapon.  See Feb. 2 Tr. at 334:13-21 (Beck, Calbert); id. at 358:7-14 (Duncan, Calbert).  Calbert noted that he faces up to thirty years and that he expects to receive a benefit from the United States in return for a truthful testimony.  See Feb. 2 Tr. at 335:2-12 (Beck, Calbert).  Calbert said that he chose to cooperate, because he was tired of SNM members

attempting to kill him.  See Feb. 2 Tr. at 335:13-336:6 (Beck, Calbert).  Calbert admitted that he has already received some benefits for his cooperation, such as a lunch from Blake's Lotaburger, $408.05, more money for the canteen, more calls, and a visit with his family.  See Feb. 2 Tr. at 336:21-337:2 (Beck, Calbert); id. at 337:9-21 (Beck, Calbert).  Calbert stated that, before he decided to cooperate, he met with Urquizo and his attorneys for about five minutes, to discuss the case, and then he met with Acee after the meeting with Uquizo.  See Feb. 2 Tr. at 337:22-338:13 (Beck, Calbert); id. at 346:15-22 (Beck, Calbert).  R. Perez asked whether Urquizo wanted to get his and Calbert's stories straight during their meeting, but Calbert maintained that Urquizo just told him what Urquizo had told the United States.  See Feb. 2 Tr. at 379:3-16 (Fox-Young, Calbert).  Calbert also mentioned that he had once served as a personal representative for Urquizo when Urquizo faced a disciplinary charge.  See Feb. 2 Tr. at 354:1-7 (Duncan, Calbert).

Calbert testified that one day in 2014, after stabbing Silva, he was in the PNM North recreation yard when Joe Martinez, or "Cheech," provided Calbert "paperwork" on Molina, consisting of a police report which showed that Molina told about some robbery.  Feb. 2 Tr. at 338:16-339:3 (Beck, Calbert).  See id. at 339:16-340:9 (Beck, Calbert).  Calbert took the "paperwork" and agreed to pass it to somebody else.  Feb. 2 Tr. at 340:17-19 (Beck, Calbert).  Calbert stated that, at first, he told J. Martinez that the "paperwork" was "nothing," but then J. Martinez said: "Pup wants you to take it down there."  Feb. 2 Tr. at 342:15-18 (Calbert).  Calbert understood this statement to mean that he was required to make sure the "paperwork" got to Southern New Mexico.  Feb. 2 Tr. at 342:22-343:4 (Beck, Calbert).  Calbert admitted that, at this point, he had never met Baca or spoken with him.  See Feb. 2 Tr. at 349:3-7 (Duncan, Calbert).  Calbert stated that he moved to PNM South four to five months after receiving the "paperwork," and there he gave Urquizo the "paperwork."  Feb. 2 Tr. at 343:8-11 (Beck, Calbert); id. at 348:24-

349:2 (Duncan, Calbert).  Calbert explained that Urquizo -- whom Calbert identified as a fellow

SNM member – had also moved to Southern New Mexico, where Molina was incarcerated.  See

Feb. 2 Tr. at 347:2-348:1 (Beck, Calbert).  Calbert was not charged for his involvement in the

Molina homicide.  See Feb. 2 Tr. at 359:7-17 (Duncan, Calbert).  Calbert admitted that the United

States did not charge him for the Molina homicide, because he is cooperating.  See Feb. 2 Tr. at

371:20-372:1 (Fox-Young, Calbert).

Calbert stated that, in 2014, after Molina's murder, he filed a lawsuit against Marcantel,

complaining about being placed on lockdown following the incident, and requesting a change in

the prison conditions, the return of the lost privileges, and monetary damages.  See Feb. 2 Tr. at

359:18-361:2 (Duncan, Calbert).  Baca asked Calbert, under penalty of perjury, whether he

asserted in his complaint that he was not involved in Molina's murder.  See Feb. 2 Tr. at 361:3-

362:5 (Duncan, Calbert).  Calbert admitted this fact, and asserted that the lawsuit never went

anywhere.  See Feb. 2 Tr. at 362:6-10 (Duncan, Calbert).  R. Perez noted Calbert's prison calls, in

which Calbert described receiving a television from the STIU and told his family that he would

get sentenced to only three years.  See Feb. 2 Tr. at 372:22-373:10 (Fox-Young, Calbert).  Calbert

admitted that he is spoiled now, compared to being in the prison in Estancia.  See Feb. 2 Tr. at

374:1-6 (Fox-Young, Calbert).

Calbert testified that, after his arrest in this case, R. Perez admitted to him that he initially

"want[ed] credit for all this that went on," but now wanted nothing to do with it.  Feb. 2 Tr. at

344:13-15 (Calbert).  See id. at 343:17-22 (Beck, Calbert); id. at 344:6-16 (Beck, Calbert).  At this

point, upon Baca and D. Sanchez' request, the Court gave a limiting instruction.[48]  See Feb. 2 Tr.

_____

[48]The Court instructed: "It appears Mr. Calbert is testifying to statements that Mr. Perez
made to him.  You can only use these statements in deciding the charges against Mr. Perez.  You

at 344:18-345:1 (Duncan, Jacks, Court).  Calbert explained that, because R. Perez is "crippled" and has trouble "getting around," Calbert believed that he "wanted to do something," and that Calbert understood R. Perez to mean that he would get credit for providing a piece of metal from his walker.  Feb. 2 Tr. at 345:6-7 (Calbert).  See id. at 345:4-15 (Beck, Calbert).  Calbert elaborated that, because R. Perez cannot fight, Calbert felt like R. Perez wanted to contribute to the murder by doing something of which he was physically capable.  See Feb. 2 Tr. at 346:1-10 (Beck, Calbert).

Calbert stated that he is currently housed with M. Rodriguez, whom Calbert has known five or ten years, and T. Martinez, whom Calbert has also known for several years.  See Feb. 2 Tr. at 374:7-375:11 (Fox-Young, Calbert).  Calbert stated that M. Rodriguez' signature move in fights is biting off ears.  See Feb. 2 Tr. at 375:24-376:9 (Fox-Young, Calbert).  Calbert admitted that both M. Rodriguez and T. Martinez were housed with Molina at Southern New Mexico.  See Feb. 2 Tr. at 375:18-23 (Fox-Young, Calbert).  Calbert admitted that people thought to be cooperating with the United States get "hit" and that there were rumors that R. Perez cooperated.  Feb. 2 Tr. at 383:9-22 (Fox-Young, Calbert).

The Court then broke for the weekend, stating:

> Because we're going to take our first weekend break during the trial, I want to remind you of a few things that are especially important.  Until the trial is completed, you're not to discuss the case with anyone, whether it's members of your family, people involved in the trial, or anyone else, and that includes your fellow jurors.  If anyone approaches you and tries to discuss the trial with you, please let me know about it immediately.

> Also, you must not read or listen to any news reports of the trial.  Again, don't get on the [internet] and do any research for purposes of this case.

> And finally, remember that you must not talk about anything with any

---

cannot use this evidence in any way in your deliberations as to the other three defendants."  Feb. 2 Tr. at 344:21-345:1 (Court).

person who is involved in the trial, even if it doesn't have anything to do with the trial.

Feb. 2 Tr. at 386:12-387:3 (Court).

The parties returned to court on Monday, February 5, 2018, and, before the jury entered the courtroom, R. Perez' counsel informed the Court that R. Perez had come down with the flu and requested a day so R. Perez could see a doctor.  See Transcript of Jury Trial Volume 6 at 4:5-5:7 (taken February 5, 2018)(Villa), filed February 22, 2019 (Doc. 2522)("Feb. 5 Tr.").  The United States offered that it is also concerned about R. Perez and that, while it is ready and willing to proceed with trial, the trial is ahead of schedule and taking a day off would not cause much delay.  See Feb. 5 Tr. at 5:10-6:12 (Beck, Armijo).  Other defense counsel provided their concern for R. Perez and stated that they did not want to get sick.  See Feb. 5 Tr. at 6:17-7:6 (Bhalla, Lowry, Jacks).  The Court decided to try and get a medical provider to the courthouse to see R. Perez by lunchtime and, if that does not occur, to have the United States Marshals take R. Perez to the hospital.  See Feb. 5 Tr. at 11:11-17 (Court).

The jury entered the courtroom, and the Court informed the jurors that R. Perez is wearing a mask, because he is sick, and that they may be taking more breaks for him.  See Feb. 5 Tr. at 18:4-14 (Court).  Calbert returned to the stand, and R. Perez continued his cross-examination, underscoring that R. Perez spoke with Calbert in 2017, three years after Molina's murder, and that R. Perez provided Calbert no details on how his walker piece was taken; Calbert verified that R. Perez did not mention M. Rodriguez took the piece or that R. Perez was scared of M. Rodriguez. See Feb. 5 Tr. at 19:12-20:13 (Fox-Young, Calbert).  Calbert testified that he had a discovery tablet -- which was briefly taken away, because somebody else had been tampering with the tablets -- and was able to see other cooperators' statements.  See Feb. 5 Tr. at 21:6-22:3 (Fox-Young, Calbert).  Calbert admitted that, when he spoke with Urquizo, he knew that R. Perez was fighting

the case.  See Feb. 5 Tr. at 23:18-24:6 (Fox-Young, Calbert).  Returning to Calbert's prison telephone calls, R. Perez asked Calbert whether he told anybody besides his mother that he thought he would only get three years and, when Calbert answered negatively, the Court gave a limiting instruction.[49]  See Feb. 5 Tr. at 27:24-28:5 (Fox-Young, Calbert).  R. Perez then played an audio recording of a telephone call, in which Calbert tells a younger brother he would be out in three years at the latest.  See Feb. 5 Tr. at 28:20-29:17 (Fox-Young, Calbert).

Calbert elaborated on the Silva assault, and he stated that Silva was in charge of the pod after A.A. Garcia was removed from the pod -- Calbert believed A.A. Garcia was "kited out," but did not know for sure -- which made Calbert feel unsafe and angry.  Feb. 5 Tr. at 37:9-14 (Jacks, Calbert); id. at 39:18-25 (Jacks, Calbert); id. at 40:18-41:6 (Jacks, Calbert).  Calbert stated that he did not recognize Silva's authority and was mad at Silva for pushing him around, so he attacked Silva.  See Feb. 5 Tr. at 41:3-22 (Jacks, Calbert).  Calbert admitted that SNM did not sanction or order the attack, and that he did the attack to improve his status within SNM.  See Feb. 5 Tr. at 41:23-42:7 (Jacks, Calbert).  Calbert explained that, when he spoke to a STIU officer after the assault, Calbert said that the assault was personal.  See Feb. 5 Tr. at 42:8-25 (Jacks, Calbert).  Calbert testified that Varela got involved, because one of Silva's friends shoved Varela during the attack.  See Feb. 5 Tr. at 43:4-24 (Jacks, Calbert).

Calbert admitted that he fought his case for two years, and that, a month after speaking with Urquizo, entered a guilty plea and now faces a maximum sentence of thirty years imprisonment, but he expects his sentence will be significantly reduced because of his cooperation.

---

[49]The Court instructed: "[T]his can only be used to impeach Mr. Calbert.  It's not to [be] consider[ed] . . . for the truth of the matter of the statements that are going to be made, but you can consider it in determining whether Mr. Calbert is truthful or credible or not."  Feb. 5 Tr. at 28:12-17 (Court).

See Feb. 5 Tr. at 44:22-45:21 (Jacks, Calbert).  Calbert stated that Urquizo told him that cooperating would bring benefits, such as privileges and visits, but not money or dropped charges in Molina's homicide.  See Feb. 5 Tr. at 53:18-54:16 (Jacks, Calbert).  Calbert clarified that he had discovery on all of the SNM cases, not just his own, and listened to audio clips, watched videos, and read statements related to Molina's homicide.  See Feb. 5 Tr. at 47:24-49:2 (Jacks, Calbert). Calbert maintained that he transferred "paperwork" from PNM to Southern New Mexico, but he admitted that he saw the "paperwork" mentioned in the discovery and thought it was something in which the United States was interested.  Feb. 5 Tr. at 49:16-50:4 (Jacks, Calbert).  Calbert described the "paperwork" as one or two typed pages about Molina's involvement in a purse-snatching.  Feb. 5 Tr. at 68:19-70:16 (Jacks, Calbert).  Calbert stated that a correctional officer escorted J. Martinez when J. Martinez passed the "paperwork" to Calbert through the recreation cage fence, and that the correctional officer did nothing about the hand-off.  Feb. 5 Tr. at 75:7-19 (Bhalla, Calbert).

During the United States' re-direct examination, Calbert admitted that, if he does not testify truthfully, he would lose his benefits and the United States could charge him with Molina's murder. See Feb. 5 Tr. at 76:12-23 (Beck, Calbert).  Calbert maintained that he did not ask to meet with Urquizo and that he had already decided to cooperate when they met.  See Feb. 5 Tr. at 76:24-77:5 (Beck, Calbert).  The Court allowed Calbert to step down, subject to recall.  See Feb. 5 Tr. at 83:8-10 (Court).

### k.    Norman Rhoades' Testimony.

The United States next called Rhoades, a NM State Police officer in the Crime Scene Unit. See Feb. 5 Tr. at 84:10-22 (Castellano, Rhoades).  Rhoades stated that, on March 7, 2017, he and other officers were called to Southern New Mexico to process a crime scene involving an inmate's

death.  See Feb. 5 Tr. at 88:13-89:1 (Castellano, Rhoades).  Rhoades stated that the scene as located

within one pod of a unit.  See Feb. 5 Tr. at 90:1-4 (Rhoades).  Rhoades said that, at the time, they

thought that nothing related to the crime occurred anywhere else, so they processed only the one

pod.  See Feb. 5 Tr. at 93:12-16 (Castellano, Rhoades).  Rhoades stated that they photographed

the scene as they found it to show what it looked like.  See Feb. 5 Tr. at 90:21-91:7 (Castellano,

Rhoades).  Rhoades walked the jury through several photographs, and stated that, upon first

walking into the pod, they saw a substance on the ground and wall later determined to be blood.

See Feb. 5 Tr. at 96:7-14 (Castellano, Rhoades).  Some photographs depicted scratches and

disturbances on the floor, of which Rhoades did not know the significance at the time.  See Feb. 5

Tr. at 103:19-104:8 (Castellano, Rhoades).  Rhoades circled a footprint in another photograph,

which he noted could be compared to the inmates' shoes in a laboratory.  See Feb. 5 Tr. at 105:8-

23 (Castellano, Rhoades).  Rhoades described different blood patterns found within Molina's cell.

See Feb. 5 Tr. at 107:17-114:7 (Castellano, Rhoades).

    Rhoades testified that a photograph of the door to the pod contained some sort of print,

possibly from a finger or palm, which is important for comparison.  See Feb. 5 Tr. at 115:14-25

(Castellano, Rhoades).  Other photographs depicted a trashcan, which Rhoades said contained a

shank underneath a chip bag to conceal the shank.  See Feb. 5 Tr. at 116:1-118:8 (Castellano,

Rhoades).  Rhoades described the shank as appearing to be made from metal, which had been

worked into a sharp point on one side, with the other side attached to a piece of string, either

through tape or plastic.  See Feb. 5 Tr. at 119:3-20 (Castellano, Rhoades); id. at 120:23-121:5

(Castellano, Rhoades).  Other photographs depicted the upper-level shower, and Rhoades noted

pieces of plastic and cardboard near the drain, with a string that appeared similar to that wrapped

around the shank found in the trashcan.  See Feb. 5 Tr. at 123:2-124:7 (Castellano, Rhoades).

Rhoades noted, in a closeup photograph, an object in a shower drain, which he identified as a shank.  See Feb. 5 Tr. at 124:8-125:1 (Castellano, Rhoades).  Rhoades stated that a rope was collected from Molina's cell, and it appeared to be saturated in blood, see Feb. 5 Tr. at 126:8-23 (Castellano, Rhoades), that a pair of sweatpants covered in blood was found soaking in water in the sink of cell 111,[50] and that pieces of plastic from a shank handle were found in that cell's toilet, see Feb. 5 Tr. at 127:25-129:3 (Castellano, Rhoades).  After the United States showed another trashcan photograph, Rhoades testified that correctional officers found another shank deep in the trashcan.  See Feb. 5 Tr. at 129:4-15 (Castellano, Rhoades).  Other photographs depicted Molina's bloody clothing, which another agent retrieved at the hospital, that appeared to contain cuts from the stabbing.  See Feb. 5 Tr. at 137:14-142:7 (Castellano, Rhoades).

After the lunchbreak, before the jury returned to the courtroom, R. Perez' counsel advised the Court of R. Perez' condition, stating that R. Perez returned from the hospital with a few prescriptions, had a fever of 101.6 and a concerning chest x-ray, and requested that the Court delay trial until the next day.  See Feb. 5 Tr. at 153:21-154:19 (Villa).  The United States Marshal informed the Court that R. Perez' flu test came back negative, and the Court noted that because R. Perez does not have the flu or pneumonia, they should continue with trial.  See Feb. 5 Tr. at 155:10-13 (Court).  With the jury present, the United States admitted as evidence the three shanks collected, and Rhoades noted that the shank collected from the drain and the shank found in the trashcan had threading on one end of the metal.  See Feb. 5 Tr. at 158:20-159:23 (Castellano, Rhoades).  The United States admitted M. Rodriguez' shoes collected on March 7, 2014, which

---

[50]Rhoades could not recall whose cell this was.  See Feb. 5 Tr. at 128:5-7 (Castellano, Rhoades).  Later testimony revealed that M. Rodriguez was housed in cell 111 at this time.  See Transcript of Jury Trial Volume 8 at 139:20-21 (taken February 7, 2018)(Armijo, M. Rodriguez), filed February 22, 2019 (Doc. 2524).

Rhoades said had been sitting in evidence until recently, when he had reason to search the shoes for a shank he believed to be located in the cloth in the back of one of the shoes. See Feb. 5 Tr. at 160:6-161:25 (Castellano, Court, Rhoades). Rhoades stated that he sawed through the right shoe's heel and found a metal shank during his second search of the shoe. See Feb. 5 Tr. at 162:7-13 (Castellano, Rhoades); id. at 164:1-14 (Rhoades, Castellano). The Court let Rhoades step down, advising him that he will be re-called. See Feb. 5 Tr. at 165:4-7 (Court).

### l.    **Hannah Kastenbaum's Testimony.**

With the defense attorneys' agreement, the United States then called Dr. Hannah Kastenbaum to the stand, out of order, to suit her schedule. See Feb. 5 Tr. at 164:19-165:3 (Castellano, Court, Villa). At the bench, outside the presence of the jury, R. Perez conducted a voir dire examination of Dr. Kastenbaum to determine her role in preparing Molina's medical examination report, because she supervised the person who conducted the autopsy and prepared the report. See Feb. 5 Tr. at 166:15-168:8 (Fox-Young, Kastenbaum). R. Perez then objected to Dr. Kastenbaum testifying about the findings, and argued that R. Perez has the Sixth Amendment right to confront the person who actually performed the autopsy. See Feb. 5 Tr. at 169:19-170:7 (Fox-Young). The United States said that it would call the person who performed the autopsy. See Feb. 5 Tr. at 171:1-7, 24-25 (Armijo).

In open court in front of the jury, Dr. Kastenbaum stated that she works at the Office of the Medical Investigator, which investigates sudden, unexpected, and unnatural deaths. See Feb. 5 Tr. at 172:12-25 (Armijo, Kastenbaum). Dr. Kastenbaum said that she received her M.D. in 2007, completed a residency in anatomic and clinical pathology, started a one-year fellowship in 2011 in forensic pathology at the Office of the Medical Investigator, and joined the staff in 2012. See Feb. 5 Tr. at 173:1-15 (Armijo, Kastenbaum). Dr. Kastenbaum stated that she is a Medical

Examiner, and that she examines dead bodies and also supervises the fellows and residents by reviewing and signing off on their findings.  See Feb. 5 Tr. at 175:3-22 (Armijo, Kastenbaum). Dr. Kastenbaum explained that the point of her examinations is to determine the cause of death, such as an injury or disease, and the manner of death, including the circumstances surrounding the death.  See Feb. 5 Tr. at 177:22-178:4 (Kastenbaum).  Dr. Kastenbaum stated that she supervised Molina's autopsy and that Dr. Leslie Hamilton performed it.  See Feb. 5 Tr. at 175:23-176:10 (Armijo, Kastenbaum).  The Court let Dr. Kastenbaum step down from the witness stand, and the United States re-called Rhoades.  See Feb. 5 Tr. at 180:14-17 (Court); id. at 180:23-24 (Castellano).

**m.    Norman Rhoades' Testimony Continued.**

Upon re-calling Rhoades, the United States passed the witness, and D. Sanchez began his cross-examination.  See Feb. 5 Tr. at 181:22-15 (Castellano, Court, Jacks).  Rhoades provided that he did not ask about the surveillance videos at Southern New Mexico and never saw any footage, because other NM State Police agents were in charge of dealing with the videos.  See Feb. 5 Tr. at 184:9-24 (Jacks, Rhoades).  Rhoades said he did not interview anyone about the potential source of the shanks and did not know about the prison's wheelchair program, where inmates refurbish wheelchairs and walkers for charity.  See Feb. 5 Tr. at 185:8-18 (Jacks, Rhoades).  Rhoades stated that all collected evidence was given to Palomares, who then sent it to the laboratory for testing. See Feb. 5 Tr. at 187:11-17 (Villa, Rhoades).  Rhoades did not recall photographing a walker, taking one into evidence, or seeing one at Southern New Mexico during his investigation.  See Feb. 5 Tr. at 191:18-192:9 (Villa, Rhoades).

Rhoades testified that they photographed every inmate housed in blue pod and collected the clothing that the inmates wore to be photographed.  See Feb. 5 Tr. at 193:4-24 (Villa, Rhoades).

Rhoades stated that the shank recovered from M. Rodriguez' shoe was never submitted to the laboratory and admitted that there is no evidence tying it to the Molina case.  See Feb. 5 Tr. at 196:15-23 (Villa, Rhoades); id. at 197:17-22 (Lowry, Rhoades).  Rhoades said that all the evidence collected during the investigation is available to the defense, that he would bring any items they want, and that his job on March 7, 2014, was only to process the crime scene.  See Feb. 5 Tr. at 198:16-199:4 (Castellano, Rhoads).  The Court excused Rhoades.  See Feb. 5 Tr. at 199:21-22 (Court).

n.    <strong><u>Guadalupe Urquizo's Testimony.</u></strong>

The United States next called Urquizo, who was in custody.  See Feb. 5 Tr. at 199:25-200:1 (Beck); id. at 220:9-11 (Beck, Urquizo).  Urquizo stated that he joined SNM in 1998, and that he "earned his bones" by assaulting inmates and correctional officers, including stabbing Paul Lasner at Torrez' request.  Feb. 5 Tr. at 200:21-201:17 (Beck, Urquizo).  Urquizo identified Torrez as the main leader at the time he joined SNM and Baca as the current leader.  See Feb. 5 Tr. at 201:18-20 (Beck, Urquizo); id. at 202:10-12 (Beck, Urquizo).  Urquizo stated that under Baca there is a four-to-six-person "tabla."  Feb. 5 Tr. at 202:6-9 (Urquizo).  Urquizo stated that SNM recruits inmates who are violent, crazy, and willing to stab, assault, bring in drugs, or do anything the gang asked.  See Feb. 5 Tr. at 202:21-25 (Beck, Urquizo).  Urquizo testified that he helped recruit M. Rodriguez, because he had assaulted correctional officers and, thus, exhibited the mentality which SNM sought.  See Feb. 5 Tr. at 203:10-23 (Beck, Urquizo).  Urquizo described the crimes that he committed for SNM: assaulting an inmate at Torrez' direction in 1998, assaulting a correctional officer in 1999 as a protest for being moved to lockdown at the Intense Supervision Unit, possessing a shank in 1999 which he used to assault a correctional officer, assaulting a correctional officer in 2002, shooting a rival prison gang member in the streets in 2002, assaulting a rival prison

gang member in prison in 2005, and assaulting fellow member Greg Chacon over a political disagreement.  See Feb. 5 Tr. at 208:1-214:16 (Beck, Urquizo).  Urquizo stated that it was incumbent on him, while running the pod with Rubio, to stop Chacon from coming in and changing the rules.  See Feb. 5 Tr. at 215:10-15 (Beck, Urquizo).  Urquizo stated that Baca had put a "greenlight," or an order to kill, on Rubio in December, 2016, about which Urquizo informed Rubio.  See Feb. 5 Tr. at 215:16-21 (Beck, Urquizo).

Urquizo listed the gang's rules: loyalty to the gang, respect for other members, no sex crimes, no "snitching" or working with law enforcement, and willingness to assault and do anything.  Feb. 5 Tr. at 204:2-7 (Urquizo).  Urquizo stated that whoever violates the rules will get stabbed.  See Feb. 5 Tr. at 204:8-11 (Beck, Urquizo).  Urquizo testified that SNM controls the drugs in prison through the mail, intimidating or paying correctional officers and non-SNM prisoners.  See Feb. 5 Tr. at 205:7-206:1 (Beck, Urquizo).  Urquizo said that he has avoided drugs since 2009, when he almost killed himself after taking methamphetamine.  See Feb. 5 Tr. at 206:11-16 (Urquizo).  While on the streets in 2006, Urquizo sold drugs and sent the money to Calbert, R. Martinez, and A.A. Garcia.  See Feb. 5 Tr. at 206:20-207:5 (Beck, Urquizo).  Urquizo stated that members communicate within prison through "huilas" -- meaning letters, or "kites" -- written in code, or through telephone calls in which an inmate calls his wife who then calls another inmate's wife who then calls the other inmate to deliver the message.  Feb. 5 Tr. at 207:8-16 (Beck, Urquizo).  Urquizo admitted to speaking in code with other SNM members.  See Feb. 5 Tr. at 207:17-24 (Beck, Urquizo).

Urquizo stated that he agreed to cooperate in February, 2017, after Acee asked him if he wanted to talk and, after initial resistance, he decided that he was tired of the lifestyle.  See Feb. 5 Tr. at 215:25-216:16 (Beck, Urquizo).  Urquizo admitted that he learned from Acee that he was

being targeted for federal crimes, which also influenced his decision to cooperate. See Feb. 5 Tr. at 216:17-22 (Beck, Urquizo). Urquizo stated that he debriefed with the FBI in August, 2017, and, afterwards, spoke with Calbert, which Urquizo said was not planned, for about five minutes. See Feb. 5 Tr. at 216:23-217:15 (Beck, Urquizo). Urquizo stated that he mostly tried to convince Calbert to cooperate, and he and Calbert only discussed Calbert's statement that Urquizo initially provided Calbert the "paperwork." Feb. 5 Tr. at 217:16-218:8 (Beck, Urquizo). Urquizo discussed his guilty plea, and he said he faces twenty years of imprisonment to be served concurrent with his state sentence of nine to twelve years. See Feb. 5 Tr. at 220:2-17 (Beck, Urquizo). Urquizo stated that facing twenty years, as opposed to life imprisonment, which he would have received had he been charged in Molina's murder, is a benefit. See Feb. 5 Tr. at 220:23-221:8 (Beck, Urquizo). Urquizo said that he has to testify truthfully and that, if he does not, the plea will get thrown out and he could face additional charges. See Feb. 5 Tr. at 221:16-222:5 (Beck, Urquizo). Urquizo discussed the other benefits which he received for his cooperation: $200 to $300, contact visits with his family, and extra telephone calls. See Feb. 5 Tr. at 222:6-13 (Beck, Urquizo). Urquizo admitted that he told his wife that he was hoping to receive ten to fifteen years. See Feb. 5 Tr. at 222:20-223:3 (Beck, Urquizo).

After the afternoon break, before the jury entered the courtroom, the Court informed the parties that one of the jurors sent a note requesting a list of the Defendants' respective charges and attorneys. See Feb. 5 Tr. at 223:13-21 (Court). The Court decided to provide the jurors with a copy of the preliminary instructions, altering the caption to include only the First Trial Defendants, and counsel agreed. See Feb. 5 Tr. at 225:3-24 (Court, Castellano, Jacks, Bhalla, Villa).

With the jury back in the courtroom, Urquizo stated that he did not want to admit to his wife that he could get sentenced to twenty years, and that he was hoping the Court would sentence

him to less for his honesty.  See Feb. 5 Tr. at 229:1-15 (Urquizo, Beck).  Urquizo said that he met

with Beck three or four times to prepare for his testimony, and that, after the first meeting on

February 1, 2018, Urquizo got in a disagreement with correctional officers when he refused to be

transported back to the Otero County Detention Center ("Otero County").  See Feb. 5 Tr. at 29:16-

230:23 (Beck, Urquizo).  Urquizo stated that he did not want to return to Otero County after

spending three months there, because it was a dirty facility, and, when inmates leave the facility

for any length of time, inmates cannot retrieve anything they purchased at the facility upon re-

entry, so he would have to start without hygiene products or clothing.  See Feb. 5 Tr. at 230:24-

231:12 (Beck, Urquizo).  Urquizo said that he felt like the NM Corrections Department treated

him unfairly, because, after spending three months at Otero County and returning to PNM, he

found that his television was gone, his commissary and family photographs were missing and

pages in his address book were torn out.  See Feb. 5 Tr. at 231:13-232:2 (Beck, Urquizo).  Urquizo

admitted that he had a meltdown in the transport van to Otero County last Thursday, and he told

the correctional officers that the was going to give D. Sanchez and Baca love, and not be truthful

about what he knows.  See Feb. 5 Tr. at 254:14-255:18 (Beck, Urquizo).  Urquizo maintained,

however, that he has been telling the truth.  See Feb. 5 Tr. at 255:19-20 (Beck, Urquizo).

Urquizo said that, in 2012 and 2013, he was incarcerated at PNM North in a pod right next

to Baca's pod.  See Feb. 5 Tr. at 232:6-23 (Beck, Urquizo).  Urquizo stated that Baca was SNM's

leader at that time and that one day, while they were outside for recreation, Baca informed him

that Molina needed to be "hit" because there was "paperwork" on him, and that Baca wanted

Urquizo to take word about Molina down to PNM South when he moved.  Feb. 5 Tr. at 232:24-

233:20 (Beck, Urquizo).  Urquizo stated that, the last time that he spoke with Baca about Molina,

Baca was in Q pod and spelled out the window to Urquizo, who was outside for recreation, "Don't

forget that message. Take care of that." and "Javier Molina." Feb. 5 Tr. at 234:8-9, 15 (Urquizo). See id. at 233:24-234:234:19 (Urquizo, Beck). Urquizo maintained that he moved to PNM South that same day. See Feb. 5 Tr. at 235:1-4 (Beck, Urquizo). Urquizo said that Calbert showed up to PNM South in February, 2014, with Molina's "paperwork," and that Calbert called Varela, R. Martinez, and Urquizo to his cell to pass the "paperwork" and tell them that "Pup wants this done." Feb. 5 Tr. at 236:2-3 (Urquizo). See id. at 235:5-236:7 (Beck, Urquizo).

Urquizo stated that the "paperwork" was a one page, black and white, typed Las Cruces police report. Feb. 5 Tr. at 236:8-24 (Beck, Urquizo). Urquizo said that the "paperwork" described Molina's version of a purse-snatching incident, in which Molina maintained that he sat in the car while Jesse Sosa grabbed the purse. Feb. 5 Tr. at 236:25-237:8 (Beck, Urquizo). Urquizo recalled that Urquizo, Calbert, Varela, and R. Martinez laughed at the "paperwork," and did not think it was really telling, but Urquizo nonetheless agreed to transport the "paperwork" to Southern New Mexico. Feb. 5 Tr. at 237:15-238:7 (Beck, Urquizo). Urquizo admitted that he willingly transported the "paperwork" knowing that it would result in Molina's murder, because SNM wanted a murder and not just an assault. Feb. 5 Tr. at 238:8-14 (Beck, Urquizo). Urquizo stated that, upon receiving the "paperwork," he hid it in his stack of legal paperwork for his appeals, because corrections officers cannot go through legal paperwork. Feb. 5 Tr. at 238:15-239:21 (Beck, Urquizo).

On March 6, 2014, the day before Molina's murder, Urquizo was moved to Southern New Mexico, and he brought Molina's "paperwork." See Feb. 5 Tr. at 239:22-240:3 (Beck, Urquizo). Urquizo stated that he could not get his property, however, until the next day. See Feb. 5 Tr. at 240:6-10 (Urquizo). Urquizo said that he stopped by the window at the door to the blue pod as he walked into the unit, and spoke with T. Martinez and M. Rodriguez, who asked, "[y]ou got that?"

and he responded, "[y]eah."  Feb. 5 Tr. at 240:15, 17 (Urquizo).  See id. at 240:10-17 (Urquizo).

Urquizo testified that he walked into yellow pod, and, while a correctional officer searched his

cell, he walked to the door between the blue and yellow pods and spoke with M. Rodriguez through

the door, verifying that he had the "paperwork" on Molina, but that the "paperwork" on J. Montoya

did not make it.  Feb. 5 Tr. at 240:25-242:9 (Beck, Urquizo).  Urquizo said that M. Rodriguez

slipped a letter under the door, and Urquizo told him that Urquizo would not get his property until

the next day, so he would pass the "paperwork" as soon as he got it.  Feb. 5 Tr. at 242:10-15

(Urquizo).  According to Urquizo, the letter discussed M. Rodriguez' desire that Urquizo have the

"paperwork" on Molina and J. Montoya, because nobody liked Molina, and because M. Rodriguez

wanted have both "hit," and M. Rodriguez provided Urquizo permission to handle his personal

dispute with Sammy Gonzalez.  Feb. 5 Tr. at 243:24-244:7 (Beck, Urquizo).  Urquizo stated that

his name was on the chalk board that lists who is arriving, so people knew he was arriving.  See

Feb. 5 Tr. at 242:18-23 (Urquizo).

Urquizo stated that Herrera also asked him about Molina's "paperwork" and that Urquizo

also told him that it was in Urquizo's property.  Feb. 5 Tr. at 243:1-9 (Beck, Urquizo).  Urquizo

said that Herrera was the yellow pod's leader at the time.  See Feb. 5 Tr. at 261:8-12 (Beck,

Urquizo).  Urquizo also stated that he and Herrera discussed "hitting" S. Gonzalez, and Herrera

said he would still help.  Feb. 5 Tr. at 243:10-19 (Beck, Urquizo).  According to Urquizo, because

he was locked down in orientation, he asked Herrera to pass a note back to M. Rodriguez verifying

that he had the Molina "paperwork" and explaining that the J. Montoya "paperwork" was at PNM

North and was not received in time, and that he wanted to "hit" S. Gonzalez; M. Rodriguez

responded that they would "hit" S. Gonzalez as soon as possible.  Feb. 5 Tr. at 244:8-245:2 (Beck,

Urquizo).  Urquizo stated that the next morning, around 11:00 a.m., he received his property and,

because certain people in the yellow and blue pods were asking for the "paperwork," he went quickly, then passed it under the cell door to Herrera. Feb. 5 Tr. at 245:3-246:20 (Beck, Urquizo). Urquizo said that Herrera looked closely at the "paperwork" with Mendez and Dale Chavez, and then passed it under the door to blue pod to M. Rodriguez, who was banging on the door asking for it. Feb. 5 Tr. at 246:21-247:9 (Beck, Urquizo). Urquizo said that, about twenty minutes later, he received a letter from M. Rodriguez saying that now they can take care of Molina, likely after dinner, and apologizing that the "hit" on S. Gonzalez was not going to occur. Feb. 5 Tr. at 248:6-18 (Urquizo). Urquizo stated that Herrera handed him Molina's "paperwork" with the letter. Feb. 5 Tr. at 249:17-23 (Beck, Urquizo). Urquizo said that, after dinner, he was the last to take a shower and he yelled to Herrera and Alex Munoz when he was done, so they hit the wall -- Urquizo believed they went to tell T. Martinez and M. Rodriguez that they were done with showers. See Feb. 5 Tr. at 248:23-249:6 (Urquizo). Urquizo said that, about five minutes after blue pod was let out of lockdown, he could hear yelling and "[g]et him, get him," so he knew Molina was being attacked. Feb. 5 Tr. at 249:7-16 (Beck, Urquizo). Urquizo said that the correctional officers ran into the blue pod and tried to revive Molina in front of the yellow and blue pods, and yelled into the yellow pod to lock down. See Feb. 5 Tr. at 250:1-24 (Urquizo, Beck). Herrera told Urquizo that Molina had been "hit" and, later that night, after finding out Molina died, Herrera told Urquizo to get rid of the "paperwork," so Urquizo tore it into pieces and flushed it. Feb. 5 Tr. at 250:25-251:12 (Beck, Urquizo). Urquizo testified that, after the murder, everybody in blue pod was moved out, and Varela and S. Gonzalez were moved from yellow pod. See Feb. 5 Tr. at 251:13-17 (Beck, Urquizo).

At some point, Urquizo and M. Rodriguez spoke, and M. Rodriguez said that, if D. Sanchez had covered the cameras during Molina's murder, then "all this wouldn't have happened." Feb. 5

Tr. at 251:23-24 (Urquizo).  See Feb. 5 Tr. at 251:21-252:1 (Urquizo).  Urquizo and M. Rodriguez

decided that D. Sanchez should be "hit" for letting his "brothers" down, and they spoke with R.P.

Martinez, R. Martinez, Archuleta, and Calbert, who agreed.  Feb. 5 Tr. at 252:15-17 (Urquizo).

Urquizo said that D. Sanchez was blue pod's leader at the time and, as a leader, was supposed to

set an example.  See Feb. 5 Tr. at 252:18-23 (Urquizo, Beck).  Urquizo said that, sometime after

Molina's murder, he was in a transport van to PNM with R. Perez.  See Feb. 5 Tr. at 255:21-23

(Beck, Urquizo).  The Court gave a limiting instruction,[51] and Urquizo stated that R. Perez

admitted to providing a shank from his walker to M. Rodriguez and to D. Sanchez for Molina's

murder.  See Feb. 5 Tr. at 256:14-25 (Court, Beck, Urquizo).  Urquizo said that R. Perez was

bragging about his involvement, and Urquizo understood R. Perez to mean that he "put in work"

for SNM by providing his walker.  Feb. 5 Tr. at 257:1-17 (Beck, Urquizo).

Urquizo said that, a year after Molina's murder, in July, 2015, Baca ordered Urquizo and

Jonathan Gomez to assault Romero -- which is charged in Count 8.[52]  See Feb. 5 Tr. at 257:18-

258:6 (Beck, Urquizo).  At that time, Gomez and Urquizo were housed in Southern New Mexico,

and were the key-holders of their pod, so they told Villegas that he had to assault Romero.  See

Feb. 5 Tr. at 258:7-259:13 (Beck, Urquizo).  Urquizo said that, after the assault, he was transferred

to PNM North, and that, because Baca was in Arizona, he called Archuleta to let him know that

they beat up Romero and that Gomez called his own wife, who called Baca's wife to pass along

the message.  See Feb. 5 Tr. at 259:14-280:6 (Beck, Urquizo).  Urquizo described that, while Baca

---

[51]The Court instructed: "All right.  He's going to testify about some statements that Mr. Perez made, or at least a statement, and these can only be used in your deliberations as to the charges against Mr. Perez, not as to the other defendants."  Feb. 5 Tr. at 256:14-18 (Court).

[52]Mr. Beck misidentified the Romero assault as charged in Count 3.  See Feb. 5 Tr. at 257:18-20 (Beck).  Count 8, however, charges the Romero assault.  See Indictment at 13-14.

had ordered Romero killed, Gomez suggested only assaulting Romero, because SNM had been on lockdown since Molina's murder and because only one person would do it -- the other two people whom Urquizo and Gomez wanted to act on Romero did not want to do the murder.  See Feb. 5 Tr. at 260:7-22 (Beck, Urquizo).

Urquizo elaborated that Archuleta had ordered Romero killed years ago, because Romero slept with Archuleta's wife, but that Baca put out the order on which they acted.  See Feb. 5 Tr. at 262:7-263:521 (Lowry, Urquizo).  Baca confronted Urquizo with a report that Acee prepared which provides that Urquizo said Baca ordered Romero assaulted, but not stabbed or killed, and Urquizo maintained that Acee may have said that on accident, and that it was Gomez and not Baca who decided not to stab or kill Romero.  See Feb. 5 Tr. at 264:9-265:8 (Lowry, Urquizo).  Urquizo admitted that the younger SNM members were trying to move up and did not like the politics Baca came with -- namely, the new agenda that he brought from out of state related to the Sureños gang. See Feb. 5 Tr. at 267:19-269:4 (Urquizo, Lowry).

During his cross-examination, Baca underscored that Urquizo requested an attorney during his first meeting with the FBI, a request that the FBI ignored, and Urquizo verified that the FBI informed him that he could be charged in Molina's murder and could face prison time in addition to his state sentence.  See Feb. 5 Tr. at 269:15-270:13 (Lowry, Urquizo).  Urquizo said that the FBI was not aggressive during this meeting and just asked Urquizo to listen.  See Feb. 5 Tr. at 270:25-271:5 (Urquizo).  Urquizo maintained that family support throughout his incarceration is important, and that he is honest with his sister and brother, but keeps some things from his wife to not hurt her.  See Feb. 5 Tr. at 271:6-272:15 (Lowry, Urquizo).  Urquizo could not recall whether he had spoken to his sister about the FBI informing him that they could impose the death penalty. See Feb. 5 Tr. at 172:16-25 (Lowry, Urquizo); id. at 274:25-275:5 (Lowry, Urquizo).  To refresh

Urquizo's recollection, Baca played a clip of the conversation in which Urquizo told his sister that the FBI informed him of the possibility of bringing the death penalty, and Urquizo stated that the FBI did not discuss the death penalty; rather, Urquizo made the assumption that it was a possibility from seeing the news reports.  See Feb. 5 Tr. at 278:10-279:1 (Lowry, Urquizo).  Urquizo admitted that the FBI informed him that, if charged with Molina's murder, he faced twenty years or life imprisonment, and that he did not lie to his sister about the possibility of the death penalty, because he saw that reported in the news and made an assumption.  See Feb. 5 Tr. at 279:2-16 (Lowry, Urquizo).  Urquizo noted that the death penalty had not been taken off the table yet, so, as far as he knew, during this conversation, it was still possible -- although the FBI did not tell him that he could face the death penalty.  See Feb. 5 Tr. at 280:6-10 (Urquizo).  Urquizo said that he decided to cooperate, because the FBI came to him and because he had been wanting out of the gang, and this situation was easier than Urquizo having to go to the FBI himself.  See Feb. 5 Tr. at 281:17-282:12 (Urquizo, Lowry).  Urquizo admitted that he was not happy with the thought of getting twenty years, because prison is difficult and because he wants to get out.  See Feb. 5 Tr. at 283:1-13 (Urquizo, Lowry).  The Court broke for the evening and gave a limiting instruction regarding Urquizo's inconsistent statements.[53]  See Feb. 5 Tr. at 283:17-283:4 (Court).

---

[53]The Court instructed:

> Ladies and gentlemen, you've just heard the testimony of Mr. Urquizo, and you've also heard that before this trial he made a statement that may be different from his testimony here in court.  This earlier statement was brought to your attention only to help you decide how believable his testimony in this trial is.  You cannot use it as proof of anything else.  You can only use it as one way of evaluating Mr. Urquizo's testimony here in court.

Feb. 5 Tr. at 283:17-284:1 (Court).

The next morning, R. Perez' counsel made a brief record outside the presence of the jury, reporting that R. Perez was still feeling awful and had been sleeping intermittently the day before, and coughed so loud at times that the people at his table could not hear questioning or testimony. See Transcript of Jury Trial Volume 7 at 5:4-22 (taken February 6, 2018)(Fox-Young), filed February 22, 2019 (Doc. 2523)("Feb. 6 Tr."). The Court requested R. Perez' counsel signal when R. Perez needs a break or anything else. See Feb. 6 Tr. at 6:17-18 (Court). When the jurors entered the courtroom, the Court informed them that it would soon pass out the preliminary instructions -- providing the Defendants' names, their charges, and their attorneys' names -- to help them follow along. See Feb. 6 Tr. at 12:15-21 (Court).

During Baca's continued cross-examination, Urquizo clarified that he had the "paperwork" on the RICO indictments, showing that everybody charged faced the death penalty, but admitted that he was not aware that the United States took the death penalty off the table before his first meeting with the FBI. Feb. 6 Tr. at 13:14-14:4 (Lowry, Urquizo). Urquizo maintained that he made an assumption from the indictments that he faced the death penalty and that this possibly was not something the FBI told him. See Feb. 6 Tr. at 14:25-15:8 (Lowry, Urquizo). Baca played a clip, however, of Urquizo telling his brother that the FBI could impose the death penalty. See Feb. 6 Tr. at 19:7-10 (Lowry, Urquizo). About two weeks after the first meeting, on March 6, 2017, Urquizo said he met with the FBI and federal prosecutors in Las Cruces, and received a Kastigar letter, providing that his statements would not be used against him. See Feb. 6 Tr. at 17:8-25 (Lowry, Urquizo).

Urquizo testified that he spoke with Baca in 2012 -- admitting that he was wrong when he told the FBI that it could have been 2013-- while they were housed in unit 3-B at PNM North. See Feb. 6 Tr. at 20:4-21:11 (Lowry, Urquizo). Urquizo said he was in W pod and Baca was in X pod,

- 154 -

that he had not been in W pod long, and that he spoke with Baca during recreation.  See Feb. 6 Tr. at 21:12-24 (Lowry, Urquizo).  Urquizo believed that he was transferred to PNM South from PNM North in late 2012, so he spoke with Baca before he moved.  See Feb. 6 Tr. at 29:5-12 (Lowry, Urquizo).  Baca noted that the FBI 302 report from the March 6, 2017, meeting mentions only one conversation between Urquizo and Baca, although Urquizo maintained that he spoke with Baca twice.  See Feb. 6 Tr. at 36:2-11 (Lowry, Urquizo).  Urquizo maintained that he told the FBI that, when he went to Southern New Mexico, he talked to T. Martinez and M. Rodriguez at the window in the door to their pod, that they told him to go to the side door, and that, when he went to the side door, M. Rodriguez slid a letter under the door and asked about the "paperwork."  Feb. 6 Tr. at 23:2-17 (Lowry, Urquizo).  Baca noted that the FBI 302 from the March 6 meeting states that M. Rodriguez asked about the "paperwork" and held a note up to the window, but Urquizo maintained that this description is not what he said.  See Feb. 6 Tr. at 23:18-25 (Lowry, Urquizo).

Urquizo said that he told the FBI and prosecutors at the March 6 meeting that there was an incident involving his brother and that he wanted to make sure nothing happened to his brother, but that they told Urquizo that they were not after his brother.  See Feb. 6 Tr. at 30:1-31:4 (Urquizo, Lowery).  Urquizo testified that the incident involved M. Rodriguez and J. Montoya calling his brother to pass along the message to Urquizo not to forget the "huila" -- the "paperwork" on Molina and J. Montoya – and that J. Montoya did not know that he was calling about his own "paperwork." Feb. 6 Tr. at 91:1-25 (Villa, Urquizo).  Urquizo said his brother did not know what the message meant, but passed it to Urquizo.  See Feb. 6 Tr. at 92:1-12 (Villa, Urquizo).  Urquizo did not recall telling his brother that the FBI was asking questions about his brother's criminal conduct or that he tried to deflect these questions, but remembered that B. Garcia's lawyer asked questions about Urquizo's brother.  See Feb. 6 Tr. at 31:5-21 (Lowry, Urquizo).  Urquizo said that he did not tell

his brother that he was in the clear, because Urquizo decided to cooperate, but did tell him that he would be safe.  See Feb. 6 Tr. at 32:15-33:13 (Lowry, Urquizo).  Urquizo said that he never dealt drugs from New Mexico to Baltimore, Maryland or worked with Duran to deal drugs.  See Feb. 6 Tr. at 31:22-14 (Lowry, Urquizo).  Urquizo clarified that he never spoke directly with Baca regarding the Romero assault, but that he understood Baca wanted him killed but that Gomez wanted to assault him instead, and somehow the 302 report mistakenly states that Baca wanted Romero only assaulted.  See Feb. 6 Tr. at 36:15-37:20 (Lowry, Urquizo).

Urquizo admitted that his wife was present at the March 6, 2017, meeting, and that he was able to embrace and kiss her, but that he did not start receiving other benefits until a few months later.  See Feb. 6 Tr. at 38:9-39:1 (Lowry, Urquizo).  Baca noted that Urquizo told his wife that he believed he would get a sentence below five years and that, if he got other people to cooperate, such as Calbert, he would get substantial reductions in his sentence, but Urquizo stated that these statements were what he was hoping, and that he was trying to comfort his wife.  See Feb. 6 Tr. at 39:21-41:1 (Lowry, Urquizo).  Baca showed Urquizo a letter describing how to smuggle Suboxone into prison, and Urquizo admitted that the NM Corrections Department told the FBI that the letter was found in Urquizo's cell, but Urquizo maintained that he did not know if it was in his cell, and that he only saw and read it for the first time a few days ago.  See Feb. 6 Tr. at 43:22-44:17 (Lowry, Urquizo); id. at 75:10-13 (Bhalla, Urquizo).  Urquizo stated that the letter is not in his handwriting and admitted that he was told that the letter was found in his cell in January, 2018.  See Feb. 6 Tr. at 75:4-16 (Bhalla, Urquizo).  Urquizo maintained that he last used Suboxone "[a] few years ago," but could not recall the exact year.  Feb. 6 Tr. at 44:22 (Urquizo).  See Feb. 6 Tr. at 44:21-25 (Lowry, Urquizo).  Urquizo admitted that he told his wife that he assaulted Chacon over a dead telephone battery, explaining that, because the STIU listens to the telephone calls, he would not

tell her the truth that it was an SNM assault, and he wanted to tell her why he could not call her. See Feb. 6 Tr. at 45:6-46:12 (Lowry, Urquizo). Baca also pointed out that Urquizo received around $650.00, as opposed to the $200.00 to $300.00 to which he testified on direct, and Urquizo stated that he was not tracking the money he received. See Feb. 6 Tr. at 53:16-25 (Lowry, Urquizo). Urquizo also admitted that, if his federal sentence is equal to or less than the amount he has left on his state sentence, he can get out without serving additional time, because the plea agreement provides that the sentences will be served concurrently. See Feb. 6 Tr. at 55:8-15 (Lowry, Urquizo).

Urquizo admitted that, in August, 2017, he met with Acee again and discussed the "hit" on Alex Sosoya, and told him that M. Rodriguez instigated the fight. Feb. 6 Tr. at 58:11-59:16 (Bhalla, Urquizo). Urquizo also admitted that he said M. Rodriguez wanted to be a leader, but M. Rodriguez' prior sexual assault charge -- for placing a hot sauce bottle in a fellow inmate's rectum -- prevents him from being a leader. See Feb. 6 Tr. at 59:17-61:9 (Bhalla, Urquizo). Urquizo said that, after deciding to cooperate, he was housed with Fred Quintana, Rubio, B. Cordova, and R. Martinez. See Feb. 6 Tr. at 72:10-74:10 (Bhalla, Urquizo). Urquizo maintained that he did not have tier time with these individuals and that the pod was locked down. See Feb. 6 Tr. at 176:10-17 (Jacks, Urquizo). Urquizo said that he was only able to speak with R. Martinez, because he was housed nearby. See Feb. 6 Tr. at 176:18-24 (Jacks, Urquizo). Urquizo stated that he did not receive a discovery tablet. See Feb. 6 Tr. at 74:11-12 (Bhalla, Urquizo). Urquizo admitted that he saw other people's discovery, which includes transcripts of recordings that Archuleta made while he was wired and cooperating, but Urquizo maintained that he was not implicated in those transcripts. See Feb. 6 Tr. at 77:8-78:24 (Urquizo, Bhalla).

R. Perez questioned Urquizo about when R. Perez and Urquizo spoke about Molina's murder, and Urquizo said the conversation occurred in 2015 in the transport van from Southern New Mexico to PNM.  See Feb. 6 Tr. at 80:12-25 (Villa, Urquizo).  Urquizo believed that the conversation occurred in June, 2015, and agreed that this conversation took place about a year and three months after Molina's murder.  See Feb. 6 Tr. at 82:17-83:11 (Villa, Urquizo).  Urquizo admitted that, during the transport, R. Perez fell between the seats on the van and the correctional officers had to stop the van to help him up.  See Feb. 6 Tr. at 85:15-21 (Villa, Urquizo).  Urquizo verified that R. Perez did not tell him that M. Rodriguez took the piece from the walker or that R. Perez was scared when this happened, and admitted that M. Rodriguez has a reputation in SNM for being violent and scary.  See Feb. 6 Tr. at 86:8-25 (Villa, Urquizo); id. at 89:5-16 (Villa, Urquizo).  Urquizo also verified that R. Perez did not say that he was scared that he would be the next victim when M. Rodriguez took the piece from his walker, but Urquizo said that SNM knows R. Perez is disabled, so R. Perez gets a pass and nobody would mess with him.  See Feb. 6 Tr. at 89:17-24 (Villa, Urquizo).  Urquizo agreed that, if R. Perez said that he was scared for his life, that would be weak, but Urquizo said that he would not believe R. Perez if he made that statement. See Feb. 6 Tr. at 90:18-23 (Villa, Urquizo).  Urquizo described himself, M. Rodriguez, Calbert, and Herrera, as close friends and that Urquizo, M. Rodriguez, and Calbert did not like Baca's politics.  See Feb. 6 Tr. at 88:4-89:4 (Villa, Urquizo).

R. Perez noted that, when Urquizo first spoke with the FBI in February, 2017, Urquizo did not mention his conversation with R. Perez, but Urquizo maintained that he did not want to say much until he got a lawyer.  See Feb. 6 Tr. at 99:3-100:18 (Villa, Urquizo).  Urquizo maintained that he told Acee about R. Perez' involvement in March, 2017, and about Urquizo's knowledge

that there were three shanks, but did not recall whether he told Acee about the transport van in this meeting or in August, 2017. See Feb. 6 Tr. at 101:16-102:12 (Villa, Urquizo).

Urquizo maintained that Molina's homicide occurred so quickly after Urquizo's arrival, because, otherwise, somebody would have "kited out" Molina. Feb. 6 Tr. at 94:2-7 (Villa, Urquizo). Urquizo also stated that the murder occurred quickly under D. Sanchez' orders. See Feb. 6 Tr. at 94:8-11 (Villa, Urquizo). Urquizo verified that he passed the "paperwork" to Herrera, who passed it to M. Rodriguez through the bottom tier's door between the yellow and blue pods. Feb. 6 Tr. at 94:19-96:4 (Villa, Urquizo).

R. Perez noted how much work Urquizo did for SNM and that he later decided to cooperate against the gang. See Feb. 6 Tr. at 104:23-108:16 (Villa, Urquizo). Urquizo admitted that M. Rodriguez also decided to cooperate, albeit recently, and that Calbert decided to cooperate after Urquizo spoke with him. See Feb. 6 Tr. at 108:17-1092 (Villa, Urquizo). Urquizo maintained that he spoke with the government before his discussion with Calbert and that cooperating is different from being in a gang. See Feb. 6 Tr. at 109:3-17 (Villa, Urquizo). Urquizo stated that other cooperators -- namely, R. Martinez and Quintana -- told him that, if he got Calbert to cooperate, he would get a shorter sentence. See Feb. 6 Tr. at 178:13-179:2 (Jacks, Urquizo). Urquizo described telling Calbert that he decided to cooperate and had told the United States about their involvement in transporting Molina's "paperwork," but stated that he did not describe the benefits which he received. Feb. 6 Tr. at 179:6-180:14 (Jacks, Urquizo).

During D. Sanchez' cross-examination, Urquizo admitted to discussing the "paperwork" story with D. Sanchez' counsel and an investigator in May, 2016, because Urquizo respected D. Sanchez, and believed he was wise, a good listener, and somebody to whom inmates looked up. Feb. 6 Tr. at 114:3-115:17 (Jacks, Urquizo). D. Sanchez noted that Urquizo laughed at this

meeting when told the United States' allegation that he brought Molina's "paperwork" down to Southern New Mexico, but Urquizo said he laughs a lot, although he admitted to saying that the United States' allegation was impossible. Feb. 6 Tr. at 116:9-117:3 (Jacks, Urquizo). Urquizo explained the transport process: first the inmate is strip searched; then the inmate is given a see-through, disposable white jumpsuit to wear during transport; and the inmate's property is placed into clear, plastic bags. See Feb. 6 Tr. at 117:14-121:5 (Jacks, Urquizo); id. at 122:12-13 (Urquizo). Urquizo did not believe that the guards inventoried his property before his transport to Southern New Mexico. See Feb. 6 Tr. at 121:6-15 (Jacks, Urquizo). Urquizo admitted, however, that he told D. Sanchez' counsel at the meeting that he gave his property to an officer who looked through it to ensure Urquizo was transporting permissible items and wrote down what was in the bag, and may have said that the officer inventoried the property. See Feb. 6 Tr. at 121:16-122:13 (Jacks, Urquizo). Urquizo did not believe that he told D. Sanchez' counsel that he never got his property back at Southern New Mexico, because Molina was killed, but maintained that he received it around 11:00 a.m. on March 7, 2014. See Feb. 6 Tr. at 137:1-19 (Jacks, Urquizo). Urquizo stated that the Molina "paperwork" consisted of one page, but admitted to telling Acee in March, 2017, that "it was probably one or two pages." Feb. 6 Tr. at 166:6 (Urquizo). See id. at 165:16-166:4 (Jacks, Urquizo). D. Sanchez noted that Calbert testified that the "paperwork" consisted of one page, and accused Urquizo of changing his description to match Calbert's, and Urquizo said that it was one page and could not recall telling Acee that it was two. Feb. 6 Tr. at 166:10-21 (Jacks, Urquizo).

D. Sanchez showed Urquizo a release that he had signed so D. Sanchez' counsel could obtain Urquizo's records, and Urquizo said he signed the release so D. Sanchez could access his telephone calls and letters, but not so D. Sanchez' counsel could corroborate that Urquizo never

received his property at Southern New Mexico.  See Feb. 6 Tr. at 142:7-143:2 (Jacks, Urquizo).

Urquizo admitted that, when he spoke to D. Sanchez' counsel, he said that he did not see or have

any "paperwork" on March 6 or 7, 2014, but that this was a lie.  Feb. 6 Tr. at 145:11-146:5 (Jacks,

Urquizo).  Urquizo also admitted that he told an STIU officer who asked him if he transported the

"paperwork" that he did not, underscoring that he was still an SNM gang member at that time.

Feb. 6 Tr. at 147:12-25 (Jacks, Urquizo).  Urquizo maintained that he informed D. Sanchez'

counsel that SNM should not have asked Armenta to stab Molina, and not that SNM would not

have asked him, because Armenta did not have much time left on his sentence and because he has

a daughter with Down syndrome.  See Feb. 6 Tr. at 148:17-149:19 (Jacks, Urquizo).

Urquizo admitted that he was housed with J. Montoya for about a month while J. Montoya

fought the state Molina murder case and that J. Montoya provided him with some of the discovery.

See Feb. 6 Tr. at 143:10-144:6 (Jacks, Urquizo).  Urquizo maintained that he did not learn that he

was accused of bringing the "paperwork" from these documents until later, when he saw the

indictments.  Feb. 6 Tr. at 144:7-21 (Jacks, Urquizo).  Urquizo stated that J. Montoya also gave

him T. Martinez' and Armenta's papers, so when he spoke of looking at T. Martinez' "paperwork"

with the FBI, that "paperwork" is what he was describing.  Feb. 6 Tr. at 173:1-24 (Jacks, Urquizo).

Urquizo was also adamant that he did not tell M. Rodriguez, in the holding cells during lunch

break, what sort of questions were being asked, but that he merely greeted him and stated that

testifying was "brutal."  Feb. 6 Tr. at 165:5 (Urquizo).  See id. at 164:11-165:5 (Jacks, Urquizo).

Urquizo admitted to loaning his PIN to other inmates so they could make telephone calls,

since he had unlimited telephone calls.  See Feb. 6 Tr. at 182:20-183:8 (Jacks, Urquizo).  Urquizo

said he hoped that he would receive a federal sentence under twenty years, concurrent to his state

sentence, and that he would be transferred to a federal facility, which would have better conditions

than the state facilities.  See Feb. 6 Tr. at 183:9-19 (Jacks, Urquizo).  Urquizo believed that his state sentence was twenty-eight years and, because he had served ten years and pled to a maximum of twenty years, he likely would not spend a day longer in prison than his state sentence.  See Feb. 6 Tr. at 183:20-184:14 (Jacks, Urquizo).  Urquizo admitted that he was not charged with a crime carrying a life sentence or the death penalty, and that, while all these benefits were important, his life is now in danger, because of his testimony.  See Feb. 6 Tr. at 184:15-21 (Jacks, Urquizo).

On re-direct, Urquizo described how Troup threatened him at Otero County last time that Urquizo was housed there.  See Feb. 6 Tr. at 189:11-24 (Beck, Urquizo).  Urquizo admitted to meeting with Mr. Beck three times to prepare for his testimony and thus explained that he was better prepared to answer Mr. Beck's questions during trial than he was to answer the FBI's questions during his debriefs.  See Feb. 6 Tr. at 190:9-191:5 (Beck, Urquizo).  The United Sates walked through Urquizo's and Baca's location history, with Urquizo noting that he was moved from PNM North to PNM South in September, 2012, and that Baca was housed in Q pod in the summer of 2012.  See Feb. 6 Tr. at 195:20-196:22 (Beck, Urquizo).  As to the letter on smuggling drugs found in Urquizo's cell, Urquizo stated that he had not seen it until it was given to him and that he was told it was found in his cell.  See Feb. 6 Tr. at 197:16-19 (Beck, Urquizo).  Urquizo also explained that he told Calbert that he wanted Calbert to cooperate, so he would not have to testify against Calbert -- whom Urquizo described as his "best friend."  Feb. 6 Tr. at 207:5 (Urquizo).  See id. at 207:2-5 (Beck, Urquizo).

The United States walked Urquizo through his plea agreement, and Urquizo noted that there were thirty-nine overt acts in his charge to which he pled guilty.  See Feb. 6 Tr. at 212:18-1 (Beck, Urquizo).  Urquizo mentioned that he is currently serving time for "[f]irst-degree attempted murder on a police officer, and aggravated assault on a police officer, and possession of a deadly

weapon by a prisoner" for stabbing a correctional officer for SNM. Feb. 6 Tr. at 215:12-14 (Urquizo). See Feb. 6 Tr. at 215:15-20 (Beck, Urquizo). Urquizo stated that the Court has the final say on his sentence in this case. See Feb. 6 Tr. at 216:13-19 (Beck, Urquizo).

R. Perez, during his re-cross examination, had Urquizo clarify that he met with Mr. Beck yesterday briefly before he testified and that Mr. Beck helped to refresh his memory on certain things. See Feb. 6 Tr. at 219:16-220:10 (Villa, Urquizo). Urquizo admitted that, after his March, 2017, meeting with Acee, he asked his lawyer to request that he be moved to Southern New Mexico and to get his visits back. See Feb. 6 Tr. at 220:11-16 (Villa, Urquizo). Urquizo stated that he did not get his requested contact visits and that he was not moved to Southern New Mexico. See Feb. 6 Tr. at 236:3-13 (Beck, Urquizo). Urquizo admitted that he told his attorney that if he gets charged for the Romero "hit," it would not carry much time, but would get him into federal custody, and that he did not trust the Assistant United States Attorneys. Feb. 6 Tr. at 221:17-222:20 (Villa, Urquizo). Urquizo also told his attorney that he did not feel like he was getting any benefits and that, if something did not happen soon, he would not testify. See Feb. 6 Tr. at 223:4-13 (Villa, Urquizo). Urquizo verified that he is not serving time for all the crimes he committed for SNM. See Feb. 6 Tr. at 223:25-224:4 (Villa, Urquizo).

Urquizo explained that the drug-smuggling letter looked like Kevin Folse's handwriting and that they were housed briefly together in W pod where they were able to hang out with each other, sometimes in Urquizo's cell. See Feb. 6 Tr. at 226:3-227:23 (Jacks, Urquizo). Urquizo stated that Folse is not an SNM member, that he and Folse spent time together in Urquizo's cell while Urquizo was cooperating, and that Urquizo had heard Folse was cooperating, but did not know if he was. See Feb. 6 Tr. at 227:24-228:9 (Jacks, Urquizo). Urquizo explained that, for approximately three weeks when T. Martinez was housed in T pod, T. Martinez -- who also

cooperated -- would hang out with Urquizo and Folse in Urquizo's cell. See Feb. 6 Tr. at 228:14-229:2 (Jacks, Urquizo). Urquizo said that Quintana, another cooperator, also hung out with them in Urquizo's cell. See Feb. 6 Tr. at 229:16-230:1 (Jacks, Urquizo). Urquizo explained that Folse had been talking to a woman and that Urquizo also started talking to her, and that she started answering Urquizo's calls, writing him letters, and sending him money, which Urquizo believed upset Folse and caused Folse to hold a grudge. See Feb. 6 Tr. at 233:17-25 (Urquizo). Urquizo stated that Folse "would always look at me funny," and two days after they all hung out in Urquizo's cell, correctional officers searched it, found Folse's drug-smuggling letter, and ordered Urquizo to take a urinalysis, which came back clean. Feb. 6 Tr. at 234:4-5 (Urquizo). See id. at 234:6-23 (Urquizo, Beck).

Urquizo verified that, from 1998 to 2008, Baca was not in New Mexico and Archuleta was one of SNM's leaders; he also said that Archuleta had ordered Romero "hit." Feb. 6 Tr. at 231:5-231:22 (Lowry, Urquizo). Urquizo understood that Archuleta pled guilty to a three-year sentence for his role in Romero's assault, which Urquizo had told his attorney he wanted, and that this sentence is much less than the twenty-year sentence Urquizo faces. See Feb. 6 Tr. at 232:15-21 (Lowry, Urquizo). Urquizo explained that he wanted the FBI to charge him, because he wanted to enter federal custody. See Feb. 6 Tr. at 232:24-234:1 (Urquizo). The Court allowed Urquizo to step down from the witness stand, subject to recall. See Feb. 6 Tr. at 237:14-18 (Court).

### o.     Daniel Blanco's Testimony.

The United States next called Blanco, the STIU Coordinator at the NM Corrections Department. See Feb. 6 Tr. at 237:21-22 (Beck); id. at 238:12-17 (Beck, Blanco). Blanco described his duties as mainly "gathering intelligence" on gang activity within the prison system, to keep the system safe and secure. Feb. 6 Tr. at 238:25 (Blanco). See id. at 238:22-239:9 (Beck,

Blanco).  He also said that STIU screens the inmates' personal mail, noting that the legal mail is delivered unopened to the inmates and that a staff member opens the envelop in the inmate's presence.  See Feb. 6 Tr. at 299:22-300:16 (Maynard, Blanco).  Blanco stated that there are currently three STGs within the system -- Los Carnales, SNM, and the California Sureños -- and that, other than the STGs, the STIU looks at non-validated groups, which are the "regular street gangs."  Feb. 6 Tr. at 240:12-13 (Blanco).  See id. at 240:3-14 (Blanco, Beck).  Blanco said that, in December, 2009, he was working as a supervisor in Southern New Mexico and visited Baca in his cell, because of an incident between Baca and one of Blanco's employees.  See Feb. 6 Tr. at 241:4-25 (Beck, Blanco).  Blanco explained that his employee found heroin in Baca's cell and radioed him over shortly after the discovery.  See Feb. 6 Tr. at 242:8-17 (Beck, Blanco); id. at 243:5-11 (Beck, Blanco).  Blanco testified that when he entered the pod, he saw two of his officers, Baca, and two other inmates arguing in Baca's cell, while the rest of the inmates were locked down, and Blanco believed his officers were in danger.  See Feb. 6 Tr. at 243:12-244:11 (Beck, Blanco).  Blanco stated that the inmates backed off and there was no altercation, because Baca told the inmates "to back down because they were making the situation worse."  Feb. 6 Tr. at 245:2-3 (Blanco).  See id. at 244:12-245:1 (Beck, Blanco).  Blanco clarified that the other inmates had entered Baca's cell to prevent the guard from taking away the heroin.  See Feb. 6 Tr. at 269:15-23 (Lowry, Blanco).

Blanco said that, when Marcantel became the NM Corrections Department Secretary in 2011, the NM Corrections Department tried to bring SNM back into the general population, but Blanco thought that this move was a bad idea, based on SNM's history.  See Feb. 6 Tr. at 245:10-246:7 (Beck, Blanco).  Blanco said that, on March 7, 2014, he was the STIU Coordinator and was called to Southern New Mexico for a possible assault; upon arriving, he learned "Molina had been

stabbed numerous times." Feb. 6 Tr. at 246:16-17 (Blanco). See id. at 246:8-13 (Beck, Blanco).

Blanco said that his job then was to assist the NM State Police in its investigation, because of

Molina's status as a validated SNM member. See Feb. 6 Tr. at 246:18-247:6 (Beck, Blanco).

Blanco explained that the SNM pod contained both validated SNM members and suspected SNM

members. See Transcript of Jury Trial Volume 8 at 13:20-14:1 (taken February 7, 2018)(Jacks,

Blanco), filed February 22, 2019 (Doc. 2524)("Feb. 7 Tr."). Blanco later recalled, however, that

escorting the inmates to the NM State Police during the investigation was the extent of the STIU's

assistance. See Feb. 6 Tr. at 302:1-4 (Fox-Young, Blanco); id. at 338:4-5 (Blanco). Blanco

assigned STIU investigators to go with Molina to the hospital, and pulled videos from the

surveillance cameras to try to see what occurred. See Feb. 6 Tr. at 247:15-248:6 (Beck, Blanco).

Blanco said that only supervisors had access to the camera system -- which he believed stored

videos for thirty days, and that one of the cameras in the blue pod was down, so only two videos

were available. See Feb. 6 Tr. at 248:7-249:16 (Beck, Blanco). Blanco stated that he focused on

video from the incident and not throughout the entire day, and noted that the camera view that

would allow him to see who entered R. Perez' cell was the broken camera. See Feb. 6 Tr. at 319:6-

17 (Fox-Young, Blanco). Blanco agreed that Herrera was not housed in the pod where Molina

was murdered and admitted that he did not pull footage from the other two pods, which would

have shown if inmates were at the doors separating each pod -- and that such footage is now long

gone. See Feb. 6 Tr. at 287:1-4 (Lowry, Blanco); id. at 293:19-294:1 (Maynard, Blanco); id. at

295:18-296:22 (Maynard, Blanco). Blanco said that they watched the videos to identify who was

doing what, and then gave the videos to the NM State Police as evidence. See Feb. 6 Tr. at 249:21-

250:5 (Beck, Blanco).

Blanco elaborated on the lockdown following Molina's murder, noting that, while the lockdown was announced in all three pods, the initial focus was securing the blue pod inmates in their assigned cells, and then filtering to the yellow and green pods. See Feb. 6 Tr. at 297:1-298:3 (Maynard, Blanco). Blanco stated, however, that there is no line of sight from one pod into another. See Feb. 6 Tr. at 298:11-21 (Maynard, Blanco). Blanco knew that the inmates' cells were searched following Molina's murder, but did not recall when the searches occurred. See Feb. 6 Tr. at 299:3-21 (Maynard, Blanco). Blanco was not aware of the "greenlight" on Molina until after the assault. Feb. 6 Tr. at 329:24-25 (Blanco). Blanco admitted that M. Rodriguez has a violent reputation. See Feb. 6 Tr. at 311:7-23 (Fox-Young, Blanco). Blanco believed that, as of March 7, 2014, D. Sanchez and his brother were both housed in the SNM unit as suspected and not validated SNM members. See Feb. 7 Tr. at 14:2-16 (Jacks, Blanco).

About a week after Molina's murder, Blanco saw R. Perez' walker in Deputy Warden James Mulheron's office. See Feb. 6 Tr. at 262:11-13 (Beck, Blanco); id. at 262:22-25 (Beck, Blanco); id. at 265:15-18 (Fox-Young, Blanco). Blanco knew that R. Perez needed the walker, and that he had been transferred to Southern New Mexico from the hospital at Central New Mexico. See Feb. 6 Tr. at 303:21-304:2 (Fox-Young, Blanco). Looking at photographs taken of the walker in Mulheron's office, Blanco noted that a piece of cloth from the institutional sheets was on the bottom of the walker, near a wheel, to hold the walker together. See Feb. 6 Tr. at 267:3-23 (Beck, Blanco). This cloth was significant to Blanco, because it meant that the walker was missing a piece, and he noted that a piece was missing from both sides of the walker. See Feb. 6 Tr. at 267:24-5 (Beck, Blanco); id. at 305:1-2 (Blanco). Blanco stated that he had learned the walker was missing a piece before he saw it, from the course of his investigation. See Feb. 6 Tr. at 306:11-307:1 (Fox-Young, Blanco). Blanco explained that his officers interviewed everybody

in Unit 1-A, from all three pods, after the NM State Police officers had finished with their interviews. See Feb. 6 Tr. at 308:17-22 (Fox-Young, Blanco); id. at 338:16-19 (Blanco). Blanco was not aware of any threats against R. Perez before Molina's murder and stated that R. Perez was moved to PNM after his walker was confiscated, along with every person involved in the Molina murder. See Feb. 6 Tr. at 324:12-325:11 (Fox-Young, Blanco); Feb. 7 Tr. at 15:2-21 (Beck, Blanco). Based on R. Perez' location history, Blanco admitted that R. Perez was not moved to PNM until June, 2015. See Feb. 7 Tr. at 17:12-20 (Fox-Young, R. Perez). Blanco said that the NM Corrections Department did not move everybody in blue pod and, based on location history, noted Herrera was moved to PNM in January, 2016. See Feb. 7 Tr. at 18:21-19:3 (Maynard, Blanco); id. at 20:14-21 (Maynard, Blanco).

Blanco stated that he was at Southern New Mexico when Romero was assaulted, which Blanco believed occurred minutes after SNM's release from lockdown for Molina's murder, and which resulted in SNM's immediate return to lockdown. See Feb. 6 Tr. at 250:14-251:22 (Beck, Blanco). Blanco said he met Romero at the hospital after the assault, and described Romero's wounds as "fairly serious." Feb. 6 Tr. at 252:12 (Blanco). See Feb. 6 Tr. at 251:25-252:7 (Beck, Blanco) Romero, a validated SNM member, stayed quiet and did not talk about the assault, which Blanco described as Romero's code. See Feb. 6 Tr. at 252:16-253:1 (Beck, Blanco). Blanco stated that he visited Romero at Memorial Medical Center, but that Romero was transported to the Trauma Center, in El Paso. See Feb. 6 Tr. at 261:22-262:6 (Beck, Blanco). Blanco believed that the STIU pulled the video of the assault the next day, which Blanco watched. See Feb. 6 Tr. at 253:2-8 (Beck, Blanco).

Blanco described the July 13, 2015, Romero assault. See Feb. 6 Tr. at 254:5-255:2 (Beck, Blanco). The United States played the video of the assault, stopping at times to have Blanco

explain what they were watching.  See, e.g., Feb. 6 Tr. at 255:7-256:9 (Beck, Blanco)(explaining that four inmates were allowed tier time at a time, because of the prior incidents).  At time stamp 14:38:16, Blanco identified Romero in the middle of the screen and an inmate in white next to him, and then, at 14:38:46, Blanco noted these two inmates were "engaging in a physical altercation."  Feb. 6 Tr. at 258:17-18 (Blanco).  See id. at 258:2-16 (Beck, Blanco).  At 14:40:09, Blanco identified an inmate in white walking away after assaulting Romero and observed that Romero attempted to stand up about three times during the assault, but the inmate continued to assault him.  See Feb. 6 Tr. at 258:23-259:7 (Beck, Blanco).  At 14:40:49, Blanco identified a dark spot on the wall between cells 108 and 109, which could be blood.  See Feb. 6 Tr. at 259:23-260:15 (Beck, Blanco).  Blanco noted that there were inmates folding laundry during the assault, and that they did not attempt to stop it or to help Romero as he staggered around afterward, but Blanco said that this lack of action was not unusual.  See Feb. 6 Tr. at 343:13-344:11 (Jacks, Blanco).

Blanco said that SNM has been somewhat divided politically, but that "[t]here has always been an organization," Feb. 6 Tr. at 271:17 (Blanco), and "Baca is the known leader," Feb. 6 Tr. at 271:20 (Blanco).  See id. at 271:11-14 (Lowry, Blanco).  Blanco maintained that Baca remained the leader while he was out of state and, although Archuleta had been a leader for years, he served under Baca.  See Feb. 6 Tr. at 271:21-272:1 (Lowry, Blanco).  Blanco admitted that Baca was removed from Southern New Mexico in 2011, because other influential SNM members wanted him out of leadership and planned to kill him.  See Feb. 6 Tr. at 272:4-20 (Lowry, Blanco).  For these reasons, the NM Corrections Department sent Baca to PNM North.  See Feb. 6 Tr. at 273:8-23 (Lowry, Blanco).  The Court let Blanco step down from the witness stand, subject to recall. See Feb. 7 Tr. at 21:18-21 (Court).

p.    **Mario Rodriguez' Testimony.**

The United States next called M. Rodriguez, who joined SNM in 2006 and is in custody, in in-house parole.  See Feb. 7 Tr. at 22:3-4 (Armijo); id. at 22:23-24 (Armijo, M. Rodriguez); id. 396:18 (M. Rodriguez).   M. Rodriguez admitted that he has denied being a gang member, explaining that "you're not supposed to admit it."  Feb. 7 Tr. at 23:16 (M. Rodriguez).  See id. at 23:12-13 (Armijo, M. Rodriguez).  M. Rodriguez described SNM as "the most violent, dangerous criminal organization in New Mexico . . . based within the prison system and outside," with "ties to other criminal organizations throughout the United States."  Feb. 7 Tr. at 23:1-4 (M. Rodriguez).  SNM, he said, is involved in "[j]ust about all criminal activity," such as anything violent or the distribution of drugs and weapons, and it promotes being "a carnal[54] first, a brother first," "hav[ing] each other's back" and "trying to be the best SNM member you can be."  Feb. 7 Tr. at 27:11-12, 17-21 (M. Rodriguez).  See id. at 27:7-21 (Armijo, M. Rodriguez).  M. Rodriguez described some of SNM's rules: no testifying or "snitching" against SNM, no denying your SNM membership to another criminal organization, and no "really bad charges" like rape or child molestation.  Feb. 7 Tr. at 27:22-28:20 (Armijo, M. Rodriguez).  M. Rodriguez stated that SNM finds it honorable to treat its enemies with respect, specifically the Los Carnales, but still attempts to kill them on sight[55] whenever an SNM member can.  See Feb. 7 Tr. at 58:9-21 (Armijo, M. Rodriguez).

According to M. Rodriguez, SNM is set up as a "tabla," consisting of people Baca appointed before he was moved out of state: A.A. Garcia, Mendez, Rupert Zamora, and

---

[54]According to one online Spanish-English dictionary, "carnal" is a colloquial Spanish term meaning "brother."  Carnal SpanishDict,   https://www.spanishdict.com/translate/carnal (last visited Sept. 24, 2019).

[55]M. Rodriguez described "kill on sight" as: "You assault [him] until someone is pulling you off him.  You try to kill him, or he's going to try to kill you."  Feb. 7 Tr. at 58:24-59:1 (M. Rodriguez).

R. Martinez. Feb. 7 Tr. at 24:8-11 (M. Rodriguez). Baca and Ramon Clark were the leaders. See Feb. 7 Tr. at 25:5-7 (Armijo, M. Rodriguez). M. Rodriguez described himself as "a soldier," "putting in work and representing the SNM to the fullest, giving it [his] all, to uplift it and never bring it down." Feb. 7 Tr. at 25:10, 12-14 (M. Rodriguez). "Putting in work," M. Rodriguez described, means doing whatever SNM needed, such as assaulting an enemy on sight -- even on camera or around a correctional officer. See Feb. 7 Tr. at 26:23-27:6 (Armijo, M. Rodriguez). M. Rodriguez identified D. Sanchez as an SNM member, and said that he and D. Sanchez held a lot of respect for each other, and that he was D. Sanchez' "right-hand man." Feb. 7 Tr. at 25:17 (M. Rodriguez). See id. at 25:14-17 (M. Rodriguez); id. at 30:8-9 (Armijo, M. Rodriguez). M. Rodriguez described D. Sanchez as his "big brother," and said he looked up to D. Sanchez and enforced anything D. Sanchez wanted, because of that adoration and respect. Feb. 7 Tr. at 29:21-25 (M. Rodriguez). D. Sanchez, M. Rodriguez explained, was A.A. Garcia's right-hand man and was set to replace him on the "tabla." Feb. 7 Tr. at 132:7-19 (Armijo, M. Rodriguez). M. Rodriguez discussed how D. Sanchez described an incident that occurred before they met, in which D. Sanchez stabbed a Sureño at Southern New Mexico and stabbed the correctional officer who got in the way.[56] See Feb. 7 Tr. at 134:8-19 (Armijo, M. Rodriguez); id. at 135:4-5 (Armijo, M. Rodriguez); id. at 136:1-8 (M. Rodriguez, Armijo).

The United States questioned M. Rodriguez about his extensive criminal history from age eighteen, eliciting the charges, the underlying conduct, and the sentences that he received. See Feb. 7 Tr. at 30:20-32:18 (Armijo, M. Rodriguez); id. at 33:4-45:12 (Armijo, M. Rodriguez).

---

[56]At Baca's request, the Court gave a limiting instruction: "These are comments that can only be used -- or evidence that can only be used against Mr. Sanchez and cannot be used against the other three defendants." Feb. 7 Tr. at 134:22-25 (Court).

M. Rodriguez admitted that he has felony convictions, mainly from his conduct in the Grant County Detention Center[57] in Silver City, New Mexico, and only one felony from the streets. See Feb. 7 Tr. at 30:23-31:6 (Armijo, M. Rodriguez). M. Rodriguez first discussed an incident in which he and four or five other inmates tried to make another inmate go into protective custody. See Feb. 7 Tr. at 35:4-25 (Armijo, M. Rodriguez). M. Rodriguez and the other aggressors assaulted the victim every day and, during one such assault, one of M. Rodriguez' co-defendants in the state case shoved a hot sauce bottle and a lotion bottle into the victim's rectum. See Feb. 7 Tr. at 36:1-37:10 (Armijo, M. Rodriguez). As a result, M. Rodriguez was convicted of kidnapping and two counts of sexual penetration in state court. See Feb. 7 Tr. at 36:24-37:10 (Armijo, M. Rodriguez). M. Rodriguez maintained that he is not a sex offender and that he does not believe he will need to register as a sex offender when he is released from prison, because his offense was not against a woman or a child. See Feb. 7 Tr. at 384:9-385:7 (Villa, M. Rodriguez). M. Rodriguez admitted, however, that, pursuant to state law, it appears that he has to register as a sex offender. See Feb. 7 Tr. at 396:11-15 (Villa, M. Rodriguez). He also verified that he does not want to register as a sex offender, because he is not a sex offender, but will do so if it is necessary to reintegrate into society. See Transcript of Jury Trial Volume 9 at 214:18-25 (taken February 8, 2018)(Jacks, M. Rodriguez), filed February 22, 2019 (Doc. 2525)("Feb. 8 Tr."). M. Rodriguez said he was present for or participated in other aspects of torture upon this victim. See Feb. 8 Tr. at 215:21-217:21 (Jacks, M. Rodriguez); id. at 218:10-14 (M. Rodriguez, Jacks). M. Rodriguez admitted that he has filed three petitions for writ of habeas corpus since 2007 to get his guilty plea for these charges

---

[57]Grant Detention is a local detention center where arrestees in Grant County, New Mexico, are sent if they cannot make bail; it is not a jail or a prison. See Transcript of Jury Trial Volume 9 at 207:9-12 (taken February 8, 2018)(Jacks, M. Rodriguez), filed February 22, 2019 (Doc. 2525)("Feb. 8 Tr."). M. Rodriguez later got sent to prison, because of the felonies he committed at Grant Detention. See Feb. 8 Tr. at 206:3.-207:6 (Jacks, M. Rodriguez).

overturned, because his conviction for sex offenses bothers him, and he does not want to register as a sex offender.  See Feb. 8 Tr. at 226:13-230:16 (Jacks, M. Rodriguez).  M. Rodriguez said that he did not harm an innocent individual, because the victim was incarcerated.  See Feb. 8 Tr. at 232:12-14 (M. Rodriguez).  He stated that he pled guilty to gain respect and make his peers believe he is crazy, not because he was guilty.  See Feb. 8 Tr. at 234:13-24 (M. Rodriguez, Jacks).  Other convictions include battery upon a peace officer and escape.  See Feb. 7 Tr. at 38:3-39:11 (Armijo, M. Rodriguez).

M. Rodriguez stated that he joined SNM while at PNM North after A.A. Garcia asked him to join, and, at A.A. Garcia's behest, kept his status as an SNM member quiet and tried to stay out of trouble, so he could move back to a Level 3 facility and attack a Burqueño or Sureño.  See Feb. 7 Tr. at 46:7-52:1 (Armijo, M. Rodriguez).  M. Rodriguez said that, in 2008, although he stayed out of trouble for three years, the NM Corrections Department would not let him out of Level 6.  See Feb. 7 Tr. at 52:11-16 (M. Rodriguez).  M. Rodriguez said that he would do heroin and weed while at PNM North as often as the drugs were available.  See Feb. 7 Tr. at 335:22-336:8 (Villa, M. Rodriguez).  M. Rodriguez was also smuggling drugs into PNM North in 2008 to use and sell, and when fellow inmate Robert Esparza did not pay his drug debt to M. Rodriguez -- which would make SNM look weak if word got out -- so M. Rodriguez stabbed him with a shank.  See Feb. 7 Tr. at 52:17-55:11 (M. Rodriguez, Armijo); id. at 129:10-13 (Armijo, M. Rodriguez).  M. Rodriguez said that he tried to pull Esparza back from the top tier's railing, but Esparza would not let go of the railing, so M. Rodriguez bit off the top of his ear.  See Feb. 7 Tr. at 70:7-19 (Armijo, M. Rodriguez).

During cross-examination, Baca showed videos of the Esparza assault in U pod at PNM North, which started in the shower where M. Rodriguez was hiding.  See Feb. 8 Tr. at 66:10-67:5

(Lowry, M. Rodriguez).[58]  M. Rodriguez explained that, to exit his cell, he had to back up to the door where a correctional officer handcuffed him through a food port and then the correctional office escorted him through the pod to the shower, where he did the same thing to have the handcuffs removed.  See Feb. 8 Tr. at 67:10-68:17 (Lowry, M. Rodriguez).  M. Rodriguez noted that he got into the shower at time stamp 8:48:45, see Feb. 8 Tr. at 69:2-7 (Lowry, M. Rodriguez), and proceeded to hide in the shower so he could ambush Esparza, see Feb. 8 Tr. at 70:3-24 (Lowry, M. Rodriguez).  M. Rodriguez waited in the shower with a shank until the correctional officer opened the shower for Esparza and then M. Rodriguez jumped on Esparza -- who was still handcuffed behind his back -- put him in a headlock, and began repeatedly stabbing him.  See Feb. 8 Tr. at 72:22-73:6 (Lowry, M. Rodriguez).  M. Rodriguez agreed that Esparza could do little to protect himself, because he was handcuffed, and M. Rodriguez verified that the correctional officers ran away, allowing M. Rodriguez to continue his assault.  See Feb. 8 Tr. at 73:7-16 (Lowry, M. Rodriguez).  M. Rodriguez noted that he was criticized for the assault and that it was the first time he attacked somebody with the intention to kill.  See Feb. 8 Tr. at 74:10-18 (M. Rodriguez, Lowry).  He said that Esparza escaped, because correctional officers were shooting rubber bullets and one ripped M. Rodriguez' shorts, so he thought it was live ammunition and hid behind a pole.  See Feb. 8 Tr. at 75:4-20 (Lowry, M. Rodriguez).  M. Rodriguez noticed a way to get to Esparza, however, so he "had to" take advantage of that opportunity, despite being

---

[58]Before the Court admitted the videos into evidence, see Feb. 8 Tr. at 65:18-20 (Court), the attorneys had a bench conference outside the jury's hearing, because the United States opposed the videos' admission as improper evidence under rule 404(b) of the Federal Rules of Evidence, see Feb. 8 Tr. at 63:12-20 (Armijo).  The Court concluded that the evidence goes to racketeering activity, which is a proper, non-404(b) purpose.  See Feb. 8 Tr. at 65:3-5 (Court).  Mr. Lowry maintained that the videos go to impeachment, too, because M. Rodriguez "said this happened out on the yard, and he made it sound like a fair fight."  Feb. 8 Tr. at 65:10-11 (Lowry).  M. Rodriguez testified on direct, however, that the assault occurred in the pod.  See Feb. 7 Tr. at 70:7-19 (Armijo, M. Rodriguez).

bombarded with rubber bullets and pepper spray.  Feb. 8 Tr. at 75:23 (M. Rodriguez).  See id. at 75:21-76:13 (Lowry, M. Rodriguez).  M. Rodriguez explained that correctional officers waited outside the pod's front door and in the control room until M. Rodriguez gave up the assault; they do not enter in such situations at PNM North.  See Feb. 8 Tr. at 77:17-78:7 (Lowry, M. Rodriguez).  M. Rodriguez stated that "[n]o one has consideration for human life in" PNM North.  Feb. 8 Tr. at 80:11-12 (M. Rodriguez).  He admitted that he bit off Esparza's ear, and was trying to put him in a headlock and pull him over the rail, and stopped because M. Rodriguez believed Esparza dead.  See Feb. 8 Tr. at 81:4-24 (Lowry, M. Rodriguez).  M. Rodriguez was never charged for this assault.  See Feb. 8 Tr. at 82:19-21 (Lowry, M. Rodriguez).  He characterized this assault as his "proving moment for the SNM" in which he "let them know [he] was down to spill blood anytime, anywhere."  Feb. 8 Tr. at 83:14-16 (M. Rodriguez).  M. Rodriguez explained that this assault is connected to SNM, because he was an SNM member when he committed it and went after Esparza for making SNM look weak.  See Feb. 8 Tr. at 316:12-14 (M. Rodriguez).  M. Rodriguez said that, "when you commit these violent acts for yourself and for SNM, you're looked up to and you're on your way up the ranks, and it's proving moments."  Feb. 8 Tr. at 316:9-12 (M. Rodriguez).

M. Rodriguez described living in an SNM pod at PNM South in 2011 with R. Martinez, and that they plotted to kill fellow SNM member Sosoya for disrespecting the "tabla" and for wanting to kill all of its members except Archuleta.  Feb. 7 Tr. at 59:2-60:13 (Armijo, M. Rodriguez).  M. Rodriguez said that "it fell in our lap," because the NM Corrections Department moved Sosoya to this pod, next to R. Martinez.  Feb. 7 Tr. at 61:16 (M. Rodriguez).  See id. at 61:19-62:6 (Armijo, M. Rodriguez).  M. Rodriguez explained that Sosoya was out of orientation for about five days, that M. Rodriguez and R. Martinez took their shanks to the yard -- hiding their weapons so the correctional officers could not see them during the strip search -- and played

basketball, and then M. Rodriguez and R. Martinez assaulted Sosoya when the gang unit left.  See Feb. 7 Tr. at 64:5-65:3 (Armijo, M. Rodriguez); id. at 129:18-130:9 (Armijo, M. Rodriguez).  The correctional officers shot tear gas and rubber bullets at them, and "hit" R. Martinez in the head, so M. Rodriguez attempted to pull out Sosoya's eyes with his hands and bit off the top of Sosoya's ear, but Sosoya got away as M. Rodriguez was sprayed with tear gas.  Feb. 7 Tr. at 66:5-25 (M. Rodriguez, Armijo).  M. Rodriguez believed that Sosoya was hospitalized for five to seven days.  See Feb. 7 Tr. at 69:10-18 (Armijo, M. Rodriguez).  M. Rodriguez stated that he was moved to PNM North, as a result of this incident, and was housed in the same pod as Baca and Herrera.  See Feb. 7 Tr. at 72:21-73:22 (Armijo, M. Rodriguez).

The Court admitted into evidence a document which Baca prepared, with a limiting instruction that the document and testimony regarding the document could be considered only against Baca.[59]  See Feb. 7 Tr. at 91:7-22 (Armijo, Court, Jacks).  M. Rodriguez explained that the document provides a structural format for SNM and that Baca went over the basis of the document with M. Rodriguez -- although M. Rodriguez admitted that he also had access to this information for the past two years through his discovery tablet.  See Feb. 7 Tr. at 91:25-92:18 (Armijo, M. Rodriguez); id. at 107:4-13 (Lowry, M. Rodriguez).  The document is a half-circle with four rays,

---

[59]The instruction, in full is:

> And I'm going to admit 223-A.  But ladies and gentlemen, it can only be used in your consideration against -- for the charges against Mr. Baca.  It can't be used in any way as to the other three defendants.

. . . .

> . . . You get the same instruction about what Mr. Rodriguez is going to say about this document and what Mr. Baca is saying in the document.

Feb. 7 Tr. at 91:9-13, 20-22 (Court).

portraying the top part of the Zia symbol, which M. Rodriguez explained represents the northern region of New Mexico, with a county in each ray, so that there are members from each set, a sergeant on the streets, a lieutenant in prison, and a captain facing all directions; Baca organized this structure to make things less complicated, build a more structured and more disciplined SNM, and prevent the regions from interfering with each other.  See Feb. 7 Tr. at 92:1-4 (M. Rodriguez); id. at 93:6-94:25 (Armijo, M. Rodriguez).  M. Rodriguez maintained that Baca returned from Nevada wanting to restructure SNM to make it stronger.  See Feb. 7 Tr. at 101:13-16 (M. Rodriguez).  M. Rodriguez said that the northern region was the most structured, because Espanola is an SNM hub and fully implemented Baca's structure, and that individuals had to adopt the structure for it to be implemented.  See Feb. 7 Tr. at 103:1-26 (Lowry, M. Rodriguez).

M. Rodriguez stated that he bought into the structure and that, when individuals from one region adopted the structure, they got to vote on who they wanted to lead as the "captain," as opposed to Baca putting in somebody whom members did not respect.  See Feb. 7 Tr. at 103:12-104:12 (M. Rodriguez); id. at 120:11-24 (Armijo, M. Rodriguez).  M. Rodriguez identified Archuleta as the northern region's elected captain.  See Feb. 7 Tr. at 106:5-6 (Lowry, M. Rodriguez); id. at 106:12-14 (M. Rodriguez).  The captains report directly to Baca and are in charge of their respective regions, including the four elected lieutenants in prison representing certain counties and the four sergeants on the streets appointed by the lieutenants.  See Feb. 7 Tr. at 120:7-10 (M. Rodriguez); id. at 121:2-10 (Armijo, M. Rodriguez); id. at 122:15-123:6 (Armijo, M. Rodriguez).  M. Rodriguez stated that the elections occurred every four years and that a member from one region who got involved in another region's politics would draw a violation.  See Feb. 7 Tr. at 126:2-23 (M. Rodriguez, Armijo).

M. Rodriguez verified that he knew Molina and that, while Molina was an SNM member, by March, 2014, he was known to be a "rat," because he gave information to the police about a case that occurred outside prison. Feb. 7 Tr. at 147:18-148:10 (Armijo, M. Rodriguez). M. Rodriguez said that, in 2013, while at PNM North, Calbert informed M. Rodriguez that Calbert had "paperwork" on J. Montoya and Molina. Feb. 7 Tr. at 148:11-149:9 (Armijo, M. Rodriguez). M. Rodriguez wanted to get the "paperwork" from Calbert, because he was about to move to PNM South, but did not have the opportunity to get the "paperwork," because Calbert was transferred to a different housing unit the day after the conversation. Feb. 7 Tr. at 150:6-12 (M. Rodriguez). M. Rodriguez stated that some members try to get others to carry out personal vendettas, which is why "paperwork" is important. Feb. 7 Tr. at 150:2-6 (M. Rodriguez). Before leaving PNM South, M. Rodriguez spoke with Varela, Urquizo, and R. Martinez, and requested that they tell Calbert to bring the "paperwork," because M. Rodriguez would not act on the "hits" without it. Feb. 7 Tr. at 153:13-18 (M. Rodriguez). M. Rodriguez explained that he knew Calbert would move to PNM South soon, and that Varela and Urquizo were next up to be transported to Southern New Mexico, because of M. Rodriguez' understanding of how the classification process worked. See Feb. 7 Tr. at 153:20-7 (M. Rodriguez, Armijo).

In late 2013, M. Rodriguez moved to Southern New Mexico from PNM South and was placed in blue pod of Unit 1-A with D. Sanchez, who was the key-holder. See Feb. 7 Tr. at 133:18-134:7 (Armijo, M. Rodriguez); id. at 138:19 (M. Rodriguez); id. at 155:25-156:4 (Armijo, M. Rodriguez). M. Rodriguez said that R. Perez was also in blue pod with them, and that Herrera and Munoz were housed in yellow pod at the time as the key-holders. See Feb. 7 Tr. at 136:23-137:6 (Armijo, M. Rodriguez); id. at 137:24-138:10 (Armijo, M. Rodriguez); id. at 260:3-5 (M. Rodriguez). M. Rodriguez explained that R. Perez spent most of his time in his cell, but would

come out for recreation about four times a week and that D. Sanchez had him in a workout routine. See Feb. 7 Tr. at 302:15-303:7 (Villa, M. Rodriguez). M. Rodriguez said that it appeared that R. Perez had gained fifty to sixty pounds since then. See Feb. 7 Tr. at 303:19-20 (M. Rodriguez). Baca, M. Rodriguez explained, was at PNM North at the time. See Feb. 7 Tr. at 138:14-17 (Armijo, M. Rodriguez). M. Rodriguez noted that he was in cell 111 of blue pod. See Feb. 7 Tr. at 139:16-21 (Armijo, M. Rodriguez). M. Rodriguez identified who was living in each cell in blue pod on March 6 and 7, 2014, and stated that Ronald Sanchez, D. Sanchez' brother, was also living in blue pod at the time, although he was not an SNM gang member, but, rather, as an associate of SNM.[60] See Feb. 7 Tr. at 143:18-146:9 (Armijo, M. Rodriguez). M. Rodriguez verified that he heard from other inmates at Southern New Mexico that D. Sanchez had a conflict with Molina and T. Martinez over something that transpired in the recreation yard See Feb. 8 Tr. at 126:15-24 (Jacks, M. Rodriguez). M. Rodriguez said that he had heard how D. Sanchez handled the conflict and did not believe it at the time, and "let it go as politics." Feb. 8 Tr. at 128:6 (M. Rodriguez). See id. at 127:21-128:8 (Jacks, M. Rodriguez).

M. Rodriguez stated that he did Suboxone every day while at Southern New Mexico and believed he once did methamphetamine, about two months before Molina's murder, for about four to five days straight, but he maintained that it has been close to seven months since he has done any drugs. See Feb. 7 Tr. at 334:17-335:18 (Villa, M. Rodriguez); Feb. 8 Tr. at 14:2-15 (Villa, M. Rodriguez). M. Rodriguez admitted that, during this methamphetamine binge before the "paperwork" arrived, he tried to convince Efrain Martinez and T. Martinez to murder Molina. Feb. 8 Tr. at 42:19-43:10 (Bhalla, M. Rodriguez). M. Rodriguez elaborated that he knew Molina's

---

[60]M. Rodriguez described an SNM associate as "a friend that lives around us, just someone that's in good standing with the SNM and carries himself right and respectful." Feb. 7 Tr. at 145:12-14 (M. Rodriguez).

"paperwork" was on its way and, while high on methamphetamine and paranoid, got in an argument with Molina, because M. Rodriguez had been awake for five days, was hallucinating, "thought people were talking shit about [him]," and thought Molina and another inmate were discussing "hitting" M. Rodriguez -- so he asked E. Martinez and T. Martinez to assault Molina. Feb. 8 Tr. at 124:1-2 (M. Rodriguez). See id. at 123:19-125:20 (Jacks, M. Rodriguez). M. Rodriguez stated that E. Martinez refused to "hit" Molina without the "paperwork." Feb. 8 Tr. at 126:2-4 (M. Rodriguez).

M. Rodriguez said that, at Southern New Mexico, he became friends with Molina, because Molina was hanging out with a friend of M. Rodriguez' from the streets -- T. Martinez. See Feb. 7 Tr. at 152:1-9 (M. Rodriguez, Armijo). According to M. Rodriguez, T. Martinez was a "hitter," meaning he brought in drugs to the prison for SNM to sell. Feb. 7 Tr. at 152:10-22 (Armijo, M. Rodriguez). M. Rodriguez explained that, sometime in March, 2014, he saw Varela's and Urquizo's names on the chalk board in the control center, which shows who is being transported to Southern New Mexico, so M. Rodriguez told D. Sanchez that he believed the "paperwork" was on its way. Feb. 7 Tr. at 154:14-155:18 (Armijo, M. Rodriguez). M. Rodriguez admitted that, before Urquizo arrived at Southern New Mexico, M. Rodriguez had called Urquizo's brother, but maintained that the call was not to get a message to Urquizo to bring the "paperwork." Feb. 7 Tr. at 313:12-25 (Villa, M. Rodriguez). M. Rodriguez explained that, when Varela and Urquizo arrived, he called Urquizo to the lower-tier door connecting the blue and yellow pods, and slid a letter under the door, which asked for a syringe and warned Urquizo that Clark wanted him killed. See Feb. 7 Tr. at 156:11-158:2 (Armijo, M. Rodriguez). M. Rodriguez said that he also introduced Urquizo to T. Martinez, who also was at the door, because T. Martinez was the "hitter" and M. Rodriguez wanted his "good budd[y]" Urquizo "in on the ride." Feb. 7 Tr. at 163:16 (M.

Rodriguez).  See id. 162:23-163:16 (M. Rodriguez).  As far as M. Rodriguez knew, yellow pod

was in lockdown during this interaction to get the new inmates in.  See Feb. 7 Tr. at 162:13-16

(Armijo, M. Rodriguez).  That same day, Herrera brought Urquizo's response to M. Rodriguez,

which outlined Urquizo's desire to stab S. Gonzalez, but M. Rodriguez responded with a note

telling Urquizo just to beat up S. Gonzalez and asking where the "paperwork" was.  Feb. 7 Tr. at

163:22-164:13 (Armijo, M. Rodriguez).  M. Rodriguez admitted on cross-examination, however,

that he was only "pretty sure" Herrera passed him Urquizo's response.  Feb. 8 Tr. at 136:22 (M.

Rodriguez).  M. Rodriguez explained that he called for Herrera and knew his voice, so he believed

it was Herrera at the door.  See Feb. 8 Tr. at 253:1-16 (Armijo, M. Rodriguez).  M. Rodriguez

elaborated that he called for Herrera both when he received Urquizo's response and when he

subsequently responded to Urquizo, but that he only got Herrera once, and somebody else passed

the note the other time.  See Feb. 8 Tr. at 255:1-15 (Armijo, M. Rodriguez).  M. Rodriguez

believed that all of these messages were passed sometime before the 4:00 p.m. count on March 6,

2014.  See Feb. 8 Tr. at 139:18-141:2 (Jacks, M. Rodriguez).  On cross-examination, D. Sanchez

noted that M. Rodriguez met with the FBI six times,[61] which M. Rodriguez did not dispute, and

M. Rodriguez could not recall whether he mentioned this note-passing in any of the interviews,

but he said that he thought he mentioned it at the January 22, 2018, meeting.  See Feb. 8 Tr. at

164:3-13 (Jacks, M. Rodriguez); id. at 172:1-7 (Jacks, M. Rodriguez).

---

[61]D. Sanchez walked through all the meetings with M. Rodriguez, getting him to recall that they occurred on: (i) October 24, 2017, with the prosecutors; (ii) November 1, 2017, with prosecutors and the FBI; (iii) November 16, 2017, with Acee, STIU officers, and D. Sanchez' brother; (iv) December 12, 2017, with FBI and STIU; (v) January 22, 2018, with the prosecutors and FBI; and (vi) February 3, 2018, with Ms. Armijo.  See Feb. 8 Tr. at 164:14-170:12 (Jacks, M. Rodriguez).

M. Rodriguez said that, the next morning, March 7, 2014, sometime before lunch, he was in the sally port area underneath the control center, where the front doors to all three pods are, and that he went to yellow pod to call Herrera and ask if Urquizo had the "paperwork"; Herrera responded that Urquizo had the "paperwork" and would send it later.  Feb. 7 Tr. at 166:11-167:24 (Armijo, M. Rodriguez); Feb. 8 Tr. at 142:17-19 (M. Rodriguez).  M. Rodriguez stated that Urquizo was in the middle cell in yellow pod, so M. Rodriguez could see him through the window in the pod's front door.  See Feb. 7 Tr. at 169:10-13 (M. Rodriguez); id. at 171:2-12 (Armijo, M. Rodriguez).  While in the recreation yard, M. Rodriguez spoke with D. Sanchez and Earnest Guerrero about not letting anything happen to Urquizo, and they thought they saw that Varela was getting his property back from the transport.  See Feb. 7 Tr. at 172:8-173-7 (M. Rodriguez, Armijo); Feb. 8 Tr. at 271:3-5 (M. Rodriguez).  M. Rodriguez also told D. Sanchez that Molina's "paperwork" had arrived.  Feb. 8 Tr. at 271:6-9 (M. Rodriguez).  After recreation, M. Rodriguez returned to blue pod, and Herrera called him to the lower-tier door between the pods and slipped underneath the door a manila envelope of legal paperwork.  See Feb. 7 Tr. at 173:16-174:22 (Armijo, M. Rodriguez).  During cross-examination, M. Rodriguez gave his belief that he received the "paperwork" after the lunch count, which lasts from 11:00 a.m. to 12:00 p.m., and that he was alone when at the door.  Feb. 8 Tr. at 143:22-144:12 (Jacks, M. Rodriguez).  See id. at 145:7-14 (Jacks, M. Rodriguez).  He maintained that Herrera passed him Molina's "paperwork."  Feb. 8 Tr. at 351:20-24 (Armijo, M. Rodriguez).  M. Rodriguez said that the inmates on orientation are released from their cells for a shower during lunch count.  See Feb. 8 Tr. at 144:13-19 (Jacks, M. Rodriguez).  M. Rodriguez stated that the "paperwork" was Urquizo's appeal from a state conviction, with Molina's "paperwork" tucked inside to hide the "real paperwork" for transportation.  Feb. 7 Tr. at 174:23-8 (Armijo, M. Rodriguez).  M. Rodriguez believed that

Molina's "paperwork" consisted of a Las Cruces Police Department police report from Sosa's case. Feb. 8 Tr. at 175:20-22 (M. Rodriguez). See id. at 176:5-12 (Jacks, M. Rodriguez). The "paperwork" appeared to M. Rodriguez to be a basic interview, on white paper with a stamp on it. Feb. 8 Tr. at 177:1-25 (Jacks, M. Rodriguez).

M. Rodriguez said that he called D. Sanchez to his cell, and they sat in front of the cell reading the "paperwork" at the same time; before M. Rodriguez could finish reading, D. Sanchez stated, "[i]t's done," which M. Rodriguez took to mean that it was time to kill Molina. Feb. 7 Tr. at 175:9-22 (Armijo, M. Rodriguez). M. Rodriguez said that, in what he read, he did not see Molina give up names, and that Molina just said he drove the car for the purse snatcher and identified the street where the purse was thrown out. See Feb. 7 Tr. at 176:2-14 (M. Rodriguez). M. Rodriguez said that, although Molina did not name anybody, Molina still "ratted," because he disclosed that a crime had occurred and where evidence had been discarded. Feb. 7 Tr. at 316:15-317:6 (Villa, M. Rodriguez). Although M. Rodriguez did not think Molina's statements were that bad, he testified that they were against SNM rules. See Feb. 7 Tr. at 317:13-319:3 (M. Rodriguez, Villa). M. Rodriguez recalled only one page discussing Molina, but believed there were maybe three pages total, although he could not remember. See Feb. 7 Tr. at 176:15-177:2 (Armijo, M. Rodriguez). M. Rodriguez returned the "paperwork" to Herrera, who said he was going to show it to green pod, but M. Rodriguez told him not to show it to green pod, because he did not trust the inmates in green pod -- even though some were on the "tabla." Feb. 7 Tr. at 177:6-25 (Armijo, M. Rodriguez). M. Rodriguez thought D. Sanchez came to the door with him to return the "paperwork," saying something about Wednesday, and Herrera said: "Just get it done." Feb. 7 Tr. at 258:18-19 (M. Rodriguez). See id. at 258:14-18 (M. Rodriguez). M. Rodriguez admitted that he told the United States on January 22, 2018, that D. Sanchez wanted to hold off on the "hit,"

because of visits.  Feb. 8 Tr. at 274:6-10 (M. Rodriguez); id. at 336:1-11 (Jacks, M. Rodriguez).

M. Rodriguez explained that he understood Herrera to be concerned that the "paperwork" would

get around and that somebody would "kite out" Molina, preventing the "hit" from occurring.  Feb.

7 Tr. at 259:3-9 (Armijo, M. Rodriguez).  M. Rodriguez wanted to return the "paperwork" to

Urquizo, because the bundle contained Urquizo's "paperwork," with which if M. Rodriguez were

caught, would result in a misconduct report.  Feb. 7 Tr. at 259:17-22 (M. Rodriguez).

     M. Rodriguez said that he then spoke with D. Sanchez about who would kill Molina, asking

if it would be the two of them, and D. Sanchez said: "No."  Feb. 7 Tr. at 178:18 (M. Rodriguez).

See id. at 178:8-21 (Armijo, M. Rodriguez).  At Baca's request, the Court gave a limiting

instruction.[62]    See Feb. 7 Tr. at 178:22-179:3 (Lowry, Court).    On re-direct, however, M.

Rodriquez retracted and provided that this conversation occurred right after lunch, but before he

received the "paperwork."  Feb. 8 Tr. at 275:18-276:8 (Armijo, M. Rodriguez).  M. Rodriguez

conveyed that D. Sanchez wanted T. Martinez, Armenta, and J. Montoya to kill Molina, and that

D. Sanchez instructed M. Rodriguez not to worry about the cameras, but to tell T. Martinez his

role.  See Feb. 7 Tr. at 179:7-180:23 (Armijo, M. Rodriguez).  M. Rodriguez explained that D.

Sanchez did not think Armenta had done anything for SNM in his sixteen years of being a member

and did not think T. Martinez would be up to it, so D. Sanchez could get him "out of the picture"

-- there were rumors of T. Martinez "punking [D. Sanchez] out."  Feb. 7 Tr. at 181:3, 5-6 (M.

Rodriguez).  See Feb. 7 Tr. at 180:13-17 (M. Rodriguez); id. at 181:1-9 (M. Rodriguez).

     M. Rodriguez testified that D. Sanchez decided that the "hit" would occur in Molina's

room, alleging that the cameras could not see inside it, and D. Sanchez told M. Rodriguez to tell

---

[62]The Court instructed: "So these statements can be used against Mr. Sanchez, but not as
to the other defendants in the case.  So you can use it only in your consideration of the charges
against Mr. Sanchez."  Feb. 7 Tr. at 178:24-179:3 (Court).

Herrera that it would occur after the 4:00 p.m. count -- which he did.  Feb. 7 Tr. at 181:19-182:7 (M. Rodriguez, Armijo); id. at 182:24-183:1 (M. Rodriguez).  M. Rodriguez described trying to make a shank with metal from his hamper, because D. Sanchez wanted Molina to be stabbed, and that, while M. Rodriguez was trying to quickly cut the metal, D. Sanchez was at R. Perez' door speaking with R. Perez.  See Feb. 7 Tr. at 183:13-25 (Armijo, M. Rodriguez).  M. Rodriguez stated that he could not hear the conversation that D. Sanchez and R. Perez were having, but said he did not hear any screaming or anything that caused him alarm.  See Feb. 7 Tr. at 186:17-187:3 (Armijo, M. Rodriguez).  M. Rodriguez said that D. Sanchez called him over to R. Perez' cell -- noting that R. Perez' door was closed, and R. Perez was inside the cell at the door -- and when he got to the cell, D. Sanchez pointed to the bar on R. Perez' walker as R. Perez stepped aside, ordering M. Rodriguez to make the shanks out of the walker.  See Feb. 7 Tr. at 184:1-3 (M. Rodriguez); id. at 185:3-6 (Armijo, M. Rodriguez); id. at 187:4-17 (Armijo, M. Rodriguez); id. at 189:14-16 (Armijo, M. Rodriguez).  M. Rodriguez admitted on cross-examination that he could tell from looking at the walker that the bar was for stabilization.  See Feb. 7 Tr. at 300:4-15 (Villa, M. Rodriguez).  M. Rodriguez stated that, around 2:00 p.m. or 2:30 p.m., he got the correctional officer in the control center to open R. Perez' door, took the walker's bar, and left, and that R. Perez later tied the sheet to the bottom of his window.  See Feb. 7 Tr. at 189:6-13 (Armijo, M. Rodriguez); id. at 191:3-7 (Armijo, M. Rodriguez).  M. Rodriguez maintained that, as he unscrewed the bar with nail clippers, R. Perez told him, "I'm down for whatever, as long as it's not me," and that R. Perez' mannerisms and tone were normal.  Feb. 7 Tr. at 194:5-6 (M. Rodriguez).  See id. at 194:3-17 (M. Rodriguez, Armijo).  M. Rodriguez stated that R. Perez did not physically help remove the bar or tell M. Rodriguez how to remove it.  See Feb. 7 Tr. at 300:18-301:1 (Villa, M. Rodriguez).  On cross-examination, R. Perez questioned M. Rodriguez about what

he told the United States on October 24, 2017, regarding R. Perez' mannerisms when M. Rodriguez took the bar, but M. Rodriguez could not recall, believing he did not pay attention to them.  See Feb. 7 Tr. at 309:8-310:13 (Villa, M. Rodriguez).  R. Perez confronted M. Rodriguez with the 302 from that meeting, which states that M. Rodriguez said that R. Perez looked scared, but M. Rodriguez said that the 302 was a misunderstanding and that R. Perez was not scared.  See Feb. 7 Tr. at 311:25-312:9 (Villa, M. Rodriguez); id. at 422:17-21 (Villa, M. Rodriguez).  M. Rodriguez did not believe that he told the FBI that R. Perez looked scared.  See Feb. 8 Tr. at 28:7-13 (Villa, M. Rodriguez).  He agreed, however, that he told the FBI that he understood R. Perez' statement to mean that R. Perez would help if he did not get hurt or otherwise be involved.  See Feb. 8 Tr. at 324:1-5 (Villa, M. Rodriguez).  M. Rodriguez at first maintained that he did not review the 302 report containing his alleged statement that R. Perez looked scared, but then said he reviewed the 302 at his November 1, 2017, meeting with the United States and clarified certain details.  See Feb. 8 Tr. at 31:4-14 (Villa, M. Rodriguez); id. at 32:4-21 (Villa, M. Rodriguez).  M. Rodriguez admitted that he did not clarify at that meeting that he did not say R. Perez looked scared.  See Feb. 8 Tr. at 36:10-13 (Villa, M. Rodriguez).  M. Rodriguez likewise did not clarify that he did not say R. Perez looked scared during his last meeting with the United States on February 3, 2018, although he maintained that he told Ms. Armijo that he did not remember making such a statement. See Feb. 8 Tr. at 39:9-20 (Villa, M. Rodriguez).  M. Rodriguez admitted that R. Perez would be in trouble with SNM if he did not give up the bar or if he "ratted" on M. Rodriguez, and that doing so could get him killed.  Feb. 7 Tr. at 312:21-313:11 (Villa, M. Rodriguez).

M. Rodriguez described returning to his cell and breaking the bar into three pieces, using the floor to sharpen two pieces into points.  See Feb. 7 Tr. at 195:18-197:14 (M. Rodriguez, Armijo).  M. Rodriguez stated that he tied a rope on the non-pointed side, explaining that the rope

goes around the stabber's wrist so he does not lose the shank. See Feb. 7 Tr. at 197:23-198:4 (M. Rodriguez, Armijo). M. Rodriguez said that he threw the third piece away, placing it in a jar with napkins into the trashcan near the stairs. See M Feb. 7 Tr. at 199:20-200:21 (Armijo, M. Rodriguez). M. Rodriguez said he stopped work on the shanks around 3:30 p.m. or 3:40 p.m. to follow D. Sanchez' order to speak to T. Martinez, who had just returned from his work at the wheelchair program. See Feb. 7 Tr. at 201:1-24 (Armijo, M. Rodriguez). M. Rodriguez told T. Martinez to get high to numb his feelings and explained that they would be moved to Level 6 after the assault, so it would be the last opportunity to get high for a while. See Feb. 7 Tr. at 201:25-202:19 (Armijo, M. Rodriguez). M. Rodriguez also told T. Martinez that the "paperwork" had arrived for his friend, and that D. Sanchez had tasked T. Martinez with knocking out Molina. Feb. 7 Tr. at 202:2-203:7 (M. Rodriguez). M. Rodriguez said that he told T. Martinez that he could knock out Molina and would let T. Martinez take the credit for knocking out Molina. See Feb. 7 Tr. at 203:13-14 (M. Rodriguez). M. Rodriguez testified that T. Martinez replied: "if this is what the onda needs me to do, I'll do it."[63]  Feb. 7 Tr. at 203:15-16 (M. Rodriguez). M. Rodriguez explained that D. Sanchez wanted T. Martinez to use his mixed martial arts experience to knock out Molina, because D. Sanchez and M. Rodriguez did not believe that J. Montoya and Armenta -- who were ordered to stab Molina -- could take out Molina if he were conscious. See Feb. 7 Tr. at 204:19-206:2 (M. Rodriguez, Armijo).

After the conversation with T. Martinez, it was time for the 4:00 p.m. count, so M. Rodriguez returned to his cell to finish making the shanks. See Feb. 7 Tr. at 201:6-10 (M. Rodriguez); id. at 206:16-22 (M. Rodriguez, Armijo). An hour later, when count ended, M.

---

[63]M. Rodriguez explained that "onda" is "another word for the SNM. It's like the family." Feb. 7 Tr. at 71:21-22 (M. Rodriguez).

Rodriguez went upstairs to T. Martinez' cell to see if he was ready, and T. Martinez said that he had Molina's shank and told M. Rodriguez to take it. See Feb. 7 Tr. at 206:23-207:25 (Armijo, M. Rodriguez). M. Rodriguez took the shank back to his cell, and then D. Sanchez and Armenta entered asking if the shanks were ready, and M. Rodriguez handed Armenta a shank. See Feb. 7 Tr. at 208:1-25 (M. Rodriguez, Armijo). M. Rodriguez said his only conversation with Armenta was telling him that D. Sanchez would handle his weapon. See Feb. 8 Tr. at 285:18-20 (M. Rodriguez). After M. Rodriguez handed Armenta the shank, D. Sanchez requested that M. Rodriguez tell J. Montoya his role -- although M. Rodriguez maintained that, initially, D. Sanchez said he would tell J. Montoya  -- so M. Rodriguez entered J. Montoya's cell, pulled a shank from his pants, and told J. Montoya that Molina's "paperwork" arrived, and that J. Montoya was ordered to "hit" Molina. Feb. 7 Tr. at 209:2-210:2 (M. Rodriguez, Armijo). M. Rodriguez told J. Montoya to change into his prison-issued uniform, explaining that both J. Montoya and Armenta were supposed to wear the uniforms to make it harder to see blood and to preclude their identification on camera. See Feb. 7 Tr. at 210:17-24 (M. Rodriguez, Armijo); id. at 332:1-5 (Villa, M. Rodriguez). M. Rodriguez then returned to T. Martinez' cell, and T. Martinez said he would choke out Molina, instead of knocking him out, so M. Rodriguez left and told D. Sanchez. See Feb. 7 Tr. at 211:5-17 (M. Rodriguez, Armijo). D. Sanchez responded, "[m]ake sure it goes right, and don't forget the dope," Feb. 7 Tr. at 211:18-19 (M. Rodriguez), and M. Rodriguez explained that they were going to shoot up Suboxone in Molina's cell, because M. Rodriguez and T. Martinez were often in there tattooing or doing drugs, see Feb. 7 Tr. at 211:20-212:5 (Armijo, M. Rodriguez). According to M. Rodriguez, "the closest people to you are the right ones to kill you in the SNM." Feb. 7 Tr. at 212:4-5 (M. Rodriguez).

M. Rodriguez said that, on March 7, 2014, he, T. Martinez, D. Sanchez, and Molina were sitting at a table on the bottom tier, and he asked Molina and T. Martinez if they were ready to do drugs; D. Sanchez then asked if he could come, but M. Rodriguez told him no, so D. Sanchez went to his cell, and the three other men went upstairs to Molina's cell. See Feb. 7 Tr. at 212:9-21 (M. Rodriguez). In Molina's cell, M. Rodriguez struggled with opening the Suboxone, so Molina grabbed it to open it himself. See Feb. 7 Tr. at 212:22-5 (M. Rodriguez); id. at 213:20-25 (M. Rodriguez). M. Rodriguez said he nodded two or three times at T. Martinez to act, but nothing happened, so M. Rodriguez assumed they would just do drugs first, until T. Martinez suddenly grabbed Molina and began choking him, making Molina drop the drug contraband. See Feb. 7 Tr. at 214:8-16 (M. Rodriguez). M. Rodriguez stated that the Molina assault "went into motions" "around 5:18, 5:20" p.m. Feb. 8 Tr. at 158:15-16 (M. Rodriguez). M. Rodriguez grabbed Molina's wrists, because Molina tried to grab T. Martinez' arms, then told T. Martinez to lay down Molina when he went unconscious, waived in J. Montoya and Armenta, and ordered T. Martinez to leave the room. See Feb. 7 Tr. at 215:1-9 (M. Rodriguez); id. at 345:4-18 (Villa, M. Rodriguez). J. Montoya and Armenta started stabbing Molina, with J. Montoya getting on top of Molina to stab him in the chest, so M. Rodriguez grabbed the Suboxone, spoon, and syringe that Molina dropped, and left the cell. See Feb. 7 Tr. at 215:10-25 (M. Rodriguez, Armijo). M. Rodriguez said that Molina suddenly stood up, and J. Montoya tried to give M. Rodriguez his shank, but M. Rodriguez and D. Sanchez told J. Montoya to get Molina and not to let him out of the cell. See Feb. 7 Tr. at 216:1-15 (M. Rodriguez, Armijo); id. at 217:4-9 (Armijo, M. Rodriguez). During cross-examination, M. Rodriguez maintained that J. Montoya did not try to give his shank to M. Rodriguez. See Feb. 7 Tr. at 351:4-7 (Villa, M. Rodriguez). Molina proceeded toward the stairs and made his way to the front door; J. Montoya and Armenta continued to stab him on the

bottom tier, but M. Rodriguez could not see what happened.  See Feb. 7 Tr. at 217:1-3 (M. Rodriguez).

M. Rodriguez said that J. Montoya threw his shank from the bottom tier to the top tier, so M. Rodriguez retrieved it, went to the shower, "took a razor blade to the handle," "cut the handle off," and bent it to "put it in the drain all the way."  Feb. 7 Tr. at 199:9-11 (M. Rodriguez).  See id. at 199:6-8 (M. Rodriguez).  M. Rodriguez explained that the plan was for him to take care of J. Montoya's shank while D. Sanchez would deal with Armenta's shank.  See Feb. 7 Tr. at 217:20-22 (M. Rodriguez); id. at 21-25 (M. Rodriguez).  Instead, however, Armenta dropped his shank in a trashcan.  See Feb. 7 Tr. at  227:16-19 (Armijo, M. Rodriguez).  M. Rodriguez recalled that, when he left the shower, he saw D. Sanchez and heard him yelling from the top tier into the emergency door "[h]ow do you like that, baby," in a bragging, excited tone, and somebody responded during lockdown, "Fuck, yeah, Dan."  Feb. 7 Tr. at 218:14, 16 (M. Rodriguez).  See id. at 218:10-16 (Armijo, M. Rodriguez); Feb. 8 Tr. at 290:14-291:5 (M. Rodriguez, Armijo).  M. Rodriguez admitted that he disclosed this statement to the United States only recently.  See Feb. 8 Tr. at 339:13-19 (Jacks, M. Rodriguez).

The United States then played two videos of Molina's homicide again, stopping at various times for M. Rodriguez to identify the people shown and to orient the video's timing to his own testimony about how the "hit" occurred.  Feb. 7 Tr. at 218:20-236:1 (Armijo, M. Rodriguez).  He admitted watching the videos three or four times.  See Feb. 8 Tr. at 159:20 (M. Rodriguez).  After showing the second video, which had a better view into Molina's cell, the United States noted that D. Sanchez was in front of the camera at some point and questioned whether he had planned to stand there, and M. Rodriguez responded that he did not know and did not pay attention to D. Sanchez' location until other SNM members noted it.  See Feb. 7 Tr. at 236:7-13 (Armijo, M.

Rodriguez).  M. Rodriguez then described going into lockdown, noting that he threw a mixture of water and hand sanitizer outside his cell to dilute the blood there, and covered his window with a towel.  See Feb. 7 Tr. at 236:18-24 (M. Rodriguez).  M. Rodriguez wrapped the syringe in Saran Wrap to place in his rectum but, when he bent over, noticed blood on his pants from disposing the shank, so he took off his pants and realized that he still had Molina's shank in his sock.  See Feb. 7 Tr. at 236:25-237:14 (M. Rodriguez, Armijo).  M. Rodriguez described working anxiously and quickly: removing the shank's handle and placing it on his desk, bending the shank in half and trying to wrap it in Saran Wrap, and throwing his pants in his sink with hand sanitizer and toothpaste to wash them.  See Feb. 7 Tr. at 237:15-238:1 (M. Rodriguez, Armijo).  M. Rodriguez explained that he could not get the shank wrapped in Saran Wrap, so he disposed of the Saran Wrap in the toilet and placed the shank in his rectum, noting that this act allowed him to bring the shank with him to PNM North the next day, March 8, 2014.  See Feb. 7 Tr. at 251:2-13 (M. Rodriguez, Armijo).  M. Rodriguez eventually disposed of the shank by flushing it down the toilet. See Feb. 7 Tr. at 366:4-10 (Villa, M. Rodriguez).

M. Rodriguez believed that the NM State Police interviewed him that evening, March 7, 2014.  See Feb. 7 Tr. at 251:14-22 (Armijo, M. Rodriguez).  M. Rodriguez said that, that evening, he was moved to 2-A or 2-B with R. Perez and some other inmates that he was cold, because he "was in a paper suit."  Feb. 7 Tr. at 254:14 (M. Rodriguez).  See id. at 251:24-252:15 (M. Rodriguez, Armijo).  M. Rodriguez explained that he spoke to R. Perez through the air vent near the toilet.  See Feb. 7 Tr. at 252:24-253:7 (M. Rodriguez).  R. Perez told M. Rodriguez "that he brought his jacket, his sweats, his radio, and that it wasn't his first rodeo."  Feb. 7 Tr. at 252:16-17 (M. Rodriguez).  M. Rodriguez said he shook his head when he saw R. Perez walk out of his cell for his interview, because he noticed the sheets on the walker for the first time, and he knew

STIU would notice and realize the bar was missing.  See Feb. 7 Tr. at 254:22-255:3 (M. Rodriguez).  When Perez returned, he asked M. Rodriguez, "is everything all good with those things," and M. Rodriguez responded, "don't worry about it.  Everything is all good."  Feb. 7 Tr. at 256:3-4, 11-12 (M. Rodriguez).  M. Rodriguez explained that R. Perez was trying to talk about the weapons, but, because M. Rodriguez did not know who was in the surrounding cells, he did not want Perez to say anything.  See Feb. 7 Tr. at 256:9-11 (M. Rodriguez).  The Court gave a limiting instruction.[64]  See Feb. 7 Tr. at 258:5-9 (Court).  The Court gave limiting instructions on re-direct as well, when Ms. Armijo revisited this testimony.[65]  See Feb. 8 Tr. at 294:1-5 (Court); id. at 295:12-13 (Court).

During the break and outside the jury's presence, the Court made a record of its observations of R. Perez, believing that he was engaged in the trial, and, while R. Perez' counsel agreed with the Court's observations of movement, Mr. Villa asserted that R. Perez has only been able to assist counsel part of the time, because of his illness, and thus moved for a mistrial, a continuance until R. Perez is healthy, or a severance.  See Feb. 7 Tr. at 238:10-243:7 (Court, Villa).  The Court denied the motion for mistrial, and decided to continue to monitor R. Perez' condition, and not to sever or to continue the trial at the moment.  See Feb. 7 Tr. at 122:3-6 (Court).  Baca

---

[64]"These statements that Ms. Armijo is getting that Mr. Rodriguez is testifying Mr. Perez said -- these can only be used against Mr. Perez.  They cannot be used against any other person." Feb. 7 Tr. at 258:5-9 (Court).

[65]When Ms. Armijo elicited R. Perez' indication that it "wasn't his first rodeo," Feb. 8 Tr. at 294:16 (M. Rodriguez), Sanchez requested a limiting instruction, see Feb. 8 Tr. at 293:23-25 (Jacks), and the Court instructed: "This testimony can only be used in consideration of the charges against Mr. Perez, not as to the other three defendants."  Feb. 8 Tr. at 294:2-5 (Court).  Similarly, when Ms. Armijo questioned M. Rodriguez about R. Perez' inquiry whether things were "all good," Feb. 8 Tr. at 295:2-3 (M. Rodriguez), Baca requested a limiting instruction, see Feb. 8 Tr. at 295:9-11 (Lowry), which the Court gave: "These will just be used against Mr. Perez, not any of the other defendants."  Feb. 8 Tr. at 295:12-13 (Court).

shared his belief that the witnesses in the holding cells were "possibly sharing testimonial information."  Feb. 7 Tr. at 244:12-13 (Lowry).  A United States Marshal said that they were keeping the witnesses separate and that, while the witnesses are in shouting distance, the United States Marshals were monitoring their conversations, and noted that the witnesses are not discussing trial, but are asking how things are going with each other.  See Feb. 7 Tr. at 244:20-245:2 (Mickendrow).

M. Rodriguez stated that, the day after Molina's homicide, March 8, 2014, he, Varela, and D. Sanchez were sent to PNM North.  See Feb. 7 Tr. at 260:15-25 (Armijo, M .Rodriguez).  M. Rodriguez verified that the State eventually charged him "[w]ith tampering with evidence, conspiracy to tamper with evidence, and possession of a weapon," all stemming from the shank found in the shower drain.  Feb. 7 Tr. at 261:11-12 (M. Rodriguez).  See id. at 261:7-14 (Armijo, M. Rodriguez); id. at 355:8-16 (Villa, M. Rodriguez).  He admitted that, even before he made the shanks for Molina's homicide, he had a thin shank shoved into the sole of his shoe.  See Feb. 7 Tr. at 261:15-262:17 (Armijo, M. Rodriguez).  M. Rodriguez maintained that he did not remove the shank on March 7, 2014, although he wore those shoes that day, and never actually used that shank. See Feb. 7 Tr. at 262:18-20 (Armijo, M. Rodriguez); Feb. 8 Tr. at 12:23-13:4 (Villa, M. Rodriguez).  M. Rodriguez said that, while his state case was pending, he was held at PNM South, isolated from "all SNM members" for about nine and a half months.  Feb. 7 Tr. at 262:23-24 (M. Rodriguez).  See id. at 262:21-263:2 (Armijo, M. Rodriguez).  After this period of isolation, M. Rodriguez was moved to a non-SNM pod in PNM North and, about a month later, was moved to the SNM pod in PNM North -- where he remained until his arrest in this case.  See Feb. 7 Tr. at 263:4-11 (M. Rodriguez, Armijo).  M. Rodriguez said that his state charges were dropped, because the federal government picked them up.  See Feb. 7 Tr. at 263:12-15 (Armijo, M. Rodriguez).

M. Rodriguez described Level 6 as solitary confinement and said that, after three years there, he became adapted to solitary confinement, noting that he had his own television and enjoys it. See Feb. 7 Tr. at 408:8-22 (Villa, M. Rodriguez). M. Rodriguez said that, if he were placed in solitary confinement for no reason, he would have a problem with such placement. See Feb. 7 Tr. at 409:5-9 (M. Rodriguez). He also admitted that solitary confinement leads to paranoia. See Feb. 8 Tr. at 36:19-21 (Villa, M. Rodriguez).

M. Rodriguez said that, when Baca returned from Colorado in October, 2015, before the federal indictment came down in December, 2015, Baca was housed in the cell below M. Rodriguez at PNM North, and they could speak through the vents and shared some recreation time. See Feb. 7 Tr. at 263:16-264:24 (Armijo, M. Rodriguez).[66] M. Rodriguez spoke about his pending case for Molina's murder with Baca, specifically that Armenta was working with the STIU and that M. Rodriguez' charges were about to be amended to first-degree murder. See Feb. 7 Tr. at 267:14-268:3 (Armijo, M. Rodriguez). M. Rodriguez said that he had discovery from the state case that provided personal information for Armenta's family, so, when Baca said that he wanted to have somebody threaten Armenta's family, M. Rodriguez wrote down the information on a piece of paper and fished it down to Baca. See Feb. 7 Tr. at 268:4-269:1 (M. Rodriguez, Armijo).

---

[66]At this point in the trial, the attorneys approached the bench to converse outside the jury's hearing, with Mr. Lowry noting that the upcoming testimony on the threats made to Armenta's family would be more prejudicial than probative. See Feb. 7 Tr. at 265:9-14 (Lowry). Mr. Lowry underscored that members of the jury cried when selected and shared fear during voir dire that their names were shared. See Feb. 7 Tr. at 265:19-25 (Lowry). The Court shared that it already made the decision to admit this evidence and did not witness this crying, noting that, while juror members looked sad, "that may be because they were selected for an eight-week trial" and that it is impressed with the jury, so the Court overruled Mr. Lowry's argument. Feb. 7 Tr. at 266:7-8 (Court). See id. at 266:3-15 (Court). Counsel for Herrera, R. Perez, and D. Sanchez joined the objection, but the Court allowed the testimony. See Feb. 7 Tr. at 266:18-267:1 (Bhalla); id. at 267:3-9 (Villa, Jacks, Court).

M. Rodriguez told Baca that he could get involved.  See Feb. 7 Tr. at 269:7-8 (M. Rodriguez).

M. Rodriguez stated that Baca was disappointed in the charges against M. Rodriguez, T. Martinez,

and J. Montoya, because they were "good brothers," and Molina was supposed to be murdered

long before M. Rodriguez got to Southern New Mexico.  Feb. 7 Tr. at 269:12-17 (M. Rodriguez).

The Court then gave a limiting instruction at D. Sanchez' request.[67]  See Feb. 7 Tr. at 269:18-24

(Jacks, Court).  Baca also informed M. Rodriguez about how Marcantel and Santistevan "were

having a banquet or a barbecue, and he was going to have someone follow [them] home," but M.

Rodriguez told Baca that he did not want to be involved.  Feb. 7 Tr. at 270:6-8 (M. Rodriguez).

M. Rodriguez stated that, before Baca arrived, he had already told SNM members that he did not

want any part in the Santistevan and Marcantel "hits."  Feb. 7 Tr. at 270:9-17 (M. Rodriguez,

Armijo).  The Court repeated the limiting instruction.[68]  See Feb. 7 Tr. at 270:20-24 (Court).  M.

Rodriguez said that he did not ask who Baca was going to have follow Santistevan and Marcantel,

because he knew somebody would tell, and because he did not want Baca to suspect him.  See Feb.

7 Tr. at 271:5-11 (M. Rodriguez).  M. Rodriguez admitted, however, that he did not inform the

FBI about the Marcantel "hit" at their October 24, 2017, meeting, admitted to only hearing about

it in January, and did not describe the recreation-yard conversation with Baca until his last debrief.

Feb. 8 Tr. at 107:18-108:18 (Lowry, M. Rodriguez).  M. Rodriguez relayed that Baca insisted that

J. Martinez told him that Calbert had Molina's "paperwork," but M. Rodriguez feigned ignorance,

---

[67]The instruction provided: "These comments that Mr. Rodriguez is testifying about that Mr. Baca made to him cannot be used against any of the other defendants.  So you can only consider those as to Mr. Baca."  Feb. 7 Tr. at 269:20-24 (Court).

[68]"Same instruction.  You can only consider this evidence about what Mr. Baca said to Mr. Rodriguez only in connection with Mr. Baca's charges, not as to the other three defendants' charges."  Feb. 7 Tr. at 270:20-24 (Court).

because only about three people knew of Calbert's involvement and M. Rodriguez did not want

Calbert's name out.  Feb. 7 Tr. at 271:18-272:19 (M. Rodriguez, Armijo).  M. Rodriguez explained

that he was speaking of one conversation with Baca, which occurred out in the recreation yard on

a day that "Behind Bars: Rookie Year" was filming; both M. Rodriguez and Baca refused to be

filmed.  Feb. 7 Tr. at 273:3-8 (M. Rodriguez).  The Court provided another instruction as to Baca's

statements.[69]  See Feb. 7 Tr. at 273:21-25 (Court).

M. Rodriguez elaborated that the United States indicted him on December 3, 2015, in two

cases: (i) the Sosoya incident with R. Martinez, who is cooperating with the United States; and

(ii) Molina's homicide.  See Feb. 7 Tr. at 279:9-280:1 (Armijo, M. Rodriguez).  M. Rodriguez

admitted that he knew T. Martinez, J. Montoya, and Armenta were cooperating with the United

States.  See Feb. 7 Tr. at 367:3-12 (Villa, M. Rodriguez).  M. Rodriguez also admitted that he had

heard Archuleta was cooperating, and, although M. Rodriguez did not believe it at the time, he

now knows it to be true.  See Feb. 8 Tr. at 15:24-16:8 (Villa, M. Rodriguez).  M. Rodriguez said

that he was the only defendant set to go to trial in the Sosoya case and arrived at a pretrial hearing

on October 24, 2017, prepared to go to trial alone;[70] he said he met with the United States about

cooperating, but, at that time, he was not interested.  See Feb. 7 Tr. at 280:2-281:3 (Armijo,

---

[69]"Yeah, these statements that are being elicited as Mr. Baca's cannot be used against any
other defendant.  They can only be used in your consideration of the charges against Mr. Baca."
Feb. 7 Tr. at 273:21-25 (Court).

[70]M. Rodriguez described his trial as "a test run with other lawyers" who "wanted to see
the outcome of [his] case."  Feb. 7 Tr. at 281:1-3 (M. Rodriguez).  R. Perez objected and requested
to approach.  See Feb. 7 Tr. at 281:4-5 (Villa).  At a bench conference outside the jury's hearing,
all the First Trial Defendants moved for a mistrial, asserting that information learned through the
joint defense privilege formed the basis of M. Rodriguez' statement.  See Feb. 7 Tr. at 282:4-10
(Villa); id. at 283:2-4 (Bhalla); id. at 283:6-15 (Lowry); id. at 283:17-18 (Jacks).  The Court
therefore struck this testimony and had the United Starts restart its questioning on this topic.  See
Feb. 7 Tr. at 283:22-284:2 (Court).

M. Rodriguez); id. at 284:4-285:15 (Armijo, M. Rodriguez).  He denied being an SNM member at this meeting.  See Feb. 8 Tr. at 71:5-9 (Lowry, M. Rodriguez).  He admitted to lying to the FBI when he denied being an SNM member at the time that he committed the Esparza assault, explaining that the FBI knew he was an SNM member and that it was "a running joke when [he] was denying it."  Feb. 8 Tr. at 82:14 (M. Rodriguez).  See id. at 82:7-18 (Lowry, M. Rodriguez).  After this meeting, however, M. Rodriguez told his lawyer, "I'm done," meaning he was tired of being a gang member and did not want to be one anymore.  Feb. 7 Tr. at 286:8 (M. Rodriguez).  See id. at 285:20-286:13 (Armijo, M. Rodriguez).  M. Rodriguez also mentioned that he did not like that he would have had to go to trial alone in the Sosoya case or that the case would be used to "see how the Government approached the next cases, the next VICAR cases, and it was a test run at [M. Rodriguez'] expense."  Feb. 8 Tr. at 312:14-17 (M. Rodriguez).  See id. at 312:1-19 (Armijo, M. Rodriguez).  He stated that this situation, combined with the test run being a joke for the Defendants, influenced his decision to cooperate.  See Feb. 8 Tr. at 312:20-25 (Armijo, M. Rodriguez).  M. Rodriguez admitted that he is still struggling with his decision to cooperate and enter into a plea agreement.  See Feb. 7 Tr. at 287:4-23 (Armijo, M. Rodriguez).

M. Rodriguez pled guilty on November 1, 2017, to all the federal charges.  See Feb. 7 Tr. at 295:6-7 (M. Rodriguez).  He met with his family and with the FBI that day to go over what danger M. Rodriguez and his family would face, because of his cooperation.  See Feb. 7 Tr. at 295:17-24 (M. Rodriguez).  M. Rodriguez went through his plea agreement with the United States, verifying that, for the Sosoya incident, he faces up to twenty years on one count and up to ten years on the other count, whereas, for Molina's homicide, he faces a mandatory term of life.  See Feb. 7 Tr. at 288:19-290:7 (Armijo, M. Rodriguez).  He stated that he agreed with the United States that the federal sentences could run concurrent with each other and the state sentence which he is

currently serving, and that the United States gave him a <u>Kastigar</u> letter and a 5K.[71]  <u>See</u> Feb. 7 Tr. at 291:7-25 (Armijo, M. Rodriguez); <u>id.</u> at 292:8 (M. Rodriguez).  M. Rodriguez explained that he has about a year and a half until he is released from state custody, so he will be free once he serves his federal time.  <u>See</u> Feb. 7 Tr. at 397:22-398:7 (Villa, M. Rodriguez).  He said that the 5K provides him the possibility for a sentence reduction, at the judge's discretion, if he helps the United States at trial.  <u>See</u> Feb. 7 Tr. at 293:5-9 (Armijo, M. Rodriguez); Feb. 8 Tr. at 242:18-25 (Jacks, M. Rodriguez).  R. Perez noted that the Court could sentence M. Rodriguez to two years total for his federal charges, which, served concurrent to his state sentence, means M. Rodriguez would be free in two years; M. Rodriguez admitted that such a scenario would be nice.  <u>See</u> Feb. 7 Tr. at 405:20-406:16 (Villa, M. Rodriguez).  M. Rodriguez admitted that he had pondered the possibility of a reduced sentence and thought he could receive about fifteen years.  <u>See</u> Feb. 7 Tr. at 406:20 (M. Rodriguez).  As to other benefits from the plea deal, he provided that he receives about $50.00 per month from the United States in his commissary.  <u>See</u> Feb. 7 Tr. at 295:13-16 (M. Rodriguez, Armijo).  M. Rodriguez admitted that not being charged for Esparza's assault is another benefit he receives from cooperating.  <u>See</u> Feb. 8 Tr. at 110:19-111:5 (Lowry, M. Rodriguez).  He also gets out of the gang life.  <u>See</u> Feb. 8 Tr. at 243:2-3 (M. Rodriguez).

M. Rodriguez stated that he saw no real opportunity to leave SNM until the United States approached him to cooperate, but he admitted that he could have gone to the RPP Program.  <u>See</u> Feb. 8 Tr. at 109:7-14 (Lowry, M. Rodriguez).  He elaborated, however, that the RPP Program began when he was being prosecuted by the state for Molina's murder and that, had he joined the

---

[71]Under § 5K1.1 of the United States Sentencing Guidelines, a sentencing court may depart from the guidelines on "motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense."  <u>See</u> <u>also</u> 28 U.S.C. 3553(e).

program, he would have served the rest of his sentence in solitary confinement.  See Feb. 8 Tr. at 109:17-110:1 (M. Rodriguez, Lowry).  M. Rodriguez said that those who left SNM for religious reasons still lived around SNM.  See Feb. 8 Tr. at 110L5-12 (Lowry, M. Rodriguez).  He said that asking for protective custody "wasn't in [his] interests."  Feb. 8 Tr. at 113:3 (M. Rodriguez).  See id. at 112:23-113:2 (Lowry, M. Rodriguez).

Accordingly, M. Rodriguez maintained that his cooperation "is the only opportunity [he has] to get completely out and [he] can never go back."  Feb. 8 Tr. at 110:17-18 (M. Rodriguez).  M. Rodriguez described his mentality as being "in 100 percent or not in at all," so he was "completely loyal to the SNM" until he decided to change his life, and "commit [himself] 100 percent to [his] cooperation and changing [his] life."  Feb. 8 Tr. at 113:19-20, 23 (M. Rodriguez); id. at 114:1-2 (M. Rodriguez).  He admitted, however, to lying to the FBI on October 24, 2017.  See Feb. 8 Tr. at 114:4-14 (Lowry, M. Rodriguez).

M. Rodriguez disputed that he ever wanted to be on the "tabla," asserting that he wanted only to be a good soldier for SNM and that "that's something you do not express.  Your brothers express that for you."  Feb. 7 Tr. at 369:2-12 (Villa, M. Rodriguez).  R. Perez showed him a 302 that FBI Agent Stemo prepared after their October 24, 2017, meeting, which provides that M. Rodriguez aspired to be on the SNM "tabla."  Feb. 7 Tr. at 369:21-370:3 (Villa, M. Rodriguez).  M. Rodriguez responded that Stemo must have misunderstood him.  See Feb. 7 Tr. at 370:2-8 (Villa, M. Rodriguez).  M. Rodriguez admitted that he would have liked to be a leader someday and that desire is why he "put in the work": "That's why I was such a good carnal.  And you want your brothers to someday trust in you that you could lead them."  Feb. 7 Tr. at 371:12-14 (M. Rodriguez).  See id. at 371:8-10 (Villa, M. Rodriguez).  M. Rodriguez explained that Sosoya was his first "hit" for SNM and that he could not have aspired to be a leader having only done one

"hit." Feb. 7 Tr. at 371:18-25 (M. Rodriguez). M. Rodriguez thought that his criminal history was not an impediment to his becoming a leader, but admitted that it could have been a problem he never considered. See Feb. 7 Tr. at 382:19-383:8 (Villa, M. Rodriguez).

M. Rodriguez verified that he still has his discovery tablet, and that he never tampered with it or lived near the men who were tampering with their tablets. See Feb. 7 Tr. at 296:24-297:7 (Armijo, M. Rodriguez). M. Rodriguez admitted that he has had the discovery in the case for the past two years, and knew it well enough that he noted to the FBI false statements in the discovery. See Feb. 8 Tr. at 43:18-44:23 (M. Rodriguez, Bhalla). M. Rodriguez explained that, at first, the tablet's use was restricted from 9:00 a.m. to 10:00 p.m., but he eventually had access to the discovery tablet all day long, with the exception of three or four hours for it to charge. See Feb. 8 Tr. at 61:11-18 (Lowry, M. Rodriguez); id. at 195:3-9 (M. Rodriguez, Jacks). M. Rodriguez noted that he did not get the last update or his own 302 reports. See Feb. 8 Tr. at 60:11-21 (Lowry, M. Rodriguez).

On cross-examination, M. Rodriguez described being shocked and upset when he listened to wiretaps of Herrera in which Herrera said unflattering things about M. Rodriguez. See Feb. 8 Tr. at 46:4-25 (Bhalla, M. Rodriguez). M. Rodriguez admitted that he felt that Herrera was acting like someone he was not, and, therefore, M. Rodriguez planned with other co-Defendants to strangle Herrera on the transport van with a sock. See Feb. 8 Tr. at 49:7-22 (Bhalla, M. Rodriguez); id. at 58:25-59:2 (Bhalla, M. Rodriguez).[72] M. Rodriguez said that Herrera also took credit for things which he had not done, but noted that this bragging did not include Molina's murder. See

_____

[72]At this point, the attorneys approached the bench with concerns about opening the door to M. Rodriguez implicating D. Sanchez in the Herrera murder plot. See, e.g., Feb. 8 Tr. at 50:5-13 (Armijo). The Court called M. Rodriguez to the bench and, outside the jury's hearing, instructed him to refrain from answering Ms. Bhalla's questions if he cannot answer them truthfully without implicating D. Sanchez. See Feb. 8 Tr. at 53:2-4, 9-11 (Court).

Feb. 8 Tr. at 326:16-21 (Bhalla, M. Rodriguez).  On his own accord, M. Rodriguez told law enforcement about this plan, which he asserted another person formed.  See Feb. 8 Tr. at 296:6-8 (Armijo, M. Rodriguez); id. at 298:3-9 (Armijo, M. Rodriguez).  M. Rodriguez verified that there were many reasons why they planned to "hit" Herrera, including his recordings, and because law enforcement interviewed Herrera's mother and brother.  Feb. 8 Tr. at 298:10-20 (Armijo, M. Rodriguez).  M. Rodriguez said that, at this time, he was "[a] high-ranking SNM member," elevated because of his involvement in the Molina murder.  Feb. 8 Tr. at 299:11 (M. Rodriguez).  See id. at 299:6-19 (Armijo, M. Rodriguez).

M. Rodriguez admitted that, before he began cooperating, he planned to attack a co-Defendant in the Sosoya indictment at court, and brought shanks into court to do so.  See Feb. 7 Tr. at 376:23-377:7 (Villa, M. Rodriguez); id. at 382:8-9 (M. Rodriguez).  M. Rodriguez said that, as an active SNM member, he took shanks everywhere, including when he spoke with the FBI, but that he does not carry shanks anymore.  See Feb. 7 Tr. at 377:8-25 (Villa, M. Rodriguez).  M. Rodriguez verified that he removed shanks from his rectum and gave them to the United States.  See Feb. 7 Tr. at 378:10-16 (Villa, M. Rodriguez).  He admitted that, although he never recruited anyone into SNM, he reached out to two friends to cooperate for the United States.  See Feb. 7 Tr. at 410:3-411:5 (Villa, M. Rodriguez).  On November 9, 2017, M. Rodriguez wrote D. Sanchez a letter explaining his decision to cooperate and to let D. Sanchez know that cooperation was an option.  See Feb. 8 Tr. at 245:12-246:7 (Jacks, M. Rodriguez).  M. Rodriguez also described some of the benefits stemming from cooperating, such as entering witness protection and receiving a new identity with a clean criminal record, information which he learned through his family's Internet research.  See Feb. 8 Tr. at 246:20-247:22 (Jacks, M. Rodriguez).  M. Rodriguez admitted that he believed he would get a new identity with a clean record and that he would not have to

register as a sex offender.  See Feb. 8 Tr. at 249:25-250:9 (Jacks, M. Rodriguez).  M. Rodriguez said that he was not told he would receive any benefits for helping secure D. Sanchez' cooperation or guilty plea.  See Feb. 8 Tr. at 246:8-15 (Jacks, M. Rodriguez).

M. Rodriguez said he met with the United States on three instances.  See Feb. 7 Tr. at 306:7 (M. Rodriguez).  R. Perez noted that M. Rodriguez met with the United States and D. Sanchez' brother recently on November 16, 2017, and M. Rodriguez verified that the meeting had occurred, but testified that he had forgotten about it and therefore did not count it when asked on direct how many times he had met with the United States.  See Feb. 7 Tr. at 411:10-412:4 (Villa, M. Rodriguez).  M. Rodriguez maintained that, although his memory is excellent, he could not recall how many times he met with the FBI.  See Feb. 8 Tr. at 85:6-11 (Lowry, M. Rodriguez).  M. Rodriguez said the November, 2017, meeting was a favor for D. Sanchez' brother, who wanted to work for the United States and who had asked M. Rodriguez to speak to D. Sanchez; M. Rodriguez testified that he told R. Sanchez that he excepted to receive contact visits once he moved to federal prison in Tucson, Arizona or in Florida.  See Feb. 7 Tr. at 412:5-23 (Villa, M. Rodriguez); id. at 20:11-15 (Villa, M. Rodriguez).  M. Rodriguez verified that R. Sanchez wanted to discuss how to convince D. Sanchez to cooperate or plead guilty, and that, had M. Rodriguez convinced D. Sanchez, he would have received a benefit.  See Feb. 8 Tr. at 165:10-24 (Jacks, M. Rodriguez).  M. Rodriguez denied that the potential benefit provided any motivation for the meeting.  See Feb. 8 Tr. at 166:25-167:4 (Jacks, M. Rodriguez).  M. Rodriguez also told R. Sanchez that he believed that the federal indictments meant that SNM would eventually lose power.  See Feb. 8 Tr. at 18:21-19:5 (Villa, M. Rodriguez).

M. Rodriguez said that SNM has always been political and that there were rumors that some members disagreed with Baca's politics.  See Feb. 8 Tr. at 86:2-13 (M. Rodriguez, Lowry).

M. Rodriguez confirmed that Baca had a disagreement with inmate Jeffrey Madrid and that Baca requested two other inmates kill Madrid.  See Feb. 8 Tr. at 86:14-21 (Lowry, M. .Rodriguez).  M. Rodriguez admitted that the inmates at Southern New Mexico, where the disagreement occurred, expected Baca to attack Madrid, but that he never did so because he did not want solitary confinement.  See Feb. 8 Tr. at 89:7-25 (Lowry, M. Rodriguez).[73]  M. Rodriguez verified that there is often discord and disagreement within SNM.  See Feb. 8 Tr. at 92:12-19 (Lowry, M. Rodriguez).  M. Rodriguez admitted to telling the FBI that Baca liked Molina, "[f]or certain reasons," Feb. 8 Tr. at 99:21 (M. Rodriguez), and that Baca would have stopped the "hit" had he been at Southern New Mexico, Feb. 8 Tr. at 101:5-13 (Lowry, M. Rodriguez).  With a limiting instruction,[74] M. Rodriguez also admitted that he told the FBI that Clark wanted to kill Baca and that no one attacked Clark even though such disloyalty violated SNM rules.  See Feb. 8 Tr. at 102:20-21 (Lowry); id. at 103:10-16 (Lowry, M. Rodriguez).  M. Rodriguez stated that he knew Romero had become involved with Archuleta's wife and that Archuleta wanted Romero killed "through SNM bylaws." Feb. 8 Tr. at 103:5-6 (M. Rodriguez).  See id. at 101:22-102:15 (Lowry, M. Rodriguez). M. Rodriguez proffered his opinion, which he maintained other SNM members shared, that Romero was not beaten severely enough, and he should have, at least, been sliced with a razor blade.  See Feb. 8 Tr. at 104:10-23 (Lowry, M. Rodriguez).

D. Sanchez asked M. Rodriguez about his October 24, 2017, meeting with the FBI, in which M. Rodriguez denied being an SNM member, and disclosed that although SNM attempted

---

[73]M. Rodriguez testified that Baca told him that the inmates at Southern New Mexico did not want him there, but the Court struck this testimony from the record.  See Feb. 8 Tr. at 91:12-22 (Lowry, M. Rodriguez, Armijo, Court).

[74]The Court instructed the jury: "This is not being admitted for the purposes of hearsay. It's just to find out whether he told that to the FBI. . . .  The jury cannot consider this statement for the truth of the matter."  Feb. 8 Tr. at 102:25-103:2 (Court); id.at 103:6-7 (Court).

to recruit him in 2005, he heard a rumor that his membership had been shot down -- which he assumed was because of his criminal sexual penetration charges.  See Feb. 8 Tr. at 115:10-116:25 (Jacks, M. Rodriguez).  M. Rodriguez had also told the FBI that, after that, he was moved to a pod with Los Carnales and SNM, and his friend Joseph Sifuentes pushed him "to get schooling from Diablo, from Los Carnales," but denied that Los Carnales recruited him or that he told the FBI that Sifuentes pushed him to join Los Carnales.  Feb. 8 Tr. at 117:13-14 (M. Rodriguez).  See id. at 117:1-118:9 (Jacks, M. Rodriguez).  D. Sanchez showed M. Rodriguez the 302 report from that October 24, 2017, meeting, containing "the statement that Joseph Sifuentes, also known as Snuffy, started pushing [M. Rodriguez] to join Los Carnales," Feb. 8 Tr. at 118:20-22 (Jacks), and M. Rodriguez responded that: (i) he skimmed that 302, (ii) made no changes to the 302, (iii) Sifuentes' moniker is "Snorty," and (iv) the statement in question is incorrect, Feb. 8 Tr. at 118:15-119:13 (M. Rodriguez, Jacks).  M. Rodriguez admitted that the report's statement that Diablo taught him how to make shanks is correct, but M. Rodriguez clarified that Diablo taught him that skill later. See Feb. 8 Tr. at 120:4-8 (Jacks, M. Rodriguez).  M. Rodriguez observed another mistake in the 302, describing that, while they were housed at Southern New Mexico before Molina's murder, D. Sanchez -- not E. Martinez, as the 302 reports -- noted an inmate who had entered protective custody at another prison, so E. Martinez and M. Rodriguez decided to stab that inmate.  See Feb. 8 Tr. at 128:19-129:23 (Jacks, M. Rodriguez).  M. Rodriguez admitted that he told the FBI that D. Sanchez told everyone not to do anything to the inmate, which made D. Sanchez look weak in M. Rodriguez's eyes and the pod's other SNM members, and so M. Rodriguez took it upon himself to tell the inmate to leave, with D. Sanchez by his side.  See Feb. 8 Tr. at 131:3-132:10 (Jacks, M. Rodriguez).

M. Rodriguez verified that Keith Johnson came into PNM North to teach reentry and became M. Rodriguez' good friend.  See Feb. 8 Tr. at 196:10-18 (Jacks, M. Rodriguez). M. Rodriguez stated that Johnson encouraged M. Rodriguez to write creatively and was the first person to tell M. Rodriguez that he was good at something.  See Feb. 8 Tr. at 196:19-24 (Jacks, M. Rodriguez).  M. Rodriguez admitted that he has used his story-telling skills in connection with his criminal cases, but did not use them in the state Molina case.  See Feb. 8 Tr. at 197:9-20 (Jacks, M. Rodriguez).  M. Rodriguez admitted that he had been housed with J. Montoya for some time during the state case's pendency, but he said that he was not housed with Armenta.  See Feb. 8 Tr. at 198:5-12 (Jacks, M. Rodriguez).  M. Rodriguez stated that he had heard of a letter which Armenta wrote to J. Montoya's lawyer, but "wasn't in the loop directly in that."  Feb. 8 Tr. at 198:19-20 (M. Rodriguez).  He verified that, according to what he heard, the letter was Armenta's attempt to exonerate J. Montoya and, because of the letter, J. Montoya's lawyer filed a motion designating Armenta as his witness.  See Feb. 8 Tr. at 199:4-16 (Jacks, M. Rodriguez). M. Rodriguez maintained that he did not help fabricate the story and would not have had contact with Armenta during this time.  See Feb. 8 Tr. at 202:12-203:11 (Jacks, M. Rodriguez).  M. Rodriguez asserted that, at that time, he thought Armenta was "snitching" and learned that Armenta "had charges contributing to the delinquency of a minor, . . . and they were charges that [M. Rodriguez] didn't agree with, and [M. Rodriguez] discontinued all communication with him." Feb. 8 Tr. at 203:4-7 (M. Rodriguez).  M. Rodriguez maintained that he therefore has not communicated with Armenta since receiving the discovery in the state case.  See Feb. 8 Tr. at 205:9-206:13 (Jacks, M. Rodriguez).  M. Rodriguez said that he was also uninvolved in a unified defense that Armenta, J. Montoya, and a third person were presenting in the state Molina case. See Feb. 8 Tr. at 203:12-15 (Jacks, M. Rodriguez).  M. Rodriguez maintained that his testimony

has been the truth, see Feb. 8 Tr. at 351:25-352:3 (Armijo, M. Rodriguez), and the Court let him

step down from the witness stand subject to recall,[75] see Feb. 8 Tr. at 352:13-16 (Court).

      q.    **Armijo's Testimony -- February 8, 2018.**

      The United States re-called Armijo.  See Feb. 8 Tr. at 353:3-4 (Castellano).[76]  Armijo

described that, sometime in 2011, while housed with Molina in the blue pod at Southern New

Mexico, he spoke with "Baby G,"[77] who lived in yellow pod, through the connecting door on the

top tier.  Feb. 8 Tr. at 357:7-358:12 (Castellano, Armijo).  Baby G had called Armijo to the door

during tier time, and informed Armijo that "he got word from the North, from the North facility,

that there was "paperwork" on Javier Molina, and that Pup wanted him hit," so Armijo asked for

the "paperwork."  Feb. 8 Tr. at 358:14-16 (Armijo).  See id. at 358:11-17 (Armijo).  Armijo

explained that "paperwork" is important, because, otherwise, "there is a possibility that people

could just hold a grudge, or personal reasons for them to have someone assaulted."  Feb. 8 Tr. at

358:20-22 (Armijo).  He said that Baby G responded that he did not have the "paperwork," so

Armijo told him that nobody was going to do anything to Molina.  Feb. 8 Tr. at 358:23-359:6

---

    [75]At Baca's request, the Court admonished M. Rodriguez before he left the courtroom: "Mr. Rodriguez, since you're subject to re-call, you're not to discuss your testimony or this case with anyone.  So don't do that, wherever you go and whoever you're talking to."  Feb. 8 Tr. at 352:20-23 (Court).  See id. at 352:18-19 (Lowry).

    [76]Before M. Armijo began testifying, the attorneys approached the bench to make a record, outside the jury's hearing, regarding the First Trial Defendants' objections to the additional James statements to which M. Armijo would testify.  See Feb. 8 Tr. at 353:12-18 (Duncan).  The Court underscored that the two statements at issue were made in furtherance of the Molina conspiracy or the Marcantel conspiracy by Baca, a member of both conspiracies, and the Court's only issue with the statements were their disclosure so close to testimony -- the Defendants needed more time to prepare for them.  See Feb. 8 Tr. at 355:17-25 (Court).

    [77]The Court notes, for the reader's convenience, that Baby G is Jonathan Gomez.  See Feb. 8 Tr. at 354:21-22 (Castellano).

(Castellano, Armijo).  Armijo, as "llavero" of blue pod at the time, ordered others in blue pod not to touch Molina although, had the "paperwork" been produced, he would have had to order Molina "hit."  Feb. 8 Tr. at 359:9-24 (Castellano, Armijo).  Armijo admitted that he liked Molina, but that would not have mattered had he received the "paperwork"; as "llavero," Armijo would have to ensure Molina was killed.  Feb. 8 Tr. at 359:25-360:6 (Castellano, Armijo).  Armijo said that he had known Baby G about a year and a half, and that he had no problem with Baby G at the time; however, Armijo said that he believes Baby G conveyed the "hit" on Armijo and, when Baca got to Southern New Mexico, he no longer liked Baby G.  Feb. 8 Tr. at 375:18-376:5 (Duncan, Armijo).  Armijo liked Molina, however, and lived with him for about a year and a half in Southern New Mexico.  See Feb. 8 Tr. at 380:6-14 (Jewkes, Armijo).  According to Armijo, Molina was well-liked and was not "mouthy."  Feb. 8 Tr. at 380:21 (Jewkes).  See id. at 380:15-22 (Jewkes, Armijo).

Armijo described that, in December, 2015, he was out of prison and went to C. Garcia's mother's house to purchase heroin for personal use from C. Garcia, whom Armijo knew as an SNM member and drug dealer.  See Feb. 8 Tr. at 360:7-23 (Castellano, Armijo).  Armijo explained that he normally bought from M. Montoya, but M. Montoya was out of heroin and on his way to C. Garcia's to buy, so M. Montoya told Armijo to follow him, which Armijo did.  See Feb. 8 Tr. at 361:7-15 (Castellano, Armijo).  Armijo described that C. Garcia gave them both heroin, as well as a third SNM member who was there, and also gave M. Montoya a gun.  See Feb. 8 Tr. at 361:18-24 (Armijo); id. at 364:1-4 (Castellano, Armijo).  About a week later, Armijo called up C. Garcia asking for heroin, and C. Garcia told Armijo to meet him at his mother's house, which Armijo did.  See Feb. 8 Tr. at 366:15-24 (Castellano, Armijo).  Armijo described that, while C. Garcia prepared heroin for Armijo, C. Garcia asked whether he knew Mandel Parker, and told him that Baca had a

mission for them.  See Feb. 8 Tr. at 367:2-9 (Armijo).  C. Garcia explained that they were supposed to "hit" Marcantel, the NM Corrections Department Secretary, and Armijo told him that he was stupid for listening to Baca, because Baca "was going to be the downfall of everybody."  Feb. 8 Tr. at 368:1-2 (Armijo).  See id. at 367:10-25 (Castellano, Armijo).  Armijo stated that Parker is also an SNM member.  See Feb. 8 Tr. at 368:3-5 (Castellano, Armijo).  The United States also showed photographs of C. Garcia, and Armijo noted an SNM tattoo and the scar from when C. Garcia got shot.  See Feb. 8 Tr. at 364:14-365:25 (Castellano, Armijo).

Armijo verified that he first met C. Garcia in the 2000s while in prison.  See Feb. 8 Tr. at 368:20-22 (Duncan, Armijo).  Armijo did not agree with C. Garcia being brought into SNM, because he thought that they wanted C. Garcia only because he had drugs.  See Feb. 8 Tr. at 369:1-6 (Duncan, Armijo).  Armijo also did not agree with C. Garcia being brought in to SNM, because C. Garcia had "snitched" while on the street.  See Feb. 8 Tr. at 369:13-17 (Duncan, Armijo).  Armijo has, however, used heroin with C. Garcia "a couple of times," most recently sometime before the first sweep in the case in December, 2015.  See Feb. 8 Tr. at 369:21-370:5 (Duncan, Armijo).  Armijo admitted to having come up with a plan, sometime in the early 2000s, to rob C. Garcia of two kilograms of cocaine with M. Montoya, but they never acted on this plan.  See Feb. 8 Tr. at 373:10-23 (Duncan, Armijo).  Armijo verified that he was charged with a RICO conspiracy in April, 2016, and that one of the overt acts alleges that he and C. Garcia ordered two others to murder Giron.  See Feb. 8 Tr. at 373:24-374:13 (Duncan, Armijo).  Armijo learned from this case's indictment that C. Garcia and Baca were charged with conspiracy to murder Marcantel.  See Feb. 8 Tr. at 375:8-12 (Duncan, Armijo).

Armijo asserted that Archuleta was SNM's leader when this case was filed and that Archuleta remained the leader until he decided to cooperate.  See Feb. 8 Tr. at 376:19-377:5

(Duncan, Armijo).  Armijo denied giving drugs to Archuleta at Archuleta's request, but Armijo admitted that he sent Suboxone to Archuleta in Tennessee at his request, which he does not characterize as a drug.  See Feb. 8 Tr. at 377:9-378:12 (Duncan, Armijo).

Armijo admitted to having used methamphetamine in 2012, when he was first released from prison, but denied suffering hallucinations while using methamphetamine.  See Feb. 8 Tr. at 370:15-20 (Duncan, Armijo).  Armijo recalled, however, that, after an interview with Evolution Group, in July, 2016, the Evolution Group concluded that he had suffered hallucinations while using methamphetamine.  See Feb. 8 Tr. at 371:17-372:5 (Duncan, Armijo).  Armijo admitted telling Evolution group that he has trouble concentrating and, at one time, had trouble controlling his violent temper.  See Feb. 8 Tr. at 372:13-20 (Duncan, Armijo).  He stated that he takes Abilify, an antipsychotic medication intended to treat anger and post-traumatic stress disorder.  See Feb. 8 Tr. at 372:21-373:3 (Duncan, Armijo).

Armijo verified that he had been convicted for battery on a police officer in 2008.  See Feb. 8 Tr. at 376:9-18 (Armijo).  He stated that, while he was a validated member of SNM and joined in 1993, he did not know how long the STIU had him validated and does not consider himself an SNM member anymore.  See Feb. 8 Tr. at 379:24 (Jewkes, Armijo).  Armijo described how he would plan a "hit" in a prison, noting that there would have to be a reason for it, that he would want to use a shank, and that he would likely attack the victim in his room or the shower -- somewhere more out of the way.  Feb. 8 Tr. at 381:22- 384:22 (Jewkes, Armijo).  Armijo stated that he would only stab the victim once, in the neck or armpit, because that is all that is needed.  See Feb. 8 Tr. at 384:23-385:21 (Jewkes, Armijo).  Armijo admitted that he has often seen inmates exhibit rage and commit violent acts while under that rage.  See Feb. 8 Tr. at 387:3-388:1 (Jewkes, Armijo).  The Court excused Armijo.  See Feb. 8 Tr. at 391:8-11 (Court).

r.    **Jerry Armenta's Testimony**.

The United States next called Armenta, who is in custody.  See Feb. 8 Tr. at 391:16-17 (Castellano); Transcript of Jury Trial Volume 11 at 150:7-11 (taken February 12, 2018)(Fox-Young, Armenta), filed February 22, 2019 (Doc. 2527)("Feb. 12 Tr.").  Armenta said that he is set to be released from his state sentence in May, 2020.  See Feb. 12 Tr. at 150:10-11 (Armenta).  Armenta said that he was an SNM member, explaining that he "let it down" and "threw it away," that he "want[s] nothing to do with it anymore."  Feb. 8 Tr. at 392:20-22 (Armenta).  He described his tattoo of a Zia symbol with the state of New Mexico behind it as an SNM tattoo, admitting that he wanted to get an "S" inside the Zia, but that M. Rodriguez and D. Sanchez would not allow it, because they said he had not "earned his bones."  Feb. 8 Tr. at 394:1-25 (Castellano, Armenta).  Armenta explained that they said he "earned his bones" all in self-defense, which was not "the right way."   Transcript of Jury Trial Volume 10 at 65:4 (taken February 9, 2018)(Armenta), filed February 22, 2019 (Doc. 2526)("Feb. 9 Tr.").  See id. at 64:20-65:4 (Castellano, Armenta).  Armenta believed that he had, however, "earned his bones," describing that, in 2005, at Lea County Correctional Facility ("Lea County Correctional") in Hobbs, he and the person who recruited him into SNM were housed with Sureños, and got jumped after getting drunk on homemade wine, so he stabbed a Sureños member.  Feb. 8 Tr. at 395:1-396:6 (Castellano, Armenta).  See id. at 397:23-398:3 (Castellano, Armenta).  Armenta stated that he had been recruited into the gang in that same year and did not realize he had inherited rivals by becoming an SNM member.  See Feb. 8 Tr. at 397:9-22 (Castellano, Armenta).  Armenta explained that this fight, caused senior SNM members, including Archuleta, to accept him into the gang.  See Feb. 9 Tr. at 19:7-12 (Armenta); id. at 20:12-21:3 (Castellano, Armenta).  Armenta described that, when he joined, he did not know anything about SNM's culture, but learned that some gang rules that

apply generally to prison life: you cannot be a "rat," you cannot have sex charges, you cannot be soft, and you fight when someone asks you to fight. Feb. 9 Tr. at 21:20-24 (Armenta). He later learned he had to do whatever SNM ordered or else be beaten up or killed. See Feb. 9 Tr. at 33:2-6 (Armenta).

Armenta related that he had been dealing drugs since he was seventeen, and has four convictions for drug trafficking, three of which happened before he joined SNM at age nineteen. See Feb. 8 Tr. at 398:9-21 (Castellano, Armenta). He explained that he picked up two more drug-trafficking charges while out of prison on conditions of release pending his first charge. See Feb. 8 Tr. at 400:2-7 (Castellano, Armenta).[78] He was a member of the North Side Locos while dealing, selling, and using marijuana and crack cocaine. See Feb. 9 Tr. at 18:7-22 (Castellano, Armenta). Armenta stated that he stopped using crack in 2008, but since then has used heroin and Suboxone sporadically. See Feb. 9 Tr. at 18:23-19:2 (Castellano, Armenta). Armenta said he has also snorted cocaine since 2008. See Feb. 9 Tr. at 168:14-25 (Jacks, Armenta).

Armenta recounted that he was released from prison in September, 2006, met his wife and had children, had a few run-ins with the law that were "mistakes," and was arrested on another drug-trafficking charge in 2011. Feb. 9 Tr. at 22:19-25:1 (Castellano, Armenta). That charge was pending for almost three years and, during that time, in 2013, Armenta was sent to Southern New

_____

[78]After breaking for the evening, outside the presence of the jury, the Court admonished Armenta at Sanchez' request: "Mr. Armenta, don't talk to anyone about your testimony now that you've taken the stand, okay? Don't talk to other witnesses." Feb. 8 Tr. at 403:22-24 (Court). See id. at 403:20-21 (Jacks).
    The next morning, before the jury entered the courtroom, Herrera argued that he has the right to impeach witnesses with his own statements inconsistent with what the witnesses testify, when contained in the same recording about which the witness is testifying. See Transcript of Jury Trial Volume 10 at 6:7-17 (taken February 9, 2018)(Bhalla), filed February 22, 2019 (Doc. 2526)("Feb. 9 Tr."); id. at 6:24-7:7 (Bhalla). The Court said that Herrera cannot elicit his own statements and will not allow witnesses to answer questions that would elicit his statements. See Feb. 9 Tr. at 7:18-24 (Court).

Mexico for contributing to the delinquency of a minor. See Feb. 9 Tr. at 25:4-15 (Castellano, Armenta). Armenta described that when he was at the facility in Los Lunas for classification, the STIU interviewed him about his gang affiliation. See Feb. 9 Tr. at 26:11-27:11 (Castellano, Armenta). Armenta told STIU that it is impossible to leave a gang, because "once you're in, you don't get out. There is no way of getting out." Feb. 9 Tr. at 28:15-16 (Armenta). See id. at 28:9-29:2 (Castellano, Armenta). At an earlier date, Armenta said that one could just walk away from the gang life, but he asserted that he was talking about his street gang and that he had not yet joined SNM. See Feb. 9 Tr. at 183:7-21 (Jacks, Armenta). He said that, at the time of classification, he had less than a year left to serve and refused to enter a drop-out program. See Feb. 9 Tr. at 30:4-19 (Castellano, Armenta). The NM Corrections Department classified Armenta to Level 4, so he moved to blue pod at Southern New Mexico shortly before Christmas of 2013. See Feb. 9 Tr. at 29:16-30:3 (Castellano, Armenta); id. at 30:20-25 (Castellano, Armenta).

Armenta first proffered his belief that everyone in blue pod at that time were SNM members, but then clarified that D. Sanchez' brother and somebody he knows only as "Polo"[79] are not SNM members. See Feb. 9 Tr. at 31:3-32:4 (Castellano, Armenta). Armenta described D. Sanchez as the pod's "llavero." Feb. 9 Tr. at 32:9-17 (Castellano, Armenta). Armenta said that he arrived at the pod at the same time as M. Rodriguez, with whom he got along, and that he and D. Sanchez were the only people he knew. See Feb. 9 Tr. at 32:21-33:9 (Castellano, Armijo). Armenta recounted that inmates sometimes ask to see an unknown inmate's "paperwork," but that nobody asked to see his "paperwork," because D. Sanchez knew that he had protected a fellow SNM member by stabbing a Sureño. Feb. 9 Tr. at 35:1-18 (Armenta, Castellano). Armenta said

---

[79]Armenta said Polo's last name is Hernandez, but Armenta did not know his full name. See Feb. 9 Tr. at 31:19 (Armenta).

that, when he arrived, the correctional officers thumbed through his legal paperwork to ensure that there was no contraband, but searched it no deeper than that.  See Feb. 9 Tr. at 36:9-15 (Castellano, Armenta).  Armenta recalled Marcantel coming down and telling SNM that he was going to let them work in the wheelchair program, and eventually get back into the general population.  See Feb. 9 Tr. at 38:18-39:5 (Castellano, Armenta).  Armenta said that he did not get a job in the wheelchair program, because he was going to court so often.  See Feb. 9 Tr. at 39:12-18 (Castellano, Armenta).

Armenta stated that Molina also lived in the blue pod and that, while they got along, they were not close.  See Feb. 9 Tr. at 39:19-25 (Castellano, Armenta).  Armenta knew, through communications with other members, that Herrera, Alex Munoz, and B. Cordova were in the yellow pod.  See Feb. 9 Tr. at 44:23-45:9 (Castellano, Armenta).  Armenta recalled telling Molina that Sosa had been in the Los Lunas facility with him.  See Feb. 9 Tr. at 40:23-41:1 (Castellano, Armenta).  Armenta said that Urquizo and Varela arrived at yellow pod on March 6, 2014, and M. Rodriguez and T. Martinez ran to the connecting door to speak with Urquizo and Varela.  See Feb. 9 Tr. at 41:5-42:11 (Castellano, Armenta).  This conversation, Armenta recalled, occurred sometime between noon and 4:00 p.m.  See Feb. 12 Tr. at 33:5-34:1 (Jacks, Armenta).  Armenta explained that it is easy to speak through the connecting doors, but that they are always locked.  See Feb. 9 Tr. at 42:18-24 (Castellano, Armenta).  Armenta described M. Rodriguez asking, "You have it?  Let me see it," explaining, "Oh, they'll give you your property tomorrow," and requesting, "As soon as you get it, let me get it."  Feb. 9 Tr. at 43:2-6 (Armenta).  Armenta explained that, at that time, he did not know what M. Rodriguez was talking about.  See Feb. 9 Tr. at 43:7-9 (Castellano, Armenta).  Armenta could not remember anything else remarkable from that day.  See Feb. 9 Tr. at 43:23-25 (Castellano, Armenta).

On March 7, 2014, Armenta recalled going to the big yard for recreation at 10:00 a.m. with M. Rodriguez, D. Sanchez, R. Sanchez, J. Montoya, and Molina. See Feb. 9 Tr. at 47:24-48:22 (Castellano, Armenta). Armenta said that people working in the wheelchair program, such as T. Martinez, did not go to the big yard for recreation, and that R. Perez stayed in his cell. See Feb. 9 Tr. at 48:23-49:6 (Castellano, Armenta). Armenta said that, around 10:30 a.m. or 10:45 a.m., he saw the property officer bringing the new inmates' property. See Feb. 9 Tr. at 50:17-21 (Castellano, Armenta); id. at 51:6 (Armenta). Armenta described returning to his cell at 11:00 a.m. for count and lunch. See Feb. 9 Tr. at 51:7-25 (Armenta, Castellano). Sometime after lunch and the release from lockdown, Armenta saw M. Rodriguez and D. Sanchez get called to the connecting door, receive something from yellow pod that looked like a few sheets of loose paper, and then sit near M. Rodriguez' room reading something. See Feb. 9 Tr. at 52:1-19 (Castellano, Armenta); Feb. 12 Tr. at 35:11-18 (Jacks, Armenta). During cross-examination, however, Armenta said that M. Rodriguez was by himself at the connecting door. See Feb. 12 Tr. at 36:10-14 (Jacks, Armenta). Armenta admitted that, in a pretrial interview, he had said that lunch lockdown occurred after the "paperwork" passed, but maintained that, had the interviewers asked him at what time the "paperwork" was passed, he would have told them the same time to which he testified. Feb. 12 Tr. at 47:5-48:2 (Jacks, Armenta). Armenta said that he was watching television at the time and that, once M. Rodriguez and D. Sanchez finished reading, they returned to the door to return whatever it was they had received. See Feb. 9 Tr. at 52:20-53:3 (Castellano, Armenta). Armenta recalled that, as M. Rodriguez and D. Sanchez spoke through the door, M. Rodriguez was staring at Armenta -- which Armenta "just took . . . as whatever." Feb. 9 Tr. at 53:11 (Armenta). See id. at 2.:3-6 (Armenta). Armenta did not hear M. Rodriguez call any names through the door, but believed these actions occurred sometime between 12:30 p.m. and 1:30 p.m.

See Feb. 9 Tr. at 53:20-54:1 (Castellano, Armenta).  Armenta admitted that he wondered whether M. Rodriguez could be coming after him because SNM may have learned about his sex offense somehow.  See Feb. 12 Tr. at 123:18-124:6 (Fox-Young, Armenta).

Armenta recalled that all inmates returned to their rooms at 2:00 p.m. and that phone yard was at 3:00 p.m. that day, describing "phone yard" as a smaller recreation yard containing workout equipment, a basketball, a handball, and a punching bag.  Feb. 9 Tr. at 54:6-23 (Armenta, Castellano).  Armenta said that he went to phone yard with D. Sanchez, J. Montoya, and Molina, and that M. Rodriguez stayed in his cell with his curtain up, having said that he was using the bathroom.  See Feb. 9 Tr. at 55:6-24 (Castellano, Armenta).  Armenta admitted that this testimony was the first time in which he told anybody that M. Rodriguez did not go to phone yard and had a curtain in his cell window.  See Feb. 12 Tr. at 41:2-42:13 (Jacks, Armenta).  Armenta recounted that, while in the phone yard, he was standing next to D. Sanchez when Clark came out of his pod and spoke with D. Sanchez about wanting to get Urquizo "hit."  Feb. 9 Tr. at 56:3-22 (Castellano, Armenta); id. at 57:4-21 (Castellano, Armenta).  D. Sanchez responded: "No, that's not going to happen."  Feb. 9 Tr. at 59:6-7 (Armenta).  Armenta recalled the wheelchair program workers returning between 3:30 p.m. and 3:45 p.m.  See Feb. 9 Tr. at 59:8-23 (Castellano, Armenta). At the 4:00 p.m. count, Armenta said returned to his cell, ate dinner, and was released from count about an hour later.  See Feb. 9 Tr. at 60:9-61:11 (Castellano, Armenta).  Armenta said that, when the doors opened, people started bringing their food trays to the front door for the correctional officers to pick up, and D. Sanchez called Armenta over to their usual dinner table, and told Armenta that Molina's "paperwork" came "and that we were going to kill him."  Feb. 9 Tr. at 61:21-22 (Armenta).  See id. at 61:13-24 (Armenta, Castellano).  Armenta asked D. Sanchez who was going to kill Molina, and D. Sanchez said that it would be Armenta and J. Montoya,

threatening Armenta that he would "be on the other side of that, too," Feb. 9 Tr. at 63:6-7 (Armenta), when Armenta protested that he had only forty-three or forty-four days left to serve. See id. at 62:14-63:10 (Castellano, Armenta).  Armenta said that he "succumbed to [D. Sanchez'] demands, . . . because [Armenta] did not want to get killed."  Feb. 9 Tr. at 63:20-22 (Armenta). Armenta knew that such work was expected from him as an SNM member, but was not expecting to have to "put in work," because he was close to being released and thought he had already "earned his bones."  Feb. 9 Tr. at 64:5-14 (Castellano, Armenta).  Armenta described that he later found out that M. Rodriguez threatened J. Montoya by approaching him in his cell with a shank and telling him that he had to commit the Molina murder.  See Feb. 12 Tr. at 125:25-126:9 (Fox-Young, Armenta).  Armenta admitted that he was scared of M. Rodriguez at the time and that this fear continued well after the murder.  See Feb. 12 Tr. at 127:18-128:5 (Fox-Young, Armenta).

D. Sanchez told Armenta to go to M. Rodriguez' room, so Armenta did, and M. Rodriguez handed him a shank and told him to wrap the string on the handle around his wrist, so it would not fall off, and demonstrated how to use the shank.  See Feb. 9 Tr. at 65:11-66:5 (Castellano, Armenta).  Armenta described the shank as metal and "almost a whole foot long," "about 10, 11 inches, black, and about the width of a pencil."  Feb. 9 Tr. at 66:8-10 (Armenta).  He identified the shank in a photograph exhibit that the United States showed.  See Feb. 9 Tr. at 80:7-12 (Castellano, Armenta).  Armenta recalled that T. Martinez was supposed to punch Molina and knock him out, and then Armenta and J. Montoya were to stab Molina.  See Feb. 9 Tr. at 66:16-22 (Armenta). Armenta said that M. Rodriguez told him to give his shank to D. Sanchez afterward for disposal and that D. Sanchez did not want to cover the cameras, which Armenta did not like.  See Feb. 9 Tr. at 67:4-68:1 (Armenta, Castellano).  Armenta said that M. Rodriguez would take care of J. Montoya's shank.  See Feb. 9 Tr. at 68:2-5 (Castellano, Armenta).  Armenta described feeling

scared and nervous, and, sometime between 5:05 p.m. and 5:15 p.m., going into his cell to wrap the shank around his wrist, and put it in his pants. See Feb. 9 Tr. at 68:9-25 (Castellano, Armenta). Later, when the cell doors closed, Armenta and J. Montoya were walking around the day room, discussing the plan and how they should not stab each other. See Feb. 9 Tr. at 69:1-15 (Castellano, Armenta). Armenta recalled telling J. Montoya not to stab Molina's chest, because Armenta did not want Molina to die, noting that, if they stab him anywhere besides his heart, he could live. See Feb. 9 Tr. at 86:8-18 (Armenta).

Armenta described that the pod doors opened, and a nurse and two correctional officers came into the pod to pass out the inmates' medication. See Feb. 9 Tr. at 70:2-15 (Castellano, Armenta). Armenta admitted that he could have told the correctional officers about the "hit," but said that he would have been attacked the moment he told the correctional officer and that nobody could have stopped it. Feb. 9 Tr. at 70:16-71:3 (Castellano, Armenta). The nurse and officers, Armenta described, were in the pod for five to ten minutes. See Feb. 9 Tr. at 71:11-12 (Castellano, Armenta). Armenta said that, during this time, D. Sanchez was sitting at the table, and that M. Rodriguez was going back and forth from Molina's cell to the day room. See Feb. 9 Tr. at 71:21-72:3 (Castellano, Armenta). Armenta said that, during this time, he was weighing his options; then he went to the top tier in front of his room, where J. Montoya eventually joined him, and waited for D. Sanchez' signal for them to enter Molina's cell and for T. Martinez to place Molina in a chokehold. See Feb. 9 Tr. at 72:9-73:6 (Castellano, Armenta). Armenta saw M. Rodriguez and T. Martinez enter Molina's cell, getting ready to do Suboxone with Molina, and then T. Martinez began to choke Molina. See Feb. 9 Tr. at 73:7-25 (Castellano, Armenta). About fifteen minutes after the correctional officers entered the pod, Armenta and J. Montoya went into Molina's room after Molina fell limp from T. Martinez' chokehold. See Feb. 9 Tr. at 72:4-8 (Castellano,

Armenta); id. at 74:1-6 (Castellano, Armenta).  On cross-examination, however, Armenta said he witnessed T. Martinez choking out Molina, and he did not see Molina put up a fight or M. Rodriguez holding down Molina's arms.  See Feb. 12 Tr. at 132:9-20 (Fox-Young, Armenta). Armenta said they hesitated at first, because M. Rodriguez told them to wait, but then J. Montoya walked into Molina's cell and began stabbing Molina's center chest, and Armenta followed, stabbing Molina's left flank.  See Feb. 9 Tr. at 74:9-24 (Castellano, Armenta).

At some point, J. Montoya told Armenta to slow down, because he did not want to be stabbed, so Armenta moved to stab Molina's right side, and Molina started convulsing, woke up, and stood up.  See Feb. 9 Tr. at 74:25-75:10 (Armenta, Castellano).  Armenta maintained that he was avoiding Molina's heart and was not trying to kill him.  See Feb. 9 Tr. at 144:2-16 (Jacks, Armenta).  M. Rodriguez told them: "Get him.  Don't let him out of the room.  Get him.  Get him." Feb. 9 Tr. at 75:15-16 (Armenta).  Armenta said that they tried, but Molina, whom Armenta described as a big, heavyset man, "bulldozed his way out of the room."  Feb. 9 Tr. at 75:19 (Armenta).  See id. at 75:17-19 (Armenta).  Molina ran downstairs to the day room and M. Rodriguez was still yelling to get him, so J. Montoya and Armenta follow him and attack him by the pod's front door.  See Feb. 9 Tr. at 76:4-14 (Armenta).  Armenta said that he did not stab Molina once he ran out of the cell, but Armenta hit Molina's face as he was attempting to escape. See Feb. 9 Tr. at 144:17-145:8 (Jacks, Armenta).  Armenta described that he had noticed that the control officer had seen what was occurring and banged on the yellow pod's window to notify the correctional officers there, and Armenta saw officers watching through the front door's window. See Feb. 9 Tr. at 77:1-11 (Armenta); id. at 80:19-22 (Castellano, Armenta).  Armenta admitted to stabbing Molina twenty or twenty-one times, and asserted that J. Montoya also stabbed Molina at

least twenty or twenty-one times. See Feb. 9 Tr. at 143:9-15 (Jacks, Armenta). Armenta verified that he killed Molina. See Feb. 9 Tr. at 143:5-6 (Jacks, Armenta).

After the assault, Armenta walked toward the stairs; D. Sanchez was near there and told Armenta to throw his shank in the trashcan, so he put it in the trashcan. See Feb. 9 Tr. at 80:23-81:7 (Castellano, Armenta). Armenta stated that he understood that D. Sanchez was tasked with disposing of the shank. See Feb. 9 Tr. at 81:8-12 (Castellano, Armenta). Armenta then returned to Molina, who was standing up, and punched him in the face, which caused a silver chain with a cross to fly off Molina's neck to the middle of the pod. See Feb. 9 Tr. at 81:13-24 (Castellano, Armenta). Armenta said he picked up the chain, and gave it to another inmate, Jason Wright. See Feb. 9 Tr. at 81:13-15 (Castellano, Armenta); id. at 81:25-82:1 (Castellano, Armenta). Armenta then went to the top tier shower to wash off blood on his body, but bumped into M. Rodriguez, so he went to the shower downstairs. See Feb. 9 Tr. at 82:2-19 (Castellano, Armenta). After rinsing off, Armenta walked to the day room, but correctional officers are entering the pod, so he grabbed his things from the shower and went into his cell, and the inmates were locked down. See Feb. 9 Tr. at 82:20-83:4 (Castellano, Armenta). Armenta explained that he began "tripping out" as he sat in his cell and "felt like a piece of shit." Feb. 9 Tr. at 83:7, 15 (Armenta). He thought about his family, Molina, and how he "just stabbed this man for an organization that [Armenta] thought loved [him] and respected [him.]" Feb. 9 Tr. at 83:23-25 (Armenta). See id. at 83:5-25 (Castellano, Armenta). About twenty to thirty minutes after being placed on lockdown, the correctional officers started getting the inmates out of their cells and placing them in cells in other units. See Feb. 9 Tr. at 84:1-13 (Castellano, Armenta). Armenta explained that there was not an open cell for him, so he was left in the recreation yard for a few hours. See Feb. 9 Tr. at 84:13-15 (Armenta). He said that his clothes were taken away, and that he only slept off and on. See Feb.

9 Tr. at 84:22-25 (Armenta).  He thought the NM State police interviewed him around 3:30 a.m. or 4:00 a.m., and he told them he was standing near the door while Molina got beat up, but did not try to place the blame on somebody else.  See Feb. 9 Tr. at 85:2-19 (Castellano, Armenta).  He described meeting with Palomares, who informed him that Molina had died, which "made [Armenta] feel more like shit."  Feb. 9 Tr. at 86:5 (Armenta).  See id. at 85:20-86:3 (Castellano, Armenta).

Armenta recalled that after Molina's murder, the NM Corrections Department wrote him up, his privileges and property were taken away, he was placed in disciplinary segregation,[80] and was indicted.  See Feb. 9 Tr. at 86:20-87:25 (Castellano, Armenta).  Armenta said he had requested that Gomez represent him in the administrative process that led to disciplinary segregation, because Gomez understood the disciplinary procedures, but that the NM Corrections Department did not allow Gomez to represent him.  See Feb. 9 Tr. at 88:5-11 (Castellano, Armenta); id. 89:6-17 (Castellano, Armenta).  Armenta described that the Doña Ana County District Attorney's office indicted him -- along with J. Montoya and M. Rodriguez -- in March, 2014, charging Armenta with "[f]irst-degree murder, conspiracy, [and] tampering with evidence."  Feb. 9 Tr. at 920:10-11 (Armenta).  See id. at 90:2-13 (Castellano, Armenta).  While facing the state charges, Armenta was housed in unit 2-A, B pod at Southern New Mexico.  See Feb. 9 Tr. at 90:18-91:2 (Castellano, Armenta).  Armenta described that he first tried to get out of the charges by lying in his first interview, the day after the murder, and saying that he was standing at the pod's door when the murder occurred.  See Feb. 9 Tr. at 149:14-19 (Jacks, Armenta); Feb. 12 Tr. at 106:9-15 (Maynard, Armenta).  He also said in the interview that he did not get involved, but admitted that this story

---

[80]Armenta described disciplinary segregation as: "Lockdown 24/7, no privileges, no electronics, no visits, no phone, no commissary, stuff like that."  Feb. 9 Tr. at 88:2-4 (Armenta).

did not work, because  video of the incident refuted it.  See Feb. 9 Tr. at 184:4-185:5 (Jacks, Armenta).   Armenta maintained that M. Rodriguez later directed him to take the fall for the charges.  See Feb. 9 Tr. at 91:14-19 (Castellano, Armenta).  According to Armenta, M. Rodriguez blamed Armenta for his charges, because the prosecution believed Armenta handed M. Rodriguez a shank when Armenta entered the top-tier shower, because the investigators found a shank in the shower.  See Feb. 9 Tr. at 91:21-92:2 (Armenta).  Armenta said that he decided to take the fall, and to exculpate J. Montoya and M. Rodriguez, because Armenta was caught on camera and there were witnesses.  See Feb. 9 Tr. at 92:9-16 (Armenta).  Armenta also said that he felt that he needed to follow M. Rodriguez' orders and thought he would be killed if he did not do as M. Rodriguez asked.  See Feb. 12 Tr. at 127:1-15 (Fox-Young, Armenta).  Armenta described that M. Rodriguez did not tell him how to take the fall for the crime, but that they discussed with J. Montoya and T. Martinez, over a few months, the story that they would tell.  See Feb. 9 Tr. at 93:7-18 (Castellano, Armenta).  T. Martinez, Armenta explained, had not been charged, but was a witness for the crime, and was going to verify the fabricated story.  See Feb. 9 Tr. at 93:18-21 (Armenta).  Armenta said that T. Martinez wrote something for him, but Armenta never sent this to his attorney, because he "was already feeling some kind of way about it."  Feb. 9 Tr. at 94:10-11 (Armenta).  See id. at 94:1-11 (Castellano, Armenta).

Armenta explained that he was housed in Southern New Mexico along with T. Martinez and J. Montoya until September, 2014, when they were moved to PNM North, where M. Rodriguez was already housed; at this time M. Rodriguez decided Armenta should take the blame.  See Feb. 9 Tr. at 94:12-95:3 (Castellano, Armenta).  Armenta explained that T. Martinez, J. Montoya, and M. Rodriguez were housed in the same pod, and that Armenta was housed in the same unit, in a separate pod.  See Feb. 12 Tr. at 129:7-14 (Fox-Young, Armenta).  Armenta verified

that there were a number of rumors around PNM as to what happened to Molina and who was involved.  See Feb. 12 Tr. at 131:8-16 (Fox-Young, Armenta).  There were also rumors that Armenta was a government witness, because of his statement that he was standing by the pod's front door, but Armenta said that, at that time, he was not cooperating.  See Feb. 12 Tr. at 132:25-133:14 (Fox-Young, Armenta).  He said that there were not rumors that R. Perez was cooperating, but the Court sustained the United States' hearsay objection to this testimony.  See Feb. 12 Tr. at 135:1-9 (Fox-Young, Armenta, Castellano, Court).

In January, 2015, Armenta wrote a letter to J. Montoya to give to J. Montoya's attorney, which stated that Armenta got into an argument with Molina and they got into a knife fight, leading to Molina's murder, and that J. Montoya was not guilty.  See Feb. 9 Tr. at 95:14-20 (Armenta); id. at 97:12-22 (Castellano, Armenta).  Armenta verified that the letter stated that he killed Molina, because Molina threatened or insulted Armenta's daughter, who suffers from DiGeorge syndrome.[81]  See Feb. 9 Tr. at 98:3-98:16 (Castellano, Armenta).  D. Sanchez had Armenta read the entire letter aloud.  See Feb. 9 Tr. at 186:24-188:17 (Jacks, Armenta).  Armenta explained that he fabricated this story, because "Molina would talk a lot about retarded children, Down syndrome children in the pod, and he'd scream it out loud, and this and that," and that witnesses would support this assertion.  Feb. 9 Tr. at 98:17-19 (Armenta).  See id. at 98:20-25 (Armenta).  Armenta said that, while it is true that his daughter is mentally handicapped, Molina never insulted her, and the story was fabricated to exonerate J. Montoya.  See Feb. 9 Tr. at 99:1-16 (Castellano, Armenta).  Armenta explained that he did this service for J. Montoya, because J. Montoya had been in jail for

---

[81]DiGeorge syndrome "is a disorder caused when a small part of chromosome 22 is missing. This deletion results in the poor development of several body systems."  DiGeorge syndrome (22q11.2 deletion syndrome), Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/digeorge-syndrome/symptoms-causes/syc-20353543 (last visited Sept. 28, 2019).

fifteen or sixteen years, and because J. Montoya "deserves to be out there to make things right with his daughter and try to see his grandma before she passes away. Make some memories. I wanted to be a good guy, let him get out." Feb. 9 Tr. at 100:3-6 (Armenta). See id. at 99:17-100:3 (Castellano, Armenta). Armenta also acknowledged that this story would have reduced his punishment, because it asserted that the murder was committed out of anger rather than premeditation. See Feb. 9 Tr. at 185:25-186:5 (Jacks, Armenta). Armenta explained that M. Rodriguez just wanted Armenta to take the blame, but had no part in drafting the letter or coming up with its story, although J. Montoya, before sending the letter to his lawyer, showed M. Rodriguez the letter. See Feb. 9 Tr. at 190:10-22 (Jacks, Armenta). Armenta discussed what the letter should include with J. Montoya and T. Martinez, and said it took a couple months to draft. See Feb. 9 Tr. at 190:23-191:7 (Jacks, Armenta); id. at 192:3-6 (Jacks, Armenta). When he drafted the letter, Armenta did not have access to discovery and had not seen the video. See Feb. 9 Tr. at 192:10-16 (Jacks, Armenta). He admitted that he did not draft the letter out of his free will, as the letter states, but because M. Rodriguez pushed him to take the blame. See Feb. 9 Tr. at 193:14-194:10 (Jacks, Armenta). Armenta acknowledged that M. Rodriguez did not threaten him, but explained that, when a violent, long-term SNM member asks a newer member to do something, he does it. See Feb. 9 Tr. at 193:14-194:10 (Jacks, Armenta). Armenta said that he had no issue saying that this letter was the truth and that he would testify to its contents in court. See Feb. 9 Tr. at 220:23-221:5 (Jacks, Armenta).

Armenta stated that he had a change of heart in February, 2015, a few weeks after Duran asked him what was most important to him; Armenta responded that his daughters and getting home to his family was his top priority, and always would be. See Feb. 9 Tr. at 100:11-102:2 (Castellano, Armenta). Armenta explained that Duran was a government witness, that they were

neighbors at the PNM North, and that they spoke every day for months.  See Feb. 12 Tr. at 25:12-26:3 (Jacks, Armenta).  Armenta did not know at the time of the conversation, however, that Duran was cooperating.  See Feb. 12 Tr. at 183:2-7 (Castellano, Armenta).  After this conversation, Duran made a telephone call to "let the right people know to pull [Armenta] out of the pod and have a little chat with them," Feb. 9 Tr. at 102:6-8 (Armenta), and Armenta met with STIU officers, see Feb. 9 Tr. at 102:11-14 (Armenta).  Armenta maintained that Duran did not tell him about the benefits he could receive as government witness.  See Feb. 12 Tr. at 27:25-29:7 (Jacks, Armenta).  Armenta described that he met with the STIU, not to determine what benefits he could receive as a witness, but to determine if Duran was serious about sending him to the right people to whom he could reveal the truth of Molina's murder.  See Feb. 12 Tr. at 30:18-24 (Jacks, Armenta); id. at 44:9-19 (Jacks, Armenta).  Armenta said that he was then transported to Southern New Mexico in June, 2015, with J. Montoya and M. Rodriguez, but Armenta was housed in yellow pod while J. Montoya and M. Rodriguez were housed in green pod.  See Feb. 9 Tr. at 102:20-103:4 (Armenta).  Armenta was housed next door to Herrera, and Herrera told Armenta that "[h]e had the say-so" with D. Sanchez; that he had confirmed that the "paperwork" was legitimate, and Molina should be moved on; and that Herrera had decided to send Armenta and J. Montoya to complete the "hit," because they had not yet "earned their bones."[82]  Feb. 9 Tr. at 109:10 (Armenta).  See id. at 108:25-109:19 (Castellano, Armenta).  Armenta provided that his understanding was that Herrera was a "llavero" and could, with "paperwork," give orders.  See Feb. 9 Tr. at 110:20-111:12 (Castellano,

---

[82]At D. Sanchez' request, the Court gave a limiting instruction: "It's just statements of Mr. Herrera, and you can only consider them in conjunction with considering the charges against Mr. Herrera, and not any of the other defendants."  Feb. 9 Tr. at 110:3-6 (Court).  See id. at 109:24-110:1 (Jacks).

Armenta).  Armenta admitted that he did not bring up this conversation with Herrera until two to three weeks ago, when he met with Acee.  See Feb. 12 Tr. at 114:18-115:22 (Maynard, Armenta).

Armenta testified that he attended an interview with his lawyer, J. Montoya's lawyer, and the district attorney on September 1, 2015, and first disclosed the truth surrounding Molina's murder; then, on September 17, 2015, met with the Assistant United States Attorneys, FBI, STIU, and NM State Police, and disclosed the truth.  See Feb. 9 Tr. at 103:9-104:6 (Castellano, Armenta); id. at 174:7-18 (Jacks, Armenta); id. at 177:21-25 (Jacks, Armenta).  At the first interview, Armenta believed that he said he was an SNM member and did not want to be one anymore, but, upon looking at the transcript, admitted that he said he was not an SNM member.  See Feb. 9 Tr. at 176:10-15 (Jacks, Armenta); id. at 177:7-20 (Jacks, Armenta).  At the September 17 interview, however, Armenta said he was an SNM member.  See Feb. 9 Tr. at 178:1-4 (Jacks, Armenta).  He disclosed in this second interview that D. Sanchez ordered him to kill Molina and that he could have been killed had he refused to kill Molina.  See Feb. 12 Tr. at 173:21-174:3 (Castellano, Armenta).  Armenta also told law enforcement the names of those involved in passing Molina's "paperwork" and how it got to Southern New Mexico, and gave names of those involved in the Marcantel-murder conspiracy.  Feb. 12 Tr. at 176:12-177:2 (Castellano, Armenta).

Between the two meetings, Armenta wrote J. Montoya another letter to inform J. Montoya that he was going to tell the truth and to try to get J. Montoya to also tell the truth.  See Feb. 9 Tr. at 105:2-8 (Castellano, Armenta); id. at 105:19-106:1 (Castellano, Armenta); id. at 221:10-20 (Jacks, Armenta).  Armenta wrote, "if it weren't for the amor of this onda, I would have had more time with her," Feb. 9 Tr. at 106:23-24 (Castellano), and explained that his daughter had surgery around this time, fell into a coma, and almost died; that "amor" means love; and "onda" refers to SNM, see Feb. 9 Tr. at 107:4-20 (Armenta, Castellano).  Armenta said he was trying to explain

that he was a father first and his gang membership meant less to him.  See Feb. 9 Tr. at 153:16-25 (Jacks, Armenta).  D. Sanchez had Armenta read out loud the letter and asked him clarifying questions.  See Feb. 9 Tr. at 222:3-232:2 (Jacks, Armenta);[83] Feb 12. Tr. at 18:20-22:12 (Jacks, Armenta).  NM Corrections Department officials, however, intercepted the letter before J. Montoya received it.  See Feb. 9 Tr. at 108:11-22 (Armenta, Castellano).  The meeting with the federal prosecutors, Armenta admitted, occurred before the federal indictment, but Armenta decided, after this meeting, to plead guilty to first-degree murder on the forthcoming federal charges, and became a government witness before the indictment came down.  See Feb. 9 Tr. at 111:13-22 (Castellano, Armenta); id. at 148:3-12 (Castellano, Armenta).  Armenta verified that, at this meeting with the federal authorities, he was told that he could face the death penalty or life imprisonment.  See Feb. 12 Tr. at 108:16-21 (Maynard, Armenta).  In October, 2015, Armenta was moved to Southern New Mexico to attend a court date in which he was going to plead guilty to the state charges.  See Feb. 12 Tr. at 135:11-17 (Fox-Young, Armenta).  Armenta admitted that

---

[83]At this point in D. Sanchez' cross-examination of Armenta, the Court broke for the weekend and repeated its instructions to the jury:

> Until the trial is completed, you're not to discuss the case with anyone, whether it's members of the trial, people involved in the trial, or anyone else, and that includes your fellow jurors.  If anyone approaches and tries to discuss the trial with you, please let me know immediately.

> Don't read or listen to any news reports of the trial.  Again, don't go home and get on the internet for purposes of this case in any way.

> And finally, remember that you must not talk about anything with any person who is involved in the trial, even if it doesn't have anything to do with the trial.

Feb. 9 Tr. at 232:10-22 (Court).  The Court also admonished the witness at Baca's suggestion: "Mr. Armenta, you're on the stand, so don't talk to anybody about your testimony.  Okay?  Don't talk to any other people in transport or in the detention facility or anything like that."  Feb. 9 Tr. at 234:3-7 (Court).  See id. at 234:1-2 (Duncan).

he was offered a plea bargain in the state case, which allowed him to plead guilty to involuntary manslaughter and face eighteen months to three years imprisonment, and thought he had made a favorable deal to settle the Molina murder charges.  See Feb. 9 Tr. at 147:1-24 (Jacks, Armenta).

Armenta stated that his state charges were dismissed in December, 2015, when the federal indictment came down.  See Feb. 9 Tr. at 91:8-13 (Armenta, Castellano).  He entered into a plea agreement in December, 2016, pleading guilty to conspiracy to murder, with a maximum penalty of ten years imprisonment, and to murder, with a mandatory term of life imprisonment.  See Feb. 9 Tr. at 112:1-3 (Castellano, Armenta); id. at 112:15-25 (Castellano, Armenta); id. at 114:5-8 (Castellano, Armenta).  Armenta admitted that, although he did not intend to kill Molina, he pled guilty to intentionally conspiring to murder and to murdering Molina, and that he is guilty of murdering Molina.  See Feb. 12 Tr. at 58:17-60:23 (Jacks, Armenta); id. at 63:11 (Armenta).  Armenta stated that J. Montoya, M. Rodriguez, D. Sanchez, Baca, and Herrera were also implicated in the conspiracy charge.  See Feb. 9 Tr. at 113:4-8 (Castellano, Armenta); id. at 113:19 (Armenta).[84]  Armenta verified that, as part of his plea agreement, he waived his rights to appeal, unless his attorney was ineffective.  See Feb. 9 Tr. at 114:25-115:9 (Castellano, Armenta).  He admitted that he agreed, in his plea agreement, to testify truthfully and that, while the United States may move for the Court to reduce his sentence, the decision to depart downward is within the Court's discretion, and the Court will ultimately sentence him.  See Feb. 9 Tr. at 115:18-116:19 (Castellano, Armenta).  Armenta would like the sentence reduction, and entered into the cooperation plea agreement with the hope that he would not receive a life sentence for Molina's murder.  See Feb. 9 Tr. at 142:10-13 (Castellano, Armenta); id. at 148:16-24 (Jacks, Armenta).

---

[84]The Court provided, in response to Armenta implicating Herrera, "a continuing limiting instruction applies.  This can only be used against Mr. Herrera."  Feb. 9 Tr. at 113:21-23 (Court).

Armenta admitted that he has been doing what he can to avoid the full consequences of his involvement in Molina's murder.  See Feb. 9 Tr. at 149:5-9 (Jacks, Armenta).  He maintained that he killed Molina because D. Sanchez made him.  See Feb. 9 Tr. at 150:15-18 (Jacks, Armenta).

Armenta verified that he received benefits in the case, which included contact visits.  See Feb. 9 Tr. at 137:3-6 (Castellano, Armenta).  Armenta described being able to hug and kiss his family in an eight-foot by eight-foot room, and admitted that he abused this privilege by engaging in oral sex with and fondling his fiancée, whom he met through Duran.  See Feb. 9 Tr. at 137:11-138:23 (Castellano, Armenta); Feb. 12 Tr. at 70:6-16 (Jacks, Armenta).  D. Sanchez played excerpted videos of two such inappropriate visits Armenta had with his fiancée, which occurred on November 5, 2016, and December 3, 2016.  See Feb. 12 Tr. at 83:17-24 (Jacks, Armenta); id. at 85:4-17 (Jacks, Armenta).  This touching violated the contact visit rules and, as a result, Armenta's contact visit privileges were terminated indefinitely.  See Feb. 9 Tr. at 138:24-140:2 (Castellano, Armenta).  He recalled being told on January 6, 2017, that his contact visits were terminated.  See Feb. 12 Tr. at 87:18-21 (Jacks, Armenta).  Armenta also received money in his inmate account from August or September, 2016, until December, 2016, which he believed to be around $500.00 to $700.00 in total.  See Feb. 9 Tr. at 140:12-141:5 (Castellano, Armenta).  During cross-examination, D. Sanchez walked Armenta through the payments that he received, which totaled $750.00.  See Feb. 12 Tr. at 65:10-66:4 (Jacks, Armenta).  Armenta said that, when the United States discovered his misconduct, his payments also stopped.  See Feb. 12 Tr. at 171:3-4 (Castellano, Armenta).  He said that his benefits also included unlimited telephone calls.  See Feb. 9 Tr. at 141:15-16 (Castellano, Armenta).

Armenta provided that he received a tablet containing the case's discovery, which contained information of which Armenta had not known, and contained information on other

murders.  See Feb. 9 Tr. at 116:20-117:8 (Castellano, Armenta).  He said that he used the tablet

almost daily, but that it was compromised in January, 2017, while he was at PNM North, because

another cooperator had determined how to reset the tablets, so Armenta reset his tablet to play

games and take pictures, which deleted the discovery from the tablet.  See Feb. 9 Tr. at 117:14-

118:23 (Castellano, Armenta).[85]  Armenta explained that he could have reset his tablet in

December, 2016, and that R.P. Martinez told him how to reset it.  See Feb. 12 Tr. at 89:20-90:24

(Jacks, Armenta).  R.P. Martinez also reset tablets for himself, F. Munoz, Clark, Archuleta,

T. Martinez, and Rivera.  See Feb. 12 Tr. at 151:25-153:17 (Duncan, Armenta).  Armenta said

that, at some point, he was moved to Sandoval County Detention, and discovered that he could use

his tablet to access the internet and looked up pornography, and that this resulted in the tablet's

---

[85]At this point in the testimony, the Court excused the jury and took a break.  See Feb. 9 Tr. at 119:14-15 (Court).  During the break, with the jury outside the courtroom, Mr. Villa noted that he believed R. Perez suffered a minor stroke.  See Feb. 9 Tr. at 120:13-23 (Villa).  The Court also put on the record that Ms. Wolf provided the Court a note, stating that she knows Damon Martinez, with which the Court did not take issue.  See Feb. 9 Tr. at 121:1-6 (Court).  Upon return from the recess, with the jury outside the courtroom, a deputy U.S. Marshal informed the Court that they had taken R. Perez to the hospital via ambulance, and that the symptom may be ketamine induced or high-blood-sugar induced, as R. Perez refused his insulin.  See Feb. 9 Tr. at 122:3-123:17 (Mickendrow).  The emergency medical technicians did not believe, however, that R. Perez had suffered a seizure.  See Feb. 9 Tr. at 123:21-24 (Mickendrow).  The deputy U.S. Marshal informed the Court that the hospital released R. Perez immediately upon discovering that his blood work was clean.  See Feb. 9 Tr. at 125:5-13 (Mickendrow).  R. Perez then moved for a mistrial and to be severed, requests which the Court denied.  See Feb. 9 Tr. at 131:10-14 (Fox-Young, Court).  R. Perez also maintained that he did not refuse his insulin.  See Feb. 9 Tr. at 131:15-18 (Fox-Young).

On Monday, February 12, 2018, the Court brought in Ms. Wolf to question how she knows D. Martinez, and she explained that he worked with her ex-husband.  See Transcript of Jury Trial Volume 11 at 5:6-22 (taken February 12, 2018)(Court, Wolf), filed February 22, 2019)(Doc. 2527)("Feb. 12 Tr.").  Ms. Wolf said that she would not be partial to the United States because of seeing his name on some of the documents.  See Feb. 12 Tr. at 6:7-12 (Court, Wolf).  A Health Services Administer also came in that morning to answer questions, outside the jury's presence, about R. Perez' medication records, and noted that his records indicate that R. Perez refused his insulin on February 8, 2018.  See Feb. 12 Tr. at 9:1-5 (Duran, Court); id. at 10:9-10 (Duran).

confiscation in April, 2017. <u>See</u> Feb. 9 Tr. at 132:14-133:10 (Castellano, Armenta). Armenta also used the tablet to access Facebook to find pictures of his daughters. <u>See</u> Feb. 9 Tr. at 161:20-162:4 (Jacks, Armenta). D. Sanchez questioned Armenta about searches that Armenta conducted on Google to find pornography, which included the term "teen," but Armenta did not recall making such searches, maintained that he is not sexually interested in girls under eighteen, and said another inmate may have used his tablet. <u>See</u> Feb. 9 Tr. at 163:19-166:20 (Jacks, Armenta). Armenta admitted to downloading pornographic materials onto his tablet so that he could watch them without an internet connection, but did not believe he had downloaded images of teenagers, because he only accessed adult sites. <u>See</u> Feb. 12 Tr. at 95:1-11 (Jacks, Armenta). He admitted to using drugs while at Sandoval County Detention, but maintained he did not use staff to obtain drugs. <u>See</u> Feb. 9 Tr. at 133:11-17 (Castellano, Armenta). The United States, however, introduced into evidence a note Armenta wrote to female inmates who worked in the kitchen, asking whether they could provide him Suboxone, and Armenta admitted to writing the note. <u>See</u> Feb. 9 Tr. at 134:3-10 (Castellano, Armenta); <u>id.</u> at 134:15-17 (Court). Although this attempt to obtain Suboxone was unsuccessful, Armenta frequently used Suboxone in the facility in violation of its rules and the law. <u>See</u> Feb. 9 Tr. at 136:4-17 (Castellano, Armenta); <u>id.</u> at 100:16-101:3 (Jacks, Armenta). Armenta said that T. Martinez was selling the Suboxone and that everybody was buying it. <u>See</u> Feb. 12 Tr. at 147:13-22 (Fox-Young, Armenta). He maintained that he last used Suboxone a month and a half ago, while housed at Otero County, and that he obtained the Suboxone from strangers who were not government witnesses. <u>See</u> Feb. 12 Tr. at 149:7-16 (Fox-Young, Armenta).

During cross-examination, Armenta laid out his convictions in chronological order: (i) distribution of cocaine in 1999; (ii) distribution of cocaine in 2000; (iii) aggravated battery in

2006; (iv) two counts of contributing to the delinquency of a minor for conduct between August 1, 2011, and February 29, 2012; and (v) drug trafficking in 2014, which was the pending case against Armenta when he killed Molina.  See Feb. 9 Tr. at 151:1-152:21 (Jacks, Armenta). Armenta maintained that he "was there for" his family, despite never having held a real job to provide for them, and denied that he ever stole their money or possessions to support his drug addiction.  Feb. 9 Tr. at 154:8-23 (Jacks, Armenta).  Upon more probing, Armenta admitted that his contributing-to-the-delinquency-of-a-minor convictions stemmed from a plea bargain in which he avoided the original charge, sexual contact with a minor in which the victim was his ex-wife's older daughter, who was fourteen at the time.  See Feb. 9 Tr. at 157:25-158:15 (Jacks, Armenta). Armenta said that he did not use his position as the family's father to apply force to the girl's genitals and that she was not distraught over the conduct.  See Feb. 9 Tr. at 158:16-25 (Jacks, Armenta).  Upon D. Sanchez asking whether the girl removed her bedroom-door handle and slept with a hammer, Armenta explained that his ex-wife had him remove the door, because the girl was not listening to his ex-wife, and that the girl slept with a hammer, because she was hanging up photographs on nails.  See Feb. 9 Tr. at 159:1-14 (Jacks, Armenta).  Armenta disputed that the girl was too traumatized to testify against him and maintained that they were both ready for court.  See Feb. 9 Tr. at 159:18-21 (Jacks, Armenta).  He admitted, however, that the girl and his ex-wife do not want to see him again, and he does not want to see his ex-wife again.  See Feb. 9 Tr. at 159:22-160:9 (Jacks, Armenta).

Armenta averred that the NM Corrections Department validated that he is an SNM member, and that, while his arrests for the sex offenses came after he joined the gang, SNM likely would have killed him had it found out that he was a sex offender -- but he maintained that he was not a sex offender.  See Feb. 9 Tr. at 179:5-181:1 (Armenta, Jacks).  Armenta, however, asserted

that he wants to be a full, responsible participant in society.  See Feb. 12 Tr. at 54:21-55:1 (Jacks, Armenta).  D. Sanchez asked Armenta about another letter, and Armenta described that F. Munoz wrote the letter and that Armenta signed it along with four other government witnesses, requesting that the PNM warden allow them and their families to have a banquet.  See Feb. 12 Tr. at 48:12-50:2 (Jacks, Armenta).  Armenta explained that the four other government-witness signatories are Clark, B. Cordova, R. Martinez, and F. Muñoz; that they had all been housed together since May, 2016; and that they sent the letter on August 26, 2016.  See Feb. 12 Tr. at 51:2-25 (Jacks, Armenta). They requested that certain people be invited to the banquet, including members of the NM Corrections Department, law enforcement, and the prosecution team.  See Feb. 12 Tr. at 52:7-19 (Jacks, Armenta).  Armenta said that this banquet request was granted and that they had a banquet on December 23, 2016.  See Feb. 12 Tr. at 57:14-19 (Jacks, Armenta).  Armenta conceded, however, that at that time, he was not acting in a way that demonstrated his desire to become a responsible member of society or his respect for corrections personnel.  See Feb. 12 Tr. at 68:13-25 (Jacks, Armenta).

Armenta allowed that, since he was housed with other government cooperators, they had the opportunity to put their stories together, but maintained that he never took that opportunity. See Feb. 12 Tr. at 111:13-20 (Maynard, Armenta).  He asserted that he never discussed the case with any of the cooperators and that, if Clark. R. Martinez, or T. Martinez testified otherwise, they would be wrong.  See Feb. 12 Tr. at 116:18-117:21 (Maynard, Armenta).  Baca elicited all the government witnesses with which Armenta had been housed: Duncan, R. Martinez, R.P. Martinez, J. Montoya, Urquizo, Clark, Hernandez, F. Muñoz, someone Armenta only knew by his moniker

"Flaco,"[86] B. Cordova, T. Martinez, Archuleta, Rivera, Lujan, M. Montoya, Rubio, M. Rodriguez, Calbert, and Lovato.   See Feb. 12 Tr. at 154:3-161:4 (Duncan, Armenta); id. at 162:10-163:7 (Duncan, Armenta); id. at 169:25-170:2 (Duncan, Armenta).   The Court excused Armenta, subject to re-call, and admonished him not to talk to anybody about his testimony.   See Feb. 12 Tr. at 184:3-7 (Court).

s.        **Jorge Borjas' Testimony.**

The United States called its next witness, Borjas, a correctional officer at Southern New Mexico, a job he has held for four and a half years.   See Feb. 12 Tr. at 184:21-22 (Castellano); id. at 185:16-25 (Castellano, Borjas).   Borjas explained that he has served in three capacities as an officer: (i) in the control center, controlling movement in the unit, making a log of who enters and exits the unit, and overseeing rovers; (ii) as a rover, moving around the unit to ensure the inmates are alive and fed, doors are secured, and locks are locked; and (iii) most recently as a visitation officer, overseeing Levels 3, 4, and 6 visitations.   See Feb. 12 Tr. at 186:11-22 (Borjas, Castellano). Borjas verified that the control officer's log also records the security checks and counts that occur in each unit.   See Feb. 12 Tr. at 216:16-23 (Jacks, Borjas).[87]

---

[86]The Court notes for the reader's convenience that "Flaco" had previously been identified for the jury as Quintana.  Feb. 6 Tr. at 175:24 (Urquizo).

[87]During the lunch break, outside the presence of the jury, Sanchez objected to a statement he expected J. Montoya to give, because it was R. Perez' admission that incriminates Sanchez, on the basis of the Fifth and Sixth Amendments.  See Feb. 12 Tr. at 245:13-20 (Jacks).  The United States said it would not elicit this statement.  See Feb. 12 Tr. at 247:11-14 (Beck).  R. Perez would not promise the same, asserting his right to present a defense, so the Court told his counsel to approach before they elicited the statement, so the Court could make a ruling.  See Feb. 12 Tr. at 249:5-21 (Fox-Young, Court).  The Court determined that the statement should not be excluded on the basis of its late disclosure, because J. Montoya revealed the statement a week before trial, and the defense has had it for two weeks.  See Feb. 12 Tr. at 248:22-25 (Court).  The Court also admonished the audience not to speak with the jurors, see Feb. 12 Tr. at 250:23-251:2 (Court), and, when the jurors entered the courtroom, re-instructed the jurors not to speak to anybody about the trial, or to read or listen to news about the trial, see Feb. 12 Tr. at 251:9-24 (Court).

Borjas explained that he became a control officer in Unit 1-A in January, 2014, and agreed that R. Perez would rarely leave his cell.  See Feb. 12 Tr. at 200:13-19 (Villa, Borjas).  D. Sanchez showed Borjas' log from March 6, 2014, when he worked from 2:00 p.m. to 10:00 p.m. in Unit 1-A, and Borjas verified that, at 7:47 p.m., new inmates were brought into yellow pod, and that it took eleven minutes for the rovers to place the new inmates into their cells.  See Feb. 12 Tr. at 218:4-23 (Jacks, Borjas); id. at 221:25-223:8 (Jacks, Borjas).  Borjas explained that, in his experience, the rovers place new inmates directly in their cells, and do not allow them to stop and chat with other inmates.  See Feb. 12 Tr. at 226:19-227:13 (Jacks, Borjas).  On March 7, 2014, from 2:00 p.m. to 10:00 p.m., Borjas served as the control officer in Unit 1-A, overseeing the green, blue, and yellow pods from the control center.  See Feb. 12 Tr. at 187:4-16 (Castellano, Borjas); id. at 214:20-215:3 (Jacks, Borjas).  On that date, Borjas had worked at Southern New Mexico for four months, on top of his two months in the Academy.  See Feb. 12 Tr. at 191:20-192:4 (Castellano, Borjas).  Borjas described that the control center is on the second level of the unit, from which he can clearly see each individual pod depending on his vantage point within the center.  See Feb. 12 Tr. at 187:21-188:12 (Castellano, Borjas).  Borjas related his view of the pods, with green on the left, blue in the middle, and yellow on the right, and that he could see all three simultaneously, with an obstructed view, by standing on one side.  See Feb. 12 Tr. at 187:21-188:12 (Castellano, Borjas).  Borjas verified that the pods have cameras, but explained that he could not see them from the control center and could not tell whether they were working.  See Feb. 12 Tr. at 192:5-12 (Castellano, Borjas).  He explained that inmates tend to pass notes between the pods' inner door and stand at the door talking to each other.  See Feb. 12 Tr. at 192:18-22 (Castellano, Borjas); id. at 193:9-10 (Borjas).  Borjas said that, by the time a correctional officer gets to the pod to intercept a note, the note is gone.  See Feb. 12 Tr. at 234:6-10 (Castellano,

Borjas).  Borjas did not recall specific instances of note-passing or talking in March, 2014, and verified that such activity would not be recorded in the log.  See Feb. 12 Tr. at 193:19-23 (Castellano, Borjas); id. at 239:9-13 (Castellano, Borjas).

Borjas explained that he would observe, but not log, when an inmate entered another inmate's cell.  See Feb. 12 Tr. at 253:23-254:6 (Villa, Borjas).  Borjas said that, on March 7, 2014, he did not see M. Rodriguez enter R. Perez' cell, and noted that the cell doors are normally closed. See Feb. 12 Tr. at 254:10-23 (Villa, Borjas).  Borjas maintained that, if another inmate wanted to go into R. Perez' cell, Borjas would not open the door.  See Feb. 12 Tr. at 254:24-255:15 (Villa, Borjas).  Borjas explained that if an inmate locked in his cell wanted out, usually the inmate would flash the cell's lights, and Borjas would open the door.  See Feb. 12 Tr. at 255:19-256:1 (Villa, Borjas).

Borjas recalled that, a little after 5:00 p.m. on March 7, 2014, Officer Price walked through the pods with a nurse, conducting rounds and passing out medication.  See Feb. 12 Tr. at 188:24-189:5 (Castellano, Borjas).  Borjas could not recall whether the rovers and the nurse entered R. Perez' cell to provide him medication, but Borjas verified that they provided R. Perez medication. See Feb. 12 Tr. at 198:13-20 (Villa, Borjas).  Borjas remembered that they entered yellow pod after leaving blue pod and, as Borjas stood between the two pods, he looked over to blue pod and noticed a blood-covered Molina running out of his cell.   See Feb. 12 Tr. at 189:6-190:10 (Castellano, Borjas).  Borjas recalled that he opened Molina's cell door, because Molina showed Borjas his bowl, which Borjas explained was a sign that Molina wanted to go back into his cell to get soup.  See Feb. 12 Tr. at 190:11-191:2 (Castellano, Borjas).  Borjas said that he was watching his rovers in yellow pod for security purposes, because there were two rovers and a nurse in a pod with sixteen inmates who were out of their cells, so he did not see anybody besides Molina entering

his cell.  See Feb. 12 Tr. at 191:3-16 (Castellano, Borjas).  Blue pod, Borjas described, had eleven

inmates that day.  See Feb. 12 Tr. at 191:17-19 (Castellano, Borjas).

Upon seeing Molina covered in blood, Borjas banged on the window facing yellow pod to

get his rovers' attention and to inform them that something was happening in blue pod, and he saw

Price go over to the blue pod door.  See Feb. 12 Tr. at 194:2-19 (Castellano, Borjas).  Borjas

grabbed his shotgun filled with bean-bag shells and saw an altercation in blue pod, but could not

shoot the shotgun to stop the altercation, because of the angle.  See Feb. 12 Tr. at 194:20-195:22

(Castellano, Borjas).  Borjas described that the window had a hole through which to put the

shotgun, but the hole was only two to three inches, so he could not point the shotgun to where the

altercation was occurring directly below him.  See Feb. 12 Tr. at 196:6-21 (Castellano, Borjas).

Borjas said that the altercation stopped when Price began giving directives through the door and

then when backup arrived Borjas opened the pod door.  See Feb. 12 Tr. at 197:1-15 (Castellano,

Borjas).  When Borjas opened the door, he saw Molina lying on the floor.  See Feb. 12 Tr. at

208:21-209:9 (Jacks, Borjas).  Borjas saw the nurse tend to Molina and the backup officers go

through each pod, placing the inmates on lockdown.  See Feb. 12 Tr. at 209:10-21 (Jacks, Borjas).

Borjas said that the backup officers had brought a gurney into the blue pod, so they placed Molina

on it and brought him to the infirmary.  See Feb. 12 Tr. at 210:13-24 (Jacks, Borjas).  The Court

excused Borjas, subject to re-call.  See Feb. 12 Tr. at 259:3-7 (Court).

### t.      Jerry Montoya's Testimony.

The United States next called J. Montoya, who appeared in custody.  See Feb. 12 Tr. at

260:3-4 (Beck); id. at 347:18-19 (J. Montoya).  J. Montoya described himself as an ex-SNM

member, and stated that he joined the gang around the year 2000, at the Bernalillo County

Detention Center.  See Feb. 12 Tr. at 260:20-261:5 (Beck, J. Montoya).  J. Montoya said that he

was in prison for a gang-related murder, and that he gravitated to SNM because his cousins were already members. See Feb. 12 Tr. at 263:1-10 (Beck, J. Montoya). J. Montoya said that he was nineteen years old at the time of the murder, during which he shot a 12-gauge shotgun, but that the other shooter shot the seventeen-year-old victim. See Transcript of Jury Trial Volume 12 at 20:4-21 (taken February 13, 2018)(Jewkes, J. Montoya), filed February 22, 2019 (Doc. 2528)("Feb. 13 Tr."); id. at 35:7-8 (Duncan, J. Montoya). His other, unrelated convictions include solicitation to bring contraband into prison and possession of a controlled substance. See Feb. 13 Tr. at 36:13-37:8 (Duncan, J. Montoya).

J. Montoya described that he demonstrated early his willingness to work for SNM by assaulting two rival gang members at the county prison, elaborating that while Archuleta ordered him to do the first assault, he did the second assault on his own volition. See Feb. 12 Tr. at 261:22-262:17 (Beck, J. Montoya). J. Montoya admitted that he committed this second assault because the victim was a rival gang member, and because the victim was a co-defendant in his murder case and had made a statement against him to law enforcement. See Feb. 13 Tr. at 38:10-22 (Duncan, J. Montoya). J. Montoya recalled SNM's leaders at the time as A. Muñoz and Archuleta. See Feb. 12 Tr. at 265:7-10 (Beck, J. Montoya). J. Montoya said that, to join SNM, he had to produce his "paperwork," meaning the judgment and sentence, and plea bargain, to show that he did not have a sex offense and the time he had left to serve. Feb. 12 Tr. at 265:22-266:5 (Beck, J. Montoya). He described certain SNM rules: no "snitching" or "ratting," and being willing to "put in violent work" for the gang. Feb. 12 Tr. at 265:18-21 (Beck, J. Montoya). J. Montoya admitted that a rumor that an SNM member had "snitched" would get that member killed. Feb. 12 Tr. at 387:8-14 (Fox-Young, J. Montoya). J. Montoya described that, if challenged, an SNM leader is expected to defend his position. See Feb. 12 Tr. at 317:16-24 (Beck, J. Montoya). J. Montoya went over

his SNM-related crimes, admitting to assaulting a third rival gang member, conspiring with A.A. Garcia to bring drugs into a correctional facility, smuggling drugs into a prison through his girlfriend, and sharing drugs with other SNM members.  See Feb. 12 Tr. at 266:24-268:24 (Beck, J. Montoya).  He could not recall committing any other crimes for SNM before Molina's murder. See Feb. 12 Tr. at 268:25-269:4 (Beck, J. Montoya).

J. Montoya described using and selling Suboxone in prison, before Molina's murder, to have money when he got out -- amassing close to $5,000.00.  See Feb. 12 Tr. at 269:7-270:1 (Beck, J. Montoya).  J. Montoya likened Suboxone's effects to those of alcohol, stating that it is similar to having a buzz, but that it lasts all day and that he still had control over what he was doing.  See Feb. 12 Tr. at 270:11-23 (Beck, J. Montoya).  In October, 2010, J. Montoya moved to Southern New Mexico.  See Feb. 12 Tr. at 359:11-14 (Fox-Young, J. Montoya).  He explained that he had a conversation about his future with Baca in the yellow pod at Southern New Mexico at this time, when J. Montoya had two or three years left on his sentence and was getting ready to parole out. See Feb. 12 Tr. at 311:3-312:12 (Beck, J. Montoya).  J. Montoya understood Baca to be SNM's top leader at that time.  See Feb. 12 Tr. at 310:20-23 (Beck, J. Montoya).  J. Montoya told Baca about himself and how he was selling drugs on the streets, and Baca responded: "You know, when you get out, you could do good things for the onda, for the SNM, for the gang.  I could put you to work to be a treasurer; you know, collect money, sell dope for the clique."  Feb. 12 Tr. at 312:21-25 (J. Montoya).  See id. at 312:15-21 (J. Montoya).  J. Montoya described that he "was all for it at that time."  Feb. 12 Tr. at 313:1-2 (J. Montoya).  He noted that, at that time, he understood Rubio and others in green pod to be unhappy with Baca's rules and leadership, and that, therefore, Baca felt Rubio was challenging his position.  See Feb. 12 Tr. at 330:6-17 (Beck, J. Montoya).  In Baca's cell in blue pod, at Southern New Mexico, J. Montoya and Baca spoke about this dispute, and Baca

requested that J. Montoya and Chris Trujillo wrap his stomach area in books and magazines.  See Feb. 12 Tr. at 330:18-331:14 (Beck, J. Montoya).  J. Montoya explained that Baca had a shank in his left knee brace and was preparing to go outside to phone yard, so that Baca could attack Rubio who was at recreation, but that Baca and Rubio talked and overcame their disagreement.  See Feb. 12 Tr. at 331:14-332:18 (J. Montoya, Beck).

J. Montoya described that, on March 7, 2014, M. Rodriguez approached him in the pod shortly after count ended at 5:00 p.m., brought him into his cell at Southern New Mexico -- cell 113, pulled out a shank, and told him: "It's time to put in work."  Feb. 12 Tr. at 286:5 (J. Montoya). See id. at 285:18-286:24 (Beck, J. Montoya); id. at 290:1-3 (Beck, J. Montoya); id. at 294:19-24 (Beck, J. Montoya).  J. Montoya understood M. Rodriguez' statement to mean that it was time for J. Montoya to stab somebody.  See Feb. 12 Tr. at 288:16-19 (Beck, J. Montoya).  J. Montoya described that, when M. Rodriguez came into his cell with the shank, he threw up his hands to show he was not armed, but did not recall whether he thought M. Rodriguez was after him.  See Feb. 12 Tr. at 365:5-12 (Fox-Young, J. Montoya).  M. Rodriguez told him that the shank came off R. Perez' walker.  See Feb. 12 Tr. at 292:2-7 (Beck, J. Montoya).  J. Montoya recalled asking questions, and that M. Rodriguez explained that J. Montoya, with Armenta, would "hit" Molina in Molina's cell, because there was "paperwork" on Molina and his cell is a blind spot.  Feb. 12 Tr. at 286:25-287:4 (J. Montoya).  See id. at 287:10-18 (J. Montoya).  J. Montoya described asking to see Molina's "paperwork" and that M. Rodriguez said he no longer had it, but that he and D. Sanchez read it, and it is legitimate.  Feb. 12 Tr. at 287:5-9 (J. Montoya).  J. Montoya had also asked to cover the cameras, so they would not catch him and Armenta entering Molina's cell, but M. Rodriguez said that D. Sanchez does not want the cameras covered, because D. Sanchez wanted to be caught, on camera, not having anything to do with the murder.  See Feb. 12 Tr. at 287:19-

288:4 (J. Montoya).  J. Montoya described M. Rodriguez and D. Sanchez as his "big homies," so he trusted that they would not send him on the mission without it being valid.  Feb. 12 Tr. at 288:23-289:3 (J. Montoya).  J. Montoya recalled that M. Rodriguez also described that M. Rodriguez and T. Martinez would lure Molina to his cell under the guise of shooting Suboxone, and T. Martinez would knock out Molina, and then Armenta and J. Montoya would enter the cell, and finish Molina.  See Feb. 12 Tr. at 291:17-292:1 (J. Montoya).

After this conversation, J. Montoya exited his cell with M. Rodriguez and walked halfway with him to the commons area, but returned to his cell to change into his green prison uniform and place the shank into his sock.  See Feb. 12 Tr. at 292:8-20 (Beck, J. Montoya).  As J. Montoya was changing, D. Sanchez entered his cell, asking if M. Rodriguez had told J. Montoya what was going on, and telling J. Montoya to get it done and to be careful.  See Feb. 12 Tr. at 293:7-18 (J. Montoya, Beck).  They shook hands, then exited J. Montoya's cell and walked to the common area.  See Feb. 12 Tr. at 294:2-6 (Beck, J. Montoya).  The United States then played the video of the incident, and had J. Montoya describe what he was doing at various points in the video.  See Feb. 12 Tr. at 294:7-304:23 (Beck, J. Montoya).  J. Montoya and Armenta conversed on the top tier, but all J. Montoya recalled was asking what they should do and telling Armenta: "It's either him or us." Feb. 12 Tr. at 297:18 (J. Montoya).  See id. at 297:16-22 (J. Montoya).  J. Montoya said that T. Martinez, M. Rodriguez, and Molina entered Molina's cell before J. Montoya entered Molina's cell, under the guise of using drugs.  See Feb. 13 Tr. at 9:20-10:6 (Jewkes, J. Montoya).  J. Montoya remembered looking into Molina's cell and seeing Molina mixing Suboxones in a spoon as T. Martinez came up from behind to strangle him.  See Feb. 13 Tr. at 10:21-11:1 (J. Montoya). J. Montoya then followed Armenta into Molina's cell, and saw T. Martinez choking Molina while M. Rodriguez held down Molina's hands, so Molina could not get out of the chokehold.  See Feb.

12 Tr. at 298:23-299:11 (J. Montoya, Beck). J. Montoya said that, after Molina lost consciousness, T. Martinez laid him to the ground on his back and stomped on his head three times. See Feb. 12 Tr. at 394:16-20 (J. Montoya);[88] Feb. 13 Tr. at 12:14-20 (Jewkes, J. Montoya); id. at 34:10-24 (Duncan, J. Montoya). J. Montoya described that T. Martinez let go and left, and J. Montoya positioned himself above a passed-out Molina's waist, stabbing Molina in the chest area about twenty times. See Feb. 12 Tr. at 299:20-301:4 (J. Montoya, Beck). J. Montoya verified that Molina was stabbed over forty times, and believed he was responsible for half of the stabs. See Feb. 12 Tr. at 366:21-25 (J. Montoya, Fox-Young).

J. Montoya disputed that he was in a state of rage, explaining that his mind was blank and was just trying to complete the order. See Feb. 13 Tr. at 14:11-19 (Jewkes, J. Montoya). J. Montoya admitted that Molina was stabbed in the heart, but did not know whether he or Armenta was responsible for that wound. See Feb. 12 Tr. at 367:6-18 (Fox-Young, J. Montoya). While J. Montoya and Armenta were stabbing Molina, Molina regained consciousness, stood up, and told J. Montoya to stay away. See Feb. 12 Tr. at 301:9-15 (J. Montoya). J. Montoya recalled that M. Rodriguez yelled that they called the code, so J. Montoya tried to hand M. Rodriguez his shank, so M. Rodriguez could get rid of it pursuant to the plan, but M. Rodriguez would not take it, and then Molina pressed his way out of the cell. See Feb. 12 Tr. at 301:16-22 (J. Montoya); id. at 302:16-21 (J. Montoya). Molina, J. Montoya explained, was headed to the exit door to get help. See Feb. 13 Tr. at 15:20-23 (Jewkes, J. Montoya). M. Rodriguez told J. Montoya to get Molina, which J. Montoya took to mean to continue stabbing Molina, so he followed Molina to stab him more. See Feb. 12 Tr. at 302:7-12 (J. Montoya); id. at 302:22-303:2 (Beck, J. Montoya). J.

---

[88]When the trial broke for the evening and the jury had left the courtroom, the Court admonished the witness: "Mr. Montoya, you're on the stand right now and you're testifying, so don't talk to anybody about your testimony." Feb. 12 Tr. at 395:5-7 (Court).

Montoya said that he hid the shank from the camera as he continued stabbing Molina, and then flung his shank up to M. Rodriguez on the top tier, so that M. Rodriguez could get rid of it. See Feb. 12 Tr. at 303:10-304:8 (Beck, J. Montoya); id. at 321:22-322:1 (Beck, J. Montoya). He verified that the shank was straight, not bent, when he stabbed Molina. See Feb. 12 Tr. at 322:13-17 (Beck, J. Montoya). J. Montoya explained that he then went to his cell to change clothes. See Feb. 12 Tr. at 304:14-20 (Beck, J. Montoya).

J. Montoya verified that he killed Molina, but maintained that he did not have personal issues with Molina and had been playing handball earlier that day with Molina as his partner. See Feb. 12 Tr. at 304:24-305:9 (Beck, J. Montoya). J. Montoya believed that he had lived with Molina in blue pod for about a year, that they were cordial, and that, while Molina "was a knucklehead," he got along with others. Feb. 13 Tr. at 17:14 (J. Montoya); id. at 17:6-15 (Jewkes, J. Montoya). J. Montoya explained that Molina could be disrespectful, "mouthy," and disruptive, which caused some problems for him, and that the other inmates did not particularly like him. Feb. 13 Tr. at 18:10-19:9 (Jewkes, J. Montoya). J. Montoya said that he did not consume any drugs the day before or the day of Molina's murder. See Feb. 12 Tr. at 270:24-271:3 (Beck, J. Montoya). J. Montoya maintained that he did not call Urquizo's brother with M. Rodriguez to ask about "hitting" Molina, and that, if Urquizo said that J. Montoya and M. Rodriguez together called Urquizo's brother, then he was mistaken. Feb. 12 Tr. at 360:22-361:3 (Fox-Young, J. Montoya); id. at 365:2-4 (Fox-Young, J. Montoya). J. Montoya maintained that he did not see M. Rodriguez kick or stomp on Molina at any point throughout the assault. See Feb. 13 Tr. at 15:5-16 (Jewkes, J. Montoya).

On March 8, 2014, J. Montoya called Ernie Holguin to speak with him, and told Holguin where shanks were located in blue pod, a call that would have gotten J. Montoya in trouble with

SNM.  See Feb. 12 Tr. at 369:1-12 (Fox-Young, J. Montoya); id. at 371:2-372:1 (Fox-Young, J. Montoya).  J. Montoya said that he did not talk much about the murder in this conversation.  See Feb. 12 Tr. at 372:4-11 (Fox-Young, J. Montoya).  He told Holguin to pull video of the incident, because it would show D. Sanchez and M. Rodriguez reviewing "paperwork" while sitting at a table.  Feb. 13 Tr. at 74:20-75:3 (Duncan, J. Montoya).  He did not mention R. Perez, saying that R. Perez did not cross his mind.  See Feb. 12 Tr. at 372:19-24 (Fox-Young, J. Montoya).  On March 25, 2014, Palomares and another NM State Police officer interviewed J. Montoya at Southern New Mexico, and J. Montoya found out that there was a video of the murder, but he did not discuss the day's events very much and was fishing for a deal.  See Feb. 12 Tr. at 381:1-382:19 (Fox-Young, J. Montoya); id. at 67:22-68:1 (Duncan, J. Montoya).  J. Montoya, in an attempt to gain favor, told them the names of others involved whom the video does not implicate, but did not mention R. Perez' name, because he did not care from where the shanks came.  See Feb. 12 Tr. at 383:6-384:15 (Fox-Young, J. Montoya).  Despite telling the officers that he wanted to cooperate, however, J. Montoya rejected two offers of a deal, explaining that his loyalties still aligned with SNM.  See Feb. 13 Tr. at 69:15-25 (Duncan, J. Montoya).

J. Montoya recalled a conversation he had with D. Sanchez a few weeks before Molina's murder, in the blue pod -- where D. Sanchez was the "llavero" -- in which J. Montoya told D. Sanchez that he wanted an SNM tattoo and D. Sanchez complained that there were SNM members in that pod who had not earned their right to the SNM tattoo.  Feb. 12 Tr. at 305:14-306:17 (Beck, J. Montoya).  See id. at 309:21-23 (Beck, J. Montoya).  J. Montoya explained that D. Sanchez was tired of SNM members getting the tattoo without earning it, and allowing rival gang members who were accidently placed in the pod to enter protective custody without a scratch.  See Feb. 12 Tr. at 307:5-308:4 (J. Montoya, Beck).  D. Sanchez also said that SNM members who were not willing

to use a shank and receive more prison time for SNM should just leave the unit.  See Feb. 12 Tr. at 308:14-309:4 (J. Montoya, Beck).[89]  J. Montoya believed that, while he was at Southern New Mexico, Rubio was green pod's "llavero" and believed Clark was also influential.  Feb. 12 Tr. at 321:11-16 (Beck, J. Montoya).  J. Montoya did not recall conflict with M. Rodriguez at that time, but admitted that he was probably scared of M. Rodriguez, who had a reputation for being "annoying," "aggressive," "unpredictable," and "scary."  Feb. 12 Tr. at 362:6-363:8 (Fox-Young, J. Montoya).  J. Montoya thought he was in good favor with SNM at the time, but verified that others, including M. Rodriguez, thought differently.  See Feb. 12 Tr. at 363:9-20 (Fox-Young, J. Montoya).  J. Montoya explained that M. Rodriguez would make fun of himself for his criminal sexual penetration charge, and that he had heard rumors that M. Rodriguez' victim was a sex offender or rapist.  See Feb. 13 Tr. at 70:3-16 (Duncan, J. Montoya); id. at 72:20-73:4 (Duncan, J. Montoya).

J. Montoya related that the state charged him with Molina's murder, but those charges were dropped when the federal government brought federal charges against him.  See Feb. 12 Tr. at 271:4-12 (Beck, J. Montoya).  J. Montoya stated that Armenta, T. Martinez, and M. Rodriguez were also charged in the state case.  See Feb. 13 Tr. at 77:14-17 (Beck, J. Montoya).  Armenta wrote J. Montoya a letter in January, 2015, to give to J. Montoya's lawyer, in which Armenta took responsibility for Molina's murder.  See Feb. 12 Tr. at 314:22-315:4 (Beck, J. Montoya); Feb. 13 Tr. at 47:2-4 (Duncan, J. Montoya).  J. Montoya was surprised by the letter because he did not ask Armenta to write it, but he explained that M. Rodriguez told J. Montoya of his idea that Armenta

---

[89]Baca asked for a limiting instruction after this testimony, see Feb. 12 Tr. at 309:9-10 (Duncan), but the Court did not provide one, believing that the statements fall under rule 803(3) of the Federal Rules of Evidence, the then-existing-state-of-mind exception to the rule against hearsay, so a limiting instruction would not be appropriate, see Feb. 12 Tr. at 309:11-13 (Court); Fed. R. Evid 803(3).

should take the fall. See Feb. 12 Tr. at 315:5-20 (Beck, J. Montoya). J. Montoya explained that M. Rodriguez also did not tell Armenta to write the letter, but had just told Armenta to somehow take responsibility for Molina's murder. See Feb. 13 Tr. at 21:24-22:13 (Jewkes, J. Montoya). Armenta wrote the letter around the time that J. Montoya was transported to the PNM North, where he was housed with Armenta, T. Martinez, and M. Rodriguez. See Feb. 12 Tr. at 375:13-376:10 (Fox-Young, J. Montoya); id. at 377:2-4 (Fox-Young, J. Montoya); id. at 21:16-20 (Jewkes, J. Montoya). J. Montoya spoke with them about the case, the murder, and the letter after it was written, but he maintained that they did not discuss cooperating. See Feb. 12 Tr. at 377:5-24 (Fox-Young, J. Montoya). J. Montoya would also communicate in the yard with B. Cordova and Duran, who were housed at PNM. See Feb. 12 Tr. at 379:11-380:3 (Fox-Young, J. Montoya).

J. Montoya verified that the letter's account of events -- that Armenta killed Molina out of anger and without Montoya's assistance -- was false, but that J. Montoya gave it to his lawyer and said that it was true, because it was potentially a way for J. Montoya to avoid significantly more prison time. See Feb. 12 Tr. at 316:19-317:15 (Beck, J. Montoya). J. Montoya wrote his attorney a letter, telling her about Armenta's letter and stating that J. Montoya wanted to hand deliver it, and requesting that his attorney interview Armenta, Wright, and T. Martinez, because J. Montoya expected that they would corroborate Armenta's letter and state that J. Montoya was not involved in Molina's murder. See Feb. 13 Tr. at 41:20-43:14 (Duncan, J. Montoya). J. Montoya explained that he wrote this letter to gain his freedom, because he did not want to be incarcerated or serve a life sentence for Molina's murder. See Feb. 13 Tr. at 81:24-82:14 (Beck, J. Montoya). J. Montoya admitted that such statements were false, but that he did not understand, at the time, that giving false testimony in court is a crime. See Feb. 13 Tr. at 43:15-23 (Duncan, J. Montoya). J. Montoya verified that his attorney filed Armenta's letter with the state court, asking the court to grant

Armenta immunity so that he would not be prosecuted for his testimony, and that the court granted this immunity. See Feb. 13 Tr. at 45:18-46:8 (Duncan, J. Montoya). J. Montoya also gave his attorney a false statement that T. Martinez wrote on J. Montoya's behalf, dated November 3, 2014. See Feb. 13 Tr. at 46:18-20 (Duncan, J. Montoya); id. at 47:23-48:9 (Duncan, J. Montoya). His attorney presented a separate, false statement from T. Martinez to the state court and requested immunity in exchange for Martinez' testifying on J. Montoya's behalf, which the court granted. See Feb. 13 Tr. at 49:3-18 (Duncan, J. Montoya). J. Montoya's attorney did the same thing with a false statement that M. Rodriguez provided, but the state court denied M. Rodriguez immunity to testify. See Feb. 13 Tr. at 50:8-23 (Duncan, J. Montoya); id. at 52:9-11 (Duncan, J. Montoya).

At some point, J. Montoya learned that D. Sanchez had put out a "hit" on him, so he decided to work with the government. Feb. 13 Tr. at 27:4-14 (Jewkes, J. Montoya). Accordingly, he told the gang unit at PNM that he wanted to work with them. See Feb. 13 Tr. at 27:18-22 (Jewkes, J. Montoya). J. Montoya pled guilty to Molina's murder in the federal case on January 27, 2017. See Feb. 12 Tr. at 271:13-15 (Beck, J. Montoya); id. at 272:21-23 (Beck, J. Montoya); id. at 355:4-6 (Fox-Young, J. Montoya). J. Montoya admitted that the United States could file a motion on his behalf for a downward departure in his sentence, if he continues to cooperate and tell the truth, but that the Court would make the final sentencing decision. See Feb. 12 Tr. at 273:5-274:3 (Beck, J. Montoya). R. Perez played a second telephone call recording, in which J. Montoya said that people from the United States would talk on his behalf at his sentencing, but J. Montoya said he made this statement up, again to provide hope. See Feb. 12 Tr. at 357:15-358:1 (Fox-Young, J. Montoya). J. Montoya asserted that the United States did not make him promises regarding his sentence and noted that he pled to a life sentence. See Feb. 12 Tr. at 348:1-3 (J. Montoya); id. at 349:1-5 (Fox-Young, J. Montoya). In response to this testimony, R. Perez played a call in which J. Montoya

told his then-wife that he pled to a maximum sentence of ten years, but J. Montoya said he lied to

give her some hope.  See Feb. 12 Tr. at 352:14-353:2 (Fox-Young, J. Montoya).  He began to

cooperate in January, 2017, and was surprised to learn he had been paid $1,124.31, believing the

amount to be $800.00, but he admitted to having one contact visit and that he was recently closed

as an informant.  See Feb. 12 Tr. at 274:4-275:5 (Beck, J. Montoya).  J. Montoya said that he did

not receive extra calls or better living conditions, explaining that he is in segregation and does not

get anything extra.  See Feb. 12 Tr. at 347:13-19 (Fox-Young, J. Montoya).  He maintained that

he has lost more than he has received, having lost friendships, security, his wife, physical property,

and eighteen years of family photographs, but that cooperating is worth the losses.  See Feb. 13

Tr. at 29:2-11 (J. Montoya, Jewkes).  J. Montoya said that he does not expect to gain anything

from testifying, and is just in court to do the right thing and to tell the truth.  See Feb. 13 Tr. at

32:20-33:3 (J. Montoya, Jewkes).

    J. Montoya admitted to using drugs while cooperating, describing that, while housed at

Sandoval County Detention, he used Suboxone and smoked marijuana, which other cooperators,

including R.P. Martinez and Clark, provided.  See Feb. 12 Tr. at 275:6-25 (Beck, J. Montoya).  He

would use Suboxone whenever it was available.  See Feb. 12 Tr. at 276:7-9 (Beck, J. Montoya).

His girlfriend brought Suboxone and a cellular telephone into Lea County Correctional for J.

Montoya, who split the Suboxone with fellow cooperator Richard Gallegos, and he used the

cellular telephone to call and to text his girlfriend, to exchange photographs, including nude

photographs, and to watch YouTube and pornography.  See Feb. 12 Tr. at 277:19-280:22 (Beck,

J. Montoya).  Such activities were not allowed and, while J. Montoya did not notify the United

States at the time what he was doing, he told the government two to three weeks ago.  See Feb. 12

Tr. at 276:10-18 (Beck, J. Montoya); id. at 280:9-18 (Beck, J. Montoya).  His girlfriend, J.

Montoya described, was a correctional officer at Lea County Correctional, which is how they met, and J. Montoya admitted to having sex with her three times while incarcerated, which is also against the rules.  See Feb. 12 Tr. at 281:1-282:3 (Beck, J. Montoya).  He verified that she has been fired, because of what she did for him.  See Feb. 12 Tr. at 335:22-336:1 (Fox-Young, J. Montoya).  J. Montoya therefore did not reveal the truth about the drugs, cellular telephone, and his relationship with this correctional officer until his meeting with Mr. Beck on February 3, 2018, and did not tell the truth at their earlier, January 22, 2018, meeting because he did not want to get his girlfriend in trouble or jeopardize their relationship.  See Feb. 12 Tr. at 284:13-285:7 (Beck, J. Montoya); id. at 344:22-345:3 (Fox-Young, J. Montoya).  At the January 22, 2018, meeting, J. Montoya told Mr. Beck that the cellular telephone belonged to his cell mate, R. Gallegos, and that R. Gallegos had received it from a friend named Pate.  See Feb. 13 Tr. at 55:18-56:9 (Duncan, J. Montoya).  J. Montoya's providing Mr. Beck false information about his criminal activity to protect his girlfriend, he admitted, violated his plea agreement and, thus, the United States has the right to rescind it.  See Feb. 13 Tr. at 88:12-23 (Duncan, J. Montoya); id. at 89:8-23 (Duncan, J. Montoya).  He admitted that the cellular telephone, drugs, and drug paraphernalia had been found before he told the United States about this misconduct.  See Feb. 12 Tr. at 340:6-25 (Fox-Young, J. Montoya).  He also admitted that there was cocaine and Xanax in the facility, but disputed that there was methamphetamine.  See Feb. 12 Tr. at 342:1-8 (J. Montoya, Fox-Young).  J. Montoya admitted that both he and his girlfriend are facing criminal charges for bringing contraband into prison, and that she faces charges for having sex with him, an inmate.  See Feb. 13 Tr. at 56:22-57:13 (Duncan, J. Montoya).  He denied that she was pregnant with his baby, allowing that she may have been without his knowledge, see Feb. 12 Tr. at 337:18-338:6 (Fox-Young, J. Montoya), but Baca presented him a letter he wrote in which he told his girlfriend: "Look at us now, we're

pregnant" and "[n]ow to find out that you're going to have my child just made us eternal."  Feb. 13 Tr. at 61:17-18, 22-24 (Duncan).  See id. at 61:8-62:1 (Duncan, J. Montoya).  He then admitted that he previously said that his girlfriend was pregnant, but believed that she was no longer pregnant.  See Feb. 13 Tr. at 62:17-23 (Duncan, J. Montoya).

J. Montoya described that, sometime after the case's indictment, but before October, 2016, he had a conversation with R. Perez while they were housed together at the Torrance County Detention Facility ("Torrance County Detention").  See Feb. 12 Tr. at 323:10-16 (Beck, J. Montoya); id. at 392:1-13 (Fox-Young, J. Montoya).  In this conversation, R. Perez told J. Montoya that he offered his walker to be fashioned into shanks for Molina's murder, because he was not in good health and this action was how he could contribute to SNM.  See Feb. 12 Tr. at 325:12-19 (Beck, J. Montoya).  J. Montoya understood R. Perez' providing metal for the shanks to be his way of justifying his SNM membership.  See Feb. 12 Tr. at 325:22-326:6 (J. Montoya, Beck).[90]  R. Perez also told J. Montoya that he gave the metal to M. Rodriguez.  See Feb. 12 Tr. at 335:2-6 (Fox-Young, J. Montoya).  J. Montoya admitted that he first disclosed this conversation to the government at their meeting on January 22, 2018, although he believed that he had disclosed it earlier.  See Feb. 12 Tr. at 333:24-334:10 (Fox-Young, J. Montoya).  He explained that he revealed this information when Mr. Beck specifically asked whether any of the four First Trial Defendants told him anything about Molina's murder.  See Feb. 13 Tr. at 76:14-17 (Beck); id. at 76:23 (J. Montoya).  J. Montoya described that he first met R. Perez when R. Perez was moved to

_____

[90]At this point in the testimony, Sanchez requested a limiting instruction, see Feb. 12 Tr. at 326:9-10 (Jacks), and the Court obliged: "Well, right now it's just a statement that's admissible against Mr. Perez.  So you can only consider this in discussing the charges against Mr. Perez.  You can't use this statement for discussing the charges against any of the other defendants."  Feb. 12 Tr. at 326:11-16 (Court).

Southern New Mexico's blue pod, and verified that R. Perez was sick and used a walker to get around.  See Feb. 12 Tr. at 359:18-360:13 (Fox-Young, J. Montoya).

Sometime in January, 2017, J. Montoya met with Acee, Ms. Armijo, Mr. Castellano, and Mr. Beck, and disclosed, in his words, "everything I know about the Molina case," and "[t]hings that I knew of that the SNM had done."  Feb. 12 Tr. at 386:11-12, 15-16 (J. Montoya).  See id. at 385:23-386:8 (Fox-Young, J. Montoya).  He disclosed at this meeting that he had asked M. Rodriguez where the shanks came from, and that M. Rodriguez had responded that he took them from R. Perez' walker.  See Feb. 12 Tr. at 387:15-24 (Fox-Young, J. Montoya).  J. Montoya did not recall telling the government that R. Perez was scared, but remembered relaying that M. Rodriguez told him that R. Perez was concerned that he was the target.  See Feb. 12 Tr. at 388:6-24 (Fox-Young, J. Montoya).  J. Montoya admitted that he did not, however, mention at that meeting or later when he pled guilty that R. Perez volunteered to help in Molina's murder.  See Feb. 12 Tr. at 390:20-23 (Fox-Young, J. Montoya).

J. Montoya could not recall how many false statements that he has given in this case, but maintained that those false statements have mostly pertained to the events at Lea County Correctional and that he has been truthful about the murder.  See Feb. 13 Tr. at 29:12-21 (Jewkes, J. Montoya).  After the murder, however, he faced disciplinary proceedings, and requested that Armenta and T. Martinez be witnesses for him, because he expected that they would untruthfully deny that they saw J. Montoya assault Molina or whether they saw J. Montoya with a shank.  See Feb. 13 Tr. at 53:7-54:14 (Duncan, J. Montoya).

J. Montoya described that he read the first part of this case's discovery, but that he shattered his tablet's screen at Lea County Correctional and, thus, has not seen any of the new discovery.  See Feb. 13 Tr. at 31:3-10 (Jewkes, J. Montoya); id. at 76:24-77:3 (Beck, J. Montoya).  He said

that he knew what Armenta would likely testify, because they are co-Defendants, but that he never discussed with T. Martinez or M. Rodriguez what they would say, and did not read any discovery on them. See Feb. 13 Tr. at 31:11-32:3 (Jewkes, J. Montoya). The Court allowed J. Montoya to step down, subject to re-call, and reminded him not to discuss his testimony with anybody. See Feb. 13 Tr. at 92:9-14 (Court).

u.    **Rogelio Fierro's Testimony.**

The United States next called Fierro, who is a correctional officer at Southern New Mexico, where he began working in November, 2012. See Feb. 13 Tr. at 92:19-20 (Beck); id. at 93:13-94:8 (Beck, Fierro). Fierro described that he was working as a rover on March 7, 2014, in Unit 4-A or 4-B at Southern New Mexico. See Feb. 13 Tr. at 94:19-95:14 (Beck, Fierro). At some point, around 5:00 p.m. that day, he received a radio call that there was a stabbing in Unit 1-A, blue pod, so he went to that pod and waited outside the front door for backup. See Feb. 13 Tr. at 95:15-96:7 (Beck, Fierro). Once the pod-door opened, Fierro entered the blue pod and saw Molina on the floor near the door, and went through the pod to lock down inmates. See Feb. 13 Tr. at 96:8-12 (Beck, Fierro). He had no recollection whether R. Perez was outside his cell. See Feb. 13 Tr. at 104:9-22 (Villa, Fierro). Fierro described that he then went upstairs to look for evidence, and that he found blood and water droplets going into either cell 110 or 111, which he told the sergeant, and was called to the infirmary to accompany Molina on the ambulance. See Feb. 13 Tr. at 96:18-24 (Fierro).

Fierro said that people attempted CPR on Molina in the infirmary, but Fierro did not do so in the infirmary, because he wanted to save his energy should he have to perform CPR in the ambulance on the way to the hospital. See Feb. 13 Tr. at 97:10-23 (Beck, Fierro). When the EMTs arrived ten to fifteen minutes later, Fierro entered the ambulance with another corrections officer,

and they continued CPR while the EMTs took Molina's vital signs.  See Feb. 13 Tr. at 98:3-20 (Beck, Fierro).  Fierro described administering CPR for the entirety of the fifteen-minute ride to the hospital, that Molina was unconscious the entire time, and that Molina was bleeding profusely. See Feb. 13 Tr. at 99:20-100:8 (Beck, Fierro).  Fierro said that nurses were waiting at the hospital for their arrival and took Molina inside to the emergency room, but that, within a few seconds, the doctor stepped inside and pronounced Molina deceased.  See Feb. 13 Tr. at 100:19-101:12 (Beck, Fierro).  Fierro said that he called Southern New Mexico and updated his supervisor, who told Fierro to stay with Molina until he was moved to the morgue.  See Feb. 13 Tr. at 102:4-10 (Beck, Fierro).  Fierro described that, after watching the medical examiner clean, count, and photograph Molina's wounds, he escorted Molina to the morgue, grabbed Molina's belongings, and returned to Southern New Mexico around 10:30 p.m.  See Feb. 13 Tr. at 102:11-103:11 (Beck, Fierro).  The Court excused Fierro from the proceedings.  See Feb. 13 Tr. at 106:21-23 (Court).

### v.  Timothy Martinez' Testimony.

The United States next called T. Martinez, who was in custody.[91]  See Feb. 13 Tr. at 107:2-3 (Armijo); id. at 116:9-11 (T. Martinez); id. at 218:23-219:5 (T. Martinez, Armijo).  T. Martinez described that he graduated from high school and was never part of a street gang.  See Feb. 13 Tr. at 116:18-22 (Armijo, T. Martinez).  He maintained that he was considered a jock and a cowboy in high school, explaining that he was in the Honor Society and excelled in sports.  See Feb. 13 Tr. at 116:23-117:5 (Armijo, T. Martinez).  T. Martinez stated that he joined the United States

---

[91]Before T. Martinez took the stand, the defense team approached the bench and, outside the jury's hearing, noted that T. Martinez' tablet was compromised, and their expert had not yet examined the tablet, so they asked for leeway in their cross-examination, which the Court said it would allow.  See Feb. 13 Tr. at 107:8-12 (Villa); id. at 108:20-22 (Villa, Court).  The Court also had M. Montoya's attorney promise not to be a conduit of the testimony for his client.  See Feb. 13 Tr. at 109:12-23 (Court, Candelaria).

Marines Corps after graduation, but he was discharged, neither honorably nor dishonorably, for striking an officer and that, after the discharge, his life took a downward turn as he became a heavy drug-user.   See Feb. 13 Tr. at 117:8-118:4 (Armijo, T. Martinez); id. at 283:22-284:7 (T. Martinez).  He explained that his first conviction was for possession with intent to distribute, but, because he received probation for that conviction, he was first imprisoned at age twenty-one for an armed robbery conviction.  See Feb. 13 Tr. at 114:6-115:5 (Armijo, T. Martinez).  Another felony conviction, T. Martinez proffered, earned him twelve and a half years of incarceration, and he explained that these three convictions occurred before he joined SNM.  See Feb. 13 Tr. at 116:4-17 (Armijo, T. Martinez).  He admitted also to convictions for attempted aggravated burglary, aggravated assault with a deadly weapon on a police officer, and false imprisonment.  See Feb. 13 Tr. at 281:22-282:9 (Jewkes, T. Martinez).

T. Martinez related that he joined SNM in March, 2009, while incarcerated at PNM South, and that A.A. Garcia, Zamora, and B. Cordova recruited him.  See Feb. 13 Tr. at 110:23-111:18 (Armijo, T. Martinez).  T. Martinez explained that the unit in which he lived at PNM South was primarily an SNM unit, so he lived with SNM members.  See Feb. 13 Tr. at 118:12-23 (Armijo, T. Martinez).  T. Martinez described SNM as "a violent criminal organization . . . that's running the New Mexico prison system," explaining that it is "known for its fear and . . . [is] also on the streets of New Mexico."  Feb. 13 Tr. at 111:20-25 (T. Martinez).  Its objective, T. Martinez stated, "is to be the best in the criminal world, pretty much, of New Mexico."  Feb. 13 Tr. at 112:12-14 (T. Martinez).  T. Martinez described SNM's structure as that of a military, with captains, lieutenants, sergeants, and soldiers, and that he was a soldier.  See Feb. 13 Tr. at 112:15-25 (Armijo, T. Martinez).

T. Martinez said that he was known in SNM for drugs.  See Feb. 13 Tr. at 113:5-6 (T. Martinez).  He explained that he would smuggle heroin, methamphetamine, cocaine, and Suboxone into prison, so he gained a reputation for being a drug dealer.  See Feb. 13 Tr. at 119:1-12 (Armijo, T. Martinez); id. at 19-21 (T. Martinez).  T. Martinez asserted that he is not a drug user, but did rarely use drugs.  See Feb. 13 Tr. at 119:13-16 (Armijo, T. Martinez).  He described that he would rather have money and live well than use drugs, so he would sell the drugs which he smuggled into the prison for a profit, and would send the money home to take care of his wife at the time or use the money in the prison canteen.  See Feb. 13 Tr. at 119:22-120:10 (Armijo, T. Martinez).

In June or July, 2011, T. Martinez moved to Southern New Mexico from PNM South.  See Feb. 13 Tr. at 122:19-123:10 (Armijo, T. Martinez).  He believed that he first met Baca in 2013, at Southern New Mexico, and knew Baca to be the head or -- in military terms -- the general, of the entire SNM.  See Feb. 13 Tr. at 124:2-15 (Armijo, T. Martinez).  At that time, T. Martinez described, the pod operated on tier time, where the top tier is locked down when the bottom tier is out, and the bottom tier is locked down when the top tier is out.  See Feb. 13 Tr. at 124:19-125:3 (Armijo, T. Martinez).  As Baca lived on the bottom tier and T. Martinez lived on the top tier, T. Martinez related that he only occasionally spoke with Baca.  See Feb. 13 Tr. at 124:19-125:3 (Armijo, T. Martinez).  T. Martinez verified that Baca revealed his plans for SNM, and described Baca's desire to move SNM forward and repair the factions within the gang by setting it up like the Zia symbol, and allowing counties to have their own sergeant.  See Feb. 13 Tr. at 125:11-126:1 (Armijo, T. Martinez).  T. Martinez said that he bought into Baca's plan, because he looked up to Baca and wanted to see SNM grow.  See Feb. 13 Tr. at 126:15-127:4 (Armijo, T. Martinez).  He

admitted to having supplied Baca with Suboxone.  See Feb. 13 Tr. at 127:5-7 (Armijo, T. Martinez).

T. Martinez said that he was "very good friends" with Molina and also knew D. Sanchez. Feb. 13 Tr. at 132:5 (T. Martinez).  See id. at 132:4-8 (Armijo, T. Martinez).  T. Martinez explained that D. Sanchez was moved to Southern New Mexico and that they were housed in the same pod. See Feb. 13 Tr. at 133:1-11 (Armijo, T. Martinez).  T. Martinez said that he has had disagreements with D. Sanchez, but that, because D. Sanchez was the key-holder of the pod, T. Martinez had to obey him.  See Feb. 13 Tr. at 133:15-21 (Armijo, T. Martinez); id. at 134:5-11 (Armijo, T. Martinez).  He elaborated that D. Sanchez never truly viewed him as a full SNM member.  See Feb. 13 Tr. at 272:23-25 (T. Martinez).  T. Martinez said that he liked D. Sanchez as an individual but disagreed with the way he ran things, although T. Martinez respected his SNM rank.  See Feb. 13 Tr. at 290:3-24 (Jewkes, T. Martinez).  T. Martinez described that, while they were housed together in blue pod, sometime at the end of 2013, D. Sanchez tattooed his back, but that D. Sanchez would not allow him to get an "S," because he had not yet "put in work."  Feb. 13 Tr. at 136:21-137:17 (Armijo, T. Martinez).  This tattoo, T. Martinez described, was meant, in part, to mend fences after he and D. Sanchez almost got into a physical altercation following a handball match in which T. Martinez slapped D. Sanchez' rear end, causing an argument.  See Feb. 13 Tr. at 273:7-274:25 (Jewkes, T. Martinez).  T. Martinez verified that this tattooing, along with any tattooing within the prison system, is not allowed and, had they been caught, they would have been sent to segregation, or lost commissary or telephone call privileges.  See Feb. 13 Tr. at 139:4-11 (Armijo, T. Martinez).  T. Martinez stated that he also knows Herrera, who lived in an adjoining pod and to whom T. Martinez sold drugs.  See Feb. 13 Tr. at 139:23-140:5 (Armijo, T. Martinez). T. Martinez identified R. Perez as also living in blue pod and as his friend.  See Feb. 13 Tr. at

140:15-16 (Armijo, T. Martinez); id. at 141:3-5 (Armijo, T. Martinez).  T. Martinez described that R. Perez was "a true friend" and that he took a liking to him, so he would buy him things from canteen when R. Perez did not have money and gave him Suboxone.  Feb. 13 Tr. at 141:11-12 (T. Martinez).  See id. at 141:16-17 (T. Martinez); id. at 142:17-21 (Armijo, T. Martinez).  He described that, at one point in 2012, R. Perez got very sick, and T. Martinez notified the correctional officers, which resulted in R. Perez' moving to the long-term care unit for a while.  See Feb. 13 Tr. at 320:7-25 (Villa, T. Martinez).  T. Martinez said that R. Perez returned to Southern New Mexico five to six months later, and got into a few fistfights, but was still sick and spent most of his time in his cell.  See Feb. 13 Tr. at 322:8-25 (Villa, T. Martinez).  T. Martinez verified that both Herrera and R. Perez are SNM members.  See Feb. 13 Tr. at 140:23-141:2 (Armijo, T. Martinez).  T. Martinez stated that he grew up with M. Rodriguez and that he was also in blue pod.  See Feb. 13 Tr. at 143:10-14 (Armijo, T. Martinez).  T. Martinez also verified that on March 7, 2014, Armenta, J. Montoya, and R. Sanchez were all housed with him in blue pod.  See Feb. 13 Tr. at 145:6-14 (Armijo, T. Martinez).  T. Martinez explained that, sometime before then, in December, 2016, or January, 2017, he got M. Rodriguez high on methamphetamine, and that M. Rodriguez revealed that there was "paperwork" on Molina, and asked T. Martinez and E. Martinez to beat up Molina and get him out of the pod.  Feb. 13 Tr. at 284:8-25 (Jewkes, T. Martinez).  T. Martinez discounted this as the ramblings of someone under the influence of drugs.  See Feb. 13 Tr. at 285:13-286:9 (T. Martinez).

T. Martinez described that he worked at the prison for a program called "Wheels for the World" in which he would refurbish wheelchairs, which would then be sent to third-world countries.  See Feb. 13 Tr. at 145:25-146:9 (T. Martinez).  According to T. Martinez, this program was a pilot offering, specifically for SNM.  See Feb. 13 Tr. at 146:12-17 (T. Martinez).  He stated

that he left for the program on March 7, 2014, around 7:30 a.m., and returned to the pod in the afternoon around 3:40 p.m. after being strip searched, because they worked with sharp equipment. See Feb. 13 Tr. at 146:20-147:19 (Armijo, T. Martinez).  T. Martinez recalled that, when he returned, his pod was in the yard for recreation time and, as he was walking into the unit, M. Rodriguez stopped him to talk.  See Feb. 13 Tr. at 148:15-24 (Armijo, T. Martinez).  M. Rodriguez told him to get high and, when T. Martinez refused, explained that Molina's "paperwork" had arrived, but that they were still waiting on J. Montoya's "paperwork."  Feb. 13 Tr. at 149:8-150:5 (T. Martinez, Armijo).  T. Martinez took the fact that there was "paperwork" to mean that there was proof that Molina was an informer.  Feb. 13 Tr. at 150:9-24 (Armijo, T. Martinez).  T. Martinez said that he was sad upon hearing about the "paperwork," and relayed how M. Rodriguez explained that he and D. Sanchez saw the "paperwork," that it was real, and that D. Sanchez wanted T. Martinez to knock out Molina so that he could not leave his cell.  Feb. 13 Tr. at 150:25-152:19 (Armijo, T. Martinez).  T. Martinez explained that D. Sanchez, as the pod's senior member, provided the order, but had M. Rodriguez tell it to T. Martinez, because M. Rodriguez and T. Martinez grew up together.  See Feb. 13 Tr. at 280L18-25 (T. Martinez, Jewkes). T. Martinez asserted that he was loyal to SNM and so did not question his orders.  See Feb. 13 Tr. at 281:1-9 (Jewkes, T. Martinez).  T. Martinez narrated that he told M. Rodriguez that he was going to get high, and, as he walked up the stairs, Molina stopped him and asked how he was doing, and handed T. Martinez his shank to hold while he showered.  See Feb. 13 Tr. at 153:17-154:22 (T. Martinez, Armijo).  T. Martinez said that he then went into his cell and made coffee, and that the correctional officers came into the pod to start the 4:00 p.m. count while Molina was still showering.  See Feb. 13 Tr. at 155:13-156:1 (Armijo, T. Martinez).

T. Martinez verified that the plan was to have Armenta and J. Montoya come in the cell after T. Martinez knocked out Molina, which he described as necessary because Molina was stockier than all of them, taller than Armenta and J. Montoya, but shorter than T. Martinez. See Feb. 13 Tr. at 156:10-23 (Armijo, T. Martinez). T. Martinez said that he stayed in his cell during count and was nervous, so he got high. See Feb. 13 Tr. at 157:3-8 (Armijo, T. Martinez); id. at 159:3-8 (T. Martinez, Armijo). He described that, during count, D. Sanchez, who lived in the cell next to his, initiated a conversation with him. See Feb. 13 Tr. at 157:9-158:4 (Armijo, T. Martinez); id. at 159:2-3 (Armijo, T. Martinez); id. at 163:19-21 (Armijo, T. Martinez). T. Martinez said that, after he got high, he heard a knock on his wall, which he believed to be D. D. Sanchez trying to get his attention, so he went down to the vent and asked: "What's up, carnal?" Feb. 13 Tr. at 159:24 (T. Martinez). See id. at 159:8-24 (T. Martinez, Armijo). T. Martinez described that they spoke about Molina's "hit," and D. Sanchez asked if M. Rodriguez had updated him, and told T. Martinez that it was time to "earn his bones." Feb. 13 Tr. at 159:25-160:21 (T. Martinez, Armijo). T. Martinez verified that D. Sanchez' asking if M. Rodriguez spoke with him underscored that the order was D. Sanchez', especially because M. Rodriguez told him that D. Sanchez wanted him to go. See Feb. 13 Tr. at 346:18-347:6 (Armijo, T. Martinez). T. Martinez relayed that D. Sanchez described how SNM has always used violence to earn its reputation and that he wants to go back to the old ways, where it was violent and feared; D. Sanchez wanted SNM to no longer only assault people, but to also kill those who break the rules so that people realize that "the SNM ain't playing no more." Feb. 13 Tr. at 161:23 (T. Martinez). See id. at 161:4-25 (Armijo, T. Martinez). T. Martinez testified, however, that he argued against killing his friend, Molina, and D. Sanchez again reiterated that SNM is returning to its old, violent ways, and told T. Martinez that he better get it done or he would be in danger himself. See Feb. 13 Tr. at 162:2-12

(T. Martinez); id. at 280:16-19 (T. Martinez).  T. Martinez thus thought that, if he did not do as

ordered, D. Sanchez would order a "hit" on him.  Feb. 13 Tr. at 287:11-24 (Jewkes, T. Martinez).

D. Sanchez also told T. Martinez not to worry, because they already made the shanks from metal

taken from R. Perez' walker.  See Feb. 13 Tr. at 192:16-193:8 (Armijo, T. Martinez).

　　　　T. Martinez said that, after count, he was still preoccupied and high, and M. Rodriguez

came to his door and tried to give him a pep talk.  See Feb. 13 Tr. at 163:24-165:6 (Armijo,

T. Martinez).  T. Martinez described that M. Rodriguez relayed that he had offered to go in

T. Martinez' place and did not want him involved, but that D. Sanchez required T. Martinez'

participation.  See Feb. 13 Tr. at 164:7-15 (Armijo, T. Martinez).  T. Martinez then showed

M. Rodriguez Molina's shank, explained how he got it, placed it in a canteen bag, and handed the

bag to M. Rodriguez.  See Feb. 13 Tr. at 164:16-165:16 (Armijo, T. Martinez).  M. Rodriguez left,

and, when he returned, T. Martinez also told M. Rodriguez that he was changing the plans, that,

instead of beating up Molina to knock him out as originally planned, T. Martinez was going to

choke out Molina, which he explained would be quieter and involve less risk of leaving his DNA

everywhere.  See Feb. 13 Tr. at 165:17-166:18 (Armijo, T. Martinez).  After M. Rodriguez agreed

that choking out Molina was a better plan, because it would not get blood everywhere, he left to

tell D. Sanchez.  See Feb. 13 Tr. at 166:23-167:6 (Armijo, T. Martinez).  T. Martinez described

that he eventually left his cell and walked over to an area on the top tier between the shower and

cell 105 -- Molina's cell, when Molina came out of his cell.  See Feb. 13 Tr. at 167:9-17 (Armijo,

T. Martinez); id. at 168:7-9 (Armijo, T. Martinez).  Molina suggested getting high -- T. Martinez

elaborated that the plan was for M. Rodriguez and T. Martinez to get Molina in his cell by offering

to do drugs in his cell, which would not be unusual, because they were all friends -- so T. Martinez

returned to his cell to get Suboxone.  See Feb. 13 Tr. at 168:17-169:25 (Armijo, T. Martinez).  T.

Martinez returned, and M. Rodriguez was with Molina, so they all entered Molina's cell and T. Martinez gave them both pieces of Suboxone.  See Feb. 13 Tr. at 170:23-171:10 (Armijo, T. Martinez).  T. Martinez explained that M. Rodriguez and Molina were looking for spoons to use to dissolve the Suboxone in hot water and inject it intravenously.  See Feb. 13 Tr. at 171:10-16 (T. Martinez, Armijo).  As they were preparing the Suboxone, T. Martinez saw M. Rodriguez nodding at him, which he took to mean that it was time to move on Molina, but he did nothing and just stood there.  See Feb. 13 Tr. at 172:17-173:1 (Armijo, T. Martinez).  T. Martinez said that M. Rodriguez nodded at him again as Molina was waiting for the Suboxone to dissolve, and, at what T. Martinez thought was a third nod, T. Martinez went up behind Molina and started choking him.  See Feb. 13 Tr. at 173:7-174:6 (Armijo, T. Martinez).  T. Martinez said that Molina reached up, ostensibly to grab T. Martinez' arms, while M. Rodriguez grabbed Molina's wrists to pull his hands down, as T. Martinez continued choking him.  See Feb. 13 Tr. at 174:9-25 (Armijo, T. Martinez).  T. Martinez described feeling Molina's body start to give, so kicked out Molina's legs and laid him down.  See Feb. 13 Tr. at 175:1-16 (Armijo, T. Martinez).

T. Martinez recalled that, when he stood up from placing Molina on the floor, M. Rodriguez had turned around, and J. Montoya and Armenta were seated near cell 101, the cell at the top of the stairs.  See Feb. 13 Tr. at 175:17-176:6 (Armijo, T. Martinez).  M. Rodriguez motioned J. Montoya and Armenta into the cell, saying "What the fuck," but T. Martinez, at the time, thought M. Rodriguez had discovered that he had not choked out Molina good enough.  Feb. 13 Tr. at 176:7-22 (Armijo, T. Martinez).  T. Martinez described that, because Molina is his friend, he had loosened his grip when he felt Molina's legs give out, so that Molina would awake quicker and have a chance at surviving the attack.  See Feb. 13 Tr. at 176:23-177:8 (Armijo, T. Martinez).  Because he thought he had been found out, T. Martinez stomped on Molina's head about three

times, hitting Molina's forehead the first time and grazing the side of Molina's head the second and third time, but mostly hitting the floor.  See Feb. 13 Tr. at 177:9-178:2 (Armijo, T. Martinez). At this point, J. Montoya and Armenta were in the cell and M. Rodriguez was yelling at them to get Molina, so T. Martinez had to maneuver himself out of the cell by stepping onto the toilet and then the bed, and he saw one of the Jerrys straddling Molina while the other was at Molina's side. See Feb. 13 Tr. at 178:4-23 (Armijo, T. Martinez).  T. Martinez left the cell and looked back, and could see J. Montoya and Armenta stabbing Molina.  See Feb. 13 Tr. at 178:24-179:9 (T. Martinez, Armijo).  T. Martinez heard noises as he walked down the stairs, but did not look, and noted that Madrid was going up the stairs, so T. Martinez told him that it was none of his business and to go back downstairs.  See Feb. 13 Tr. at 180:1-14 (Armijo, T. Martinez).  T. Martinez described that Madrid stopped and looked up, and would have seen directly into Molina's room.  See Feb. 13 Tr. at 180:17-23 (Armijo, T. Martinez).

T. Martinez said that he was downstairs in the common area, and saw a blood-stained Molina leave his cell, saying "you got me, all right I'll leave" as he walked downstairs, with M. Rodriguez telling J. Montoya and Armenta to get Molina.  Feb. 13 Tr. at 181:12 (T. Martinez). See id. at 181:1-25 (T. Martinez, Armijo); id. at 183:1-6 (Armijo, T. Martinez).  He did not hear M. Rodriguez tell Molina that he is not a carnal, but verified that he did not believe Molina to be a carnal, because of the "paperwork" on him.  Feb. 13 Tr. at 333:14-23 (Villa, T. Martinez).  See id. at 350:5-20 (Armijo, T. Martinez).  T. Martinez recalled D. Sanchez and his brother were also in the common area, sitting at a table playing cards.  See Feb. 13 Tr. at 184:8-16 (Armijo, T. Martinez).  T. Martinez described that J. Montoya and Armenta were a few steps behind Molina, who took a fighting stance when he got downstairs, and that J. Montoya then punched Molina and they got in a fight.  See Feb. 13 Tr. at 182:1-12 (Armijo, T. Martinez); id. at 185:10-16 (Armijo,

T. Martinez).  T. Martinez did not see J. Montoya holding or using a shank, but saw Armenta join the fight and stab Molina more, and, at some point, Molina fell.  See Feb. 13 Tr. at 185:17-186:9 (T. Martinez, Armijo).  When Molina fell, T. Martinez said that J. Montoya disappeared to his room, and that Armenta stabbed Molina a few more times and kicked him, then walked over to the middle of the pod to retrieve Molina's chain that had flown off.  See Feb. 13 Tr. at 186:9-187:7 (T. Martinez, Armijo).  Armenta walked away, and T. Martinez heard scuffling, then the correctional officers opened the door and entered the pod, so T. Martinez climbed up the bars to the top tier and went to his cell.  See Feb. 13 Tr. at 187:11-188:2 (Armijo, T. Martinez).  He stated that the correctional officers locked everyone down and that he knew D. Sanchez was put in his cell next to T. Martinez', because they had a conversation.  See Feb. 13 Tr. at 188:10-25 (Armijo, T. Martinez).

T. Martinez described that D. Sanchez again initiated conversation by knocking on the wall, so T. Martinez went to the vent, and Sanchez congratulated him and told him that he now had D. Sanchez' respect.  See Feb. 13 Tr. at 189:3-16 (Armijo, T. Martinez).[92]  D. Sanchez reiterated that SNM was "going back to the old ways," and instructed T. Martinez not to talk or worry, because the cameras could not see into Molina's cell so there would be no evidence against him.  Feb. 13 Tr. at 189:24-190:12 (Armijo, T. Martinez).  T. Martinez explained that he was in shock, having participated in assaulting or killing -- he did not know if Molina was still alive or not -- one of his best friends, and reeling from Suboxone and his adrenaline rush.  See Feb. 13 Tr. at 190:13-24 (Armijo, T. Martinez).  He provided he would be shocked to discover that he participated in Molina's assault over "paperwork" that did not contain much.  Feb. 13 Tr. at 335:6-

---

[92]At R. Perez' request, the Court provided a limiting instruction: "These conversations can only be considered in the charges against Mr. Sanchez, not against the other three defendants." Feb. 13 Tr. at 189:20-22 (Court).  See id. at 189:18-19 (Villa).

21 (Villa, T. Martinez).  T. Martinez described that, at least thirty minutes later, the NM State Police arrived and locked down the scene, then took each inmate to the unit manager's office to collect clothes and take pictures, and moved them all to unit 2-A.  See Feb. 13 Tr. at 191:1-16 (Armijo, T. Martinez).

When Palomares and another NM State Police officer interviewed T. Martinez on March 8, 2014, T. Martinez stated that he did not know anything about the murder, was in Molina's room discussing food, and just wanted to go home.  See Feb. 13 Tr. at 223:3-224:9 (Duncan, T. Martinez).  T. Martinez said that he only found out that Molina died when the STIU interviewed him that same day, and maintained that he did not give the STIU a statement, only telling them that he was in Molina's cell making small talk and discussing food.  See Feb. 13 Tr. at 192:1-15 (T. Martinez, Armijo); id. at 224:14-21 (Duncan, T. Martinez).  He then, however, told the STIU that he was in Molina's cell to get high, but that he panicked and ran out when he saw "them two coming in."  Feb. 13 Tr. at 225:24 (Duncan).  See id. at 225:13-9 (Duncan, T. Martinez).  T. Martinez also gave the STIU his opinion as to various people's roles in SNM who were in Southern New Mexico at that time and suggested that Molina's murder was a "hit."  Feb. 13 Tr. at 226:21-227:1 (Duncan, T. Martinez); id. at 317:20-25 (Villa, T. Martinez).  T. Martinez verified that the STIU suspected that the shanks came from metal acquired from the wheelchair program and questioned him about it, but T. Martinez did not tell them that the metal came from R. Perez' walker.  See Feb. 13 Tr. at 318:1-16 (Villa, T. Martinez).  T. Martinez knew that, early that next morning, D. Sanchez, Varela, and M. Rodriguez were placed on emergency transport to PNM North.  See Feb. 13 Tr. at 191:17-23 (Armijo, T. Martinez).  On March 10, 2014, T. Martinez gave another statement in a recorded interview, which was provided on the discovery tablets, in which he said he was getting high with Molina in Molina's cell when two people ran into the cell,

surprising him as he did not know if they were coming for him.  See Feb. 13 Tr. at 227:5-21 (Duncan, T. Martinez); id. at 230:11-231:19 (Duncan, T. Martinez).   T. Martinez told the interviewers -- an NM State Police officer and an FBI agent -- that he recognized the men who ran into the cell and that they had a shank, but would not give up the men's names, just saying the cameras would tell.  See Feb. 13 Tr. at 231:23-233:2 (Duncan, T. Martinez); id. at 233:12-23 (Duncan, T. Martinez); id. at 298:2-11 (Villa, T. Martinez).  T. Martinez also told them that Molina was killed in a cowardly way and that, had he intervened, Molina could still be alive.  See Feb. 13 Tr. at 298:22-299:11 (Villa, T. Martinez).  He admitted, however, that he told the interviewers that one of the men was a fan of Tupac[93] -- which is one of J. Montoya's identifying traits -- that he heard the men call Molina a "rat," and that he asked how he could help the investigation.  Feb. 13 Tr. at 233:24-234:21 (Duncan, T. Martinez).  T. Martinez admitted that he lied to a federal agent in the interview, a crime for which he has not been charged.  See Feb. 13 Tr. at 318:24-319:14 (Villa, T. Martinez).  T. Martinez remained at Southern New Mexico for about six months, because he faced a writeup there.  See Feb. 13 Tr. at 191:24-192:1 (Armijo, T. Martinez); id. at 193:15-17 (T. Martinez).

T. Martinez described that his institutional writeup at Southern New Mexico carried four charges -- "murder, attempted complicity to a murder, gang activity[,] . . . and tampering with evidence" -- but verified that he was not charged at the state level for Molina's murder.  Feb. 13 Tr. at 193:12-14 (T. Martinez).  See id. at 193:9-11 (Armijo, T. Martinez).  T. Martinez said he fought the writeup, and was found guilty of only the attempted complicity to murder and gang activity charges, so he was moved to PNM North around September, 2014 -- although his offender

---

[93]For the reader's edification, "Tupac" refers to Tupac Amaru Shakur, an American rapper and actor who passed away in 1996.

location history showed he moved to PNM North in June, 2015.  See Feb. 13 Tr. at 193:18-194:10 (Armijo, T. Martinez); id. at 324:12-14 (Villa, T. Martinez).  T. Martinez verified that he denied knowledge of Molina's murder in the disciplinary hearing over the writeup.  See Feb. 13 Tr. at 277:5-14 (Jewkes, T. Martinez).  T. Martinez recalled that, while at PNM North, there was talk about Molina's murder, although such talk was rare.  See Feb. 13 Tr. at 327:18-328:3 (Villa, T. Martinez).  With the Court's limiting instruction,[94] T. Martinez verified that he heard rumors that R. Perez had been cooperating with the STIU regarding Molina and that, if the rumors were true, R. Perez could be killed.  See Feb. 13 Tr. at 331:10-23 (Villa, T. Martinez).

In October, 2015, while T. Martinez was still housed at PNM North, Baca returned to PNM North after having been incarcerated out of state.  See Feb. 13 Tr. at 199:7-24 (Armijo, T. Martinez).  T. Martinez said that, at some point in the week before Halloween, he was in the yard with Baca, who was still SNM's main leader, and they talked.  See Feb. 13 Tr. at 200:11-21 (Armijo, T. Martinez); id. at 205:20-22 (Armijo, T. Martinez); id. at 343:25-344:3 (Armijo, T. Martinez).  Baca told T. Martinez that he "sent them a letter, they didn't want to take me seriously when I said I would stop the killings.  They thought I was joking.  Now they have a body on their hands."  Feb. 13 Tr. at 205:24-206:2 (Armijo).  See id. at 206:3 (T. Martinez).[95]  Baca also told T.

---

[94]After a bench conference, the Court told the jury:

> Ladies and gentlemen, you're going to hear Mr. Martinez testify as to what rumors he heard.  You cannot consider what these rumors are for the truth of the matter.  So it's only the existence of the rumors that  you can consider, not the truth of the rumors in any way in the testimony that Mr. Martinez is about to give.

Feb. 13 Tr. at 331:1-7 (Court).

[95]The Court provided a limiting instruction: "You can only use this statement as to Mr. Baca in your consideration of the charges against him.  You can't use it against any of the other three defendants."  Feb. 13 Tr. at 206:4-7 (Court).

Martinez that SNM needed to reestablish its power so that its presence was felt again and wanted to "hit" the top officials, and revealed that there was a plan regarding Marcantel and Santistevan. Feb. 13 Tr. at 206:9-23 (Armijo, T. Martinez). Baca also said that it would be nice to "hit" wardens to add to SNM's name, noting that the worst thing that could result would be if SNM members were shipped out of state, but that they would eventually be let back in to New Mexico. Feb. 13 Tr. at 207:4-19 (Armijo, T. Martinez). Baca revealed that Molina's murder was a building block to show the prison system that SNM means business, and told T. Martinez not to worry about Armenta, who was known to be cooperating at that time with the state, because Baca was going to have somebody visit Armenta's family. See Feb. 13 Tr. at 207:20-208:19 (Armijo, T. Martinez). T. Martinez took this visit to mean that Armenta's family was told to tell Armenta to stay quiet. See Feb. 13 Tr. at 208:20-23 (Armijo, T. Martinez). Baca also told T. Martinez to not cooperate with law enforcement, keep his head up, and be strong and proud. See Feb. 13 Tr. at 208:23-24 (T. Martinez). A few days later, T. Martinez was transferred to Southern New Mexico, because the state trial, in which he was supposed to testify on J. Montoya's behalf, was about to start. See Feb. 13 Tr. at 209:2-6 (T. Martinez).

T. Martinez described that he had written J. Montoya a false statement under penalty of perjury in November, 2014, on his own volition to get J. Montoya out of the murder charge and to have Armenta take the fall. See Feb. 13 Tr. at 195:22-196:18 (Armijo, T. Martinez). In this statement, he reported that his earlier, March 10, 2014, statement was false, although he did not know if this prior statement was in the state discovery. See Feb. 13 Tr. at 229:15-24 (Duncan, T. Martinez). T. Martinez verified that he also wrote an earlier draft of the statement for J. Montoya, in September, 2014, which J. Montoya edited, and which eventually became the November, 2014, statement. See Feb. 13 Tr. at 236:24-8 (Duncan, T. Martinez); id. at 238:11-20

(T. Martinez, Duncan). Baca had T. Martinez read the draft statement out loud, and T. Martinez described that he came up with its contents to match the video evidence that T. Martinez expected existed and Molina's reputation for being a bully, so that the statement would be believable while exonerating J. Montoya. See Feb. 13 Tr. at 239:19-245:19 (Duncan, T. Martinez). T. Martinez verified that he signed this statement under penalty of perjury as well, to give weight to the statement, and that the statement itself was perjury, which is a crime. See Feb. 13 Tr. at 245:21-246:15 (Duncan, T. Martinez). The later, revised statement, T. Martinez explained, included J. Montoya's ideas to portray T. Martinez as being very high during Molina's murder, so his earlier statements could be written off as part of a drug-induced haze; to admit his friendship with Molina; to provide an incentive for T. Martinez to lie earlier; and to help J. Montoya's edits to match the story that he knew Armenta was telling. See Feb. 13 Tr. at 247:16-251:19 (Duncan, T. Martinez). Baca also walked T. Martinez through statements that T. Martinez made under oath in an affidavit T. Martinez signed, and T. Martinez admitted that such statements were false, despite his oath that they were truthful. See Feb. 13 Tr. at 257:16-261:5 (Duncan, T. Martinez). T. Martinez admitted that he has not been charged with perjury. See Feb. 13 Tr. at 296:12-15 (Villa, T. Martinez).

T. Martinez described STIU waking him up around 5:00 a.m. on December 3, 2015, in his cell at Southern New Mexico, telling him that it was for emergency transport, and that he arrived at the federal courthouse in Albuquerque, where U.S. Marshals interviewed and arrested him on the federal charges; he was arraigned the next day. See Feb. 13 Tr. at 120:20-121:16 (Armijo, T. Martinez). On this date, T. Martinez had over $25,000.00 in his NM Corrections Department account from selling drugs -- both inside and outside of prison. See Feb. 13 Tr. at 121:17-122:3 (Armijo, T. Martinez). He described that he did not yet have his SNM tattoo on this date, noting that, while he has many Zia symbol tattoos, none contain "SNM," and that he got his SNM tattoo

while on federal hold in Torrance County Detention, which tattoo he said was allowed, because he "put in work." Feb. 13 Tr. at 134:12-135:15 (Armijo, T. Martinez).  T. Martinez admitted that this work was helping kill Molina, and the tattoo was celebratory in a way, as he had finally earned the right to carry SNM's patch.  See Feb. 13 Tr. at 294:8-17 (Villa, T. Martinez); id. at 338:2-13 (Jewkes, T. Martinez).[96]  T. Martinez described talking with R. Perez at Torrance County Detention Center, at some point between R. Perez' was arrest in the case and December 29, 2016. See Feb. 13 Tr. at 209:10-16 (Armijo, T. Martinez); id. at 312:7-312:13 (Villa, T. Martinez).  R. Perez told T. Martinez that everybody has a part to play in SNM, even if it is just staying quiet, and that his own part, because R. Perez was not physically capable of carrying out the "hit," was to provide pieces from his walker.  Feb. 13 Tr. at 210:2-14 (Armijo, T. Martinez).[97]  See id. at 210:25-211:7 (Armijo, T. Martinez).  T. Martinez admitted that he did not tell the United States about this conversation until January 23, 2018, despite speaking with the government the day on which he left Torrance County Detention and  entered his plea agreement.  See Feb. 13 Tr. at 312:4-6 (Villa, T. Martinez); id. at 312:14-24 (Villa, T. Martinez).

T. Martinez provided that he decided to cooperate in the case at the end of 2016, and pled guilty on January 26, 2017, to conspiracy to murder and murder.  See Feb. 13 Tr. at 211:11-21 (Armijo, T. Martinez); id. at 212:17-23 (Armijo, T. Martinez).  T. Martinez was loyal to SNM

---

[96]After Mr. Jewkes finished his cross-examination, but before Ms. Armijo began her redirect, the Court sent the jury outside the courtroom so it could advise Mrs. Molina that she either had to compose herself, as she was entering and exiting the courtroom audibly crying and making a scene, or leave the courtroom.  See Feb. 13 Tr. at 341:13-23 (Court).  Mrs. Molina chose to leave. See Feb. 13 Tr. at 342:5 (Molina).

[97]At this point in the testimony, Baca requested a limiting instruction and the Court provided: "You can only use that statement -- the testimony that was just given about what Mr. Perez said -- only in your consideration of the charges against Mr. Perez.  You cannot use it in your discussion of the charges against the other three defendants."  Feb. 13 Tr. at 210:17-22 (Court).  See id. at 210:15-16 (Duncan).

until he officially decided to cooperate on December 29, 2016. <u>See</u> Feb. 13 Tr. at 303:10-14 (Villa, T. Martinez); <u>id.</u> at 350:21-24 (Armijo, T. Martinez). He described that he decided to cooperate, because the murder of his friend weighed on him and, having found God again, wanted to take responsibility and do the right thing. <u>See</u> Feb. 13 Tr. at 217:25-218:17 (Armijo, T. Martinez). T. Martinez also said that he felt like SNM used him in the murder and does not care about him, so he wanted a new life and cooperating gave him the opportunity to get out of SNM. <u>See</u> Feb. 13 Tr. at 219:6-23 (Armijo, T. Martinez). T. Martinez verified that the murder charge carries a mandatory term of life imprisonment. <u>See</u> Feb. 13 Tr. at 212:24-213:1 (Armijo, T. Martinez). T. Martinez admitted to betraying his friend, because he wanted to help SNM and "earn his bones," and that, if not for his conduct, Molina may still be alive. Feb. 13 Tr. at 292:22-293:17 (Villa, T. Martinez). T. Martinez described his understanding of the addendum to his plea agreement, in which he agreed to be a cooperating witness and to testify truthfully in this and any future proceeding. <u>See</u> Feb. 13 Tr. at 213:24-214:12 (Armijo, T. Martinez). He said that, by testifying, he has exposed himself to being "hit." Feb. 13 Tr. at 300:14-17 (Villa, T. Martinez). T. Martinez verified that he could get a reduced sentence, but that that reduction depends on the prosecutors first filing a motion for a downward departure, which they have not promised to do. <u>See</u> Feb. 13 Tr. at 264:12-21 (Duncan, T. Martinez). He said that he is not, however, hoping for a reduced sentence, but is instead testifying to clear his conscience and atone for his sins. <u>See</u> Feb. 13 Tr. at 301:6-19 (Villa, T. Martinez). As impeachment, R. Perez played a telephone call in which T. Martinez told his wife that it would be a blessing if he got sentenced to time served or a couple years. <u>See</u> Feb. 13 Tr. at 307:18-308:12 (Villa, T. Martinez). T. Martinez described that his wife wanted a lower sentence for him, because of his minimal role. <u>See</u> Feb. 13 Tr. at 345:19-346:9 (Armijo, T. Martinez).

T. Martinez admitted that he is hoping that the United States helps him relocate, because he is in danger if he stays in New Mexico. See Feb. 13 Tr. at 308:21-25 (Villa, T. Martinez). R. Perez played another telephone call, however, in which T. Martinez told his wife that, if he gets prison time, the government will get him trained in an electrical field and help him to get a job upon release. See Feb. 13 Tr. at 309:19-25 (Villa, T. Martinez). T. Martinez verified that he visited with his wife at a plea hearing and later had one contact visit with her while at PNM North. See Feb. 13 Tr. at 268:7-22 (Duncan, T. Martinez). He admitted to receiving $50.00 a month from the United States, but disagreed that the payments added up to over $1,100.00, until Baca showed him receipts. See Feb. 13 Tr. at 265:1-268:6 (Duncan, T. Martinez). After making the decision to cooperate, T. Martinez was moved, and housed with other cooperators. See Feb. 13 Tr. at 214:13-21 (Armijo, T. Martinez). He gave names of all the Defendants with whom he could recall being housed since his federal arrest. See Feb. 13 Tr. at 262:1-263:24 (Duncan, T. Martinez).

T. Martinez described that he had discovery tablet and that, at some point, while housed at Sandoval County after entering into the cooperation addendum, he discovered how to reset the tablet to its factory settings and access the internet. See Feb. 13 Tr. at 214:22-215:25 (Armijo, T. Martinez); id. at 222:2-8 (Duncan, T. Martinez). He admitted that this modification was "[a]bsolutely not" allowed. Feb. 13 Tr. at 216:6 (T. Martinez). See id. at 216:4-5 (Armijo). With the internet access, T. Martinez watched movies, used Google to help him with his math assignments in his college classes, created a Facebook page, and watched pornography. See Feb. 13 Tr. at 216:7-21 (Armijo, T. Martinez). At some point in May, 2017, the tablet was seized, and T. Martinez has not had it since. See Feb. 13 Tr. at 216:22-217:1 (Armijo, T. Martinez); id. at 353:6-8 (Duncan, T. Martinez). T. Martinez also verified that, after his federal arrest, he continued dealing drugs at Torrance County and Sandoval County, which was not allowed, but that he

stopped dealing about five months ago.  See Feb. 13 Tr. at 217:6-24 (Armijo, T. Martinez).  He admitted that he decided to take on the drug trade at Sandoval, with F. Munoz, after deciding to cooperate and getting close with God again.   See Feb. 13 Tr. at 221:18-222:1 (Duncan, T. Martinez).  He also admitted to entering a romantic relationship with a correctional officer at Sandoval County who was not his wife, although he said that his wife and he were going through a divorce at the time.  See Feb. 13 Tr. at 222:13-20 (Duncan, T. Martinez).  The Court allowed T. Martinez to step down, subject to re-call, and ordered him not to discuss his testimony with anybody during the trial's pendency.  See Feb. 13 Tr. at 355:24-356:4 (Court).

w.     **Jack Vigil's Testimony.**

The United States next called Jack Vigil, a correctional officer at Southern New Mexico. See Feb. 13 Tr. at 356:10 (Armijo); id. at 357:8-13 (Armijo, Vigil).  Vigil said that he has worked as a Southern New Mexico correctional officer for six years, both as rover and control officer.  See Feb. 13 Tr. at 357:14-358:1 (Armijo, Vigil).  He said that he was working on July 13, 2015, as a unit rover in Unit 1-A.  See Feb. 13 Tr. at 358:2-17 (Armijo, Vigil).  Vigil described that this unit was an SNM unit at that time and that SNM members had just gotten back their tier time.  See Feb. 13 Tr. at 359:13-22 (Armijo, Vigil).  He said he was working overtime in this unit on July 13, 2015, switching out the tiers with his colleague, when they heard a loud banging noise.  See Feb. 13 Tr. at 360:1-9 (Armijo, Vigil); id. at 363:14-17 (Armijo, Vigil).  Vigil said that they checked A pod, did not find the source of the noise, and checked green pod -- C pod -- and saw Romero covered in blood, banging on the door.  See Feb. 13 Tr. at 360:9-14 (Vigil); id. at 362:14-20 (Vigil, Armijo); id. at 364:17-23 (Armijo, Vigil).  Vigil said that they called the responders and their supervisors, then told the control officer to open the door so they could retrieve Romero.  See Feb. 13 Tr. at 365:16-20 (Armijo, Vigil).

Vigil said that, once they got Romero out of the pod, hear appeared beat up with cuts, lots of blood on his face, and possibly an indentation in his head. See Feb. 13 Tr. at 365:12-15 (Armijo, Vigil); id. at 365:22-23 (Vigil). Vigil described Romero as an older man, and one of the four individuals who had been let out for tier time, along with Villegas, a man he identified as "Uranda," and a man whose name he could not recall. Feb. 13 Tr. at 364:4-16 (Armijo, Vigil). Vigil said that the responders arrived to assist after pulling out Romero, so they went into green pod to lock down the inmates. See Feb. 13 Tr. at 365:23-25 (Vigil). Vigil described that, when he entered the pod, he saw Villegas rush into the shower with his sneakers on, which raised Vigil's suspicion that he was doing so to wash off blood. See Feb. 13 Tr. at 366:3-13 (Armijo, Vigil). Vigil said that Villegas was shirtless, wearing only shorts or boxers and his white sneakers. See Transcript of Jury Trial Volume 13 at 13:13-20 (taken February 14, 2018)(Armijo, Vigil), filed February 22, 2019 (Doc. 2529)("Feb. 14 Tr."). Vigil saw the other two individuals let out for tier time standing near the laundry cart as if nothing happened. See Feb. 13 Tr. at 366:19-22 (Armijo, Vigil). Accordingly, Vigil told Villegas to stop and, as Villegas walked out of the shower, Vigil said that he knew Villegas had started it. See Feb. 13 Tr. at 367:4-9 (Armijo, Vigil). Vigil said that, after locking down everyone, they checked the inmates for marks, and Villegas was the only one with any marks on him. See Feb. 13 Tr. at 367:10-13 (Vigil). Villegas, Vigil described, had long, black hair, was younger than Romero, and was fit. See Feb. 14 Tr. at 13:21-2 (Vigil, Armijo). The Court excused Vigil from the proceedings. See Feb. 14 Tr. at 15:23-25 (Court).

### x.     Julian Romero's Testimony.

The United States' next witness was Romero, who was released from custody in October, 2015. See Feb. 14 Tr. at 16:3-4 (Beck); id. at 37:25-38:3 (Beck, Romero). Romero stated that he was first incarcerated in 1977 at age eighteen, and was incarcerated at the PNM on his twenty-first

birthday.  See Feb. 14 Tr. at 24:14-25:3 (Beck, Romero).  While Romero was incarcerated there, the PNM had the worst, most gruesome prison riot in New Mexico history.  See Feb. 14 Tr. at 24:14-25:3 (Beck, Romero).  Romero stated that SNM formed after this riot, and verified that he was one of SNM's founding members.  See Feb. 14 Tr. at 25:4-12 (Beck, Romero).  He admitted to his various convictions, which included residential larceny, escape from jail, armed robbery, aggravated battery, trafficking heroin, and failure to appear.  See Feb. 14 Tr. at 35:12-36:24 (Beck, Romero).  He also admitted that he was shot in 2003, but did not know who shot him.  See Feb. 14 Tr. at 59:5-9 (Beck, Romero).

Romero said J. Baca asked him to help found SNM in 1981 or 1982.  See Feb. 14 Tr. at 16:21-17:5 (Beck, Romero).  Romero described that J. Baca brought him into his cell at the county jail and they did some heroin, and J. Baca told Romero how he wanted to start a New Mexico prison gang at the PNM in the wake of the riot.  See Feb. 14 Tr. at 17:9-10 (Romero); 17:17-18:3 (Beck, Romero).  J. Baca told Romero some of the proposed bylaws, such as that members must be the "cream of the crop" at PNM, meaning they must have leadership ability, and not have been informants.  Feb. 14 Tr. at 18:4-16 (Beck, Romero).  Potential members also had to have been in the penitentiary for three years, could not have run away from fights, could not have weakness, had to be smart, and had to be stand-up people.  See Feb. 14 Tr. at 30:2-14 (Beck, Romero).  Romero explained that, if an SNM member did not participate in a murder when ordered, that member would be murdered.  See Feb. 14 Tr. at 30:15-18 (Beck, Romero).

Romero said that J. Baca knew that Romero was headed to PNM to serve an eight-year sentence, so J. Baca told Romero to meet up with some of the guys there and that it would take

some violence, because they had to get rid of another gang there called "Nuestra Familia."[98]  Feb. 14 Tr. at 19:3-20 (Beck, Romero).  Romero described that, at PNM in 1982, he met up with the seven men whom J. Baca told him to meet, gave them the bylaws as instructed, thus forming SNM. See Feb. 14 Tr. at 19:21-20:25 (Beck, Romero).

Romero verified that he stabbed a member of Nuestra Familia in 1982 on J. Baca's orders. See Feb. 14 Tr. at 25:13-23 (Beck, Romero); id. at 26:11-13 (Beck, Romero); id. at 28:4-18 (Beck, Romero).  Two years later, Romero stabbed another person at J. Baca's behest, because the victim had switched from Nuestra Familia to SNM, which in contravention of prison-gang rules.  See Feb. 14 Tr. at 26:18-27:10 (Beck, Romero).  Romero explained that SNM was targeting Nuestra Familia because it was SNM's rival gang at the time.  See Feb. 14 Tr. at 27:22-25 (Beck, Romero). He described how, in 1986, a man named Troca tried to stab fellow SNM member Angel Munoz with a broom stick, which resulted in an immediate "greenlight" on Troca.  Feb. 14 Tr. at 28:19-29:8 (Beck, Romero).

Romero explained that he recruited two people into SNM, Jesse Chavez and Javier Parra, but did not recruit B. Garcia.  See Feb. 14 Tr. at 29:18-30:1 (Beck, Romero).  He also said that he, along with an individual whose name he could not remember, designed SNM's gang symbol, which he said is a Zia symbol with a "S" and "NM" inside.  Feb. 14 Tr. at 30:19-31:15 (Beck, Romero).  Romero does not have this symbol tattooed on his body.  See Feb. 14 Tr. at 32:18-20 (Beck, Romero).  Romero explained that, despite being an informant, he is still an SNM member, because "[y]ou don't get out of the SNM until the day you die, no matter what."  Feb. 14 Tr. at 42:25-43:2 (Romero).

---

[98]For the reader's convenience, the Court notes that the Spanish phrase "nuestra familia" means "our family."

Romero explained SNM's relationship with drugs in prison: SNM normally gets a portion of all drugs brought into correctional facilities, regardless of who smuggles them. See Feb. 14 Tr. at 32:21-8 (Beck, Romero). Romero admitted that he started using drugs at age sixteen and that, while he used to be a drug addict, he now takes one strip of Suboxone a day to stop using. See Feb. 14 Tr. at 33:12-34:2 (Beck, Romero). Romero verified that he has been using the Suboxone pursuant to a prescription. See Feb. 14 Tr. at 58:6-14 (Beck, Romero).

Romero described that he decided to cooperate in the case after he spoke with federal agents in 2015, before his release from prison, and they explained the RICO Act to him. See Feb. 14 Tr. at 38:8-14 (Beck, Romero); id. at 38:25-39:2 (Beck, Romero). Romero explained that SNM "turned into a creature that [he] never even thought it would . . . become," because people who had not been recruited were saying they were SNM, everybody had their own agenda and hating on each other, and there was no organization, so he did not want to be involved with it. Feb. 14 Tr. at 38:15-16 (Romero). See id. at 38:17-24 (Beck, Romero). Romero verified that the federal government paid him about $2,855.00 for his meetings with the FBI, and that sometimes the FBI agents would provide him fast food. See Feb. 14 Tr. at 39:3-22 (Beck, Romero).

Romero described returning from Oregon in 1998 and getting to know Archuleta, who was also an SNM member, at PNM North. See Feb. 14 Tr. at 40:1-10 (Beck, Romero). Romero said that they both got out around 2000 and hung out a bit, but that, when Archuleta returned to prison, Romero got together with Archuleta's girlfriend, and that Archuleta did not like their relationship. See Feb. 14 Tr. at 40:10-15 (Romero). Romero said that, during Archuleta's incarceration, he did not communicate with Archuleta, but that Romero hung out with Archuleta's girlfriend, which led to Romero and the woman becoming romantically involved in 2000 or 2001. See Feb. 14 Tr. at 40:16-41:8 (Beck, Romero). After this relationship began, Romero described, Archuleta tried to

put out fake "paperwork" purporting to show that Romero had informed and to get people to go after Romero, putting a "greenlight" on him, which precipitated the formation of another SNM. Feb. 14 Tr. at 41:12-23 (Beck, Romero).  See id. at 43:21-24 (Beck, Romero).  He elaborated on the "paperwork," saying that the informant had the same name as him but was younger, so Archuleta had ripped off the date of birth, and "everybody fell for it" and threw Romero "under the bus."  Feb. 14 Tr. at 42:10-11 (Romero).  See id. at 41:24-42:9 (Beck, Romero).  Romero explained that "paperwork" showing a member informed is an automatic "greenlight" for that member to be murdered.  Feb. 14 Tr. at 43:9-20 (Beck, Romero).  Romero did not follow the other group because he did not support divisions within SNM, and he emphasized that SNM "turned into a creature that [he] did not understand" and "got out of hand."  Feb. 14 Tr. at 44:1-11 (Beck, Romero).  He maintained that, despite this division, SNM was still just one gang.  See Feb. 14 Tr. at 44:12-15 (Beck, Romero).

Romero said that, on July 13, 2015, he was in the yellow pod at Southern New Mexico. See Feb. 14 Tr. at 45:11-21 (Beck, Romero).  Romero verified that Pete Aronda, Urquizo, Gomez, Villegas, and M. Rodriguez were all in yellow pod with him on that date, and that they were all SNM members.  See Feb. 14 Tr. at 45:24-46:25 (Beck, Romero).  He explained that, at Villegas' request, his wife would call Villegas' wife to see where she was and why she was not sending money.  See Feb. 14 Tr. at 47:1-11 (Beck, Romero).  Romero stated that, before July 13, 2015, the pod was in lockdown status -- meaning everybody was in their cell twenty-three hours a day, but that day was the first time they were allowed on the tier with other members at the same time since the lockdown.  See Feb. 14 Tr. at 47:21-48:12 (Beck, Romero).  He could not really remember, but knew that, once they were let out for tier time for the first time, he was knocked out.  See Feb. 14 Tr. at 47:15-20 (Beck, Romero); id. at 48:13-18 (Beck, Romero).  Romero recalled being let

out of his cell and talking to somebody, but then his memory goes blank.  See Feb. 14 Tr. at 48:23-49:4 (Beck, Romero).  He said that his next memory is waking up on a gurney and being sewn up around his eyes, and then being transferred via helicopter from Memorial Medical Center to a hospital in El Paso.  See Feb. 14 Tr. at 49:5-23 (Beck, Romero).

The United States played video of the assault, which Romero said he had not seen before trial, and Romero pointed to the cell he occupied on the bottom tier at the end, right next to the shower, in Unit 1-A, C pod.  See Feb. 14 Tr. at 51:4-52:2 (Beck, Romero).  Watching the video, Romero verified that "it sort of looks like [he is] getting the crap knocked out of [him]."  Feb. 14 Tr. at 54:12-13 (Romero).  The video then shows Romero talking to two other men and walking to the shower and grabbing a towel, but Romero could not recall doing these things.  See Feb. 14 Tr. at 55:2-18 (Beck, Romero).  Romero then walked to the front door, outside of the video's frame, which he also does not remember doing.  See Feb. 14 Tr. at 55:20-56:3 (Beck, Romero).  Romero stated that he believes that he was in the hospital for three days.  See Feb. 14 Tr. at 56:4-7 (Beck, Romero).  He described his injuries as a missing tooth and a bunch of cuts that were stitched up, but does not remember that there was an indentation in his head.  See Feb. 14 Tr. at 56:8-22 (Beck, Romero).

In 2016, Romero was charged federally with conspiracy to distribute Suboxone, because he received about sixty hits of Suboxone in the mail from a friend while he was incarcerated, which he was going to sell to make canteen money.  See Feb. 14 Tr. at 56:23-57:15 (Beck, Romero).  Romero verified that, at some point, this charge was dismissed.  See Feb. 14 Tr. at 44:24-45:6 (Beck, Romero).  He asserted that he mostly sold the Suboxone he received for canteen money and that he sold the Suboxone to other SNM members.  See Feb. 14 Tr. at 57:20-58:2 (Beck, Romero).  The Court excused Romero from the proceedings.  See Feb. 14 Tr. at 65:24-25 (Court).

y.    **Martin Espinoza's Testimony**.

The United States next called Espinoza to the witness stand; Espinoza is a sergeant correctional officer at Southern New Mexico, and has been a correctional officer for twenty-one years.  See Feb. 14 Tr. at 66:3-4 (Castellano); id. at 66:21-67:2 (Castellano, Espinoza).  Espinoza described that he currently oversees and provides security to Units 3-A and 3-B, ensuring that monthly and random urinalyses are completed to deter drug use, that the pods and phone yards are clean, and that the inmates receive bedding upon coming into the facility and return it when they leave.  See Feb. 14 Tr. at 67:3-18 (Castellano, Espinoza).  He explained that, if an inmate's urinalysis tests positive for a controlled substance, a disciplinary report is made.  See Feb. 14 Tr. at 67:19-25 (Castellano, Espinoza).  Espinoza said that he is also involved in Southern New Mexico's program that allows inmates who fit certain criteria -- namely, who do not have recent disciplinary reports or any sexual crime convictions -- to train and care for a dog, which increases the chances of the dog being adopted and gives the inmates responsibility.  See Feb. 14 Tr. at 68:1-69:2 (Castellano, Espinoza).

Espinoza stated that he was on duty at Southern New Mexico on March 7, 2014, working as a compound sergeant monitoring inmates' movements.  See Feb. 14 Tr. at 81:25-82:6 (Castellano, Espinoza).  Espinoza said that this work involves monitoring the different levels, and physically opening and closing gates to ensure inmates from different levels do not mix.  See Feb. 14 Tr. at 84:5-16 (Espinoza, Lowry).  He described that he opened the gates for the ambulance to come into the facility and pick up Molina.  See Feb. 14 Tr. at 81:7-21 (Castellano, Espinoza).  After the ambulance picked up Molina and left, Espinoza secured the gates and went back to the compound to continue monitoring.  See Feb. 14 Tr. at 81:22-82:6 (Castellano, Espinoza).

Espinoza verified that he was also on duty at Southern New Mexico on July 13, 2015, working as a sergeant for Units 3-A and 3-B, which he explained house Level 3 inmates. See Feb. 14 Tr. at 69:3-15 (Castellano, Espinoza). At some point that day, Espinoza was called to get a camera from the captain's office and bring it to the infirmary to take pictures of Romero's injuries from the assault. See Feb. 14 Tr. at 69:16-70:2 (Castellano, Espinoza). Espinoza verified that Romero was an inmate at that time, but that he did not know Romero that well, because he hardly ever worked in the unit where Romero lived. See Feb. 14 Tr. at 70:3-10 (Castellano, Espinoza). Espinoza said that he took pictures of Romero's injuries, explaining that there was an indention on the right side of his skull and his eyes were swollen shut, and that a blood-covered Romero was quiet and seemed as if he was in shock. See Feb. 14 Tr. at 70:11-23 (Castellano, Espinoza). Espinoza said that he did not ask Romero what had happened, because he did not expect an answer given the culture against "snitches." Feb. 14 Tr. at 70:24-71:7 (Castellano, Espinoza). The United States then published to the jury the photographs that Espinoza took of Romero's injuries. See Feb. 14 Tr. at 72:14-16 (Castellano, Court). The photographs showed Romero covered in so much blood it is dripping, his eyes swollen shut, a cut over an eyebrow, a swollen elbow, and the indention on his head. See Feb. 14 Tr. at 72:22-73:18 (Castellano, Espinoza); id. at 74:14-25 (Castellano, Espinoza); id. at 75:13-24 (Castellano, Espinoza); id. at 76:7-25 (Castellano, Espinoza). These photographs reveal the indention on the area near Romero's right temple. See Feb. 14 Tr. at 77:1-18 (Castellano, Espinoza).

Espinoza explained that he was part of the transport team when Romero left the infirmary for Memorial Medical Center, where a helicopter was waiting to immediately take him to the University Medical Center in El Paso. See Feb. 14 Tr. at 78:4-79:10 (Castellano, Espinoza). Espinoza followed in a vehicle and guarded Romero in his room at the El Paso hospital until 11:30

that evening, when other officers relieved him.  See Feb. 14 Tr. at 79:11-80:6 (Castellano, Espinoza); id. at 80:17-20 (Castellano, Espinoza).  The Court allowed Espinoza to step down and excused him from the proceedings.  See Feb. 14 Tr. at 85:18-20 (Court).

z.      **Gerald Archuleta's Testimony.**

The United States next called Archuleta, who is in custody.  See Feb. 14 Tr. at 85:23-24 (Beck); id. at 147:3-5 (Court); id. at 238:21-22 (Lowry, Archuleta).  Archuleta admitted to various convictions, first discussing an involuntary manslaughter charge from 1986 in which he accidentally shot a sawed-off shotgun and hit his cousin in the neck, killing him.  See Feb. 14 Tr. at 101:3-102:22 (Beck, Archuleta).  Archuleta also discussed his 1988 conviction at age nineteen for second-degree murder with aggravating circumstances, explaining that he strangled his wife when he learned that another man had impregnated her.  See Feb. 14 Tr. at 103:12-104:3 (Beck, Archuleta).  In 2002, Archuleta pled no contest for conspiracy to commit second-degree murder, explaining that he was involved in ordering and planning a "hit" on a "greenlit" SNM member, Matthew Cavalier, who had "paperwork" showing he was an informant.  Feb. 14 Tr. at 104:6-105:3 (Beck, Archuleta).  Archuleta described that he deceived Cavalier by telling him that, if he did some work for SNM, the "greenlight" would be called off, and then came up with a plan to get Cavalier in his cell with other SNM members under the guise of smoking cigarettes and doing heroin in the evening, and killing him.  Feb. 14 Tr. at 265:3-14 (Lowry, Archuleta); id. at 266:3-268:24 (Lowry, Archuleta).  The other SNM members strangled Cavalier,  but did not die, so they had to go back and break his neck, and the correctional officers did not notice until the next morning, because they thought Cavalier was sleeping.  See Feb. 14 Tr. at 269:12-270:17 (Lowry, Archuleta).  He explained that his probation for different convictions had been revoked at various times for committing a robbery, failing a urinalysis test, and failing to meet his curfew.  See Feb.

14 Tr. at 102:23-103:3 (Beck, Archuleta); id. at 105:4-106:6 (Beck, Archuleta).  In 2008, Archuleta was convicted of conspiracy to commit assault with a deadly weapon, explaining that this charge stemmed from a confrontation at the methadone clinic in Albuquerque in 2006 in which Archuleta shot another individual after Archuleta learned of a "hit" that other SNM members had placed on him.  Feb. 14 Tr. at 106:7-107:12 (Beck, Archuleta).

Archuleta described joining SNM in the middle of 1988 while housed at PNM and that several SNM members sponsored his joining, including R. Martinez.  See Feb. 14 Tr. at 87:9-88:2 (Beck, Archuleta).  Archuleta said that, after he was brought into SNM, he distributed drugs collected payments for SNM, and eventually stabbed people to "earn his bones" and his SNM membership.  Feb. 14 Tr. at 88:3-17 (Beck, Archuleta).  He explained that three high-ranking SNM members advised him that a man named Chaparro had shorted them on drugs and, because Chaparro lived with Archuleta, they told Archuleta to stab Chaparro in the neck and make an example of him -- so Archuleta did as ordered.  See Feb. 14 Tr. at 88:18-89:17 (Beck, Archuleta). Likewise, when SNM asked Archuleta to "remove" a man named Eddie Lopez, because "he was no good," Archuleta did as ordered.  Feb. 14 Tr. at 90:5-6 (Archuleta).  See id. at 89:20-90:7 (Beck, Archuleta).  Some other SNM-related crimes in which Archuleta participated included an assault at the Southern New Mexico in 1993, assaults on Aryan Brotherhood members, calling a "hit" on Torrez when he refused to step down as "llavero" after he was asked to give up his position, and calling "hits" on SNM members who had informed.  Feb. 14 Tr. at 117:25-122:16 (Beck, Archuleta).  Archuleta verified that two of the assaults on Aryan Brotherhood members were executed so he could be moved from Southern New Mexico back up north to PNM to be closer to his family.  See Feb. 14 Tr. at 246:12-251:22 (Lowry, Archuleta); id. at 253:6-10 (Lowry, Archuleta).  He also verified that, when the "hit" on Torrez was attempted and Torrez was moved

out of the PNM South, Archuleta became SNM's leader in that facility.  Feb. 14 Tr. at 259:2-4 (Lowry, Archuleta).  Archuleta maintained that he did not, however, call a "hit" on Bernalillo County Sheriff White, who had used Archuleta's name and photograph as support for his proposed three-strikes bill because of Archuleta's criminal history.  Feb. 14 Tr. at 123:9-124:2 (Beck, Archuleta).  Archuleta said that he liked that White used him as a "poster boy," stating: "When you're in that lifestyle, you want people to think that you can call a hit on a sheriff."  Feb. 14 Tr. at 124:7-9 (Archuleta).  See id. at 124:3-13 (Beck, Archuleta).

Archuleta described that, when he joined SNM, B. Cordova, Barros, and Phillip Cordova were SNM's top leaders, but this structure changed as they left prison.  See Feb. 14 Tr. at 90:8-18 (Beck, Archuleta).  Archuleta provided that, in 1998, A. Muñoz, who had been SNM's leader, gave Archuleta his spot, so Archuleta became SNM's leader and created the five-member "tabla." Feb. 14 Tr. at 90:19-91:21 (Beck, Archuleta).  He explained that he wanted a group, rather than an individual, to call shots for SNM, and that he appointed Mendez, Zamora, R. Martinez, and A.A. Garcia to the "tabla."  Feb. 14 Tr. at 91:22-92:7 (Beck, Archuleta).  Archuleta described that "llaveros" in each facility led their respective facilities and reported to the "tabla."  Feb. 14 Tr. at 92:12-18 (Beck, Archuleta).  Archuleta said that he was in control of the "tabla" until about 2011, when he was released from prison and he gave his position to A.A. Garcia.  Feb. 14 Tr. at 92:19-22 (Beck, Archuleta); id. at 96:15-17 (Beck, Archuleta).  He said that Baca, however, was SNM's boss and carried more rank than Archuleta, so Baca, when he was in state, had greater authority than the "tabla."  Feb. 14 Tr. at 93:1-16 (Beck, Archuleta).  See id. at 96:21-25 (Beck, Archuleta). Archuleta could not see Baca in the courtroom at first, but, after looking at some photographs, he was able to identify Baca in the courtroom.  See Feb. 14 Tr. at 94:6 (Archuleta); id. at 211:8-212:23 (Beck, Archuleta).

Archuleta explained that each older, high-ranking SNM member -- such as himself, B. Garcia, and Romero -- had his own following, but that loyalty to SNM transcends individualized alignments.  See Feb. 14 Tr. at 94:17-95:6 (Beck, Archuleta).  Archuleta explained some of the gang rules, stating that, before 2006, SNM members were expected to assault a Los Carnales member on sight, but that this  rule changed because of a truce with the Los Carnales gang.  See Feb. 14 Tr. at 95:11-21 (Beck, Archuleta).  Other SNM requirements include, according to Archuleta, not being convicted of sex crimes involving children, not being a rapist, and never having cooperated with law enforcement. See Feb. 14 Tr. at 96:4-8 (Beck, Archuleta).  Archuleta said that membership is for life and that, if a member is released, he is expected to send money to his fellow members and help out SNM.  See Feb. 14 Tr. at 96:9-10 (Beck, Archuleta); id. at 97:20-25 (Beck, Archuleta).  Archuleta explained that SNM members sell drugs while on the streets and send some of the money to incarcerated members, and verified that he has done this work and that C. Garcia gave him drugs on credit to sell.  See Feb. 14 Tr. at 98:1-16 (Beck, Archuleta).  He identified SNM's symbol as a Zia with a "S" in the middle.  Feb. 14 Tr. at 97:3-6 (Beck, Archuleta).  SNM, Archuleta explained, controls prisons through intimidation, violence, and fear.  See Feb. 14 Tr. at 98:17-99:7 (Beck, Archuleta).   SNM also requires that anyone with drugs must share with SNM members, even if they are not themselves SNM members, or SNM will assault them and take the drugs.  See Feb. 14 Tr. at 98:17-99:7 (Beck, Archuleta).  Archuleta said that an SNM member who brings drugs into prison will distribute the drugs to make money, distributing profits among other members.  See Feb. 14 Tr. at 99:8-13 (Beck, Archuleta).  Archuleta admitted to smuggling heroin into prison through contact visits.  See Feb. 14 Tr. at 99:14-100:2 (Beck, Archuleta).  Archuleta admitted that he has seen SNM members take credit for things they did not do, even though  such bragging is supposed to result in consequences.  See Feb. 14 Tr. at 100:3-

11 (Beck, Archuleta).   Once Baca brought certain instances of such bragging to Archuleta's attention, however, Archuleta admitted that it occurs.  See Feb. 14 Tr. at 278:19-282:24 (Lowry, Archuleta).  Archuleta said other SNM members would immediately detect false bragging because, among SNM members, it is common knowledge who did what.  See Feb. 14 Tr. at 100:12-19 (Beck, Archuleta).

Archuleta explained that Romero was "one of [his] big homies," Feb. 14 Tr. at 113:1 (Archuleta), and that they would communicate via Archuleta's wife when Romero was on the street and when Archuleta was incarcerated: Archuleta would give a message to his visiting wife, and she would pass it along, see Feb. 14 Tr. at 113:11-18 (Beck, Archuleta).  On one occasion, they used this method of communication to authorize an SNM "hit" on somebody.  Feb. 14 Tr. at 113:19-21 (Beck, Archuleta).  Archuleta explained that, after he tasked his wife to relay an order for Romero to organize a murder of a witness in Cavalier's murder trial, Archuleta discovered his ex-wife's relationship with Romero, because Romero never followed up with Archuleta on this "hit," and his ex-wife stopped visiting as often.  Feb. 14 Tr. at 215:13-216:15 (Lowry, Archuleta).  Archuleta said he was upset by Romero violating what Archuleta maintained is SNM's "number one rule": "do[] not mess around with another brother's wife."  See Feb. 14 Tr. at 216:20-24 (Lowry, Archuleta).   Archuleta said that he therefore did not take Romero's indiscretion personally, and instead opined that Romero disrespected SNM by violating its rule.  See Feb. 14 Tr. at 217:2-5 (Lowry, Archuleta).  Archuleta explained that he got A. Munoz's approval, as SNM's leader at the time, to order a "hit" on Romero.  Feb. 14 Tr. at 217:11-24 (Lowry, Archuleta).

Archuleta verified that he ordered a "hit" on Romero around 2001, because of Romero's affair with Archuleta's wife.  Feb. 14 Tr. at 113:2-10 (Beck, Archuleta).  Archuleta admitted that this affair turned into a long-term relationship, and his ex-wife and Romero still live together.  See

Feb. 14 Tr. at 213:19-214:3 (Lowry, Archuleta).  Archuleta explained that the Romero "greenlight" remained, because F. Muñoz, who was originally tasked with killing Romero, only shot Romero in the leg.  Feb. 14 Tr. at 113:22-114:16 (Beck, Archuleta).  On cross-examination, Archuleta explained that two people were tasked with killing Romero -- F. Munoz and Shiman Pacheco -- and they sprayed bullets around the house where Romero was, "hitting" Romero in the leg.  Feb. 14 Tr. at 219:14-220:21 (Lowry, Archuleta).  At some point after 2003, while Archuleta was in Tennessee, C. Garcia called Archuleta to tell him that Romero had been assaulted in July, 2015, which Archuleta said surprised him, because he had not ordered anybody to assault Romero at that time.  See Feb. 14 Tr. at 114:17-115:2 (Beck, Archuleta); id. at 295:23-296:9 (Beck, Archuleta).  Further, in 2016, Herrera told Archuleta that Romero had been assaulted.  See Feb. 14 Tr. at 115:12-17 (Beck, Archuleta).  Archuleta stated that Herrera and D. Sanchez are SNM members, and identified D. Sanchez in the courtroom.  See Feb. 14 Tr. at 115:23-116:3 (Beck, Archuleta); id. at 116:8-18 (Beck, Archuleta).

Archuleta explained that, after Romero was shot, B. Garcia told Archuleta that  because the "hit" on Romero was personal, Archuleta needed to leave SNM out of it and drop the "hit."  Feb. 14 Tr. at 222:11-223:14 (Lowry, Archuleta).   Archuleta refused this request and maintained that the "hit" was SNM business, so B. Garcia left the conversation feeling disrespected.  Feb. 14 Tr. at 222:11-223:14 (Lowry, Archuleta).  Archuleta verified that the incident with his wife and Romero divided SNM, and described that, because of this division and Romero's following as a "big homie," B. Garcia ordered Archuleta killed and sent his nephew "Baby Zack" to kill Archuleta at the methadone clinic; this led Archuleta to call a "hit" on Baby Zack.  Feb. 14 Tr. at 122:17-123:8 (Beck, Archuleta); id. at 223:15-23 (Lowry, Archuleta).   This confrontation led to Archuleta's shooting up parking lot and Baby Zack; Archuleta was then again arrested, about

which he was not happy, especially because everyone who had just tried to kill him were SNM members.  See Feb. 14 Tr. at 224:24-225:13 (Lowry, Archuleta).  Archuleta verified that he has not cancelled the "greenlight" that he issued on Romero in 2001.  Feb. 14 Tr. at 214:4-6 (Lowry, Archuleta).  He described that this controversy with Romero formed deep divisions among SNM, with some members on Archuleta's side and others on Romero's side.  See Feb. 14 Tr. at 214:12-21 (Lowry, Archuleta).  Archuleta verified that the divisions wreaked havoc on SNM's internal structure, because it was difficult to determine who trusted whom.  See Feb. 14 Tr. at 226:16-22 (Lowry, Archuleta).  Archuleta described that a group of SNM members who had been stabbed by other SNM members formed a group called "the All Stars."  Feb. 14 Tr. at 117:3-9 (Beck, Archuleta).  He said that he called "hits" on Torrez, who tried to start the All Stars, and on an SNM member named Chaparro, who was also involved.  Feb. 14 Tr. at 117:10-24 (Beck, Archuleta).

        Archuleta verified that the United States charged him in this case and that he was arrested in December, 2015, for the Romero assault, but that he decided to cooperate, because he wanted a better life for himself and his son, and had already begun to distance himself from SNM after his release from prison in 2011 by moving to Tennessee.  See Feb. 14 Tr. at 107:13-108:3 (Beck, Archuleta); id. at 108:18-20 (Beck, Archuleta); id. at 170:7-9 (Beck, Archuleta).  Archuleta admitted, however, that he maintained contact with SNM members after his move and that some sent him Suboxone.  See Feb. 14 Tr. at 108:4-10 (Beck, Archuleta).  He described that Vincent Garduno sent drugs through the mail to Archuleta and sent him an empty package, so Archuleta ordered somebody to talk to Garduno.  See Feb. 14 Tr. at 285:17-286:15 (Lowry, Archuleta).  Archuleta discussed his plea agreement, admitting that he pled guilty to violent crimes in aid of racketeering activity, and conspiracy to commit assault resulting in serious bodily injury, which carries a maximum term of imprisonment of three years.  See Feb. 14 Tr. at 108:25-109:12 (Beck,

Archuleta).  Archuleta explained that, since he started cooperating, he has received $2,399.62 from the federal government in his account.  See Feb. 14 Tr. at 110:3-15 (Beck, Archuleta).  This money, Archuleta verified, was for commissary and to make telephone calls to his family.  See Feb. 14 Tr. at 237:17-22 (Lowry, Archuleta).  Archuleta admitted that the biggest benefit from his plea deal is that the United States decided not to charge him for all SNM activities in which he was involved, which add up to twelve assaults, and instead only charged him with a crime carrying a three-year sentence, on which he has less than a year to complete.  See Feb. 14 Tr. at 238:3-22 (Lowry, Archuleta); id. at 275:16-21 (Lowry, Archuleta).  Archuleta prefers this sentence to the life sentence he would have faced had he been charged in the RICO conspiracy.  See Feb. 14 Tr. at 239:13-17 (Lowry, Archuleta).  He admitted that he lied to the FBI when he initially began cooperating, by downplaying his SNM role, but that he has not been charged for this lie.  See Feb. 14 Tr. at 242:17-243:10 (Lowry, Archuleta).

Archuleta said that, as part of his cooperation, he recorded other inmates.  See Feb. 14 Tr. at 110:16-19 (Beck, Archuleta).  Archuleta described that he was housed next to Herrera at PNM North from about February to April, 2016, and recorded their conversations.  See Feb. 14 Tr. at 170:10-25 (Beck, Archuleta).  With the Court's limiting instruction,[99] the United States played portions of one such recording.  See Feb. 14 Tr. at 171:1-3 (Beck, Archuleta).  Archuleta identified his and Herrera's voices on the recording, and then identified him in the courtroom.  See Feb. 14

---

[99]The Court instructed:

[T]hese are going to be recordings that Mr. Archuleta made of Mr. Herrera talking, so you can use these in your consideration of the charges against Mr. Herrera.  But you can't use them against anyone else.  And so if you're taking notes, there's going to be a number of these played.  You might want to really note these.  These can only be considered as to Mr. Herrera, and not the other three gentlemen.

Feb. 14 Tr. at 171:4-12 (Court).

Tr. at 171:25-172:15 (Beck, Archuleta); id. at 173:10-17 (Beck, Archuleta).  Archuleta explained that they were initially discussing a raid on Herrera's mother, in which law enforcement was looking for Suboxone, which was being snuck into the facility, and that, while Herrera had twenty strips of Suboxone in the house to bring into the facility, they were not discovered.  See Feb. 14 Tr. at 173:20-174:11 (Beck, Archuleta).  The recording also revealed Herrera discussing how law enforcement needed recordings of individuals talking about Molina's case for there to be evidence, and how the cooperators in this case are on psychiatric medication, so they could be attacked on that basis.  See Feb. 14 Tr. at 176:4-21 (Beck, Archuleta).  Herrera discussed the "tap-out" program, in which gang members renounce their affiliation and give information, which Archuleta verified results in automatically being "green lighted and targeted to be killed."  Feb. 14 Tr. at 179:24-180:19 (Beck, Archuleta).  Archuleta explained that, when Herrera said they should all renounce and make a mess, Herrera was suggesting that they pretend to renounce their gang affiliation so they could enter the program and kill the true renouncers.  See Feb. 14 Tr. at 180:20-181:3 (Beck, Archuleta).  In another recording the United States played for the jury, Herrera said that Romero thought Archuleta's "hit" on him had gone away and he was safe, but then he was assaulted.  Feb. 14 Tr. at 181:13-182:8 (Beck, Archuleta).  Archuleta also asked Herrera how the man who assaulted Romero knew of the "greenlight" on him, and Herrera explained that the assaulter was just following orders and did not know why there was a "greenlight" on him.  Feb. 14 Tr. at 183:10-184:1 (Beck, Archuleta).

Archuleta verified that SNM members have assaulted correctional officers, but said that SNM did not have a rule requiring its members to assault a correctional officer who disrespected them.  See Feb. 14 Tr. at 192:22-193:7 (Beck, Archuleta).  The United States then continued playing various recordings, and, in one, Herrera was heard discussing an unsuccessful attempt to

assault an inmate in the shower with a broomstick and how he finally assaulted a non-SNM member who consistently disrespected SNM.  See Feb. 14 Tr. at 194:8-21 (Beck, Archuleta). Herrera was also heard discussing how he brought drugs into various prison facilities, including by having someone hide them inside a picture mailed to incarcerated Herrera.  See Feb. 14 Tr. at 197:11-198:17 (Beck, Archuleta); id. at 199:3-8 (Beck, Archuleta).   In another clip, Herrera verified that Archuleta's ex-wife is giving Romero two Suboxones a week.  See Feb. 14 Tr. at 201:8-16 (Beck, Archuleta).  Archuleta verified that Herrera also discussed Molina's murder with him, explaining that he understood that Herrera was in touch with Baca, as Herrera was a pod leader at Southern New Mexico.  See Feb. 14 Tr. at 203:19-204:11 (Beck, Archuleta).  The United States played a portion of a recording, and Archuleta explained that Herrera was talking about whom he was concerned would cooperate with law enforcement.  See Feb. 14 Tr. at 205:3-12 (Beck, Archuleta).  Herrera is heard expressing concern that Clark and Alonso were "no good," and would talk, because they were indicted but already in the gang tap-out program.  Feb. 14 Tr. at 206:1-14 (Beck, Archuleta).  Archuleta explained that an SNM member in good standing is expected to assault any cooperating or tap-out SNM member he encounters.  See Feb. 14 Tr. at 206:24-207:3 (Beck, Archuleta).   Herrera is heard talking about Red -- identified in other testimony as T. Martinez -- being friends with Molina, and that this friendship is why SNM used Red in Molina's murder, as this relationship would show Red's loyalty to the gang.  See Feb. 14 Tr. at 207:7-208:4 (Beck, Archuleta).  Herrera is also heard discussing J. Montoya, and Archuleta opined that Herrera believed there was "paperwork" on J. Montoya, which is why SNM used J. Montoya in Molina's murder.  Feb. 14 Tr. at 208:5-15 (Beck, Archuleta).  Archuleta admitted that Molina's murder occurred two years before he made these recordings of Herrera.  See Feb. 14 Tr. at 289:2-5 (Bhalla, Archuleta).  He also admitted that he does not speak Spanish and only knows

certain slang terms, but maintained that the Spanish he interpreted from the recordings were slang words of which he was aware. See Feb. 14 Tr. at 291:3-21 (Bhalla, Archuleta).

Archuleta admitted to resetting his discovery tablet to enable its Wi-Fi capability, and using the internet to contact his son and to download pornography, which resulted in the tablet's confiscation. See Feb. 14 Tr. at 111:3-113:1 (Beck, Archuleta). He also admitted to using Suboxone during his incarceration as a cooperator, explaining that Clark and J. Montoya supplied it. See Feb. 14 Tr. at 112:2-12 (Beck, Archuleta). During cross-examination, Archuleta admitted that T. Martinez and R.P. Martinez also supplied him with Suboxone. See Feb. 14 Tr. at 285:2-7 (Lowry, Archuleta). Archuleta maintained, however, that Christmas, 2017, was the last time he used drugs. See Feb. 14 Tr. at 112:13-22 (Beck, Archuleta). The Court excused Archuleta from the proceedings. See Feb. 14 Tr. at 299:8-9 (Court).

### aa.    Frederico Munoz' Testimony.

The United States next called F. Munoz to the stand, who is in custody. See Feb. 14 Tr. at 299:12 (Armijo); Transcript of Jury Trial Volume 14 at 75:4-9 (Armijo, F. Munoz)(taken February 15, 2018)(Court), filed February 22, 2019 (Doc. 2530)("Feb. 15 Tr.").[100] He discussed his various convictions, beginning when he was sixteen years old: receiving or transferring a stolen vehicle, armed robbery, and two first-degree murders -- for which he is serving two life sentences. See Feb. 14 Tr. at 303:15-17 (Armijo, F. Munoz); id. at 305:10-14 (Armijo, F. Munoz); Feb. 15 Tr. at 64:18-20 (Armijo, F. Munoz); id. at 75:4-6 (Armijo, F. Munoz); id. at 79:16-80:24 (Armijo, F.

---

[100]The Court broke for the evening during F. Munoz' direct examination and did not hear testimony the next morning, because a juror, May, was in the emergency room. May did not return, because she was diagnosed with the flu, and the Court advised the other jurors that May would no longer be participating in the trial and, if they feel sick, to get flu medication early. See Transcript of Jury Trial Volume 14 at 60:8-62:2 (taken February 15, 2018)(Court), filed February 22, 2019 (Doc. 2530).

Munoz); id. at 99:3 (F. Munoz).  F. Munoz maintained that he committed these murders for SNM.
See Feb. 15 Tr. at 96:16-20 (F. Munoz).

F. Muñoz described SNM as "the largest gang in the state of New Mexico" doing
"[e]verything from theft to murder," and, although it operates largely within the prison system, it
also has a presence outside the prison.  Feb. 14 Tr. at 300:7-8, 10 (F. Muñoz).  See id. at 300:11-
14 (Armijo, F. Muñoz).  F. Muñoz said that there is no question that SNM is the dominant prison
gang and that Los Carnales is its largest rival, but Los Carnales cannot "do anything" to SNM.
Feb. 14 Tr. at 309:25-310:5 (Armijo, F. Munoz).  F. Muñoz said that he joined SNM at age sixteen,
stating that he stole cars and was sent to the adult prison system as a juvenile, right before he turned
sixteen.  See Feb. 14 Tr. at 300:18-301:4 (Armijo, F. Muñoz).  He described having a way into the
gang, because his girlfriend's uncle was Barros, a prominent senior SNM member at that time,
whom F. Muñoz understood to be directly below the main leader, A. Muñoz.  See Feb. 14 Tr. at
301:5-20 (Armijo, F. Muñoz).  F. Muñoz elaborated that, before he even got to prison, his girlfriend
had told Marty Barros about F. Muñoz, and Barros communicated to F. Munoz, through his
girlfriend, that they would look out for him when he arrived.  See Feb. 14 Tr. at 301:25-302:8
(Armijo, F. Munoz).  F. Muñoz described that he met B. Garcia, one of SNM's main members at
that time, at the facility in Grants in 1996, and that B. Garcia advised him that he needs to be a
"brother" if he is going to be in the system around SNM members, so he joined.  Feb. 14 Tr. at
302:21-21 (F. Munoz).   302:21-21 (F. Munoz).  See id. at 302:12-303:3 (Armijo, F. Munoz).  F.
Munoz explained that he was considered an SNM member, and provided that he understood
SNM's rules to be to obey the commands of the facility's boss without question.  See Feb. 14 Tr.
at 309:6-17 (Armijo, F. Munoz).

F. Munoz described that, at sixteen, he was placed into segregation after  unsuccessfully trying to assault another inmate.  See Feb. 14 Tr. at 308:17-309:5 (Armijo, F. Munoz).  Upon release from segregation, F. Munoz was released to PNM and met Baca there, whom F. Munoz described as SNM's boss directly below A. Munoz.  See Feb. 14 Tr. at 310:12-311:19 (Armijo, F. Munoz).  F. Munoz also met Archuleta while at the PNM, whom F. Munoz described as a senior SNM member, below A. Munoz, Baca, and Marty Barros.  See Feb. 15 Tr. at 67:18-68:11 (Armijo, F. Munoz).  Archuleta, F. Munoz described, introduced F. Munoz to Romero, whom F. Munoz believed had been part of SNM since its genesis.  See Feb. 15 Tr. at 75:14-76:3 (Armijo, F. Munoz).  At some time after meeting Archuleta, Archuleta told SNM members to leave David Padilla alone, whom F. Munoz believed was a Los Carnales member despite Padilla's telling Archuleta otherwise; F. Munoz assaulted Padilla anyway.  See Feb. 15 Tr. at 105:17-107:13 (Jacks, F. Munoz).  F. Munoz said he had a personal motive for this assault, because he did not want to take the risk that Padilla was lying about renouncing his Los Carnales membership and assaulting F. Munoz first, and because, if he was successful, the assault would only enhance F. Munoz' reputation.  See Feb. 15 Tr. at 107:14-108:24.  F. Munoz said that, in 1997, Baca and his subordinates at the time -- R. Martinez, Shaun Ural, and F. Sanchez -- assigned F. Munoz to the violation crew, which F. Munoz described as the group which beat up those SNM members who violated the leadership's rules.  See Feb. 14 Tr. at 312:8-313:1 (Armijo, F. Munoz); id.at 313:18-20 (Armijo, F. Munoz).  After a limiting instruction,[101] F. Munoz provided that R. Martinez told

---

[101]The Court instructed:

> I'm not exactly sure what the statement is going to be, but whatever it is, you can't consider it for the truth of the matter.  You can only consider it for the impact that it had on Mr. Munoz, and maybe explain why he did what he did.  But you can't consider these statements that you're about to hear for the truth of the matter.

him that he and another guy "were going to be violating some brothers for breaking rules."  Feb. 14 Tr. at 317:21-22 (F. Munoz).  He described doing work for the violation crew on two occasions, including for assaulting two men in a blind spot in the facility, because they failed to attend a meeting they were supposed to attend.  See Feb. 14 Tr. at 313:23-314:13 (Armijo, F. Munoz).  F. Munoz said that Baca and other SNM leaders designed this system where members who committed minor infractions would just get beaten and addressed, because the infraction was not severe enough to warrant death.  See Feb. 14 Tr. at 314:14-23 (Armijo, F. Munoz).

F. Munoz stated that he was convicted of armed robbery and released in 2001.  See Feb. 15 Tr. at 70:19-22 (Armijo, F. Munoz); id. at 73:6-9 (Armijo, F. Munoz).  Archuleta knew that F. Munoz was on the streets, so he told F. Munoz to shoot Romero, because Romero had a romantic relationship with Archuleta's wife.  F. Munoz verified that SNM members are not permitted to enter into romantic relationships with the current or former partners of other SNM members, because it creates "dysfunction" and "distrust" among the members.  Feb. 15 Tr. at 76:9-77:6 (Armijo, F. Munoz).  F. Munoz described his belief that this "hit" was a lawful order and therefore began looking for Romero.  Feb. 15 Tr. at 77:7-12 (Armijo, F. Munoz).  F. Munoz said that, in March, 2003, he and Pacheco drove a rental car to the house where F. Munoz was told Romero would be.  See Feb. 15 Tr. at 77:13-78:13 (Armijo, F. Munoz).  Romero was in the driveway of that house, talking to someone in a vehicle.  See Feb. 15 Tr. at 78:2-4 (F. Munoz).  F. Munoz called Romero's name.  See Feb. 15 Tr. at 78:2 (F. Munoz).  F. Munoz described that Pacheco, however, became "antsy" and started yelling at F. Munoz to shoot Romero, so F. Munoz fired the shot before he was

Feb. 14 Tr. at 317:9-15 (Court).

ready.  See Feb. 15 Tr. at 78:13-15 (Armijo, F. Munoz).  Instead of shooting Romero in the head as planned, F. Munoz shot Romero in the torso and leg, and Romero survived the attack.  See Feb. 15 Tr. at 78:12-23 (Armijo, F. Munoz).  About a month later, F. Munoz shot a Los Carnales member who walked into the barbershop where F. Munoz was.  See Feb. 15 Tr. at 73:18-74:3 (Armijo, F. Munoz); id. at 77:17-18 (F. Munoz).  F. Munoz believed that SNM was in a war requiring rivals be killed, and so, when the man announced his membership in Los Carnales, F. Munoz shot and killed him in the barbershop.  See Feb. 15 Tr. at 74:9-75:3 (Armijo, F. Munoz).  This shooting resulted in a murder conviction and life sentence for F. Munoz.  See Feb. 15 Tr. at 79:16-23 (Armijo, F. Munoz).

F. Munoz said that he was no longer invested in SNM when he returned to prison and instead he sought the life of normalcy that he had on the streets.  See Feb. 15 Tr. at 80:25-81:12 (Armijo, F. Munoz).  But because F. Munoz did not know how to leave the gang, he continued to be an SNM member.  See Feb. 15 Tr. at 80:25-81:12 (Armijo, F. Munoz).  F. Munoz, however, lost respect and love for his boss, Archuleta, when he discovered that Archuleta had been simultaneously trying to negotiate a peace treaty with the Los Carnales gang and telling F. Munoz to kill them, which F. Munoz felt made his work meaningless.  See Feb. 15 Tr. at 81:13-82:7 (F. Munoz, Armijo).  Then, in 2007 or early 2008, F. Munoz agreed to be in a documentary, and was recorded saying he no longer wanted to be part of SNM.  See Feb. 15 Tr. at 83:25-18 (F. Munoz, Armijo).  These statements put him in danger, so the NM Corrections Department changed his classification.  He was, however, still living with those he had criticized, albeit in segregation.  See Feb. 15 Tr. at 83:25-18 (F. Munoz, Armijo).  F. Munoz said that, after this segregation, he spoke with some federal government officials in 2008.  See Feb. 15 Tr. at 84:19--85:5 (Armijo, F. Munoz).  He admitted that he used drugs, mainly marijuana and heroin,

throughout his SNM career, and that SNM is involved in drug trafficking. See Feb. 15 Tr. at 96:1-9 (Armijo, F. Munoz). He also admitted that he felt he was the driving force behind violence within SNM between 1998 and 2007, because he advocated for "hits" on feuding members. Feb. 15 Tr. at 104:10-105:3 (Jacks, F. Munoz).

F. Munoz said that he knew that the United States was working on taking down SNM before the first federal indictment came down in December, 2015, and that he was charged, in a RICO conspiracy indictment separate from this case, with different defendants, in April, 2016. See Feb. 15 Tr. at 85:6-86:16 (Armijo, F. Munoz). F. Munoz admitted that he has three SNM tattoos. See Feb. 15 Tr. at 91:17-92:1 (Armijo, F. Munoz). F. Munoz pled guilty to an "information," which exposed him to a greater sentence than on what he had been indicted. See Feb. 15 Tr. at 90:9-14 (Armijo, F. Munoz). He pled guilty to a racketeering conspiracy and a greater charge, for which he could receive up to life imprisonment. See Feb. 15 Tr. at 90:19-91:1 (Armijo, F. Munoz). F. Munoz verified that the federal charges meant he was immediately taken into federal custody. See Feb. 15 Tr. at 98:11-25 (Duncan, F. Munoz). He admitted discussing with his mother a plan for the United States to tell the Court that F. Munoz should be released once his second life sentence is complete, and for the New Mexico Governor commute his sentence, so he could be released within a year and a half. See Feb. 15 Tr. at 99:22-100:21 (Duncan, F. Munoz). He never, however, discussed with the prosecution his idea of requesting clemency. See Feb. 15 Tr. at 112:5-8 (Armijo, F. Munoz). F. Munoz stated that the earliest he could parole on his second state life sentence would be in 2037, and noted that this parole is not mandatory, and that a parole board would decide whether to release him. See Feb. 15 Tr. at 112:12-113:1 (Armijo, F. Munoz).

F. Munoz believed that, since his cooperation, he has received $250.00 quarterly in his inmate account from the United States. See Feb. 15 Tr. at 93:21-94:9 (Armijo, F. Munoz). He

admitted that he had a discovery tablet for his case and, while housed at Sandoval County, reset the tablet, which erased the discovery but allowed him to access the internet. See Feb. 15 Tr. at 94:10-95:8 (Armijo, F. Munoz). F. Munoz said that he suspected that resetting the tablet was forbidden, but that he did so anyway to watch pornography, download games, and obtain music files. See Feb. 15 Tr. at 95:9-22 (Armijo, F. Munoz). He maintained that he has not, however, used any drugs since renouncing the gang. See Feb. 15 Tr. at 96:9-15 (F. Munoz, Armijo).

ab.    **Robert Martinez' Testimony.**

The United States' next called R. Martinez, who appeared in custody. See Feb. 15 Tr. at 115:4-5 (Armijo); id. at 124:6-14 (Armijo, R. Martinez). R. Martinez walked through his convictions, beginning at age eighteen in 1983 for a robbery. See Feb. 15 Tr. at 119:2-9 (Armijo, R. Martinez). Three years later, he was convicted for second-degree murder, and in 1994, he was convicted of battery with a deadly weapon, possession of a deadly weapon by a prisoner, and conspiracy. See Feb. 15 Tr. at 119:16-19 (Armijo, R. Martinez); id. at 120:3-11 (Armijo, R. Martinez); id. at 120:23-121:11 (Armijo, R. Martinez). In 2002, R. Martinez was convicted of aggravated battery and conspiracy to commit aggravated battery, and, six years later, he was convicted of battery on a peace officer. See Feb. 15 Tr. at 122:2-23 (Armijo, R. Martinez); id. at 123:18-22 (Armijo, R. Martinez). R. Martinez calculated that he has about thirty-five more years to serve on his state sentences. See Feb. 15 Tr. at 125:4-127:7 (Armijo, R. Martinez). He stated that he has been continuously incarcerated since the murder he committed at age twenty-two, and his other felony convictions are from conduct within the prison system. See Feb. 15 Tr. at 128:1-13 (Armijo, R. Martinez).

R. Martinez verified that he was an SNM member, which he described as a prison gang that formed after the 1980 riot and is "supposed to be a family," but is really "a bunch of killers."

Feb. 15 Tr. at 116:4-5 (R. Martinez), see id. at 115:22-116:4 (Armijo, R. Martinez).  He testified

that he has renounced the gang.  See Feb. 15 Tr. at 147:2-3 (R. Martinez).  He stated that he joined

SNM in 1988, but did not think somebody had brought him in, explaining that he had always

associated with SNM members in prison before he knew what SNM was.  See Feb. 15 Tr. at

116:16-25 (Armijo, R. Martinez).  R. Martinez said that SNM would always have a shot-caller in

each facility, and that the gang's main rules are no "snitching," and no child molestation or sex

crimes.  Feb. 15 Tr. at 128:18-129:16 (Armijo, R. Martinez).  He verified that the penalty for

"snitching" is death, and that "paperwork," which could be statements, recordings, or transcripts,

shows that someone "snitched."  Feb. 15 Tr. at 129:14-18 (Armijo, R. Martinez); id. at 145:1-17

(Armijo, R. Martinez).  R. Martinez said that drugs have always been part of SNM's culture.  See

Feb. 15 Tr. at 144:3-7 (Armijo, R. Martinez).  R. Martinez said that SNM has a "tabla," which

consists of three to five members who "call the shots" and an overall SNM leader.  Feb. 15 Tr. at

130:8-21 (Armijo, R. Martinez).  He said that, when he joined, Barros and Felipe Cordova were

SNM's overall leaders.  See Feb. 15 Tr. at 130:22-25 (Armijo, R. Martinez).

R. Martinez said that he was on the "tabla" "throughout the '90s into the 2000s."  Feb. 15

Tr. at 131:17-18 (R. Martinez).  See id. at 131:12-15 (Armijo, R. Martinez).  He said that, over the

years, other people on the "tabla" included Zamora, Baca, A.A. Garcia, and Fernie Hernandez.

Feb. 15 Tr. at 131:19-24 (Armijo, R. Martinez).  R. Martinez said that there were not necessarily

different "tablas" at different prison facilities, and that a "tabla" member's ranking relative to a

shot-caller was dependent on the shot-caller's performance.  Feb. 15 Tr. at 131:25-132:15 (Armijo,

R. Martinez).  R. Martinez said that B. Garcia was a shot-caller, even though he was never on a

"tabla."  Feb. 15 Tr. at 132:19-133:25 (Armijo, R. Martinez).  R. Martinez identified Baca as

SNM's leader.  See Feb. 15 Tr. at 133:22-23 (Armijo, R. Martinez).  R. Martinez said that the

"tabla" was created while Baca was sent out of state in the 1990s.  Feb. 15 Tr. at 134:17-24 (Armijo, R. Martinez); id. at 137:14-24 (Armijo, R. Martinez).  R. Martinez said that SNM would not need a "tabla" when Baca returned to the NM prison system because he would be the only shot-caller.  Feb. 15 Tr. at 138:9-16 (Armijo, R. Martinez).

R. Martinez said that the convictions he picked up in 2002 stemmed from an assault in which he participated at Southern New Mexico for SNM.  See Feb. 15 Tr. at 140:7-12 (Armijo, R. Martinez).  He explained that one day he was in the recreation yard and some SNM members noted that a man in the yard had killed a fellow member in 1991, so R. Martinez picked up a rock, after he could not find a shank, and busted open the man's head, but he survived.  See Feb. 15 Tr. at 140:16-142:15 (Armijo, R. Martinez).  R. Martinez described that his conviction for assault on a peace officer stemmed from his attempt to assault two correctional officers in the early 2000s, when, at PNM North, people were slipping out of their handcuffs to assault rivals.  See Feb. 15 Tr. at 142:16-143:7 (Armijo R. Martinez).  He said that it was common for SNM members to assault correctional officers at that time if the correctional officers were disrespecting them, because letting such disrespect makes SNM members look weak.  See Feb. 15 Tr. at 143:8-18 (Armijo, R. Martinez).

R. Martinez described that he had issues with SNM member Sosoya, because, sometime between 2005 and 2007, while housed in PNM North, Herrera told R. Martinez, underneath the bunk and through the wall as they were neighbors, to be careful if Sosoya gives him anything, because Sosoya was saying that SNM would be better without R. Martinez, A.A. Garcia, and Archuleta.  See Feb. 15 Tr. at 146:18-24 (Armijo, R. Martinez); id. at 147:5-23 (Armijo, R. Martinez); id. at 148:19-149:2 (Armijo, R. Martinez).  R. Martinez took this warning to mean that Sosoya was trying to kill him, so he put a "greenlight" on Sosoya.  Feb. 15 Tr. at 147:24-148:1

(R. Martinez).  At PNM South in 2011, R. Martinez acted on this "greenlight" when Sosoya was moved to the cell next to his cell.  Feb. 15 Tr. at 149:20-24 (Armijo, R. Martinez).  See id. at 151:3-6 (R. Martinez).  R. Martinez described that one day an argument started in the recreation yard between those from top tier and those from bottom, and M. Rodriguez took that opportunity to hit Sosoya from behind, so R. Martinez hit Sosoya's side.  See Feb. 15 Tr. at 153:15-154:17 (Armijo, R. Martinez).  R. Martinez said that although he told the other SNM members not to help him assault Sosoya, M. Rodriguez.  See Feb. 15 Tr. at 211:18-212:1 (Villa, R. Martinez).  R. Martinez maintained that their only plan was to move onto Sosoya while they were in the yard together.  See Feb. 15 Tr. at 212:8-17 (Villa, R. Martinez).  R. Martinez said that he dropped his shank as he went to assault Sosoya, so he was not able to stab Sosoya, but continued attacking Sosoya until R. Martinez was hit in the head by a gas grenade.  See Feb. 15 Tr. at 155:6-17 (Armijo, R. Martinez).  R. Martinez described that the correctional officers were within seconds of using lethal force to stop the fight, and he spent two days in the hospital afterwards.  See Feb. 15 Tr. at 155:18-25 (Armijo, R. Martinez).  R. Martinez said that M. Rodriguez has never been a shot-caller, but is one of the best soldiers SNM had, because he was tough and was not afraid of violence.  See Feb. 15 Tr. at 215:5-10 (Villa, R. Martinez); id. at 217:3-25 (Villa, R. Martinez).  R. Martinez admitted, however, that he may view M. Rodriguez differently from other SNM members, because of his sex offense.  See Feb. 15 Tr. at 218:1-4 (Villa, R. Martinez).

R. Martinez described how, in 2013, while at PNM South, he heard information about "paperwork" on Molina, and in a conversation with Urquizo, M. Rodriguez, and Varela, decided that if any of them went to Southern New Mexico, they would kill Molina.  Feb. 15 Tr. at 157:4-9 (Armijo, R. Martinez); id. at 158:4-159:13 (Armijo, R. Martinez); id. at 160:9-15 (Armijo, R. Martinez).  He recalled that M. Rodriguez went to Southern New Mexico first, before the

holidays in 2013, and then Urquizo and Varela arrived right after the holidays.  See Feb. 15 Tr. at 159:19-160:8 (Armijo, R. Martinez).  R. Martinez verified that the "hit" on Molina had been outstanding for at least a year before he was killed.  Feb. 15 Tr. at 160:19-23 (Armijo, R. Martinez). He described a rumor that Clark, Rubio, and "Little Cruces" had received Molina's "paperwork" the year before but did not act on it.  Feb. 15 Tr. at 210:20-211:4 (Villa, R. Martinez).  R. Martinez explained that SNM requires "paperwork" before carrying out a "hit."  Feb. 15 Tr. at 223:20-22 (Armijo, R. Martinez).  R. Martinez said that he was at Southern New Mexico when Molina was killed, but after the murder, Marcantel sent him back to PNM North.  See Feb. 15 Tr. at 160:24-161:9 (Armijo, R. Martinez).  He explained that J. Montoya had been in the gang for thirteen or fifteen years before he "earned his bones" by killing Molina.  Feb. 15 Tr. at 222:6-22 (Armijo, R. Martinez).

R. Martinez stated that he expected to be at PNM North for three to six months, so he was unhappy that he was there for over a year.  See Feb. 15 Tr. at 162:9-20 (Armijo, R. Martinez).  He said that because Marcantel moved D. Sanchez, Baca, and Varela out of state, and because Marcantel "locked up" SNM members at PNM North in 2015, R. Martinez and R.P. Martinez, another SNM leader, decided to put a "hit" on Marcantel.  Feb. 15 Tr. at 162:24-164:3 (Armijo, R. Martinez).  Accordingly, R. Martinez wrote letters to some SNM members on the streets, advising them that "it was time for them to step up."  Feb. 15 Tr. at 164:4-13 (Armijo, R. Martinez). He said that the Marcantel "hit" was an idea he and his neighbors R.P. Martinez and Duran developed, which was inspired by the hit Baca had placed on Santistevan for his comments about Baca.  Feb. 15 Tr. at 166:7-167:23 (Armijo, R. Martinez).  R. Martinez learned of the "hit" on Santistevan through Duran.  Feb. 15 Tr. at 185:1-6 (Duncan, R. Martinez).  R. Martinez read to the jury one letter he wrote to SNM member Ruben Rojos, who was on the streets, that if he did

not kill Marcantel and Santistevan, and if SNM cannot find him, SNM members will kill his family.  See Feb. 15 Tr. at 169:6-170:10 (Armijo, R. Martinez).  He wrote a similar letter to Sammy Griego, another SNM member on the streets, with the same threat, ordering that Archuleta step up to help with these "hits."  Feb. 15 Tr. at 170:14-171:14 (Armijo, R. Martinez).  R. Martinez said that this "hit" was an opportunity for Griego, who had had disagreements with many SNM members, to redeem himself in the gang.  Feb. 15 Tr. at 171:22-172:6 (Armijo, R. Martinez).  R. Martinez said that, after he wrote these two letters, he gave them to Duran to send out through the legal mail, which was off-limits to correctional officers.  See Feb. 15 Tr. at 173:11-23 (Armijo, R. Martinez).

R. Martinez said that he and R.P. Martinez wanted to be sent out of state.  See Feb. 15 Tr. at 189:1-191:8 (Duncan, R. Martinez).  Baca played a recording Duran made of a conversation between Duran, R.P. Martinez and R. Martinez, in which Duran, who was housed between R. Martinez and R.P. Martinez, relayed what they said to each other.  See Feb. 15 Tr. at 191:12-15 (Duncan, R. Martinez); id. at 193:3-25 (Duncan, R. Martinez).  R. Martinez said that he was not aware that he was being recorded and, had he known Duran was working with law enforcement, he would have tried to kill him.  See Feb. 15 Tr. at 218:18-219:4 (Armijo, R. Martinez).  R. Martinez explained that Duran was not a leader, and that his role in SNM was to get drugs.  See Feb. 15 Tr. at 219:5-10 (Armijo, R. Martinez); id. at 219:22-25 (Armijo, R. Martinez).  The recording showed that R.P. Martinez did not want the administration to learn of the "hits," and that R. Martinez wanted to let the administration know so that they would be shipped out of state.  Feb. 15 Tr. at 195:11-196:25 (Duncan, R. Martinez).  R. Martinez verified that he had assaulted someone in 1996 in order to move facilities.  See Feb. 15 Tr. at 199:9-201:8 (Duncan, R. Martinez).

R. Martinez said that sometime in 2015, however, he had a change of heart, because he was tired of the gang life and SNM's in-fighting. See Feb. 15 Tr. at 174:9-24 (Armijo, R. Martinez). Accordingly, he renounced his SNM membership in May, 2015, by telling a correctional officer that he wanted to talk to Wendy Perez, the PNM North Unit manager. He met with W. Perez, told her that he no longer wanted to be an SNM member, and gave her the shank that he had kept in his rectum. See Feb. 15 Tr. at 175:16-176:4 (Armijo, R. Martinez). He also told an STIU officer that he wanted to see Marcantel dead, so they would send R. Martinez out of state. See Feb. 15 Tr. at 190:7-17 (R. Martinez). He subsequently spoke with STIU and the FBI. See Feb. 15 Tr. at 179:12-180:11 (R. Martinez, Armijo).

R. Martinez verified that he was indicted in this case and in a separate case, with M. Rodriguez, for the Sosoya incident. See Feb. 15 Tr. at 180:12-17 (Armijo, R. Martinez). He stated that he pled guilty in this case for conspiracy to murder Marcantel and Santistevan, and pled guilty in the other case to conspiracy to murder, assault resulting in serious bodily injury, and assault with a dangerous weapon. See Feb. 15 Tr. at 181:8-182:2 (Armijo, R. Martinez). He said that he has not reached an agreement with the United States as to what his federal sentence should be, indicating that his state time will exceed his federal time, and that he will be in his late eighties by the time he is released from prison. See Feb. 15 Tr. at 182:12-183:1 (Armijo, R. Martinez). R. Martinez verified that he receives money in his inmate account quarterly for being a confidential human source with the FBI, and that he still has his discovery tablet and has not reset it to access the internet. See Feb. 15 Tr. at 183:2-11 (Armijo, R. Martinez); id. at 184:1-6 (Armijo, R. Martinez). The Court excused R. Martinez from the proceedings. See Feb. 15 Tr. at 224:24-25 (Court).

### ac.  **R. P. Martinez' Testimony.**

The United States next called R.P. Martinez, who is in custody.  See Feb. 15 Tr. at 225:4-5 (Castellano); Transcript of Jury Trial Volume 15 at 50:21-23 (taken February 16, 2018)(Castellano, R.P. Martinez), filed February 22, 2019 (Doc. 2531)("Feb. 16 Tr.").[102] R.P. Martinez listed his convictions: (i) a 1993 conviction for unlawful use of a motor vehicle, for which he was not sentenced to prison,  see Feb. 16 Tr. at 20:19-21:1 (Castellano, R.P. Martinez), (ii) a 1994 conviction for aggravated assault with a firearm enhancement, for which he received a three-year sentence, see Feb. 16 Tr. at 21:5-17 (Castellano, R.P. Martinez), (iii) a 1997 arson conviction, see Feb. 16 Tr. at 62:8-63:9 (Castellano, R.P. Martinez), and (iv) a 2001 first-degree murder conviction.  See Feb. 16 Tr. at 35:22-36:4 (R.P. Martinez, Castellano); id. at 51:17 (Castellano, R.P. Martinez); id. at 53:5-7 (Castellano, R.P. Martinez).  The 2001 murder arose from R.P. Martinez' shooting a police officer with whom he was romantically involved when she tried to reach for his gun during what he thought was a set-up  See Feb. 16 Tr. at 44:7-16 (Castellano, R.P. Martinez); id. at 46:11-47:10 (Castellano, R.P. Martinez); id. at 47:24-49:11 (Castellano, R.P. Martinez); id. at 153:11-16 (Lowry, R.P. Martinez).  In 2002, R.P. Martinez was convicted of second-degree murder for killing Cavalier.  See Feb. 16 Tr. at 53:8-18 (Castellano,

---

[102]Before R.P. Martinez started testifying on February 16, 2018, and before the jury entered the courtroom for the morning, the Court shared with the parties that Becker had received a Facebook post from an old friend the prior night, of a man wearing a yellow hoodie with a Zia symbol on the hoodie, which made her uncomfortable, because Becker had not spoken to this friend in years.  See Feb. 16 Tr. at 5:15-6:2 (Clerk, Court).  The parties requested the name of the friend to give to a U.S. Marshal officer to investigate.  See Feb. 16 Tr. at 6:6-12 (Jacks, Clerk, Court).

After the lunch break, before the jury returned to the courtroom, the Court advised the parties that his courtroom deputy clerk advised Becker not to speak with the other jurors about the Facebook post and that U.S. Marshal Deputy Mickendrow has a photograph of the post, but needs to get permission before he can release it.  See Feb. 16 Tr. at 159:5-15 (Court).  Villa relayed that he had spoken with Mickendrow, who said the investigation was closed and the post did not appear to be anything suspect.  See Feb. 16 Tr. at 159:18-23 (Villa).

R.P. Martinez).  R.P. Martinez said that Cavalier, who had spoken with law enforcement about a 1996 murder and was therefore marked to be killed, entered the pod where R.P. Martinez, Archuleta and four other SNM members were housed.  See Feb. 16 Tr. at 53:22-55:24 (Castellano, R.P. Martinez).  R.P. Martinez testified that, at a meeting with Archuleta, Samuel Silva, and Francisco Villalobos, they decided that, because there was "paperwork" on Cavalier, they had to kill him pursuant to SNM gang rules or face retaliation themselves.  Feb. 16 Tr. at 55:3-17 (Castellano, R.P. Martinez).  See id. at 55:25-56:5 (Castellano, R.P. Martinez); id. at 56:18-24 (Castellano, R.P. Martinez).  R.P. Martinez admitted that, although Cavalier had saved his life, he tried to make Cavalier feel safe despite the plan to kill him.  See Feb. 16 Tr. at 164:20-165:18 (Lowry, R.P. Martinez).  R.P. Martinez said that, after the "chow count," he strangled Cavalier as S. Silva held him and as Villalobos held his feet.  Feb. 16 Tr. at 56:25-57:23 (Castellano, R.P. Martinez).  R.P. Martinez verified that he pled guilty in this case, that it was a generous plea offer, and that his sentence runs concurrently with his life sentence for the 1998 murder.  See Feb. 16 Tr. at 168:2-17 (Lowry, R.P. Martinez).  In 2013, R.P. Martinez explained, he was convicted for possession of a deadly weapon or explosive by a prisoner, because of the shank found in his cell, and was consequently moved from Southern New Mexico to PNM North.  See Feb. 16 Tr. at 84:20-85:7 (Castellano, R.P. Martinez).

R.P. Martinez said that he joined SNM in 1995.  See Feb. 16 Tr. at 19:8-12 (Castellano, R.P. Martinez).  R.P. Martinez described the circumstances of his entry into SNM, explaining that, while serving his aggravated assault sentence at the PNM, a Los Carnales member named Mike Dallas confronted R.P. Martinez for allegedly beating Dallas' brother.  See Feb. 16 Tr. at 22:4-19 (Castellano, R.P. Martinez).  Two SNM members, Chaparro and Cavalier, provided R.P. Martinez with two shanks for the fight even though he had not yet joined the gang.  See Feb. 16 Tr. at 23:19-

24:2 (Castellano, R.P. Martinez). Dallas, however, made a commotion in the yard at the outset of the fight, so correctional officers tackled him and locked him up. See Feb. 16 Tr. at 24:3-9 (Castellano, R.P. Martinez). R.P. Martinez said Chaparro was mad because of this incident and stabbed two Los Carnales members, breaking the peace treaty between SNM and Los Carnales. See Feb. 16 Tr. at 24:18-25:2 (Castellano, R.P. Martinez). Barros, SNM's leader at the time, agreed that R.P. Martinez should be killed for disrespecting a Los Carnales member. See Feb. 16 Tr. at 24:10-25:18 (Castellano, R.P. Martinez). R.P. Martinez explained that Cavalier was supposed to kill him, but told him about the "hit" and recommended that R.P. Martinez enter protective custody. Feb. 16 Tr. at 25:19-26:16 (Castellano, R.P. Martinez). R.P. Martinez did not want to enter protective custody, however, and R. Clark called out R.P. Martinez and asked if he would kill the Los Carnales leader and join SNM, explaining that he liked R.P. Martinez' refusal to enter protective custody and did not agree with the peace treaty. See Feb. 16 Tr. at 26:17-28:14 (Castellano, R.P. Martinez). R.P. Martinez agreed, but before R. Clark gave the signal for the "hit," R.P. Martinez was attacked. Feb. 16 Tr. at 30:17-32:6 (Castellano, R.P. Martinez). R.P. Martinez said that SNM members in the pod chased off his attackers, and, about two or three weeks later, A.A. Garcia stabbed the Los Carnales leader. See Feb. 16 Tr. at 32:16-33:16 (Castellano, R.P. Martinez). R.P. Martinez said that he did not admit his SNM membership to correctional officers or others, because he was told to keep it quiet. See Feb. 16 Tr. at 34:17-24 (Castellano, R.P. Martinez). He said that the older SNM members would teach him about expected conduct, such as staying quiet and doing what you are supposed to do without discussion. See Feb. 16 Tr. at 24:25-25:12 (Castellano, R.P. Martinez). He also stated that SNM prohibits "snitching" and requires "hits" on those who do. Feb. 16 Tr. at 56:9-17 (Castellano, R.P. Martinez).

In 1996, R.P. Martinez met A. Munoz, and A. Munoz and Archuleta mentored R.P. Martinez over the next two years.  See Feb. 16 Tr. at 41:8-18 (Castellano, R.P. Martinez). R.P. Martinez looked up to and respected A. Munoz, because he was the boss.  See Feb. 16 Tr. at 42:1-11 (Castellano, R.P. Martinez).  R.P. Martinez said that he was willing to kill for A. Munoz in those days.  See Feb. 16 Tr. at 42:22-43:1 (Castellano, R.P. Martinez).  He said that, while he was on the streets before picking up the murder charge, he gave A. Munoz' wife drugs and money to show his continued loyalty to A. Munoz.  See Feb. 16 Tr. at 43:13-44:6 (Castellano, R.P. Martinez).

R.P. Martinez said that he "earned his bones" in 1998 by stabbing a Supreme White Power member, who had just "hit" an SNM member.  Feb. 16 Tr. at 35:13-36:17 (Castellano, R.P. Martinez); id. at 41:19-25 (Castellano, R.P. Martinez).  The victim survived; however, R.P. Martinez still "earned his bones" and was never prosecuted for it.  Feb. 16 Tr. at 40:14-24 (Castellano, R.P. Martinez).  R.P. Martinez explained that, two days before this assault, he got his SNM tattoo.  See Feb. 16 Tr. at 40:25-41:2 (Castellano, R.P. Martinez).  R.P. Martinez described his tattoo of a Zia with an "SNM" inside as a "plaquiaso," meaning it is a symbol representing one's membership in SNM.  Feb. 16 Tr. at 18:23-19:7 (Castellano, R.P. Martinez).

R.P. Martinez explained that he waited to take the plea for Cavalier's murder to see the discovery.  See Feb. 16 Tr. at 169:4-6 (Lowry, R.P. Martinez).  When he saw the discovery, he learned that Archuleta had "snitched" on him against SNM's rules, but R.P. Martinez never had the opportunity to kill Archuleta for this "snitching."  Feb. 16 Tr. at 169:7-171:5 (Lowry, R.P. Martinez).  He stated that he probably would have tried to kill Archuleta had they been in the same facility.  See Feb. 16 Tr. at 228:8-15 (Castellano, R.P. Martinez).  He said that Archuleta tried to get Romero to kill someone else who had "snitched" in Cavalier's case, but Romero did

not execute the "hit" and slept with Archuleta's wife. Feb. 16 Tr. at 171:9-172:6 (Lowry, R.P. Martinez). This action, R.P. Martinez explained, politically divided SNM into those members who followed Archuleta and did not know he had "snitched," and those members who followed Romero. Feb. 16 Tr. at 172:10-16 (Lowry, R.P. Martinez). R.P. Martinez maintained that, despite this division, both sides of SNM came together to handle external threats. See Feb. 16 Tr. at 172:24-173:19 (Lowry, R.P. Martinez). He verified that F. Munoz tried to shoot Romero, but did not believe anyone was killed over this division. See Feb. 16 Tr. at 174:1-12 (Lowry, R.P. Martinez).

R.P. Martinez said that, while he was housed at Southern New Mexico in 2012 and 2013, he met Molina, with whom he had no problems. See Feb. 16 Tr. at 66:1-9 (Castellano, R.P. Martinez). He described being quickly sent to PNM North from Southern New Mexico, because correctional officers found a shank in his cell. See Feb. 16 Tr. at 66:10-17 (Castellano, R.P. Martinez). R.P. Martinez explained that, around 2013 or 2014, while at PNM North, he received "paperwork" on Molina through the legal mail, which appeared to be "a bench warrant or something," and consisted of two or three pages, mixed in with other papers. Feb. 16 Tr. at 63:8 (R.P. Martinez). See id. at 63:1-19 (Castellano, R.P. Martinez). He did not know who mailed it to him. See Feb. 16 Tr. at 214:4-7 (Jacks, R.P. Martinez). He said that he did not think anything of the "paperwork" until he recognized the name and saw things underlined, but characterized the "paperwork" as being "real brief" and not "a big old long thing." Feb. 16 Tr. at 64:4-5 (R.P. Martinez). See id. at 63:20-25 (Castellano, R.P. Martinez). R.P. Martinez described that he stashed the "paperwork" in his own legal paperwork, because he had learned that he could be tied to a cooperator's death if that cooperator's information was found in his cell, and that the correctional officers cannot read legal paperwork -- they can only skim through it. Feb. 16 Tr. at

64:11-65:11 (Castellano, R.P. Martinez).  He maintained that he did not do anything else with the "paperwork" until Molina was killed, when he gave it to "Slim," a Sureño who lived next to R.P. Martinez, to hold during the shakedown.  Feb. 16 Tr. at 65:22-25 (Castellano, R.P. Martinez).  See id. at 72:17-25 (Castellano, R.P. Martinez).  R.P. Martinez explained that he was supposed to get it back after the shakedown, but that return did not happen because he was moved.  See Feb. 16 Tr. at 73:22-3 (R.P. Martinez).  R.P. Martinez said that correctional officers responded to Molina's murder by stripping all SNM members, removing their property, and placing them in cells with nothing but a mattress for about three days.  See Feb. 16 Tr. at 82:20-83:3 (Castellano, R.P. Martinez).  This lockdown, R.P. Martinez admitted, angered him because he did not think it was fair to punish him for something in which he was not involved and the administrative process was not followed.  See Feb. 16 Tr. at 83:4-20 (Castellano, R.P. Martinez).  R.P. Martinez said that he therefore filed a lawsuit, because the NM Corrections Department had not followed its policies when it instituted this lockdown.  See Feb. 16 Tr. at 92:15-24 (Castellano, R.P. Martinez).  He explained that he filed the lawsuit himself, without an attorney.  See Feb. 16 Tr. at 92:25-93:17 (Castellano, R.P. Martinez).  R.P. Martinez discussed in this suit the disrespect that he felt from the prison administration, including Marcantel's statement that SNM's leaders started crying when they learned that they were being sent out of state.  See Feb. 16 Tr. at 113:23-114:10 (Lowry, R.P. Martinez).  R.P. Martinez also complained about his conditions of confinement in the lawsuit, but admitted that his conditions did not change over the five months after he filed his lawsuit in May, 2015.  See Feb. 16 Tr. at 115:15-117:7 (Lowry, R.P. Martinez).

R.P. Martinez accordingly wrote a letter to Adam Vigil -- who worked under Santistevan at the STIU -- at the end of September, 2015, asking to be sent to Arizona, because he wanted less restrictive conditions and was ready to change his ways.  See Feb. 16 Tr. at 117:8-25 (Lowry,

R.P. Martinez).  He noted in the letter SNM's belief that the NM Corrections Department sets them up to kill each other and by knowingly placing inmates in an environment where they would be hurt.  See Feb. 16 Tr. at 117:8-119:18 (Lowry, R.P. Martinez).  He later sent A. Vigil another letter, asking if A. Vigil would help him to get his property back, which was supposed to have been returned to him.  See Feb. 16 Tr. at 119:19-121:6 (Lowry, R.P. Martinez).  R.P. Martinez explained PNM North's restrictive conditions: no visits; no telephone calls; showers three times a week; no yard time for the first sixty days; and, after that first sixty days, one hour in the yard five days a week alone -- besides the yard time and showers, they were confined to their cells.  See Feb. 16 Tr. at 195:2-196:15 (Villa, R.P. Martinez).  These restrictions, R.P. Martinez explained, lasted a year, and were applied to all SNM members.  See Feb. 16 Tr. at 197:7-22 (Villa, R.P. Martinez).

Because of the lockdown, R.P. Martinez agreed with others to kill Marcantel and Santistevan.  See Feb. 16 Tr. at 93:24-94L3 (Castellano, R.P. Martinez).  R.P. Martinez explained that this plot began in 2013 in a conversation with Baca and Duran, in which Baca aired his frustration with being locked up, with the administration, and with Santistevan's response to him that he was not getting out of lockdown.  See Feb. 16 Tr. at 94:9-95:4 (Castellano, R.P. Martinez).  R.P. Martinez recalled making a statement to the FBI on December 17, 2015, relaying Baca's frustration with the administration and belief that Santistevan's son would be an easy target.  See Feb. 16 Tr. at 224:16-225:8 (Castellano, R.P. Martinez).  R.P. Martinez said that Marcantel had not been mentioned in this conversation, but that Baca had discussed placing a "hit" on Santistevan's son, a lieutenant at Central New Mexico, to make a point.  Feb. 16 Tr. at 95:5-16 (Castellano, R.P. Martinez).  Baca also discussed how he wanted to "flip [Level 4] upside down," because he was frustrated with it and believed it was full of informants, and how he was upset at

always being locked up.  See Feb. 16 Tr. at 95:21-96:4 (Castellano, R.P. Martinez).  R.P. Martinez said that, because of this conversation, he and Duran agreed to "get it done" if they could and that he believed Santistevan was targeted because he was responsible for SNM's movement.  Feb. 16 Tr. at 96:11 (R.P. Martinez).  See id. at 96:5-18 (Castellano, R.P. Martinez).

R.P. Martinez explained that, in 2014 sometime after Molina's murder, M. Rodriguez was eventually housed with R.P. Martinez at PNM North.  See Feb. 16 Tr. at 78:10-22 (Castellano, R.P. Martinez); id. at 194:1-6 (Villa, R.P. Martinez).  M. Rodriguez expressed to R.P. Martinez that he was upset with someone following Molina's murder, and R.P. Martinez agreed to place a "hit" on R. Sanchez in D. Sanchez' place, because D. Sanchez was out of state, for something that occurred during Molina's murder.  See Feb. 16 Tr. at 79:11-13 (Castellano, R.P. Martinez); id. at 80:3-17 (Castellano, R.P. Martinez).  R.P. Martinez believed that R. Martinez and Calbert were also part of this plan.  See Feb. 16 Tr. at 80:18-81:1 (Castellano, R.P. Martinez).  R.P. Martinez said that M. Rodriguez held a lot of respect and might have been moving up the SNM ladder.  See Feb. 16 Tr. at 198:20-199:3 (Villa, R.P. Martinez).

R.P. Martinez described his relationship with Baca, explaining that he had briefly met Baca in 1995 and grew to know him better while they were serving time together at Southern New Mexico.  See Feb. 16 Tr. at 67:17-68:6 (Castellano, R.P. Martinez).  R.P. Martinez explained that, during this time at Southern New Mexico, Baca was SNM's leader, and that Baca had a conversation with R.P. Martinez in which he described his ideas for SNM's structure.  See Feb. 16 Tr. at 68:19-69:5 (Castellano, R.P. Martinez).  R.P. Martinez said that Baca wanted to add discipline, structure, and respect to SNM.    See Feb. 16 Tr. at 69:6-11 (Castellano,

R.P. Martinez).[103]   R.P. Martinez said that he agreed with Baca's ideas.  See Feb. 16 Tr. at 69:22-70:9 (Castellano, R.P. Martinez).  R.P. Martinez explained that, while at Southern New Mexico, SNM unit's pods[104] voted to form the "tabla," with R.P. Martinez, Rubio, and Herrera as the "tabla" members, and to have Baca as the highest-ranking SNM leader.  Feb. 16 Tr. at 70:16-25 (Castellano, R.P. Martinez); id. at 174:21-23 (Lowry, R.P. Martinez).  R.P. Martinez said that blue pod, including D. Sanchez and Molina, did not want Baca as the leader.  Feb. 16 Tr. at 71:1-8 (Castellano, R.P. Martinez).  R.P. Martinez explained that the "tabla" was responsible establishing discipline and keeping members in line.  Feb. 16 Tr. at 71:17-21 (Castellano, R.P. Martinez).  The "tabla" needed to handle "paperwork" and the corresponding murders immediately or else they would "be dealt with."  Feb. 16 Tr. at 72:5 (R.P. Martinez).  See id. at 71:22-72:5 (Castellano, R.P. Martinez).  R.P. Martinez said that Baca told him in 2013 that Rubio might have had "paperwork" on Molina but was not acting on it, so both Molina and Rubio needed to be killed.  Feb. 16 Tr. at 81:2-82:4 (Castellano, R.P. Martinez).  Baca also said that Rubio needed to be killed because, as a "tabla" member, he should have acted immediately on the "paperwork."  Feb. 16 Tr. at 82:9-19 (Castellano, R.P. Martinez).   A 2016 FBI 302 report from a meeting between R.P. Martinez and the FBI revealed that SNM called for a "hit" on Molina a year before Molina was murdered.  Feb. 16 Tr. at 223:10-15 (Castellano, R.P. Martinez).  See id. at 224:6-15 (Castellano, R.P. Martinez).[105]  R.P. Martinez verified that Herrera was a "llavero" during the year

---

[103]Upon D. Sanchez' inquiry, the Court gave a limiting instruction: "These statements that are being testified about that Mr. Baca made are limited just to him.  And you cannot use them in your consideration against the charges against any of the other defendants."  Feb. 16 Tr. at 69:15-19 (Court).  See id. at 69:12-13 (Jacks).

[104]The blue pod abstained.  See Feb. 16 Tr. at 174:18-25 (Castellano, R.P. Martinez).

[105]Before the United States elicited R.P. Martinez' recorded statement, the Court gave a limiting instruction:

between the call for the "hit" and Molina's death.  Feb. 16 Tr. at 238:7-16 (Castellano, R.P. Martinez).

R.P. Martinez stated that J. Montoya told him that the "paperwork" on J. Montoya was fake.  Feb. 16 Tr. at 73:13-18 (Castellano, R.P. Martinez).  R.P. Martinez relayed that J. Montoya also said that Baca "agreed that it was all good," but R.P. Martinez never had a conversation with Baca about it.  Feb. 16 Tr. at 74:3-4 (R.P. Martinez).  See id. at 74:5-7 (Castellano, R.P. Martinez). Sometime after this conversation, R.P. Martinez stated, a shank was found in his room and he was placed in segregation, and he chose Baca to represent him in the subsequent administrative proceedings.  See Feb. 16 Tr. at 74:8-15 (Castellano, R.P. Martinez); id. at 75:12-25 (Castellano, R.P. Martinez); id. at 77:20-22 (Castellano, R.P. Martinez).[106]  At the legal meeting between Baca and R.P. Martinez, Baca provided that he was upset about being "kited out" of Southern New Mexico and placed into segregation at PNM North, and believed that D. Sanchez, Molina, and Drama[107] were responsible.  Feb. 16 Tr. at 76:10-77:7 (Castellano, R.P. Martinez).  See id. at 77:15-19 (Castellano, R.P. Martinez).

---

Ladies and gentlemen, you're going to hear a statement, and the only purpose of this is to let you decide whether Mr. Martinez has made inconsistent statements. The statement itself is not being offered for the truth of the matter.  You should only use it for determining whether Mr. Martinez made consistent statements.

Feb. 16 Tr. at 222:16-24 (Court).

[106]The Court gave a limiting instruction, because the United States indicated it would elicit Baca's out-of-court statement: "Well, then the comments can be used against Mr. Baca, but not the other three defendants."  Feb. 16 Tr. at 75:7-9 (Court).  See id. at 74:25-75:3 (Court, Castellano).

[107]R.P. Martinez did not know Drama's real name.  See Feb. 16 Tr. at 77:8-9 (Castellano, R.P. Martinez).

R.P. Martinez explained that he was charged for the shank in state court, and took a plea deal around December, 2013. See Feb. 16 Tr. at 86:20-24 (Castellano, R.P. Martinez); id. at 86:1-5 (Castellano, R.P. Martinez). He stated that he agreed to cooperate, because he was tired of "living that life, and just wanted to do the right thing." Feb. 16 Tr. at 86:12-13 (R.P. Martinez). See id. at 86:6-13 (Castellano, R.P. Martinez). This cooperation, R.P. Martinez verified, led to the FBI signing up R.P. Martinez as a confidential informant and paying him $1,350.00. See Feb. 16 Tr. at 86:14-24 (Castellano, R.P. Martinez). The FBI terminated R.P. Martinez as a confidential informant when pills were found in his mattress. See Feb. 16 Tr. at 86:25-87:5 (Castellano, R.P. Martinez). The pills, R.P. Martinez explained, were his medication that he had stored up, so he had more than he should have had. See Feb. 16 Tr. at 87:6-9 (Castellano, R.P. Martinez).

In July or August 2015, R.P. Martinez wrote letters called "golden tickets," because they would get things done on the streets. Feb. 16 Tr. at 97:3-9 (Castellano, R.P. Martinez); See id. at 106:13-17 (Castellano, R.P. Martinez). R.P. Martinez read aloud one such letter that he wrote to Arthur Chavez, an SNM member, instructing Chavez that it was time to execute the "hits" on Santistevan, his son, and Marcantel, and that Marcantel was the priority. Feb. 16 Tr. at 98:13-100:5 (Castellano, R.P. Martinez); id. at 101:19-22 (Castellano, R.P. Martinez). R.P. Martinez explained that Marcantel was put on the list, because, according to Duran, Baca wanted to make a bigger statement than just killing Santistevan, and that Baca had felt that Marcantel was disrespectful toward him. See Feb. 16 Tr. at 100:6-101:8 (Castellano, R.P. Martinez). R.P. Martinez verified that Duran brought up the idea of killing Marcantel and that he trusted Duran's word that it was coming from Baca, although he never spoke with Baca about it. See Feb. 16 Tr. at 178:17-19 (Lowry, R.P. Martinez); id. at 179:4-5 (Lowry, R.P. Martinez); id. at 189:11-25 (Lowry, R.P. Martinez). R.P. Martinez wrote in the letter to A. Chavez that A. Chavez had the "greenlight,"

provided the contact information for six members to use, and threatened A. Chavez with the visit of three secret members if he talked to the police or failed to execute the murders by August 31. Feb. 16 Tr. at 101:19-103:17 (Castellano, R.P. Martinez).  R.P. Martinez said that he wrote the letter to get Marcantel killed, and that he was very upset by being placed on lockdown.  See Feb. 16 Tr. at 103:21-104:3 (Castellano, R.P. Martinez).  R.P. Martinez explained that the letter was not coded, because he believed Duran would send it through legal mail to his girlfriend, who would take it to its intended recipient.  See Feb. 16 Tr. at 104:4-13 (Castellano, R.P. Martinez).  R.P. Martinez said that the letter writing was Duran's idea, who did not want the information broadcast, whereas R. Martinez wanted everyone, including the STIU, to know because he wanted to be moved out of state.  See Feb. 16 Tr. at 186:17-187:25 (Lowry, R.P. Martinez).  R.P. Martinez maintained, however, that Duran did not trick him into joining the murder conspiracies, as he had already agreed the two men should be murdered.  See Feb. 16 Tr. at 229:24-230:7 (Castellano, R.P. Martinez).

The United States had R.P. Martinez read out loud another letter that he had written urging that the addressee, known to R. P. Martinez only as "Gotti," kill Marcantel and warning that three SNM members are on standby if anybody refuses to participate in the mission.  See Feb. 16 Tr. at 104:18-105:12 (Castellano, R.P. Martinez).  In this letter, R.P. Martinez also told Gotti to have another SNM member accompany him on the mission, and provided this other member's contact information, and told Gotti to kill this member if he refused.  See Feb. 16 Tr. at 105:14-106:12 (Castellano, R.P. Martinez).  In a third letter, R.P. Martinez told the addressee that SNM's leaders have decided it was time for him to show his loyalty by completing a mission and that he should get in touch with Gotti soon to begin work on completing it, as they would have until August or September, 2015 to do so.  See Feb. 16 Tr. at 106:18-107:3 (Castellano, R.P. Martinez).  The letter

repeated the threat of three members standing by to deal with the addressee and his family should he not complete the mission of killing Marcantel -- which the letter emphasized was "not a request."   Feb. 16 Tr. at 107:11 (R.P. Martinez).   See id. at 107:3-16 (R.P. Martinez). R.P. Martinez explained that Marcantel made a statement to SNM, by locking them in strip cells after Molina's murder, and personally telling them that Baca was "a crybaby" and "on [his] way out."  Feb. 16 Tr. at 107:25 (R.P. Martinez).  See id. at 107:17-108:7 (Castellano, R.P. Martinez). R.P. Martinez stated that even though no one believed what Marcantel said about Baca, his words angered them.  See Feb. 16 Tr. at 181:3-22 (Lowry, R.P. Martinez).

In the fall of 2015, after R.P. Martinez' conditions of confinement got worse, he wrote another letter to A. Vigil telling him about the Marcantel plot, stating that he did not want to participate in the plot, and placing the blame on R. Martinez, who had disappeared to the drop-out program.  See Feb. 16 Tr. at 121:7-122:20 (Castellano, R.P. Martinez).  R.P. Martinez said that this letter was his attempt to get out without entering protective custody or entering the drop-out program.  See Feb. 16 Tr. at 122:25-123:7 (Lowry, R.P. Martinez).  His last letter to A. Vigil stated that the murder plans were still on, but he hoped they would fail and was staying out if it, and requested A. Vigil speak with the district officer about suspending R.P. Martinez' sanctions, because he kept getting written up.  See Feb. 16 Tr. at 123:21-124:18 (Lowry, R.P. Martinez).

R.P. Martinez said that he was charged in this case, and pled guilty to conspiracy to kill Marcantel and Santistevan, and that, as part of his plea agreement, he agreed to testify truthfully. See Feb. 16 Tr. at 14:2-12 (Castellano, R.P. Martinez); id. at 17:3-6 (Castellano, R.P. Martinez). R.P. Martinez said that he conspired with Baca, R. Martinez, and Duran.  See Feb. 16 Tr. at 16:4-10 (Castellano, R.P. Martinez).   He verified that both these counts carry a term of ten years imprisonment, so he faces a sentence of up to twenty years, but, because of his plea agreement, his

sentence could be reduced in the Court's discretion in exchange for his truthful testimony.  See Feb. 16 Tr. at 15:15-24 (Castellano, R.P. Martinez); id. at 17:7-15 (Castellano, R.P. Martinez).  On December 17, 2015, R.P. Martinez met with Acee and Mr. Castellano to tell the truth about what he knew, and revealed some outstanding "hits" on SNM members, including Herrera, for not acting on the "paperwork."  Feb. 16 Tr. at 109:15-110:12 (Bhalla, R.P. Martinez).  See id. at 232:13-21 (Bhalla, R.P. Martinez).  He did not mention the conspiracy against Marcantel because he believed there was a conspiracy to kill only Santistevan and because Duran approached him saying that Santistevan needed to be killed.  See Feb. 16 Tr. at 125:1-25 (Lowry, R.P. Martinez).  He maintained, however that he spoke about the conversation he had with Baca and Duran in 2013, although this conversation was not documented.  See Feb. 16 Tr. at 126:19-22 (Lowry, R.P. Martinez); id. at 127:17-25 (Lowry, R.P. Martinez).  R.P. Martinez verified that he later "sent a letter to Agent Vigil"[108] requesting a transfer to Southern New Mexico to the same pod as Herrera, because Herrera got along with his fellow SNM members and did not plot to kill them.  Feb. 16 Tr. at 112:9-10 (Bhalla).  See id. at 112:9-113:2 (Bhalla, R.P. Martinez).  He said, however, that Herrera could not overlook somebody "snitching."  Feb. 16 Tr. at 226:6-20 (Castellano, R.P. Martinez).  In January, 2016, R.P. Martinez met with the FBI again, and did not mention the 2013 meeting between him, Baca, and Duran.  See Feb. 16 Tr. at 128:10-130:5 (Lowry, R.P. Martinez).  He also met with the FBI in September, 2016, after the United States had given him benefits, and again failed to mention this 2013 meeting with Baca and Duran.  See Feb. 16 Tr. at 131:9-132:10 (Lowry, R.P. Martinez).  R.P. Martinez maintained that he mentioned this meeting at his December, 2016, debrief with the FBI, although it was not recorded, and verified that he

---

[108]Ms. Bhalla did not elaborate on whom she meant when she referred to "Agent Vigil," but the Court notes for the reader's edification that the Court believes she was referring to Adam Vigil, an officer with the STIU who worked beneath Santistevan at the STIU.

reviewed the FBI's reports to correct them before they were filed, although he never noted that the 2013 meeting was absent from any of the reports. See Feb. 16 Tr. at 133:2-134:5 (Lowry, R.P. Martinez). These reports also do not mention that R.P. Martinez received Molina's "paperwork" through the mail. Feb. 16 Tr. at 146:2-148:24 (Lowry, R.P. Martinez, Court). He maintained that he told the FBI this information in six of his interviews, but admitted that he did not mention it when specifically interviewed about Molina's murder on December 2, 2016. See Feb. 16 Tr. at 215:14-216:23 (Jacks, R.P. Martinez). This interview took place in the presence of Clark, Armenta, and R. Martinez. See Feb. 16 Tr. at 216:1-23 (Jacks, R.P. Martinez).

While housed next to M. Rodriguez at Otero County after their arrests in this case, R.P. Martinez received a letter from M. Rodriguez. See Feb. 16 Tr. at 200:2-201:23 (Villa, R.P. Martinez). In the letter, which was shown to the jury, M. Rodriguez asked R.P. Martinez whether he was going to take a plea or "dive back into the Bible," which he had been studying for about nine years. Feb. 16 Tr. at 203:4-23 (Villa, R.P. Martinez)(internal quotation marks omitted). M. Rodriguez went on to state that SNM needed R.P. Martinez to rebuild SNM and keep it strong. See Feb. 16 Tr. at 204:5-22 (Villa, R.P. Martinez). R.P. Martinez interpreted the letter to mean that M. Rodriguez wanted him to stay and improve SNM instead of taking a plea. See Feb. 16 Tr. at 206:8-14 (Villa, R.P. Martinez).

R.P. Martinez admitted that he reset his discovery tablet at PNM North, which erased the discovery, to access its original features. See Feb. 16 Tr. at 87:10-88:2 (Castellano, R.P. Martinez). He stated that, when he moved to Sandoval County Detention, he helped everyone else in the pod to reset their tablets, and that he learned what Wi-Fi was when Armenta obtained a connection. See Feb. 16 Tr. at 88:3-89:3 (Castellano, R.P. Martinez). R.P. Martinez explained that he could not access the Wi-Fi in his cell, so he would loan his tablet to Armenta to download pornography

and other files so he could access the downloaded files from his cell. See Feb. 16 Tr. at 89:4-11 (Castellano, R.P. Martinez). He was not aware of Armenta using his tablet to access child pornography. See Feb. 16 Tr. at 209:8-12 (Villa, R.P. Martinez). He verified that he was eventually moved to a cell with Wi-Fi access and would use the tablet for pornography, Facebook, email, and video games, but the tablet was seized in the middle of last year when the tampering was discovered. See Feb. 16 Tr. at 89:10-90:2 (R.P. Martinez, Castellano). R.P. Martinez stated that he reviewed the discovery before he reset the tablet and realized that Duran had recorded R.P. Martinez and R. Martinez, but said that he did not listen to all the recordings, because he knew what happened and found the evidence boring. See Feb. 16 Tr. at 135:3-136:1 (Lowry, R.P. Martinez). He explained that Duran was housed in the cell between him and R. Martinez at PNM North. See Feb. 16 Tr. at 183:32-184:3 (Lowry, R.P. Martinez). He also verified that, after he pled and agreed to cooperate with the United States, that he used Suboxone while housed at Sandoval County Detention and Lea County Correctional, but did not use any other controlled substances. See Feb. 16 Tr. at 90:3-14 (Castellano, R.P. Martinez). He admitted to buying Suboxone from fellow cooperators T. Martinez and J. Montoya. See Feb. 16 Tr. at 209:19-24 (Villa, R.P. Martinez); id. at 211:23-212:3 (Villa, R.P. Martinez). R.P. Martinez explained that he "stopped doing everything" in 2001, because he started reading the Bible, and has avoided needles since 2008, when he underwent treatment for hepatitis C. Feb. 16 Tr. at 90:17-18 (R.P. Martinez). See id. at 90:15-23 (Castellano, R.P. Martinez). R.P. Martinez admitted that he knew of other cooperators' misbehavior, like bringing in drugs and striking up romantic relationships with correctional officers, but did not inform the FBI of these infractions. Feb. 16 Tr. at 139:3-140:3 (Lowry, R.P. Martinez). He said that, when J. Montoya allowed correctional officers to film the

confidential discovery videos of Molina's murder, he told his lawyer to tell Ms. Armijo what was going on, but that nothing happened. See Feb. 16 Tr. at 140:23-143:7 (Lowry, R.P. Martinez).

R.P. Martinez verified that, as part of his cooperation, he participated in providing gang training to law enforcement officers with Acee and an anti-gang program for youth offenders. See Feb. 16 Tr. at 91:5-11 (Castellano, R.P. Martinez). He also verified that he was provided a contact visit with his daughter. See Feb. 16 Tr. at 91:12-14 (Castellano, R.P. Martinez). R.P. Martinez attended the cooperators' pizza party as well. See Feb. 16 Tr. at 91:15-18 (Castellano, R.P. Martinez). R.P. Martinez described attending philosophy classes to learn how to think differently. See Feb. 16 Tr. at 92:2-14 (Castellano, R.P. Martinez). He verified that his conditions and life improved, but he misbehaved anyway. See Feb. 16 Tr. at 13:9-11 (Lowry, R.P. Martinez); id. at 131:7-8 (Lowry, R.P. Martinez); id. at 134:18-24 (Lowry, R.P. Martinez). R.P. Martinez described that, while housed downstairs at the courthouse when he was not testifying, he saw other cooperators housed there, but was unable to talk with them. See Feb. 16 Tr. at 206:19-207:18 (Villa, R.P. Martinez). He verified, however, that during the case's pendency, he was able to talk with other cooperators, as they were housed together. See Feb. 16 Tr. at 207:19-24 (Villa, R.P. Martinez). The Court excused R.P. Martinez from the proceedings. See Feb. 16 Tr. at 244:8-10 (Court).

### ad.    Joey Aranda's Testimony.

The United States next called Aranda, a correctional officer with fourteen years of experience who works with Level 4 inmates at PNM. See Feb. 16 Tr. at 244:13-14 (Beck); id. at 245:7-24 (Beck, Aranda). Aranda stated that he mainly works at PNM South, and that the Main facility closed in 1998. See Feb. 16 Tr. at 247:12-248:18 (Beck, Aranda). He said that, on November 14, 2005, he was working in the Unit 3B's control tower, opening and closing the doors,

when D. Sanchez stabbed another inmate, Daniel Munoz, in V pod, which was an SNM pod.  See Feb. 16 Tr. at 249:1-250:15 (Beck, Aranda); id. at 252:9-11 (Beck, Aranda); id. at 20-25 (Beck, Aranda).  Aranda stated that D. Munoz had just moved into that pod and, because Aranda did not believe D. Munoz was an SNM member, that he had been placed incorrectly.  See Feb. 16 Tr. at 253:1-7 (Beck, Aranda).

Aranda said that D. Munoz was under PHD, meaning prehearing detention, and he was not allowed outside his cell with any other inmates, and was to be escorted to and from the shower in handcuffs.  See Feb. 16 Tr. at 253:8-21 (Beck, Aranda); id. at 260:5-6 (Jacks); id. at 260:10 (Aranda).  Aranda observed D. Munoz in the bottom shower and D. Sanchez in the top shower, and, because the control officer did not shut the top shower, when the officer cuffed D. Munoz to bring him back to his cell, D. Sanchez ran out of the shower and down the stairs toward them, and pushed them both into the cell.  See Feb. 16 Tr. at 253:22-254:13 (Beck, Aranda).  Aranda saw the officer pepper spray both inmates.  See Feb. 16 Tr. at 255:18-22 (Beck, Aranda).  Aranda responded by "hitting" the emergency button on his radio, which alerted main control to an emergency somewhere in the facility, and breaking the seal to the shotgun so he could use it.  Feb. 16 Tr. at 254:13--255:7 (Aranda, Beck).  Aranda explained that, once he returned to the window to the shotgun, the officer was running to the pod door to leave the unit, telling Aranda to close B-4 and 5.  See Feb. 16 Tr. at 255:10-17 (Aranda, Beck).  Aranda closed the doors, which locked D. Sanchez and D. Munoz in their own cells, and then D. Munoz called over the intercom to tell Aranda that he had been stabbed, so the responders and a nurse retrieved him, and took him to medical.  See Feb. 16 Tr. at 256:7-21 (Beck, Aranda).  Aranda believed D. Sanchez stabbed D. Munoz with an eight-or-nine-inch screw for a mop bucket ringer.  See Feb. 16 Tr. at 257:4-11

(Beck, Aranda). The Court excused Aranda from the proceedings. See Feb. 16 Tr. at 261:9-11 (Court).

### ae.    Katie Brusuelas' Testimony.

The United States next called Katie Brusuelas to the stand, who stated that she currently works as a contract employee with the "Department of Drug Enforcement Association." Feb. 16 Tr. at 263: 14-16 (Castellano, Brusuelas). See id. at 261:14-15 (Castellano). Brusuelas explained that she is a retired FBI Special Agent, a job she held for over twenty-one years. See Feb. 16 Tr. at 263:19-24 (Castellano, Brusuelas). She said that she has received training on investigating, evidence, and interviewing, and has investigated a variety of crimes. See Feb. 16 Tr. at 263:25-264:8 (Castellano, Brusuelas). Brusuelas stated that, in February, 2015, she was on a gang and drug activity squad, and was assigned to a new initiative that focused on violations in the prison system, meaning that she investigated employees who brought in drugs, gang activity, and illegal activity in and around the prisons. See Feb. 16 Tr. at 264:9-22 (Castellano, Brusuelas). She explained that she spent one or two days a week at PNM working with the STIU, which would provide tips as to potential cooperators and whether drugs were being smuggled into the prison. See Feb. 16 Tr. at 264:23-265:9 (Castellano, Brusuelas). She said that they would not disclose if an inmate spoke with law enforcement, so they would try to arrange meetings outside the prison, and she would wear plain clothes at the prison, so she could not be identified as FBI. See Feb. 16 Tr. at 265:22-266:15 (Castellano, Brusuelas).

Brusuelas verified that she met Duran on February 19, 2015, at least a week after Captain Sergio Sapien at the PNM received a letter from Duran saying that he wanted to cooperate and had information he wanted to share. See Feb. 16 Tr. at 266:16-267:4 (Castellano, Brusuelas). Brusuelas explained that it took time to sort out logistics to meet with Duran, who wanted to give

information about drugs and cold cases, but that they met at the Santa Fe FBI office with NM
Corrections Department officials, task force officers, an Albuquerque Police Department officer,
and a Bernalillo County Sheriff's Office deputy.  See Feb. 16 Tr. at 267:5-268:3 (Castellano,
Brusuelas).  She stated that Duran provided information about three cold case homicides,
conspiracies to murder high-ranking NM Corrections Department officials, and drug trafficking.
See Feb. 16 Tr. at 270:7-271:5 (Castellano, Brusuelas).  These homicides, Brusuelas verified,
involved Molina, S. Chavez, and Freddie Sanchez, and Duran also provided information on who
called some of these murders.  See Feb. 16 Tr. at 271:17-272:12 (Castellano, Brusuelas).  Duran
also gave information about SNM, including its leader.  See Feb. 16 Tr. at 272:13-18 (Castellano,
Brusuelas).  Brusuelas stated that Duran agreed to help law enforcement and to be opened as an
FBI source, and that the FBI opened him as a source about a month after this meeting.  See Feb.
16 Tr. at 273:8-18 (Castellano, Brusuelas); id. at 275:13-16 (Castellano, Brusuelas).  She said that
they informed him that he was not forced to provide information, that he must provide only truthful
information, that he must follow directions, that he is not a United States agent, that he cannot do
anything illegal without prior authorization, and that he is not promised payment.  See Feb. 16 Tr.
at 273:19-274:4 (Castellano, Brusuelas).  These admonishments, Brusuelas explained, are
provided annually to all confidential human sources.  See Feb. 16 Tr. at 282:14-16 (Duncan,
Brusuelas).  She stated that she also completed a background check on Duran, to ensure that he
had not been the subject of an investigation, to look at his criminal history, and to see if he had
been opened as a source before this time.  See Feb. 16 Tr. at 282:19-283:5 (Duncan, Brusuelas).

        Duran agreed to record his conversations with particular inmates whom the FBI was
investigating.  See Feb. 16 Tr. at 274:22-275:12 (Castellano, Brusuelas).  She explained that Duran
could not tell if the first device they provided him was on or was holding a charge, an issue the

FBI discovered when he returned the device without the recordings he thought that he had made about cold case homicides.  See Feb. 16 Tr. at 275:20-276:24 (Castellano, Brusuelas); id. at 277:17-21 (Castellano, Brusuelas).  Accordingly, they gave Duran a different recording device, with a better battery.  See Feb. 16 Tr. at 277:22-278:2 (Castellano, Brusuelas).  Brusuelas noted that the device itself cannot play the recordings.  See Feb. 16 Tr. at 278:9-24 (Castellano, Brusuelas).

Brusuelas stated that she does not know how long Duran recorded other inmates, because she only worked with him for a few months before transferring him to Acee, when she moved to a different squad.  See Feb. 16 Tr. at 278:25-279:12 (Castellano, Brusuelas).  This transfer occurred in August, 2015.  See Feb. 16 Tr. at 280:9-12 (Castellano, Brusuelas). The Court excused Brusuelas from the proceedings.  See Feb. 16 Tr. at 295:14-16 (Court).

### af.    Thomas Neale's Testimony.

The United States next called Neale, an FBI Special Agent hired in April, 2015. See Feb. 16 Tr. at 295:19 (Armijo); id. at 296:13-17 (Armijo, Neale).  Neale explained that he was assigned to the SNM investigation, which involved looking into homicides, drug and firearm trafficking, and SNM gang members living on the streets.  See Feb. 16 Tr. at 297:7-298:7 (Armijo, Neale). Neale verified that C. Garcia was one such member living on the street, and he was targeted because of his alleged drug trafficking in Albuquerque.  See Feb. 16 Tr. at 298:13-299:3 (Armijo, Neale).  Neale described using an undercover officer and confidential human sources -- including Griego, Duran, and M. Montoya -- to make controlled purchases of crack cocaine and heroin from C. Garcia.  See Feb. 16 Tr. at 299:8-307:22 (Armijo, Neale).

Neale stated that both Duran and M. Montoya had cellular telephones with consensual wiretaps on them, and Neale did not know if Duran and M. Montoya knew that each other was

working with the FBI.  See Feb. 16 Tr. at 314:21-31:24 (Armijo, Neale).  Neale verified that there were conversations among M. Montoya, Duran, and Baca, and between M. Montoya and C. Garcia, and that the FBI set up an undercover operation to pass a firearm from C. Garcia to M. Montoya.  See Feb. 16 Tr. at 320:19-321:10 (Armijo, Neale).  Neale said that, on November 29, 2015, M. Montoya picked up a handgun from C. Garcia at C. Garcia's house, while wearing a recording device, then turned it over to the FBI.  See Feb. 16 Tr. at 321:13-323:7 (Armijo, Neale). Neale said that the FBI tested the firearm and that it appeared to be functional.  See Feb. 16 Tr. at 327:15-25 (Armijo, Neale).  On December 3, 2015, the FBI arrested C. Garcia, and served search warrants on his and his parents' residences.  See Feb. 16 Tr. at 328:23-329:3 (Armijo, Neale); id. at 330:17 (Armijo, Neale).  Neale said that what appeared to be marijuana was found in C. Garcia's toilet, digital scales were recovered from his house, and what was later determined to be about two hundred grams of heroin was found in his parents' residence.  See Feb. 16 Tr. at 334:6-325:23 (Armijo, Neale).

Neale verified that Acee tasked him with drafting the overt acts for B. Cordova, which are the acts he committed in furtherance of a conspiracy.  See Feb. 16 Tr. at 342:14-25 (Villa, Neale). Neale admitted, however, that he stopped drafting these overt acts and that B. Cordova became a cooperator, and was never charged federally in connection with the FBI's SNM investigation.  See Feb. 16 Tr. at 344:5-24 (Villa, Neale).  Neale described looking into whether B. Cordova was involved in S. Chavez' murder, with which B. Cordova has never been charged.  See Feb. 16 Tr. at 345:3-20 (Neale, Villa).  Neale agreed that, about a month after opening B. Cordova as a source for the FBI, he recorded R. Perez, which was used in the determination to charge R. Perez.  See Feb. 16 Tr. at 346:9-24 (Villa, Neale).  Neale said that he was not involved in B. Cordova's closure

investigation.  See Feb. 16 Tr. at 347:4-11 (Villa, Neale).  Neale also admitted attending the pizza

party at PNM North.  See Feb. 16 Tr. at 348:2-22 (Villa, Neale).

### ag.    Leslie Hamilton's Testimony.

The United States next called Dr. Leslie Hamilton, a pathologist who also conducts

autopsies.  See Transcript of Jury Trial Volume 16 at 8:4-9 (taken February 20, 2018)(Armijo,

Castellano), filed February 22, 2019 (Doc. 2532)("Feb. 20 Tr."); id. at 9:6-7 (Armijo, Hamilton).

Dr. Hamilton stated that she completed a fellowship in forensic pathology[109] at the University of

New Mexico in Albuquerque from July, 2013 to June, 2014.  See Feb. 20 Tr. at 9:20-10:4 (Armijo,

Hamilton).  The Court allowed Dr. Hamilton to offer opinion testimony in forensic pathology.  See

Feb. 20 Tr. at 12:6-8 (Court).  Dr. Hamilton stated that she performed the autopsy on Molina,

determined the cause and manner of his death, and prepared the report that Dr. Kastenbaum

reviewed.  See Feb. 20 Tr. at 12:17-13:2 (Armijo, Hamilton).  Dr. Hamilton said that there were

forty-three stab wounds on Molina's body, so she grouped them based on how they were clustered.

See Feb. 20 Tr. at 15:10-16:12 (Armijo, Hamilton).  Three groups, she explained, were associated

with "significant injuries" within the body, including defects to the sternum, to the left lung, and

to the heart.  Feb. 20 Tr. at 17:21-18:16 (Armijo, Hamilton).  Dr. Hamilton stated that these injuries

were fatal, and so extensive that, even if Molina had seen a doctor more quickly, he would not

have survived.  See Feb. 20 Tr. at 16:19 (Hamilton); id. at 22:17-22 (Armijo, Hamilton).  She

described that there were many mechanisms that led to his death, as he had nine-hundred milliliters

of blood in his left chest cavity, which would have compressed the lung, and the defects to the

heart would have affected its ability to pump blood.  See Feb. 20 Tr. at 22:23-23:12 (Armijo,

---

[109]Dr. Hamilton explained that pathology involves diagnosing disease through examining
body tissues, and that forensic pathologists apply the knowledge gained through pathology to legal
and medical problems.  See Feb. 20 Tr. at 10:18-11:2 (Armijo, Hamilton).

Hamilton).  Dr. Hamilton did not find any sign of alcohol or "common drugs of abuse" in his system, but did not test for Suboxone.  See Feb. 20 Tr. at 23:13-23 (Armijo, Hamilton).  She determined that stab wounds were the cause of death, while the manner of death was homicide.  See Feb. 20 Tr. at 24:2-7 (Armijo, Hamilton).  The Court excused Dr. Hamilton from the proceedings.  See Feb. 20 Tr. at 24:24-25 (Court).

### ah.    Mario Montoya's Testimony.

The United States next called to the stand M. Montoya, who was in custody.  See Feb. 20 Tr. at 31:1-2 (Castellano); id. at 80:18-20 (Castellano, M. Montoya).  M. Montoya said that he joined SNM in the early 1990s while in prison.  See Feb. 20 Tr. at 31:20-32:18 (Castellano, M. Montoya); id. at 34:6-9 (Castellano, M. Montoya).  He stated that when he was sent to PNM North for assaulting someone for a friend, his friend and Torrez recruited him to SNM.  See Feb. 20 Tr. at 32:19-34:1 (Castellano, M. Montoya).  M. Montoya said that SNM told him that he needed the approval of three more members before he could join SNM; after M. Montoya became close to Romero, B. Garcia, and Bobby Ortega, Romero told him just to tell people that they brought him into SNM.  See Feb. 20 Tr. at 34:10-35:5 (Castellano, M. Montoya).  M. Montoya said that, when he joined SNM, A. Munoz, R. Clark, Henry Clark, and F. Cordova were the gang's leaders.  See Feb. 20 Tr. at 35:6-10 (Castellano, M. Montoya).  M. Montoya said that, when he first joined, he mainly ensured that non-SNM members who got drugs in prison shared with SNM.  See Feb. 20 Tr. at 35:18-36:14 (Castellano, M. Montoya).  He admitted that he was a drug addict, so he paid attention to who was getting drugs, because he wanted to get high.  See Feb. 20 Tr. at 36:21-25 (M. Montoya).  SNM's rules, he stated, were: (i) do not "snitch"; (ii) do not become friends with law enforcement officers; (iii) have a record free from child molestation; (iv) follow orders; (v) respect other SNM members; (vi) be loyal to other SNM members; (vii) do not become

romantically involved with other members' wives or girlfriends.  Feb. 20 Tr. at 38:9-19 (Castellano, M. Montoya).  M. Montoya said that disobeying an order would likely lead to being "hit."  Feb. 20 Tr. at 38:20-22 (Castellano, M. Montoya).  He said that an SNM member was expected to deny his membership to the correctional officers, but never deny it to another inmate, and that the gang was supposed to come before everything.  See Feb. 20 Tr. at 41:6-25 (Castellano, M. Montoya).

M. Montoya verified that in 1996 he was convicted for bringing drugs into prison, explaining that he brought them in for SNM and himself.  See Feb. 20 Tr. at 42:7-21 (Castellano, M. Montoya).  M. Montoya said that he was released from prison in 2001 for eight months before returning to prison because of a "dirty" urinalysis.  Feb. 20 Tr. at 43:10-44:25 (Castellano, M. Montoya).  After being released again from prison, M. Montoya was convicted of heroin possession.  See Feb. 20 Tr. at 45:8-10 (Castellano, M. Montoya).  In 2011 and 2012, M. Montoya, who was trying to turn his life around, began dealing drugs to take care of his family, although he did not use the drugs himself.  See Feb. 20 Tr. at 46:24-47:21 (Castellano, M. Montoya).  M. Montoya said that, after C. Garcia's release from prison, he became M. Montoya's drug supplier.  See Feb. 20 Tr. at 49:18-25 (Castellano, M. Montoya).

M. Montoya stated that he had a good relationship with SNM until he left his ex-wife, who then became involved with another SNM member, A. A. Garcia, who had been one of M. Montoya's best friends.  See Feb. 20 Tr. at 50:17-25 (Castellano, M. Montoya).  M. Montoya said that he sent A.A. Garcia notes saying that A.A. Garcia did him a favor, because M. Montoya thought it was positive that his ex-wife was moving on from their relationship.  See Feb. 20 Tr. at 50:25-51:25 (M. Montoya, Castellano).  M. Montoya said that, in 2012, when he was released from prison for the last time, people told him that A.A. Garcia was trying to put a "hit" on him,

- 327 -

but A.A. Garcia denied the accusation.  See Feb. 20 Tr. at 53:23-54:9 (Castellano, M. Montoya).

M. Montoya said that rapists and known informants were on SNM's boards, and calling shots, in

contravention of SNM's rules.  See Feb. 20 Tr. at 54:10-14 (M. Montoya).  M. Montoya said that,

because someone "dropped a kite on" him, he was placed in the prison's lockup unit each time he

returned to prison.  See Feb. 20 Tr. at 54:14-17 (M. Montoya).  He began to grow tired of the

lifestyle, so he stopped using drugs in order to create a new life for himself and his daughter.  See

Feb. 20 Tr. at 54:10-21 (M. Montoya).  M. Montoya characterized SNM as having "turned into

something like real evil," so he distanced himself from the gang.  Feb. 20 Tr. at 55:10-11

(M. Montoya).  See id. at 55:6-22 (Castellano, M. Montoya).  In 2015, however, M. Montoya was

still selling drugs and, after an incident in which an SNM member claimed M. Montoya owed him

drugs and threatened M. Montoya by shooting into the air, M. Montoya picked up a gun from

C. Garcia's house.  See Feb. 20 Tr. at 55:23-56:17 (Castellano, M. Montoya).  M. Montoya said

that he felt threatened but admitted that, because he was a convicted felon, he was not supposed to

possess a firearm.  See Feb. 20 Tr. at 58:5-59:1 (Castellano, M. Montoya).  On September 11,

2015, M. Montoya sold Robert Madrid, whom he did not trust, a bag of heroin mixed with sugar.

See Feb. 20 Tr. at 61:3-61:22 (Castellano, M. Montoya).  When he realized he accidentally had

given R. Madrid a bag of pure heroin, he unsuccessfully tried to get the bag back from R. Madrid.

See Feb. 20 Tr. at 61:25-62:22 (Castellano, M. Montoya).  M. Montoya said that, when he hung

up the telephone after R. Madrid finally agreed to come back and return it, Acee and other law

enforcement showed up at M. Montoya's house and arrested him.  See Feb. 20 Tr. at 63:3-13

(M. Montoya, Castellano).

        M. Montoya said that he was booked on a parole violation, then later was charged for being

a felon in possession of a firearm and heroin trafficking, but he had already decided that he was

"going to do whatever it took not to be away from [his] family again" and was going to cooperate. Feb. 20 Tr. at 64:22-23 (M. Montoya).  See id. at 64:24-65:14 (Castellano, M. Montoya).  At some point, M. Montoya said, he was released from jail to begin cooperating with the FBI.  See Feb. 20 Tr. at 66:11-14 (Castellano, M. Montoya).  M. Montoya said that he reported to Acee and still had a drug problem.  See Feb. 20 Tr. at 71:20-22 (Castellano, M. Montoya); id. at 72:16-19 (Castellano, M. Montoya).  M. Montoya described using methadone to detoxify and to stop using drugs.  See Feb. 20 Tr. at 72:20-73:13 (Castellano, M. Montoya).  He explained that, as part of his cooperation, he agreed to take telephone calls from incarcerated SNM members, to make controlled buys, and to answer questions honestly in his debriefs.  See Feb. 20 Tr. at 66:15-20 (Castellano, M. Montoya).  He said he made some controlled buys from C. Garcia, for which he was provided a recording device, was searched before and after the buys, and was given the money for the buys. See Feb. 20 Tr. at 66:21-67:3 (Castellano, M. Montoya).

M. Montoya explained that he had a debrief interview with his attorney present, under the protection of a Kastigar letter, and revealed his participation in Dix' murder in 2005 with Anthony Cordova and C. Garcia.  See Feb. 20 Tr. at 67:15-68:7 (Castellano, M. Montoya); id. at 80:21-24 (Castellano, M. Montoya).  M. Montoya explained that C. Garcia was in Las Vegas, Nevada, at the time of the murder, so he would not be blamed for it, and that M. Montoya's understanding was that C. Garcia wanted Dix killed, because Dix had shot him during a disagreement.  See Feb. 20 Tr. at 68:8-69:10 (Castellano, M. Montoya).  M. Montoya said that, when C. Garcia was shot, M. Montoya was still in a relationship with his ex-wife who worked at the hospital, which is how M. Montoya knew that C. Garcia barely survived the shooting.  See Feb. 20 Tr. at 69:14-21 (Castellano, M. Montoya).  M. Montoya believed that he participated in the Dix homicide a few years after Dix shot C. Garcia, and explained that C. Garcia had a lot of money from dealing drugs

and always paid the bond for M. Montoya when he was arrested for domestic violence.  See Feb. 20 Tr. at 70:1-15 (Castellano, M. Montoya).  M. Montoya later verified that the homicide occurred a year after Dix shot C. Garcia in 2004 and that, until he provided this information to the FBI, nobody had been charged for it.  See Feb. 20 Tr. at 80:21-81:7 (Castellano, M. Montoya).  M. Montoya stated that A. Cordova was awaiting trial for the Dix homicide and that C. Garcia pled guilty to the homicide.  See Feb. 20 Tr. at 81:8-15 (Castellano, M. Montoya).  M. Montoya said that C. Garcia also was known for giving out a "baby baller startup kit" to those who got out of prison, containing some cash and some drugs.  Feb. 20 Tr. at 70:25-71:9 (Castellano, M. Montoya).

M. Montoya said that he was out on the street cooperating for two years until he again got arrested, for failure to pay a traffic ticket and for an automobile burglary.  See Feb. 20 Tr. at 73:19-74:4 (Castellano, M. Montoya).  He characterized spending these two years on the streets as time spent living his life, working and doing things of which he did not believe he was capable.  See Feb. 20 Tr. at 74:9-14 (Castellano, M. Montoya).  M. Montoya said that the United States paid about $3,000.00 to send him to trade school but that the biggest benefit of his cooperation was burning the bridge with SNM.  See Feb. 20 Tr. at 74:15-25 (Castellano, M. Montoya).  He admitted, however, that the United States also paid to fix his recreational vehicle, so he could leave town when the investigation concluded, and gave him about $5,200.00 in payments, so he received about $10,500.00 in total benefits from the United States.  See Feb. 20 Tr. at 75:1-13 (Castellano, M. Montoya).  M. Montoya clarified that he left New Mexico once he finished cooperating, but was arrested about two years later for not staying in touch with Acee, picking up the new charge, and violating his conditions of release, which is why he is currently in jail.  See Feb. 20 Tr. at 80:6-20 (Castellano, M. Montoya).

M. Montoya explained that, in October and November, 2015, he recorded Duran, who was housed in PNM North in the cell next to Baca's cell.  See Feb. 20 Tr. at 83:3-24 (Castellano, M. Montoya).  M. Montoya stated that he knew and was not surprised that Duran had a cellular telephone with him in the prison, because some correctional officers could be paid to bring in packages, but that he was not aware at the time that Duran was also cooperating.  See Feb. 20 Tr. at 83:25-84:11 (Castellano, M. Montoya).  M. Montoya recalled receiving a telephone call from Duran in which Duran relayed that Baca wanted to speak to M. Montoya; M. Montoya explained that Baca grew up down the street from him and that they also knew each other from prison.  See Feb. 20 Tr. at 85:4-7 (Castellano, M. Montoya); id. at 85:15-25 (Castellano, M. Montoya).  M. Montoya said that Baca got on the telephone, and Baca said that the STIU wanted to kill an SNM member.  See Feb. 20 Tr. at 85:8-14 (M. Montoya, Castellano).  The United States played this telephone call for the jury.  See Feb. 20 Tr. at 86:17-20 (Castellano).  M. Montoya explained that Duran is easier to hear in the recording than Baca, because Duran tells Baca what M. Montoya said through the heater vent between their cells, and then repeats what Baca said to M. Montoya.  See Feb. 20 Tr. at 88:17-25 (Castellano, M. Montoya); id. at 92:1-12 (Castellano, M. Montoya).  After the recording was played, the Court gave a limiting instruction at D. Sanchez' request.  See Feb. 20 Tr. at 106:5-11 (Jacks, Court).[110]  M. Montoya told C. Garcia about the STIU murder conspiracy, even though C. Garcia was not supposed to be privy to that information.  See Feb. 20 Tr. at 110:12-110:18 (Castellano, M. Montoya).  Although C. Garcia initially thought the conspiracy as a bad idea, he later changed his mind.  See Feb. 20 Tr. at 110:19-111:3 (Castellano, M. Montoya).  M. Montoya explained that he played along with the discussions and suggested that

---

[110]The Court instructed: "These are conversations that were recorded of Mr. Baca, and so you can only use these conversations in your deliberation of the charges against Mr. Baca and not as to the other three gentlemen."  Feb. 20 Tr. at 106:7-11 (Court).

they aim big, at someone who makes decisions as opposed to just an officer.  See Feb. 20 Tr. at 113:23-114:9 (Castellano, M. Montoya).

M. Montoya maintained that he distanced himself from the gang at this point and only talked to those members who were his friends before prison, and that he was not talking to any other inmates.  See Feb. 20 Tr. at 123:3-12 (Castellano, M. Montoya).  He explained that Parker got involved in the conspiracy, because Baca let M. Montoya choose who else he wanted involved.  See Feb. 20 Tr. at 123:15-124:6 (Castellano, M. Montoya).  M. Montoya described telling Parker that they were supposed to kill a NM Corrections Department official, and that they would get recognition for it, and that C. Garcia would provide the weapons.  See Feb. 20 Tr. at 125:2-18 (Castellano, M. Montoya).  The Court provided a limiting instruction on D. Sanchez' request.  See Feb. 20 Tr. at 127:10-17 (Jacks, Court).[111]  The United States continued playing recordings and asked M. Montoya to explain the conversations.  See, e.g., Feb. 20 Tr. at 131:8-132:19 (Castellano, M. Montoya); id. at 132:24-137:20 (Castellano, M. Montoya).  M. Montoya explained that he asked Baca about J. Montoya's attitude, because SNM had forced J. Montoya to kill Molina right before J. Montoya was scheduled to be released from prison.  See Feb. 20 Tr. at 137:12-20 (Castellano, M. Montoya).  M. Montoya also proffered his understanding that Baca wanted him to bring people back together and under SNM's control, because "everybody is done" and "trying to get away from all this."  Feb. 20 Tr. at 146:12-13 (M. Montoya).  See id. at 146:6-11 (Castellano, M. Montoya).  As the United States continued to play portions of recordings, D. Sanchez again requested a limiting instruction, which the Court provided.  See Feb. 20 Tr. at 153:4-11 (Jacks,

---

[111]The Court instructed: "These are all conversations of Mr. Baca, so you'll need to only consider the testimony and the evidence against Mr. Baca in deliberating on the charges against him, and you may not consider it as evidence against the other three gentlemen."  Feb. 20 Tr. at 127:12-17 (Court).

Court).[112]  In another conversation, M. Montoya explained, M. Montoya and C. Garcia told Baca that he needed to aim to kill someone with more authority than Santistevan or an administrative manager, because they do not decide who gets shipped out of state, and that he should instead focus on attacking someone like Marcantel.  See Feb. 20 Tr. at 154:6-155:15 (Castellano, M. Montoya).  M. Montoya stated that, on November 29, 2015, C. Garcia gave him a pistol, without a clip, and some bullets to murder Marcantel.  See Feb. 20 Tr. at 157:1-19 (Castellano, M. Montoya).  This interaction with C. Garcia was recorded, and M. Montoya said that he had to quickly pull over after leaving C. Garcia's house so law enforcement could search him and could retrieve the gun and recording device.  See Feb. 20 Tr. at 159:6-19 (M. Montoya, Castellano).  The United States then played the recording of this interaction and had M. Montoya explain.  See, e.g., Feb. 20 Tr. at 160:7-161:13 (Castellano, M. Montoya).  M. Montoya explained that C. Garcia recommended that he kill Parker afterward, because of the risk that he may tell.  See Feb. 20 Tr. at 163:6-24 (Castellano, M. Montoya).

    M. Montoya testified that, after his cooperation outlined above, he pled guilty to his heroin distribution charge on December 18, 2015, and that his plea agreement was sealed to prevent others from learning that he had cooperated in this case.  See Feb. 20 Tr. at 175:17-176:19 (Castellano, M. Montoya).  M. Montoya stated that he understood that the United States Attorney's Office could move to lower his sentence because of his cooperation, but that the judge has the final discretion in deciding his sentence.  See Feb. 20 Tr. at 177:20-178:3 (Castellano, M. Montoya).  Next, M. Montoya recalled a public conversation with Troup, in which Troup told him that "all of

---

[112]The Court instructed: "And these are continuing to be discussions with Mr. Baca, so you're only to consider these in your deliberations, this testimony and this evidence, in conjunction with your deliberation of the charges against Mr. Baca, not against the other three defendants." Feb. 20 Tr. at 153:6-11 (Court).

us cooperators think that the F.B.I. and U.S. Government is our friend, but we're going to find out in the end that . . . they're going to line us up and prosecute us next; that we're probably going to end up with more time than them." Feb. 20 Tr. at 179:13-23 (Castellano, Montoya). M. Montoya stated that Clark and J. Montoya, with whom he was housed, also heard Troup. See Feb. 20 Tr. at 180:8-20 (Castellano, Montoya). The Court provided a limiting instruction.[113] See Feb. 20 Tr. at 181:9-15 (Court). M. Montoya explained that he used an RV to relocate on December 24, 2015, because he was afraid that SNM members would learn that he was cooperating and kill him. See Feb. 20 Tr. at 184:17-185:14 (Castellano, Montoya). M. Montoya also testified that, sometime between 1995 and 1999, he helped bring D. Sanchez into SNM. See Feb. 20 Tr. at 186:3-25 (Castellano, Montoya).

Next, M. Montoya testified that he decided to distance himself from SNM after the birth of his daughter, the beginning of his drug addiction recovery, and the sight of several people murdered, but that it would be difficult to leave SNM without being killed. See Feb. 20 Tr. at 189:10-190:4 (Lowry, Montoya). M. Montoya stated that, after he started cooperating with the government, the United States sent him to driving school to attain a commercial driver's license and gave him a stipend of $5,000.00 so that he could relocate. See Feb. 20 Tr. at 191:7-192:6 (Lowry, Montoya). M. Montoya stated that he was arrested in September, 2015, after selling heroin and a firearm to a confidential informant, but his plea agreement made no mention of the firearm, which M. Montoya described as a "very good bargain." Feb. 20 Tr. at 201:6 (Lowry, Montoya). M. Montoya further explained that, under the terms of his plea agreement, he "joined

---

[113]The Court instructed: "[T]his latest statement by Mr. Troup is not [limited to Mr. Baca]. . . . If you're taking notes, make sure that you specify that the Armenta conversation can only be used in the discussions with Mr. Baca's charges, and not as to the other three gentlemen." Feb. 20 Tr. at 181:10-15 (Court).

Team America" and agreed to testify truthfully about all of his criminal conduct. Feb. 20 Tr. at 201:11 (Lowry, Montoya). M. Montoya said that SNM had changed over the years and that it now resembled a "popularity contest" in which members were less loyal to the gang. Feb. 20 Tr. at 211:2-25 (Lowry, Montoya). M. Montoya explained that SNM's rules constantly changed with every new leader and that new leaders were selected based on who had the most "charisma." Feb. 20 Tr. at 215:11-19 (Lowry, Montoya). M. Montoya stated that he blames SNM's changes on poor leadership quality and bad decisions. See Feb. 20 Tr. at 219:8-12 (Lowry, Montoya).

Referring to the tape recordings played earlier, M. Montoya stated that he recalled that Marcantel's name was mentioned, but that he did not remember on which tape. See Feb. 20 Tr. at 227:16-228:10 (Lowry, Montoya). After reviewing a transcript of a tape, M. Montoya states that he did not hear Marcantel's name, but that he remembered hearing his name on one of the tapes. See Feb. 20 Tr. at 232:20-233:2 (Lowry, Montoya). M. Montoya confirmed that, at one point in the conversations, Baca told him not to tell C. Garcia about anything and that the FBI never told him to tell anything to C. Garcia. See Feb. 20 Tr. at 240:12-241:22 (Lowry, Montoya). M. Montoya also testified that he was selected to kill Marcantel. See Feb. 20 Tr. at 241:23-243:14 (Lowry, Montoya). M. Montoya stated that he has an extensive criminal history, and that he had spent his entire life addicted to drugs and committing crimes to obtain drugs. See Feb. 20 Tr. at 253:19-254:7 (Lowry, Montoya). M. Montoya acknowledged that his history will factor into his sentencing guideline calculation. See Feb. 20 Tr. at 256:21-257:9 (Lowry, Montoya). M. Montoya further stated that he believes his plea bargain indicates a sentence of four years. See Feb. 20 Tr. at 257:13-16 (Montoya).

M. Montoya next discussed his prior escape conviction; he testified that he escaped the prison in Milan, New Mexico, through a hole in the prison yard fence and was not captured for

five days. See Feb. 20 Tr. at 258:20-259:10 (Castellano, Montoya). Asked about the term "one-year bitch," M. Montoya testified that it refers to the Habitual Offender Act,[114] and that "everybody calls it 'the bitch' for short." Feb. 20 Tr. at 259:18-19 (Castellano, Montoya). M. Montoya testified that Baca had wanted to kill someone in the prison administration or STIU, but by November 29, 2015, Marcantel became the "focus." Feb. 20 Tr. at 261:16 (Castellano, Montoya). M. Montoya testified that both Baca and C. Garcia wanted Marcantel to be killed. See Feb. 20 Tr. at 263:13-25 (Castellano, Montoya). During Baca's re-cross examination, M. Montoya testified that, at this time, Baca was living at Level 6 at PNM North, and that every call using the prison telephones or using Duran's cellphone -- which was wiretapped -- would have been recorded, but that other inmates had cellphones as well. See Feb. 20 Tr. at 265:11-266:6 (Lowry, Montoya). The Court excused M. Montoya from the proceedings. See Feb. 20 Tr. at 267:24-25 (Court).

### ai.    Eric Duran's Testimony.

The United States next called Duran to the stand. See Feb. 20 Tr. at 268:1-3 (Court, Armijo); id. at 272:14-19 (Court). Duran stated that he first became aware of SNM when he initially went to prison at PNM South in 1998 and that he became an SNM member in 2003. See Feb. 20 Tr. at 279:3-11 (Armijo, Duran). Duran testified that he helped bring drugs into facilities for SNM. See Feb. 20 Tr. at 280:13-21 (Armijo, Duran). Duran also stated that he had been caught with a cellphone and drugs once while incarcerated at PNM North. See Feb. 20 Tr. at 285:10-14 (Armijo, Duran). Duran discussed a conversation he had with R. Perez at PNM North, for which the Court gave a limiting instruction.[115] See Feb. 20 Tr. at 292:10-15 (Court, Montoya).

---

[114]N.M. Stat. § 31-18-17.

[115]Duran stated that R. Perez was in a wheelchair at the time and "was down to do whatever needed to be done, regardless of his circumstances," and the Court instructed: "That statement will

Duran testified that he met D. Sanchez in 1998 while incarcerated at PNM South and that D. Sanchez was an SNM member. See Feb. 20 Tr. at 286:12-17 (Armijo, Duran). Duran stated that the next time he met D. Sanchez was in 2007 at PNM North and that he subsequently "spent quite a lot of time with [D. Sanchez]." Feb. 20 Tr. at 287:13-24 (Armijo, Duran). Duran also testified that he knows Herrera from being housed with him at several facilities, that Herrera is an SNM member, and that, from 1998 to 2004, he would buy heroin from Herrera's mother to sell. See Feb. 20 Tr. at 288:21-290:3 (Armijo, Duran). In addition, Duran testified that he knows R. Perez, whom he met around August, 2015, at PNM North, and that R. Perez is an SNM member. See Feb. 20 Tr. at 290:8-291:7 (Armijo, Duran). Duran also testified that he knows Baca, whom he first met in 2013 at the Southern New Mexico, and that Baca is an SNM member. See Feb. 20 Tr. 293:4-294:16 (Armijo, Duran).

Duran testified that, in 2013, Baca discussed with him his plan to murder Molina before Baca left Southern New Mexico. See Feb. 20 Tr. at 297:13-22 (Armijo, Duran). According to Duran, Baca also wanted to "hit" three correctional officials: "Dwayne Santistevan, who was the STIU director; Gregg Marcantel, who was the Secretary of Corrections; and Dwayne Santistevan, Jr., [who] is the son of the STIU director." Feb. 20 Tr. at 298:7-16 (Armijo, Duran). Duran explained that Baca's plan "was to send the assailants to murder Javier Molina, [and to order] two other members of the organization that were about to be released to the streets within a six-to-seven-month period . . . to carry out the assassination of the correctional facility officials." Feb. 20 Tr. at 298:17-299:3 (Armijo, Duran). Duran further testified that he was at PNM North when Molina was killed in March, 2014. See Feb. 20 Tr. at 299:21-300:1 (Armijo, Duran).

---

be limited just in your considerations to the charges against Perez and not against the other three defendants." Feb. 20 Tr. at 292:10-22 (Court, Duran).

Duran stated that, by early 2015, he decided to start cooperating with the FBI.  See Feb. 20 Tr. 301:4-18 (Armijo, Duran).  Duran testified that he told the FBI about Molina's murder and about the "hits" that Baca wanted to conduct against the correctional officers.  Feb. 20 Tr. 304:2-10 (Armijo, Duran).  After Duran started to cooperate with the FBI, he stated that he was asked to record Robert Martinez and Roy Martinez, both of whom he recorded with a battery-operated device.  See Feb. 20 Tr. at 306:1-5 (Armijo, Duran); id. at 307:9-14 (Armijo, Duran).  According to Duran, only two people within the NM Corrections Department knew that he was cooperating with the FBI.  See Feb. 20 Tr. at 308:19-25 (Armijo, Duran).

Duran testified that he started working with Acee in May, 2015, and that he received a wiretapped cellphone to conduct drug deals and to help carry out Baca's plans.  See Feb. 20 Tr. at 309:11-310:12 (Armijo, Duran).  Duran stated that he had conversations on the cellphone with Baca's girlfriend, Yvonne; Baca's cousin and C. Garcia's girlfriend, Claudette; and Baca's mother.  See Feb. 20 Tr. at 313:7-19 (Armijo, Duran).  According to Duran, these conversations were at Baca's direction.  See Feb. 20 Tr. at 314:4-6 (Armijo, Duran).

The United States continued to play a series of tape recordings, about which the Court gave a limiting instruction.[116]  See Transcript of Jury Trial Volume 17 at 17:8-12 (taken February 21, 2018)(Court), filed February 22, 2019 (Doc. 2533)("Feb. 21 Tr.").  Duran testified that, in one tape recording, Baca ordered Jonathan Gomez, or "Baby G," to kill Javier Rubio, or "BB."  Feb. 21 Tr. at 37:11-25 (Armijo, Duran).  Duran also explained that Baca often speaks in "code talk . . . so correctional officers couldn't understand or comprehend what we were discussing in our

---

[116]The Court instructed: "We're going to be playing tapes this morning.  These are conversations with Mr. Baca.  And so again, these can only be used in your discussions of the charges against Mr. Baca and not the other three gentlemen."  Feb. 21 Tr. at 17:8-12 (Court).

communications." Feb. 21 Tr. at 41: 8-16 (Armijo, Duran). The Court gave another limiting instruction.[117] See Feb. 21 Tr. at 41:17-42: (Court). Duran testified that Baca had told him about an altercation over drugs between Baca and another SNM member that led Baca to stab the SNM member. See Feb. 21 Tr. at 51:3-13 (Armijo, Duran); id. at 52:2-6 (Armijo, Duran). Duran testified that, in another tape recording, Baca told Duran that he planned to enforce a "hit" on Javier Molina. Feb. 21 Tr. at 57:6 (Armijo, Duran). In the next tape recording, Duran testified that Baca told him that he sent a message to Armenta's mother "to let [Armenta] know, if he testifies [or cooperates], somebody in his family would be hurt," because Baca did not want Armenta, who was involved in the Molina murder, to cooperate with the FBI. Feb. 21 Tr. at 61:14-24 (Armijo, Duran).

Duran stated that he and Baca had discussed "fear," and how "SNM uses [fear] to get our way within the Department of Corrections. We like to embed fear into people's hearts, including our rivals, to overcome and be superior over people." Feb. 21 Tr. 65:10-14 (Armijo, Duran). Duran explained that in the following tape recording Baca "told Baby G to carry out a hit on Petey, [who] is . . . a rival gang member [who] was being housed with us." Feb. 21 Tr. 68:13-18 (Armijo, Duran). Regarding another taped conversation, Duran testified that Baca had asked him to obtain a "cuete," or gun, for Baca to "to be used in the assassination of Mr. Marcantel or Santistevan." Feb. 21 Tr. at 75:15-22 (Armijo, Duran). After playing the next tape, Duran said that Baca had

---

[117]The Court instructed:

> Mr. Duran is making certain statements on here. What Mr. Duran is saying is irrelevant. It's not being offered for the truth. So you're not to consider what he's saying for the truth. You're to consider what Mr. Baca is saying. So I give you what Mr. Duran is saying just so that you understand the context.

Feb. 21 Tr. at 17-24 (Court).

instructed C. Garcia to give one gun to M. Montoya and to erase any serial numbers on the gun "so it can't be traced back to the original owner." Feb. 21 Tr. at 91:8-92:5 (Armijo, Duran). Duran testified that, during a conversation between him and Baca, Baca wanted to know the "locations of the targets so [they] could pinpoint their whereabouts," and that the "targets" refer to Marcantel and Santistevan. Feb. 21 Tr. at 101:1-11 (Armijo, Duran). Duran explained that he and Baca wanted to discover where Marcantel and Santistevan lived, and that this information would be shared with the assailant to carry out the murders. See Feb. 21 Tr. at 103:4-13 (Armijo, Duran). Duran said that Baca later directed C. Garcia to "destroy evidence so nothing would link them back to the SNM." Feb. 21 Tr. at 115:23-24 (Duran). Duran also stated that Baca watched the news after Marcantel's murder was to be carried out "in hopes that he would see" reports about Marcantel's murder. Feb. 21 Tr. at 116:12-21 (Armijo, Duran). Duran testified that, in the next tape, Baca expressed that, if Armenta testifies, "we'll get a lot more power, notoriety, and credibility through hitting his family members." Feb. 21 Tr. at 117:21-25 (Armijo, Duran). Duran said that, because he was cooperating with the United States as an informant, "[t]he Department of Corrections [] awarded me a lump sum, which is within their guidelines of their policies and procedures for saving lives." Feb. 21 Tr. 119:2-4 (Duran). Duran testified that, after he was released from prison, the FBI relocated him "to a different part of [the] country" to keep him and his family "safe" from SNM members, and that he continued to receive monetary benefits from the FBI. Feb. 21 Tr. at 119:18-120:14 (Armijo, Duran).

Duran next testified that he helped raise his stepdaughter while living in prison, and that he instructed his wife to "whoop," or slap, his stepdaughter. Feb. 21 Tr. at 139:11-140:23 (Duncan, Duran). Duran also testified that he would "whoop [his stepdaughter's] ass so she would know who the boss is." Feb. 21 Tr. at 185:2-8 (Duncan, Duran). Duran testified later, however, that he

was "playing" and that his "gesture [was] a joke." Feb. 21 Tr. at 244:15-16 (Duran). Duran was asked about several encounters with law enforcement after he was released from prison, and he testified that he provided a false name to a police officer. See Feb. 21 Tr. at 149:4-13 (Duncan, Duran). Duran further testified that he had previously used a false identity. See Feb. 21 Tr. at 151:7-10 (Duncan, Duran). Duran was shown a Facebook photograph of himself holding and throwing money into the air, but he testified that the FBI did not provide the money. See Feb. 21 Tr. at 154:6-15 (Duncan, Duran). Next, a tape recording was played, and Duran testified that, on the tape, he told law enforcement that Baca originally had planned to "hit" Santistevan, and not Marcantel, and that it was not until August, 2015, that Baca wanted to "hit" Marcantel as well. Feb. 21 Tr. at 159:6-14 (Duncan, Duran). Duran also testified that he had been convicted of possessing a shank while in prison. See Feb. 21 Tr. at 160:15-21 (Duncan, Duran). After listening to another tape recording of a conversation between him and law enforcement, Duran testified that he had denied to law enforcement that he was an SNM member. See Feb. 21 Tr. at 168:5-10 (Duncan, Duran). Duran also stated that, while in prison, he was able to read some discovery material on Armenta's tablet. See 175:2-8 (Duncan, Duran). Duran testified that he and Baca were both incarcerated at Southern New Mexico from January to June, 2013. See Feb. 21 Tr. at 200:18-24 (Duncan, Duran).

Duran next testified that he met with STIU and the FBI in February, 2015, where Duran gave STIU and the FBI information about Molina's murder and about outstanding "greenlights." Feb. 21 Tr. at 209:10-17 (Bhalla, Duran). Duran stated that he told them that there was an outstanding "greenlight" on Herrera. Feb. 21 Tr. at 209:18-211:8 (Bhalla, Duran). Duran further stated that he knew Herrera had a "greenlight" on him because he "didn't follow an order by Pup." Feb. 21 Tr. at 211:23-24 (Duran).

Duran next said that the first time he met R. Perez was around August, 2015, in the prison yard at PNM North.  See Feb. 21 Tr. at 223:10-20 (Villa, Duran).  Duran confirmed that the first time he ever conveyed this information to law enforcement was on February 18, 2018.  See Feb. 21 Tr. at 223:21-224:16 (Villa, Duran).  Duran also confirmed that he recorded conversations with M. Rodriguez and T. Martinez.  See Feb. 21 Tr. at 224:18-225:21 (Villa, Duran).  Duran testified that he "got time off" of his sentence, because he "saved two lives."  Feb. 21 Tr. at 227:8-11 (Villa, Duran).  Duran stated that his sentence was reduced by two years and that, when he was out of prison, he created a new "persona."  Feb. 21 Tr. at 230:11-24 (Jacks, Duran).  Duran next testified that he was testifying "on my free will" and not because of a subpoena.  Feb. 21 Tr. at 246:1-3 (Armijo, Duran).  Duran reiterated that he was never provided his own tablet with discovery.  See Transcript of Jury Trial Volume 18 at 15:24-16:2 (taken February 22, 2018)(Armijo, Duran), filed February 22, 2019 (Doc. 2534)("Feb. 22 Tr.").  The Court allowed Duran to step down from the witness stand, subject to re-call, and reminded him not to discuss his testimony with anybody.  See Feb. 22 Tr. at 16:13-17 (Court).

### aj.    Billy Cordova's Testimony.

The United States next called B. Cordova to the stand.  See Feb. 22 Tr. at 17:1-2 (Castellano).  B. Cordova stated that he is a former SNM member.  See Feb. 22 Tr. at 17:24-25 (Cordova).  B. Cordova testified that, at the age of sixteen, he was convicted of several crimes he committed on SNM's behalf -- for which he was tried as an adult.  See Feb. 22 Tr. at 20:10-14 (Castellano, Cordova).  B. Cordova testified that, soon after, in 2001, he started working for SNM by tracking down and robbing people who owed SNM money.  See Feb. 22 Tr. at 24:3-7 (Cordova).  He also testified that he kidnapped a rival drug dealer named Popeye and took him to A. Munoz, who was SNM's leader at the time.  See Feb. 22 Tr. at 24:8-22 (Castellano, Cordova).

B. Cordova testified that, during this time, he remained an SNM prospect, but he became a member in 2003.  See Feb. 22 Tr. at 28:20-23 (Castellano, Cordova).  B. Cordova said that he became a member after committing several assaults, including strangling a man named Richard Torrez, who nearly died.  See Feb. 22 Tr. at 29:9-13 (Cordova).  B. Cordova admitted that he was "very violent," which made him a good candidate to join SNM.  Feb. 22 Tr. at 32:4-8 (Castellano, Cordova).  B. Cordova testified that assaulting rival gang members was "expected of us" as SNM members. Feb. 22 Tr. at 29:19-21 (Castellano, Cordova).  B. Cordova further testified that SNM members are killed if they cooperate with law enforcement.  See Feb. 22 Tr. at 31:3-7 (Castellano, Cordova).

Next, B. Cordova testified that, in 2005, he would send drugs that he acquired from C. Garcia into New Mexico jails and prisons.  See Feb. 22 Tr. at 44:14-22 (Castellano, Cordova).  In particular, B. Cordova stated that he sent drugs to A.A. Garcia, D. Sanchez, Roybal, and Clark. See Feb. 22 Tr. 45:3-4 (Castellano, Cordova).  B. Cordova testified that he was found guilty of manslaughter in 2015.  See Feb. 22 Tr. at 46:8-11 (Castellano, Cordova).  B. Cordova testified that, in December, 2015, the Metropolitan Detention Center where he was housed became crowded with SNM members, many of whom had been moved from other facilities and were facing new RICO charges for murder.  See Feb. 22 Tr. at 46:16-47:23 (Castellano, Cordova).  B. Cordova testified that he was also aware that SNM members murdered Molina and that he thought Herrera would have been one of the charged SNM members, but that he was notably missing amongst SNM members at the Metropolitan Detention Center.  See Feb. 22 Tr. at 52:10-18 (Castellano, Cordova).  B. Cordova also testified that he thought R. Perez would have been housed in Metropolitan Detention Center following the RICO charges, because he believed that other SNM members "got the shanks from [R. Perez'] walker [and] used [them] to murder Javier Molina." Feb. 22 Tr. at 55:5-23 (Castellano, Cordova).

B. Cordova testified that, in January, 2016, he met with law enforcement and that he was unsure at the time whether he wanted to cooperate with the government. See Feb. 22. Tr. at 58:10-59:13 (Castellano, Cordova). B. Cordova stated, however, that he was "tired of living the way I was" and "wanted out" of SNM. Feb. 22 Tr. at 59:21 (Cordova). Because he is cooperating with the government, B. Cordova testified: "I'm a rat. In our world, I'm a piece of junk. I'm worthless now. I'm scum. I threw all my reputation away." Feb. 23 Tr. at 235:3-5 (Cordova). Cordova said that, after he ultimately decided to cooperate with the United States, the FBI and United States Attorney's Office provided B. Cordova a lawyer, and B. Cordova began telling law enforcement about his past under the protection of a Kastigar letter. See Feb. 22 Tr. at 61:11-21 (Castellano, Cordova). B. Cordova testified that he also told law enforcement that he believed that two people -- Herrera and R. Perez -- were not arrested but should have been arrested, and he agreed to record the two individuals. See Feb. 22 Tr. at 74:10-16 (Castellano, Cordova).

First, B. Cordova stated that he recorded R. Perez at PNM North and that law enforcement relocated B. Cordova to a cell next to R. Perez' cell to make things easier. See Feb. 22 Tr. at 74:17-20 (Castellano, Cordova); id. at 81:20-82:8 (Castellano, Cordova). B. Cordova recorded conversations with R. Perez about the Molina murder, and B. Cordova testified that R. Perez told him that another SNM member by the name of "Trigger" told others that the Molina murder was carried out with "fierros," or homemade shanks, fashioned from R. Perez' walker. Feb. 22 Tr. at 90:10-91:7 (Castellano, Cordova). B. Cordova testified that R. Perez told him that he was going to act like he did not know anything about the Molina murder or his walker's role in the murder. See Feb. 22 Tr. at 92: 10-21 (Castellano, Cordova). B. Cordova stated that, on March 6 or 7, 2014, shortly before the murder, D. Sanchez asked him for a shank. See Feb. 23 Tr. at 228:12-16 (Jacks, Cordova). B. Cordova also stated that R. Perez told him that he gave the shanks to two other

people and that those are the only people who know the shanks came from his walker.  See Feb. 22 Tr. at 95:15-21 (Castellano, Cordova).  B. Cordova testified that SNM always gathers discovery relating to a case and that SNM uses the discovery to produce "paperwork" on SNM members who cooperate with the government.  Feb. 22 Tr. at 107:12-21 (Castellano, Cordova).  B. Cordova stated that he believed that Armenta and Montoya were charged with Molina's murder, but T. Martinez and M. Rodriguez were not charged.  See Feb. 22 Tr. at 143:7-11 (Castellano, Cordova). B. Cordova further testified that he and other SNM members did not "want [charges under the] RICO Act.  We don't want the federal government interfering with our business because it makes [it] harder than we already have it.  And we didn't want the FBI coming in and breaking up what we were trying to put together."  Feb. 22 Tr. at 148:9-14 (Cordova).  After listening to another recorded conversation, B. Cordova testified that R. Perez said: "I couldn't participate in  [the murder], so I had to do my part.  And I had to give up the fierros to make the shanks out of the walker."  Feb. 22 Tr. at 152:16-21 (Castellano, Cordova).  B. Cordova interpreted R. Perez' contribution of the walker as R. Perez "doing his part."  Feb. 22 Tr. at 152:22 (Cordova).  B. Cordova explained that, because R. Perez was in a wheelchair, "[p]hysically, he couldn't put in work, so he did what he could for the carnals."  Feb. 22 Tr. at 154:1-2 (Cordova).

Next, B. Cordova confirmed that, from February 16, 2016, to March 18, 2016, he lived in a cell adjacent to Herrera's cell at PNM South, and B. Cordova testified that he recorded his conversations with Herrera during this time period.  See Feb. 22 Tr. at 187:21-188:25 (Castellano, Cordova).  B. Cordova testified that Herrera was an SNM member.  See Feb. 22 Tr. at 190:3-4 (Castellano, Cordova).  B. Cordova stated that he and Herrera had a conversation about how SNM was less driven by fear than it once was.  See Feb. 22 Tr. at 192:23-193:6 (Castellano, Cordova); id. at 208:16-21 (Castellano, Cordova).  B. Cordova further explained that Herrera said that, "to

gain recognition" amongst other street gangs, SNM should start using the "most brutal force necessary, because fear is what brings respect within the gang culture." Feb. 22 Tr. at 201:11-19 (Castellano, Cordova).   B. Cordova testified, however, that he believed that Herrera was "conflicted" about the Molina murder and that Herrera "knew he should have waited," because SNM members were "trying to get . . . back out to the prison population." Feb. 22 Tr. at 227:5-15 (Cordova).  B. Cordova stated that, nevertheless, "when the [Molina] murder went down," Herrera seemed to feel "that it[] strengthened the SNM, because a lot of dudes started [leaving SNM] that were scared.  And it got rid of a lot of what [Herrera] calls the negativity."  Feb. 22 Tr. 234:20-24 (Cordova).  B. Cordova also testified that he and Herrera had discussed recruiting prostitutes to "infiltrate" the NM Corrections Department by getting jobs there so that SNM could "murder certain STIU officers" and "put fear back in the Department of Corrections."  Feb. 22 Tr. at 208:25-209:7 (Castellano, Cordova).

Reflecting on Molina's murder, B. Cordova testified that Herrera told him the assailants in Molina's murder "could have done better," because they accidentally "let [Molina] out of the room when they were stabbing him."  Transcript of Jury Trial Volume 19 at 28:10-21 (taken February 23, 2018)(Castellano, Cordova), filed February 22, 2019 (Doc. 2535)("Feb. 23 Tr.").  According to B. Cordova, Herrera told him that D. Sanchez "was supposed to dispose of the shanks after Javier Molina got murdered."  Feb. 23 Tr. at 27:15-23 (Castellano, Cordova).  B. Cordova testified that, before the Molina murder, Herrera told him to tell "[his] people we're going to be on lockdown."  Feb. 23 Tr. at 42:21-25 (Castellano, Cordova).  B. Cordova stated that, after the murder, inmates who were not involved in the Molina murder and therefore should have been unaware of the murder, began talking about the murder.  See Feb. 23 Tr. at 30:13-20 (Castellano, Cordova).

Next, B. Cordova listened to a tape recording in which he told his wife, Crystal Salas, that he was working for the United States to protect her and his mother from possibly going to prison, and B. Cordova then testified that he had lied to his wife.  See Feb. 23 Tr. at 63:4-14 (Villa, Cordova).  B. Cordova stated that he decided to start working for the United States when Acee told him that he might soon face RICO charges and that, if he cooperated with the government, he "would have immunity from anything that [he] had done for the SNM."  Feb. 23 Tr. at 64:24-65:15 (Villa, Cordova).  Acee advised B. Cordova to try to get R. Perez to speak about the Molina murder and B. Cordova testified that he brought up with R. Perez that there were rumors about his involvement in the murder to get R. Perez to talk about it.  See Feb. 23 Tr. at 72:3-20 (Villa, Cordova).  B. Cordova also stated that he lied at an earlier suppression hearing where he had testified that he had not used any illegal drugs in several years and that he had used drugs shortly before that hearing.  See Feb. 23 Tr. at 79:4-81:12 (Villa, Cordova).  B. Cordova testified that Acee was considering charging him under the RICO Act and charging him with the murder of Sammy Chavez.  See Feb. 23 Tr. at 119:2-9 (Villa, Cordova).  Asked about R. Perez' health, B. Cordova testified that R. Perez was physically able to stop someone from taking a piece of his walker if he wanted to stop someone.  See Feb. 23 Tr. at 134:12-23 (Villa, Cordova).  B. Cordova also stated that R. Perez told him that he has never disrespected SNM or its rules.  See Feb. 23 Tr. at 144:3-21 (Villa, Cordova).  According to B. Cordova, R. Perez was upset that other SNM members had decided to murder Molina by stabbing him instead of choking him.  See Feb. 23 Tr. at 148:19-149:1 (Villa, Cordova).  B. Cordova also stated that he was terminated as a confidential informant in January, 2017, because he had violated the rules by having sex in the contact room.  See Feb. 23 Tr. at 161:5-24 (Villa, Cordova).

B. Cordova testified that, as a result of his cooperation with the United States, the FBI paid him $650.00 for being a confidential human source, $100.00 for food, and $200.00 for telephone expenses, all for a total of $950.00.  See Feb. 22 Tr. at 183:10-20 (Castellano, Cordova).  He also stated that he has not been charged in the case.  See Feb. 22 Tr. at 183:21-23 (Castellano, Cordova). B. Cordova testified that he also received other benefits, such as more tier time, more telephone calls, and more contact visits.  See Feb. 22 Tr. at 184:5-22 (Castellano, Cordova).  B. Cordova also stated that he asked the United States to give money to his wife in exchange for his cooperation; although he admitted that he had testified at a December, 2017, hearing that he had not asked for money to be given to his wife.  See Feb. 23 Tr. at 180:22-181:18 (Bhalla, Cordova).  B. Cordova testified that, in the past, he "use[d] the system and manipulate[d] the rules to get lighter sentences," but that he was not doing so in this case.  Feb. 23 Tr. at 195:24-196:9 (Jacks, Cordova). B. Cordova testified that he and four other government witnesses sent the PNM warden a letter requesting "a holiday party for [the] five government witnesses and their famil[ies]," because of their cooperation.  Feb. 23 Tr. at 199:21-200:9 (Jacks, Cordova).  B. Cordova stated, however, that, although the letter has his name at the end, he did not write the letter and that he had not read it, but he admitted that the party occurred.  See Feb. 23 Tr. at 248:1-10 (Castellano, Cordova).  B. Cordova also stated that he told his wife that, when he is out of prison, the United States would provide them both with money and a house through its witness protection program, and would line up a job for him.  See Feb. 23 Tr. at 203:22-204:20 (Jacks, Cordova).  B. Cordova further testified that, in January, 2017, the FBI revoked his privileges and terminated him as a confidential human source after he had sex with his wife in the prison visiting room in the presence of his eleven-year-old and twelve-year-old daughters.  See Feb. 22 Tr. at 185:14-187:1 (Castellano, Cordova). B. Cordova said that, during the time that he has been waiting to testify, he has been housed with

several government cooperators, including T. Martinez, M. Rodriguez, Duran, F. Munoz, and Rubio.  See Feb. 23 Tr. at 222:6-22 (Jacks, Cordova).  The Court excused B. Cordova from the proceedings.  See Feb. 23 Tr. at 281:15-16 (Court).

> ### ak.    **Santistevan's Testimony**.

The United States next called Santistevan to the stand.  See Feb. 23 Tr. at 281:20-21 (Beck). Santistevan stated that, between 2014 and early 2016, the NM Corrections Department employed him as the Acting Deputy Director in the STIU.  See Feb. 23 Tr. at 282:15-19 (Beck, Santistevan). According to Santistevan, the NM Corrections Department created the STIU because it "saw that there was a significant threat, not only to the safety of our prisons, but [] to the public[] as well, with these gangs and the violence that they were engaging in within the prison system."  Feb. 23 Tr. at 289:5-13 (Beck, Santistevan).  Santistevan testified that he first met Baca in June, 2008, and that Baca is "the identified leader of the SNM."  Feb. 23 Tr. at 292:11-24 (Beck, Santistevan). The Court excused Santistevan from the proceedings.  See Feb. 23 Tr. at 301:14-15 (Court).

> ### al.    **Acee's Testimony -- February 23, 2018**.

The United States next called Acee to the stand.  See Feb. 23 Tr. at 301:19-20 (Castellano). Acee testified that he was not notified when Duran, who was cooperating as a confidential human source, was arrested, even though the FBI was supposed to notify him through traditional channels. See Feb. 23 Tr. at 303:4-17 (Castellano, Acee).  Acee stated that one of the STIU's goals was "the dismantlement of the [SNM]."  Feb. 23 Tr. at 312:21-25 (Castellano, Acee).  Acee opined that it is "demoralizing" for an SNM leader to become a government witness.  Feb. 23 Tr. at 314:21-25 (Castellano, Acee).  Acee stated his belief that Duran figured out by the end of the conspiracy investigation that M. Montoya was also a cooperator.  See Feb. 23 Tr. at 328:22-329:9 (Castellano, Acee).  The United States rested its case in chief.  See Feb. 23 Tr. at 342:17-18 (Court, Castellano).

am.     **Christian Filipiak's Testimony.**

D. Sanchez called Filipiak to the stand.  See Feb. 23 Tr. at 361:23-24 (Jacks).  Filipiak

stated that the Federal Public Defender's office in Nevada currently employs him, that he

previously worked as a private investigator for twenty-five years, and that the Court appointed him

to help investigate the case against D. Sanchez.  See Feb. 23 Tr. at 362:16-362:4 (Jacks, Filipiak).

Filipiak testified that he had interviewed Urquizo on May 25, 2016, about transporting

"paperwork" for Molina from PNM South to Southern Correctional Facility, to which Urquizo

responded that he did not transport the "paperwork" because doing so would have been

"impossible." Feb. 23 Tr. at 366:5-367:10 (Jacks, Filipiak).  Filipiak stated that he did not record

his interview with Urquizo, because he believed that prison policy did not allow him to bring a

recording device to his interview.  See Feb. 23 Tr. at 375:11-18 (Armijo, Filipiak).  Filipiak said

that he was not aware that Urquizo told law enforcement that Filipiak and Jacks asked Urquizo to

testify that he did not bring the "paperwork" from PNM South, even if he brought the "paperwork."

Feb. 23 Tr. at 376:7-19 (Armijo, Filipiak).  The Court excused Filipiak from the proceedings.  See

Feb. 23 Tr. at 388:15-16 (Court).

an.     **Tim Bryan's Testimony.**

Baca called Bryan to the stand.  See Transcript of Jury Trial Volume 20 at 35:24-25

(Lowry)(taken February 26, 2018), filed February 22, 2019 (Doc. 2536)("Feb. 26 Tr.").  Bryan

testified that he has worked at Crowe Horwath, LLP, since 2001, and that he has been a partner

for approximately one year in the accounting firm's investigation practice group.  See Feb. 26 Tr.

at 36:20-37:4 (Lowry, Bryan).  Bryan stated that he specializes in "forensic technology, which

includes computer forensics investigations, E-discovery, [and] litigation support." Feb. 26 Tr. at

37:9-14 (Lowry, Bryan).  The Court allowed Bryan to "offer opinion testimony in the field of

Computer Forensics and Forensic Technological Services." Feb. 26 Tr. at 40:14-17 (Court). Bryan testified that he inspected and analyzed five tablets that the FBI sent to him and on which he found "a lot of internet history, . . . a lot of [] Facebook messaging, Facebook activity, email activity, and a lot of web browsing activity." Feb. 26 Tr. at 43:13-24 (Lowry, Bryan). Bryan admitted that, based on his conversations with counsel, he expected to find discovery material on the tablets, but he did not find any discovery material. See Feb. 26 Tr. at 43:25-44:7 (Lowry, Bryan). Bryan testified that the tablets had connected to the internet using a network "called Walmart" between February, 2017, and April, 2017, and that the most-viewed websites were Facebook and pornography websites. Feb. 26 Tr. at 45:3-25 (Lowry, Bryan). Bryan testified that he found that one of the tablets searched for and used "web proxies," which enable the user to "obfuscate or make it difficult for the true identity of an individual to be known to the website [] which [the individual is] visiting." Feb. 26 Tr. at 46:24-47:2 (Lowry, Bryan). Bryan testified that the one tablet using proxy websites was assigned to Armenta. See Feb. 26 Tr. at 48:20-22 (Lowry, Bryan). Bryan admitted that, although the tablet attempted to use proxy websites, he could not determine whether the tablet "had engaged . . . or [went] through a web proxy." Feb. 26 Tr. at 49:1 (Bryan). Bryan further testified that Armenta's tablet was used to search for teenage pornography, and that the tablet "had approximately 650 individual searches done that utilized 'teen' within the search for pornography." Feb. 26 at 55:22-56:1 (Lowry, Bryan). Bryan stated, however, that the tablet accessed the internet using Microsoft Internet Explorer, which makes it "unlikely" that a user could find child pornography through the web interface. Feb. 26 Tr. at 58:14-59:9 (Lowry, Bryan). Bryan also testified that the tablet contained searches conducted on April 7, 2017, for Armenta's ex-wife. See Feb. 26 Tr. at 65:2-12 (Lowry, Bryan).

Bryan testified that using proxy websites is one way to "conceal" searches from the United States. Feb. 26 Tr. at 71:16-23 (Jacks, Bryan). Bryan further stated that the searches conducted on the tablet represented "unsophisticated" attempts to obtain underage pornography, because Google and Internet Explorer filter out most or all child pornography. Feb. 26 Tr. at 73:62-13 (Jacks, Bryan). On recross-examination, Bryan confirmed that he could not say with certainty whether the tablet accessed web proxies, nor definitively say whether Armenta was the person who conducted searches on the tablet assigned to him. See Feb. Tr. at 81:16-82:14 (Beck, Bryan). Bryan admitted that, during his analysis of the tablets, the tablets appeared to have been "repurposed or reset from their original purpose of housing discovery." Feb. 26 Tr. at 87:8-11 (Beck, Bryan). Although Bryan testified that there were between 750 and 800 internet searches conducted in the Defendants' exhibits on the tablet assigned to Armenta, the United States presented evidence showing that there were 2,223 searches, meaning the Defendants' exhibits represented only about one-third of the total searches. See Feb. 26 Tr. at 89:1-91:20 (Beck, Bryan). Bryan stated that a "majority" of the remaining searches also related to child pornography. See Feb. 26 Tr. at 94:20-95:4 (Lowry, Bryan). The Court excused Bryan from the proceedings. See Feb. 26 Tr. at 95:21-22 (Court).

### ao.    Edward Urtiaga's Testimony.

Baca called Urtiaga to the stand. See Feb. 26 Tr. at 95:25-96:1 (Duncan). Urtiaga stated that the NM Corrections Department employed him as a sergeant in February, 2015. See Feb. 26 Tr. at 96:20-25 (Duncan, Urtiaga). Urtiaga testified that, on February 18, 2015, Duran threatened him by saying he knew where Urtiaga lived, and called out Urtiaga's address and license plate number in front of other SNM members, and stated that he was going to kill Urtiaga, which caused Urtiaga to feel scared. See Feb. 26 Tr. at 97:20-22 (Duncan, Urtiaga); id. at 100:3-101:19 (Duncan,

Urtiaga).  Urtiaga stated that, although he was unsure whether Duran was sanctioned for his threat, sometimes inmates negotiate with the administration or with STIU to avoid sanctions for their disciplinary infractions.  Feb. 26 Tr. at 116:25-117:19 (Duncan, Urtiaga).  Urtiaga also stated that he was currently on administrative leave, but that he was an active employee when Duran threatened him.  See Feb. 26 Tr. at 106:24-107:10 (Duncan, Urtiaga).

Urtiaga admitted that, because Duran was confidentially cooperating with law enforcement, he still needed to act like an active SNM member while in the presence of other SNM members who did not know he was cooperating with the United States.  See Feb. 26 Tr. at 17-21 (Armijo, Urtiaga).  Urtiaga also stated that the Defendants' private investigators approached him at his home, which made him feel uncomfortable.  See Feb. 26 Tr. at 113:2-10 (Armijo, Urtiaga).  Urtiaga stated that the NM Corrections Department was "retaliating against me . . . right now" for testifying.  Feb. 26 Tr. at 114:18-25 (Duncan, Urtiaga).  Urtiaga also admitted, however, that, although he was placed on administrative leave and was being investigated for excessive use of force, the NM Corrections Department was retaliating against him because he was testifying.  See Feb. 26 Tr. at 121:5-124:20 (Armijo, Urtiaga).  Urtiaga further testified that, based on Baca's location history report, Baca was housed in the Colorado Department of Corrections from March 12, 2014, to October 22, 2015. See Feb. 26 Tr. 124:21-126:17 (Duncan, Urtiaga).

### ap.    Acee's Testimony -- February  26, 2019.

Baca called Acee to the stand.  See Feb. 26 Tr. at 127:13-14 (Lowry).  Acee testified that, based on a debrief with Duran around August 5, 2015, he created a report indicating that Baca "was eager to kill" Marcantel.  Feb. 26 Tr. at 129:22-130:8 (Lowry, Acee).  Acee admitted that he wanted Duran to record his conversations with Baca, and that when gave Duran a tape recorder, he told Duran, "'If it's not recorded, the conversation, in my mind, didn't happen.'"  Feb. 26 Tr.

at 131:4-16 (Lowry, Acee).  Acee testified that Baca did not mention to Duran that he wanted to kill Marcantel until about six to eight weeks after being in adjacent cells, even though Acee stated in his grand jury testimony that, immediately upon moving into a cell adjacent to Duran's cell, Baca expressed a desire to kill Marcantel.  See Feb. 26 Tr. at 138:22-141:19 (Lowry, Acee).  Acee also testified that he had told Julian Romero that several "younger guys" wanted to kill Romero, but that Baca had intervened and said not to kill Romero.  See Feb. 26 Tr. at 161:1-8 (Lowry, Acee); id. at 162:11-20 (Lowry, Acee).

Acee next testified that Robert Martinez was an influential SNM member.  See Feb. 26 Tr. at 183:23-25 (Fox-Young, Acee).  Acee agreed that Robert Martinez never identified R. Perez during his testimony.  See Feb. 26 Tr. at 187:9-14 (Fox-Young, Acee).  Acee also testified that M. Rodriguez had told him that he hid additional shanks at PNM North and PNM South.  See Feb. 26 Tr. at 188:3-25 (Fox-Young, Acee).  The shanks were ultimately found inside a heating vent and inside a bed mattress.  See Feb. 26 Tr. at 189:7-11 (Acee).  Acee also said that M. Rodriguez had told him that he was going to stab Mauricio Varela, a co-defendant in the larger SNM case, at trial during a lunch break or recess using a knife he was carrying in his rectum.  See Feb. 26 Tr. at 198:14-199:2 (Fox-Young, Acee).  Acee testified that M. Rodriguez ultimately decided that cooperating with the United States was his "best option," and Acee told him that he would have an "[e]asier time" in prison if he cooperated.  Feb. 26 Tr. at 216:22-217:24 (Fox-Young, Acee).  Acee also testified that, although B. Cordova had testified that he would not brag about a murder he did not commit, B. Cordova told Sammy Griego and Freddie Quintana that he killed S. Chavez.  See Feb. 26 Tr. at 242:10-23 (Fox-Young, Acee).  Acee stated, however, that the NM Corrections Department "ha[d] [B. Cordova] in custody at the time of the murder."  Feb. 26 Tr. at 244:2-6 (Fox-Young, Acee).  Although Acee does not believe B. Cordova actually killed Sammy Chavez,

Acee believes that B. Cordova was involved in S. Chavez' murder by giving advice to the person who shot him.  See Feb. 26 Tr. at 248:6-13 (Fox-Young, Acee).  The Court allowed Acee to step down, subject to re-call.  See Feb. 26 Tr. at 318:16-18 (Court).

aq.     **James Brewster's Testimony.**

D. Sanchez called Mr. Mr. Brewster to the stand.  See Feb. 26 Tr. at 218:25 (Jacks).  Mr. Mr. Brewster testified that he is the NM Corrections Department's General Counsel, as well as the records custodian for the purposes of the Inspection of Public Records Act, ("IPRA").  Feb. 26 Tr. at 219:20-320:2 (Jacks, Brewster).  Mr. Mr. Brewster stated that New Mexico prisons are required to keep records of when inmates are transported between facilities and of the property that inmates carry with them.  See Feb. 26 Tr. at 321:22-322:4 (Jacks, Brewster).  According to Mr. Brewster, the facility where an inmate starts out is required to inventory an inmate's property using a property inventory list, which is kept at both the sending and receiving institutions.  See Feb. 26 Tr. at 322:5-323:3 (Jacks, Brewster); id. at 324:23 (Mr. Brewster).  Mr. Mr. Brewster testified that he completed several requests the Defendants made for documents on April 13, 2017.  See Feb. 26 Tr. at 329:1-331:8 (Jacks, Brewster).  Mr. Brewster admitted that one of the documents the NM Corrections Department provided was not "directly responsive" to the defense's IPRA request.  Feb. 26 Tr. at 342:1-7 (Jacks, Brewster).

Mr. Brewster testified that, anytime an inmate's property is confiscated, a private inventory officer must complete a "confiscate property" form, which should remain in the inmate's private file.  Transcript of Jury Trial Volume 21 at 19:21-25 (Beck, Brewster)(taken February 27, 2018), filed February 22, 2019 (Doc. 2537)("Feb. 27 Tr.").  Prison policy does allow inmates to store and "retain legal materials with regard to cases they intend to file in the near future," and concerning active cases.  Feb. 27 Tr. at 20:12-20 (Beck, Brewster).  Mr. Brewster admitted, however, that

inmates often have more legal materials than they can fit in the prison's designated storage area. See Feb. 27 Tr. at 21:12-22:2 (Beck, Brewster). Next, Mr. Brewster confirmed that the United States made an IPRA request for all materials pertaining to three inmates -- Reynaldo Enriquez, Urquizo, and Varela -- around March 16, 2014, and that the prison provided only one property file for Enriquez in response. See Feb. 27 Tr. at 22:11-23:3 (Beck, Brewster). Mr. Brewster admitted that the property file contained a property inventory list that was filled out under PNM's policy, but that Enriquez' property inventory list should have been filled out under the NM Corrections Department's policy. See Feb. 27 Tr. at 23:9-16 (Beck, Brewster). Mr. Brewster stated that, as a result, the property inventory list lacked a required inventory officer's signature. See Feb. 27 Tr. at 23:17-24:2 (Beck, Brewster). Mr. Brewster also admitted that, in response to the United States' IPRA request, the prison provided a PNM property inventory list for Enriquez, but not a Southern New Mexico property inventory list, which is the facility to which Enriquez was transferred. See Feb. 27 Tr. at 48:15-49:9 (Beck, Brewster). Mr. Brewster acknowledged several discrepancies between property inventory lists that the United States showed to him. See Feb. 27 Tr. at 59:6-60:3 (Beck, Brewster); id. at 60:18-61:3 (Beck, Brewster). The United States showed Mr. Brewster the New Mexico Corrections Department Property Policy for Receipt for Confiscated Property form, which Mr. Brewster confirmed PNM was required to use when confiscating property. See Feb. 27 Tr. at 70:18-72:11. Mr. Brewster stated that he believes that Urquizo was transferred from PNM's South Facility to its North Facility on December 10, 2015. See Feb. 27 Tr. 72:23-73:9 (Beck, Brewster). Mr. Brewster acknowledged discrepancies between two December 10, 2015, inventory lists that purport to list Urquizo's confiscated items. See Feb. 27 Tr. 77:14-81:17 (Beck, Brewster). Mr. Brewster observed that neither inventory list accords with NM Corrections Department's policy for inventorying confiscated items. See Feb. 27 Tr. 76:1-25 (Beck, Brewster).

Mr. Brewster acknowledged that the inventory lists show that Urquizo took "a lot more items" into his cell on December 10, 2015, than on March 6, 2014, even though he was being transferred into a unit where fewer items would be permitted.  Feb. 27 Tr. 81:24-82-19; 98-99:5 (Beck, Brewster). Mr. Brewster stated that he "can't tell" if a property officer inventoried Urquizo's property on March 6, 2014, and Mr. Brewster admitted that he "can't say" whether Urquizo had the items listed in Defendants' Trial Exhibit U2.  Feb. 27 Tr. 104:7-9; 105:6-8 (Beck, Brewster).

On redirect examination,  Mr. Brewster observed that the December 10, 2015, personal property and disposition inventory sheet indicates that the property that had been removed from Urquizo was either going to be released to him or destroyed.  See Feb. 27 Tr. 122:1-123:25 (Jacks., Mr. Brewster).  Mr. Brewster acknowledged that, while inmates are not permitted to exchange most items with each other, he "suspect[s] it happens."  Feb. 27 Tr. 126:19-127:1 (Jacks, Brewster).  On recross-examination, Mr. Brewster acknowledged that many items listed as destroyed in a 2015 inventory list were not listed in the 2014 property inventory list.  See Feb. 27 Tr. 128:3-130:7 (Beck, Brewster).

### ar.     William Edgman's Testimony.

The Defendants conducted Edgman's direct examination.  See  Feb. 27 Tr. 142:21-143:3 (Court, Jacks).  Edgman testified that he works as the Deputy Warden of Operations at Southern New Mexico and that he was "the major, the Chief of Security" at that facility in March, 2014. Feb. 27 Tr. 143:5-15 (Jacks, Edgman).  Edgman stated that the security camera in the blue pod, which captured the right-side of that pod as well as the inner pod emergency doors, was not considered operational because of its image quality on March 7, 2014.  See Feb 27 Tr. 146:13-147:8 (Jacks, Edgman).  Edgman testified that he did not see any video from the non-operational camera preserved in connection with the investigation into the March 7, 2014

homicide.  See Feb. 27 Tr. 148:5-10.  Edgman said that the left camera from the yellow pod recorded the inner pod security doors between the blue and yellow pods, but that he does not know if any video of the inner pod security doors was preserved in connection with investigation into the March 7, 2014 homicide.  See Feb. 27 Tr. 150:2-19 (Jacks, Edgman).  Edgman stated that he did not know when the monitor system became "operational for the individual video cameras." Feb. 27 Tr. 151:23-152:1.  (Lowry, Edgman).    Edgman stated that he does not know if footage from the yellow pod capturing the homicide was preserved and that he "probably" would have been aware if it had been preserved.  Feb 27 Tr. 153:4-12 (Maynard, Edgman).

On cross-examination, Edgman admitted that, in March, 2014, "there was a whole gamut of issues" with the security camera system, including nonoperational cameras and digital video recording systems.  Feb. 27 Tr. 157:9-12 (Edgman).  He explained that motion activated the security cameras, which meant that a busier pod would be recorded more frequently and, consequently, would have its recordings maintained for a shorter period of time.  See Feb. 27 Tr. 159:7-10 (Castellano, Edgman).  Edgman agreed that, once a camera was broken, it was "virtually impossible to get [it] repaired under the contract."  Feb. 27 Tr. 163:4-10 (Castellano, Edgman).

### as.    Jodi Upshaw's Testimony.

D. Sanchez examined Upshaw on direct.  See Feb. 27 Tr. 165:5-8 (Jacks).  Upshaw testified that she is a compliance officer with the NM Corrections Department and that, in March, 2014, she worked there as a classification officer.  See Feb. 27 Tr. 165:10-22 (Jacks, Upshaw).  Upshaw stated that, when she reclassified D. Sanchez, he received a total of seven points based on his conviction, a violent incident in the prison, his clear disciplinary history for twenty-four months, his satisfactory program and work performance, and his age.  See Feb. 27 Tr. 169:6-171:20. (Jacks, Upshaw).  He did not receive any points for gang activity in the past ten years.  See Feb. 27 Tr.

171:8-12. (Jacks, Upshaw).  The United States then cross-examined Upshaw.  See Feb 27 Tr. 173:1-3 (Armijo).  Upshaw clarified that, regardless of the number of points a suspected or classified gang member earned, they would be considered a "Level 4," the highest classification at Southern.  Feb. 27 Tr. 177:3-5 (Armijo, Upshaw); id. at 179:9-21 (Armjio, Upshaw).  On the Defendants' redirect examination, Upshaw clarified that she believed D. Sanchez' sentence as of March, 2014, was life imprisonment.  See Feb. 27 Tr. 180:15-22 (Jacks, Upshaw).

### at.    Herman Gonzales' Testimony.

The Defendants examined Gonzales.  See Feb. 27 Tr. 185:23-15 (Jacks).  Gonzales stated that he was a transport officer with the NM Corrections Department in March, 2014.  See Feb. 27 Tr. 186:4-12. (Gonzales, Jacks).  Gonzales said that, when he transports inmates, he puts their property in a trailer inaccessible to the inmates who are in the vehicle.  See Feb. 27 Tr. 193:24-194:6 (Jacks, Gonzales).  He confirmed that he was transporting Urquizo from PNM's Level 5 facility to Southern New Mexico on March 6, 2014.  See Feb. 27 Tr. 208:24-209:2 (Jacks, Gonzales).  Gonzales explained that, when handing over inmate property, the property officer usually gives him a receipt, but that he did not "see a receipt for the property in this package of material[.]"  Feb. 27 Tr. 217:23-218:2 (Jacks, Gonzales).

### au.    Benjamin Clark's Testimony.

R. Perez examined B. Clark on direct.  See Feb. 27 Tr. 231:48 (Court, Villa).  Clark clarified that B. Cordova never told Clark that he murdered Chavez, but that B. Cordova gave Clark the appearance that he murdered Chavez.  See Feb. 27 Tr. 232:8-13 (Villa, Clark).  On cross-examination, Clark confirmed that, in his plea agreement, he agreed to be truthful and not to exaggerate or to minimize any person's role in the crime.  See Feb. 27 Tr. 241:11-24 (Beck, Clark).  Clark reiterated that B. Cordova "never flat-out said, 'I killed Sammy Chavez.'"  Feb. 27

Tr.242:11-14 (Beck, Clark).  On redirect examination, Clark agreed that, if B. Cordova was in custody when Chavez was killed, then B. Cordova must have been dishonest when he implied that he killed Chavez.  See  Feb. 27 Tr. 244:7-14 (Villa, Clark).

### av.     Bobby Delgado's Testimony.

The Defendants examined Delgado on direct.  See Feb. 27 Tr. 246:5-7 (Bhalla).  Delgado, who lived in the yellow pod in March, 2014, saw Urquizo brought into the yellow pod the day before Molina's murder.  See Feb. 27 Tr. 252:10-11; 253:7-16 (Bhalla, Delgado).  Delgado stated that he did not see Urquizo talking to Herrera  during tier time the day before Molina's murder and that he believed that he probably would have noticed them talking.  See Feb. 27 Tr. 257:25-258:13 (Bhalla, Delgado). Delgado also stated that he did not notice Herrera outside Urquizo's door, or passing "paperwork" under the security door between the blue and yellow pods the day before Molina's murder, and that he believed that he would have noticed those occurrences.   Feb. 27 Tr. 257:14-20 (Bhalla, Delgado).  See id. at 259:5-10.  On cross-examination, Delgado admitted his friendships with multiple SNM members, but stated that he has maintained that he is not an SNM member since "the first time [he] got to prison."  Feb. 27 Tr. 272:9-274:9.  (Beck, Delgado).  On redirect examination, Delgado repeated that he did not see Herrera pass "paperwork" under the security door.  Feb. 27 Tr. 279:7-9 (Bhalla, Delgado).

### aw.     Benjie Montano's Testimony.

After initially pleading the Fifth Amendment, Montano abruptly answered questions and stated that B. Cordova bragged to Montano about murdering Dix. See Feb. 27 Tr. 287:22-25. (Villa, Montano).  On cross-examination, Montano stated that B. Cordova did not give Montano details about the Dix murder.  See Feb. 27 Tr. 309:5-21 (Armijo, Montano).  Montano thinks that he told the FBI that B. Cordova only participated in the murder and did not state that B. Cordova

executed the murder.  See Feb. 27 Tr. 314:13-20 (Villa, Montano).  On redirect examination, Montano agreed that, if B. Cordova said he participated in the murder without having participated in the murder, he would be taking credit for something he did not do.  See Feb. 27 Tr. 316:4-9 (Villa, Montano).

### ax.    Paul Valenzula's Testimony.

R. Perez examined Valenzula on direct.  See Feb. 27 Tr. 320:3-6 (Fox-Young).  Valenzula stated that, in the "early part of 2014," R. Perez was sick and using a walker.  See Feb. 27 Tr. 322:2-7.  Valenzula stated that he spoke to Captain Blanco about a threat against Molina and was subsequently placed in segregation for approximately three months.  See Feb. 27 Tr. 327:23-328:13 (Fox-Young, Valenzula).

### ay.    Stemo's Testimony.

R. Perez conducted the direct examination of Stemo.  See Feb. 27 Tr. 331:1-3 (Villa).  Stemo testified that she is an FBI agent.  See Feb. 27 Tr. 331:5-8 (Villa, Stemo).  Stemo interviewed M. Rodriguez.  See Feb. 27 Tr. 333:1-16.  Stemo stated that, during the interview, M. Rodriguez told her that "he took the metal piece off of Perez' walker" and that R. Perez appeared frightened.  Feb. 27 Tr. 335:13-19 (Villa, Stemo).  Stemo testified that she recorded these statements in her report, which she believes she would have done only if M. Rodriguez had made the statements.  See Feb. 27 Tr. 335:20-24 (Villa, Stemo).  Stemo stated that M. Rodriguez told her that R. Perez said that he was "'down for whatever,'" and that M. Rodriguez interpreted that statement as R. Perez saying "he did not want to be hurt and would go along with [the hit]" as long as he "did not otherwise have to be involved."  Feb. 27 Tr. 336:2-13 (Villa, Stemo).  Stemo stated that she found a letter that M. Rodriguez wrote in a box of his items that had been taken from PNM.  See Feb. 27 Tr. 341:9-19.    Stemo said that the letter contradicts statements that M.

Rodriguez made during their interview.  See Feb. 27 Tr. 345:20-25 (Villa, Stemo).  Stemo stated

that, among other contradictions, the letter says that M. Rodriguez never saw M. Montoya assault

Molina.  See Feb. 27 Tr. 352:16-21 (Villa, Stemo).  Stemo also noted that Martinez did not mention

R. Perez to her.  See Feb. 27 Tr. 358:9-14 (Villa, Stemo).  Stemo clarified that M. Rodriguez did

not mention Urquizo in either his October 24, 2017, or his February 3, 2018, interviews with

Stemo.  See Feb. 27 Tr. 363:7-364:20.  (Jacks, Stemo).

### az.     Heather Brislen's Testimony.

R. Perez called Brislen, M.D.  See Feb. 28 Tr. at 98:3-4 (Fox-Young).  Dr. Brislen first

testified that she is a licensed medical doctor, board-certified in internal medicine, and serves on

the University of New Mexico Hospital ("UNM Hospital") faculty.  Feb. 28 Tr. at 103:18-19

(Brislen); id. at 105:24-25 (Brislen).  The Court allowed without objection Dr. Brislen to offer

opinions on internal medicine.  See Feb. 28 Tr. at 109:16-19 (Court, Armijo).  Dr. Brislen stated

that the Court paid her to be an expert for R. Perez and that, beginning in October, 2016, she

reviewed over 10,000 pages of R. Perez' medical records dating back to 1992.  See Feb. 28 Tr. at

110:5-8 (Fox-Young, Brislen); id. at 110:22-25 (Fox-Young, Brislen).  Dr. Brislen, a court-

appointed expert, stated that she had billed $27,000.00 for her work, and that reviewing R. Perez'

medical records was an onerous and laborious task as the records were a mix of typed and

handwritten notes, and not in chronological order.  See Feb. 28 Tr. at 111:7-9 (Fox-Young,

Brislen); id. at 111:22-112:13 (Fox-Young, Brislen).  Dr. Brislen attributed part of this burden to

the nature of prison medical records, which she stated are "more difficult" than those she

encounters in her "usual course of business."  Feb. 28 Tr. at 113:6-14 (Brislen).

Dr. Brislen stated that "one of the most remarkable things" about R. Perez' health is that

he "has a series of traumatic events that have led to this sort of cumulative burden of

musculoskeletal health issues . . . ".  Feb. 28 Tr. at 114:19-23.  Dr. Brislen stated her opinion that "even in 1992 it was very well documented that he walks with a limp and he struggles with falls," which resulted from "stabbing injuries, gunshot wounds, and also trauma from surgical repair to those areas."  Feb. 28 Tr. at 115:8-9.  See id. at 115:18-20.  Dr. Brislen also stated her opinion that, around 2004 after intensive physical therapy, R. Perez' "maximal functioning at that time was that he could walk for five minutes on a treadmill at . . . one mile an hour, and he was not thought to be stable walking independently without an assistive device like a walker."  Feb. 28 Tr. at 116:19-23 (Brislen).  Dr. Brislen opined that R. Perez' need for assistive devices since 2004 only increased, as his records indicate that he was shot in both legs in 2006.  See Feb. 28 Tr. at 117:10-13 (Fox-Young, Brislen).  Dr. Brislen averred, based on R. Perez' medical records, that use of a walker "almost always leads to more falls" and is less effective for R. Perez than a wheelchair.  Feb. 28 Tr. at 117:18-25 (Brislen).  See id. at 118:2-5 (Brislen).

Dr. Brislen stated that R. Perez has a long history of head injuries resulting in "more than one kind" of seizure disorder.  Feb. 28 Tr. at 125:15-16 (Brislen).  See id. at 118-15-24 (Fox-Young, Brislen).  Dr. Brislen testified that individuals, such as R. Perez, who suffer from seizures will often experience memory loss and disorientation after each seizure episode.  See Feb. 28 Tr. at 126:1-15 (Brislen, Fox-Young).  According to Dr. Brislen, "impulsivity" characterizes such post-seizure states.  Feb. 28 Tr. at 135:1-7 (Brislen).  Dr. Brislen related that R. Perez had a seizure at UNM Hospital which "lasted at least eight days without a break."  Feb. 28 Tr. at 127:12-19 (Brislen).  According to Dr. Brislen, this seizure, which occurred in late May, 2013, rendered R. R. Perez "completely unresponsive" throughout the eight days, until medication abated the seizure.  Feb. 28 Tr. at 165:3-16 (Fox-Young, Brislen).

Dr. Brislen discussed R. Perez' other ailments, including digestive problems associated with scar tissue from stab wounds, see Feb. 28 Tr. at 120:24-25 (Brislen), and type II diabetes, see Feb. 28 Tr. at 121:1-2 (Brislen). R. Perez may also be infected with hepatitis C, Dr. Brislen stated, but she could not so conclude with certainty, given that R. Perez has not been definitively tested. See Feb. 28 Tr. at 122:6-13 (Fox-Young, Brislen). R. Perez has also suffered a series of abdominal injuries, Dr. Brislen stated, such that his "core musculature is now permanently distorted . . . [and] his posture is very weak and unable to really ever improve because his muscular status can't really get itself coordinated against because of all this disruption he's had," rendering him particularly prone to falls. Feb. 28 Tr. at 119:10-19 (Brislen). Dr. Brislen also discussed R. Perez' potential diagnosis of "intermittent explosive disorder, which is an impulse control disorder that overlaps a number of other psychiatric diagnoses." Feb. 28 Tr. at 131:14-17 (Brislen).

Dr. Brislen related that R. Perez' medical records indicate that he had a seizure on September 1, 2012, see Feb. 28 Tr. at 144:1-4 (Fox-Young, Brislen), and was admitted to Memorial Medical Center, "which is a hospital . . . that's nearby to wherever he was held at the time," from September 4 to September 6, 2012. Feb. 28 Tr. at 143:1-5 (Fox-Young, Brislen). Dr. Brislen said that, from September 6 to September 8, 2012, R. Perez was housed in a prison hospital, after which his condition worsened, and he was admitted to UNM Hospital on September 8, 2012, where he stayed for "eight to ten weeks" to recover from an emergency abdominal surgery to treat intestinal infection. Feb. 28 Tr. at 145:13-14 (Brislen). See Feb. 28 Tr. at 145:1-6 (Fox-Young, Brislen). Dr. Brislen related that R. Perez had "somewhere on the order of seven or eight procedures" at UNM Hospital, and opined that he "almost died during this time." Feb. 28 Tr. at 149:9-25 (Brislen). Dr. Brislen related that R. Perez was transferred to palliative care during this time, but he began to stabilize after antibiotics alleviated his abdominal infection. See Feb. 28 Tr.

at 151:15-20 (Fox-Young, Brislen).  R. Perez' medical records indicate that he returned to PNM

on November 19th or 20th.  See Feb. 28 Tr. at 153:23-154:1 (Fox-Young, Brislen).  Despite

returning to PNM, Dr. Brislen testified that, R. Perez was still in "intensive care"  for several weeks

there, as his intestines remained artificially bypassed with feeding tubes and a waste-collecting

ostomy bag.  Feb. 28 Tr. at 156:5-23 (Fox-Young, Brislen).  Dr. Brislen related that R. Perez "lost

100 pounds because of the inability to feed himself through his mouth and just the metabolic

exhaustion" of "trying to heal . . . from something this profound."  Feb. 28 Tr. at 167:18-21

(Brislen).

        Dr. Brislen then described R. Perez' wheelchair and walker prescriptions.  See Feb. 28 Tr.

at 181:13-21 (Fox-Young, Brislen).   In September, 2013, R. Perez' medical care providers

classified him as "modified independent," meaning he no longer needed another person to assist

him in walking, but he would need mechanical assistance in the form of a walker or wheelchair.

Feb. 28 Tr. at 182:15-18 (Brislen).  See id. at 183:8-20 (Brislen).  Dr. Brislen related that R. Perez

received his walker on November 8, 2013, and received his wheelchair later that month.  See Feb.

28 Tr. at 183:12-13 (Brislen); id. at 184:3-12 (Fox-Young, Brislen).  As far as Dr. Brislen could

tell from R. Perez' medical records, he had that walker throughout 2014.  See Feb. 28 Tr. at 184:17-

22 (Fox-Young, Brislen).  Dr. Brislen said that, from January, 2014, to February, 2016, R. Perez

regained much of his weight, "and his general strength has improved," but he remained "physically

fragile, very prone to falls, and with chronic pain," and suffered sporadic, recurring seizures.  Feb.

28 Tr. at 186:10-16 (Brislen). See id. at 207:16-23 (Fox-Young, Brislen).

        Dr. Brislen also discussed R. Perez' medications.  See Feb. 28 Tr. at 191:4-13 (Fox-Young,

Brislen).   Dr. Brislen opined that, between 2012 and 2014, R. Perez was prescribed six

"psychoactive" drugs and eight "not-psychoactive drugs."  Feb. 28 Tr. at 192:1-4, 12-16 (Brislen).

These medications generally cause a variety of side effects, Dr. Brislen asserted, including "fatigue, sedation, and nausea." Feb. 28 Tr. at 198:13-16 (Fox-Young, Brislen). Dr. Brislen opined that these medications, in combination, could result in excessive sedation or inability to do "complex tasks." Feb. 28 Tr. at 201:10 (Brislen). See id. at 200:11-201:10.

On cross-examination, the United States asked Dr. Brislen whether she had watched R. Perez at all walk during the trial and whether she "had an opportunity to watch him get up in between court sessions and go over and throw things away." Feb. 28 Tr. at 227:4-6 (Armijo). Dr. Brislen replied that she had not seen R. Perez walk. See Feb. 28 Tr. at 227:7 (Brislen). At the bench, outside the jury's hearing, R. Perez moved for a mistrial "on the basis of Ms. Armijo's questioning as to Perez' ability to walk. He's shackled. She can't cross this witness on that subject because Perez is shackled." Feb. 28 Tr. at 232:21-24 (Fox-Young). The Court denied the motion, because Dr. Brislen merely responded that she "didn't see it," so the questioning did not prejudice R. Perez. Feb. 28 Tr. at 233:5-9 (Court).

Dr. Brislen acknowledged that R. Perez' treating physicians attributed to R. Perez both "intermittent explosive disorder" -- which is a "diagnosis of exclusion," used to describe frequent, impulsive emotional outbursts, Feb. 28 Tr. at 229:6-12 (Armijo, Brislen) -- and "antisocial personality disorder" -- which entails "not following usual social norms about behavior in terms of cause-and-effect consequences of your actions, usual mores and customs," Feb. 28 Tr. at 238:22-239:2 (Brislen). Dr. Brislen stated that it was her understanding that individuals with antisocial personality disorder tend to be aggressive and are prone to fights. See Feb. 28 Tr. at 242:19-24 (Armijo, Brislen).[118] Dr. Brislen also acknowledged that she was uncertain which

---

[118] On this line of questioning, R. Perez objected and requested a limiting instruction "as this evidence can't be offered for propensity instructions." The following colloquy resulted:

diagnosis appears most frequently in R. Perez' medical records.  See Feb. 28 Tr. at 240:8-22 (Armijo, Brislen).  Dr. Brislen noted that, in R. Perez' 2013 psychiatry records, the term "antisocial personality disorder" is used, but the phrase "intermittent explosive disorder" is not used.  Feb. 28 Tr. at 246:1-8 (Armijo, Brislen).

On the topic of R. Perez' medical records' reliability, Dr. Brislen conceded that, despite R. Perez' medical records stating that he has a low intelligence quotient score, she could not conclude he has a low intelligent quotient score to a reasonable degree of medical certainty without more information.  See Feb. 28 Tr. at 229:1-4 (Armijo, Brislen).  Dr. Brislen also acknowledged that R. Perez provide varying and sometimes contradictory responses to his physicians' inquiries about his childhood.  See Feb. 28 Tr. at 248:3-19 (Armijo, Brislen).  Dr. Brislen noted further that R.

---

The Court: What did you offer your testimony for?

Ms. Fox-Young: Well, I think this is propensity evidence.  I don't think --

The Court: What did you offer yours for?

Ms. Fox-Young: We didn't offer any propensity evidence.

The Court: What is it offered for, then?

Ms. Fox-Young: Your honor, if the Court declines to give a limiting instruction --

The Court: Well, I guess I need to know what you offered it for.

Ms. Fox-Young: Well, we didn't offer evidence for -- we didn't offer any propensity evidence, Judge.

The Court: That's not my question.  What did you offer it for?

Ms. Fox-Young: We offered it to demonstrate that Perez didn't agree, as is charged in this case, among other purposes.

The Court: Well, I'm not understanding your objection.

Feb. 28 Tr. at 233:5-243:24.  The Court denied the limiting instruction.  See Feb. 28 Tr. at 243:25-244:1 (Court).

Perez' medical records provided no specific details concerning many of the traumatic events, like stabbings and car accidents, on which Dr. Brislen testified on direct examination. See Feb. 28 Tr. at 250:1-251:11 (Armijo, Brislen); id. at 253:20-25 (Brislen); id. at 255:9-11 (Brislen).

At the bench, outside the jury's hearing, R. Perez objected on relevance grounds to the United States' proposed questioning of Dr. Brislen about how many children R. Perez had and their ages. See Feb. 28 Tr. at 258:1-6. The United States responded that "it's important because [Ms. Fox-Young] labeled [R. Perez] as fragile," a point which the United States sought to contest with how many children R. Perez had and their ages. Feb. 28 Tr. at 7-14 (Armijo). The Court asked whether R. Perez called Dr. Brislen as a rule 404(b) witness to show R. Perez could not physically act in conformity with the allegations. See Feb. 28 Tr. at 259:8-11 (Court). R. Perez replied that he was instead using Dr. Brislen to show that he is fragile and unable to defend himself, and therefore was afraid of other SNM members. See Feb. 28 Tr. at 260:3-10 (Fox-Young). The Court noted that R. Perez objected to the United States asking Dr. Brislen about antisocial personality disorder generally. See Feb. 28 Tr. at 260:11-14 (Court). R. Perez clarified that the United States, and not R. Perez, first referred to antisocial personality disorder and then reiterated the request for a limiting instruction. See Feb. 28 Tr. at 261:15-17 (Fox-Young). In response to the Court's further inquiry about the purposes for which R. Perez called Dr. Brislen, R. Perez argued that the testimony was "offered to show what his medical state was at the time that Mario Rodriguez came in and took that piece form the walker, and it's offered to show what his medical state was at the time that he made statements to Billy Cordova." Feb. 28 Tr. at 263:18-22 (Villa). R. Perez further argued that Dr. Brislen's testimony is "relevant to show whether [R. Perez] entered into an agreement to commit the crime." Feb. 28 Tr. at 264:5-6 (Villa). The United States argued that "the only way they can come to that conclusion" that R. Perez' infirmity prevented

him from agreeing with other SNM members is to show that R. Perez' mental and physical conditions from other periods in his life amount to a propensity to suffer from those conditions during his alleged involvement in the murders.  See Feb. 28 Tr. at 264:10-24 (Beck).  Accordingly, the United States argued, it should be permitted to rebut Dr. Brislen's testimony with evidence of R. Perez' children's number and ages.  See Feb. 28 Tr. at 265:10-13 (Beck).  R. Perez responded that Dr. Brislen's testimony was relevant under "motive, the voluntariness of the statements, and also [R. Perez'] state of mind,"  Feb. 28 Tr. at 267:9-10 (Fox-Young), and demonstrates R. Perez' inability to stop SNM members from taking pieces from his walker, see Feb. 28 Tr. at 267:23-25 (Villa).  The Court permitted the questioning and provided a limiting instruction.[119]  See Feb. 28 Tr. at 268:9-11 (Court).

In response to Dr. Brislen asserting that R. Perez' physicians may not have had particularized bases to diagnose him with antisocial personality disorder, the United States proposed questioning Dr. Brislen on R. Perez' statements, listed in one of his medical records, to which R. Perez' doctors referred in connection with the antisocial personality diagnosis.  See Feb. 28 Tr. at 270:3-7 (Armijo).  At the bench, away from the jury's hearing, R. Perez objected to these statements as excessively prejudicial in violation of rule 403.  See Feb. 28 Tr. at 271:7-12 (Fox-

---

[119] The Court advised the jury:

> Evidence of Perez' diagnoses that are in the records is not admissible and it should not be used by you to prove or to influence you in any way that on March 7, 2014, or in February of 2016, when the recordings were made, that Perez was acting in accordance with those characters [sic] or traits or diagnoses that appear in the medical records that Dr. Brislen was testifying about.  She's given some testimony about what some of those disorders are, and you can't use those to decide that Perez was acting in accordance with those diagnoses on those particular dates, which are the ones that are primarily at issue here.

Feb. 28 Tr. at 268:18-269:5 (Court).

Young).  R. Perez noted that R. Perez made the statements in 2009, and so their prejudicial effect substantially outweighs their relevance.  See Feb. 28 Tr. at 271:15-19 (Fox-Young).  The Court indicated that it disagreed with R. Perez, as R. Perez questioned Dr. Brislen on records dating back to 1992.  See Feb. 28 Tr. at 272:8-10 (Court).  The Court also noted that the records include R. Perez' own statements, and so advised counsel to raise objections to questions individually.  See Feb. 28 Tr. at 273:15-20 (Court).  The United States also asserted that the records are relevant to impeach Dr. Brislen's credibility and show bias.  See Feb. 28 Tr. at 275:8-12 (Beck).  The Court advised the parties to take and to object to each question one at a time.  See Feb. 28 Tr. at 275:13-14 (Court).

The United States presented an NM Corrections Department clinical assessment of R. Perez to refresh Dr. Brislen's memory of R. Perez' records.  See Feb. 28 Tr. at 275:19-23 (Armijo). Dr. Brislen related that, in 2009, R. Perez' physicians noted that he had long been diagnosed as having antisocial personality disorder.  See Feb. 28 Tr. at 277:20-23 (Armijo, Brislen).  Dr. Brislen also conceded that R. Perez' physicians cited his specific statements as bases for the antisocial personality disorder diagnosis.  See Feb. 28 Tr. at 279:19-23 (Armijo, Brislen).

Dr. Brislen also discussed the limitations of reviewing medical records alone.  See e.g. Feb. 28 Tr. at 295:8-14 Dr. Brislen noted that R. Perez would sometimes refuse or decline his medications, including his anti-seizure medications in 2013, see Feb. 28 Tr. at 283:12-21 (Armijo, Fox-Young), but that it would be difficult to guarantee, from the records alone when R. Perez took all of his medications,   see Feb. 28 Tr. at 295:8-14 (Armijo, Brislen).   Dr. Brislen also acknowledged that she did not speak to any of R. Perez' caregivers or medical providers, but rather relied solely on his medical records for her report and testimony.  See Feb. 28 Tr. at 295:15-18 (Armijo, Brislen); id. at 297:25-298:3 (Armijo, Brislen).

Regarding R. Perez' seizures, Dr. Brislen noted that individuals sometimes become violent post-seizures, but probably unconsciously, and that deliberately stabbing somebody would not typically be symptomatic of post-seizure, unconscious violence.  See Feb. 28 Tr. at 301:2-24 (Armijo, Brislen).  Dr. Brislen also testified that somebody undergoing the seizures from which R. Perez suffers would likely seem "confused," or be unable to "meaningfully speak or participate in social stuff," but Dr. Brislen asserted that she would be unable to diagnose such a seizure from an audio recording alone.  Feb. 28 Tr. at 306:10-15.  See id. at 307:21-24.

During recess, away from the jury's hearing, Baca complained of the United States' disclosure that morning of Stemo's notes on Acee's interview with Urquizo.  See Feb. 28 Tr. at 311:11-15 (Lowry).  Baca asserted that he requested the "FBI 302 field notes for all the people that participated in the interviews of Lupe Urquizo, Mario Rodriguez, and Timothy Martinez." Feb. 28 Tr. at 311:17-19 (Lowry).  The Court indicated that these notes would probably constitute Jencks Act materials, and therefore the United States should produce them.  See Feb. 28 Tr. at 312:9-11 (Court).  The United States argued that the 302 reports would only fall under Jencks Act if they were verbatim and that, as shorthand summaries, they fell under Giglio instead.  See Feb. 28 Tr. at 312:22-313:1 (Beck).  The Court directed the United States to produce the notes for the Court's review.  See Feb. 28 Tr. at 313:2-9 (Court).

Before the jury, Dr. Brislen acknowledged that, although it can be difficult to diagnose whether someone is suffering a seizure, a voice or a video recording of that person would be helpful to make such a diagnosis.  See Feb. 28 Tr. at 314:15-315:5 (Armijo, Brislen).  Dr. Brislen conceded that, although she knew that there were recordings of R. Perez taken during the time period in which Dr. Brislen asserted he was taking medications with potential side effects, and during which he may have been having seizures, she did not listen to any of those recordings in forming her

opinions.  See Feb. 28 Tr. at 319:11-16 (Armijo, Brislen).  Dr. Brislen asserted that her intent was not to diagnose R. Perez, but to summarize his medical records.  See Feb. 28 Tr. at 321:4-9 (Brislen); id. at 322:18-25 (Brislen).  Dr. Brislen acknowledged, however, that she asserts in her report, "a cane is not an appropriate choice of assistive device" for R. Perez.  Feb. 28 Tr. at 324:17-24 (Brislen).

On redirect, Dr. Brislen asserted that her opinions are based not just on R. Perez' medical records, but also on her training and experience.  See Feb. 28 Tr. at 327:15-24 (Fox-Young, Brislen).  Dr. Brislen also averred that it would be inappropriate for any doctor to diagnose someone the doctor has never met by listening to a recording of that person.  See Feb. 28 Tr. at 329:2-4 (Brislen).  Regarding seizures, Dr. Brislen opined that R. Perez might have been hesitant to report each of his seizures, as he may have been embarrassed because of incontinence or unconsciousness.  See Feb. 28 Tr. at 5-16 (Fox-Young, Brislen).

### ba.    Clint Snodgrass' Testimony.

Baca called Snodgrass, a City of Portland, Oregon, police officer.  See Feb. 28 Tr. at 336:6-7 (Duncan); id. at 337:3-4 (Snodgrass).  Snodgrass testified to his encounter with Duran on November 11, 2017.  See Feb. 28 Tr. at 337:17-20 (Duncan, Snodgrass).  Snodgrass related that he received a complaint about people sleeping in a car in a hotel parking garage.  See Feb. 28 Tr. at 337:23-25 (Snodgrass).  Snodgrass described how, when he arrived at the car, two people were asleep in the car's front seats.  See Feb. 28 Tr. at 339:2-10 (Duncan, Snodgrass).  Snodgrass asserted that Duran was asleep in the passenger seat, with a cellphone in his lap.  See Feb. 28 Tr. at 339:14-24 (Duncan, Snodgrass).  Snodgrass asserted that the driver had a gun in his lap.  See Feb. 28 Tr. at 340:1-6 (Snodgrass).  Snodgrass described waking up the two men in the car by shining a bright light and using a public address system to alert the men to the officers' presence.

See Feb. 28 Tr. at 341:3-7 (Snodgrass).  Snodgrass asserted that he and other officers first arrested the driver, that he "then saw Duran in the passenger seat sit up," and that Duran initially followed his commands.  Feb. 28 Tr. at 342:5-11 (Duncan, Snodgrass).  Snodgrass related that Duran "slid all the way down completely out of view . . . [where he] remained for probably thirty seconds, then he sat back up."  Feb. 28 Tr. at 342:22-343-2 (Snodgrass).  After the driver was taken into custody, Snodgrass stated, Snodgrass removed Duran from the car and placed him in Snodgrass' patrol vehicle.  See Feb. 28 Tr. at 343:16-22 (Duncan, Snodgrass).  Snodgrass related that he found a Glock semi-automatic handgun in the driver's seat of the car, "other magazines, gun magazines for different caliber guns and some ammo in the car," and, under the passenger seat, "there was another semi-automatic handgun."  Feb. 28 Tr. at 344:11-18 (Snodgrass).  Snodgrass testified that he also found a "box of bullets" that "had what appeared to be dried blood on the actual cardboard box."  Feb. 28 Tr. at 345:18-19 (Snodgrass).

Snodgrass testified that he then returned to Duran and found him holding "a bag of what appeared to be heroin."  Feb. 28 Tr. at 346:8-18 (Snodgrass).  Snodgrass stated that Duran told him that he "found [the bag] in the [patrol] car."  Feb. 28 Tr. at 6-7 (Snodgrass).  Snodgrass asserted that, when he later was walking Duran into the precinct holding cell, Snodgrass "located three other small bindles of what appeared . . . to be heroin."  Feb. 28 Tr. at 348:22-25 (Snodgrass).  Snodgrass testified that Duran told him that Duran got the bindles from the driver with whom Snodgrass found Duran.  See Feb. 28 Tr. at 349:6-9 (Snodgrass).  Snodgrass asserted that Duran told Snodgrass that "he was an FBI informant, and that when he got in the car, the driver handed him the heroin," but that Duran would not tell Snodgrass "a name and somebody [Snodgrass] could call to show up and vouch for him."  Feb. 28 Tr. at 349:12-22 (Duncan, Snodgrass).  Snodgrass also asserted that Duran told him that Duran did not know there was a gun under the passenger

seat.  See Feb. 28 Tr. at 350:12-16 (Snodgrass).  Snodgrass testified that he did not believe Duran, because it was obvious that there was a gun under the seat and so it was unlikely that Duran would not notice it.  See Feb. 28 Tr. at 350:23-25 (Snodgrass).  Snodgrass also related his opinion that Duran was under the influence of heroin when Snodgrass arrested him, as he was difficult to wake and "fell asleep from the precinct to the jail, which is maybe a twenty-minute trip."  Feb. 28 Tr. at 352:3-6 (Snodgrass).  See id. at 351:13-21 (Snodgrass).

Baca then asked Snodgrass whether he had an opinion of Duran's character for truthfulness.  See Feb. 28 Tr. at 352:7-8 (Duncan).  Snodgrass responded that he believed Duran "was not being 100 percent honest with" him.  Feb. 28 Tr. at 352:24 (Snodgrass).  Snodgrass then stated that neither the FBI nor the United States Attorney's Office had contacted him about Duran. See Feb. 28 Tr. at 353:2-7 (Duncan, Snodgrass).

On cross-examination, Snodgrass clarified that his opinion of Duran's truthfulness related to his encounter with Duran and not to Duran's general character for truthfulness.  See Feb. 28 Tr. at 353:21-354:2 (Armijo, Snodgrass).  Snodgrass also related that he had not been contacted by "the federal government" to give Duran "favorable treatment."  Feb. 28 Tr. at 354:3-15 (Armijo, Snodgrass).  Snodgrass also testified that he was unaware that the FBI had served a search warrant on Duran for his DNA in connection with the incident in Portland.  See Feb. 28 Tr. at 355:6-9 (Armijo, Snodgrass).

### bb.    Ernie Holguin's Testimony.

R. Perez called Holguin to testify.  See Feb. 28 Tr. at 356:3-4 (Holguin).  Holguin stated that NM Corrections Department employed him as an officer, a position he had held for sixteen years.  See Feb. 28 Tr. at 357:15-20 (Villa, Holguin).  Holguin testified that, as training when he first began his position with the NM Corrections Department, he "was sent to Santa Fe for eight

weeks for DOC corrections training, which consisted of policies, procedures, [and] use of force."
Feb. 28 Tr. at 358:19-21 (Holguin). Holguin stated that, after seven years in an introductory officer
position, he was transferred to the STIU. See Feb. 28 Tr. at 359:11-24 (Villa, Holguin); id. at
360:1-7 (Villa, Armijo). As part of that transfer, Holguin related, he "was sent to Santa Fe to do
a two-week course on just gang activities, what to look for." Feb. 28 Tr. at 360:12-13 (Holguin).
Holguin stated that he has worked at Southern New Mexico for his entire career with the NM
Corrections Department. See Feb. 28 Tr. at 360:22-24 (Villa, Holguin).

Holguin stated that he investigated the Molina homicide in 2014. See Feb. 28 Tr. at 10-14
(Villa, Holguin). Holguin related that this investigation was done in coordination with Palomares,
with whom Holguin would share reports and documentation of the investigation. See Feb. 28 Tr.
at 366:7-16 (Villa, Holguin).

Holguin testified that, as part of this investigation, he interviewed R. Perez on March 13,
2014. See Feb. 28 Tr. at 367:20-24 (Villa, Holguin); id. at 370:2 (Holguin). Holguin asserted that
he interviewed R. Perez, because he interviewed each inmate housed in the pod in which Molina
was killed. See Feb. 28 Tr. at 369:1-2 (Holguin). Holguin related that he documented this
interview in a memorandum and that he was concerned for R. Perez' safety. See Feb. 28 Tr. at
370:10-18 (Villa, Holguin).

At this point, counsel approached the bench and, outside the jury's hearing, R. Perez
proposed soliciting R. Perez' statements to Holguin which Holguin documented in the
memorandum. See Feb. 28 Tr. at 370:24:371:5 (Villa). Specifically, R. Perez proposed admitting
R. Perez' statements that he did not report the piece missing from his walker out of fear. See Feb.
28 Tr. at 371:2-8 (Villa). R. Perez argued that these statements should be admissible not for their
truth, but to show R. Perez' state of mind and to impeach Palomares' statement that he was

unaware of threats to R. Perez. See Feb. 28 Tr. at 371:9-13 (Villa). Accordingly, R. Perez argued that the statements were admissible under rule 803(4), and necessary to impeach R. Perez' accusers. See Feb. 28 Tr. at 372:6-7 (Villa). The United States responded that the memorandum was "improper impeachment" because R. Perez did not confront Palomares with it. See Feb. 28 Tr. at 373:5-7 (Armijo). The United States further argued that the memorandum is "self-serving hearsay." Feb. 28 Tr. at 373:12-13 (Villa). Baca also objected to admitting the memorandum, because it was "precisely the antagonistic defense [Baca had] been complaining about since day one," and so, if the Court admitted the statement, Baca would request a "severance or a mistrial." Feb. 28 Tr. at 373:24-374:4 (Lowry). D. Sanchez then objected, arguing R. Perez' statements were testimonial and so inadmissible on constitutional grounds. See Feb. 28 Tr. at 374:7-12 (Jacks). R. Perez responded, first to the United States' argument, noting that "Agent Palomares clearly testified that he never heard anything about any threat whatsoever. It was definitive." Feb. 28 Tr. at 375:1-3 (Villa). R. Perez then argued that, even if the statements were testimonial, that was not grounds to exclude them as to R. Perez. See Feb. 28 Tr. at 375:5-9 (Villa). The Court noted that Palomares stated only that he had not heard of R. Perez being threatened, which was not enough to bring the Holguin memorandum in for impeachment purposes. See Feb. 28 Tr. at 375:10-15 (Court). The Court also indicated that R. Perez wanted to use the statements for the truth they asserted and that these statements were testimonial, so it would sustain the objections. See Feb. 28 Tr. at 375:18-24 (Court).

Back in open court, Holguin testified that, after interviewing R. Perez, Holguin placed R. Perez on lockdown for R. Perez' safety. See Feb. 28 Tr. at 377:1-11 (Villa, Holguin). On cross-examination, Holguin asserted that he interviewed each inmate in the pod in which Molina was murdered, and that each of these inmates were locked down, and not only R. Perez. See Feb.

28 Tr. at 378:1-14 (Armijo, Holguin). Holguin also testified that, when he spoke with R. Perez, R. Perez did not appear to be confused, and seemed able to understand Holguin's questions. See Feb. 28 Tr. at 378:18-23 (Armijo, Holguin).

### bc.    James Mulheron's Testimony.

R. Perez called Mulheron. See Transcript of Jury Trial Volume 23 at 14:17-18 (taken March 1, 2018)(Villa), filed February 22, 2019 (Doc. 2539)("Mar. 1 Tr."). Mulheron testified Southern New Mexico has employed him as a warden for the last three years. See Mar. 1 Tr. at 15:19-20 (Mulheron). Mulheron stated that he also has worked as deputy warden and STIU coordinator at Southern New Mexico. See Mar. 1 Tr. at 16:5-14 (Villa, Mulheron). Mulheron testified that he was deputy warden when Molina was killed. See Mar. 1 Tr. at 17:3-7 (Villa, Mulheron).

Mulheron related that he participated in the initial investigation into the Molina murder, during which he went to the Wheelchair Restoration Program, at which "four or five" SNM members worked. Mar. 1 Tr. at 20:1 (Mulheron). See id. at 19:5-21 (Villa, Mulheron). Mulheron stated that he did not find "anything that was consistent with what the weapons [used to kill Molina] were made out of." Mar. 1 Tr. at 20:12-13 (Mulheron). About a week later, Mulheron testified, he interviewed R. Perez because R. Perez had a walker. See Mar. 1 Tr. at 20:18-20 (Mulheron). Mulheron testified that he had spoken with R. Perez before as part of investigations into other incidents. See Mar. 1 Tr. at 27:2-9 (Villa, Mulheron). These conversations were "very brief and very short," as R. Perez "didn't want to talk to" Mulheron. Mar. 1 Tr. at 27:5-8 (Mulheron). When Mulheron spoke to R. Perez after the Molina murder, Mulheron related that R. Perez seemed more willing to speak to him. See Mar. 1 Tr. at 29:19-20 (Mulheron). Mulheron testified that, during this conversation, he noticed a piece of R. Perez' walker was missing. See

Mar. 1 Tr. at 29:7-8 (Mulheron).  Mulheron asserted that R. Perez seemed "unnerved . . . scared, worried."  Mar. 1 Tr. at 1-4 (Mulheron).  Mulheron stated that, after this interaction, he directed Holguin to investigate further the Molina murder, but that Holguin never delivered a report of his investigation to Mulheron.  See Mar. 1 Tr. at 31:16-32:2 (Villa, Mulheron).

At this point, counsel approached the bench and, away from the jury's hearing, R. Perez proposed eliciting from Mulheron R. Perez' statements about his fear of reprisal from other SNM members.  See Mar. 1 Tr. at 32:8-15 (Villa).  R. Perez argued that these statements are admissible as to R. Perez' state of mind, and that R. Perez does not wish to admit them for the truth they asserted.  See Mar. 1 Tr. at 32:16-23 (Villa).  The United States responded that these statements would not be admissible to R. Perez' state of mind because he made them a week after the Molina murder.  See Mar. 1 Tr. at 33:8-10 (Beck).  Baca reiterated its argument that R. Perez' statements to Mulheron are testimonial and so admission would violate Baca's rights under the Confrontation Clause in the Sixth Amendment to the Constitution of the United States of America.  See Mar. 1 Tr. at 34:1-3 (Duncan).  The Court responded that it would exclude the statements as hearsay not within any exception.  See Mar. 1 Tr. at 34:22-23 (Court).

Mulheron then testified to general safety precautions taken with SNM members housed in the pod where Molina was killed.  See Mar. 1 Tr. at 36:10-19 (Villa, Mulheron).  Each member was placed in segregation, which entailed confining them to their cells and excluding them from recreational activity with other inmates.  See Mar. 1 Tr. at 36:17-19 (Mulheron).  Finally, Mulheron noted that, on June 17, 2015, R. Perez was transferred from PNM South to PNM North for disciplinary reasons.  See Mar. 1 Tr. at 37:24-38:10 (Villa, Mulheron).

On cross-examination, Mulheron noted that R. Perez' cell at Southern New Mexico in 2013 was not wheelchair-accessible.  See Mar. 1 Tr. at 39:22-24 (Beck, Mulheron).  Mulheron also

acknowledged that Southern New Mexico has no wheelchair-accessible showers.  See Mar. 1 Tr. at 41:23-42:7 (Beck, Mulheron).  Mulheron further elaborated that the pictures of the shanks used to murder Molina showed maroon or black metal shanks, which were inconsistent with the walkers in the  Wheelchair Restoration Program, but consistent with R. Perez' walker.  See Mar. 1 Tr. at 51:5-8 (Beck, Mulheron).  On redirect, Mulheron noted that R. Perez had no control over in which pod he was housed, and opined that, when he spoke to R. Perez after the Molina murder, R. Perez' nervousness was probably not out of fear of slipping and falling.  See Mar. 1 Tr. at 53:12-15 (Villa, Mulheron);   id. at 54:4-7 (Villa, Mulheron).   On recross-examination, however, Mulheron acknowledged that R. Perez could have requested administrative segregation, or could have renounced his SNM affiliation and been placed into Southern New Mexico's Restoration into Population program. See Mar. 1 Tr. 54:19-25 (Beck, Mulheron).  Mulheron also noted that inmates anonymously can warn corrections officers if another inmate is in danger.  See Mar. 1 Tr. at 62:10-22 (Beck, Mulheron).  On further redirect examination, Mulheron noted that this procedure is "not very fast" and so may take time to process.  Mar. 1 Tr. at 68:13.  See id. at 68:7-13.

After excusing Mulheron, counsel approached the bench and, away from the jury's hearing, the Defendants again noted that it had just received another round of FBI field notes.  See Mar. 1 Tr. at 70:2-3 (Lowry).  Baca noted that the parties had agreed to call Acee as the defense's last witness, but, given the late disclosures, the parties did not feel prepared to call him.  See Mar. 1 Tr. at 69:11-22 (Lowry, Court).  The United States acknowledged that, given the volume of the disclosures, the Defendants should be permitted to call additional witnesses.  See Mar. 1 Tr. at 71:9-12 (Beck).  Herrera's counsel argued that the field notes' breadth meant he "may have to recall every single witness."  Mar. 1 Tr. at 71:17-22 (Bhalla).  Counsel then agreed that the Court

would ask whether the United States had any rebuttal instead of asking whether the Defendants rested.  See Mar. 1 Tr. at 73:11-21 (Court, Bhalla).

### bd.    Anthony Romero's Testimony.

The United States called Romero as its first rebuttal witness.  See Mar. 1 Tr. at 13-16 (Court, Beck).  Romero testified that the NM Corrections Department employs as Deputy Director of Adult Prisons.  See Mar. 1 Tr. at 85:11-15 (Beck, Romero).  Romero stated that, in November, 2017, he was acting warden at PNM.  See Mar. 1 Tr. at 87:8-10 (Beck, Romero).  Romero testified to the NM Correction Department's procedures for internal affairs investigations.  See Mar. 1 Tr. at 87:22-25 (Romero); id. at 88:7-18 (Beck, Romero).  Romero testified that the NM Corrections Department divides incidents between two categories: type one for serious assault and type two for less serious offenses.  See Mar. 1 Tr. at 88:20-89:12 (Beck, Romero).

Romero stated he was involved in an investigation into Urtiaga.  See Mar. 1 Tr. at 90:14-17 (Beck, Romero).  Romero testified that he had classified this investigation as type one.[120] Mar. 1 Tr. at 91:16-20 (Beck, Romero).  Romero stated that NM Corrections Department Procedure, which he followed in the Urtiaga investigation, is for Romero to review and screen the initial referral, and then send it to the Office of Professional Standards("OPS").  See Mar. 1 Tr. at 9-14 (Beck, Romero).

---

[120]The Court issued a limiting instruction and advised the jury that it could use this evidence

just because Mr. Romero is using this as a type one incident, that's what he used it for, for his internal administrative proceedings.  But the jury cannot use that as evidence of the classification.  That's his classification, but you can't use it in your determination of the charges in this case.  It's simply evidence of what he was relying on to make the determination.  So you can't rely upon the characterization of it as a type one as the truth of the matter.

Mar. 1 Tr. at 94:2-12 (Court).

be.     **Wendy Perez' Testimony.**

The United States next called W. Perez.  See Mar. 1 Tr. at 97:22 (Armijo).  W. Perez is an

NM Corrections Department unit manager at PNM and oversees ninety-six inmates.  See Mar. 1

Tr. at 99:20-100:22 (Armijo, W. Perez).  She testified that R. Perez was housed in the same unit

she managed, and that he lived in special cells, because of his disability.  See Mar. 1 Tr. at 101:18-

22; id. at 103:3-104:16 (Armijo, W. Perez).  She said that SNM members lived in the same pod as

R. Perez.  See Mar. 1 Tr. at 104:17-19; id. at 105:6-18 (Armijo, W. Perez).  W. Perez testified that

in her frequent interactions with R. Perez, she never had a concern about his physical or mental

health.  See Mar. 1 Tr. at 107:22-108:10 (Armijo, W. Perez).  She also said that correctional

officers check inmates every thirty minutes, and mental health providers check inmates at least

once a week.  See Mar. 1 Tr. at 109:7-110:16 (Armijo, W. Perez).  She then testified that she was

not aware of any safety concerns for R. Perez,  see Mar. 1 Tr. at 110:24 (W. Perez), and then

described what prison administrators do for inmates with these concerns, see Mar. 1 Tr. at 111:6-

112:10 (Armijo, W. Perez).  W. Perez then testified that R. Perez was placed at PNM because of a

homicide investigation at Southern New Mexico.  See Mar. 1 Tr. at 115:4-6 (W. Perez).  She said

that she did not have any concern about his safety while he was at the PNM North facility.  See

Mar. 1 Tr. at 116:13 (W. Perez).  W. Perez then testified that she prepared a referral to OPS for

Urtiaga.  See Mar. 1 Tr. at 117:7 (W. Perez).  She acknowledged that Defendants' Exhibit FW-1

contains the line: "'After completing his sanction, [R. Perez] was not transferred back to SNMCF

due to safety concerns that SNMCF had for [R. Perez] in that facility.'"  Mar. 1 Tr. at 118:11-14

(Armijo).

On cross-examination, W. Perez gave more detail on the NM Corrections Department

organizational structure.  See Mar. 1 Tr. at 119:18-121:25 (Fox-Young, W. Perez).  She then

agreed that R. Perez was moved to PNM in the summer of 2015 for reasons other than his handicap. See Mar. 1 Tr. at 123:5, 7 (W. Perez). She gave more detail on her weekly rounds, see Mar. 1 Tr. at 124:19-125:20 (Fox-Young, W. Perez), agreed that she did not and could not medically examine R. Perez, see Mar. 1 Tr. at 125:21-126:10 (Fox-Young, W. Perez), and testified that she did not know the details of R. Perez' medical history well, see Mar. 1 Tr. at 126:11-127:14 (Fox-Young, W. Perez). After refreshing her memory, she testified further about R. Perez' transfer history. See Mar. 1 Tr. at 127:15-131:20 (Fox-Young, W. Perez).

On redirect, W. Perez stated that she would have been aware of any safety concerns from Southern New Mexico when he was transferred, and that there were no concerns. See Mar. 1 Tr. at 139:20-140:1 (Fox-Young, W. Perez).

### bf.     Acee's Testimony -- March 2, 2018

R. Perez then continued his examination of Acee. See Transcript of Trial at 10:5 (taken March 2, 2018)("Mar. 2 Tr."). Acee did not dispute that he learned during his investigation that M. Rodriguez was in charge of the blue pod, see Mar. 2 Tr. at 11:1 (Acee), and that M. Rodriguez was "highly motivated to put in work" for SNM, Mar. 2 Tr. at 12:5 (Fox-Young). Acee then testified that Sainato had possession of nearly a thousand pages of documents from M. Rodriguez since June 2017, but had not reviewed them in-depth until a few days before testifying. See Mar. 2 Tr. at 12:13-15:1 (Fox-Young, Acee). Acee stated that he generally was unaware of M. Rodriguez' comments in the documents. See Mar. 2. Tr. at 17:12-21:14 (Fox-Young, Acee). He then said that B. Cordova recruited M. Rodriguez into SNM, see Mar. 2 Tr. at 23:16 (Acee), and that, despite being "closed" as a United States witness in January, 2017, B. Cordova continued to work with STIU, Mar. 2 Tr. at 24:14; id. at 26:4-8 (Acee). Acee testified that B. Cordova wanted to "be a gangster on the street as an informant." Mar. 2 Tr. at 32:1-2 (Acee).

On Herrera's direct examination, Acee testified that three letters from T. Martinez' ex-girlfriend were in the FBI office for the least eight months. See Mar. 2 Tr. at 34:12-35:14 (Bhalla, Acee). Acee then stated that M. Rodriguez' documents contained letters sent to the county clerk's office, requesting discovery in other cases. See Mar. 2 Tr. at 35:24 (Acee).

On direct examination from D. Sanchez, Acee first testified that R. Sanchez is a validated SNM member who lived in the blue pod at the time of Molina's murder. See Mar. 2 Tr. at 36:19-37:8 (Jacks, Acee). He then clarified that Molina was convicted of a robbery with a firearm rather than for a "strong-armed robbery." Mar. 2 Tr. at 41:18-20 (Acee). Acee discussed his procedure for interviewing suspects in this case. See Mar. 2 Tr. at 42:21-45:21 (Jacks, Acee). Acee then testified that Calbert consistently had said he provided one page of "paperwork" to Urquizo, and this story did not change in the three times Acee spoke with him, but that in Calbert's trial testimony, he said that the "paperwork" was two pages. Mar. 2 Tr. at 46:14-50:14 (Jacks, Acee). Acee then agreed that Urquizo had previously stated that he received two pages of "paperwork," but at trial testified that it was only one page of "paperwork." Mar. 2 Tr. at 50:15-53:1 (Jacks, Acee). Acee then testified that he told Urquizo and other defendants that they could either cooperate or face prosecutions, see Mar. 2 Tr. at 54:13-16, but denied that he threatened anyone with the death penalty or threatened to prosecute Urquizo's brothers, see Mar. 2 Tr. at 54:20-55:16 (Jacks, Acee).

D. Sanchez continued direct examination by asking questions about M. Rodriguez. See Mar. 2 Tr. at 55:17-18 (Jacks). Acee testified that M. Rodriguez stated that he had assaulted a child molester in prison, but that the victim was incarcerated for driving while intoxicated. See Mar. 2 Tr. at 57:2-18 (Jacks, Acee). He also stated that, while he never told M. Rodriguez that cooperating with the United States would give him a clean criminal record, see Mar. 2 Tr. at 59:9-

10 (Acee), M. Rodriguez suggested in a letter to D. Sanchez that D. Sanchez would get a clean record if he became a government witness, <u>see</u> Mar. 2 Tr. at 60:16-61:17 (Jacks, Acee).

Acee then admitted that Armenta's trial testimony that T. Martinez was not with M. Rodriguez when "paperwork" was passed under the door between the yellow and blue pods was inconsistent with a prior statement he made to Acee.  Mar. 2 Tr. at 64:9 (Acee).  He then stated that B. Cordova told him that D. Sanchez asked him for a shank a week before Urquizo and Varela arrived at Southern New Mexico, <u>see</u> Mar. 2 Tr. at 65:24-25 (Acee), which was also "a little bit off" from B. Cordova's trial testimony, Mar. 2 Tr. at 66:4 (Acee).  Acee next discussed his process for conducting interviews in this case.  <u>See</u> Mar. 2 Tr. at 66:5-73:6 (Jacks, Acee).  On the subject of Duran, Acee testified that he spoke with FBI agents about Duran's Facebook posts but did not provide any information to the Defendants about this investigation.  <u>See</u> Mar. 2 Tr. at 74:13-75:6 (Jacks, Acee).

Acee then testified that he did not want to participate in the holiday party for the United States witnesses and did not remember telling anyone from the NM Corrections Department that it was a good idea. <u>See</u> Mar. 2 Tr. at 76:10; <u>id.</u> at 77:12. (Acee).  He also stated that it was decided that he would not write a search warrant for the compromised tablets seized from Defendants, <u>see</u> Mar. 2 Tr. at 86:12-13 (Acee), and agreed that the tablets had been seized for nine months, <u>see</u> Mar. 2 Tr. at 86:23 (Acee).

On the subject of the M. Rodriguez documents, Acee first testified that he did not know why M. Rodriguez had letters that were written to T. Martinez about witnesses matching statements to discovery in this case.  <u>See</u> Mar. 2 Tr. at 88:10-11 (Acee).  He also stated that he did not investigate what court documents M. Rodriguez was trying to acquire.  <u>See</u> Mar. 2 Tr. at 89:22 (Acee).

On cross-examination, Acee gave more context to his response to finding the M. Rodriguez documents, see Mar. 2 Tr. at 96:7-22 (Castellano, Acee), the T. Martinez letter M. Rodriguez had, see Mar. 2 Tr. at 98:12-99:9 (Castellano, Acee), and the decision not to search the tablets, see Mar. 2 Tr. at 99:10-102:7 (Castellano, Acee).  He also reiterated that he conducted his December 2, 2016, inmate interviews independently and "not as a group."  Mar. 2 Tr. at 1-7:4 (Acee).  Acee then testified that it was his understanding that C. Garcia provided advice or suggestions to M. Montoya on how he could plant evidence,  see Mar. 2 Tr. at 108:20 (Acee), and Acee discussed his own philosophy towards recording witness statements, see Mar. 2 Tr. at 110:12-111:8 (Castellano, Acee).  The government then played several recordings of Duran,  Baca, and M. Montoya.  See Mar. 2 Tr. at 112:2-113:12 (Castellano, Acee).  Acee described why he thought Duran was a skilled manipulator,  see Mar. 2 Tr. at 114:13-19 (Acee), and testified that he had no reason to think that Armenta or Robert Martinez cooperated against their will, see Mar. 2  Tr. at 115:8-22 (Castellano, Acee).  He then stated that when Duran approached Roy Martinez regarding the Marcantel "hit," it was to remind him of prior conversations rather than suggest a new idea. Mar. 2 Tr. at 118:22-119:1 (Castellano, Acee).  Acee next clarified his statements regarding Urquizo's communications with M. Rodriguez.  See Mar. 2 Tr. at 120:10-121:5 (Castellano, Acee).

Acee then testified regarding his understanding of how the "paperwork" could be passed in the prison.  Mar. 2 Tr. at 121:24-124:24 (Castellano, Acee).  He also said that he asked Robert Martinez about the various SNM members and their statuses "well after" the Molina murder.  See Mar. 2 Tr. at 127:13 (Acee).  He said that Robert Martinez turning over his shanks meant there was "no turning back" for him and recalled that B. Cordova brought a shank to the courtroom for self-defense.  Mar. 2 Tr. at 128:12; see id. at 129:7 (Acee).  He stated that, while the Defendants had communicated with each other, the purpose was not to put a fraud on the court, but the

"opposite." Mar. 2 Tr. at 130:16 (Acee). He then testified that R. Sanchez attempted to negotiate a deal for his brother, D. Sanchez, see Mar. 2 Tr. at 131:25 (Acee), and that Acee did not threaten B. Cordova with the death penalty or his involvement in the Shane Dix murder, see Mar. 2 Tr. at 132:14, 20-21 (Acee). Acee stated that some cooperators falsely minimized the time they were facing in conversations with their families and also lied about their motivations for cooperating. See 137:4-8 (Acee).

Next, Acee testified about the extent of his trust in B. Cordova. See Mar. 2 Tr. at 138:3-9 (Acee). He then described the two emails that he received from cooperating witnesses from their tablets in prison. See Mar. 2 Tr. at 138:10-139:10 (Castellano, Acee). He noted that someone can help the FBI without being a confidential human source. See Mar. 2 Tr. at 140:23 (Acee). He also testified that B. Cordova corrected his statement about when D. Sanchez asked for a shank in January, 2018. See Mar. 2 Tr. at 141:10 (Acee). He described the indictment writing process for cooperators. See Mar. 2 Tr. at 142:7-143:5 (Castellano, Acee). He testified that Calbert and Urquizo had met, but that their attorneys, who are bound by ethical rules, were in the room at the time. See Mar. 2 Tr. at 143:16-144:4 (Castellano, Acee). Finally, Acee testified that M. Rodriguez' judgment and commitment did not mention any sex-offender registration requirements, see Mar. 2 Tr. at 148:7-150:4 (Castellano, Acee), and that M. Rodriguez was upset upon learning he faced this requirement, see Mar. 2 Tr. at 150:15 (Acee).

On Herrera's redirect, Acee discussed how the government went about turning over all of his notes to the Defendants. See Mar. 2 Tr. at 153:7-155:11 (Bhalla, Acee). On Baca's redirect, Acee first testified about how the FBI conducts controlled buys. See Mar. 2 Tr. at 155:23-157:8, id. at 160:22-163:2 (Lowry, Acee). He stated that the FBI authorized Duran to conduct controlled purchases in November, 2017, but that he was not authorized when he was arrested. See Mar. 2

Tr. at 165:1-3 (Acee).  Baca replayed a recording from earlier that morning between Duran and Baca, and Acee agreed that any recorded call with someone outside the facility occurred after November 4, 2015.  See Mar. 2 Tr. at 169:1 (Acee).  He also agreed that Duran did not record Baca between October 24, 2015 and October 28, 2015.  See Mar. 2 Tr. at 172:11 (Acee).  Acee then stated that after Duran left New Mexico and ran into "legal troubles," Mar. 2 Tr. at 172:14 (Lowry), Acee tried to get in touch with him and conducted a brief investigation, see Mar. 2 Tr. at 172:12-173:14.  Acee did not think that the results of this investigation were turned over to the Defendants.  See Mar. 2 Tr. at 173:12 (Acee).

Acee then testified that following a March 6, 2017, meeting with Urquizo, the FBI was "confident" that Baca did not want Romero killed, stabbed, or beat up.  Mar. 2 Tr. at 173:19 (Lowry); see id. at 174:1-6 (Lowry, Acee).  He noted that Urquizo's trial testimony concerning "Mr. Baca's intention" to have Romero killed was at odds with his previous statements to Acee.  Mar. 2 Tr. at 175:25-176:1 (Acee).

Baca then presented Acee with recreation yard records from PNM North.  See Mar. 2 Tr. at 177:12-13 (Lowry).  Acee testified that the Department of Corrections told him that no records existed showing Calbert and J. Martinez in the same recreation cage at the same time.  See Mar. 2 Tr. at 179:17 (Acee).  Acee then testified that it was "fair" to say that Urquizo was motivated to convince Calbert to cooperate when they met together on August 22, 2017.  Mar. 2 Tr. at 182:5 (Acee).  He said they had ten minutes together, and their attorneys were present.  See Mar. 2 Tr. at 182:23-24 (Acee).  He again clarified his statements regarding M. Rodriguez and Urquizo's communication through a window in prison.  See Mar. 2 Tr. at 183:19-188:3 (Acee).

Next, Acee discussed his revisions to United States Exhibit 777, which is a chart of the case's FBI debriefs, and Baca challenged the chart's entries.  See Mar. 2 Tr. at 188:7-190:12

(Lowry, Acee). Acee stated that he did not debrief Armijo on November 16, 2017, even though he drove him to a courthouse for an initial appearance. See Mar. 2 Tr. at 191:11-192:10 (Lowry, Acee). Acee then admitted that a date was wrong on his latest revision to the debriefing chart. See Mar. 2 Tr. at 193:14 (Acee). Acee denied, however, that he debriefed Urquizo on the day Urquizo made an initial appearance -- despite what his expense report for that day stated. See Mar. 2 Tr. at 194:10-22 (Lowry, Acee). See also Mar. 2 Tr. at 199:22-200:12 (Lowry, Acee). He also denied that a November 16, 2017, meeting with M. Rodriguez and R. Sanchez was a debriefing session. See Mar. 2 Tr. at 196:2 (Acee). Acee also denied that a December 12, 2017, meeting with M. Rodriguez was a debriefing, even though a written 302 was produced from it. See Mar. 2 Tr. at 197:2-17 (Lowry, Acee). Acee denied that a December 2, 2016, meeting with Armenta where he asked one question constitutes a debrief under his definition of the word, see Mar. 2 Tr. at 197:18-199:2 (Lowry, Acee), and he also denied that a meeting with Armenta at Armenta's plea hearing constitutes a debrief, see Mar. 2 Tr. at 199:3-21 (Lowry, Acee). Acee said he was not sure whether a July 16, 2016, meeting with Romero is a debriefing, because Romero made controlled buys for the FBI in other cases. See Mar. 2 Tr. at 201:12-14 (Acee). He then discussed other non-debriefing meetings with Romero and his experience debriefing cooperators. See Mar. 2 Tr. at 201:18-206:6 (Lowry, Acee). Acee then admitted that a March 18, 2016 meeting with Archuleta appeared to be a debrief, but that the FBI did not have a 302 on the meeting. See Mar. 2 Tr. at 206:7-207:1 (Lowry, Acee). He also noted that there was a potential wrong date on a debriefing session with R. Martinez. See Mar. 2 Tr. at 209:24-25 (Acee). He also admitted that an August 5, 2015 debrief session with Duran was not on the chart, see Mar. 2 Tr. at 211:16-17 (Acee), and admitted that the summary chart was not accurate, see Mar. 2 Tr. at 211:24 (Acee).

On R. Perez' redirect, Acee noted that there were two instances where B. Cordova made it seem as though he committed a murder when he actually did not.  See Mar. 2 Tr. at 229:3-6; id. at 230:1; id. at 232:14 (Acee).  Acee also said that he trusted B. Cordova to testify truthfully, even though he had already given false testimony concerning his drug use.  See Mar. 2 Tr. at 233:8-18 (Fox-Young, Acee).

D. Sanchez' redirect focused first on the meeting between M. Rodriguez and R. Sanchez.  See Mar. 2 Tr. at 234:10-235:25 (Jacks).  D. Sanchez then asked Acee about his interviews with B. Cordova.  See Mar. 2 Tr. at 236:1-2 (Jacks).  Acee clarified previous testimony regarding how he heard about B. Cordova's statements during a January 24, 2018 interview.  See Mar. 2 Tr. at 237:7-238:23 (Jacks, Acee); id. at 241:20-242:3.  Acee agreed that B. Cordova had made inconsistent statements.  See Mar. 2 Tr. at 238:4-21 (Jacks, Acee).  He also admitted that he did not know to which other cooperators Urquizo had access before trial.  See Mar. 2 Tr. at 243:16 (Acee).

The United States then re-crossed Acee.  See Mar. 2 Tr. at 244:1.  Acee first explained a written notation from an August 14, 2015 interview with Duran, which he said indicated that Duran gave him information on Shane Dix' murder.  See Mar. 2 Tr. at 244:9-14; id. at 246:7-22.  He then discussed how he learned from Urquizo that M. Rodriguez and T. Martinez  were able to communicate.  See Mar. 2 Tr. at 247:14-250:10 (Castellano, Acee).  R. Perez and D. Sanchez each then briefly conducted redirect.  See Mar. 2 Tr. at 250:21-251:11; id. at 251:19-252:4 (Fox-Young, Jacks).

### bg.    Joseph Sainato's Testimony.

Finally, D. Sanchez called Joseph Sainato, an FBI special agent. See Mar. 2 Tr. at 253:15; id. at 253:21 (Sainato).  He testified that he interviewed Urquizo on January 22, 2018, but that a

different FBI agent prepared the 302.  See Mar. 2 Tr. at 254:10; id. at 255:21-256:12 (Jacks, Sainato).  Sainato then stated that, the day before Molina's murder, Urquizo stated that he was transferred to Southern New Mexico Correctional Facility, and that, while he was escorted to the prison's yellow pod, he passed the door to the blue pod where he saw M. Rodriguez, T. Martinez, and J. Montoya.  See Mar. 2 Tr. at 258:8; id. at 259:3, 15-17, 19 (Sainato).  Sainato also testified that Urquizo said that M. Rodriguez later passed him notes under the door between the two pods that said that M. Rodriguez wanted T. Martinez, J. Montoya, and Armenta to kill Molina.  See Mar. 2 Tr. at 260:9-261:12 (Jacks, Sainato).  Sainato said Urquizo stated that M. Rodriguez assigned D. Sanchez to cover the camera.  See Mar. 2 Tr. at 261:20 (Sainato).  Sainato then testified that Urquizo told him that, after Molina's murder, SNM members discussed killing D. Sanchez or his brother, because D. Sanchez had not covered the camera or participated in the homicide.  See Mar. 2 Tr. at 265:17-266:20 (Jacks, Sainato).  Sainato then noted that the FBI 302 report from the interview did not mention these details.  See Mar. 2 Tr. at 266:24-269:19 (Jacks, Sainato).

On cross-examination, Sainato provided more context surrounding his interview with Urquizo.  See Mar. 2 Tr. at 270:9-25 (Armijo, Sainato).  He stated his understanding was that the 302's purpose is just to provide new information.  See Mar. 2 Tr. at 271:17 (Sainato).  He then testified that much of the information that was left out of the 302 report was in a 302 report from March 6, 2017.  See Mar. 2 Tr. at 272:6-274:7 (Armijo, Sainato).  He also testified that information from Urquizo was provided to defense attorneys in a January 28, 2018 letter.  See Mar. 2 Tr. at 276:21-277:22 (Armijo, Sainato).  Sainato then clarified that the note passed to Urquizo merely stated "the desire" to have T. Martinez, J. Montoya, and Armenta do the "hit," and not that M. Rodriguez personally desired it.  Mar. 2 Tr. at 278:11-12 (Armijo).  See id. at 278:8-23 (Armijo, Sainato).

Sainato next testified that his report indicated that there was a "hit" on D. Sanchez, because he did not participate in the Molina homicide or cover the camera. Mar. 2 Tr. at 281:15 (Sainato). He also stated that, in his interview with Mr. Matt Beck, Urquizo did not tell him that D. Sanchez was not involved in Molina's murder. See Mar. 2 Tr. at 283:11 (Sainato).

On redirect, D. Sanchez asked Sainato about the March 302. See Mar. 2 Tr. at 283:24-284:19. He reiterated that an AUSA only asked him for only new information, see Mar. 2 Tr. at 284:23 (Sainato), and that, in the interview his job was to summarize every topic that was discussed, see Mar. 2 Tr. at 286:23 (Sainato). Finally, Sainato stated that Urquizo did not say anything else about D. Sanchez' role in Molina's homicide other than that he was supposed to cover the camera. See Mar. 2 Tr. at 290:13 (Sainato).

### 3. The M. Rodriguez Disclosure and Impeachment.

On February 26, 2018, in the jury's presence, the First Trial Defendants called Acee to the stand. See Transcript of Excerpt of Testimony of Bryan Acee at 44:3-4 (Lowry)(taken February 23, 2018 and February 26, 2018), filed April 4, 2018 (Doc. 2063)("First Acee Tr."). R. Perez used Acee to introduce Defendants' Trial Exhibit FV, a letter M. Rodriguez wrote in 2014 on Montoya's behalf to clear him of the Molina assault, which Acee recognized "was just produced to the Government and the defense yesterday." First Acee Tr. at 118:2-3 (Acee). See id. at 117:23-118:11 (Acee, Fox-Young). Stemo then testified, before the jury, on February 27, 2018, stating that, on February 25, 2018, she received the box of M. Rodriguez' belongings and found his 2014 letter -- Defendants' Trial Exhibit FV -- when she went through the box before returning it to M. Rodriguez to ensure "that there wasn't anything in there that he shouldn't have." Transcript of Excerpt of Testimony of Nancy Stemo at 13:23-25 (Stemo)(taken February 27-28, 2018), filed April 3, 2018 (Doc. 2044)("Stemo Tr."). See id. at 13:9-25 (Villa, Stemo). According to Stemo,

the attorneys for the United States received a copy of the letter that Sunday, February 25, 2018. See Stemo Tr. at 25:23-25 (Villa, Stemo). Stemo believed the box was found under Sainato's desk and that he had acquired it six to eight months before "in the summer of 2017." Stemo Tr. at 25:14 (Stemo). See id. at 14:8-20 (Villa, Stemo); id. at 25:9-25 (Villa, Stemo). Stemo provided the letter to Sainato, instead of returning it to M. Rodriguez, because the letter's information contradicts what M. Rodriguez had told the FBI in the past. See Stemo Tr. at 17:15-25 (Villa, Stemo). Stemo testified to a number of inconsistencies between the letter and M. Rodriguez' prior statements, specifically, the letter's assertions that: (i) T. Martinez' and Wright's statements from March 10, 2014 are false, see Stemo Tr. at 20:25-21:18 (Villa, Stemo); (ii) M. Rodriguez did not see Montoya assault Molina or possess a weapon, see Stemo Tr. at 21:19-22:1 (Villa, Stemo); (iii) M. Rodriguez did not see drugs in Molina's room or see Molina injecting drugs, see Stemo Tr. at 22:2-11 (Villa, Stemo); (iv) food was being prepared for a large pod meal in a brown canteen bag and M. Rodriguez was in Molina's cell looking at the tattoo work he had done on Molina, see Stemo Tr. at 22:12-22 (Villa, Stemo); (v) M. Rodriguez did not hear footsteps or anybody call out "rat," and that he would have noticed if "rat" had been said because the word calls attention, Stemo Tr. at 22:25-23:11 (Villa, Stemo); (vi) in a stairwell, M. Rodriguez heard Molina yell at Montoya not to come near him or he would punch Montoya, see Stemo Tr. at 24:1-7 (Villa, Stemo); and (vii) Montoya had to pass near Molina, because Molina was blocking the exit of the stairwell, see Stemo Tr. at 24:8-15 (Villa, Stemo).

During trial, on February 28, 2018, before Stemo continued testifying and before the Court brought the jury back into the courtroom, R. Perez brought a discovery issue to the Court's attention:

> On the 25th, which I believe was Sunday, counsel received an email from the Government regarding a bag of property that had apparently belonged to Mario

Rodriguez.  And the representation from Ms. Armijo as forwarded to her from her agents at the FBI, was that Agent Sainato had had these documents under his desk since approximately July of last year, and they had actually been obtained through [the STIU] from the Penitentiary of New Mexico.

And back in the summer there had been several SNM members who had property still at PNM and the FBI had been apprised of that by NMCD officials; and that Agent Sainato had ended up with these documents under his desk, although of course he is a member of the prosecution team, the Corrections Department officials are members of the prosecution team, including Mr. Cupit, who was involved.

They hadn't looked at these documents.  That's the representation from the Government.

Yesterday, the Court will recall that Agent Stemo testified about the letter that was included in that batch of documents from Mario Rodriguez, and that's Exhibit FU -- FV.  Excuse me, Your Honor.  And that exhibit was admitted through Agent Acee.

That document, as Agent Stemo acknowledged, is absolutely contradictory to other statements that Mr. Rodriguez made on the stand and that he has made to the Government.  It's clearly exculpatory information.

Agent Stemo's testimony is something along the lines of, she ultimately did review these materials before returning them, before planning to return them to Mr. Rodriguez.

Our question now is: What else is in this bag of materials?  Why wasn't it produced to the defense?  Why was this single document only produced after the Government had rested and after Mario Rodriguez had already taken the stand?

And so we had asked the Government to produce all of these documents. Immediately upon receiving this email on February 25th, I made that request.  I didn't receive a response.  I made subsequent requests.  I asked that the Government perform a Brady and Giglio review of the documents if they weren't going to produce all of them.

I finally received a response yesterday, and the Government has indicated this morning that the documents will be provided and that they are copying them.

Stemo Tr. at 43:3-45:4 (Fox-Young).  Learning about these new documents during the trial's fifth

week understandably concerned R. Perez:

My concern is, I don't understand how a bag of documents from one of the

Government's main testifying informants didn't make its way to the defense. I think it's likely all Rule 16.

Certainly we already know about one document that has exculpatory information in it, and it's far too late for this stuff to be produced, and it absolutely prejudices the defense. And so I think we need immediate production. We need an opportunity to review it and an opportunity to re-call who we may need to recall.

You know, and the Court will recognize perhaps that is something of a remedy, but when the Government has already rested its case and we've completed cross-examination of these witnesses, it really prejudices the defense when we haven't had the opportunity to even review these materials which, you know, if we get them today, we will attempt to review them immediately. But as I stand here, they have not yet been produced.

And I'd also ask that in the FBI or NMCD or anybody else the prosecution team, including the prosecutors, are in possession of other property for these cooperating witnesses, including writings and other statements, that that immediately be produced.

Thank you, Your Honor.

Stemo Tr. at 45:5-46:6 (Fox-Young). The United States then explained that,

on February 23rd when they were looked through, I think, as Special Agent Stemo testified yesterday, she recognized that the document was important and contradictory to some of the testimony or previous statements of Mr. Rodriguez.

As soon as she recognized that, the FBI alerted us. We alerted the defense. We produced that report, and they were able to use it with Special Agent Acee, and now Special Agent Stemo.

The rest of the documents in the property file were brought for our office in Las Cruces yesterday. As soon as we had them, last night after we finished, I briefly looked through the documents. There was a journal in there. Based on -- the journal had entries, I think, reflecting times when Mr. Rodriguez was a juvenile.

Based on my review of it, we asked Special Agent Sainato make copies of all of the documents in that folder as quickly as possible so that we may produce them to the defense immediately.

Stemo Tr. at 47:2-22 (Beck). The United States then indicated that it was producing the documents

out of an abundance of caution and not because it believes that it must disclose those documents

under Brady, Giglio, or rule 16 of the Federal Rules of Criminal Procedure. See Stemo Tr. at

47:24-48:6 (Beck).  The United States also said that the documents are not exculpatory.  See Stemo Tr. at 47:23-24 (Beck).  As to the letter about which Stemo testified, the United States said that it may be exculpatory, but, because of the in-court testimony and "vigorous cross-examination, it's the United States' position that it's not material," and, thus, the late disclosure does not violate Brady or Giglio.  Stemo Tr. at 49:5-7 (Beck).

On March 2, 2018, the First Trial Defendants continued questioning Acee about the box of M. Rodriguez' property.  See Transcript of Excerpt of Testimony of Bryan Acee at 5:10-14 (Fox-Young, Acee)(taken March 2, 2018), filed April 4, 2018 (Doc. 2065)("Second Acee Tr.").  Acee stated that Sainato received the box around June, 2017, but that Acee personally did not know that the box of documents existed until the prior Sunday.  See Second Acee Tr. at 5:21-6:7 (Fox-Young, Acee).  Acee said that "it would be important for the FBI to look at 1,000 pages of documents that came from Mario Rodriguez, that were in his personal protection," as "[i]t's important for [FBI agents] to look at everything that comes across [their] desks."  Second Acee Tr. at 8:14-19 (Fox-Young, Acee).  R. Perez questioned Acee about M. Rodriguez' box of documents, asking Acee whether he knew if the documents detail M. "Rodriguez having thrived on being feared," Second Acee Tr. at 10:14 (Fox-Young), M. Rodriguez' "obsession with cutting ears off," Second Acee Tr. at 11:5 (Fox-Young), M. "Rodriguez' obsession with sex offenses," Second Acee Tr. at 11:2 (Fox-Young), M. "Rodriguez' desire to butcher and rape other individuals," Second Acee Tr. at 12:5-6 (Fox-Young), or M. Rodriguez threatening others, see Second Acee Tr. at 13:24-25 (Fox-Young).  Acee stated that he had not looked at the documents and that he had only seen those that the defense showed the jury, so he could only say that the documents had writing suggesting that M. Rodriguez thrived on being feared and that they included threats that M. Rodriguez made against others.  See

Second Acee Tr. 10:12-11:11 (Fox-Young, Acee); id. at 11:24-12:6 (Fox-Young, Acee); id. at 12:23-13:5 (Fox-Young, Acee).

Acee verified that M. Rodriguez had been convicted of a sexual offense, and that M. Rodriguez was concerned and upset that he would have to register as a sex offender. See Second Acee Tr. at 48:19-49:20 (Jacks, Acee). Acee stated, however, that based solely on M. Rodriguez' judgment and commitment for the sex crime, there is no indication of a requirement that M. Rodriguez must register as a sex offender. See Second Acee Tr. at 141:4-143:1 (Castellano, Acee). When, however, presented with a handwritten document discussing how the author was about to go to the police station and register as a sex offender, Acee admitted that the handwriting appeared to be M. Rodriguez'. See Second Acee Tr. at 210:16-211:4 (Fox-Young, Acee). Acee also verified that he had discussed with M. Rodriguez how, if he cooperated, M. Rodriguez could potentially be put in the United States' witness security program, which would relocate him and provide him a new identity. See Second Acee Tr. at 51:8-25 (Jacks, Acee). Acee noted that R. Martinez identified M. Rodriguez as a "shot caller," which contradicted M. Rodriguez' testimony. First Acee Tr. at 101:19-25 (Fox-Young, Acee). See id. at 102:7-9 (Fox-Young). Acee recalled how M. Rodriguez had discussed solitary confinement with him, and that it increased his violence and paranoia. See First Acee Tr. at 122:4-17 (Fox-Young, Acee); id. at 123:13-22 (Fox-Young).

Acee discussed some letters, dated after the Molina murder, to T. Martinez from an ex-girlfriend or ex-wife, which stated that certain government witnesses made statements that contradicted discovery. See Second Acee Tr. at 26:5-15 (Bhalla, Acee); id. at 27:18-24 (Bhalla); id. at 28:7 (Acee); id. at 80:20-24 (Jacks, Acee). This letter discussed witnesses in the state proceedings regarding the Molina murder, in which Armenta attempted to take the fall for the defendants in that case. See Second Acee Tr. at 91:9-92:6 (Castellano, Acee). Acee also stated

that he saw a letter M. Rodriguez had sent to the clerk of court in Las Cruces, attempting to get court materials in other cases.  See Second Acee Tr. at 28:15-21; id. at 81:23-82:10 (Jacks, Acee).

### 4.    The Urquizo Disclosure and Impeachment.

Acee noted that David Calbert, a cooperator charged in United States v. Varela, testified that the "paperwork" he provided Urquizo on Molina was two pages, which was in contravention to his prior statements to the FBI.  Second Acee Tr. at 43:4-11 (Jacks, Acee).  Acee agreed that Urquizo had previously maintained that the "paperwork" was two pages, but testified that it was one page.  Second Acee Tr. at 43:18-45:15 (Jacks, Acee).  Acee established that both Calbert and Urquizo changed their testimony as to the "paperwork" at trial, and that these cooperators were housed together, or at least had met, before trial.  Second Acee Tr. at 45:16-46:5 (Jacks, Acee).  See id. at 175:6-21 (Lowry, Acee).  Urquizo and Calbert met at the Albuquerque FBI office on August 22, 2017, and, wanted to get Calbert to cooperate because it would be looked on favorably at sentencing.  Urquizo was motivated to get Calbert to cooperate.  Second Acee Tr. at 172:15-23 (Lowry, Acee); id. at 174:16-175:5 (Lowry, Acee).  Acee noted that Urquizo testified that Baca wanted him killed, which contradicts with Acee's notes from a March 6, 2017 debrief with Urquizo.  See Second Acee Tr. at 168:12-23 (Acee, Lowry).  Acee also noted that Urquizo's testimony that he slipped papers under a door contradicts the 302 Acee prepared after the March 6, 2017, debrief, in which Acee understood Urquizo had held the papers up to a window.  See Second Acee Tr. at 178:5-179:11 (Lowry, Acee).

### 5.    The Sanchez MTD.

D. Sanchez filed his MTD on March 1, 2018.  See Sanchez MTD at 1.  D. Sanchez argues that the United States committed "outrageous misconduct and irreparable suppression of exculpatory evidence" by failing to disclose the "notes of FBI Agent Nancy Stemo that pertain to

a January 22, 2018 interview of government witness, Lupe Urquizo,"[121] until February 28, 2018 -
- twenty-two days after Urquizo testified and five days after the United States closed its case in
chief.  Sanchez MTD at 1-2.  D. Sanchez asserts that the United States, on January 30, 2018,
disclosed the "FBI 302 that purportedly documents the important information from this January
22, 2018 interview."  Sanchez MTD at 3.  D. Sanchez also asserts that the 302 omits exculpatory
information contained in Stemo's notes, specifically: (i) that "Mario Rodriguez passed Urquizo a
note under the door, that stated his desire to have Timothy Martinez, Jerry Armenta and Jerry
Montoya do the hit on Molina," Sanchez MTD at 2; (ii) that M. "Rodriguez sent Urquizo another
letter stating that Molina would be hit that afternoon," Sanchez MTD at 2; (iii) that, in that letter,
M. "Rodriguez said that Montoya, Armenta and Martinez were going to be tasked with the hit,"
Sanchez MTD at 3; and (iv) that Urquizo, M. Rodriguez, "Calb[e]rt, Robert Martinez, and Roy
Martinez talked about hitting Daniel Sanchez because *he did not participate in the homicide* or
even cover the camera like he was supposed to," Sanchez MTD at 3 (emphasis in original).

    D. Sanchez contends that this information contradicts "[t]he government's theory of the
case" that D. Sanchez directed and participated in the homicide, Sanchez MTD at 2-3, and "that
this information was omitted from the official report of the interview suggests a deliberate,
concerted, and conscious effort to hide the exculpatory evidence," Sanchez MTD at 4.  Knowledge
of this information, D. Sanchez argues, "would have informed the cross-examination strategy of
each and every government cooperating witness that participated in the Molina homicide," and
may have "averted the pursuit of conflicting defenses that has developed at this trial."  Sanchez

---

[121]D. Sanchez erroneously identifies Stemo as the agent who produced the notes, because
she prepared the resulting 302.  See Sanchez MTD at 1; Sanchez NTM at 35 n.29.  Later, at the
hearing on March 1, 2018, D. Sanchez learned that Sainato made the notes.  See Sanchez NTM at
35 n.29.  The Court refers to the notes as the parties do, although the reader should keep in mind
that they are Sainato's notes and not Stemo's notes.

MTD at 4.  D. Sanchez also contends that the United States violated its duty to disclose evidence favorable to the defense under Brady and Giglio.  See Sanchez MTD at 5.  According to D. Sanchez, "the prosecution also has a duty to disclose any favorable evidence that could be used 'in obtaining further evidence.'"  Sanchez MTD at 6 (quoting Giles v. Maryland, 386 U.S. 66, 74 (1974)).  D. Sanchez further asserts that, pursuant to the Due Process Clause of the Fifth Amendment, "[w]hen the conduct of government agents is sufficiently outrageous, federal courts have recognized that the prosecution of any charges resulting therefrom cannot be allowed to proceed and must be dismissed."  Sanchez MTD at 7 (citing United States v. Russell, 411 U.S. 423, 431-32 (1973)).  D. Sanchez concludes that the United States' delayed disclosure of Stemo's notes constitutes outrageous conduct which "demands nothing less than the immediate dismissal of all charges against Mr. Sanchez."  Sanchez MTD at 8.

### 6.    **The Herrera MTD.**

Herrera filed his MTD on March 1, 2018, after making an oral motion to the Court.  See Herrera MTD at 1.[122]  Herrera asserts that, "[o]n February 28, 2018, during the Defendants' case in chief, the government disclosed 981 pages of new material," which, per "representations made by the government," came from a "box [that] contained personal property belonging to Mr. Rodriguez."  Herrera MTD ¶¶ 4, 7, at 1.  Herrera also asserts that Brady and Giglio required the United States to disclose those documents.  See Herrera MTD at 1.  According to Herrera,

> 8.    Included in the box are letters to Timothy Martinez, a cooperating witness who previously testified, from his wife, indicating that the government witness stories did not match up.  How or why Mr. Rodriguez had

---

[122]On March 1, 2018, Baca joined the Herrera MTD.  See Defendant Anthony Ray Baca's Notice of Joinder to Defendant Carlos Herrera's Motion to Dismiss, or in the Alternative, for Mistrial [sic] Based on Repeated Brady and Giglio Violations [Doc. 1842] at 1, filed March 1, 2018 (Doc. 1843).  On the same day, Sanchez filed his notice, also joining the Herrera MTD.  See Defendant Sanchez's Notice of Joinder in Co-Defendant Carlos Herrera's Motion to Dismiss, filed March 1, 2018 (Doc. 1845).

possession of relevant materials to this case, in his possession, is unclear.

9.    The box also contained letters from Gerald Archuleta, presumably to Mario Rodriguez and Mario Rodriguez' letters to the county clerk requesting information on another homicide.

10.   Mr. Rodriguez' box also contains hundreds of handwritten pages which detail assaults, murders and his role within the SNM which clearly contradict his previous testimony in this matter. It also contains the personal information, including home addresses and social security numbers of other government witnesses, defense attorney and a judge who were involved in the State of New Mexico's case against the government witnesses for their role in the murder of Javier Molina.

Herrera MTD ¶¶ 8-10, at 1-2 (footnote omitted).

Additionally, Herrera contends that the United States produced, on March 1, 2018, "handwritten notes by Agent Stemo."[123]   Herrera MTD ¶ 11, at 2.   Herrera argues that those handwritten Stemo notes are material to his defense, because they

indicate that one of the government witnesses, Timothy Martinez, who participated in the murder, indicated to Federal Agents that he did not know how Defendant Herrera was involved but that he did not get along with Defendant Herrera. This is important to the defense as the government's theory of the case is that Defendant Herrera ordered the murder and approved it. This witness provided information to the FBI contradictory to that theory. Timothy Martinez murdered Javier Molina not on Carlos Herrera's orders, but under another impression that has nothing whatsoever to do with Carlos Herrera.

Herrera MTD ¶ 12, at 2. Herrera concludes by observing that "[t]he government's suggestion, that the Defense recall all these witnesses, is simply untenable," because "to coordinate with 4 defendants who to recall and when, to follow up on investigation concerning these new disclosures and to process this information, in the few days we have left to prepare for closing arguments, is

---

[123]Both Herrera and Sanchez make arguments regarding Stemo's notes, but they refer to two distinct sets of notes. Sanchez makes arguments regarding typed notes that Sainato took during a January 22, 2018, interview with Urquizo, which Sanchez erroneously identifies as Stemo's notes, see Typed Notes at 1 (undated), filed March 1, 2018 (Doc. 1841-1), while Herrera refers to handwritten notes that Acee took during an interview of T. Martinez, which Herrera erroneously identifies as Stemo's notes, see Herrera MTD ¶ 11, at 2.

simply outrageous." Herrera MTD ¶¶ 12-13, at 2. Herrera notes that the Court has repeatedly warned the United States to produce materials, and that this is not the United States' first violation of the Court's order to produce Brady and Giglio materials; therefore, Herrera requests sanctions for the United States' conduct. See Herrera MTD ¶¶ 15-17, at 2-3.

### 7.    **The Perez MTD.**

R. Perez filed his MTD also on March 1, 2018. See Perez MTD at 1.[124] R. Perez moves for a dismissal, a mistrial or, alternatively, to strike M. Rodriguez' testimony. See Perez MTD at 1, ¶¶ 13-14, at 2. R. Perez asserts that such relief is appropriate, because:

> 7.    On February 28, 2017, the government produced over 980 pages of paper discovery, which according to the government had been placed under FBI Agent Sainato's desk. *See* Email [(dated February 25, 2018), filed March 1, 2018 (Doc. 1844-1)].
>
> 8.    The following day, on March 1, 2018, the government produced via email approximately 45 pages of handwritten notes.
>
> 9.    By the government's own admission, the documents belonging to Rodriguez have been in the government's possession since at least July of 2017.

Perez MTD ¶¶ 7-9, at 1-2. According to R. Perez, "[t]he law enforcement notes and many of the documents belonging to Rodriguez are material, exculpatory, and contain valuable impeachment material." Perez MTD ¶ 10, at 2. Further, R. Perez asserts that the handwritten notes and M. Rodriguez' documents would have changed R. Perez' trial strategy, see Perez MTD ¶ 11, at 2, so "[t]he untimely disclosure of this information, after the government has rested its case-in-chief and weeks after many of the cooperating witnesses [testified] has prejudiced Mr. Perez," Perez MTD ¶ 12, at 2.

---

[124]On March 2, 2018, Baca filed his second notice, joining the Perez MTD. See Defendant Anthony Ray Baca's Notice of Joinder to Defendant Rudy Perez's Motion to Dismiss [Doc. 1844] at 1, filed March 2, 2018 (Doc. 1860).

8.    **The MTD Response.**

The United States filed a single response to the Sanchez MTD, the Herrera MTD, and the Perez MTD.  See United States' Response to Defendant Daniel Sanchez's Motion to Dismiss Case for Government's Outrageous Misconduct and Irreparable Violation of Brady v. Maryland, Defendant Carlos Herrera's Motion to Dismiss, or in the Alternative, for Mistr[ia]l Based on Repeated Brady and Giglio Violations, and to Defendant Perez's Motion to Dismiss at 1, filed March 2, 2018 (Doc. 1850)("MTD Response"). The United States argues that it did not violate Brady or Giglio, because "the information [belatedly] disclosed is cumulative, is not exculpatory, and is not material." MTD Response at 1.  Further, the United States argues that, because the First Trial Defendants "cannot articulate any prejudice the delay caused," they would not be entitled to a remedy even if there was a Brady violation.  MTD Response at 1.  The United States notes that it disclosed the information before the First Trial Defendants closed their case-in-chief, so the First Trial Defendants could have recalled any witness -- and the United States would have made any witness available -- and are therefore not prejudiced.  See MTD Response at 1.  The United States also extensively discusses the impeachment and cross-examination both of Urquizo and of M. Rodriguez, and the First Trial Defendants' examinations of Acee and of Stemo.   See MTD Response at 3-7, 10-11.

Specifically, the United States asserts that the information from Stemo's typed notes which the Sanchez MTD identifies is also in an FBI 302 from March 6, 2017 -- based on "the principal debrief of Urquizo," MTD Response at 25 -- which the United States provided to the Defendants in early January, 2018, as part of its Jencks Act disclosures, see MTD Response at 3 n.1, 13 n.4, 17. See also FBI 302 at 2-3 (dated March 6, 2017), filed March 2, 2018 (Doc. 1850-2)("March 302")(describing Urquizo's written exchanges with M. Rodriguez); id. at 4 (indicating that

Urquizo told the FBI that "RODRIGUEZ also said, 'Dan screwed up.  He was supposed to cover cameras.'  RODRIGUEZ also mentioned that . . . 'Dan was supposed to get Creeper's shank.'"); id. ("URQUIZO said that the SNM called a greenlight on Daniel Sanchez after the MOLINA hit because he failed to cover the camera and did not retrieve ARMENTA's shank after the hit.").  The United States further asserts that the information in the notes are not exculpatory, because the notes align with the disclosed March 302 -- which implicates D. Sanchez in organizing the "hit" on Molina -- and because D. Sanchez used information from the notes on M. Rodriguez', who agreed that "he wanted the murder to happen and wanted Montoya, Armenta and Martinez to kill Molina."  MTD Response at 18-19.  According to the United States, its obligation under Brady "is to provide the information, not to provide the information in duplicative reports and notes."  MTD Response at 20.  The United States adds that -- because D. Sanchez already had the information contained in Stemo's notes – D. Sanchez "cannot meet the [United States Court of Appeals for the] Tenth Circuit's prejudice requirement" for a Brady violation, MTD Response at 20, and that "the United States' conduct doesn't rise to the level of 'shocking, outrageous, and clearly intolerable,'" MTD Response at 25-26 (quoting United States v. Mosley, 965 F.2d 906, 910 (10th Cir. 1992)).  The United States responds to D. Sanchez' outrageous-government-conduct defense by arguing that, even if its conduct was outrageous in some sense of the word, no outrageous government conduct defense is available, because, the Tenth Circuit requires a defendant to show "either '(1) excessive government involvement in the creation of the crime, or (2) significant government coercion to induce the crime.'"  MTD Response at 26 (quoting United States v. Dyke, 718 F.3d 1282, 1288 (2013)).  The United States contends that D. Sanchez' allegations that the United States withheld agents' notes do not meet this burden.  See MTD Response at 26.

The United States then addresses the Herrera MTD.  See MTD Response at 20.  The United

States asserts that "the most probative evidence for the Defendants [in the box of M. Rodriguez'

property] was a letter from Rodriguez in which he provided statements about the Molina murder

. . . that were inconsistent with his in-court testimony."  MTD Response at 20.  The United States

adds that, while the Defendants did not know about that letter when they cross-examined M.

Rodriguez, they were able to introduce the letter into evidence, and to highlight its inconsistency

with M. Rodriguez' testimony during Stemo's and Acee's cross-examinations.  See MTD

Response at 21.  The United States contends that this use of M. Rodriguez' letter was probably

more effective than using the letter during M. Rodriguez' cross-examination, "because whereas

Rodriguez could've explained both on cross and on re-direct why he gave those differing

statements, neither SA Stemo nor SA Acee could provide that rebuttal."  MTD Response at 21.[125]

According to the United States, it follows that the delayed disclosure of M. Rodriguez' letter did

not prejudice Baca, Herrera and D. Sanchez, the Convicted First Trial Defendants.  See MTD

Response at 21.

> Further, the United States observes that
>
> it's not as if Rodriguez didn't get impeached.  He was impeached several times, on
> several grounds, by each Defendant.  Rodriguez was also impeached about the plan
> to provide the story he gave in the letter when he was asked about Martinez's,
> Montoya's, and Armenta's plan to create a version of the Molina murder in which
> only Armenta would take the fall.  That plan also was brought out through each of
> Martinez, Montoya, and Armenta, all of whom included Rodriguez as in on the
> plan.

MTD Response at 21.  The United States reasons that M. Rodriguez' extensive impeachment

means that "the letter in Rodriguez's property from Martinez's wife regarding that Martinez's,

---

[125]Neither the First Trial Defendants nor the United States argued at trial that, under rule 613 of the Federal Rules of Evidence, M. Rodriguez' letter -- as extrinsic evidence of a witness' prior inconsistent statement -- "is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it."  Fed. R. Evid. 613(b).

Armenta's, and Montoya's stories aren't aligning is cumulative to the information already admitted as evidence in this trial." MTD Response at 21. According to the United States, "[t]here is no doubt that there was a plan to tell a false story about the Molina murder in the state case. And since that has been established through M. Rodriguez, Martinez, Armenta, Montoya, and SA Acee, it's not lost on the jury." MTD Response at 21. The United States reaches similar conclusions regarding the other belatedly disclosed M. Rodriguez documents:

> Similarly, the information found in Rodriguez's address book in which he had the addresses for those involved in his state case is not exculpatory or material. It's been established many times throughout this case that Rodriguez was a defendant in the state case, and so he had access to all of this information in connection with that case. Defendants may get more use out of that address book and the information therein by cross-examining any of the three FBI agents who the Defendants requested to be available for trial, and who the United States is making available. Again, therefore, Defendants cannot establish prejudice.

> With regard to the letters from Gerald Archuleta, Archuleta testified that he kept in contact with SNM members while he was out of state in Tennessee. And indeed, he was impeached when he said that he did so to keep up appearances. He was cross-examined and impeached when he admitted that he was being furnished drugs from an SNM member during that time and that Urquizo called him to report on the Julian Romero assault. So this information, as well, is cumulative and, therefore, not material.

MTD Response at 22 (citations omitted).

Finally, the United States addresses the Perez MTD. See MTD Response at 22. The United States asserts that "Defendant Perez's MTD does not add to that information that is contained within Herrera's MTD" and that "[t]he only addition that Perez has is" a contention that the delayed disclosures impacted his trial strategy. MTD Response at 22 (quoting Perez MTD ¶ 11, at 2). The United States argues that "Defendant Perez does not explain how his trial strategy would have changed. And it would not have. Defendant Perez may have had a few more documents with which to impeach M. Rodriguez, but it would not have added to the trial." MTD Response at 22. The United States continues:

> Rodriguez's writings are actually mitigating when compared with the questions elicited about his crimes and the video of his Esparza assault that Defendant Baca played for the jury -- two times from different cameras. Rodriguez's writings explain how he came to the mindset in which he committed these assaults, and discussed remorse for the lifestyle that brought him to that mindset. Those are not writings that would've helped Defendant Perez's defense that Rodriguez is a dangerous, perhaps psychopathic or sociopathic, criminal.

MTD Response at 23. The United States concludes by arguing that its belated disclosures did not impact trial strategy, because "the United States offered to make all cooperators available for the Defendants to be recalled to this trial when these motions were filed, but each Defendant, including Defendant Perez, put on the record that they didn't want to call any of the cooperating witnesses back." MTD Response at 23. The United States also notes that the Convicted First Trial Defendants conducted robust cross-examinations of M. Rodriguez and each cooperator, and that the Convicted First Trial Defendants cannot "articulate to the district court the reasons why the delay should be regarded as materially prejudicial" MTD Response at 23-24 (internal quotation marks omitted)(quoting United States v. Burke, 571 F.3d 1048, 1056 (10th Cir. 2009). Accordingly, the United States argues that the Sanchez MTD, the Herrera MTD, and the Perez MTD "fail to find support in the facts or in the law," and requests that the Court deny these motions. MTD Response at 14.

### 9.     The Sanchez NTM.

D. Sanchez filed his motion for a new trial on October 9, 2018, moving the Court "for a judgment of acquittal, or, in the alternative, pursuant to Federal Rule of Criminal Procedure Rule 33 ('Rule 33'), a new trial." Sanchez NTM at 1.[126] D. Sanchez asserts that the Court should grant

---

[126]Herrera joins the Sanchez NTM except for Sections B.2., B.2.a. and B.2.d., which are inapplicable to Herrera's case -- these Sections discuss prejudice to D. Sanchez because of the limited admission of R. Perez' and Herrera's statements. See Herrera NTM at 2 n.1; Sanchez NTM at 26-54. Baca also joins the Sanchez NTM. See Baca NTM at 1.

the Sanchez NTM, because the United States' evidence against him "was based entirely on the uncorroborated testimony of accomplice/informants, who testified in exchange, for a panoply of government benefits, including the reduction, or complete avoidance of criminal consequences for the Molina murder," which he maintains "was contradicted by contemporaneous prison records and, was incapable of belief beyond a reasonable doubt by any rational fact-finder." Sanchez NTM at 2. D. Sanchez contends:

> The evidence at trial established that there was little doubt that Molina was murdered; that the murder was a concerted effort of at least four individuals, Rodriguez, Martinez, Armenta, and Montoya; and that at least four individuals, Rodriguez, Martinez, Armenta, and Montoya, conspired with each other, and aided and abetted each other, to accomplish the murder.

Sanchez NTM at 17. D. Sanchez avers that the issues in the case against him were whether he conspired with the killers to commit the murder, and whether he "aided and abetted the murder." Sanchez NTM at 17. D. Sanchez notes that video footage shows that he saw the attack on Molina at some point "and did not intervene," but argues that mere presence at the scene, knowledge of the murder, or membership in SNM is insufficient to prove liability for the murder as an aider and abettor. Sanchez NTM at 17-18.

D. Sanchez asserts that the United States exclusively relied on witnesses to establish that he "conspired to murder Molina and aided and abetted the Molina murder," and did not produce any "prison video that corroborated the accomplice/informants' story," even though the units where the conspiracy occurred were continuously recorded by video cameras. Sanchez NTM at 18 & n.13. According to D. Sanchez, the witnesses who testified against him -- Calbert, Urquizo, M. Rodriguez, Armenta, J. Montoya, T. Martinez, and B. Cordova -- all "expected to receive, received, or helped themselves to, substantial benefits in exchange for their testimony," and "each had a lengthy history of deceitful and manipulative conduct directed toward avoiding the

consequences of their criminal activity." Sanchez NTM at 18-19. D. Sanchez maintains that, because these witnesses "had access to the case discovery materials and to each other[, t]hey were able to study the government's evidence and theory of prosecution and understand where it needed assistance," and, thus, "piece together a seemingly truthful story implicating Mr. Sanchez in the conspiracy to murder and murder of Molina." Sanchez NTM at 19. D. Sanchez also questions B. Cordova's testimony that D. Sanchez asked him for a spare shank, because B. Cordova had been a cooperator "since at least January 2016," but did not mention this alleged conversation "until December 15, 2017, approximately a month before trial." Sanchez NTM at 21. D. Sanchez further asserts that, because Urquizo's explanation why SNM wanted to kill D. Sanchez or his brother was not disclosed until February 28, 2018, he "was unable to confront Cordova with Urquizo's inconsistent explanation," Sanchez NTM at 21 n.16, as B. Cordova had earlier testified that SNM wanted to kill D. Sanchez or his brother, because D. Sanchez did not "dispose of Armenta's shank after the Molina attack."

D. Sanchez asserts that the United States' case against him relies on the cooperators' assertions of "his receipt of the directive to kill Molina, along with the corroborating "paperwork," and his subsequent actions to cause M. Rodriguez, Martinez, Armenta and Montoya to carry out the directive." Sanchez NTM at 22. This story, he asserts, "fell apart under the slightest probing and was contradicted by [NM Corrections Department] operational records that were made contemporaneously with the events they recorded." Sanchez NTM at 22. See id. at 22-23 (showing the contradictions that D. Sanchez established during cross-examination of the witnesses and presentation of evidence). Further, D. Sanchez reiterates the lack of corroborating evidence: there was no video of any of the alleged events connecting D. Sanchez to the conspiracy or murder, no prison guards from the housing units "claimed to have observed any of this unusual activity,"

and no "paperwork" was recovered.  Sanchez NTM at 24.  Accordingly, D. Sanchez argues that "[n]o reasonable fact-finder could find that the government's accomplice/informants' story of the passing and transportation of the paperwork was proof beyond a reasonable doubt," and so his conviction cannot stand.  Sanchez NTM at 25.  D. Sanchez asserts that, where the United States' "proof was deficient, the jury was not free to engage in speculation and conjecture," or "to use the statements of co-defendants, inadmissible against Mr. Sanchez, but presented at the joint trial, to fill the void left by the government's lack of convincing proof" and to convict D. Sanchez. Sanchez NTM at 25-26.  D. Sanchez posits, however, that he "is not asking this Court to consider the jury's credibility determinations or its conclusions about the weight of the evidence"; rather, D. Sanchez maintains that

> [h]e is asking this Court to find that, on the state of the trial record, even if viewed in the light most favorable to the government, no reasonable juror, properly applying the legal standards and limiting instructions provided by the court, could have found Mr. Sanchez guilty of Counts 6 and 7, beyond a reasonable doubt.

Sanchez NTM at 26.  Thus, D. Sanchez requests that the Court "enter a judgment of acquittal on both Counts 6 and 7."  Sanchez NTM at 26.

In the alternative, D. Sanchez requests that the Court grant him a new trial.  See Sanchez NTM at 26.  First, D. Sanchez argues that the Court can act as a "thirteenth juror" and, in that role, "consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice."  Sanchez NTM at 27 (citing United States v. Lopez, 576 F.2d 840, 845 n.1 (10th Cir. 1978); United States v. Lutz, 154 F.3d 581, 589 (6th Cir. 1998)).  The Court should, D. Sanchez argues, "independently consider the credibility of the government accomplice/informant witnesses and evaluate the character and quality of the accomplice/informant testimony for itself to determine whether it is worthy of belief beyond a reasonable doubt," while also considering "the collaboration that took place between

accomplice/informants as the trial approached, the late-blooming nature of accomplice/informant testimony describing Mr. Sanchez's purported role in these crimes, the extent the testimony was affected by self-interest, and the total and complete lack of corroboration of the accomplice/informants' paperwork story."  Sanchez NTM at 27.  D. Sanchez asserts that he "should not have been convicted on the unsupported testimony of an accomplice or informant, unless it was worthy of belief beyond a reasonable doubt."  Sanchez NTM at 28.

Second, D. Sanchez argues that "[t]he Court should also determine whether, given the character and weight of this evidence, a miscarriage of justice likely occurred as to Mr. Sanchez because of other circumstances that developed during trial."  Sanchez NTM at 28.  D. Sanchez notes five issues that he requests the Court consider in deciding if a miscarriage of justice occurred: whether, (i) R. Perez' and Herrera's admissions, "which directly incriminated Mr. Sanchez and provided corroboration of the otherwise incredible accomplice/informant testimony, were the type of evidence likely to create such a strong impression in the minds of the jurors that they would be unable to disregard them in their consideration of Mr. Sanchez's case"; (ii) the United States "suppressed material and favorable evidence, including Urquizo's pre-trial statements that he and others wanted to kill Mr. Sanchez after the Molina murder because Mr. Sanchez '*did not participate in the* [Molina] *homicide*,' prejudiced Mr. Sanchez's right to a fair trial"; (iii) the United States' "introduction of co-defendant Perez's responses to law enforcement interrogation, in violation of Mr. Sanchez's Sixth Amendment right to confront and cross-examine witnesses, and co-defendant Perez's subsequent attempts to introduce the same, prejudiced Mr. Sanchez's right to a fair trial"; (iv) "the state-wide, highly inflammatory, publicity, including that on the eve of jury selection, had more than a 'very slight effect on the verdict of the jury'"; and (v) "any one of these events singly, and/or all of them, collectively, contributed to a trial environment where

jurors were likely to convict Mr. Sanchez, whether or not the government proved, with admissible evidence, the truth of the charges against him beyond a reasonable doubt." Sanchez NTM at 29-30 (emphasis in Sanchez NTM)(first quoting Typed Notes at 4, then quoting Sumrall v. United States, 360 F.2d 311, 314 (10th Cir. 1966)).

D. Sanchez asserts that, despite the Court's limiting instruction, it was impossible for the jury to ignore R. Perez' and Herrera's statements – that were admitted in trial only against them as "admissions of a party opponent," but were inadmissible hearsay as against D. Sanchez -- when considering D. Sanchez' guilt, because of their "powerful, reliable, and probative" nature. Sanchez NTM at 31. D. Sanchez reasserts that the United States' "admissible evidence against Mr. Sanchez consisted of unreliable and wholly incredible testimony of accomplice/informants that was contradicted by contemporaneous records kept by the NMCD," and so, with the "irrefutable, recorded statements of Perez and Herrera" directly implicating D. Sanchez in the crime, D. Sanchez argues that "it cannot be said that the verdicts against Mr. Sanchez are free from the taint of this powerfully incriminating, but 'inadmissible' evidence, presented during the joint trial." Sanchez NTM at 34-35.

D. Sanchez argues that by "intentionally suppress[ing] material, favorable evidence" in the Typed Notes[127] until days after the close of the United States' case-in-chief, and after "Sanchez had cross-examined each and every one of the government accomplice/informants that claimed to have participated in the conspiracy to murder and murder of Molina," the United States violated Brady. Sanchez NTM at 35. D. Sanchez notes that the United States disclosed the Typed Notes

---

[127]D. Sanchez made the same argument in the Sanchez MTD. At that time, however, D. Sanchez believed that Stemo made the notes, because she prepared the resulting 302. See Sanchez NTM at 35 n.29; Sanchez MTD at 1. Later, at a hearing on March 1, 2018, D. Sanchez learned that Sainato made the notes. See Sanchez NTM at 35 n.29.

twenty-two days after Urquizo testified.  See Sanchez NTM at 36.  D. Sanchez asserts that the

Typed Notes were disclosed concurrently with "482 pages of agent notes" and "[a]t least another

980 pages of documents" relating to M. Rodriguez.  Sanchez NTM at 35-36, 36 n.30.  D. Sanchez

argues that the Typed Notes contain exculpatory information, specifically that: (i) M. "Rodriguez

passed Urquizo a note under the door, that stated his desire to have Martinez, Armenta and

Montoya do the hit on Molina"; (ii) M. "Rodriguez sent Urquizo another letter stating that Molina

would be hit that afternoon"; (iii) M. "Rodriguez said that Montoya, Armenta and Martinez were

going to be tasked with the hit"; and (iv) "Urquizo, Rodriguez, Calb[e]rt, Robert Martinez, and

Roy Martinez talked about hitting Daniel Sanchez because *he did not participate in the homicide*

or even cover the camera."  Sanchez NTM at 36 (emphasis in original).  This information, D.

Sanchez asserts, contradicts the United States' theory of D. Sanchez' involvement in the case.  See

Sanchez NTM at 36.  Further, D. Sanchez asserts, this information is not in the 302 for this

interview, which "suggests a deliberate, conscious, and concerted effort to conceal exculpatory

evidence from Mr. Sanchez and undermines both the integrity of the investigation and the

credibility of the FBI Agents and government prosecutors involved in this prosecution."  Sanchez

NTM at 37.  According to D. Sanchez, the remedy that the Tenth Circuit has outlined "for a *Brady*

violation involving the late disclosure of evidence is a new trial at a time in which the defendant

could make use of the withheld information."  Sanchez NTM at 38 (citing United States v. Davis,

578 F.2d 277, 280 (10th Cir. 1978)).  D. Sanchez maintains that having the Typed Notes' earlier

> would have informed Mr. Sanchez's overall trial strategy and his cross-examination
> strategy for each and every government accomplice/informant witness that claimed
> to have participated in the Molina murder (including Armenta, Montoya,
> Rodriguez, Martinez, Urquizo, and Calb[e]rt) or claimed to have had discussions
> with others, after the Molina murder, about killing Mr. Sanchez, or his brother
> (including Cordova, Roy Paul Martinez, and Robert Martinez).

Sanchez NTM at 38-39.  Further, D. Sanchez argues that the United States' suppression of this evidence not only violates Brady, but also constitutes "outrageous governmental misconduct." Sanchez NTM at 39.

D. Sanchez argues that the United States prejudiced his right to a fair trial under the Fifth Amendment by not timely "produc[ing] Agent Sainato's notes of the Urquizo interview," and by "its practice of engaging in massive, last-minute discovery dumps, up through the second to last day of trial."  Sanchez NTM at 39.  These discovery disclosures, D. Sanchez maintains, were in contravention of the Court's order to produce documents pursuant to rule 16 of the Federal Rules of Criminal Procedure, Brady, and Giglio by June 9, 2017, and Jencks Act material continuously but "no later than two weeks before trial."  Sanchez NTM at 40 (citing Transcript of Motion Proceedings at 207:7-9 (Court, Beck, Armijo)(commencing May 9, 2017), filed May 23, 2017 (Doc. 1160); id. at 215:4-9 (Court)).  D. Sanchez notes that, from January 29, 2018, through the trial's end, the United States "produced an additional 6,282 pages of materials," including the Typed Notes.  Sanchez NTM at 41.  D. Sanchez asserts that even if the late disclosure of the Typed Notes does not violate Brady, the late disclosure violates the Jencks Act §§ 3500(a) and (e)(2). See Sanchez NTM at 41-42.  Further, D. Sanchez reasserts that the late disclosure prejudiced him, because he could not use the information in forming his trial strategy or cross-examination strategy, and could not "timely counter the government's presentation of contrary evidence about why, after the Molina murder, others, including the government's accomplice/informants, wanted to kill Mr. Sanchez."  Sanchez NTM at 42-43.  D. Sanchez asserts that the resulting prejudice "could have been cured by way of a mistrial," but he moved for a dismissal at the time because the United States' delay "appeared calculated and deliberate."  Sanchez NTM at 43.  The prejudice to D. Sanchez, he asserts, "has gone without remedy."  Sanchez NTM at 43.  Because he has been

convicted, D. Sanchez posits that "the least severe sanction for the government's failure to timely disclose the notes from the pretrial statement of Urquizo would be for the Court to order a new trial." Sanchez NTM at 43-44.

D. Sanchez argues that R. Perez' attempt to introduce his own testimonial statements and the United States' introduction of these statements prejudiced D. Sanchez and violated his Sixth Amendment right to confront witnesses. See Sanchez NTM at 44. According to D. Sanchez, the Court ruled that R. Perez' statements during two interrogations -- one with New Mexico State Police Detective Antonio Palomares and the other with Southern New Mexico Deputy Warden James Mulheron -- "were self-serving and testimonial, and, absent R. Perez taking the stand and subjecting himself to cross-examination, their admission at a joint trial would violate Mr. Sanchez's Sixth Amendment right to confrontation." Sanchez NTM at 45 (footnote omitted). See id. at 44. Nonetheless, D. Sanchez avers that R. Perez' counsel referred to the statements in her opening statement and that the United States elicited the statements from Palomares, which the Court attempted to cure with a limiting instruction. See Sanchez NTM at 46. D. Sanchez notes that R. Perez attempted to introduce more of his statements to rebut the testimony, but that the Court ruled the additional statements inadmissible. See Sanchez NTM at 46-47. This combination of events, D. Sanchez asserts, "impermissibly served to buttress the accomplice/informant testimony of M. Rodriguez and Cordova that implicated Mr. Sanchez in the conspiracy to murder and murder of Molina," while preventing D. Sanchez from cross-examining R. Perez to challenge this corroboration. Sanchez NTM at 47.

Finally, D. Sanchez argues that his rights to a fair trial and impartial jury under the Fifth Amendment were prejudiced by inflammatory, state-wide publicity, "includ[ing] an article published the day before jury selection began [which] referenced an email from the United States

Marshal's Service to the Court regarding courtroom security concerns and the trial defendants' lengthy and violent criminal histories." Sanchez NTM at 47. D. Sanchez notes Marshall v. United States, 360 U.S. 310 (1959), in which, he posits, the Supreme Court of the United States "set aside a federal conviction where the jurors were exposed 'through news accounts' to information about the defendant's prior criminal record that was not admitted at trial." Sanchez NTM at 48 (quoting Marshall v. United States, 360 U.S. at 313). D. Sanchez asserts that the conviction was overturned even with "the statement of each juror 'that he would not be influenced by the news articles, that he could decide the case only on the evidence of record, and that he felt no prejudice against petitioner as a result of the articles.'" Sanchez NTM at 49 (quoting Marshall v. United States, 360 U.S. at 312). D. Sanchez notes the publication of many "inflammatory articles, accompanied by scary photographs and recitations of the defendants' violent criminal histories." Sanchez NTM at 50 (citing Table of SNM Media Coverage at 1-13 (undated), filed October 9, 2018 (Doc. 2408-19)). Specifically, D. Sanchez discusses an Albuquerque Journal article that regional newspapers reprinted -- "including the Las Cruces Sun News, the Deming Headlight[,] and the Alamogordo News" -- which contained color mug shots of the four Trial Defendants in the first trial, and "discussed provocative topics," including how the First Trial Defendants "would be shackled for the proceedings," how some Defendants had brought shanks to court, and how each Defendant had a lengthy and violent criminal history. Sanchez NTM at 51. D. Sanchez maintains that the local NPR affiliate in Las Cruces also reported the article's statements. See Sanchez NTM at 51. Further, D. Sanchez posits that the jury service erroneously told the jurors before they entered the courtroom that their identities would remain anonymous and that this statement may have amplified the inflammatory news coverage. See Sanchez NTM at 51 n.41. D. Sanchez argues that, for crimes of violence, jurors cannot "completely ignore the concern that, if they acquit the

defendant because of the government's failure of proof, someone else may get hurt." Sanchez NTM at 53. The inflammatory media coverage, D. Sanchez urges, is another "source of powerfully incriminating information that was not technically submitted to the jury for their consideration, but that may have been the proverbial straw that broke the camel's back." Sanchez NTM at 53. Accordingly, D. Sanchez requests that the Court, if it does not enter a judgment of acquittal, order a new trial. See Sanchez NTM at 54.

           10.    **The Sanchez NTM Response.**

        The United States responded. See United States' Response to Daniel Sanchez's Motion for Judgement of Acquittal or, in the Alternative, a New Trial (Doc. 2408), filed November 26, 2018 (Doc. 2451)("Sanchez NTM Response"). The United States first argues that the Court should deny D. Sanchez' request for an acquittal, because of the testimony about the "paperwork" on Molina's "hit" and the testimony establishing D. Sanchez as the "llavero" -- who is tasked with "enforc[ing] orders to assault and murder people" -- for the pod where Molina lived. Sanchez NTM Response at 4. The United States posits that "[t]he jury could have concluded that the defendant oversaw and called for the Molina murder because it was his duty to do so as an SNM leader." Sanchez NTM Response at 5. The United States asserts that this case is not one where "the evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." Sanchez NTM Response at 5 (citing United States v. White, 673 F.2d 299, 301 (10th Cir. 1982)).

        According to the United States, D. Sanchez "concedes a number of points that are sufficient to overcome his Rule 29 motion," by admitting that R. Perez' statements corroborate other witnesses' testimony. Sanchez NTM Response at 5. Further, D. Sanchez' assertion that prison records controvert witness testimony is problematic, the United States argues, because James

Brewster's examination showed that these records are unreliable – to the extent that they could not be introduced as business records under rule 806(6) of the Federal Rules of Evidence.  See Sanchez NTM Response at 5.  According to the United States, rule 29's standard means that the Court should "view the evidence, both direct and circumstantial, in the light most favorable to the government, and without weighing conflicting evidence or considering the credibility of witnesses, determine whether that evidence, if believed, would establish each element of the crime."  Sanchez NTM Response at 6 (internal quotation marks omitted)(quoting United States v. White, 673 F.2d at 301-02; and citing United States v. Downen, 496 F.2d 314, 318 (10th Cir. 1974); Goff v. United States, 446 F.2d 623, 624 (10th Cir. 1971)).

The United States concedes that some cases indicate that a court "may weigh the evidence and consider the credibility of witnesses in determining whether the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred," Sanchez NTM Response at 6 (quoting United States v. Evans, 42 F.3d 586, 593 (10th Cir. 1994)), but other cases find it "difficult to accept the proposition that a trial judge can reasonably determine that the evidence is legally sufficient to support a finding of guilt beyond a reasonable doubt but that such a verdict is against the weight of the evidence," Sanchez NTM Response at 6 (quoting State v. Johnson, 692 S.W.2d 412, 413 (Tenn. 1985), superseded by statute).  Further, the United States notes that "motions for new trials are 'regarded with disfavor and should only be granted with great caution.'"  Sanchez NTM Response at 6 (quoting United States v. Quintanilla, 193 F.3d 1139, 1146 (10th Cir. 1999)).  Coconspirators' uncorroborated testimony, the United States argues, is not grounds for reversing a conviction.  See Sanchez NTM Response at 7 (citing United States v. Dewberry, 790 F.3d 1022, 1029 (10th Cir. 2015)).  Here, the United States argues, "a great deal of the testimony was corroborated, leading to additional challenges to [D. Sanchez] prevailing on

his motion." Sanchez NTM Response at 7. The United States notes that appellate courts do not assess credibility and will not find that "testimony is, as a matter of law, incredible unless it is unbelievable on its face." Sanchez NTM Response at 7 (internal quotation marks omitted)(quoting United States v. Dewberry, 790 F.3d at 1029). The United States underscores that rule 29's standard "is based upon deep respect for the fact-finding function of the jury." Sanchez NTM Response at 8 (citing United States v. White, 673 F.2d at 302).

The United States then argues that the Court properly admitted R. Perez' and Herrera's statements at the first joint trial, and "appropriately gave limiting instructions to the jury directing them to use the statements only against the statements' declarants." Sanchez NTM Response at 8. The United States notes that "[i]t would be difficult to find a place in the record where the Court denied a limiting instruction requested by a defendant." Sanchez NTM Response at 9. The United States asserts that it redacted the transcripts and the recordings presented at trial to avoid having two juries, removing any mention of D. Sanchez (and any other non-declarant, First Trial Defendant) from the statements. See Sanchez NTM Response at 9. The United States alleges that the First Trial Defendants also "benefitted from additional redactions when they made eleventh-hour requests for those redactions." Sanchez NTM Response at 9-10. As to the mention of R. Perez' statements in his counsel's opening statement, the United States posits that "statements, arguments, objections, and questions by counsel are not evidence," and that, because D. Sanchez did not object to the opening statement at trial, "the Court should review that claim for plain error." Sanchez NTM Response at 10. The United States maintains that D. Sanchez cannot overcome the weight of the evidence standard or establish the requirements of plain error. See Sanchez NTM Response at 10. Further, the United States argues that the Court "took steps to keep out the

inadmissible evidence" and properly admitted R. Perez' statements against him with limiting instructions. Sanchez NTM Response at 10-11.

Next, the United States asserts that it did not violate Brady, "because the information disclosed is cumulative, is not exculpatory, and is not material." Sanchez NTM Response at 11. The United States contends that the Convicted First Trial Defendants "cannot articulate any prejudice the delay caused," so they are not entitled a remedy even if there was a Brady violation. Sanchez NTM Response at 11. The United States underscores that it disclosed the information before the First Trial Defendants rested their case and that it would have made any witness available that the First Trial Defendants wished to recall. See Sanchez NTM Response at 11. The United States notes that it disclosed the March 302 "weeks before trial," so D. Sanchez "possessed all of the information on which his motion for new trial" rests. Sanchez NTM Response at 12. According to the United States, Urquizo's trial testimony is consistent with his prior statements, including those in the Typed Notes and in the cooperators' testimony. See Sanchez NTM Response at 12. The United States contends that the Typed Notes are consistent with the March 302 and that, if D. Sanchez had cross-examined Urquizo about M. Rodriguez' letter stating "'*the* desire'* to have Martinez, Montoya and Armenta do the hit on Molina," Urquizo would have repeated that M. "Rodriguez and Sanchez were going to have Martinez, Montoya and Armenta do the hit." Sanchez NTM Response at 13 (emphasis in Sanchez NTM Response). The United States argues that the Typed Notes, therefore, are not exculpatory or material for Brady purposes. See Sanchez NTM Response at 13. The United States further contends that, because D. Sanchez cross-examined M. Rodriguez, and elicited testimony that M. Rodriguez "wanted the murder to happen and wanted Montoya, Armenta and Martinez to kill Molina," D. Sanchez already got all the benefit he could from the Typed Notes' statement that M. Rodriguez wanted Montoya, Armenta, and

Martinez to kill Molina.  Sanchez NTM Response at 13.  See id. at 14.  The United States posits that the third piece of allegedly new information -- that D. Sanchez did not participate in the "hit" -- is also in the March 302, because it states that D. Sanchez messed up by not covering the cameras or retrieving Armenta's shank.  Sanchez NTM Response at 14.  Finally, the United States rebuts D. Sanchez' argument that the notes are exculpatory because they state that M. Rodriguez sent another letter saying Molina would be "hit" that afternoon.  Sanchez NTM Response at 14.  The United States argues that the notes do not indicate that M. Rodriguez ordered the "hit" for the afternoon, and that the statement is consistent with D. Sanchez ordering the "hit."  Sanchez NTM Response at 14-15.

The United States asserts that Brady requires only disclosure of information, and does not require that the United States "provide the information in duplicative reports and notes."  Sanchez NTM Response at 15.  The United States is adamant that D. Sanchez had all the information in the Typed Notes, because the March 302 had the same information, and the United States provided it before Urquizo testified.  See Sanchez NTM Response at 15.  The United States thus contends that D. Sanchez cannot show prejudice, because he had all the information that he complains the United States suppressed.  See Sanchez NTM Response at 15.  The United States contends that it did not disclose this allegedly exculpatory material earlier, because it is not exculpatory and because it was disclosed in the March 302; the United States also adopts its argument in the MTD Response.  See Sanchez NTM Response at 16.  The United States notes that other cooperators, such as B. Cordova, corroborated Urquizo's testimony.  See Sanchez NTM Response at 16.  The United States points the Court to United States v. Varela's resolution, because Urquizo provided exculpatory information as to Varela which "resulted in dismissal of Varela from the Molina murder counts."  Sanchez NTM Response at 17.  As to D. Sanchez' contention that "last-minute

discovery dumps" prejudiced him, the United States notes that one such disclosure resulted from Stemo's discovery of a box containing M. Rodriguez' property underneath Sainato's desk, and that she "quickly inventoried" to provide disclosure to the Defendants. Sanchez NTM Response at 17.[128] The United States notes that it went through the 981 pages of M. Rodriguez materials to explain in its MTD Response "how the materials were cumulative, not exculpatory, and not material." Sanchez NTM Response at 17. The United States also notes that the First Trial Defendants refused its offer to recall witnesses. See Sanchez NTM Response at 18.

Further, the United States contends that the "most probative evidence for the defendants from the box of" M. Rodriguez' property is a letter with statements that are inconsistent with his in-court testimony. Sanchez NTM Response at 18. The United States asserts that this letter is immaterial, because the First Trial Defendants had already admitted an exhibit containing the same information -- Defendants' Trial Exhibit FL.[129] See Sanchez NTM Response at 18 n.9. The United Stated also notes that the First Trial Defendants used this letter twice, in their examinations of Acee and Stemo, and "probably [used it] more effectively in this matter, because whereas M. Rodriguez could have explained both on cross and on re-direct why he gave those differing statements, neither Agent Stemo nor Agent Acee could provide that rebuttal." Sanchez NTM Response at 18-19. According to the United States, each of the First Trial Defendants impeached

---

[128]The United States avers that some of the material "related to Trial 2 and had no relevance to Trial 1," while "[o]ther documents were for people who were not trial participants." Sanchez NTM Response at 17 n. 7.

[129]Defendants' Trial Exhibit FL is Montoya's request for "defense witness use immunity for Mr. Mario Rodriguez." See Amended Defendant's Application Motion for Defense Witness Immunity at 1, filed in state court May 12, 2015, filed in federal court November 11, 2018 (Doc. 2451-12)("Immunity Motion"). Montoya attaches to the Immunity Motion the testimony that M. Rodriguez would provide on behalf of Montoya, which is a hand-written letter written by M. Rodriguez and dated October 16, 2014. See Immunity Motion at 4.

M. Rodriguez "several times, on several grounds," including "Martinez's, Montoya's, and Armenta's plan to create a version of the Molina murder in which only Armenta would take the fall." Sanchez NTM Response at 19. Thus, the United States contends that "the letter in Rodriguez's property from Martinez's wife regarding Martinez's, Armenta's, and Montoya's stories aligning is cumulative to the information already admitted as evidence in this trial," because many witnesses already established that there was a plan to falsify the Molina murder story in the state case. Sanchez NTM Response at 19. The United States asserts that D. Sanchez' only remaining argument is that his "counsel would have changed trial strategy" because of the documents' contents, but that D. Sanchez "cannot explain how his trial strategy would have changed." Sanchez NTM Response at 19-20. As support, the United States contends that M. Rodriguez' personal writings in the box "which detail assaults, murders and his role within the SNM . . . are actually mitigating when compared with the questions elicited about his crimes and the two videos of his Esparza assault." Sanchez NTM Response at 20. Finally, the United States contends that, given the First Trial Defendants' robust cross-examinations of each cooperating witness, M. Rodriguez' property would not have added any value and are not material, and that D. Sanchez has not established a Brady violation. See Sanchez NTM Response at 21.

As to D. Sanchez' allegation of inflammatory publicity prejudicing his right to a fair trial, the United States clarifies that, under Tenth Circuit precedent, for a court to determine that "inflammatory pretrial publicity so permeated the community as to render impossible the seating of an impartial jury, the court must find that the publicity in essence displaced the judicial process, thereby denying the defendant his constitutional right to a fair trial." Sanchez NTM Response at 22 (internal quotation marks omitted)(quoting United States v. McVeigh, 153 F.3d 1166, 1181 (10th Cir. 1998)). Accordingly, the United States asserts that there is no presumption of prejudice

because of trial publicity and thus requests that the Court deny the Sanchez NTM.  See Sanchez

NTM Response at 22.  The United States notes two reasons why the trial publicity did not prejudice

D. Sanchez' right to a fair trial: (i) "numerous jurors were screened and dismissed before trial

based on their answers to jury questionnaires that addressed, among other things, prospective

jurors' knowledge, feelings, and beliefs about the case"; and (ii) "the Court and the parties

addressed any additional concerns during *voir dire*."  Sanchez NTM Response at 22-23.  The

United States contends that, because the parties dismissed many prospective jurors before they

were called to service, the jury pool who engaged in voir dire "represented a much more objective

and untainted group, a group that was pre-screened for biases resulting from media coverage of

the case."  Sanchez NTM Response at 24.  Further, the United States argues that the First Trial

Defendants brought out during trial many of the assertions in the Albuquerque Journal article that

D. Sanchez mentions and that the article "paled in comparison to the impeachment evidence

introduced by the defendants."  Sanchez NTM Response at 25.  See id. at 24.  Finally, the United

States contends that the Court's denial of the First Trial Defendants' request for mistrial following

Acee's comment is reviewed for abuse of discretion, see Sanchez NTM Response at 25 (citing

United States v. Kravchuk, 335 F.3d 1147, 1154 (10th Cir. 2003)), and that the Court properly

denied the motion for mistrial, see Sanchez NTM Response at 26.  The United States thus requests

that the Court deny the Sanchez NTM, because the verdict "is not contrary to the weight of the

evidence," which "weighs heavily in favor of upholding the verdict."  Sanchez NTM Response at

27-28.

### 11.     The Sanchez NTM Reply.

D. Sanchez replies.  See Defendant Daniel Sanchez's Reply in Support of His Motion for

Judgment of Acquittal (FRCP Rule 29) or, in the Alternative, a New Trial (FRCP Rule 33) at 1,

filed December 4, 2018 (Doc. 2462)("Sanchez NTM Reply"). D. Sanchez first contends that the Court should not deny the Sanchez NTM just because it denied his oral rule 29 motion "made at the close of the government's case." Sanchez NTM Reply at 2. D. Sanchez asserts that, even if he were a "llavero," the United States failed to meet its burden to "prove him guilty beyond a reasonable doubt of the conspiracy to commit murder and murder of Javier Molina." Sanchez NTM Reply at 2. As to the United States' assertion that Herrera's and R. Perez' admissions corroborate the cooperator testimony against D. Sanchez, D. Sanchez notes that these admissions were inadmissible against him, could not be considered against him at trial and cannot be considered against him now. See Sanchez NTM Reply at 3. D. Sanchez contends that "[t]he fact that a governmental team of highly educated and experienced prosecutors can't correctly apply and argue the import of the Court's evidentiary rulings in discussing the strength of its case against Mr. Sanchez highlights the problem with relying on lay jurors to give meaning to the Court's instructions." Sanchez NTM Reply at 3. D. Sanchez asserts that no prison record corroborates the "paperwork" story and that the prison records produced at trial -- of which the United States questioned the accuracy of only one -- contradict this story. See Sanchez NTM Reply at 4.

D. Sanchez then underscores that trial judges have broad discretion to grant a new trial if they believe that there was a miscarriage of justice, and that the United States' reliance on the appellate standard of review is misplaced. See Sanchez NTM Reply at 4-5. D. Sanchez also notes that the United States does not address his "argument that the cumulative effect of the trial errors, prosecutorial misconduct, and provocative media coverage on the eve of trial created a trial environment where jurors were likely to convict Mr. Sanchez, regardless of whether the government proved the truth of the charges against him beyond a reasonable doubt." Sanchez NTM Reply at 5. D. Sanchez also asserts that the Typed Notes are different from the other,

disclosed reports because the Typed Notes reflect that "Urquizo did not mention Daniel Sanchez doing anything, whatsoever, to plan, organize, or execute the Molina murder," and that, in Urquizo's eyes, D. Sanchez refused to perform the role SNM assigned him. Sanchez NTM Reply at 6. According to D. Sanchez, the Court should reject the United States' speculation about what Urquizo would say on cross-examination when presented with this information, because the United States should have timely disclosed the information if it "wanted the Court to know what Urquizo, or, for that matter, its other accomplice/informants, would have said if he/they were cross-examined" about the Typed Notes' content. Sanchez NTM Reply at 7. D. Sanchez also questions why the United States would allow for the recall of its witnesses "[i]f the information contained in the Sainato notes was simply duplicative of information contained in other government disclosures." Sanchez NTM Reply at 7. D. Sanchez asserts that the recall of witnesses "is not an adequate remedy for the government's failure to timely disclose favorable information." Sanchez NTM Reply at 8. Finally, D. Sanchez argues that the United States "ignores the fact that the most prejudicial and widely disseminated reporting came just hours before jury selection began, long after jurors were dismissed based on their month-old responses to the questionnaire," and that, although many witnesses testified to the content of the Albuquerque Journal article, "their accounts did not carry the credibility or authority of the United States Marshals Service or the Court, whose private discussions were quoted in the media reports on the eve of trial." Sanchez NTM Reply at 9. Accordingly, D. Sanchez requests that the Court grant him an acquittal or, in the alternative, a new trial in light of the totality of the circumstances. See Sanchez NTM Reply at 10.

12.     **The Herrera NTM.**

Herrera filed his motion for a new trial on October 15, 2018,[130] noting a number of factors that he alleges resulted in a miscarriage of justice at trial, including: (i) disqualification of lead counsel two months before trial and the Court's denial of a continuance; (ii) prejudice from the United States' "untimely and voluminous disclosure of discovery, containing *Brady* and *Giglio* information favorable to Herrera's defense"; (iii) "newly disclosed evidence" that proves B. Cordova's testimony inadmissible and untruthful; (iv) "[n]ewly discovered evidence" that "calls into question the truthfulness of other government witnesses"; (v) "the violation of Herrera's right to present a defense"; and (vi) "the violation of his right to a fair and impartial jury."  Herrera NTM at 1.

First, Herrera recounts the timeline of the Court's appointment of his counsel.  See Herrera NTM at 3.  The Court appointed Michael V. Davis to represent Herrera on May 3, 2016.  See Herrera NTM at 3.  On September 22, 2016, the Court granted Herrera's Ex Parte Motion for Second Counsel and Appointment Pro Hac Vice, filed September 7, 2016 (Doc. 674), and appointed Carey C. Bhalla as second counsel for Herrera.  See Herrera NTM at 3 (citing Ex Parte Order Approving Second Counsel and Appointment Pro Hac Vice, filed September 22, 2016 (Doc. 697)).  Herrera states that Ms. Bhalla "had no federal criminal trial experience and had not yet been appointed to the [Criminal Justice Act] A panel."  Herrera NTM at 3 (citing Ex Parte Motion for Second Counsel and Appointment Pro Hac Vice).  On May 4, 2017, the United States filed a sealed motion to disqualify Mr. Davis, because "a former client of Mr. Davis was expected to testify and . . . his testimony may be adverse to Herrera's interest, thereby creating an alleged

---

[130]Both Sanchez and Baca joined in the Herrera NTM.  See Defendant Daniel Sanchez's Notice of Joinder in Co-Defendants' Motion for New Trial (Docs. 2413 and 2421) at 1, filed October 22, 2018 (Doc. 2431)("Sanchez Joinder"); Baca NTM at 1.

conflict in Mr. Davis's continued representation of Herrera at trial." Herrera NTM at 3. Herrera

notes that the hearing on this motion "was not held until November 8, 2018," and that on December

3, 2017, "[t]he Court ordered that Mr. Davis be removed as Herrera's counsel." Herrera NTM at

3. In anticipating the Court's disqualification of Mr. Davis, on November 28, 2017, Herrera

"moved to appoint new lead counsel and to continue the January 29, 2018 trial setting." Herrera

NTM at 3-4 (citing Defendant Carlos Herrera's Motion to Appoint Lead Counsel and Continue

January 29, 2018, Trial Setting and Related Scheduling Order, filed November 28, 2017

(Doc. 1488)). Herrera states that "[t]he Court appointed William Maynard on November 30, 2017,

but reserved ruling on the motion to continue until the court's hearing on December 7, 2017."

Herrera NTM at 4 (citing Proposed order Granting Appointment of William Maynard, filed

November 30, 2017 (Doc. 1511)). Herrera recalls that, at the hearing, Ms. Bhalla noted the

extensive discovery, "her lack of experience in federal criminal cases," and that she felt

disadvantaged, because co-defense counsel "had at least a couple of years to prepare for the case."

Herrera NTM at 4. Herrera indicates that Mr. Maynard raised similar issues, noting "the

complexity of the case, his knowledge of the type of charges at issue, . . . the volume of discovery,"

and "his ethical duties to other clients." Herrera NTM at 4. The Court denied this motion to

continue and another filed on January 25, 2018, so trial began on January 29, 2018. See Herrera

NTM at 4-5.

　　　Herrera contends that "[i]nadequate case preparation can jeopardize an accused's right to

effective assistance of counsel." Herrera NTM at 6-7 (internal quotation marks omitted)(quoting

United States v. King, 664 F.2d 1171, 1173 (10th Cir. 1981)). He notes five factors which he

alleges a court should consider in determining whether there was sufficient time for the attorney

to provide effective assistance: "(1) the time afforded for investigation and preparation; (2) the

experience of counsel; (3) the gravity of the charge; (4) the complexity of possible defenses; and (5) the accessibility of witnesses to counsel." Herrera NTM at 7 (internal quotation marks omitted)(quoting United States v. Golub, 694 F.2d 207, 215 (10th Cir. 1982)). Herrera argues that all five factors "demonstrate that counsel for Herrera was inadequately prepared for trial, such that his right to a fair trial and effective assistance of counsel was jeopardized." Herrera NTM at 7. Herrera notes Ms. Bhalla's multiple admissions "that she was unable to adequately represent Herrera given her lack of federal experience and insufficient time to prepare for a complex and lengthy trial," a fact which he alleges is underscored by her failure to "renew the motion to continue." Herrera NTM at 8. Herrera contends that, had his counsel been given more time to prepare, "the cross-examinations of the government's witnesses would have been more effective, issues would have been better preserved and Herrera would have been able to present a more comprehensive and effective defense." Herrera NTM at 8.

Second, Herrera contends that the United States disclosed over six-thousand pages of discovery after trial began that contained Brady and Giglio evidence, which foiled his right to a fair trial. See Herrera NTM at 8. Herrera argues that at least the following evidence is exculpatory: (i) the February 28, 2018, disclosure of M. Rodriguez' diary and letters which contradict his testimony, such as M. Rodriguez' telling the jury he did not have to register as a sex offender; (ii) the February 28, 2018, disclosure of T. Martinez wife's letter to T. Martinez discussing how their stories did not match up and that "the informants needed to do a better job scripting their stories"; (iii) M. Rodriguez' letter to a "clerk's office requesting discovery in a homicide case in which Lupe Urquizo provided testimony" in "an effort to obtain paperwork," despite M. Rodriguez' testimony that "other people were responsible for providing the Molina

paperwork"; (iv) the March 2, 2018, disclosure of Acee's[131] notes stating that T. Martinez "told federal agents that he did not know how Herrera was involved but that he did not get along with Herrera," which contradicts the United States' theory that Herrera ordered Molina's murder; (v) the January 30, 2018, disclosure of the FBI's SNM Gang Questionnaire, which Herrera alleges "direct[s] the narrative the Government wished to sell," because the questions' phrasing "suggested the answers required." Herrera NTM at 9. See id. at 9-10. Herrera contends that his "counsel was already at a severe disadvantage when bombarded during trial with 6,282 pages of discovery." Herrera NTM at 11. Herrera argues that he "could have used the above-referenced information to cause reasonable doubt as to the evidence presented by the government witnesses," and that the late disclosure of the SNM Gang Questionnaire "prevented the presentation of a completely new line of defense," i.e., "that the government provided the narrative it wished to present in the forms it provided to the government informants." Herrera NTM at 11. Due to the discovery's disclosure after the witnesses had already been called, Herrera contends that he was unable to "effectively present [the late discovery] to the jury," as "[r]ecalling the witnesses would have further confused the jury and ultimately detracted from the defense strategy of the way their evidence was presented." Herrera NTM at 11. Further, Herrera argues that the United States violated the Court's order to produce all Brady and Giglio material "on multiple occasions," and that allowing the United States to violate an order sets a bad precedent. Herrera NTM at 12.

---

[131]Herrera identifies these notes as Stemo's in the Herrera NTM, see Herrera NTM at 9, but the United States identifies the notes as Acee's in its response, see United States' Response to Carlos Herrera's Motion for New Trial (Doc. 2413) at 11, filed November 30, 2018 (Doc. 2454). Because the United States is in the better position to identify which agent made the notes, and Herrera identifies them as Acee's in his reply, see Reply to the Government's Response at 5, filed December 13, 2018 (Doc. 2465), the Court concludes that Acee made these notes.

Third, Herrera asserts that B. "Cordova was an unreliable witness from the outset as a government cooperator who was promised leniency and other benefits in exchange for his testimony against Herrera and other co-defendants," and that, at trial, his admission "to lying under oath about his drug use" further tainted his credibility. Herrera NTM at 12. Herrera contends that "a new 302 surfaced on June 25, 2018 [] further demonstrates that Cordova lied under oath." Herrera NTM at 12 (citing March 1, 2018 302 at 1 (drafted March 1, 2018), filed October 15, 2018 (Doc. 2413-5)("Neale Investigation 302")). Herrera notes that B. Cordova testified to dumping a body at a church, and that the body was eventually found. See Herrera NTM at 12-13 (citing Feb. 23 Tr. at 123:19-124:12 (Villa, Cordova)). Herrera contends that the Neale Investigation 302 provides the same allegation, but shows that Agent Neale investigated and found no corroborating evidence. See Herrera NTM at 13 (citing Neale Investigation 302 at 1). Herrera asserts that he could have used this evidence to impeach B. Cordova, who the jury likely found credible because it believed B. Cordova was honest about his own criminal activities, and would thus be honest about other SNM members' activities. See Herrera NTM at 13. Herrera requests that the Court find B. Cordova unreliable, "and that no reasonable juror could find that the evidence he presented was sufficient to demonstrate that Herrera made any admissions of involvement in the Molina murder." Herrera NTM at 13. Herrera further contends that "[B.] Cordova frequently interpreted the evidence and provided improper opinions for the jury, despite being offered only as a lay witness by the government." Herrera NTM at 14 (citing Feb. 22 Tr. at 191:19-23 (Castellano, B. Cordova); id. at 192:16-22 (Castellano, B. Cordova); id. at 208:25-209:7 (Castellano, B. Cordova)). Herrera argues that this speculative opinion testimony should not have been admitted, because B. Cordova was not proffered as an expert witness and because he had no personal

knowledge as to what he testified.  See Herrera NTM at 14-15.  This testimony, Herrera avers, was therefore "unduly prejudicial."  Herrera NTM at 14.

Fourth, Herrera notes that Acee's conversation with informant J. Martinez on April 4, 2018, "indicate[s] that the entire theory of the government's case concerning how the paperwork was passed, as described by David Calb[e]rt, was a complete fiction" and did not make sense.  Herrera NTM at 15 (citing Transcript of Telephonic Interview at 1 (undated), filed October 15, 2018 (Doc. 2413-6)).  Herrera expresses that no 302 of this conversation, or any conversation Acee had with J. Martinez, has ever been produced -- which "is simply incredible," as the Molina "paperwork" story "forms the linchpin of the government's case."  Herrera NTM at 15.

Fifth, Herrera contends that the United States introduced recorded statements Herrera made to informants that tended to implicate him, but "redacted and did not intend to present other recorded statements that tended to impeach his prior statements," or "tended to show the bias and motives of cooperating witnesses."  Herrera NTM at 16.  Herrera argues that the Court precluded him from introducing these statements as impeachment, "because they were barred as hearsay."  Herrera NTM at 16 (citing Defendant Herrera's Trial Brief Regarding Impeachment of Government Witnesses, Right to Present a Defense and Notice of Joinder, filed February 9, 2018 (Doc. 1765)).  Herrera also contends that, during his cross of M. Rodriguez, the Court precluded Herrera from asking questions to demonstrate M. Rodriguez' bias and instructed M. Rodriguez not to answer any questions which "tended to implicate some of the other co-defendants."  Herrera NTM at 16 (citing Feb. 8 Tr. at 54:16-21 (Court, M. Rodriguez)).  Herrera contends that the Court's limitation "prevented evidence from being introduced regarding Rodriguez's bias towards Herrera that otherwise would have been introduced."  Herrera NTM at 16.  This imposition, Herrera argues, also underscores that the Court should have granted the Motions to Sever, because the joint trial

"impeded the ability of counsel to present a complete defense. See Herrera NTM at 17 (citing Defendant Daniel Sanchez's Motion to Sever the Trial of Counts 6-7 from the Trial of Counts 8-12, filed October 6, 2017 (Doc. 1296); Joint Motion to Renew Motion to Sever Defendants Charged with Offenses in Counts 6 and 7, filed January 21, 2018 (Doc. 1664)).

Last, Herrera contends that "the clerk's office made comments to the members of the jury pool that tainted their view of the defendants as dangerous criminals from the outset," such as the clerk's office telling them to "only use their juror numbers" and "not to use their names out of safety concerns." Herrera NTM at 17. Herrera argues that, if the "jurors were already given information to indicate that they should be fearful of the defendants before the [trial] even began, it logically follows that they were not impartial towards defendants." Accordingly, because of all the above factors and the arguments in the Sanchez NTM, Herrera contends "that the interests of justice require that Herrera be granted a new trial," and requests that the Court grant the Herrera NTM. Herrera NTM at 18.

### 13. **The Herrera NTM Response**.

The United States responds to the Herrera NTM. See United States' Response to Carlos Herrera's Motion for New Trial (Doc. 2413) at 1, filed November 30, 2018 (Doc. 2454)("Herrera NTM Response"). The United States addresses all of Herrera's arguments in turn, first arguing that the record does not support Herrera's contention that his attorneys were unprepared for trial. See Herrera NTM Response at 4. The United States notes that Ms. Bhalla began representing Herrera "only four months after excused counsel, Mr. Davis, entered his appearance," "and discovery had been released to the defendants on the tablets only a month earlier." Herrera NTM Response at 4. Further, when Mr. Davis was disqualified, the United States contends that "the key issues had already been identified, the motions practice had largely concluded, and counsel had

been working together until two months before trial." Herrera NTM Response at 4. The United States notes that the Court denied Herrera's motion to continue "at the December 7, 2017 hearing without prejudice to renewing the motion," but that Herrera "did not renew his motion to continue." Herrera NTM Response at 4. This failure, the United States avers, cannot be blamed on Ms. Bhalla's lack of experience, because she had Mr. Maynard as co-counsel who, as "an experienced and well-seasoned litigator," "would not have allowed Ms. Bhalla to make such a blunder." Herrera NTM Response at 5. The United States contends that there is "no significant difference . . . between a federal trial and state trial," and that, assuming Ms. Bhalla is less experienced than other counsel, "it was a better tactical decision to ride into trial on other more experienced attorneys' coattails than it would have been to try the case alone," i.e., utilize the joint defense agreement. Herrera NTM Response at 5. The United States posits that Herrera's "attorneys participated at trial and represented the defendant effectively," and utilized a joint defense which allowed "an opportunity to attack witnesses and the government's case multiple times." Herrera NTM Response at 6. The United States notes that Herrera "does not point to any specific prejudice caused by the denial of the continuance and points to no place in the record where counsels' performance at trial was deficient," and that there are no circumstances here which "warrant a new trial." Herrera NTM Response at 7.

Second, the United States maintains that it did not violate Brady with its last-minute discovery disclosure, because "the information disclosed is cumulative, is not exculpatory, and is not material." Herrera NTM Response at 7-8. The United States avers that, even if it violated Brady with this late disclosure, "the defendants are not entitled to a remedy, because they cannot articulate any prejudice the delay caused," and notes that "it would not oppose the defendants recalling any witnesses whom they wished and whom the United States would make available."

Herrera NTM Response at 8.  The United States contends that "at least two attorneys" impeached M. Rodriguez about his testimony at trial that he did not believe he would have to register as a sex offender, so the new information relating to M. Rodriguez "is cumulative, not material, and not exculpatory."  Herrera NTM Response at 9.  The United States alleges that "[t]he most probative evidence for the defendants from the box" of M. Rodriguez' documents is a letter in which he provides statements about the Molina murder that "were inconsistent with his in-court testimony."  Herrera NTM Response at 9.  This letter, the United States notes, was used three times at trial, however, and "was apparently in the defense's possession prior to trial," because a document that "contains the exact same information as the Rodriguez letter" was admitted as Defendants' Exhibit FL "during Jerry Montoya's testimony on February 13, 2018."  Herrera NTM Response at 9 n.5.  The United States contends that the First Trial Defendants' use of the letter -- walking through it line-by-line with Acee and Stemo to elicit "that the information in the letter was different from Rodriguez's trial testimony" -- was more effective than crossing M. Rodriguez with it, because "he could have explained on cross and on re-direct why he gave those different statements" whereas the agents could not provide such rebuttal.  Herrera NTM Response at 10.  The United States underscores that M. Rodriguez "was impeached several times," and that T. Martinez' wife's letter and M. Rodriguez' discovery request to a clerk are "cumulative to the information already admitted as evidence in this trial."  Herrera NTM Response at 10.  The United States avers that the "plan to tell a false story about the Molina murder in the state case" was "established through Rodriguez, Martinez, Armenta, Montoya, and Agent Acee."  Herrera NTM Response at 10-11.  Further, because the First Trial Defendants "made use of this evidence in [their] questioning of Agent Acee on March 2, 2018," the United States contends that there is no Brady violation.  Herrera NTM Response at 11.

Likewise, the United States asserts it did not violate <u>Giglio</u> "by not turning over Agent Acee's notes from [T.] Martinez's December 2016 interview in which the notes said that [T.] Martinez did not know 'how' Herrera was involved in the Molina murder," because the United States never contended, and there is no evidence, that T. "Martinez knew or should have known how Herrera was involved in the Molina murder." Herrera NTM Response at 11. That T. Martinez did not know how Herrera was involved, the United States avers, matches the 302s on T. Martinez, the evidence, and "the United States' theory and presentation of the case." Herrera NTM Response at 12. The United States also argues that the First Trial Defendants cross-examined Acee about the SNM Gang Questionnaire, and that the SNM Gang Questionnaire would not have been useful, because it "highlighted the fact that the FBI was investigating the right targets for each of its homicide investigations." Herrera NTM Response at 12. The United States contends that Herrera could argue that having the documents' contents "would have changed trial strategy," but asserts that Herrera cannot explain how his strategy would have changed and that his strategy would not have changed. <u>See</u> Herrera NTM Response at 12. That Herrera's strategy would not have changed, the United States asserts, is underscored by his "put[ting] on the record that [he] did not want to call any of the cooperating witnesses back." Herrera NTM Response at 13.

Third, the United States argues that Herrera's assertion that B. Cordova's lacks credibility does not warrant granting him a new trial, because the jury determines credibility, "and the jury returned guilty verdicts knowing the information about which the defendant complains." Herrera NTM Response at 14. The United States disagrees with Herrera's contention that the Neale Investigation 302 establishes that B. Cordova lied under oath, because, in the United States' view, the report establishes only that the church's pastor did not recall finding a body on the property. <u>See</u> Herrera NTM Response at 14. As to the admissibility of B. Cordova's testimony, the United

States asserts that he "testified about recorded conversations he had with the defendant, as well as the history, goals, and rules of the SNM gang," and because he had firsthand knowledge of all of this, he was "was well within the limits of Rule 701." Herrera NTM Response at 15. The United States notes that, when B. Cordova gave opinions, "his testimony was tailored to Rule 701 based on his perception," because he was giving "his understanding of what certain things meant." Herrera NTM Response at 15. The United States avers that it is the jury's role to assess the weight of such evidence. See Herrera NTM Response at 16.

Fourth, the United States notes that J. Martinez is "implicated in both the Javier Molina and Freddie Sanchez murders" as "the person who helped pass the paperwork." Herrera NTM Response at 16-17. The United States asserts that J. Martinez' interview "largely corroborates the testimony of other witnesses," except for his denial of participation -- and, the United States notes, he has "plenty of motive to lie about passing paperwork . . . that would expose him to two VICAR murder charges," especially because he had recently been released from prison. Herrera NTM Response at 17. Thus, the United States contends, "this information does not prove witnesses lied at trial and would add nothing to an examination of any of the cooperating witnesses." Herrera NTM Response at 17. Further, the interview corroborates others' testimony, according to the United States, because J. Martinez admits that he was incarcerated with Calbert and that he had seen the Molina "paperwork." Herrera NTM Response at 17-18.

Fifth, the United States argues that the Court's rulings "were in accord with the rules of evidence" and "did not hamper the defense." Herrera NTM Response at 18. According to the United States, the Court's refusal to admit Herrera's own hearsay is not grounds for a new trial, "unless the Court is inclined to reverse itself and allow the introduction of the defendant's inadmissible hearsay at a subsequent trial." Herrera NTM Response at 19. The United States

makes the same argument regarding the Court's rulings during Herrera's cross-examination of M. Rodriguez, but further asserts that the Court should not reconsider these rulings "because they were proper and still allowed the defendant to impeach Rodriguez." Herrera NTM Response at 19. The United States also contends that the Court's rulings protected D. Sanchez, "because Rodriguez was prohibited from testifying that Sanchez was part of the conspiracy to murder [Herrera]." Herrera NTM Response at 19.

Sixth, the United States contends that "[n]othing in the record establishes the [clerk's office's] comments tainted the jurors," and that this is especially true of the empaneled jurors who heard the evidence and returned the verdicts. Herrera NTM Response at 20. According to the United States, Herrera "points to nowhere in the record where the Court failed to adequately address prospective jurors' concerns about whether it was unusual for their names to be used during jury selection." Herrera NTM Response at 21. The United States notes the prospective jurors' other concerns, "such as the length of the trial and a fear of retaliation." Herrera NTM Response at 21. The Court, the United States argues, "adequately addresses all such topics and properly tested for impartiality such that 'prejudice would be discovered if present.'" Herrera NTM Response at 21 (quoting United States v. Nell, 526 F.2d 1223, 1229 (5th Cir. 1976)).

Last, the United States posits that the Court should not hold a hearing on the Herrera NTM, because "a district court is not required to hold an evidentiary hearing before resolving a motion for a new trial, particularly when the record is complete or the petitioner raised only legal claims that can be resolved without the taking of additional evidence." Herrera NTM Response at 21 (internal quotation marks omitted)(quoting United States v. Velarde, 485 F.3d 553, 559 (10th Cir. 2007)(McConnell, J.)). The United States further contends that "the weight of the evidence weighs heavily in favor of upholding the verdict." Herrera NTM Response at 21. Accordingly, the United

States requests that the Court deny the Herrera NTM without a hearing. See Herrera NTM Response at 21.

### 14.    **The Herrera NTM Reply**.

Herrera replies. See Reply to the Government's Response at 1, filed December 13, 2018 (Doc. 2465)("Herrera NTM Reply"). Herrera contends that "[i]t is incredible, after withholding thousands of relevant, often exculpatory records, that the Government would ignore their own conduct and argue that Mr. Herrera is not even entitled to a hearing on this Motion." Herrera NTM Reply at 1. Upon reflection, Herrera posits that his counsels' "post-trial feeling of being unprepared[] during trial" resulted from "the repeated and ongoing discovery violations during trial which thwarted a fair trial." Herrera NTM Reply at 1. Herrera now asserts that "[n]o lawyer, no matter their level of experience, could have effectively represented their client in the midst of repeated discovery violations during trial." Herrera NTM Reply at 1-2. Accordingly, Herrera withdraws his ineffective-assistance-of-counsel claim, and requests that "the Court focus on how the ongoing and repeated discovery violations produced an unfair trial which violated Mr. Herrera's due process rights." Herrera NTM Reply at 2.

Herrera asserts that the United States conducted a "trial by ambush" through its massive discovery dumps and only offered one remedy: the ability "to recall dozens of witnesses and ask them about this new information, information that would be impossible to process in a week, let alone in a day or two, during trial." Herrera NTM Reply at 2. Herrera contends that, "[e]ven if every single record produced was irrelevant," as the United States maintains, the discovery dumps still resulted in prejudice because they caused "every single lawyer [to] scramble to sort through thousands of pages of information while also trying to focus on voir dire, opening statements, cross examination, re-analyzing defense witnesses, closing arguments, trial briefs and other important

issues." Herrera NTM Reply at 3. Herrera questions what sanctions the Court would have imposed had this been a civil case instead, and asserts that criminal defendants should not "be afforded lesser protections than civil ones," especially because "their lives are on the line." Herrera NTM Reply at 3. Herrera underscores that there are discovery rules, and that they would be rendered meaningless "if there are no consequences for violating them." Herrera NTM Reply at 3. Herrera asserts that he "has a fundamental right to due process and to a fair trial," and "allowing the government to utilize these types of trial tactics thwarts those basic, constitutional principles." Herrera NTM Reply at 3.

Herrera maintains that noting each "time the late discovery was prejudicial would take months of time" and that "[t]he bigger issues were summarized in the [Herrera NTM]," so in his Reply, Herrera simply "articulate[s] why and how some of these disclosures were prejudicial." Herrera NTM Reply at 3. Herrera first turns to two letters that, he argues, suggest that government witnesses colluded to "manufacture evidence": (i) the letter from M. Rodriguez taking responsibility for the Molina murder, which "was first admitted on February 13, 2018"; and (ii) the letter from T. Martinez' wife to T. Martinez stating that the Defendants' "stories did not match the evidence being presented against them," which the United States first disclosed to the Defendants on February 26, 2018. Herrera NTM Reply at 4. Herrera contends that the letter to T. Martinez is "additional evidence linking several defendants committed to conspiring with one another to present a unified lie," which is "something else entirely" from "cross examin[ing] a witness about his credibility concerning the truth." Herrera NTM Reply at 4. Herrera questions how T. Martinez' wife had access to discovery, why this letter was in M. Rodriguez' property, and whether other Defendants saw this letter. See Herrera NTM Reply at 4. Herrera notes that no Defendant interviewed T. Martinez' wife, who Herrera posits is "clearly a witness with relevant

information, information qualifying as <u>Giglio</u> and <u>Brady</u>," and that she "was nowhere on the radar until February 26, 2018, after four weeks of trial and after every single government informant had already testified." Herrera NTM Reply at 4. Herrera argues that the United States "rel[ied] upon and present[ed] to the Court individuals who were proven untruthful, untruthful in court proceedings and untruthful under oath," and so his "likely" life sentence "rests on the testimony of witnesses who have been proven to lie, and witnesses who were not thoroughly impeached since evidence of their lies was withheld by the Government." Herrera NTM Reply at 5.

Herrera then turns to the SNM Gang Questionnaire, asserting that it "clearly informs each potential witness interviewed that the government was seeking incriminating evidence on the targets discussed in the questionnaire." Herrera NTM Reply at 5. According to Herrera, this strategy is underscored by Acee's notes of T. Martinez' December 29, 2016, interview, which state that T. "Martinez did not know how Carlos Herrera was involved," when the SNM Gang Questionnaire states, as Herrera paraphrases, "We know that Carlos Herrera was involved in the murder of Javier Molina. We want to know how?" Herrera NTM Reply at 5-6. Herrera contends that Acee used the SNM Gang Questionnaire to signal "potential government witnesses that he needed testimony against Carlos Herrera" and that providing these witnesses, who the United States knew had "lied in court proceedings in the past," with the names of those individuals who the United States was "investigating became the bones of the narrative those witnesses created." Herrera NTM Reply at 6. Herrera posits that the SNM Gang Questionnaire's disclosure's timing precluded the First Trial Defendants from inquiring during cross-examination about the United States indirectly giving the witnesses what it wanted them to say in this Questionnaire. <u>See</u> Herrera NTM Reply at 6. Herrera contends that "Acee's notes and the questionnaire together develop this

picture, a real and compelling explanation of how and why these stories were manufactured," and that this was "something the jury should have been able to consider." Herrera NTM Reply at 6.

Finally, Herrera argues that the Neale Investigation 302, combined with J. Martinez' statements on the "paperwork" story, "add[] a further, more robust layer of Mr. Cordova's willingness to lie, proof that, again, was withheld from the Defense." Herrera NTM Reply at 6. Herrera notes that the United States has not disclosed any report or 302 concerning J. Martinez' interview that occurred before Acee's April 4, 2018, telephone call with him, despite the defense sending the United States a request for such documentation. See Herrera NTM Reply at 7. Herrera states that "counsel was able to speak with Mr. Martinez on the phone," and J. Martinez said he had a meeting in December, 2016, with the STIU and the FBI and discussed that the "paperwork" story was a lie and that "[B.] Cordova tried to frame him . . . for a murder he did not commit." Herrera NTM Reply at 7. This conversation, according to Herrera, reveals that "[B.] Cordova was willing to lie at the drop of a hat," but that, because of these late disclosures, "[B.] Cordova was never impeached on either of his lies." Herrera NTM Reply at 7. Herrera contends that had B. Cordova been "fully cross examined," this additional impeachment "likely would have led to a much different result when the Jury was determining how much weight to give his testimony." Herrera NTM Reply at 7. Accordingly, Herrera asserts that the above examples show the United States' "refusal to acknowledge the serious nature of their discovery violations and how these violations produced an unfair result," necessitating "a new trial with full and fair discovery." Herrera NTM Reply at 8.

15.     **The Baca NTM.**

Baca filed the Baca NTM[132] on October 15, 2018, requesting a new trial pursuant to rule 33 of the Federal Rules of Criminal Procedure.  See Baca NTM at 1.  The next day, Baca separately filed an appendix of his supporting exhibits.  See Defendant Anthony Ray Baca's Appendix of Exhibits in Support of His Motion for a New Trial at 1, filed October 16, 2018 (Doc. 2423)("Baca App.").  Baca maintains that the United States' "late disclosure of discovery and its suppression of *Brady* and *Giglio* evidence caused a miscarriage of justice in the trial against Mr. Baca."  Baca NTM at 4.

Baca first contends that M. Rodriguez "was a critical witness against Mr. Baca," who "claimed to know a lot about Mr. Baca and his role in various SNM activities."  Baca NTM at 6-7.  Baca notes that M. Rodriguez testified about: (i) discussions with Baca in which Baca provided "ideas regarding the structure and future of the SNM"; (ii) Armenta's cooperation with the United States and Baca offering "to threaten Armenta's family"; (iii) Baca's disappointment that those "who murdered Molina were charged for the murder because Molina was supposed to be killed before 2014"; and (iv) Baca's knowledge of the Molina's "paperwork" being passed.  Baca NTM at 6.  M. Rodriguez also claimed that Baca told him about the Marcantel murder conspiracy.  See Baca NTM at 7.  According to Baca, however, a June 8, 2018, disclosure of a November 14, 2017, telephone conversation between M. Rodriguez and his mother "directly contradicted Rodriguez's claimed knowledge of Mr. Baca's activities."  Baca NTM at 7.  Baca provides an excerpt of M. Rodriguez' conversation: "The only one they want to use me against is Dan.  ***And they won't use me against Pup because I don't have nothing on him***.  So I don't have to.  But I'll have to

---

[132]Both Sanchez and Herrera joined the Baca NTM.  See Sanchez Joinder at 1; Notice of Joinder in Defendant Anthony Baca's Motion for a New Trial (Doc. 2421), filed October 18, 2018 (Doc. 2430).

do for the other ones.  They want me to do four of them. . . ."  Baca NTM at 7 (emphasis in Baca NTM)(quoting November 14, 2017 Audio Recording at 19:35, filed October 16, 2018 (on file with the Court)).  Baca maintains that M. Rodriguez' multiple, prior statements to law enforcement corroborated this "statement to his mother that he did not 'have anything on' Mr. Baca."  Baca NTM at 7 (quoting November 14, 2017 Audio Recording at 19:35).  For example, M. Rodriguez' first statement to the FBI provides "that Mr. Baca 'liked Molina because Molina bought into the [changes Mr. Baca had proposed for SNM].'"  Baca NTM at 7 (alteration in Baca NTM)(quoting 10/24/2017 Debrief of Mario Rodriguez, aka "Blue" at 5 (drafted October 25, 2017), filed October 16, 2018 (Doc. 2423-1)("M. Rodriguez Oct. 302")).  Baca also notes that the M. Rodriguez Oct. 302 provides that "***Rodriguez did not know if Baca wanted Molina killed***," and that, "[b]y virtue of his position, Baca ***possibly*** authorized" the Molina "hit."  Baca NTM at 8 (emphasis in Baca NTM)(internal quotation marks omitted)(quoting M. Rodriguez Oct. 302 at 7-8).  Baca notes that, about two weeks before M. Rodriguez' call with his mother, the FBI interviewed M. Rodriguez again and M. Rodriguez said nothing about Baca's attempt to discuss the Marcantel murder plot with him and "provided no new information regarding Mr. Baca's alleged role in" the Molina murder.  Baca NTM at 8 (citing SA Bryan Acee Notes of 11-1-17 Mario Rodriguez Debrief at (dated November 1, 2017), filed October 16, 2018 (Doc. 2423-2)).

Baca asserts that M. Rodriguez did not tell "law enforcement the stories he told at trial regarding Mr. Baca discussing the alleged plot to kill Gregg Marcantel and Jerry Armenta" until February 3, 2018.  Baca NTM at 8.  Baca concedes that counsel "was aware of the evolution of Rodriguez's statements and believe[d] the later statements to be fabricated," Baca NTM at 8, Baca asserts that, if counsel had the recording of M. Rodriguez' telephone call with his mother admitting "to having 'nothing' on Mr. Baca," "their cross examination of Rodriguez would have been far

more effective and there is a reasonable probability that the result of the proceeding would have been different." Baca NTM at 9. Baca contends that this telephone call also "is substantial evidence" that M. Rodriguez colluded with T. Martinez -- with whom M. Rodriguez was housed "in the weeks before trial" -- so M. "Rodriguez's testimony against Mr. Baca [would] 'match up to' [T.] Martinez's statements." Baca NTM at 9 (quoting Letter from Robin Martinez to Tim Martinez at 5 (dated October 23, 2015), filed October 16, 2018 (Doc. 2423-3)("Mrs. Martinez' Letter")). Further, because this "recorded telephone call was in the possession of the New Mexico Department of Corrections as of November 14, 2017," Baca argues that it "could and should have been disclosed before trial." Baca NTM at 9-10. Baca contends that, had the United States timely disclosed the telephone call, "counsel could have used it in their impeachments of Rodriguez and Martinez and there is a reasonable probability that the result of the trial would have been different." Baca NTM at 10.

Baca then asserts that Urquizo perjured himself, because the sign language conversation Urquizo described having with Baca could never have happened. See Baca NTM at 10. First, contrary to Urquizo's testimony, Baca was housed in Pod S, not cell 106 in Pod Q. See Baca NTM at 10. Further, Baca maintains that "it is impossible to stand in the first cage of the recreation yard where Lupe Urquizo claimed to be and see into what would have been (purportedly) Defendant Baca's cell," because a guard shack stands in front of Pod Q, cell 106, "completely obstructing the view." Baca NTM at 11. Baca contends that this testimony affected his "constitutional right to a fair trial under *Brady* and *Giglio*, as well as his right to not have the United States present perjured testimony at trial in order to convict him, [so] a new trial must be issued." Baca NTM at 11. Baca asserts that the United States' close relationship with the NM Corrections Department precludes the United States from reasonably arguing "that it could not have known that this viewing angle

was impossible." Baca NTM at 11. Baca therefore posits that the United States' failure "to disclose an architectural obstruction that made its witness's testimony impossible violated the United States' duty to disclose exculpatory evidence and impeachment material to the defense, and allowed a material witness to lie on the stand," which "was not a harmless error" and necessitated a new trial. Baca NTM at 11.

Last, Baca contends that the NM Corrections Department's destruction of exculpatory evidence in its possession warrants a new trial. See Baca NTM at 12. Baca states that Urquizo, M. Rodriguez, and T. Martinez all testified to having conversations with Baca about the Marcantel, Santistevan, and Molina murder conspiracies in the recreation yard at PNM Level VI. See Baca NTM at 12. Baca also notes that Calbert testified "that he obtained the Molina paperwork from Anthony Baca via Joe Martinez while both men were exercising in the Level VI recreation yard." Baca NTM at 12. Baca asserts that the United States failed to verify these claims via NM Corrections Department "records memorializing who was in the recreation yard and when," Baca NTM at 12, despite the Court's ruling that "the United States had a duty under *Brady* to 'search the files' of the [NM Corrections Department] 'where there is a reasonable prospect of finding exculpatory evidence,'" Baca NTM at 12-13 (quoting Memorandum Opinion and Order at 104, 2017 WL 2271430, at *49, filed February 8, 2017 (Doc. 907)). Baca reveals that, "after the first trial had ended, Defense counsel requested and obtained the first batch of Level VI recreation yard records covering the time period from September 13, 2011 to September 13, 2012." Baca NTM at 13 (citing Inspection of Public Records Act Request at 1-5 (dated April 17, 2018), filed October 16, 2018 (Doc. 2423-8)). Baca states that, however, when "defense counsel requested all recreation yard records from September 14, 2012 through March 6, 2014," the NM Corrections Department "claimed that the Department no longer has any responsive documents at this point,"

because it keeps such records for only three years. Baca NTM at 13 (quoting Email from Catherine Earl to Marc M. Lowry (dated May 16, 2018), filed October 16, 2018 (Doc. 2423-10)). According to Baca, in response to an Inspection of Public Records Act request for documents concerning the destruction of these records, the NM Corrections Department "explained that the materials defense counsel sought were destroyed four days *after* receiving defense counsel's request to disclose those same records." Baca NTM at 13 (emphasis in Baca NTM)(citing Email from Catherine Earl to Patricia Sanchez at 1 (dated September 19, 2018), filed October 16, 2018 (Doc. 2423-12)). Baca contends that he is entitled to a new trial under either the California v. Trombetta, 467 U.S. 479 (1984)("Trombetta"), standard -- which applies where "the exculpatory nature of evidence was 'apparent before' its destruction, Baca NTM at 14 (quoting Trombetta, 467 U.S. at 489) -- or the Arizona v. Youngblood, 488 U.S. 51 (1988)("Youngblood"), standard -- which applies where "the exculpatory value is indeterminate, and may have been 'potentially useful,'" Baca NTM at 14 (quoting Youngblood, 488 U.S. at 58). Baca contends that, because of T. Martinez', Calbert's, and M. Rodriguez' testimony about having recreation yard conversations with Baca, the NM Corrections Department "was in a position to understand that [the recreation yard records] was material to Defendant Baca's defense," when it destroyed the recreation yard records. Baca NTM at 16. Baca further asserts that "it is obvious that the first defense request for information precipitated widespread document destruction," which "is indicative of knowledge of the materiality of the documents." Baca NTM at 16. With no comparable evidence, Baca argues that "the Court should order a new trial for Defendant Baca and instruct the next jury that the destruction of these records indicates that the missing evidence does not favor the government's case." Baca NTM at 17. Baca contends that, should the Court instead apply the Youngblood standard, "there is sufficient evidence to find bad faith on the part of the [NM Corrections

Department] in destroying these records." Baca NTM at 17. Baca argues that the recreation yard records are "potentially useful" and that the NM Corrections Department clearly "had these materials when Defendant Baca requested them and destroyed them with haste." Baca NTM at 17. Accordingly, Baca requests that the Court grant him a new trial. See Baca NTM at 17.

### 16.     **The Baca NTM Response.**

The United States responds. See United States' Sealed Response to Anthony Ray Baca's Motion for a New Trial (Doc. 2421), filed November 30, 2018 (Doc. 2457)("Baca NTM Response"). The United States contends that the M. Rodriguez debriefs were limited in nature, and that it did not ask M. Rodriguez about the Marcantel murder conspiracy until the February 3, 2018, interview. See Baca NTM Response at 4-5. The United States argues that the First Trial Defendants received all three of M. Rodriguez' debriefs before he testified, and used the debriefs "to their advantage for a 'robust' cross examination of" M. Rodriguez. Baca NTM Response at 5. Therefore, the United States contends that the telephone conversation recording of M. Rodriguez and his mom is not "critical 'impeachment' material," but rather is consistent with the debriefs. Baca NTM Response at 5. The United States explains that this telephone call was disclosed pursuant to Amy Jacks, D. Sanchez' counsel, Inspection of Public Records Act request, and that Baca made similar requests prior to trial, but did not request M. Rodriguez' prison telephone calls. See Baca NTM Response at 5. Further, as to the box of M. Rodriguez' property, the United States contends that, "once it was located, Stemo quickly inventoried those materials before they were to be returned to the" NM Corrections Department, resulting in a "mid-trial disclosure." Baca NTM Response at 5. The United States reiterates that it reviewed this discovery and, in the MTD Response, explained "how the materials were cumulative, not exculpatory, and not material" and that it "agreed to make available witnesses who had already testified in order for the defendants to

- 447 -

conduct further examinations of those witnesses," but "[t]he defendants refused the offer."  Baca NTM Response at 5.  Again, the United States maintains that the M. Rodriguez letter containing statements inconsistent with his in-court testimony was used twice by the Defendants; the First Trial Defendants impeached M. Rodriguez with the letter, line-by-line, through Acee and Stemo's cross-examinations.  See Baca NTM Response at 6.  The United States also asserts that T. Martinez' wife's letter "is cumulative to the information already admitted as evidence in this trial," so Baca "cannot establish prejudice."  Baca NTM Response at 7.  According to the United States, the jury understood there was a plan to fabricate a story about the Molina murder in the state case and the First Trial Defendants robustly cross-examined M. Rodriguez, so the M. Rodriguez documents would not have added anything were they disclosed earlier.  See Baca NTM Response at 7.

The United States also argues that Urquizo did not perjure himself, because he would have been able to communicate with Baca as he testified.  See Baca NTM Response at 8.  The United States first notes that Baca and Urquizo "were in the same housing unit for approximately six months . . . and could have had recreation together."  Baca NTM Response at 8.  The United States argues that Baca, when housed in cell 106 in Pod Q at PNM, "could still communicate with inmates in the recreation yard[,]" because "[t]he view from Q-106 is not entirely blocked."  Baca NTM Response at 8.  Further, the United States asserts it had no obligation to disclose any obstruction in the cell's view, because the First Trial Defendants "had numerous opportunities to tour the prisons, and in fact, did so, without the presence of the United States."  Baca NTM Response at 8-9.  The United States notes that it "made Urquizo available for the defense to call in their case on March 1, 2018," but Baca did not call him.  Baca NTM Response at 9.

Last, the United States contends that there is no showing that the destroyed recreation yard records "were 'exculpatory' in nature or that the documents themselves were exculpatory." Baca NTM Response at 9. Further, the United States contends that Inspection of Public Records Act "requests are the responsibility of the Department of General Counsel" of the NM Corrections Department, and that the "United States Attorney's Office had no communications with the NM Corrections Department about the destruction of the logs, nor was the destruction of the logs done at the USAO's demand, direction, request or suggestion." Baca NTM Response at 11-12 (citing Affidavit of James Brewster ¶¶ 2, 8, at 1, 8 (executed November 15, 2018), filed November 30, 2018 (Doc. 2457-5)("Brewster Aff.")). According to the United States, neither Mr. Brewster nor his office directed the destruction of these records; rather, the PNM administration independently decided to destroy the records, likely because they were stored in a room full of rodent waste that could pose a health threat. See Baca NTM Response at 12 (citing Brewster Aff. ¶¶ 10-12, at 4-5). Accordingly, the United States asserts that Baca "fails to meet his burden to show that the destruction of the records allow him to receive a new trial." Baca NTM Response at 12. As in the Herrera NTM Response, the United States requests that the Court deny the Baca NTM without a hearing. See Baca NTM Response at 12.

### 17.    The Baca NTM Reply.

Baca replies, alleging that "the United States has not raised a legal or factual justification for denying Defendant Baca's request for a new trial." Defendant Anthony Ray Baca's Reply in Support of His Motion for a New Trial at 1, filed December 15, 2018 (Doc. 2469)("Baca NTM Reply"). Baca underscores that his "request for a new trial is not predicated on the sufficiency of the evidence presented to the jury" as the United States contends, but that he "asks that the Court consider the false evidence provided by the government witnesses in this case, quite the opposite

of an 'untainted administration of justice,' when assessing whether a new trial is warranted here."
Baca NTM Reply at 2 (quoting <u>Mesarosh v. United States</u>, 352 U.S. 1, 14 (1956)). He reiterates
that the undisclosed prison telephone call between M. Rodriguez and his mother "is critical
impeachment information," because it "provided direct evidence, in Mario Rodriguez' own voice,
that seriously undermines the credibility of Rodriguez's subsequent claims on the eve of trial to
have a great deal of information incriminating Mr. Baca in the Molina murder and Marcantel
murder conspiracy." Baca NTM Reply at 2-3. Baca maintains that the telephone call where he
said that he would not testify against "Baca because he had '*nothing on him*,'" is consistent with
M. Rodriguez' first, vague statement to the FBI, because M. Rodriguez incriminated Baca in the
Molina and Marcantel murder conspiracies only "after having multiple opportunities to confer with
Timothy Martinez to get their stories in alignment and for the benefit of a reduction in his
sentence." NTM Reply at 3 (emphasis in Baca NTM Reply)(quoting November 14, 2017 Audio
Recording at 19:35). Baca is suspicious because M. Rodriguez did not mention the Marcantel plot
or Baca's alleged involvement in the Molina murder during his first FBI interview in October,
2017, when M. Rodriguez would have known that both murder conspiracies were of interest to the
FBI, "was asked about Mr. Baca's alleged leadership," and "provided information about Mr.
Baca's relationship with [NM Corrections Department] administration officials." Baca NTM
Reply at 3. Baca maintains that the telephone call recording is therefore "critical impeachment
information" and that "the clear exculpatory nature of the information portrayed in the call"
therefore makes it irrelevant that he did not directly request the call. Baca NTM Reply at 4. Baca
argues that the United States' failure to timely disclose these calls, combined with its withholding
of other <u>Brady</u> and <u>Giglio</u> information, mandates a new trial. <u>See</u> Baca NTM Reply at 4.

Baca then argues that the United States "does not try to defend Lupe Urquizo's actual trial testimony that Defendant Baca complains about" -- that Urquizo communicated via sign language with Baca on September 13, 2012, while Urquizo was in the recreation yard and "Baca was housed inside Unit 3A, Q pod, cell 106." Baca NTM Reply at 5. Baca contends that the United States cannot defend this testimony, "because the United States knows, unequivocally, that Defendant Baca was not in cell 106 of the Q pod during September of 2012," so Urquizo's testimony "is an undisputed lie." Baca NTM Reply at 5 (citing Offender Physical Location History for Anthony Ray Baca at 1 (dated March 27, 2017), filed December 15, 2018 (Doc. 2469-1)). Although the United States notes that Urquizo would have had other occasions to speak with Baca as he testified, Baca contends "that is not the point. The point is that if Mr. Urquizo would so easily lie about getting hand communications from Mr. Baca who was standing in a place that everyone knows he could not have been, then he could have lied about anything," and "did lie about anything." Baca NTM Reply at 5. For example, Baca notes that Urquizo lied at trial about having never seen discovery on a tablet. See Baca NTM Reply at 5-6 (citing Feb. 6 Tr. at 207:11-12 (Beck, Urquizo); Audio Recording at 00:07:08-:07:50, filed with the Court at the December 17-18 hearing as Defendant Baca's Exhibit Q; Audio Recording at 00:12:06-:12:30, filed with the Court at the December 17-18 hearing as Defendant Baca's Exhibit R). Baca contends that the United States cannot now argue that the recreation yard conversation occurred on a different day. See Baca NTM Reply at 8. Further, Baca argues that, because Urquizo mentioned this conversation for the first time at trial, "counsel had no notice to pay attention to the guard shack" that blocks the line of sight. Baca NTM Reply at 8. Baca asserts that, because Urquizo's "lies were instrumental in connecting Defendant Baca to the Molina murder and the Marcantel conspiracy, Defendant Baca

is entitled to a new trial in the interest of justice under _Mesarosh_ [v. United States, 352 U.S. 1 (1956).]." Baca NTM Reply at 8.

Last, Baca elucidates that he does not contend that the United States directed the destruction of the recreation yard records; rather, Baca argues that the NM Corrections Department, "an arm of the prosecution team in this case, destroyed the records after defense counsel made an explicit request that they be preserved." Baca NTM Reply at 9. Baca notes that "[n]o explanation exists for why [an] employee of Level VI falsely informed the general counsel that the records had been destroyed." Baca NTM Reply at 9. Baca argues that "the United States cannot claim that an innocent explanation exists" for this turn of events. Baca NTM Reply at 9. Accordingly, Baca asserts he is entitled to a new trial. _See_ Baca NTM Reply at 9.

### 18.    The December 17-18, 2018, Hearing.

The Court held a hearing on December 17 and 18, 2018. _See_ Transcript of Hearing (taken December 17, 2018)(Doc. 2479)("Dec. 17 Tr."). First, D. Sanchez argued his MTD. _See_ Dec. 17 Tr. at 82:20-83:10 (Court, Jacks). D. Sanchez called Stemo to testify about her 302 report on the Urquizo interviews. _See_ Dec. 17 Tr. at 90:18-21 (Stemo). Stemo testified that it was standard procedure to deliver 302 reports to the United States Attorneys' offices within a week of preparing them, but after her supervisors' approval. _See_ Dec. 17 Tr. at 94:9-95:8 (Jacks, Stemo). Stemo admitted that her 302 report was based on Sainato's notes, but asserted that she did not forward Sainato's notes to the United States Attorney's office, as she typically does not divulge notes that she did not prepare herself. _See_ Dec. 17 Tr. at 98:1-9 (Jacks, Stemo). Stemo admitted that she was unaware which agents interviewed Urquizo, as she simply wrote "FBI personnel" on the 302, a general label which Stemo did not use for other 302 reports, and which she attributed to a "mistake." Dec. 17 Tr. at 108:7-19. _See id._ at 11:15-16 (Jacks, Stemo). Stemo testified that she

was "trying to turn this 302 out as quickly as possible so that it could be turned over to defense."

Dec. 17 Tr. at 114:1-2 (Stemo).  Stemo was also unaware why the document containing Sainato's

notes was titled "Agent Stemo's notes," which Stemo stated was not consistent with standard FBI

practice.  Dec. 17 Tr. at 121:5-122:2 (Jacks, Stemo).  Stemo admitted that Sainato's notes reflect

Urquizo's statement that Calbert, Urquizo, M. Rodriguez, and J. Martinez discussed killing D.

Sanchez, because he did not participate in the Molina murder, but that Stemo did not include this

statement in her 302.  See Dec. 17 Tr. at 126:13-25 (Jacks, Stemo).  On cross-examination, Stemo

further elaborated that "SNM talked about hitting Daniel Sanchez because he failed to cover the

cameras and retrieve the shank from Jerry Armenta," which he had previously agreed to do.  Dec.

17 Tr. at 133:11-19 (Castellano, Stemo).  Stemo testified that this was not "new information,"

which she asserts is the reason she omitted this information from her report.  Dec. 17 Tr. at 133:20-

22; id. at 134:5-11 (Castellano, Stemo).  Stemo also pointed to March 302, which expressly refers

to SNM's "hit" on D. Sanchez because he failed to cover the camera and retrieve Armenta's shank.

Dec. 17 Tr. at 138:19-24.

D. Sanchez then developed his arguments under Brady and rule 29 of the Federal Rules of

Criminal Procedure, but felt "pretty comfortable that [he] put [his] arguments in writing" with

regards to the disclosure of the Sainato notes.  Dec. 17 Tr. at 165:10-12 (Jacks).  The United States

responded that its theory of the case was irrelevant and that, instead, the Court should focus on the

evidence introduced at trial.  See Dec. 17 Tr. at 166:18-19 (Castellano).  The United States further

argued that it repeatedly sought to introduce additional testimony corroborating D. Sanchez'

involvement in the Molina murder, but that Ms. Jacks objected to this evidence as cumulative.  See

Dec. 17 Tr. at 169:19-25 (Castellano).  Herrera acknowledged he could have recalled Urquizo to

testify during his case-in-chief, but averred that doing so is "like asking Mike Smith to change

horses in the last stretch of the Kentucky Derby." Dec. 17 Tr. at 160:16-18 (Jacks). The United States then agreed that "the rest of the pleadings speak for themselves" on the purported Brady violations concerning the Sainato notes. Dec. 17 Tr. at 172:25-173:1 (Castellano). The Court then informed the parties that it would deny the Sanchez NTM. See Dec. 17 Tr. at 178:5-7 (Court).

Herrera then argued his MTD and NTM. See Dec. 17 Tr. at 178:8-14 (Court, Bhalla). Herrera attempted to proffer Joe Martinez' statements to Ms. Bhalla that: (i) the United States' theory of how SNM disseminated the Molina "paperwork" was "impossible" and inaccurate, and that J. Martinez told this to Acee in December, 2016; and (ii) Martinez "believed Billy Cordova had framed [J. Martinez] for a murder [J. Martinez] did not commit." Dec. 17 Tr. at 187:16-188:15 (Bhalla). The United States would not stipulate to the proffer, but pointed out that J. Martinez was facing criminal liability for two separate murders, and requested the Court put the proffer "in proper context." Dec. 17 Tr. at 190:18-25. See id. at 192:1-8 (Castellano, Court). Herrera then reiterated his briefs' arguments, underlining "the more important points," namely, the alleged Brady violations involving Acee's communications with J. Martinez after the trial. Dec. 17 Tr. at 195:14; see id. at Dec. 196:16-197:17 (Bhalla).[133] Herrera adopted D. Sanchez' argument with regards to recalling witnesses during the Defendants' case in chief, noting that "it's impossible . . . to sit down and assimilate thousands of pages of information given to you during trial and figure out how to weave that back into your trial strategy at the last minute by recalling Government witnesses when that information was withheld." Dec. 17 Tr. at 208:3-8 (Bhalla). Finally, the United States asserted that Herrera withdrew his argument that the disqualification of Mr. Davis amounted to a miscarriage of justice. See Dec. 17 Tr. at 224:20-22 (Castellano); id. at

---

[133]Herrera acknowledged, in response to the Court's questioning, that disclosure of Acee's communications with J. Martinez would not constitute a Brady violation, but rather is a "new evidence issue." Dec. 17 Tr. at 198:14-16 (Bhalla).

227:7-17 (Court, Bhalla).   The United States then "rel[ied] on its briefing" on Herrera's NTM.

See Dec. 17 Tr. 226:22-23 (Castellano).  After hearing Herrera's argument, the Court noted that

"there was considerable evidence introduced against him, and that nothing here would have

changed to any significant degree or materially the strategy of the case," Dec. 17 Tr. at 232:2-5

(Court), and indicated its inclination to deny the motion as to Herrera and to the joined co-

Defendants, see Dec. 17 Tr. at 232:7-9 (Court).

        Last, Baca presented additional evidence supporting his NTM, "preferring to argue on

paper afterwards."  Dec. 17 Tr. at 232:17-22 (Lowry).   Baca first called Leonor Delgado, Mr.

Lowry's investigator.   See Dec. 17 Tr. at 234:12-13 (Lowry).  Baca presented a video that was

taken of the PNM North recreation yard on a sunny day at 11:15 a.m., in which it was difficult to

see into Baca's cell when he allegedly communicated with Baca about the Molina "hit."  Dec. 17

Tr. at 258:22-25.  See id. at 259:4-19 (Delgado, Lowry).  On cross-examination, Delgado admitted

she did not know what the recreation yard looked like in 2012 and that she had only visited the

recreation yard once, shortly after 11 a.m. on December 13, 2018.  See Dec. 17 Tr. at 261:5-7; id.

at 262:11-17 (Delgado, Armijo).  Nor could Ms. Delgado verify whether a person in Q-106 would

be able to talk to someone in the recreation yard.  See Dec. 17 Tr. at 263:3-9 (Armijo, Delgado).

        Baca then called Mr. Brewster, general counsel for the NM Corrections Department.  See

Dec. 17 Tr. at 264:20-265:4 (Lowry, Brewster).  Mr. Brewster reiterated his statements from the

Affidavit of James Brewster (executed November 15, 2018), filed November 30, 2018 (Doc. 2457-

5).  See Dec. 17 Tr. at 275:2-22 (Lowry, Brewster); id. at 278:3-279:2-14 (Armijo, Brewster).

        The United States then called PNM Captain Sergio Sapien.  See Dec. 17 Tr. at 287:10-25

(Armijo, Sapien).   Sapien testified that inmates in the PNM recreation yard are able to

communicate with inmates housed in Q-106.  See Dec. 17 Tr. at 297:3-14 (Armijo, Sapien).

Sapien admitted on cross-examination, however, that communication would not be possible between inmates in the recreation yard and inmates in S pod at PNM North. See Dec. 17 Tr. at 307:21-308:12; id. at 310:2-6 (Lowry, Sapien). At the close of Baca's NTM argument, the Court indicated it would deny the NTM, noting that Baca's presentation at the hearing consisted primarily of additional evidence. See Transcript of Hearing (taken December 18, 2018), filed January 4, 2019 (Doc. 2480)("Dec. 18 Tr.").

### 19.    The Baca NTM Brief.

Following the hearing, Baca filed a brief containing argument supporting the Baca NTM. See Defendant Anthony Ray Baca's Written Argument in Support of His Motion for New Trial at 1, filed January 11, 2019 (Doc. 2488)("Baca NTM Brief"). Baca asserts that, under the Mesarosh v. United States, 352 U.S. 1, 10-11 (1956), interests-of-justice standard, "if 'there is any reasonable likelihood that the government knowingly relied on perjury to obtain a guilty verdict, reversal is required.'" Baca NTM Brief at 1 (quoting United States v. Crockett, 435 F.3d 1305, 1317 (10th Cir. 2006)). Baca asserts that a new trial is necessary to uphold the proper administration of justice, because evidence shows that the United States presented untruthful testimony at trial, and because the United States failed to timely produce exculpatory and impeachment material as required under Brady, Giglio, and the Jencks Act. See Baca NTM Brief at 1-2.

Baca first notes M. Rodriguez' testimony, asserting that, when trial began, Baca did not have notice from the disclosed 302s that M. Rodriguez's testimony would provide material evidence as to Baca's guilt for Molina's murder or the Marcantel and Santistevan murder conspiracies. See Baca NTM Brief at 3. Baca asserts that it was not until February 3, 2018, that he learned, via a new 302, that M. Rodriguez provided information about Baca discussing the Marcantel and Santistevan murder conspiracies and Molina murder. See Baca NTM Brief at 4-5.

According to Baca, M. Rodriguez and the United States explained that this information was not revealed earlier, because it was only at the February 3, 2018, debrief in preparation for M. Rodriguez' testimony that the prosecutors specifically asked M. Rodriguez about Baca. See Baca NTM Brief at 5. This explanation, Baca posits, is false, because "[t]he SNM questionnaire that Rodriguez filled out on November 1, 2017 specifically asked Rodriguez what murders Defendant Baca had 'committed or sanctioned,' and Rodriguez mentioned only one -- Joseph Montoya." Baca NTM Brief at 5 (source of quoted material not cited). This questionnaire, Baca maintains, put the United States on notice that M. Rodriguez' testimony was a sham. See Baca NTM Brief at 7. Baca notes a telephone call M. Rodriguez made to his mother in which he says that the government cannot use his testimony on Baca, because he does not know anything. See Baca NTM Brief at 6. Baca asserts that this telephone call combined with M. Rodriguez' October, 2017, November, 2017, and January, 2018, debriefs, support the view that M. Rodriguez did not learn about Molina's murder or the Marcantel and Santistevan conspiracies from Baca. Further, Baca asserts that the telephone conversation was the best impeachment evidence available for M. Rodriguez, but that the United States suppressed this evidence, and the call was only discovered via Ms. Jack's post-trial Inspection of Public Records Act request. See Baca NTM Brief at 6.

Next, Baca contends that "Urquizo is a prolific liar" and notes that Urquizo's testimony that Baca ordered Romero killed contradicts the information in the 302s provided before trial, in which Urquizo said Baca did not want Romero killed, and only wanted him assaulted. See Baca NTM Brief at 7. Baca also notes that Urquizo testified that, on his last day in PNM North in September, 2012, Baca directed him, via hand signals, to murder Molina while Baca was in cell Q-106 in housing Unit 3A and Urquizo was in the yard. See Baca NTM Brief at 8. Baca maintains that evidence shows he was not in that cell at any point in September, 2012. See Baca NTM Brief

at 8.  Baca states that Acee's notes from Urquizo's February 24, 2017, debrief reveal that Urquizo does not have first-hand knowledge of Baca's calling the "hit" on Molina, and that this information is not in the resulting 302 report.  Baca NTM Brief at 8.  Baca asserts that the United States did not address its duty of correcting such untruthful testimony, and will likely instead argue that Baca is at fault, because he did not recall Urquizo when the conflicting information was discovered.  See Baca NTM Brief at 9.  Baca argues that the United States faces the additional obstacle of there being a guard shack in the recreation yard precluding the view into cell Q-106 that Urquizo said he had from the recreation yard.  See Baca NTM Brief at 10.  Further, Baca maintains that, because prisoners in separate units would not be in the recreation yard together, Urquizo lied when he testified about having a conversation with Baca in the recreation yard, as they were housed in separate units.  See Baca NTM Brief at 11.  Accordingly, Baca asserts that a Napue v. Illinois, 360 U.S. 264 (1959), violation occurred, because the United States knew that Urquizo committed perjury in material testimony.  See Baca NTM Brief at 12 (citing United States v. Garcia, 793 F.3d 1194, 1207 (10th Cir. 2015)).

Finally, Baca notes that, when Defendants sent a preservation request to the NM Corrections Department on May 17, 2018, for the recreation yard records, the NM Corrections Department verified that it possessed the records.  See Baca NTM Brief at 12.  Baca asserts that Acee verified at trial that such records may contain exculpatory information.  See Baca NTM Brief at 13.  Baca argued that the prosecution was on notice in April, 2018, when J. Martinez told them that he never provided Calbert "paperwork," that the recreation yard records may contain exculpatory information.  Baca NTM Brief at 13.  Further, Baca posits that Mr. Brewster should have been on notice, by providing extensive recreation yard records on May 10, 2018, not to take at face value an employee's claim that newer recreation yard records had been destroyed and that

he had a duty to perform due diligence in determining whether the preservation request could be completed.  See Baca NTM Brief at 13-14 (citing Sterlin v. Biomune Sys., 154 F.3d 1191, 1204 (10th Cir. 1998)).

### FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes.  The Court bases these conclusions on the testimony it heard at its James hearing as well as the evidence it admitted at that hearing.  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to a search.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so doing, the court is not bound by evidence rules, except those on privilege.").  Notwithstanding the Court's findings, all of the Defendants are presumed innocent. Accordingly, the Court makes the following findings:

1. The United States interviewed Urquizo, an SNM member and one of its cooperators, on March 6, 2017.  See FBI March 302 at 1.

2.      On July 7, 2017, the Court set the trial date for the first trial, on Counts 6-12, for January 29, 2018, at the Federal Courthouse in Las Cruces.  See Fourth Scheduling Order at 2, filed July 7, 2017 (Doc. 1205).

3.      The United States provided the March 302, which was a summary of the March 6, 2017, interview of Urquizo, to the Defendants in early January 2018, as part of its Jencks Act, 18 U.S.C. § 3500, disclosure.  See MTD Response at 13.

4.      On January 22, 2018, the United States met with Urquizo again.  See FBI 302 at 1 (dated January 29, 2018), filed March 2, 2018 (Doc. 1850-1)("January 302").

5.      Sainato conducted the interview and took four pages of typed notes.  See Transcript of Excerpt of Testimony of Joseph Sainato at 3:2-9 (Jacks, Sainato)(taken March 1-2, 2018), filed April 4, 2018 (Doc. 2064)("Sainato Tr."); Typed Notes at 1-4 (undated, filed March 1, 2018 (Doc. 1841-1).

6.      Stemo prepared the January 302, which consists of four paragraphs, see January 302 at 1.  See also Sanchez NTM at 35 n.29.

7.      Jury selection for the first trial, in which D. Sanchez, Baca, Herrera, and R. Perez (collectively, "First Trial Defendants") remained, on Counts 6-12, began on January 29, 2018.  See Clerk's Minutes at 1-2, filed January 29, 2018 (Doc. 1746).

8.      The United States provided the January 302 to the Defendants on January 30, 2018. See Sanchez MTD at 3.

9.      In approximately June, 2017, Sainato "was at the penitentiary of New Mexico," and he was "made aware that there was still some SNMers that had property in PNM's storage." Sainato Tr. at 10:16-19 (Sainato).

10.    Sainato briefly examined that property, which included a bag of M. Rodriguez' documents.  See Sainato Tr. at 10:21-11:4 (Sainato, Bhalla).

11.    Sainato did not go through the bag of documents at that time.  See Sainato Tr. at 11:10-12 (Bhalla, Sainato).

12.    Sainato took those documents with him when he left PNM.  See Sainato Tr. at 16:6-8 (Bhalla, Sainato).

13.    Sainato examined those documents "a couple days later," Sainato Tr. at 15:17-18 (Sainato), but he "[d]idn't catch anything of note,"  Sainato Tr. at 16:24-25 (Sainato).

14.    Those documents contained potentially exculpatory evidence and evidence with which the United States' witnesses could have been impeached.  See Sainato Tr. at 25:22-44:21 (Bhalla, Sainato).

15.    After quickly reviewing those documents, Sainato placed them in a box underneath his desk, intending to return them to PNM, but Sainato forgot about those documents and never returned them.  See Sainato Tr. at 47:3-13 (Bhalla, Sainato).

16.    On February 23, 2018, a Friday, Sainato rediscovered the M. Rodriguez documents while going through a box under his desk.  See Sainato Tr. at 47:16-48:7 (Bhalla, Sainato).

17.    Sainato did not think that the documents were "important or relevant," so he gave those documents to another law enforcement officer to return to PNM, and that officer gave "it to Agent Stemo to bring down to Las Cruces."  Sainato Tr. at 48:15-23 (Sainato, Bhalla).

18.    That Sunday evening, February 25, 2018,  Stemo informed Sainato that she went through the box of M. Rodriguez documents "just to make sure there was no contraband in it before she gave it back," and she noticed that one document contained "statements about the Molina homicide."  Sainato Tr. at 69:1-9 (Sainato).

19.     That evening, Sainato told Acee and Assistant United States Attorneys Maria Armijo, Randy Castellano, and Matthew Beck about Stemo's discovery.  See Sainato Tr. at 49:10-20.

20.     That evening, the United States provided one document to the Defendants, and it provided the rest of the approximately 1,000 pages to the Defendants on February 28, 2018 at 2:00 p.m.  See Transcript of Excerpt of Testimony of Bryan Acee at 8:20-10:6 (Fox-Young, Court, Jacks, Beck)(taken March 2, 2018), filed April 4, 2018 (Doc. 2065).

## LAW REGARDING MOTIONS FOR JUDGMENT OF ACQUITTAL

Rule 29 of the Federal Rules of Criminal Procedure provides:

**(a) Before Submission to the Jury**.  After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.  The court may on its own consider whether the evidence is insufficient to sustain a conviction.  If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

**(b) Reserving Decision**.  The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict.  If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

**(c) After Jury Verdict or Discharge**.

**(1) Time for a Motion**.  A defendant may move for a judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict or after the court discharges the jury, whichever is later.

**(2) Ruling on the Motion**.  If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal.  If the jury has failed to return a verdict, the court may enter a judgment of acquittal.

**(3) No Prior Motion Required**.  A defendant is not required to move for a judgment of acquittal before the court submits the case to the jury as a prerequisite for making such a motion after jury discharge.

**(d) Conditional Ruling on a Motion for a New Trial**.

> **(1) Motion for a New Trial**.  If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed.  The court must specify the reasons for that determination.

> **(2) Finality**.  The court's order conditionally granting a motion for a new trial does not affect the finality of the judgment of acquittal.

> **(3) Appeal.**

>> **(A) Grant of a Motion for a New Trial**.  If the court conditionally grants a motion for a new trial and an appellate court later reverses the judgment of acquittal, the trial court must proceed with the new trial unless the appellate court orders otherwise.

>> **(B) Denial of a Motion for a New Trial**.  If the court conditionally denies a motion for a new trial, an appellee may assert that the denial was erroneous.  If the appellate court later reverses the judgment of acquittal, the trial court must proceed as the appellate court directs.

Fed. R. Crim. P. 29 (bold in original).  In Jackson v. Virginia, 443 U.S. 307 (1979), the Supreme Court noted that the long-settled practice of allowing federal courts to enter judgments of acquittal when evidence is insufficient to sustain a conviction "only . . . highlight[s] the traditional understanding in our system that the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion."  443 U.S. at 317 n.10.  A judgment of acquittal thus enables a federal district court to protect a defendant's due process rights by removing from jury consideration a charge with respect to which no rational trier of fact could find guilt beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. at 317-19.

In deciding a motion for judgment of acquittal, courts are not permitted to weigh the evidence or assess witness credibility, see Burks v. United States, 437 U.S. 1, 16 (1978), but instead must "ask only whether taking the evidence -- both direct and circumstantial, together with the reasonable inferences to be drawn therefrom -- in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt," United States v.

McKissick, 204 F.3d 1228, 1239 (10th Cir. 2000)(internal quotation marks omitted)(quoting United States v. Hanzlicek, 187 F.3d 1282, 1289 (10th Cir. 1999)).  Entry of a judgment of acquittal is thus "confined to cases where the prosecution's failure is clear."  Burks v. United States, 437 U.S. at 17.

Courts must "rely on the jury, as the fact finder, 'to resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented,'" United States v. Radcliff, 331 F.3d 1153, 1157-58 (10th Cir. 2003)(quoting United States v. McKissick, 204 F.3d at 1289-90), and "must 'accept the jury's resolution of the evidence as long as it is within the bounds of reason,'" Messer v. Roberts, 74 F.3d 1009, 1013 (10th Cir. 1996)(quoting Grubbs v. Hannigan, 982 F.2d 1483, 1487 (10th Cir. 1993)).  The district court's role is to "determine 'whether [the] evidence, if believed, would establish each element of the crime.'"  See United States v. Delgado-Uribe, 363 F.3d 1077, 1081 (10th Cir. 2004)(alteration in United States v. Vallo)(quoting United States v. Vallo, 238 F.3d 1242, 1247 (10th Cir. 2001)).  Moreover, "the evidence necessary to support a verdict 'need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt.'"  United States v. Wood, 207 F.3d 1222, 1228 (10th Cir. 2000)(quoting United States v. Wilson, 182 F.3d 737, 742 (10th Cir. 1999)).  A court should not overturn a jury's finding unless no reasonable juror could have reached the verdict, see United States v. Carter, 130 F.3d 1432, 1439 (10th Cir. 1997)(citations omitted); however, a court should not uphold a conviction "obtained by piling inference upon inference.  'An inference is reasonable only if the conclusion flows from logical and probabilistic reasoning,'" United States v. Valadez-Gallegos, 162 F.3d 1256, 1262 (10th Cir. 1998)( internal citation omitted)(first citing United States v. Jones, 44 F.3d 860, 865 (10th Cir. 1995)(Seymour, C.J.); and then quoting United States v. Taylor, 113 F.3d 1136, 1144 (10th Cir. 1997)).  The Tenth Circuit has stated:

> The rule that prohibits the stacking of inference upon inference merely indicates that at some point along a rational continuum, inferences may become so attenuated from underlying evidence as to cast doubt on the trier of fact's ultimate conclusion. In other words, "the chance of error or speculation increases in proportion to the width of the gap between underlying fact and ultimate conclusion where the gap is bridged by a succession of inferences, each based upon the preceding one."

United States v. Summers, 414 F.3d 1287, 1295 (10th Cir. 2005)(quoting United States v. Shahane, 517 F.2d 1173, 1178 (8th Cir. 1875)).  See United States v. Neha, No. CR 04-1677 JB, 2006 WL 1305034, at *2-3 (D.N.M. April 19, 2006)(Browning, J), aff'd, 301 F. App'x 811 (10th Cir. 2008)(unpublished).  Hence, a court must examine the record to determine whether a guilty verdict rests on inferences reasonably drawn from the evidence, rather than on "conjecture" or "speculation."  United States v. Aponte, 619 F.3d 799, 804 (8th Cir. 2010).  See United States v. Bowers, 811 F.3d 412, 424 (11th Cir. 2016)(stating that "reasonable inferences" rather than "mere speculation" must support a verdict based on circumstantial evidence (citing United States v. Klopf, 423 F.3d 1228, 1236 (11th Cir. 2005)); United States v. Long, 905 F.2d 1572, 1576 (D.C. Cir. 1990)(Thomas, J.)(same).

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE UNDER THE DUE PROCESS CLAUSE

The Due Process Clause requires that the United States disclose to the defendant any evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady, 373 U.S. at 87.  The Supreme Court has extended the prosecution's disclosure obligation to include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.  See Giglio, 405 U.S. 153; Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [government's] witnesses by showing bias and interest.'"  (quoting

United States v. Bagley, 473 U.S. 667, 676 (1985)); Bowen v. Maynard, 799 F.2d 593, 610 (10th Cir. 1986)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence.").  Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence: "[R]egardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United States v. Bagley, 473 U.S. at 682).  See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").

      **1.**      **Material Exculpatory Evidence Under Brady.**

"The Constitution, as interpreted in *Brady*, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant."  Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995).  Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment."  Brady, 373 U.S. at 87.  "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. at 682.  See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010).  A "reasonable probability," in turn, "is a probability sufficient to undermine confidence in the outcome."  United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted).  The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy

the constitutional materiality standard." United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994)(Seymour, C.J.). The Tenth Circuit has also stated that evidence is material if it "might meaningfully alter a defendant's choices before and during trial . . . [including] whether the defendant should testify." Case v. Hatch, 731 F.3d 1015, 1041 (10th Cir. 2013)(Tymkovich, J.)(alteration in Case v. Hatch)(internal quotation marks omitted)(quoting United States v. Burke, 571 F.3d at 1054).

"To be material under *Brady*, undisclosed information or evidence acquired through that information must be admissible." Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir. 1995)(internal quotation marks omitted)(quoting United States v. Kennedy, 890 F.2d 1056, 1059 (9th Cir. 1989)). The Supreme Court in Cone v. Bell, 556 U.S. 449 (2009), noted:

> Although the Due Process Clause of the Fourteenth Amendment, as interpreted by *Brady*, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations. See *Kyles*, 514 U.S. at 437 . . . ("[T]he rule in *Bagley* (and, hence, in *Brady*) requires less of the prosecution than the ABA Standards for Criminal Justice Prosecution Function and Defense Function 3-3.11(a) (3d ed. 1993)"). See also ABA Model Rule of Professional Conduct 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal").

Cone v. Bell, 556 U.S. at 470 n.15.

The government bears the burden of producing exculpatory materials; defendants have no obligation to first point out that such materials exist. See Kyles v. Whitley, 514 U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable

probability' is reached"); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973)(granting a mistrial for failure to produce personnel files of government witnesses), overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir. 1984); United States v. Padilla, No. CR 09-3598 JB, 2011 WL 1103876, at *6 (D.N.M. Mar. 14, 2011)(Browning, J.).  This obligation means that the United States must "volunteer exculpatory evidence never requested, or requested only in a general way."  Kyles v. Whitley, 514 U.S. at 433 (internal quotation marks omitted). Additionally, "[u]nder *Brady*, the good or bad faith of government agents is irrelevant."  United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982).  "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence."  Kyles v. Whitley, 514 U.S. at 439.

### 2.    **Timing of the Disclosure Under Brady.**

"The obligation of the prosecution to disclose evidence under *Brady v. Maryland* can vary depending on the phase of the criminal proceedings and the evidence at issue."  United States v. Harmon, 871 F. Supp. 2d 1125, 1149 (D.N.M. 2012)(Browning, J.), aff'd, 742 F.3d 451 (10th Cir. 2014).  As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in *Brady v. Maryland*."  United States v. Burke, 571 F.3d at 1053.  The Tenth Circuit has recognized, however, that "[i]t would eviscerate the purpose of the *Brady* rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial."  United States v. Burke, 571 F.3d at 1054.  "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'"  United States v. Burke, 571 F.3d at 1054 (quoting United States v. Young, 45 F.3d 1405, 1408 (10th Cir. 1995)).  The Tenth Circuit has stated:

> Where the district court concludes that the government was dilatory in its
> compliance with *Brady*, to the prejudice of the defendant, the district court has
> discretion to determine an appropriate remedy, whether it be exclusion of the
> witness, limitations on the scope of permitted testimony, instructions to the jury, or
> even mistrial.

United States v. Burke, 571 F.3d at 1054. Notably, "not every delay in disclosure of *Brady* material is necessarily prejudicial to the defense." United States v. Burke, 571 F.3d at 1056. "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial." United States v. Burke, 571 F.3d at 1056.

Once a prosecutor's obligations under Brady have been triggered, however, they "continue[] throughout the judicial process." Douglas v. Workman, 560 F.3d at 1173. For instance, the prosecutor's obligation to disclose Brady material can arise during trial. See United States v. Headman, 594 F.3d 1179, 1183 (10th Cir. 2010)("Although *Brady* claims typically arise from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable evidence (such as impeachment evidence) that is unavailable to the government until trial is underway."). The disclosure obligation continues even while a case is on direct appeal. See United States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819, 820 (10th Cir. 1997)(Seymour, C.J.)(applying Brady to a claim that the prosecutor failed to disclose evidence received after trial but while the case was on direct appeal).

The Supreme Court has held that Brady does not require "preguilty plea disclosure of impeachment information." United States v. Ruiz, 536 U.S. 622, 629 (2002)("We must decide whether the Constitution requires that preguilty plea disclosure of impeachment information. We conclude that it does not."). The Supreme Court has recognized that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary*." United States v. Ruiz, 536 U.S. at 629 (emphasis in original). The Supreme Court has acknowledged that,

"[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 629. The Supreme Court added:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor.

United States v. Ruiz, 536 U.S. at 630. The Supreme Court has explained that "a constitutional obligation to provide impeachment information during plea bargaining, prior to entry of a guilty plea, could seriously interfere with the Government's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure the efficient administration of justice." United States v. Ruiz, 536 U.S. at 631. The Tenth Circuit has reiterated these principles from United States v. Ruiz:

> Johnson asserts that his plea was not knowing and voluntary because he did not know that he was giving up a claim that the government failed to disclose impeachment evidence. The Supreme Court, however, foreclosed this exact argument in *United States v. Ruiz*, . . . by holding that the government has no constitutional obligation to disclose impeachment information before a defendant enters into a plea agreement. *Ruiz* emphasized that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary*." Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances -- even though the defendant may not know the *specific detailed* consequences of invoking it."

United States v. Johnson, 369 F. App'x 905, 906 (10th Cir. 2010)(per curiam)(unpublished)(alteration in United States v. Johnson, emphasis in United States v.

Ruiz)(quoting United States v. Ruiz, 546 U.S. at 630).[134]

The Tenth Circuit has held, however, that United States v. Ruiz does not apply to exculpatory evidence but rather applies only to impeachment evidence:

> Ruiz is distinguishable in at least two significant respects. First, the evidence withheld by the prosecution in this case is alleged to be exculpatory, and not just impeachment, evidence. Second, Ohiri's plea agreement was executed the day jury selection was to begin, and not before indictment in conjunction with a "fast-track" plea. Thus, the government should have disclosed all known exculpatory information at least by that point in the proceedings. By holding in Ruiz that the government committed no due process violation by requiring a defendant to waive her right to impeachment evidence before indictment in order to accept a fast-track plea, the Supreme Court did not imply that the government may avoid the consequence of a Brady violation if the defendant accepts an eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in the government's possession.

United States v. Ohiri, 133 F. App'x 555, 562 (10th Cir. 2005)(unpublished). The Tenth Circuit qualified its holding in United States v. Ohiri, however, stating that the case presented "unusual circumstances." 133 F. App'x at 562.

The Courts of Appeals "have split on the issue whether Brady v. Maryland's restrictions apply to suppression hearings." United States v. Harmon, 871 F. Supp. 2d at 1151. In an

---

[134]United States v. Johnson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court concludes that United States v. McIntosh, 573 F. App'x. 760, 762 (10th Cir. 2014), United States v. Ohiri, 133 F. App'x 555 (10th Cir. 2005)(unpublished), United States v. Johnson, 117 F.3d 1429, 1997 WL 381926 (10th Cir. 1997)(unpublished table decision), United States v. Bullock, 130 F. App'x 706, 723 (6th Cir. 2005)(unpublished), and United States v. Dahl, 597 F. App'x 489, 491 n.2 (10th Cir. 2015)(unpublished), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

unpublished opinion, the Tenth Circuit, without discussing whether <u>Brady</u> applies to a suppression

hearing, rejected a defendant's argument that the prosecution violated <u>Brady</u> by failing to disclose

impeachment evidence before a suppression hearing on the basis that the evidence was not

impeachment evidence and not material.  <u>See</u> <u>United States v. Johnson</u>, 117 F.3d 1429, 1997 WL

381926, at *3 (10th Cir. 1997)(unpublished table decision).  Specifically, the Tenth Circuit found:

> [D]isclosure of the evidence existing at the time of the hearing, even if impeaching,
> would not establish a reasonable probability that the outcome of the suppression
> hearing would have been different.  First, we question whether the evidence in
> question would have been admitted at the suppression hearing.  Even if it had been
> admitted, however, in light of [the defendant's] lack of truthfulness, our confidence
> in the result of the hearing has not been undermined.  Therefore, we hold that the
> evidence was not material, and that its nondisclosure by the prosecution does not
> constitute a *Brady* violation.

<u>United States v. Johnson</u>, 1997 WL 381926, at *3 (citation omitted).

The United States Court of Appeals for the District of Columbia Circuit has recognized

that "it is hardly clear that the *Brady* line of Supreme Court cases applies to suppression hearings,"

because "[s]uppression hearings do not determine a defendant's guilt or punishment, yet *Brady*

rests on the idea that due process is violated when the withheld evidence is 'material either to guilt

or to punishment.'"  <u>United States v. Bowie</u>, 198 F.3d 905, 912 (D.C. Cir. 1999)(quoting <u>Brady</u>,

373 U.S. at 87).  Without deciding the issue and in an unpublished opinion, the United States Court

of Appeals for the Sixth Circuit quoted with approval this language from <u>United States v. Bowie</u>.

<u>See</u> <u>United States v. Bullock</u>, 130 F. App'x 706, 723 (6th Cir. 2005)(unpublished)("Whether the

suppression hearing might have come out the other way, however, is of questionable relevance to

the *Brady* issues at stake here.").  The United States Court of Appeals for the Seventh Circuit held

that, under its precedent and the law from other Courts of Appeals, it was not "obvious" for clear-

error purposes that "*Brady* disclosures are required prior to suppression hearings."  <u>United States</u>

<u>v. Stott</u>, 245 F.3d 890, 902 (7th Cir. 2001).

Before the Supreme Court issued its United States v. Ruiz decision, the United States Courts of Appeals for the Fifth Circuit and the Ninth Circuit held that Brady applies to suppression hearings.  See United States v. Barton, 995 F.2d 931, 935 (9th Cir. 1993)("[W]e hold that the due process principles announced in Brady and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant."); Smith v. Black, 904 F.2d 950, 965 (5th Cir. 1990)("Timing is critical to proper Brady disclosure, and objections may be made under Brady to the state's failure to disclose material evidence prior to a suppression hearing."  (citations omitted)), vacated on other grounds, 503 U.S. 930 (1992).

Most recently, the Tenth Circuit has suggested that Brady does not apply to suppression hearings, because "Brady rests on the idea that due process is violated when the withheld evidence is material to either guilt or punishment," but "[s]uppression hearings do not determine a defendant's guilt or punishment."  United States v. Dahl, 597 F. App'x 489, 491 n.2 (10th Cir. 2015)(unpublished)(Tymkovich, J.)(internal quotation marks omitted)(quoting United States v. Lee Vang Lor, 706 F.3d 1252, 1256 n.2 (10th Cir. 2013)(acknowledging that "[w]hether Brady's disclosure requirements even apply at the motion to suppress stage is an open question")). Although the Courts of Appeals have split on whether Brady applies to suppression hearings, "it is not likely that a prosecutor must disclose impeachment evidence before a suppression hearing in light of the Supreme Court's conclusion in United States v. Ruiz that a prosecutor does not have to disclose impeachment evidence before the entry of a guilty plea."  United States v. Harmon, 871 F. Supp. 2d at 1151.  The Tenth Circuit affirmed United States v. Harmon, in which the Court concluded that the United States need not disclose impeachment information before a suppression hearing.

Given that the Court has located no Tenth Circuit case deciding this issue, the Court believes that the Tenth Circuit would extend the holding of United States

> *v. Ruiz* to suppression hearings.  The Supreme Court's rationale distinguishing the guilty-plea process from a trial applies equally to a comparison of the suppression-hearing process and a trial.  The Court believes that both the Tenth Circuit and the Supreme Court would recognize that impeachment evidence need not be disclosed before a suppression hearing.  In *United States v. Ruiz*, the Supreme Court recognized that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary*."  *United States v. Ruiz*, 536 U.S. at 632 . . . (emphasis in original).  It acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant."  *United States v. Ruiz*, 536 U.S. at 632 . . . .  Likewise, "the more information the defendant has, the more" likely he will be able to successfully suppress a particular piece of evidence, but "the Constitution does not require the prosecutor to share all useful information with the defendant."  *United States v. Ruiz*, 536 U.S. at 632 . . . .

United States v. Harmon, 871 F. Supp. 2d at 1169.  Accordingly, Brady does not require the United States to disclose impeachment evidence before suppression hearings.  See United States v. Harmon, 871 F. Supp. 2d at 1165-67.

## LAW REGARDING MOTIONS FOR A NEW TRIAL

Rule 33 of the Federal Rules of Criminal Procedure provides:

> **(a) Defendant's Motion.**  Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.  If the case was tried without a jury, the court may take additional testimony and enter a new judgment.
>
> **(b) Time to File.**
>
>> **(1) Newly Discovered Evidence.**  Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty.  If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.
>>
>> **(2) Other Grounds.**  Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

Fed. R. Crim. P. 33 (bold in original).  Under rule 33, the district court has discretion to grant a new trial if the interests of justice require one.  See Fed. R. Crim. P. 33(a).  See also United States

v. Quintanilla, 193 F.3d 1139, 1146 (10th Cir. 1999)("Federal Rule of Criminal Procedure 33 authorizes a district court to grant a new trial if required by the interests of justice."). "A motion for a new trial is not," however, "regarded with favor and should only be granted with great caution." United States v. Sinclair, 109 F.3d 1527, 1531 (10th Cir. 1997)(citing United States v. Chatman, 994 F.2d 1510, 1518 (10th Cir. 1993)). "[A] defendant may not invoke rule 33 when he or she has pled guilty." United States v. Christy, 883 F. Supp. 2d 1040, 1044 (D.N.M. 2012)(Browning, J.)(citing United States v. Lambert, 603 F.2d 808, 809 (10th Cir. 1979)).

"The Tenth Circuit has further stated that when 'deciding a motion for new trial, the [trial] court may weigh the evidence and consider the credibility of witnesses in determining whether the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred.'" United States v. Thomas, No. 13-CR-01874 MV, 2016 WL 9819560, at *8 (D.N.M. Aug. 5, 2016)(Vázquez, J.)(alteration added by United States v. Thomas)(quoting United States v. Evans, 42 F.3d 586, 593 (10th Cir. 1994)(Seymour, C.J.)). "The power to grant a new trial on the ground that the verdict is against the weight of the evidence should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." United States v. Guzman-Martinez, No. CR 03-2118 RB, 2004 WL 7338099, at *1 (D.N.M. March 10, 2004)(Brack, J.).

The Court has previously addressed motions for new trials under rule 33 in various cases. See, e.g., United States v. Baca, No. CR 16-1613 JB, 2019 WL 2649835, at *44-54 (D.N.M. June 27, 2019)(Browning, J.)(denying a motion for a new trial where the defendant argued the witnesses were unreliable and the verdict was against the weight of the evidence, because the Court determined that the trial evidence supports the verdict); United States v. Folse, No. CR 15-2485 JB, 2018 WL 6047415, at *20-22 (D.N.M. Nov. 19, 2018)(Browning, J.)(denying a motion for a new trial and a request for additional discovery where the defendant did not produce evidence that,

with additional discovery, he could show that the United States destroyed evidence and, despite having earlier had notice that alleged deficiencies might exist in the United States' evidence, he did not seek evidence of such information); United States v. Neha, No. CR 04-1677 JB, 2006 WL 4062889, at *2-4 (D.N.M. June 26, 2006)(Browning, J.)(denying a new trial motion where the defendant complained of the United States' brief references to his criminal history and of the United States' comment to the jury that the Court altered a co-conspirator's statement, because the weight of the evidence supported the verdict).

Rule 33 permits a defendant to move for a new trial in the event of newly discovered evidence if the defendant presents that motion within three years of the verdict of guilt. See Fed. R. Crim. P. 33(b)(1). Ordinarily, a defendant seeking a new trial under rule 33(b)(1) must satisfy a five-part test for newly discovered evidence that the Tenth Circuit outlined in United States v. Sinclair. See United States v. Sinclair, 109 F.3d at 1531. The defendant must show that:

> "(1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal."

United States v. Sinclair, 109 F.3d at 1531 (quoting United States v. Stevens, 978 F.2d 565, 570 (10th Cir. 1992)). See United States v. Quintanilla, 193 F.3d at 1147 (discussing United States v. Sinclair's rule 33 test). See also United States v. Velarde, No. CR 98-391 JB, 2008 WL 5993210, at *31-44 (D.N.M. May 16, 2008)(Browning, J.)(permitting a new trial in a sexual assault case where, after the trial, the defendant uncovered evidence that the alleged victim had accused other individuals of sexual assault). "Under Sinclair, a court cannot grant a new trial on the discovery of new impeachment evidence." United States v. Rodella, No. CR 14-2783 JB, 2015 WL 711931, at *33 (D.N.M. Feb. 2, 2015)(Browning, J.)(citing United States v. Sinclair, 109 F.3d at 1531).

## LAW REGARDING THE NEED FOR PRACTICAL AND EFFECTIVE CRIMINAL DISCOVERY

In 1990, a jury convicted Debra Milke of murdering her four-year-old son, Christopher. See Milke v. Ryan, 711 F.3d 998, 1000 (9th Cir. 2013). The judge sentenced her to death. The Honorable Alex Kozinski, Chief Justice for the Ninth Circuit, described the trial as "a swearing contest between Milke and Phoenix Police Detective Armando Saldate, Jr." Milke v. Ryan, 711 F.3d 1000. At the trial, Saldate testified that Milke confessed to the murder; Milke vehemently protested her innocence and denied confessing. See Milke v. Ryan, 711 F.3d at 1000. With no other witnesses, the judge and jury believed Saldate. They were unaware, however, of one fact that might have changed their minds: Saldate had a "long history of lying under oath and other misconduct." Milke v. Ryan, 711 F.3d at 1000-01. Specifically, Saldate had lied to a grand jury or a judge in four cases, requiring state judges to throw out indictments or confessions. See Milke v. Ryan, 711 F.3d at 1004. In another four cases, "judges threw out confessions or vacated convictions because Saldate had violated suspects' Miranda and other constitutional rights during interrogations, often egregiously." Milke v. Ryan, 711 F.3d at 1004. Finally, Saldate's personnel file documented a five-day suspension "for taking sexual liberties with a motorist he stopped and then lying to his supervisors about it." Milke v. Ryan, 711 F.3d at 1011. The file revealed that his "supervisors had caught him in a lie and concluded that his credibility was compromised." Milke v. Ryan, 711 F.3d at 1006, 1012 (describing the report as showing that "Saldate has no compunction about lying during the course of his official duties" and that he has "a willingness to abuse his authority to get what he wants"). The information about Saldate's misconduct was in the hands of the party responsible for ensuring that justice is carried out -- the state. Unfortunately, however, the state did not disclose this information, despite its requirements under Brady and Giglio. See Milke v. Ryan, 711 F.3d at 1005 (describing how the state did not mention the

evidence, even though a critical question in Milke's case was whether Saldate ignored Milke's request for an attorney).  "This error resulted in a 'one-sided presentation of evidence' and 'impeded [the jury's] ability to fully and fairly assess the credibility of both [Milke] and Saldate." Milke v. Ryan, 711 F.3d at 1005 (alterations in the original).  More than that, however, the error resulted in Milke's death sentence and imprisonment on death row for twenty-two years.  See Milke v. Ryan, 711 F.3d at 1001.[135]

The disclosure problem is not confined to the context of overzealous police officers closing murder cases.  It reaches to all corners of the criminal justice system.  Judges and scholars are increasingly recognizing the problem with blatant Brady violations.  See Daniel S. Medwed, Brady's Bunch of Flaws, 67 Wash. & Lee L. Rev. 1533 (2010); David Keenan et al., The Myth of Prosecutorial Accountability After Connick v. Thompson: Why Existing Professional Responsibility Measures Cannot Protect Against Prosecutorial Misconduct, 121 Yale L.J. Online 203 (2011).  For example, in 2012, an investigation revealed that two Department of Justice prosecutors intentionally hid evidence in the 2008 political corruption case against Senator Ted Stevens, the longest serving Republican Senator in history.  See United States v. Stevens, No. 08-cr-231 (EGS), 2009 WL 6525926 (D.D.C. April 7, 2009)(Sullivan, J.).  See Henry F. Schuelke III, Special Counsel, Report to Hon. Emmet G. Sullivan of Investigation Conducted Pursuant to the Court's Order (dated April 7, 2009), filed March 15, 2012 in In re Special Proceedings, No. 1:09-

---

[135]After the Ninth Circuit vacated Milke's conviction and gave Arizona the chance to re-try Milke, the Arizona Court of Appeals barred any re-trial in a scathing opinion that garnered the New York Times' attention.  See Arizona: No Retrial for Woman Freed from Death Row, N.Y. Times (Dec. 11, 2014), http://www.nytimes.com/2014/12/12/us/arizona-no-retrial-for-woman-freed-from-death-row.html?_r_1.    The Court of Appeals described the "long course of Brady/Giglio violations" as a "flagrant denial of due process" and a "severe stain on the Arizona justice system."  Milke v. Mroz, 339 P.3d 659, 665-66, 668 (Ariz. App. Ct. 2014).

mc-00198-EGS (D.D.C. March 15, 2012)("Stevens Report").   Special prosecutor Henry F. Schuelke III's blistering report found that the United States team concealed documents that would have damaged the credibility of key United States witnesses and helped the late Stevens to defend himself against false-statements charges.   See Stevens Report at 12.   Stevens lost his Senate seat as the scandal unfolded, dying at age eighty-six in a plane crash two years later.   See Carrie Johnson, Report: Prosecutors Hid Evidence in Ted Stevens Case, NPR News (May 15, 2012), http://www.npr.org/2012/03/15/148687717/report-prosecutors-hid-evidence-in-ted-stevens-case. Schuelke based his 500-page report on a review of 128,000 documents and interviews with prosecutors and FBI agents.   See Stevens Report at 12.   United States Attorney General Eric Holder moved to vacate Stevens' conviction.   See Jerry Seper, Inquiry Slams Prosecution of Stevens Corruption Case By Justice Department, The Washington Times (March 15, 2012).   The Department of Justice ("DOJ") subsequently "instituted a sweeping training curriculum for all federal prosecutors, and made annual discovery training mandatory."   Mark Memmott, Report Slams   Sen.   Stevens'   Prosecutors,   NPR   News   (March   15,   2012), http://www.npr.org/sections/thetwo-way/2012/03/15/148668283/report-slams-sen-stevens-prosecutors.

As Milke v. Ryan and the Stevens Report reveal, prosecutors hold a tremendous amount of power in criminal prosecutions, often more than the jury.   See Alex Kozinski, Criminal Law 2.0, 44 Geo. L.J. Ann. Rev. of Crim. Proc. iii, xxii (2015)(explaining that prosecutors often hold more power "than jurors because most cases don't go to trial").   They are the ones with access to the evidence, both inculpatory and exculpatory.   They can disclose it easier than anyone else can. See Scott H. Greenfield, The Flood Gates Myth, Simple Justice (Feb. 16, 2015), http://blog.simplejustice.us/2015/02/16/the-flood-gates-myth/.   As one illustration, in Milke v.

Ryan, Milke discovered the impeachment evidence detailing Saldate's misconduct "only after a team of approximately ten researchers in post-convictions proceedings spent nearly 7000 hours sifting through court records." Milke v. Ryan, 711 F.3d at 1018. The team worked eight hours a day for three and a half months searching through the clerk of court's officers for Saldate's name in every criminal case file from 1982 to 1990. See Milke v. Ryan, 711 F.3d at 1018. It took another researcher another month to review motions and transcripts from each of those cases to find examples of Saldate's misconduct. See Milke v. Ryan, 711 F.3d at 1018. The Ninth Circuit concluded: "A reasonably diligent lawyer couldn't possibly have found these records in time to use them at Milke's trial." Milke v. Ryan, 711 F.3d at 1018. The prosecutor was in the best position to give Milke the opportunity to effectively cross-examine Saldate and ensure that she had a fair trial. Although Brady and Giglio require prosecutors to disclose exculpatory evidence to the defense, it is often extremely difficult for criminal defendants to know whether the prosecution is complying with this obligation. Furthermore, prosecutors exert tremendous control over witnesses.

> They can offer incentives -- often highly compelling incentives -- for suspects to testify. This includes providing sweetheart plea deals to alleged co-conspirators and engineering jail-house encounters between the defendant and known informants. Sometimes they feed snitches non-public information about the crime so that the statements they attribute to the defendant will sound authentic. And, of course, prosecutors can pile on charges so as to make it exceedingly risky for a defendant to go to trial. There are countless ways in which prosecutors can prejudice the fact-finding process and undermine a defendant's right to a fair trial.

Kozinski, supra, at xxii (internal footnotes omitted).

To address this problem, Holder put together a working group of senior prosecutors, law enforcement representatives, and information technology professionals to improve the DOJ's discovery practices. See Hearing on the Special Counsel's Report on the Prosecution of Senator Ted Stevens at 3-4, Committee on the Judiciary United States Senate (March 28,

2012)("Hearing").   The DOJ then issued guidelines that federal prosecutors must follow in complying with their discovery obligations in criminal cases.  See Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Issuance of Guidance and Summary of Actions Taken in Response to the Report of the Department of Justice Criminal Discovery and Case Management Working Group (Jan. 4, 2010); Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Requirement for Office Discovery Policies in Criminal Matters (Jan. 4, 2010); Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Guidance for Prosecutors Regarding Criminal Discovery (Jan. 4, 2010), https://www.justice.gov/dag/memorandum-department-prosecutors.  These memoranda are intended to establish a methodical approach to discovery obligations and to address inconsistent discovery practices among prosecutors within the same office.  See Hearing at 4-5.  Although these memoranda are "not intended to have the force of law or to create or confer any rights, privileges or benefits," DOJ attorneys will likely have to follow the guidance in the memoranda to argue that they have complied with their discovery obligations. Later in January 2010, Deputy Attorney General David W. Ogden appointed a long-serving career prosecutor as the DOJ's first full-time National Criminal Discovery Coordinator to lead and oversee all DOJ efforts to impose disclosure practices.  See Hearing at 4.

Many courts and scholars have argued, however, that training prosecutors is insufficient to fully combat discovery abuse.  Instead of relying on prosecutors alone to disclose all potentially exculpatory evidence, they have suggested that judges take a more active role in preventing Brady and Giglio violations.   See United States v. Jones, 686 F. Supp. 2d 147, 149 (D. Mass. 2010)(Wolf, J.)(expressing the district court's skepticism that prosecution-initiated training sessions, in the absence of strong judicial action, would effectively curb Brady violations).  Chief

Judge Kozinski has asserted that "[t]here is an epidemic of *Brady* violations abroad in the land. Only judges can put a stop to it."[136]   United States v. Olsen, 737 F.3d 625, 626 (9th Cir. 2013)(Kozinski, C.J., dissenting).  Two years after Chief Judge Kozinski described the "epidemic of *Brady* violations," he observed that his use of the phrase "caused much controversy but brought about little change in the way prosecutors operate."  Kozinski, supra, at viii (citing Center for Prosecutor Integrity, An Epidemic of Prosecutor Misconduct, White Paper (Dec. 2013), available at                            http://www.prosecutorintegrity.org/wp-content/uploads/EpidemicofProsecutor-Misconduct.pdf.  Accordingly, he proposed some additional reforms, such as requiring open-file discovery.  See Kozinski, supra, at xxvi-vii.  North Carolina has adopted such a rule by statute that requires courts to order the "State to make available to the defendant the complete files of all law enforcement agencies, investigatory agencies, and prosecutors' offices involved in the investigation of the crimes committed or the prosecution of the defendant."  N.C. Gen. Stat. § 15A-903(a)(1) (2011).  The DOJ, however, has opposed such a law, instead advocating that prosecutors should remain in charge of deciding what evidence will be material to the defense.  See Video Recording: Ensuring that Federal Prosecutors Meet Discovery Obligations: Hearing on S. 2197 Before the S. Judiciary Comm., 112th Cong. (2012)(on file with S. Judiciary Comm.)(statement of James M. Cole, Deputy Att'y Gen., U.S. Dep't of Justice opposing the bill: "[I]n reacting to the *Stevens* case, we must not let ourselves forget . . . true improvements to discovery practices will come from prosecutors and agents . . . .  In other words, new rules are unnecessary."); Eric Holder Jr., Preface, In the Digital Age, Ensuring that the Department Does Justice iii, 41 Geo. L.J. Ann.

---

[136]Neither Chief Judge Kozinski nor anyone else has empirically shown that an epidemic of Brady violations is occurring.  The Court does not see it.  The Assistant United States Attorneys appear to take their duties very seriously.

Rev. Crim. Proc. (2012). Chief Judge Kozinski contends that effectively deterring <u>Brady</u> and

<u>Giglio</u> violations means that prosecutorial offices across the country must establish firm open-file

policies to ensure compliance.[137]  <u>See</u> Kozinski, <u>supra</u>, at xxviii.

---

[137]The New Mexico Legislature has not enacted an open-file policy for its state prosecutors, nor has the United States Department of Justice. <u>See</u> David W. Ogden, Deputy Attorney General, <u>Criminal Resource Manual</u> § 165 (2010)("Prosecutors should never describe the discovery being provided as 'open file.'"). The United States Attorney's Office for the District of New Mexico has, however, previously represented to the Court it operates under such a policy. <u>See</u> <u>United States v. Rodella</u>, 2015 WL 711931, at *39 n.12 (D.N.M. Feb. 2, 2015)(Browning, J.)(stating that the United States Attorney's Office for the District of New Mexico has "consistently represented that they maintain an 'open file policy'"). The Court recognized that, despite the United States' representations that it maintains an open-file policy, its "conduct before the Court suggests otherwise." <u>United States v. Rodella</u>, 2015 WL 711931, at *39 n.12.

> These attorneys have at times shown that they are willing to disclose to criminal defendants only the bare minimum that the law requires and nothing more. In *United States v. Roybal*, No. CR 12-3182 JB, 2014 WL 4748136 (D.N.M. Sept. 4, 2014)(Browning, J.), the United States refused to produce certain raw wiretap data and progress reports they made concerning wiretaps. *See* 2014 WL 4748136, at *1. The United States did not give a reason for denying the defendants' request for the information, other than that the law did not require it to produce the documents. *See* 2014 WL 4748136, at *4. Again in *United States v. Folse*, the United States refused to disclose reports related to a shooting between a co-defendant and a Federal Bureau of Investigation agent for a similar reason: the law did not require it to disclose the information. *See United States v. Folse*, No. CR 14–2354, Unsealed Memorandum Opinion and Order, filed January 26, 2015 (Doc. 75). . . By its very name -- the Department of Justice -- the United States is also interested in the pursuit of justice. In refusing to disclose evidence, documents, and materials unless the law requires it to produce the items, the United States may be undermining the appearance of justice. Defendants are often left in the dark, not knowing what information the United States has in its possession. While Courts and Congress have placed requirements on what information the United States must disclose, these requirements are a bare minimum and not a recommendation. Criminal defendants are already at a disadvantage, because of the United States' resources and because the United States gets a head start in every case by being able to investigate before bringing an indictment. The United States need not compound this disadvantage by refusing to give over any evidence unless it is absolutely required. After the United States secures a conviction, the criminal defendant, and the public at large, should feel that the conviction was based on a fair trial in which there was nothing else the defendant could have done to obtain a different result -- *i.e.* the appearance of justice. The nation may not be well served when a defendant is left wondering whether things would have been different if the United States had

While these reforms may indeed decrease the number of Brady and Giglio violations that occur, the Court cannot unilaterally impose those requirements upon attorneys.  Judges have several other tools at their disposal, however, and the Court uses several of these tools to ensure compliance with Brady and Giglio in the District of New Mexico.  First, while the Court must rely heavily on the prosecutors to do their job under Brady and Giglio, the Court does more than rely solely on the prosecutors to comply with their obligations.  See Kozinski, supra, at xxxiii ("*Brady* is not self-enforcing; failure to comply with *Brady* does not expose the prosecutor to any personal risk."); Imbler v. Pachtman, 424 U.S. 409, 430, 431 n.34 (1976)(noting that prosecutors are absolutely immune for "activities [that are] intimately associated with the judicial phase of the criminal process," including the willful suppression of exculpatory evidence).   The Court enters orders at the beginning of the case directing prosecutors to comply with those obligations by disclosing documents and objects, reports and tests, expert witness opinions, and all relevant

---

disclosed all of the information that it possessed.  By refusing to disclose all available information, the United States may create the perception that it obtained a conviction through gamesmanship and concealment, *i.e.*, through sharp practices, and not through the pursuit of truth and justice.  This perception undermines the pillars of our criminal justice system.  The Court will continue to faithfully follow the law and will not require the United States to disclose any information which the law does not require it to disclose.  The Court, however, cautions the United States that, if it continues its pattern of refusing to disclose available information to criminal defendants, it is undermining the representation that it routinely makes that it has an open file policy and that the Court will take that purported policy with a grain of salt.  That representation, which is not completely accurate, and the unclear practices of the Assistant United States Attorneys undermine the administration of justice and the public's perception of the justice system. It also puts its convictions unnecessarily at risk, if the Court is wrong that the United States did not have to produce the documents. The United States is a key player in the adversarial system; as the people's representative, it too plays a fundamental role in ensuring the appearance of justice.

United States v. Rodella, 2015 WL 711931, at *39.  It appears that the United States has finally abandoned its representations that it has an open-file policy.

material that Brady and Giglio require.  If courts do not enter an order requiring prosecutors to comply with Brady and Giglio, the court lacks the power to sanction attorneys, because those attorneys will not have violated any court-imposed obligations.  See Henry F. Schuelke III, supra, at 507-510.  By entering such orders, the Court can hold prosecutors personally responsible for failures to disclose information.

Second, when prosecutors hide Brady and Giglio material, courts can name the offending prosecutors in their judicial opinions.  One author terms this technique "public shaming."  Adam M. Gershowitz, Prosecutorial Shaming: Naming Attorneys to Reduce Prosecutorial Misconduct, 42 U.C. Davis L. Rev. 1059 (2009).  Naming prosecutors' names can serve as a unique tool to encourage compliance with a prosecutor's disclosure obligations.  Prosecutors will know that non-compliance can expose them to embarrassment in front of their friends and colleagues.  See Jenia Iontcheva Turner, Policing International Prosecutors, 45 N.Y.U. J. Int'l L. & Pol. 175, 229 (2012)("The court's judgment condemning particular actions of prosecutors as unlawful can serve as a potent deterrent for most prosecutors, who would not like to be called out publicly by a court for failing in their obligation.").  While the Court is usually reluctant, in both civil and criminal cases, to name the attorneys it sanctions, prosecutors run the risk that the Court may, depending on the egregiousness of a violation, believe that more than a sanction is necessary.

Finally, several scholars have endorsed Professor Jason Kreag's proposal that judges engage in a formal colloquy with the prosecutor on the record during pretrial hearings.  See Jason Kreag, The Brady Colloquy, 67 Stan. L. Rev. Online 47 (2014); Kozinski, supra, at xxxiv (endorsing Kreag's colloquy); Adam M. Samaha & Lior Jacob Strahilevitz, Don't Ask, Must Tell -- And Other Combinations, 103 Cal. L. Rev. 919, 984 n.296 (2015).  Kreag suggests that trial judges routinely ask a series of questions such as:

1.    Have you reviewed your file, and the notes and file of any prosecutors who handled this case before you, to determine if these materials include information that is favorable to the defense?

2.    Have you requested and reviewed the information law enforcement possesses, including information that may not have been reduced to a formal written report, to determine if it contains information that is favorable to the defense?

3.    Have you identified information that is favorable to the defense, but nonetheless elected not to disclose this information because you believe that the defense is already aware of the information or the information is not material?

4.    Are you aware that this state's rules of professional conduct require you to disclose all information known to the prosecutor that tends to be favorable to the defense regardless of whether the material meets the *Brady* materiality standard?

5.    Now that you have heard the lines of cross-examination used by the defense and have a more complete understanding of the theory of defense, have you reviewed your file to determine if any additional information must be disclosed?

Kreag, supra, at 50-51 (internal footnotes omitted).  Kreag contends that the formality of facing a judge on the record impresses upon prosecutors the need to scrupulously comply with their disclosure obligations.  See Kreag, supra, at 49.  He further argues that the colloquy will require prosecutors to explain why they are not disclosing certain information at the time they decide not to disclose that information, instead of asking for an explanation years later when the non-disclosure comes to light.  See Kreag, supra, at 53-54.

The Court agrees that some form of pretrial questioning will increase compliance with Brady and Giglio.  Despite this agreement, the Court believes that the formal colloquy that Kreag proposes is not only unnecessary, but also somewhat impractical for district judges that see hundreds of criminal cases a year.  Because the District of New Mexico sees more felony cases

than any other federal district in the country,[138] and more criminal cases than most courts in the country, the Court has developed professional relationships with the United States Attorneys who appear before it on a regular basis.  See Criminal Cases Commenced, by Number of Felony Defendants, Excluding Reopens, During the 12-Month Period Ending March 31, 2015, JNET, Criminal Caseload Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-caseload-tables (listing New Mexico as having the highest number of criminal cases involving felony defendants in the nation).  Asking United States Attorneys whether they intentionally refused to disclose exculpatory information can appear derogatory and insulting to attorneys who frequently appear before the Court.  See Radley Balko, Judge Says Prosecutors Should Follow Law.  Prosecutors Revolt., The Wash. Post. (March 7, 2014), http:// www.washingtonpost.com/ news/the-watch/wp/2014/03/07/judge-says-prosecutors-should-follow-the-law-prosecutors-revolt (describing how a prosecutor opposed the Arizona Supreme Court's recommendation that Arizona adopt an ethical rule to ensure that prosecutors disclose new evidence of a potential wrongful conviction, in part because he was insulted by the suggestion that an ethical guideline was needed to encourage him to do what he claimed he would do as a matter of course).  Kreag concedes that "some prosecutors might be insulted by having to answer these or similar questions from the court,

---

[138]In addition to seeing more felony cases than other courts, the District of New Mexico consistently sees more criminal cases than most other courts in the country.  See Criminal Cases Commenced, Terminated, and Pending (Including Transfers), During the 12-Month Periods Ending March 31, 2014 and 2015, JNET, Criminal Caseload Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-caseload-tables ("Criminal Filings").  In 2015 alone, 4,227 criminal cases were filed in the District of New Mexico.  See Criminal Filings at 1.  Only Arizona, with 5,059, and Texas' Southern and Western Districts, with 5,491 and 6,074, respectively, saw more criminal filings.  See Criminal Filings at 1.  In comparison, 98 criminal cases were filed in the District of Rhode Island, 128 were filed in Vermont, 116 were filed in the Northern District of Mississippi, 109 were filed in the Western District of Wisconsin, and 61 were filed in the Eastern District of Oklahoma.  See Criminal Filings at 1.

believing that the questions themselves amount to an accusation." Kreag, supra, at 56. The Court

agrees with this assessment. The Court has known many of these lawyers for years; there is no

need to insult them with questions about whether they have complied with their ethical duties that

it does not ask of defense lawyers or civil lawyers.

Moreover, the Court can accomplish the same goals that the colloquy seeks to accomplish

by getting assurances at a pretrial hearing that the United States has complied with its duty. Merely

holding a hearing or a pretrial conference where the United States Attorney knows that he or she

must answer to the Court about discovery issues and what has been produced heightens the

importance of disclosing Brady and Giglio material; the hearing impresses upon attorneys the

seriousness of their representations to the Court.[139] The Court can therefore "signal to young

prosecutors [] the importance the judge places on enforcing a prosecutor's ethical and *Brady*

obligations" by holding a hearing or pretrial conference and asking about discovery issues, without

running through a standardized and potentially insulting checklist. Kreag, supra, at 54. Second, a

hearing or pretrial conference does more than demonstrate the seriousness of the situation. Like

the colloquy, it also personalizes the prosecutor's decision not to disclose. A hearing or pretrial

conference requires prosecutors to acknowledge that they made the non-disclosure decision and

that they are responsible for providing an explanation for that non-disclosure. Furthermore, the

hearing emphasizes -- without having to say it -- that they may be sanctioned for any

misrepresentations they make about Brady and Giglio material. This accountability -- and threat

of sanctions for making misrepresentations to the Court -- increases disclosure on the front-end

---

[139]Those professors and judges who have endorsed the formal colloquy do not hear criminal cases at the district court level, especially with the frequency that the Court does. See Kozinski, supra; Kreag, supra. The District of New Mexico sentences hundreds more criminal defendants than judges in most other districts. A formal colloquy is not always practical in this context.

without the need for "public shaming" on the back end if the Court later discovers a Brady or Giglio violation.  The Court agrees that some of Kreag's suggested questions may be useful in some hearings or pretrial conferences.  Other situations, however, call for more pointed and probing questions.  Moving away from a checklist of questions gives judges the flexibility to get to the point more quickly and easily, to ask specific questions rather than general ones, and to avoid impairing its working relationship with United States Attorneys and the assistants in the meantime.  Finally, holding a hearing or pretrial conference encourages prosecutors to review their notes and to effectively prepare a reason for non-disclosure early in the proceedings.  Accordingly, while asking some of Kreag's questions may be helpful, the Court can more practically curb Brady and Giglio violations by asking questions tailored to the circumstance rather than going through a standardized formal checklist.

In sum, the Court is not comfortable with engaging in a colloquy with an Assistant United States Attorney like he or she is a defendant.  While no one wants to admit this fact, the truth is that, if the DOJ prosecutors do not do their duties under Brady and Giglio the system is in trouble. The Court, the defense bar, and the nation, to a great extent, trust them.  They are, therefore, entitled to respect, not suspicion, mistrust, or hostility, until they conduct themselves in a manner that is unprofessional.  Sometimes more vigilance is achieved in a respectful environment than one where the Court asks the lawyer: "Have you been ethical today?"

One additional check that the Court requires of prosecutors is to disclose officers' and investigators' notes as "statement[s]" within the meaning of the Jencks Act.  See United States v. Harry, 2013 WL 684671, at *1 (D.N.M. Feb. 6, 2013)(Browning, J.).  As explained above, some courts -- including the Court -- have concluded that an officer's interview notes may be "statement[s]" that the Jencks Act requires the United States to disclose.  18 U.S.C. § 3500.  See

United States v. Harry, 2013 WL 684671, at *11-12 ("The United States must turn over to Harry, after the witness testifies at trial, any investigative notes containing statement from those witnesses . . . ."); United States v. Tarango, 760 F. Supp. 2d 1163, 1167 (D.N.M. 2009)(Browning, J.)(requiring the United States to produce FBI reports, which contain statements from prosecution witnesses after those witnesses testify at trial); United States v. Cooper, 283 F. Supp. 2d at 1238 (noting that rough interview notes may be discoverable under the Jencks Act); United States v. Smith, 984 F.2d at 1086 ("Interview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim."); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act).  Officers then maintain these notes pursuant to various standards and protocols.  See United States v. Harrison, 524 F.2d 421, 424 n.2 (D.C. Cir. 1975); United States v. Lujan, 530 F. Supp. 2d 1224, 1267 (D.N.M. 2008)(Brack, J.)(stating that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential impeachment value of the notes may not become evident until trial," the United States must preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses" under 18 U.S.C. § 3500).  Officers then use their notes as the basis for their reports.  When officers write their reports, however, they may exclude certain information that does not help the prosecution.  These reports are then placed in a prosecutor's file, but the notes are not.  To ensure that any impeachment information is disclosed, the Court requires prosecutors to disclose the investigating officer's notes as Jencks material after the government witness testifies at trial.  This disclosure could reveal information that conflicts with the officer's report, serving as valuable impeachment evidence.  The more often that district judges require prosecutors to disclose a testifying officer's notes, the more care officers will take to ensure that their reports reflect their notes and accurately summarize the events leading to an arrest.  Even

if some courts resist requiring such disclosure, see United States v. Lujan, 530 F. Supp. 2d at 1266, cases are randomly assigned to different judges. The threat of being assigned to a judge who requires disclosure may incentivize officers to include all exculpatory and impeachment evidence in their formal report. Additionally, even if a prosecutor's file omits the officer's notes, courts must require prosecutors to disclose exculpatory information in officers' notes under Brady. See Kyles v. Whitley, 514 U.S. at 437 (placing an affirmative obligation on prosecutors to learn of exculpatory evidence in others' possession); United States v. Padilla, 2011 WL 1103876, at *5 (D.N.M. Mar. 14, 2011)(Browning, J.)("The Due Process Clause of the Constitution requires the United States to disclose information favorable to the accused that is material to either guilt or to punishment."); United States v. Burke, 571 F.3d at 1054 (holding that the "belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an earlier disclosure would have created a reasonable doubt of guilt").

## LAW REGARDING NEWLY DISCOVERED EVIDENCE IN THE CONTEXT OF A MOTION FOR A NEW TRIAL

Rule 33 authorizes the court to grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). The rule provides, however, that "any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(c). Moreover, the United States Court of Appeals for the Tenth Circuit has emphasized that rule 33 "motions for a new trial based on newly discovered evidence are generally disfavored and should be granted only with great caution." United States v. Watson, 207 F. App'x 913, 2006 WL 3518005, at *3 (10th Cir.2006).[140] Before a new trial may be granted

---

[140]United States v. Watson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding

on newly discovered evidence not involving a prosecutorial violation of <u>Brady</u>, a defendant must satisfy a five-part test:

> (i) the defendant did not discover the evidence until after trial; (ii) the failure to learn of the evidence did not result from the defendant's own lack of diligence; (iii) the new evidence is more than merely impeaching; (iv) the new evidence is material to principal issues; and (v) the new evidence seriously undermines the result at trial.

<u>United States v. Sinclair</u>, 109 F.3d at 1531; <u>See</u> <u>United States v. Gwathney</u>, 465 F.3d 1133, 1144 (10th Cir.2006); <u>United States v. Vigil</u>, 506 F. Supp. 2d 571, 577-78 (D.N.M. 2007).

## **<u>LAW REGARDING THE CONFRONTATION CLAUSE</u>**

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), the Supreme Court held that, consistent with the Sixth Amendment, "[t]estimonial [hearsay] statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." <u>Crawford v. Washington</u>, 541 U.S. at 59. In <u>Davis v. Washington</u>, 547 U.S. 813 (2006), the Supreme Court further elaborated on what a "testimonial" statement is:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

---

precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." <u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).

Davis v. Washington, 547 U.S. at 822.  The Tenth Circuit has restated this rule, defining a testimonial statement as "a 'formal declaration made by the declarant that, when objectively considered, indicates' that the 'primary purpose of the [statement is] to establish or prove past events potentially relevant to later criminal prosecution.'"  United States v. Morgan, 748 F.3d 1024, 1048 (10th Cir. 2014)(alteration in original)(quoting United States v. Smalls, 605 F.3d at 777-78).  Accord United States v. Chaco, 801 F. Supp. 2d 1200, 1209-10 (D.N.M. 2011)(Browning, J.)(discussing developments in Tenth Circuit precedent on the test regarding what qualifies as a testimonial statement).

In Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), the Supreme Court addressed whether the admission of a sworn affidavit by a forensic chemist, who testified in the affidavit that the substance which police seized from the defendant was cocaine of a certain amount, violated the Confrontation Clause.  See Melendez-Diaz v. Massachusetts, 557 U.S. at 307.  The Supreme Court first found that such affidavits were testimonial, because they were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" and because, under Massachusetts law, the sole purpose of the affidavit was to provide prima facie evidence of the content of the substance seized.  Melendez-Diaz v. Massachusetts, 557 U.S. at 310.  The Supreme Court then used the affidavit introduced by the prosecution to outline its concerns regarding the lack of cross-examination when such affidavits are introduced as evidence:

> The affidavits submitted by the analysts contained only the bare-bones statement that "[t]he substance was found to contain: Cocaine."  At the time of trial, petitioner did not know what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed.  While we still do not know the precise tests used by the analysts, we are told that the laboratories use "methodology recommended by the Scientific Working Group for the Analysis of

> Seized Drugs[.]"   At least some of that methodology requires the exercise of
> judgment and presents a risk of error that might be explored on cross-examination.

Melendez-Diaz v. Massachusetts, 557 U.S. at 320 (citation omitted).   Because there was no opportunity to cross-examine on these issues, the Supreme Court concluded that introduction of the affidavit violated the defendant's rights under the Confrontation Clause.   See Melendez-Diaz v. Massachusetts, 557 U.S. at 329 ("The Sixth Amendment does not permit the prosecution to prove its case via *ex parte* out-of-court affidavits, and the admission of such evidence against Melendez-Diaz was error.").   The Supreme Court has since extended this holding to "forensic laboratory report[s] containing a testimonial certification -- made for the purpose of proving a particular fact -- through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification."   Bullcoming v. New Mexico, 564 U.S. 647, 652 (2011).   See id. at 661("Accordingly, the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'"(quoting Melendez-Diaz v. Massachusetts, 557 U.S. at 319-23 n.6)).

The importance of the Confrontation Clause's application is further delineated by the Supreme Court's consideration of the prosecution's use of live or recorded video testimony without the defendant having the ability to confront the witness face-to-face, which -- except in rare cases -- will violate a defendant's Confrontation Clause rights -- absent a showing of unavailability and prior opportunity to confront the witness.   See United States v. Sandoval, No. 04-2362, 2006 WL 1228953, *7-9 (D.N.M. Mar. 7, 2006)(Browning, J.).   In Maryland v. Craig, 497 U.S. 836 (1990) -- which the Supreme Court decided before Crawford v. Washington -- the Supreme Court rejected a Confrontation Clause challenge to a Maryland statute that allowed a child witness in a child molestation case, under certain circumstances, to testify via a one-way

closed circuit television, which did not allow the witness to view the defendant.  See Maryland v. Craig, 497 U.S. at 860.  While upholding the constitutionality of a child's testimony outside the defendant's presence, the Supreme Court in Maryland v. Craig recognized that the "central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."  Maryland v. Craig, 497 U.S. at 845.[141]

The Supreme Court in Maryland v. Craig recognized that the context of an adversary proceeding before the trier of fact involves "[t]he combined effect of these elements of confrontation -- physical presence, oath, cross-examination, and observation of demeanor by the trier of fact" that "is the norm of Anglo-American criminal proceedings."  Maryland v. Craig, 497 U.S. at 846.  The Supreme Court in Maryland v. Craig also acknowledged the peculiar power of face-to-face confrontation in that "face-to-face confrontation enhances the accuracy of fact finding by reducing the risk that a witness will wrongfully implicate an innocent person," Maryland v. Craig, 497 U.S. at 846 (citing Coy v. Iowa, 487 U.S. 1012, 1019-20 (1988)), and that "face-to-face confrontation forms 'the core of the values furthered by the Confrontation Clause,'" Maryland v. Craig, 497 U.S. at 847 (quoting California v. Green, 399 U.S. 149, 157 (1970)).

The Supreme Court explained in Maryland v. Craig that the Confrontation Clause "reflects a preference for face-to-face confrontation at trial," but that the preference "must occasionally give way to considerations of public policy and the necessities of the case."  Maryland v. Craig, 497 U.S. at 849 (internal quotation marks omitted).  The Supreme Court emphasized that the preference for face-to-face confrontation is strong, and that a defendant's Sixth Amendment

---

[141]The Supreme Court has since distanced itself from this holding that the purpose of the Confrontation Clause is to ensure the reliability of evidence.  See Crawford v. Washington, 541 U.S. at 61.

confrontation right "may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." Maryland v. Craig, 497 U.S. at 850.

While the issue is decidedly less clear, it is unlikely that a violation of a defendant's Confrontation Clause rights occurs when he calls one of his own witnesses who is aligned with him by videoconference or telephonically. See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him . . . ." (emphasis added)). Cf. United States v. Olguin, 643 F.3d 384, 392 (5th Cir. 2011)("The Sixth Amendment guarantees the right to confrontation against a party testifying against him, not against others."). The need for "adversariness" is not present when the witness is aligned with the defendant. Maryland v. Craig, 497 U.S. at 845. The Supreme Court spoke in Crawford v. Washington about the need for the defendant to have "an adequate opportunity to cross-examine" a witness to satisfy the Confrontation Clause, a need which is not present when the witness is aligned with the defendant. Crawford v. Washington, 541 U.S. at 58. The Federal Rules of Evidence, for example, generally do not permit a party to ask leading questions -- a key tool of cross examination -- of a witness aligned with the party calling the witness. See Fed. R. Evid. 611(c).[142] A defendant might also waive a Confrontation Clause challenge by calling his own witness by videoconference or telephonically. See United States v. Lopez-Medina, 596 F.3d 716, 730-734 (10th Cir. 2010)("Prior to Crawford, we held there was 'no doubt' a defendant could

---

[142]Rule 611(c) of the Federal Rules of Evidence provides: "(c) **Leading Questions.** Leading questions should not be used on direct examination except as necessary to develop the witness's testimony.   Ordinarily, the court should allow leading questions: (1) on cross-examination; and (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." Fed. R. Evid. 611(c) (bold in original).

waive his rights under the Confrontation Clause. The parties do not argue <u>Crawford</u> changed this rule.").

Like many constitutional rights, a defendant may choose to waive his Confrontation Clause rights. In 1969, the Supreme Court recognized that a defendant may waive his Confrontation Clause rights and that defendants commonly do so when pleading guilty. <u>See</u> <u>Boykin v. Alabama</u>, 395 U.S. 238, 270 (1969)("Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial. . . . Third, is the right to confront one's accusers."). The Tenth Circuit has recognized that, both before and after the Supreme Court's decision in <u>Crawford v. Washington</u>, a defendant may knowingly waive his Confrontation Clause rights at trial. <u>See</u> <u>United States v. Lopez-Medina</u>, 596 F.3d at 730-734 (recognizing that Confrontation Clause rights may be waived at trial "at least where there is an explicit waiver"). Specifically, the Tenth Circuit stated: "Prior to <u>Crawford</u>, we held there was 'no doubt' a defendant could waive his rights under the Confrontation Clause. The parties do not argue <u>Crawford</u> changed this rule." <u>United States v. Lopez-Medina</u>, 596 F.3d at 731 (citations omitted). The Tenth Circuit has held that a defendant's counsel can stipulate to the admissibility of evidence that would otherwise violate the Confrontation Clause if doing so "was a matter of prudent trial strategy." <u>Hawkins v. Hannigan</u>, 185 F.3d 1146, 1155 (10th Cir. 1999). The United States Court of Appeals for the Sixth Circuit has recognized that such a waiver can be permissible in the context of the prosecution admitting one of its witnesses' videotaped deposition. <u>See</u> <u>Earhart v. Konteh</u>, 589 F.3d 337, 344 (6th Cir. 2009). The Sixth Circuit in that case relied on one of its prior decisions where it had permitted such a waiver:

> The State relies upon our holding in <u>Bailey v. Mitchell</u>, 271 F.3d 652 (6th Cir. 2001), to argue that Earhart waived his right to contest the admission of the videotape deposition. In <u>Bailey</u>, we held that a criminal defendant waived his right to confrontation by entering into a <u>quid</u> <u>pro</u> <u>quo</u> agreement with a state prosecutor.

> Id. at 657.  The petitioner in Bailey had agreed to allow the State to admit the videotape deposition if the prosecutor would consent to the defendant's motion for a continuance.  Id.  Importantly, the Ohio state courts found as a factual matter that Bailey had made an explicit deal with the prosecutor for the admission of the videotape.  Id.

Earhart v. Konteh, 589 F.3d at 344.  Notably, the Tenth Circuit's case in United States v. Lopez-Medina involved an oral waiver on the record in open court.  See United States v. Lopez-Medina, 596 F.3d at 731 ("It is clear from this statement [to the judge] that defense counsel intentionally relinquished his (or rather, his client's) confrontation right through his questioning of Johnson.").

## LAW REGARDING THE JENCKS ACT

In Jencks v. United States, 353 U.S. 657, 667 (1957), the Supreme Court held that a "criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial."  Jencks v. United States, 353 U.S. at 672.  In so holding, the Supreme Court recognized that the

> rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

Jencks v. United States, 353 U.S. at 671.  Congress later codifies the Jencks v. United States into 18 U.S.C. § 3500.  See United States v. Kimoto, 588 F.3d 464, 475 (7th Cir. 2009)(explaining that "the Jencks Act, 18 U.S.C. § 3500[,] . . . was enacted in response to the Supreme Court's holding in Jencks v. United States, 353 U.S. 657 . . . ").

Section 3500 of Title 18 of the United States Code provides:

**(a)**    In any criminal prosecution brought by the United States, no statement or

report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

**(b)**    After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.  If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. §§ 3500(a)-(b).  "The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is 'in the possession of the United States' once that witness has testified."  United States v. Lujan, 530 F. Supp. 2d at 1232 (quoting 18 U.S.C. §§ 3500(a) & (b)).  The Jencks Act "manifests the general statutory aim to restrict the use of such statements to impeachment."  Palermo v. United States, 360 U.S. 343, 349 (1959). The Jencks Act's purpose is "not only to protect Government files from unwarranted disclosure but also to allow defendants materials usable for the purposes of impeachment."  United States v. Smaldone, 544 F.2d 456, 460 (10th Cir. 1976)(citing Palermo v. United States, 360 U.S. at 352).

The Jencks Act defines statements as:

**(1)**    a written statement made by said witness and signed or otherwise adopted or approved by him;

**(2)**    a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

**(3)**    a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e).

The Tenth Circuit has held: "Interview notes could be 'statements' under the [Jencks] Act

if they are substantially verbatim." United States v. Smith, 984 F.2d 1084, 1086 (10th Cir. 1993). At least one district court within the Tenth circuit has distinguished interview notes from reports that "embody only the agent's epitomization, interpretation, or impression of an interview," finding that the latter are not producible under the Jencks Act. United States v. Jackson, 850 F. Supp. 1481, 1508 (D. Kan. 1994)(Crow, J.). In United States v. Lujan, the Honorable Robert C. Brack, United States District Judge for the District of New Mexico, explained that rough interview notes may be discoverable under the Jencks Act, when a defendant makes "at least . . . a colorable claim that an investigator's discarded rough notes contained exculpatory evidence not included in any formal interview report provided to the defense." 530 F. Supp. 2d at 1266. Judge Brack went on to hold that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential impeachment value of the notes may not become evident until trial," the United States must preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses" under 18 U.S.C. § 3500. 530 F. Supp. 2d at 1267. See United States v. Cooper, 283 F. Supp. 2d 1215, 1238 (D. Kan. 2003)(Crow, J.)(noting that rough interview notes may be discoverable under the Jencks Act); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act).

The defendant bears the initial burden of showing that particular materials qualify under the Jencks Act, but the defendant's burden is not heavy. See United States v. Smaldone, 544 F.2d at 460 ("[T]he burden is on the defendant to show that particular materials qualify as 'Statements' and that they relate to the subject matter of the testimony of the witness."); United States v. Harry, 2013 WL 684671, at *10 (D.N.M. Feb. 6, 2013)(Browning, J.). To satisfy this burden, the defendant need not prove that particular materials are within the scope of the Jencks Act, as the documents are not in the defendant's possession, but rather, "must plainly tender to the Court the

question of the producibility of the document at a time when it is possible for the Court to order it produced, or to make an appropriate inquiry." United States v. Smith, 984 F.2d at 1086 (quoting Ogden v. United States, 303 F.2d 724, 733 (9th Cir. 1962)). See United States v. Burton, 81 F. Supp. 3d 1229, 1250-51 (D.N.M. Jan. 26, 2015)(Browning, J.). The defendant's demand for documents under the Jencks Act must be sufficiently precise for a court to identify the requested statements. See United States v. Smith, 984 F.2d at 1086. For example, in United States v. Smith, the Tenth Circuit found that a defendant had met his burden and made a prima facie showing that a statement of a witness existed which may be producible under the Jencks Act when a government witness testified during the United States' case-in-chief that she had been interviewed by a government agent before testifying, and the defense counsel moved for production of the notes. See United States v. Smith, 984 F.2d at 1085-86. Once the defendant makes a prima facie showing that a witness statement exists that may be producible under the Jencks Act, the court should conduct a hearing or in camera review of the statement. See United States v. Smith, 984 F.2d at 1086.

In United States v. Fred, No. CR 05-801 JB, the Court ordered the United States to produce "any personal notes or investigative materials that Federal Bureau of Investigation" agents "may have created regarding an interview" with the defendant. No. CR 05-801 JB, Order at 1, filed November 8, 2006 (Doc. 86). The Court required the United States to disclose the notes and investigative materials in a timely manner, so that the defendant could properly prepare for cross-examination at trial of the FBI agent who conducted the interview. See No. CR 05-801 JB, Order at 1-2. The Court has applied the Jencks Act to Drug Enforcement Agency agents' notes, generated from interviews with defendants, holding that the notes must be turned over to the defendants after the agents testify at trial. See United States v. Goxcon-Chagal, No. CR 11-2002 JB, 2012 WL

3249473, at *2, *6 (D.N.M. Aug. 4, 2012)(Browning, J.).  In United States v. Tarango, 760 F. Supp. 2d 1163 (D.N.M. 2009)(Browning, J.), the Court, applying 18 U.S.C. § 3500, held that the United States must produce Federal Bureau of Investigation ("FBI") agents' 302s, after the United States' witnesses testified at trial, to the extent those reports contained statements from witnesses who testified at trial.  See 760 F. Supp. 2d at 1164, 1167 (citing United States v. Nevels, 490 F.3d 800, 803 (10th Cir. 2007)).

## LAW REGARDING JURY BIAS

Pretrial publicity can manifest into due process violations in one of two ways: (1) pretrial publicity is "so pervasive and prejudicial"  throughout the community that the Court presumes the jury pool will be biased, or (2) pretrial publicity affects the jury selection in a sufficiently "substantial" way as to "taint the entire jury pool."  Goss v. Nelson, 439 F.3d 621, 628 (10th Cir. 2006)(Tymkovich, J.).  The Tenth Circuit, which binds this Court, is reluctant to find that pretrial publicity merits a new trial, and finds prejudice can be presumed only "where publicity 'created either a circus atmosphere in the court room or a lynch mob mentality such that it would be impossible to receive a fair trial.'"  Goss v. Nelson, 439 F.3d at 628 (quoting Hale v. Gibson, 227 F.3d 1298, 1332 (10th Cir. 2000)).  The defendant must show that an "irrepressibly hostile attitude pervaded the community"  which must be more than showing only that "all the potential jurors knew about the case and that there was extensive pretrial publicity."  Hale v. Gibson, 227 F.3d 1298, 1332 (10th Cir. 2000)(Ebel, J.)(quoting Stafford v. Saffle, 34 F.3d 1557, 1567 (10th Cir. 1994)).

The district court has discretion to decide how to handle allegations of juror bias.  See United States v. McHorse, 179 F.3d 889, 904 (10th Cir.1999).  When evaluating juror bias, the district court must first examine "whether actual bias existed or whether the circumstances compel

an imputation of inherent bias to the juror as a matter of law such that the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." United States v. Lawrence, 405 F.3d 888, 903 (10th Cir. 2005). Despite its discretion, the district court still should exercise caution when deciding "to haul jurors in ... to probe for potential instances of bias, misconduct, or extraneous influences" after a verdict has been rendered. United States v. Connolly, 341 F.3d 16, 34 (1st Cir. 2003)(quoting Neron v. Tierney, 841 F.2d 1197, 1205 (1st Cir. 1988)). Similarly, the district court should ensure that it permits post-trial investigations only when "there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant" as to ensure the defendant is not engaging on a "fishing expedition." United States v. Moon, 718 F.2d 1210, 1234 (2d Cir. 1983) (internal citation omitted). See United States v. Foghorn, No. CR 03-2365 JB, 2006 WL 4017477, at *13 (D.N.M. Oct. 20, 2006)(Browning, J.)

## LAW REGARDING DESTRUCTION OF EVIDENCE

The Tenth Circuit has held that:

> "The Supreme Court's jurisprudence divides cases involving nondisclosure of evidence into two distinct universes. *Brady* and its progeny address exculpatory evidence still in the government's possession. *Arizona v. Youngblood,* 488 U.S. 51 . . . (1988) and *California v. Trombetta,* 467 U.S. 479 . . . (1984) govern cases in which the government no longer possesses the disputed evidence."

Fero v. Kerby, 39 F.3d 1462, 1472(10th Cir. 1994)(Holloway, J.)(quoting United States v. Femia, 9 F.3d 990, 993 (1st Cir. 1993)). Accord United States v. Gomez, 191 F.3d 1214, 1218-19 (10th Cir. 1999). The remedy provided when the government violates a defendant's due process rights under either California v. Trombetta, 467 U.S. 479 (1984), or Arizona v. Youngblood, 488 U.S. 51 (1988), is severe: "[W]hen evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing . . . the State's most

probative evidence." California v. Trombetta, 467 U.S. at 487.  See United States v. Bohl, 25 F.3d 904, 914 (10th Cir. 1994)("Accordingly, after concluding that there has been a violation of *Youngblood,* the decision to either suppress the government's secondary evidence describing the destroyed material or to dismiss the indictment turns on the prejudice that resulted to the defendant at trial."); United States v. Fletcher, 801 F.2d 1222, 1225 n.3 (10th Cir. 1986)(remanding for a hearing on whether the government violated California v. Trombetta, and, if so, whether the proper remedy would be to suppress evidence derived from the lost or destroyed material, or to dismiss the indictment).

"Under the two-prong *Trombetta* test, the government violates a defendant's right to due process when: (1) it destroys evidence whose exculpatory significance is 'apparent before' destruction; and (2) the defendant remains unable to 'obtain comparable evidence by other reasonably available means.'" United States v. Bohl, 25 F.3d at 909-10 (quoting California v. Trombetta, 467 U.S. at 489).  "To invoke *Trombetta*, a defendant must demonstrate that the government destroyed evidence possessing an 'apparent' exculpatory value." United States v. Bohl, 25 F.3d at 910 (quoting California v. Trombetta, 467 U.S. at 489).  The government commits a constitutional violation when it destroys evidence "that might be expected to play a significant role in the suspect's defense." California v. Trombetta, 467 U.S. at 488-89.  "We think the test to be applied in such circumstances is whether defendant demonstrates that the evidence is so material that he could not receive a fair trial without it." United States v. Wilks, 629 F.2d 669, 675 (10th Cir. 1980).[143]  In United States v. Wilks, the Tenth Circuit found that lost evidence was not so

---

[143]The Tenth Circuit does not cite to either California v. Trombetta or Arizona v. Youngblood in United States v. Wilks, 629 F.2d 669 (10th Cir. 1980).  See United States v. Wilks, 629 F.2d at 671-75.  In United States v. Wilks, the Tenth Circuit analyzed whether the United States' loss of a lemonade can that was found in a defendant's cell and contained the heroin for which the defendant was charged violated the defendant's due-process rights. See 629 F.2d at 674-

material that that its loss rendered a defendant's trial unfair, because the evidence "could not prove

defendant's innocence. . . ."  629 F.2d at 675.  The defendant was charged with possessing heroin

with an intent to distribute, but the government lost a lemonade can containing the heroin that was

found in the defendant's cell.  United States v. Wilks, 629 F.2d at 672, 675. The defendant asserted

that the lemonade can was the one piece of evidence which could exculpate him, because, if his

fingerprints were not on the can, the government would have no evidence that he possessed the

heroin.  United States v. Wilks, 629 F.2d at 672, 675.  The Tenth Circuit noted that the absence of

_____

75. The Tenth Circuit did not cite to either California v. Trombetta or Arizona v. Youngblood in its decision.  See United States v. Wilks, 629 F.2d at 671-75.  The defendant's argument, however, was that "the trial court abused its discretion in refusing to dismiss the case because an item of evidence was lost by the government." United States v. Wilks, 629 F.2d at 674.  A trial court may dismiss a case when the government's destruction of evidence violates a defendant's due-process rights under California v. Trombetta or Arizona v. Youngblood.  See California v. Trombetta, 467 U.S. at 487 ("[W]hen evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing ... the State's most probative evidence.").  The defendant, thus, sought a remedy which would only be available under California v. Trombetta or Arizona v. Youngblood.  The Tenth Circuit noted that the defendant was not alleging "bad faith or intentional withholding or destruction on the part of the government," and, thus, the defendant's theory was not that the government violated his due-process rights under Arizona v. Youngblood.  United States v. Wilks, 629 F.2d at 674.  See United States v. Bohl, 25 F.3d at 910 ("The Court in Youngblood extended Trombetta to provide that, if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was 'potentially useful' for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence." (quoting Arizona v. Youngblood, 488 U.S. at 58)).  The trial court, therefore, could only have dismissed the case if the government's loss of the lemonade can violated the defendant's due-process rights under California v. Trombetta.  Additionally, the Tenth Circuit cited to United States v. Agurs when it announced that, when a defendant does not demonstrate that evidence was destroyed intentionally or in bad faith, "the test to be applied in such circumstances is whether defendant demonstrates that the evidence is so material that he could not receive a fair trial without it."  United States v. Wilks, 629 F.2d at 674.  The Supreme Court applied United States v. Agurs' standard of "constitutional materiality" in California v. Trombetta, indicating that the United States v. Agurs standard of materiality is applicable when determining whether the government's loss of evidence violates a defendant's due-process rights under California v. Trombetta.  California v. Trombetta, 467 U.S. at 488–89, 104 S.Ct. 2528 (citing United States v. Agurs, 427 U.S. at 109–110, 96 S.Ct. 2392).  The Court concludes, thus, that in United States v. Wilks, the Tenth Circuit was applying California v. Trombetta's test to determine whether the government's loss of the lemonade can violated the defendant's due-process rights, even though the Tenth Circuit does not cite to California v. Trombetta in its opinion.

the defendant's fingerprints on the lemonade can would be material to his defense, but disagreed that the loss of the can caused his trial to be unfair, because the can could not, alone, prove his innocence.  United States v. Wilks, 629 F.2d at 672.  Another inmate had testified that he placed the can with the heroin in the defendant's cell, but the United States undermined this confession with other evidence.  United States v. Wilks, 629 F.2d at 672.  The Tenth Circuit determined that the "absence of Wilks' fingerprints on the can . . . would provide cumulative evidence," given that another inmate confessed to the offense.    United States v. Wilks, 629 F.2d at 674-75.  Because the lemonade can could not alone prove the defendant's innocence, and would be cumulative to the other inmate's confession, the Tenth Circuit determined that the loss of the lemonade can did not render the defendant's trial unfair and violate his due-process rights.  See United States v. Wilks, 629 F.2d at 674-75.

If the exculpatory value of evidence that the United States failed to preserve is "indeterminate," then the defendant must show: (i) that the evidence was " 'potentially useful' for the defense;" and (ii) "that the government acted in bad faith in destroying the evidence."  United States v. Bohl, 25 F.3d at 910 (quoting Arizona v. Youngblood, 488 U.S. at 58).  "Potentially useful evidence" is "evidence of which 'no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.'"  United States v. Bohl, 25 F.3d at 910 (emphasis in original)(quoting Arizona v. Youngblood, 488 U.S. at 57).  Unlike asserted violations of Brady v. Maryland, for which the prosecutor's state of mind is irrelevant, if a defendant asserts that the prosecution violated his or her due-process rights by failing to preserve potentially exculpatory evidence, the defendant may prevail under Arizona v. Youngblood only if he or she demonstrates that the prosecution's failure to preserve the evidence was done in bad faith.  See United States v. Pedraza, 27 F.3d 1515, 1527 (10th Cir. 1994)("[I]f the government

destroys or otherwise fails to preserve potentially exculpatory evidence, the defendant bears the burden of demonstrating that the government acted in bad faith in doing so.").

> Thus, while the state of mind of the prosecutor is irrelevant to the question under Brady of whether the prosecution failed to disclose material exculpatory evidence, "the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." Arizona v. Youngblood, 488 U.S. 51, 57, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)(emphasis added).

Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 824 n.34.

The "inquiry into bad faith 'must necessarily turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.'" United States v. Bohl, 25 F.3d at 911 (alterations in original)(quoting Arizona v. Youngblood, 488 U.S. at 57 n.*). "[T]he district court's determination regarding bad faith is a mixed question of fact and law, in which the quintessentially factual question of intent predominates. . . ." United States v. Richard, 969 F.2d 849, 853 (10th Cir. 1992)(internal quotations omitted). "The mere fact that the government controlled the evidence and failed to preserve it is by itself insufficient to establish bad faith." United States v. Richard, 969 F.2d at 853-54 (citing United States v. Zambrana, 841 F.2d 1320, 1343 (7th Cir.1988)). "[M]ere negligence on the government's part in failing to preserve such evidence is inadequate for a showing of bad faith." United States v. Bohl, 25 F.3d at 912 (citing Arizona v. Youngblood, 488 U.S. at 58). In determining whether the government failed to preserve evidence in bad faith, the Tenth Circuit first considers whether the government was on notice of the potentially exculpatory evidence, and whether the potential exculpatory value of the evidence is based on more than mere speculation or conjecture. See United States v. Bohl, 25 F.3d at 911 (noting that the government "was explicitly placed on notice that [defendants] *Bell* and *Bohl* believed the tower legs were potentially exculpatory," and that the "potentially exculpatory value

was not merely conclusory, but instead was backed up with objective, independent evidence giving the government reason to believe that further tests on the legs might lead to exculpatory evidence"). Second, the Tenth Circuit also looks to whether the government had "possession or the ability to control the disposition" of potentially exculpatory evidence at the time the government is put on notice to its existence. United States v. Bohl, 25 F.3d at 912. Third, the Tenth Circuit weighs whether the evidence "was central to the government's case," as opposed to the government possessing evidence "more probative on the issue." United States v. Bohl, 25 F.3d at 912 (noting that, in defense to the charge of conspiring to defraud the United States by failing to conform with construction contracts that required a particular structural composition, "the evidence disposed of here was central to the government's case," and "nothing was more probative on the issue of the steel composition," and thus, because the evidence was destroyed, the defendants could only "rebut the government's test results ... [with] a general denial of the allegations and seek to undermine the credibility of the government's chemical analyses of the allegedly nonconforming steel"). Fourth, the Tenth Circuit considers whether the government is able to offer an "innocent explanation for its failure to preserve" potentially exculpatory evidence. United States v. Bohl, 25 F.3d at 912-13 ("[E]ven if the government destroys or facilitates the disposition of evidence knowing of its potentially exculpatory value, there might exist innocent explanations for the government's conduct that are reasonable under the circumstances to negate any inference of bad faith.").

## LAW REGARDING RULE 608 EVIDENCE

"Rule 608 of the Federal Rules of Evidence provides certain mechanisms for attacking witnesses' character for truthfulness or untruthfulness." Montoya v. Sheldon, No. CIV 10-0360 JB/WDS, 2012 WL 5476882, at *7 (D.N.M. Oct. 31, 2012)(Browning, J.). See United States v.

Huerta-Rodriguez, No. CR 09-3206 JB, 2010 WL 3834061, at *7 (D.N.M. Aug. 12, 2010)(Browning, J.)(same).  In the criminal context, the Tenth Circuit has stated that "'defense counsel should ordinarily be given wide latitude when cross examining a witness about credibility or bias.'"  United States v. Rosario Fuentez, 231 F.3d 700, 704 (10th Cir. 2000)(alteration omitted)(quoting United States v. DeSoto, 950 F.2d 626, 629 (10th Cir. 1991)).  Nevertheless, "[o]ne key aspect of this rule is that its application is explicitly within the discretion of the district court."  Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1114 (10th Cir. 2001).  See United States v. Rosario Fuentez, 231 F.3d at 704 (10th Cir. 2000)("The trial court . . . retains discretion to reasonably limit cross-examination.")(internal quotations omitted)(quoting United States v. DeSoto, 950 F.3d at 629).

> Rule 608(a) states:
>
> A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character.  But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked.

Fed. R. Evid. 608(a).  The truthfulness or untruthfulness of a witness may be attacked by opinion or reputation evidence without ever proffering evidence of a good character for truthfulness.  See United States v. Holt, 486 F.3d 997, 1002 (7th Cir. 2007)(noting that, while it is within the trial court's discretion to prohibit cross-examination of a police officer as to whether he had been suspended to call into question his credibility, the plaintiff "could have used Rule 608(a) and called a member of the department to testify directly about his opinions or reputation of [the credibility of the officer]").  To establish a proper foundation for the opinion or reputation testimony, a witness must show: "such acquaintance with the person under attack, the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which

generally he is regarded." United States v. Ruiz-Castro, 92 F.3d 1519, 1529 (10th Cir. 1996),

overruled on other grounds by, United States v. Flowers, 464 F.3d 1127 (10th Cir. 2006)(quoting

United States v. Bedonie, 913 F.2d 782, 802 (10th Cir. 1990)).

> Rule 608(b) provides the rule for admission of specific instances of conduct:
>
> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:
>
> > **(1)** the witness; or
> >
> > **(2)** another witness whose character the witness being cross-examined has testified about.

Fed. R. Evid. 608(b). "Under Federal Rule of Evidence 608(b), specific unrelated instances of a

witness's prior misconduct may be used to impeach the witness at the discretion of the court,

however, only to the extent the misconduct reflects on the witness's character for truthfulness."

United States v. Beltran-Garcia, 338 F. App'x 765, 770 (10th Cir. 2009)(unpublished).[144]

"Though Rule 608 does not explicitly specify how the trial court should exercise its discretion, the

discretion must be exercised within the ambit of the other rules of evidence, including Rules 401,

402, and 403, which address the relevance and probative value of possible evidence." United

---

[144]United States v. Beltran-Garcia is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court concludes that United States v. Beltran-Garcia, 338 F. App'x 765 (10th Cir. 2009)(unpublished), and United States v. Embry, 452 F. App'x 826 (10th Cir. 2011)(unpublished), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

States v. Beltran-Garcia, 338 F. App'x at 770.  The United States Court of Appeals for the District

of Columbia Circuit has noted:

> Although 608(b) of the Federal Rules of Evidence does state that specific instances
> of misconduct may be admissible to impeach a witness, that rule does not require
> or imply that every negative bit of evidence existing concerning a witness may be
> dragged into a case no matter how remote or minor the alleged misconduct.

United States v. Lafayette, 983 F.2d 1102, 1106 (D.C. Cir. 1993).

Rule 608 was amended in 2003 "to clarify that the absolute prohibition on extrinsic

evidence applies only when the sole reason for proffering that evidence is to attack or support the

witness' character for truthfulness," and not "to bar extrinsic evidence for bias, competency and

contradiction impeachment."  Fed. R. Evid. 608 advisory committee's note to 2003 amendment.

The rule precluding the

> admission of extrinsic evidence of specific instances of conduct of the witness when
> offered for the purpose of attacking credibility . . . does not apply, however, when
> extrinsic evidence is used to show that a statement made by a defendant on direct
> examination is false, even if the statement is about a collateral issue.

United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994)(citing 27 Charles A. Wright &

Victor J. Gold, Fed. Practice and Procedure: Evidence § 5096, at 546-47 (1990)).   This doctrine,

"known as 'specific contradiction,'" allows such impeachment "even if the evidence elicited . . .

ordinarily might be collateral or otherwise inadmissible."  United States v. Crockett, 435 F.3d

at 1313.  See United States v. Cerno, 529 F.3d 926, 944 (10th Cir. 2008)("If there is evidence that

specifically contradicts a witness's testimony, impeachment evidence is admissible to demonstrate

that the witness lacks credibility and has a propensity for lying.").[145]

---

[145]Professors Charles Alan Wright and Victor James Gold recognize that, before the 2003
amendment, the "greater weight of authority" held that "Rule 608 regulates only the admissibility
of character evidence and that subdivision (b) should not be read literally."  28 Charles A. Wright
& Victor J. Gold, Fed. Practice and Procedure § 6117, at 86 (1993 & Supp. 2011).  Professors
Wright and Gold confirm that, as a result of the 2003 amendment, rule 608(b) "has been amended

It is generally true that "a party may inquire into specific instances of conduct by extrinsic evidence only on cross-examination of a witness in challenging the truthfulness of his testimony." See Bennet v. Longacre, 774 F.2d 1024, 1027 (10th Cir. 1985). Where a party has already attacked a witness' credibility by cross-examination on specific instances of conduct and the witness made a false statement on the stand, however, the party may provide extrinsic evidence to impeach that witness on re-direct or during a later direct examination. See United States v. Embry, 452 F. App'x 826, 835 (10th Cir. 2011)(unpublished)(noting that "Rule 608(b)(1) . . . allows impeachment testimony . . . on direct or redirect examination . . . where a party already has attacked the credibility of a witness by referring to specific instances of conduct"). When a witness makes a false statement while providing testimony, the opposing party is allowed to prove that lie by presenting rebuttal witnesses. See United States v. Crockett, 435 F.3d at 1313 ("[W]hen a defendant makes a false statement during direct testimony, the prosecution is allowed to prove, either through cross-examination or by rebuttal witnesses, that the defendant lied as to that fact.").

It is "permissible impeachment to expose a witness's bias." United States v. Baldridge, 559 F.3d 1126, 1135 (10th Cir. 2009)(citing United States v. Abel, 469 U.S. 45, 51 (1984)). "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." United States v. Abel, 469 U.S. at 52. Thus, because bias is never collateral, "it is permissible to [prove bias] by extrinsic evidence." Montoya v. City of Albuquerque, No. CIV 03-0261 JB/RHS, 2004 WL 3426435, at *4 (D.N.M. May 18, 2004)(Browning, J.). The Tenth Circuit describes bias, based on its definition at common law, as "the relationship between a

---

to make clear that it applies only to extrinsic evidence of conduct offered for the purpose of proving character for truthfulness or untruthfulness." 28 Wright & Gold, supra § 6117, at 14 (supp. 2011).

witness and a party which might cause the witness to slant his testimony for or against the party."

United States v. Baldridge, 559 U.S. F.3d at 1135 (citing United States v. Abel, 469 U.S. at 52).[146]

## LAW REGARDING CUMULATIVE ERROR

The Tenth Circuit has instructed that, in conducting a cumulative error analysis, a court must determine whether "'the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error.'" Greig v. Botros, 525 F. App'x 781, 795 (10th Cir. 2013)(unpublished)(quoting United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir. 1990)).[147]  At the same time, "[c]umulative error analysis applies where there are two or more actual errors; it does not apply to the cumulative effect of non-errors." Moore v. Reynolds, 153 F.3d 1086, 1113 (10th Cir. 1998).  Accordingly, "[i]n a cumulative-error analysis,

---

[146]Prejudice is defined as "[a] preconceived judgment formed with little or no factual basis; a strong bias." Black's Law Dictionary 1229 (J. Garner ed., 9th ed. 2009).  See New Oxford American Dictionary 1378 (3d ed. 2010) ("[P]reconceived opinion that is not based on reason or actual experiences . . . dislike, hostility. . . .").  Bias is defined as: "Inclination; prejudice; predilection." Black's Law Dictionary, supra, at 183.  Although bias and prejudice in contemporary discourse may be used interchangeably, with courts and lawyers both asserting that one has bias for something and bias against, they historically have been and are often distinguished by saying that there may be "bias or prejudice." E.g., Nev. Comm'n on Ethics v. Carrigan, 564 U.S. 117, 123-24 (2011)(quoting 28 U.S.C. § 144, which makes "any 'personal bias or prejudice' a basis for recusal.").  Bias is associated more with an informed reason for favoring a person and prejudice with an uninformed hostility toward a class of persons.  Bias now appears to be all inclusive, covering prejudice, too, and prejudice covers bias if the preposition "for" follows.  The terms have thus apparently lost any distinction.

[147]Greig v. Botros is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored.  However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court concludes that Greig v. Botros, 525 F. App'x 781 (10th Cir. 2013)(unpublished), has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

we 'aggregate all errors found to be harmless and analyze whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'" United States v. Battles, 745 F.3d 436, 462 (10th Cir. 2014)(quoting United States v. Toles, 297 F.3d 959, 972 (10th Cir. 2002)).  "Thus, the defendant must prove that 'multiple non-reversible errors' infected her trial."  United States v. Battles, 745 F.3d at 462 (quoting United States v. Barrett, 496 F.3d 1079, 1121 (10th Cir. 2007)).  In conducting this analysis, courts must consider "whether the defendant's substantial rights were affected by the cumulative effect of the harmless errors." United States v. Toles, 297 F.3d at 972.  "Additionally, if any errors to be aggregated are constitutional errors, the government 'bears the burden of proving that the constitutional errors were harmless beyond a reasonable doubt'"  United States v. Battles, 745 F.3d at 462 (quoting United States v. Rivera, 900 F.2d at 1470 n.5).

## ANALYSIS

The Court concludes that the delayed disclosures that the Defendants identify did not violate the United States' discovery obligations under Brady or Giglio.  The Court also concludes that, even if the United States violated Brady or Giglio, dismissing the charges against the Defendants -- and thereby entering a de facto judgment of acquittal – is not the proper remedy. Further, the Court concludes that the United States' delayed disclosures in this case do not provide an outrageous government conduct defense to the First Trial Defendants.  Moreover, the Court concludes that a reasonable factfinder could have found the uncorroborated witness testimony credible and believable beyond a reasonable doubt.  Accordingly, the Court denies the Sanchez MTD, the Herrera MTD, the Perez MTD, the Sanchez NTM, the Herrera NTM, and the Baca NTM.

## I.    THE UNITED STATES' DELAYED DISCLOSURES DO NOT AMOUNT TO A DUE PROCESS VIOLATION UNDER BRADY OR GIGLIO.

"The Constitution, as interpreted in *Brady*, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 823.  Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." Brady, 373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682. See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010).  A "'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. at 682 (quoting Strickland v. Wash., 466 U.S. 668, 694 (1984)).  The Supreme Court has explicitly admonished lower courts, when considering alleged Brady violations, that "suppressed evidence" should be "considered collectively, not item by item." Kyles v. Whitley, 514 U.S. 419, 436 (1995).

"[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'" United States v. Burke, 571 F.3d at 1054 (quoting United States v. Young, 45 F.3d 1405, 1408 (10th Cir. 1995)).  Notably, "not every delay in disclosure of *Brady* material is necessarily prejudicial to the defense." United States v. Burke, 571 F.3d at 1056.  "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial." United States v. Burke, 571 F.3d at 1056.  The Tenth Circuit has held "that *Brady* is not violated when the *Brady* material is made available to defendants during trial." United States v. Scarborough, 128 F.3d 1373, 1376 (10th Cir. 1997)(internal quotation marks omitted)(quoting United States v. George, 778 F.2d 556, 561 (10th Cir. 1985)).  But see

United States v. Burke, 571 F.3d at 1054 ("It would eviscerate the purpose of the *Brady* rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial.").

The Court is not convinced that the delayed disclosures that the Sanchez MTD, the Herrera MTD, the Perez MTD, the Sanchez NTM and the Herrera NTM reiterate[148] significantly prejudiced the First Trial Defendants.  First, as to the Typed Notes' February 28, 2018, disclosure, the Court agrees that the corresponding January 302 does not contain the information which D. Sanchez identifies as exculpatory in the Sanchez MTD, specifically: (i) M. Rodriguez' note to Urquizo expressing M. Rodriguez'[149] desire that T. Martinez, Armenta, and J. Montoya kill Molina; (ii) M. Rodriguez' second note, stating that Molina would be killed that afternoon by T. Martinez, Armenta, and J. Montoya; and (iv) that Urquizo, M. Rodriguez, R. Martinez, and R.P. Martinez discussed killing D. Sanchez, because he failed to cover the cameras or participate in Molina's "hit."  Sanchez MTD at 2-3.  Compare January 302 at 1, with Typed Notes at 1-4. Most of this information, however, is in the March 302, which was disclosed to the First Trial

---

[148]The Sanchez NTM and the Herrera NTM base their miscarriage-of-justice arguments in part on the delayed disclosures of the Typed Notes and M. Rodriguez' box of personal property, which are first identified in the Sanchez MTD and the Herrera MTD, respectively.  The Court does not discuss the alleged Brady violation Baca raises in the Baca NTM in this section of the analysis, because it deals with a disclosure that was made after trial ended, and is thus unrelated to the disclosures with which the First Trial Defendants take issue in the Sanchez MTD, Herrera MTD, Perez MTD, Sanchez NTM, and Herrera NTM.

[149]As discussed later in this section, the Court concludes that D. Sanchez is misconstruing what the Typed Notes say.  D. Sanchez asserts that the Typed Notes states that "Mario Rodriguez passed Urquizo a note under the door that stated *his* desire to have Timothy Martinez, Jerry Armenta and Jerry Montoya do the hit on Molina."  Sanchez MTD at 2 (emphasis added).  The Typed Notes do not, however, say this statement, but, rather, states that "RODRIGUEZ's note also stated *the* desire to have Timothy MARTINEZ, Jerry Montoya and Jerry ARMENTA do the hit on MOLINA."  Typed Notes at 3 (emphasis added).  The Typed Notes do not provide that this desire was M. Rodriguez' desire.  See Typed Notes at 3-4.

Defendants in early January, 2018.[150]  For instance, the Typed Notes contains statements regarding

communications between Urquizo and M. Rodriguez before the Molina murder:

---

[150]Whether the March 302's disclosure in early January, 2018, was timely is a separate issue that the First Trial Defendants do not raise.  The United States asserts that it disclosed the March 302 as part of its Jencks Act disclosure "weeks before trial even began."  MTD Response at 13 & n.4.  According to the United States, "the Jencks Act doesn't require disclosure of Jencks information until after the witness testifies at trial."  MTD Response at 13 n.4.  It does not necessarily follow, however, that the United States provided the March 302 to the Defendants "weeks before it was required," MTD Response at 13 n.4, because "[i]t is an open question in this circuit, and there is a conflict among the circuits, as to timing of disclosure of witness statements subject to the Jencks Act that also meet the *Brady* criteria,"  United States v. Lujan, 530 F. Supp. 2d at 256.

The Court, however, addressed that issue at its October 4, 2016, hearing.  See Oct. 2016 Tr. at 23:10-19 (Court)(simultaneously permitting the United States to delay its production of Jencks Act material until fourteen days before trial but requiring the United States "to produce the Brady material promptly, immediately").  The Court's resolution of that issue -- "I am going to require early Brady review of these materials by the Government," Oct. 2016 Tr. at 23:14-15 (Court) -- contradicts the Jencks Act's text:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a government witness or prospective Government witness (other than the defendant) shall be the subject of subpena [sic], discovery, or inspection until said witness has testified on direct examination in the trial of the case.

18 U.S.C. § 3500(a).  See Palermo v. United States, 360 U.S. 343, 353 n.11 (1959)(commenting that the Jencks Act "as interpreted does not reach any constitutional barrier," and "is obviously a reasonable exercise of power over the rules of procedure and evidence.").  The Court's determination regarding the interaction of the Jencks Act and Brady is, however, consistent with the Department of Justice's standard practices.  See David W. Ogden, Deputy Attorney General, Criminal Resource Manual § 165 (2010)("Exculpatory information, regardless of whether the information is memorialized, must be disclosed to the defendant reasonably promptly after discovery.").  See also id. (stating that the federal prosecutors' duty to search for impeachment and exculpatory information extends to "information prosecutors are required to disclose under rules 16 and 26.2 of the Federal Rules of Criminal Procedure and the Jencks Act).

The tension between the Court's ruling and the Jencks Act is unsurprising, because conflict between Brady and the Jencks Act, as construed by the Supreme Court, is inevitable.  Soon after Congress adopted the Jencks Act, the Supreme Court interpreted its discovery limitations broadly:

> To be sure, the statute does not, in so many words, state that it is the exclusive, limiting means of compelling for cross-examination purposes the production of statements of a government witness to an agent of the Government.  But some things too clearly evince a legislative enactment to call for a redundancy of

RODRIGUEZ passed URQUIZO a note under the door, which also asked if he had the MOLINA paperwork or the MONTOYA paperwork. RODRIGUEZ's note also stated the desire to have Timothy MARTINEZ, Jerry MONTOYA and Jerry

---

utterance.

Palermo v. United States, 360 U.S. at 350. That reading of the Jencks Act renders entirely undiscoverable statements made by prospective witnesses who do not actually testify, see 18 U.S.C. § 3500(b)(requiring -- and permitting -- discovery only after a witness testifies), as well as witness statements that fail to satisfy the Jencks Act's restrictive definition of the term "statement," compare 18 U.S.C. § 3500(e)(stating that Jencks Act statements include only written statements, contemporaneous and substantially verbatim recordings of oral statements, and statements made to a grand jury), with Fed. R. Evid. 801(a)("'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion.").

It does not tax the judicial imagination to craft examples in which "there is a reasonable probability that, had" a prospective witness's oral statement that was not recorded substantially verbatim "been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682. Similarly, complying with the Jencks Act's provisions regarding disclosure timing -- i.e., "[a]fter a witness called by the United States has testified on direct examination," 18 U.S.C. § 3500(b) -- violates Brady "when an 'earlier disclosure would have created a reasonable doubt of guilt,'" United States v. Burke, 571 F.3d at 1054 (quoting United States v. Young, 45 F.3d at 1408). The Jencks Act's statement that trial courts "may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial," does not necessarily avert clashes between Brady discovery and Jencks Act timing. 18 U.S.C. § 3500(c). While a recess permits a defendant to prepare to use a witness' statement on cross examination, it cannot address situations, for example, where a defendant stipulates -- or concedes in an opening statement -- a fact that a subsequently disclosed Jencks Act statement casts into doubt.

While the Court cannot disagree with the Supreme Court's determination that Congress reasonably exercised its power to proscribe procedural rules when it adopted the Jencks Act, see Palermo v. United States, 360 U.S. at 353 n.11, procedural rules -- reasonable or otherwise -- must yield to constitutional ones, see, e.g., Crawford v. Washington, 541 U.S. 36, 61 (2004)(Scalia, J.)("Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence . . . ."); id. at 52 ("Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices."). Brady and its progeny are rooted in the Due Process Clause, see Brady, 373 U.S. at 87, so the discovery requirements they impose trump the Jencks Act's discovery restrictions where the two conflict.

Thus, if the March 302 is materially exculpatory evidence, under Brady, it should have been disclosed to the Defendants soon after it was created and not weeks before trial. If the March 302 is instead material impeachment evidence under Giglio -- vis-à-vis particular witnesses -- the United States should have disclosed it to the Defendants soon after the United States knew, with reasonable certainty, that it was going to call those witnesses. The parties have not argued this point, however.

ARMENTA do the hit on MOLINA, then they would hit MONTOYA afterward.

. . . .

RODRIGUEZ sent URQUIZO another letter saying MOLINA would be hit that afternoon, before URQUIZO came out of orientation lockdown. RODRIGUEZ said MONTOYA, ARMENTA and MARTINEZ were going to be tasked with the hit.  Daniel SANCHEZ was supposed to cover the camera.

Typed Notes at 3.  The March 302 contains substantially the same information:

RODRIGUEZ asked URQUIZO, via a note, if he had brought the paperwork on MOLINA and Jerry MONTOYA, aka: "JR."  RODRIGUEZ held the note up to the door.

. . . .

After receiving the paperwork, RODRIGUEZ showed it to Daniel SANCHEZ.  RODRIGUEZ then wrote URQUIZO a letter and sent it to him under the door.  RODRIGUEZ said that he and SANCHEZ were gonna have the pod move on MOLINA.  RODRIGUEZ explained the plan and apologized to URQUIZO about moving so quickly.

March 302 at 2-3.  The Typed Notes also contain information regarding SNM members'

dissatisfaction with D. Sanchez after the Molina murder:

Following the murder, URQUIZO, RODRIGUEZ, David CALB[E]RT, Robert MARTINEZ and Roy MARTINEZ talked about hitting Daniel SANCHEZ because he did not participate in the MOLINA homicide or even cover the camera like he was supposed to.  Plan was to hit SANCHEZ as soon as possible, but he was moved out of state.  They then discussed hitting SANCHEZ's brother (Ronald SANCHEZ) instead, but URQUIZO said it wasn't his fault and he shouldn't have to pay for SANCHEZ's violation.

Typed Notes at 4.  Again, the March 302 contains substantially the same information:

URQUIZO said that the SNM called a greenlight on Daniel SANCHEZ after the MOLINA hit because he failed to cover the camera and did not retrieve ARMENTA's shank after the hit.  The operation had been briefed and Daniel SANCHEZ failed to perform his duties.  According to URQUIZO, "a lot of brothers felt Dan wiped his ass with those guys."  Daniel SANCHEZ was transferred out of state on an interstate compact.  Leadership within the SNM discussed hitting Ronald SANCHEZ, since they couldn't get to Dan Dan.

URQUIZO was close with Daniel SANCHEZ and Ronald SANCHEZ. URQUIZO spread the word that Ronald was not to be hit, as he had done nothing

wrong.  Urquizo pointed out that Ronald was not even a carnal (SNM member) and should not be punished for the actions of failures of his brother.

March 302 at 4-5.  Accordingly, the only information in the Typed Notes to which D. Sanchez points that was not previously disclosed is that M. Rodriguez first passed Urquizo a note expressing the desire that T. Martinez, Armenta, and J. Montoya "hit" Molina, and passed Urquizo a second note stating that these three men were tasked with the "hit."  This information does not exculpate D. Sanchez and does not contradict the United States' theory that D. Sanchez helped organize Molina's homicide.  Contra Sanchez MTD at 2-3.  This information, at best, provides impeachment material of M. Rodriguez, because he testified that D. Sanchez chose T. Martinez, Armenta, and J. Montoya to act on Molina's "hit," whereas the Typed Notes could be read to indicate that M. Rodriguez wanted those three men to act on the "hit," although the Typed Notes are ambiguous as to whose desire M. Rodriguez expressed in the note by using "the" instead of naming who had the desire.  Compare Typed Notes at 3, with Feb. 7 Tr. at 179:7-180:23 (Armijo, M. Rodriguez).  The ambiguous nature of the previously undisclosed information lowers its impeachment value.

In addition, the late disclosure of this information did not significantly prejudice D. Sanchez.  The previously undisclosed information is not exculpatory and provides little, if any, impeachment value.  To the extent that the Typed Notes and March 302 differ in their details, providing impeachment material of Urquizo, D. Sanchez had the opportunity to present those inconsistencies to the jury, because he could have recalled Urquizo to cross-examine him, but D. Sanchez elected not to recall him.  Further, D. Sanchez cross-examined Urquizo about the notes he received from M. Rodriguez, and did not ask Urquizo what M. Rodriguez' plan was for Molina's murder, which, according to the March 302, the second letter contained, which could have led Urquizo to reveal some of the details provided in the Typed Notes.  See Feb. 5 Tr. at

151:20-154:2 (Jacks, Urquizo); March 302 at 3 ("RODRIGUEZ explained the plan and apologized to URQUIZO about moving so quickly."). D. Sanchez similarly did not recall M. Rodriguez. The Court therefore concludes that the United States' disclosure of the Typed Notes during trial did not materially prejudice D. Sanchez, and that an "earlier disclosure would [not] have created a reasonable doubt of [D. Sanchez'] guilt." United States v. Young, 45 F.3d at 1408.[151]

Similarly, even without access to the M. Rodriguez documents that the United States disclosed during trial, the First Trial Defendants had ample information with which to impeach M. Rodriguez and did extensively impeach him. First, as to Herrera's assertion that M. Rodriguez' journal and personal correspondence show that he lied when he said he did not have to register as a sex offender, the Court witnessed the First Trial Defendants extensively cross-examine M. Rodriguez on this issue, and elicited from him that he knew he would have to register as a sex offender as early as 2007. See Feb. 7 Tr. at 384:11-385:10 (Villa, M. Rodriguez); id. at 394:20-396:15 (Villa, M. Rodriguez); Feb. 8 Tr. at 214:9-215:3 (Jacks, M. Rodriguez); id. at 226:9-230:16 (Jacks, M. Rodriguez). To do the cross-examination on M. Rodriguez, the First Trial Defendants relied on M. Rodriguez' first petition for writ of habeas corpus, in which M. Rodriguez argued that he received ineffective assistance of counsel and requested that his plea deal for the sexual offenses be overturned, because counsel did not inform M. Rodriguez that he would have to register as a sex offender upon his release. See Feb. 8 Tr. at 227:15-228:23 (Jacks, M. Rodriguez). Although the letters and journal provide additional impeachment on this topic, it would have been needlessly cumulative and arguably inadmissible after M. Rodriguez admitted to knowing that he has to register as a sex offender. See Feb. 8 Tr. at 229:7-11 (Jacks, M. Rodriguez); Fed. R. Evid. 403

---

[151]None of the other First Trial Defendants joined the Sanchez MTD or otherwise provided how the Typed Notes' belated disclosure prejudiced them, which is why the Court discusses the Typed Notes only in relation to Sanchez.

("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence."). Accordingly, these letters and journal are not material. See United States v. Trujillo, 136 F.3d 1388, 1394 (10th Cir. 1998)("[A]n incremental amount of impeachment evidence on an already compromised witness does not amount to material evidence." (citing United States v. Derr, 990 F.2d 1330, 1336 (D.C. Cir. 1993))).

The First Trial Defendants also note M. Rodriguez' letters requesting discovery from the county clerk in an unrelated homicide, stating that he lied in the letters "in an effort to obtain paperwork concerning a co-defendant" while "testifying at trial that other people were responsible for providing the Molina paperwork at issue in this trial." Herrera NTM at 9. The Court read the one letter Herrera provides and does not see how it demonstrates that M. Rodriguez lied to get discovery material, and notes that the clerk knew that the case for which M. Rodriguez requested information was not his case. See Letter from Mario Rodriguez to County Clerk at 1 (dated November 19, 2014), filed October 15, 2018 (Doc. 2413-2). To the extent the letters contain false statements as the First Trial Defendants assert, the letters themselves are inadmissible as extrinsic evidence of M. Rodriguez' character for truthfulness, and they could only inquire of their alleged falsity through a witness. See Fed. R. Evid. 608(b). They asked Acee about these letters, which Acee admitted existed, but he did not know whether the letters requested information affecting M. Rodriguez' case or whether he falsely represented that the information affected his case. See Mar. 2 Tr. at 35:18-36:2 (Bhalla, Acee); id. at 89:1-22 (Jacks, Acee). The First Trial Defendants collectively asked Acee only one question -- compounded with another -- about the alleged false statements M. Rodriguez made in the letters, and they did not get a clear response:

> Q.     And in those letters, Mario Rodriguez falsely represented that he was trying to get the court materials because it affected his case?  Like his appeal, I think he said?
>
> A.     I have an idea what he was asking for, but I can't say if he -- he may have had an appeal.  He's certainly been arrested a lot of times.
>
> Q.     But the documents he was requesting had nothing to do with any sort of legal proceeding against him, did they?
>
> A.     I'm not sure.  It listed a cause number.  I just don't remember if it said a person's name related to that.

March. 2 Tr. at 89:7-19 (Jacks, Acee).  The First Trial Defendants did not press this line of questioning further or try to refresh Acee's recollection by showing him at least one of the letters, which would have shown that the case for which M. Rodriguez was requesting information was not his case.  See, e.g., Letter from Mario Rodriguez to County Clerk at 1.  The First Trial Defendants also could have recalled M. Rodriguez and questioned him about making such false statements, but chose not to.  Also, as previously stated, the First Trial Defendants substantially impeached M. Rodriguez.  Accordingly, these letters do not provide a new basis for impeachment and are not material.  See United States v. Cooper, 654 F.3d 1104, 1120 (10th Cir. 2011)("[W]here the credibility of a witness 'has already been substantially called into question in the same respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim.'"  (quoting Nuckols v. Gibson, 233 F.3d 1261, 1267 n.8 (10th Cir. 2000))).

The last evidence the First Trial Defendants note regarding M. Rodriguez is his SNM Gang Questionnaire, a form which they argue indicates that "the government provided the narrative it wished the informants to support by the way they formed their questions."  Herrera NTM at 9. They specifically take issue with question 106: "Javier Molina was killed in 2014 at the Southern New Mexico Correctional Facility by Jerry Armenta, Jerry Montoya, Mario Rodriguez, Timothy

Martinez, Anthony Baca, Mauricio Varela, Daniel Sanchez, Carlos Herrera, and Rudy Perez.  Why did this murder take place?"  SNM Gang Questionnaire at 6 (dated November 1, 2017), filed October 15, 2018 (Doc. 2413).  The New Trial Defendants assert that such questionnaires were disclosed on January 30, 2018 -- the day before opening statements -- and that this "late disclosure . . . prevented the presentation of a completely new line of defense, that the government provided the narrative it wished to present in the forms it provided to the government informants." Herrera NTM at 11.  See id. at 10.  The Court has examined the SNM Gang Questionnaire and does not read it as providing a narrative that the United States wished to present at trial or as suggesting the answers.  To the extent that the First Trial Defendants could have used the SNM Gang Questionnaire to suggest such assertions, this evidence would have been impeachment material and not exculpatory, as it highlights that the FBI knew the First Trial Defendants were involved in violent crimes in aid of racketeering and requested additional information -- not who participated, but, rather, what the participants said or why certain crimes occurred.  See SNM Gang Questionnaire at 5-7.  The First Trial Defendants received the SNM Gang Questionnaire before opening statements and before any of the witnesses took the stand, so they had opportunity to cross-examine any cooperating witness they desired about the SNM Gang Questionnaire.  Further, the First Trial Defendants briefly questioned Acee about the SNM Gang Questionnaire, which he said he prepared, and did not pursue this line of defense, although they noted some specific questions on the SNM Gang Questionnaire.  See Mar. 2 Tr. at 43:15-44:24 (Jacks, Acee).  This case is not one where the arguably impeachment information was withheld "until after the defense ha[d] committed itself to a particular strategy during opening statements."  United States v. Burke, 571 F.3d at 1054.  The SNM Gang Questionnaire was disclosed the day before the opening statements.  The Court therefore concludes that an earlier disclosure of the SNM Gang

Questionnaire would not have created a reasonable doubt as to the First Trial Defendants' guilt, and therefore it is not material. See United States v. Burke, 571 F.3d at 1054.

The next piece of late-disclosed evidence that the First Trial Defendants assert as exculpatory is a set of letters found in M. Rodriguez' box of personal property from T. Martinez' wife, Robin, to T. Martinez, stating that the cooperators' statements do not match the case's discovery. See Herrera NTM at 9; Mar. 2 Tr. at 34:12-35:2 (Bhalla, Acee); id. at 35:10 (Acee). Herrera provided one such letter to the Court, which, in the relevant portion, reads: "Yeah I would like to know what ole boy had to say -- But you already know that his version of the story DOES Not match up to the evidence or to every one [sic] elses [sic] statements!" Letter from Robin Martinez to Tim Martinez at 5 (dated October 23, 2015)(admitted at the December 17-18, 2018, hearing as Defendant's Exhibit A-Doc. 2413).[152] This evidence is not exculpatory and, at best, provides little additional impeachment material on the state defendants' story fabrication. The First Trial Defendants extensively impeached T. Martinez about the false statements that he provided J. Montoya in the state case. See e.g., Feb. 13 Tr. at 229:15-24 (Duncan, T. Martinez); id. at 236:24-8 (Duncan, T. Martinez); id. at 238:11-20 (T. Martinez, Duncan); id. at 247:16-251:19 (Duncan, T. Martinez); id. at 257:16-261:5 (Duncan, T. Martinez). They extensively impeached J. Montoya about fabricating narratives in the state Molina case. See, e.g., Feb. 12 Tr. at 375:13-376:10 (Fox-Young, J. Montoya); id. at 377:2-4 (Fox-Young, J. Montoya); id. at 21:16-20 (Jewkes, J. Montoya); Feb. 13 Tr. at 41:20-43:14 (Duncan, J. Montoya); id. at 47:2-4 (Duncan, J. Montoya). The First Trial Defendants also impeached Armenta with the story fabrication, showing that he tried to escape the charges by providing a story which did not match the video

---

[152]The letter as Bate-stamped is out of order, and page five, to which the Court cites, corresponds to Bate stamp 55725 and is the letter's third page, inclusive of the copy of the envelope. This single page of the letter is filed on the docket as document 2413-1.

evidence, see Feb. 9 Tr. at 149:14-19 (Jacks, Armenta); id. at 184:4-185:5 (Jacks, Armenta); Feb. 12 Tr. at 106:9-15 (Maynard, Armenta), and then discussing the story which Armenta provided to get J. Montoya out of the charges, see, e.g., Feb. 9 Tr. at 92:9-16 (Armenta).  Although M. Rodriguez was not impeached on this topic, because he denied involvement in the story's fabrication, see Feb. 8 Tr. at 197:9-20 (Jacks, M. Rodriguez); id. at 198:19-20 (M. Rodriguez), J. Montoya's and Armenta's testimonies contradicted M. Rodriguez' denial, because they said that M. Rodriguez told Armenta to take the blame for the murder, see Feb. 9 Tr. at 91:21-92:2 (Armenta); Feb. 12 Tr. at 127:1-15 (Fox-Young, Armenta); id. at 315:5-20 (Beck, J. Montoya); Feb. 13 Tr. at 21:24-22:13 (Jewkes, J. Montoya).  J. Montoya even testified about a letter that M. Rodriguez wrote which did not accurately portray J. Montoya's involvement in Molina's murder. See Feb. 13 Tr. at 79:9-25 (Beck, J. Montoya); id. at 80:8-10 (Beck, J. Montoya).  The letter from Robin Martinez to T. Martinez does not provide a new basis for impeachment, and "insignificantly impact[s] the degree of impeachment" on this topic, so it is not "sufficient to meet the . . . materiality standard."  Douglas v. Workman, 560 F.3d 1156, 1174 (10th Cir. 2009)(per curiam).  Further, the First Trial Defendants used the letter to elicit Acee's admission that Robin Martinez sent T. Martinez a letter that "specifically referenced the fact that certain individuals' statements that people had made, government witnesses had made, didn't match up with the discovery in the case." Mar. 2 Tr. at 87:23-1 (Jacks). See id. at 88:2 (Acee). See also id. at 34:12-2 (Bhalla, Acee); id. at 35:10 (Acee).  Accordingly, the Court concludes that the letter is not material.

The First Trial Defendants also assert that Acee's handwritten notes produced in early March, 2018,[153] are exculpatory, because they indicate that T. Martinez did not get along with Herrera and did not know how Herrera was involved in the murder. See Herrera MTD ¶ 12, at 2; Herrera NTM at 9. The notes provide: "[T. Martinez] unknown about how Carlos Herrera involved. Never got along." Handwritten Notes at 1 (undated), filed October 15, 2018 (Doc. 2413-3).[154] This information is not impeachment or exculpatory material. T. Martinez did not testify about Herrera's involvement in Molina's murder, and the parties did not contend at trial that T. Martinez knew how Herrera was involved. T. Martinez lived in blue pod whereas Herrera lived in yellow pod and there is no evidence T. Martinez was present when Herrera passed the "paperwork" to M. Rodriguez. Feb. 7 Tr. at 173:16-174:22 (Armijo, M. Rodriguez). See id. at Feb. 8 Tr. 143:22-144:12 (Jacks, M. Rodriguez); id. at 145:7-14 (Jacks, M. Rodriguez); id. at 351:20-24 (Armijo, M. Rodriguez). Although Herrera had the opportunity to ask T. Martinez whether he knew how Herrera was involved, he did not ask. As to the New Trial Defendants' assertion that these notes combined with the SNM Gang Questionnaire show that the United States told its witnesses what it wanted them to testify, the Court does not read these two pieces of evidence in this way. See Herrera NTM Reply at 6. Notwithstanding the Court's stance, the New Trial Defendants could have questioned Acee about the SNM Gang Questionnaire to figure out whether the answers were suggested, but they did not pursue this line of questioning despite having access to these pieces of evidence. Accordingly, Acee's handwritten notes are not material.

---

[153]The Herrera MTD asserts the notes were produced March 1, 2018, but the Herrera NTM asserts the notes were produced March 2, 2018. See Herrera MTD ¶ 11, at 2; Herrera NTM at 9.

[154]The United States posits that Acee took these notes at his December, 2016, interview with T. Martinez. See Herrera NTM Response at 11.

Further, the Perez MTD, which Baca joined, notes that the United States produced the documents from M. Rodriguez' box of personal property on February 28, 2017, and produced handwritten law enforcement notes on March 1, 2018.  See Perez MTD ¶¶ 7-8, at 1-2.  Although R. Perez asserts that having these documents earlier would have changed his trial strategy, and that many of these documents contain exculpatory and impeachment material, he does not cite to specific evidence or documents.  See Perez MTD ¶¶ 10-11, at 2.  The Court has discussed specific documents in these disclosures in the preceding paragraphs and concludes that these documents do not contain material evidence.  R. Perez bears the burden of proving that the late-disclosed evidence was favorable to the defense and material.  See, e.g., United States v. Williams, 576 F.3d 1149, 1163 (10th Cir. 2009)("To establish a Brady violation, the defendant must prove that the prosecution suppressed evidence, the evidence was favorable to the defense, and the evidence was material."  (citing United States v. Erickson, 561 F.3d 1150, 1163 (10th Cir. 2009))).  See Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 824 n.33 ("It is clear the defendant bears the burden of establishing a Brady violation."  (citations omitted)).  Simply stating that documents contain exculpatory and impeachment evidence is insufficient to meet this burden, especially without citing specific documents.  Accordingly, the Court concludes that the Perez MTD provides no Brady violation.[155]

---

[155]The United States posits that, of the documents in M. Rodriguez' box of property, "the most probative evidence for the Defendants was a letter from Rodriguez in which he provided statements about the Molina murder . . . that were inconsistent with his in-court testimony."  MTD Response at 20.  This letter was introduced at trial as Defendants' Exhibit FV on February 26, 2018.  See Feb. 26 Tr. at 203:2-4 (Court).  The First Trial Defendants used this letter during their examinations of Acee and Stemo, extensively impeaching M. Rodriguez by having Stemo note the inconsistencies between the letter -- which M. Rodriguez ostensibly wrote to clear J. Montoya of Molina's murder -- and M. Rodriguez' testimony about how the murder occurred.  See Feb. 27 Tr. at 345:15-353:6 (Villa, Stemo).  This letter, however, is almost identical to the Defendants' Exhibit FL, admitted at trial on February 13, 2018.  See Feb. 13 Tr. at 79:1-2 (Court).  The substantive difference between the two exhibits is that Defendants' Exhibit FL has two sentences scribbled

Last, examining the net effect of all this evidence does not provide a reasonable probability that an earlier disclosure would have raised a reasonable doubt of the Convicted First Trial Defendants' guilt.  See Kyles v. Whitley, 514 U.S. at 421-22; United States v. Young, 45 F.3d at 1408.  Most of the evidence contains cumulative impeachment information or information with an insignificant impact on impeachment, so the evidence's late disclosure is not material.  See United States v. Cooper, 654 F.3d at 1120; Douglas v. Workman, 560 F.3d at 1174.  None of the information that the First Trial Defendants note "would have created a reasonable doubt of guilt," United States v. Young, 45 F.3d at 1408, or would have made "the difference between conviction and acquittal," United States v. Burke, 571 F.3d at 1054, had it timely been disclosed.  Accordingly, the Court concludes that the United States' delayed disclosures of M. Rodriguez' property and agent notes did not violate Brady or Giglio.

Even if a Brady or Giglio violation occurred, the First Trial Defendants' requested relief in their motions to dismiss, "immediate dismissal of all charges," i.e., acquittals, Sanchez MTD at 8, would not be appropriate, because "a violation of due process under *Brady* does not entitle a defendant to an acquittal," United States v. Davis, 578 F.2d 277, 280 (10th Cir. 1978).  Further, "the district court has discretion to determine an appropriate remedy [for dilatory, prejudicial Brady compliance], whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial."  United States v. Burke, 571 F.3d at 1054).

---

out and the introductory phrase "Dear, to whom it may concern," and Defendants' Exhibit FV does not have those changes.  Compare Letter from Mario Rodriguez at 1 (dated October 16, 2014), admitted at trial as Defendants' Exhibit FL ("Exhibit FL"), with Letter from Mario Rodriguez at 1 (dated October 16, 2014), admitted at trial as Defendants' Exhibit FV ("Exhibit FV").  The United States and the First Trial Defendants impeached M. Rodriguez with Exhibit FL, see, e.g., Feb. 13 Tr. at 50:8-51:12 (Duncan, J. Montoya); id. at 79:9-25 (Beck, J. Montoya); id. at 80:8-10 (Beck, J. Montoya), so the nearly identical Exhibit FV does not provide new grounds for impeachment -- and the First Trial Defendants were able to use it to impeach M. Rodriguez -- and its late disclosure therefore does not violate Brady.  United States v. Cooper, 654 F.3d at 1120.

Assertions regarding the United States' culpability, see Sanchez MTD at 4; Herrera MTD ¶¶ 15-17, at 2-3, do not alter that conclusion, because "[t]he test [under Brady] generally doesn't fluctuate with the government's culpability."  United States v. Reese, 745 F.3d 1075, 1084 (10th Cir. 2014)(stating that Brady's purpose "is not to punish the misdeeds of the prosecutor, but to avoid an unfair trial").  Further, as discussed, the convicted Defendants have not established that, if they had possessed the late-disclosed information earlier and could have used it more effectively, there is a reasonable probability that they would have been acquitted.  The Court kept many of the United States' cooperating witnesses under charge, allowing the First Trial Defendants to recall these witnesses should they want to have them recalled; they chose not to recall these witnesses.  The Court therefore denies the Sanchez MTD, Herrera MTD, and Perez MTD.  The Court will address the Sanchez NTM and Herrera NTM miscarriage-of-justice arguments related to these disclosures in later sections.

## II.    THE UNITED STATES' DELAYED DISCLOSURES DO NOT CONSTITUTE OUTRAGEOUS GOVERNMENT CONDUCT REQUIRING ACQUITTAL.

The Sanchez MTD's assertions regarding outrageous government conduct likewise do not justify dismissing the charges against D. Sanchez, because the outrageous-government-conduct defense is an outgrowth of the Supreme Court's entrapment jurisprudence and not of its cases regarding the prosecution's discovery obligations.  In Sorrels v. United States, 287 U.S. 435 (1932), the Supreme Court recognized that entrapment is a defense to a federal criminal charge, because principles of statutory construction -- and not the federal Constitution or its amendments -- demand that result:

> The [Supreme] Court said: "All laws should receive a sensible construction.
> General terms should be so limited in their application as not to lead to injustice,
> oppression, or an absurd consequence.  It will always, therefore, be presumed that
> the legislature intended exceptions to its language, which would avoid results of
> this character.  The reason of the law in such cases should prevail over its letter."

. . . .

We think that this established principle of construction is applicable here. We are unable to conclude that it was the intention of the Congress in enacting this statute that its processes of detection and enforcement should be abused by the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them to its commission and to punish them. We are not forced by the letter to do violence to the spirit and purpose of the statute.

287 U.S. at 447-48 (quoting United States v. Kirby, 74 U.S. (7 Wall.) 482, 486-87 (1868)). In

Sherman v. United States, 356 U.S. 369 (1958), the Supreme Court reaffirmed the Sorrells v.

United States' analysis. Sherman v. United States, 356 U.S. at 372 ("The intervening years have

in no way detracted from the principles underlying that decision."). Sherman v. United States

expounded:

Congress could not have intended that its statutes were to be enforced by tempting innocent persons into violations.

However, the fact that government agents "merely afford opportunities or facilities for the commission of the offense does not" constitute entrapment. Entrapment occurs only when the criminal conduct was "the product of the *creative activity*" of law-enforcement officials. (Emphasis supplied.) See [Sorrells v. United States] 287 U. S. at pages 441, 451. . . . To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. The principles by which the courts are to make this determination were outlined in Sorrells. On the one hand, at trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an "appropriate and searching inquiry into his own conduct and predisposition" as bearing on his claim of innocence. See 287 U. S. at page 451 . . . .

Sherman v. United States 356 U.S. at 372-73 (italics and parenthesis in original). Sherman v.

United States stands, thus, for two propositions: (i) the entrapment defense is statutory and not

constitutional; and (ii) entrapment requires both law enforcement conduct that creates the offense

and an otherwise "innocent" offender. United States v. Sherman, 356 U.S. at 372-73. In United

States v. Russell, the respondent requested that the Supreme Court "adopt a rigid constitutional

rule that would preclude any prosecution when it is shown that the criminal conduct would not

- 531 -

have been possible had not an undercover agent 'supplied an indispensable means to the commission of the crime that could not have been obtained otherwise, through legal or illegal channels.'" United States v. Russell, 411 U.S. at 431 (quoting United States v. Russell, (No. 71-1585) 411 U.S. 429, Brief for the United States at 32  (1973)).  The Supreme Court was not willing, however, to constitutionalize the entrapment defense and, thus, declined to overrule Sorrells v. United States and Sherman v. United States.  See United States v. Russell, 411 U.S. at 430-31, 433.  The Supreme Court wrote that "the defense is not of a constitutional dimension," United States v. Russell, 411 U.S. at 433, but allowed that, "some day," it may face "a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction," United States v. Russell, 411 U.S. at 431-32 (citing Rochin v. California, 342 U.S. 165 (1952)).[156]

Outrageous government conduct thus entered the Supreme Court's lexicon, because it

---

[156]The Supreme Court wrote in Rochin v. California:

[W]e conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically.  This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents -- this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities.  They are methods too close to the rack and the screw to permit of constitutional differentiation.

. . . .  Due process of law, as a historic and generative principle, precludes methods that offend "a sense of justice."

. . . .  So here, to sanction the brutal conduct which naturally enough was condemned by the court whose judgment is before us, would be to afford brutality the cloak of law.  Nothing would be more calculated to discredit law and thereby to brutalize the temper of a society.

Rochin v. California, 342 U.S. at 172-74 (quoting Brown v. Mississippi, 197 U.S. 285-86 (1936)).

wanted to prop the constitutional door ajar for the narrow case where law enforcement tactics inducing a defendant to commit a crime "violat[e] that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." United States v. Russell, 411 U.S. at 432 (quoting Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 236 (1960)).  The Tenth Circuit has refined United States v. Russell's dicta regarding outrageous government conduct such that "a defendant asserting the outrageous governmental conduct defense bears the burden of proving either '(1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime.'" United States v. Dyke, 718 F.3d at 1288 (quoting United States v. Pedraza, 27 F.3d 1515, 1521 (10th Cir. 1994)). This burden is high, because the outrageous-government-conduct defense "is an extraordinary defense reserved for only the most egregious circumstances.  It is not to be invoked each time the government acts deceptively or participates in a crime that it is investigating.  Nor is it intended merely as a device to circumvent the predisposition test in the entrapment defense." United States v. Mosley, 965 F.2d 906, 910 (10th Cir. 1992)(citing United States v. Warren, 747 F.2d 1339, 1341-42 (10th Cir. 1984)(Holloway, C.J.)).  See United States v. Clonts, 966 F.2d 1366, 1369 (10th Cir. 1992)(stating that the outrageous-government-conduct defense "has been severely limited, and requires a defendant 'to establish that the police conduct is shocking to the universal sense of justice'"  (internal citation omitted)(quoting and citing United States v. Fadel, 844 F.2d 1425, 1429 n.3 (10th Cir. 1988))).

D. Sanchez has made no entrapment argument.  His complaints regarding the United States' discovery practices have nothing to do with creating or inducing the crimes he is accused of committing.  Supreme Court and Tenth Circuit precedent indicates that an outrageous government conduct defense exists, if at all, within entrapment's gravitational field.  As applied to

the United States' discovery obligations in a criminal case, a so-called outrageous government conduct defense is: (i) a restyled <u>Brady</u> or <u>Giglio</u> argument; (ii) an assertion that the United States' conduct -- notwithstanding compliance with <u>Brady</u> and <u>Giglio</u> -- violates "fundamental fairness, shocking to the universal sense of justice," <u>Kinsella v. United States ex rel. Singleton</u>, 361 U.S. at 246; or (iii) nothing more than a rhetorical flourish. The Sanchez MTD does not make out a <u>Brady</u> or <u>Giglio</u> violation, nor do its allegations regarding belated discovery shock the universal sense of justice, and rhetorical flourishes do not justify an "immediate dismissal" of D. Sanchez' charges. Sanchez MTD at 8. The Court denies the Sanchez MTD.

### III.    D. SANCHEZ, HERRERA, AND BACA ARE NOT ENTITLED TO A JUDGMENT OF ACQUITTAL, BECAUSE A REASONABLE JURY COULD FIND THEM <u>GUILTY BEYOND A REASONABLE DOUBT.</u>

In deciding a motion for a judgment of acquittal, the Court cannot assess witness credibility or weigh the evidence. See <u>Burks v. United States</u>, 437 U.S. at 16. The Court therefore examines the evidence in the light most favorable to the United States to determine whether a reasonable jury could find D. Sanchez, Herrera, and Baca guilty beyond a reasonable doubt. See <u>United States v. McKissick</u>, 204 F.3d at 1289 (quoting <u>United States v. Hanzlicek</u>, 187 F.3d at 1228). The convicted Defendants specifically assert that their convictions rest on the uncorroborated testimony of cooperating witnesses who expected benefits in return for their testimony and whose testimony regarding Molina's "paperwork" was unbelievable. Sanchez NTM at 18-24. The Court has carefully reviewed the record in this case, and concludes that a reasonable jury could find D. Sanchez and Herrera, guilty of Counts 6 and 7, and Baca guilty of Counts 6, 7, 9, and 10. The Court addresses each convicted Defendant in turn.

A.    **A REASONABLE JURY COULD, BASED ONLY ON THE EVIDENCE ADMISSIBLE AGAINST D. SANCHEZ AT TRIAL AND WITHOUT SPECULATION OR UNREASONABLE INFERENCES, FIND D. SANCHEZ GUILTY OF CONSPIRING TO MURDER AND MURDERING MOLINA.**

D. Sanchez asserts that the witnesses on which the United States relied to convict him -- Calbert, Urquizo, M. Rodriguez, Armenta, J. Montoya, T. Martinez, and B. Cordova -- are government informants and that promises of lenient sentences and dropped charges motivated these informants to testify for the government.  See Sanchez NTM at 18.  Supreme Court precedent forbids the Court from reassessing the credibility of witnesses in the context of a motion for acquittal.  See Burks v. United States, 437 U.S. at 16.  The jury has evaluated the credibility of these witnesses, and the Court defers to their evaluation of witness credibility.  See United States v. Brown, 50 F. App'x 970, 977 (10th Cir. 2002)(finding the trial court had applied the incorrect standard of review when it substituted its judgment of witness' credibility instead of relying on the jury's judgment).  This deference is required even if there is conflicting evidence, see United States v. Radcliff, 331 F.3d at 1157-58, as D. Sanchez alleges exists here, see Sanchez NTM at 22 (stating that "corroborating paperwork. . . was contradicted by NMCD operational records").

Moreover, the Court must draw all inferences in the United States' favor when considering acquittal post-conviction, see United States v. McKissick, 204 F.3d at 1289 (quoting United States v. Hanzlicek, 187 F.3d at 1239), and it is not in the United States' favor to infer that the witnesses' testimony lined up only because the witnesses collaborated on their story.  See Sanchez NTM at 19 (stating that the witnesses were able to "piece together a seemingly untruthful story implicating Mr. Sanchez" because they had "continuing access to the case discovery materials and to each other").  Further, there was sufficient evidence for a reasonable jury to find D. Sanchez guilty and to convict him.  See Grubbs v. Hannigan, 982 F.2d 1483, 1487 (10th Cir. 1993)(finding the

sufficiency standard to obligate the court to "accept the jury's resolution of the evidence as long as it is within the bounds of reason"); United States v. Parrish, 925 F.2d 1293, 1297 (10th Cir. 1999)(finding that the evidence necessary to support a verdict "need not negate all possibilities except guilt").  For example, the jury could have reasonably inferred D. Sanchez' uncontroverted status as a "llavero" for the blue pod and that the homicide occurred in the blue pod.  Feb. 9 Tr. at 32:9-17 (Castellano, Armenta).  See Sanchez NTM Response at 4.  Moreover, M. Rodriguez testified that D. Sanchez decided that the "hit" would occur in Molina's room, Feb. 7 Tr. at 181:19-182:7 (M. Rodriguez, Armijo), and that D. Sanchez wanted Molina to be stabbed, see Feb. 7 Tr. at 183:13-25 (Armijo, M. Rodriguez).  M. Rodriguez also testified that D. Sanchez wanted T. Martinez, Armenta, and J. Montoya to kill Molina, see Feb. 7 Tr. at 179:7-180:23 (Armijo, M. Rodriguez), and Urquizo testified that the murder occurred quickly under D. Sanchez' orders, see Feb. 6 Tr. at 94:8-11 (Villa, Urquizo).  Armenta similarly testified that D. Sanchez told him that Armenta and J. Montoya would be responsible for carrying out Molina's murder, and that D. Sanchez was tasked with disposing of the shank.  See Feb. 9 Tr. at 63:6-7 (Armenta); id. at 81:8-12 (Castellano, Armenta).  Furthermore, B. Cordova testified that, shortly before the murder, D. Sanchez asked him for a shank.  See Feb. 23 Tr. at 228:12-16 (Jacks, Cordova).  There was, therefore, sufficient evidence, when viewed in the light most favorable to the United States, for a reasonable jury to infer guilt and convict D. Sanchez.  Thus, no miscarriage of justice occurred.

   **B.    A REASONABLE JURY COULD, BASED ONLY ON THE EVIDENCE ADMISSIBLE AGAINST HERRERA AT TRIAL AND WITHOUT SPECULATION OR UNREASONABLE INFERENCES, FIND HERRERA GUILTY OF CONSPIRING TO MURDER AND MURDERING MOLINA.**

   Herrera  joins D. Sanchez' motion to grant acquittal on the basis that the United States relied "exclusively" on cooperating witnesses' testimony to support the conviction.  Herrera NTM at 1 (joining Sanchez' motion); Sanchez NTM at 16.  The Court must defer to the jury's

assessments of credibility and conflicting evidence, see Burks v. United States, 437 U.S. at 16, draw all inferences in the light most favorable to the United States, see United States v. McKissick, 204 F.3d at 1289 (quoting United States v. Hanzlicek, 187 F.3d at 1239), and then decide whether a reasonable juror could have found the defendant guilty beyond a reasonable doubt, see United States v. McKissick, 204 F.3d at 1289. As the Court discussed above, the Court concludes that, when drawing all inferences in the light most favorable to the United States, a reasonable factfinder could have found the cooperating witnesses had a unified story, because their story is the truth and not because they collaborated.

There was sufficient evidence for a reasonable jury to infer guilt and convict Herrera. For example, several witnesses testified that Herrera was a "llavero" and leader of the yellow pod. Feb. 2 Tr. at 145:23-25 (Beck, Rubio); Feb. 5 Tr. at 261:8-12 (Beck, Urquizo); Feb. 7 Tr. at 137:5-6 (M. Rodriguez); Feb. 9 Tr. at 110:20-111:12 (Castellano, Armenta); Feb. 16 Tr. at 238:7-16 (Castellano, R.P. Martinez). Moreover, Urquizo testified that Herrera provided him with Molina's "paperwork," Feb. 5 Tr. at 249:17-23 (Beck, Urquizo), and that, after Molina's murder, Herrera told Urquizo to get rid of the "paperwork," Feb. 5 Tr. at 250:25-251:12 (Beck, Urquizo). Rubio also testified that Herrera told him that he ordered Molina's murder. See Feb. 2 Tr. at 154:12 (Rubio). Armenta testified that Herrera decided to send Armenta and J. Montoya to complete the "hit," because they had not yet "earned their bones." Feb. 9 Tr. at 109:10 (Armenta). See id. at 108:25-109:19 (Castellano, Armenta). Furthermore, B. Cordova testified that Herrera told him the assailants in Molina's murder "could have done better," Feb. 23 Tr. at 28:10-21 (Castellano, Cordova), that Herrera was "conflicted" about the Molina murder, and that Herrera "knew he should have waited," because SNM members were "trying to get . . . back out to the prison population," Feb. 22 Tr. at 227:5-15 (Cordova). In addition, Herrera errs in asserting that the notes

from T. Martinez' conversation with Acee, which state that T. Martinez did not know "how" Herrera was involved in the Molina murder, conflict with T. Martinez' account of Herrera's involvement in the Molina murder. Herrera NTM at 9 (citing Notes from Agent Stemo, produced March 2, 2018 (Doc. 2413-C)). Drawing inferences in the United States' favor, the Court concludes that a reasonable juror could have inferred that Martinez did not mean that Herrera did not participate in the murder, but that he did not know in what ways Herrera participated in the murder. Nevertheless, several other witnesses testified to Herrera's involvement in Molina's murder. There was, therefore, sufficient evidence, when viewed in the light most favorable to the United States, for a reasonable jury to infer guilt and convict Herrera. Thus, no miscarriage of justice occurred.

### C.   A REASONABLE JURY COULD, BASED ONLY ON THE EVIDENCE ADMISSIBLE AGAINST BACA AT TRIAL AND WITHOUT SPECULATION OR UNREASONABLE INFERENCES, FIND BACA GUILTY OF CONSPIRING TO MURDER AND MURDERING BACA.

Baca joins D. Sanchez' NTM. See Baca NTM at 1. The Court must defer to the jury's assessments of credibility and conflicting evidence, see Burks v. United States, 437 U.S. at 16, draw all inferences in the light most favorable to the United States, see United States v. McKissick, 204 F.3d at 1289 (quoting United States v. Hanzlicek, 187 F.3d at 1239), and then decide whether a reasonable juror could have found the defendant guilty beyond a reasonable doubt, see United States v. McKissick, 204 F.3d at 1289. As the Court discussed above, the Court finds that, when drawing all inferences in the light most favorable to the United States, a reasonable factfinder could have found the cooperating witnesses had a unified story, because their story is the truth, and not because they collaborated on the story. Moreover, Baca errs in asserting that "[s]ubstantial evidence existed that Martinez and [M.] Rodriguez had previously colluded to manufacture evidence, and Rodriguez's telephone call with his mother is substantial evidence that they did so

again in concocting [M.] Rodriguez's testimony against Mr. Baca to 'match up to' Martinez's statements." Baca NTM at 9 (quoting Mrs. Martinez' Letter at 5). M. Rodriguez stated in his initial debrief that, at the time of his phone call with his mother, he did not yet know if Baca wanted Molina killed. See Baca NTM Response at 4. Thus, his telephone call is not inconsistent with his first debrief and does not show that M. Rodriguez concocted his testimony against Baca. See Baca NTM Response at 5.

There was sufficient evidence for a reasonable jury to infer guilt and convict Baca. Multiple witnesses testified that Baca is SNM's leader. See Feb. 5 Tr. at 201:18-20 (Beck, Urquizo); id. at 202:10-12 (Beck, Urquizo); Feb. 6 Tr. at 271:20 (Blanco); Feb. 7 Tr. at 25:5-7 (Armijo, M. Rodriguez); Feb. 12 Tr. at 310:20-23 (Beck, J. Montoya). Roark further testified that Baca "concede[d] that he could control the members of the SNM." Feb. 1 Tr. at 120:7-13 (Roark). Urquizo testified that Baca ordered a number of "greenlights," or orders to kill various individuals, including Rubio, Feb. 5 Tr. at 215:16-21 (Beck, Urquizo), Molina, see Feb. 5 Tr. at 232:24-233:20 (Beck, Urquizo), and Gomez, see Feb. 5 Tr. at 257:18-258:6 (Beck, Urquizo). Moreover, T. Martinez testified that Baca said that it would be nice to "hit" wardens to add to SNM's name. Feb. 13 Tr. at 207:4-19 (Armijo, T. Martinez). M. Montoya and Duran both testified that Baca wanted Marcantel killed, see Feb. 20 Tr. at 263:13-25 (Castellano, Montoya); Feb. 20 Tr. at 298:7-16 (Armijo, Duran), and Armijo and Duran both testified that Baca ordered for Santistevan to be killed, see Feb. 15 Tr. at 166:7-167:23 (Armijo, R. Martinez); Feb. 21 Tr. at 159:6-14 (Duncan, Duran). Furthermore, after a tape recording was played in the courtroom, Duran testified that Baca told him that he planned to enforce a "hit" on Javier Molina. Feb. 21 Tr. at 57:6 (Armijo, Duran). There is, therefore, sufficient evidence, when viewed in the light most favorable to the United

States, for a reasonable jury to infer guilt and convict Baca. Thus, no miscarriage of justice occurred.

## IV.    HERRERA IS NOT ENTITLED TO A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE UNDER RULE 33(A) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE.

Rule 33 of the Federal Rules of Criminal Procedure authorizes courts to grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Tenth Circuit has emphasized, however, that rule 33 "motions for a new trial based on newly discovered evidence are generally disfavored and should be granted only with great caution." United States v. Watson, 207 F. App'x 913, 913 (10th Cir. 2006)(quoting United States v. Gwathney, 465 F.3d 1133, 1143 (10th Cir. 2006)). Herrera argues that he is entitled to a new trial because of newly discovered evidence. See Herrera NTM at 1. Herrera contends that newly discovered evidence: (i) undermines B. Cordova's credibility by suggesting that he lied under oath about his past criminal activity; and (ii) reveals conversations between informants suggesting that some informants were motivated to lie under oath. See Herrera NTM at 1. Because the newly discovered evidence merely impeaches some informants' testimony, the Court concludes that there has been no miscarriage of justice and that Herrera is not entitled to a new trial.

### A.    THE NEWLY DISCOVERED EVIDENCE REGARDING BILLY CORDOVA'S TESTIMONY IS MERELY IMPEACHING AND THEREFORE DOES NOT ENTITLE HERRERA TO A NEW TRIAL.

Herrera argues that he has suffered a miscarriage of justice, because newly discovered evidence suggests that B. Cordova lied under oath about his past criminal activity. See Herrera NTM at 12-13 (stating that former pastors of the church did not corroborate B. Cordova's account of leaving a body at a church). To determine whether this newly discovered evidence merits a new trial, the Court has to conduct a five-step analysis. See United States v. Sinclair, 109 F.3d at 1531.

The Court quickly dispenses of its analysis of the first two elements of the newly discovered evidence test.  First,  the defendant must demonstrate that the newly discovered evidence was not discovered until after trial.  See United States v. Sinclair, 109 F.3d at 1531.  Herrera contends that he did not discover the 302 until June 25, 2018.  See Herrera NTM at 12.  The United States does not contradict the date of discovery.  See Herrera NTM Response at 14 (contradicting the 302's implications, but not the date it surfaced).  The Neale Investigation 302's date of entry is "06/25/2018."  Neale Investigation 302 at 1.  The Court concludes that the evidence was discovered after trial.  Second, something other than the defendant's lack of due diligence must have caused the evidence to be newly discovered.  See United States v. Sinclair, 109 F.3d at 1531.  The Court concludes that the 302's June 25, 2018, entry, and not Herrera's lack of due diligence, delayed the date of discovery.

Herrera does not, however, meet the test's third element -- that the newly discovered evidence is more than merely impeaching.  Herrera contends that newly discovered evidence from the 302 undermines B. Cordova's credibility.  Undermining a witness's credibility is, however, the definition of impeachment.[157]  Herrera discusses the newly discovered evidence's importance only in the context of  "Mr. Cordova's willingness to lie. . . ," not in the context of demonstrating that B. Cordova's was lying about this case.  Herrera NTM at 13.  See Jan. 31 Tr. at 58:21-59:17 (Fox-Young)(stating that B. Cordova was motivated "to say anything in order to get a deal").  Moreover, although the Court may "consider the credibility of witnesses in determining whether the verdicts contrary to the weight of the evidence," United States v. Evans, 42 F.3d at 593, it is primarily the jury's job to assess the defendant's credibility, see Herrera NTM Response at 14.

---

[157] Definition of Impeach, Black Law's Dictionary (11th ed. 2019)(defining impeach as "[t]o discredit the veracity of (a witness)").

The jury was able to consider B. Cordova's several admissions of lying when weighing his credibility.  See Feb. 22 Tr. at 282:5-283:17 (Cordova)(stating that he "lied" to his wife that the federal government threatened to give him the death penalty or a life sentence unless he cooperated); Feb. 22 Tr. at 283:17-25; 284:18-19 (responding affirmatively to the question whether he lied to his mother that part of his deal with the federal government was that they would not prosecute her); Feb. 22 Tr. at  396: 4-5 (admitting that he "probably wasn't being truthful with [his] wife").   If the jury concluded B. Cordova was credible, they did so with knowledge that he had motivation to lie and had admitted lying several times.  The Court thus concludes that the newly discovered evidence is merely impeaching, and that the evidence does not weigh heavily against the jury's verdict.

B. Cordova's testimony was not inadmissible opinion testimony.  B. Cordova is permitted under rule 701(a) to give testimony based on his "perception."  Fed. R. Evid. 701(a).  B. Cordova's testimony was based on his firsthand knowledge and observation of his experiences with SNM as a long-time member of that organization, not "'scientific, technical, or other specialized knowledge within the scope of Rule 702.'"  Reply to Herrera NTM at 14 (quoting  Fed. R. Evid. 701(a), (b), (c)).   When Herrera objected to B. Cordova's testimony as opinion or speculation, the Court instructed the attorneys to "make sure we ask questions so that the defendants can object and make sure that it doesn't become a narrative,"[158] and instructed B. Cordova to "couch" his testimony in "his understanding." Jan. 31 Tr. at 452: 21-22 (Court).   B. Cordova was permitted to give his

---

[158]Herrera references three exchanges in his NTM as examples of Cordova's improper witness testimony.  See Herrera NTM at 14.   The second exchange occurs immediately after the Court instructs attorneys to "make sure we ask questions so that the defendant can object," but Herrera did not object to this question or response.  After Ms. Bhalla objects to the third exchange, the Court overrules the objection and suggests that Ms. Bhalla "take it up on cross," which Ms. Bhalla does not do.  Jan 31 Tr. at  178:22-797.

firsthand knowledge of his years of experience and the Court encouraged and handled objections to his testimony.

### B. THE NEWLY DISCOVERED EVIDENCE REGARDING A CONVERSATION BETWEEN ACEE AND J. MARTINEZ DOES NOT SUPPORT A NEW TRIAL FOR HERRERA.

Herrera argues that he has suffered a miscarriage of justice, because newly discovered evidence suggests that government informants in the case were lying. Herrera points to a conversation between Acee and an informant, J. Martinez. In the conversation, which occurred on April 4, 2018, Martinez told Acee that, given the jail's strict security, it would have been impossible for him to pass "paperwork" to another inmate as the United States argued at trial. Herrera NTM at 15. J. Martinez also suggested to Acee that SNM gang members who were working as informants for the government were attempting to bring others down along with themselves. See Herrera NTM at 15. Herrera argues that the conversation between Acee and J. Martinez "tends to prove" that the informants on which the United States relied were making up evidence. Herrera NTM at 15.

This newly discovered evidence does not prove that Herrera suffered a miscarriage of justice. J. Martinez' commentary on the state of mind of the United States' informants would merely serve to impeach these witnesses, and "a court cannot grant a new trial on the discovery of new impeachment evidence." United States v. Rodella, No. CR 14-2783 JB, 2015 WL 711931, at *33 (D.N.M. Feb. 2, 2015)(Browning, J.)(citing United States v. Sinclair, 109 F.3d at 1531). J. Martinez' statements denying involvement in passing "paperwork" are neither material to Herrera's conviction nor are they "of such a nature that in a new trial [they] would probably produce an acquittal." United States v. Sinclair, 109 F.3d at 1531. J. Martinez provided an alternate source of the Molina "paperwork" in his conversation with Acee, United States Response

to Carlos Herrera's Motion for New Trial, filed November 30, 2018 (Doc. 2413-4), at 8, and this was already a small detail in the overall case against Herrera. In any event, J. Martinez had excellent reason to deny any involvement in the murders of F. Sanchez and Molina while speaking with an FBI agent who was investigating the murders. Nothing in the conversation suggests Herrera did not commit the crime for which he was convicted at trial.

## V.   THE INTEREST OF JUSTICE DOES NOT REQUIRE A NEW TRIAL FOR THE DEFENDANTS PURSUANT TO RULE 33(B) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE.

Under rule 33 of the Federal Rules of Criminal Procedure, the district court has discretion to grant a new trial if the interests of justice require one. See Fed. R. Crim. P. 33(a). See also United States v. Quintanilla, 193 F.3d 1139, 1146 (10th Cir. 1999). The Tenth Circuit has held, however, that "a motion for a new trial is not regarded with favor and should only be granted with great caution." United States v. Sinclair, 109 F.3d 1527, 1531 (10th Cir. 1997)(citing United States v. Chatman, 994 F.2d 1510, 1518 (10th Cir. 1993)). D. Sanchez, Baca, and Herrera argue that the interest of justice requires a new trial because of: (i) alleged violations of D. Sanchez' rights under the Confrontation Clause, see Sanchez NTM at 45; (ii) alleged violations of the Jencks Act by the United States, see Sanchez NTM at 40-42; Baca NTM Brief at 1-2; (iii) prejudicial publicity of the trial that biased the jury pool, see Sanchez NTM at 29-30; (iv) alleged violations of Baca's due process rights, see Baca NTM at 15-17; (v) the Court's exclusion of several hearsay and impeaching statements, see Herrera NTM at 16; and (vi) trial errors that cumulatively impaired D. Sanchez' and Herrera's ability to present a defense, see Sanchez NTM at 16-53; Herrera NTM at 8-18. The Court has carefully reviewed the record in this case, and concludes that the interest of justice does not require a new trial.

## A.    D. SANCHEZ IS NOT ENTITLED TO A NEW TRIAL FOR CONFRONTATION CLAUSE VIOLATIONS.

D. Sanchez argues that the introduction of R. Perez' testimony in R. Perez' lawyer's opening statement, Palomares' testimony, and the attempt to introduce evidence suggesting that R. Perez felt threatened to give up his walker all combined to violate the Confrontation Clause. See Sanchez NTM at 45. In opening arguments, R. Perez' counsel referred to R. Perez' statements to law enforcement officers investigating Molina's murder. R. Perez' counsel stated that "you will also hear from the Government's witnesses who investigated after Javier Molina died that Rudy had been threatened and that he would have been killed if he had tried to stop this from happening." Dec. 17 Tr. at 49:5-9. R. Perez' statements to investigators were generally testimonial, see United States v. DeLeon, 287 F. Supp. 3d 1187, 1252 (D.N.M. 2018)(Browning, J.), and were thus inadmissible against Defendants other than R. Perez without R. Perez' testimony. The opening statement did not, however, violate D. Sanchez' confrontation rights. The statement did not accuse anyone of a crime, and given the strength of the United States' case against D. Sanchez, the statement was, at most, harmless error.

R. Perez' statement to Palomares, the officer investigating Molina's homicide, does not directly implicate his co-Defendants, so introducing those statements at trial against R. Perez does not offend any Confrontation Clause rights. See Feb. 2 Tr. at 95:2-96:7 (Armijo, Palomares); Richardson v. Marsh, 481 U.S. at 208 (stating that a defendant's confession was admissible in a joint trial, because, as to the declarant's codefendant, "the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial"). See also United States v. DeLeon, 287 F. Supp. 3d at 1252 n.17. R. Perez was careful to avoid mentioning names to Palomares or otherwise incriminating anyone. See Feb. 2 Tr. at 95:2-96:7 (Armijo, Palomares). R. Perez' statement was also properly admitted with a limiting instruction when it was introduced

during trial.  See Feb. 2 Tr. at 96:15-20 (Court)("Ladies and gentlemen, these statements that Mr. Palomares is reciting that Mr. Perez made can only be used against Mr. Perez. They can't be used against any of the other three gentlemen in the courtroom. So it can only be used in your deliberations about Mr. Perez.").

R. Perez' attempt to rebut Palomares' testimony with additional testimonial statements did not violate the Confrontation Clause.  Importantly, R. Perez' efforts to introduce his own testimonial statements was only an "attempt."  Sanchez NTM at 47.  The Court sustained objections to two of R. Perez' lines of questioning that attempted to introduce these testimonial statements.  See Feb. 28 Tr. at 375:14-376:3; Mar. 1 Tr. at 34:22-23 (Court).  Because the testimonial statements were not admitted, D. Sanchez' confrontation right was not violated.

### B.     THE UNITED STATES DID NOT VIOLATE THE JENCKS ACT.

D. Sanchez and Baca aver that the United States' delayed disclosures run afoul of the Jencks Act.  See Sanchez NTM at 40-42; Baca NTM Brief at 1-2.  D. Sanchez' and Baca's Jencks Act violation arguments largely echo their Brady violation arguments.  D. Sanchez asserts that the United States violated the Court's order to produce Jencks Act material "no later than two weeks before trial," and that this late disclosure further violates the Jencks Act §§ 3500(a) & (e)(2).  See Sanchez NTM at 40-42.  D. Sanchez contends, however, that the United States did not disclose some of Stemo's notes from her interview with Urquizo until twenty-two days after Urquizo testified, when Stemo discovered a box underneath Sainato's desk containing evidence mostly pertaining to M. Rodriquez.  See Sanchez MTD at 1-2.  Baca similarly contends that the United States did not timely produce exculpatory and impeachment evidence as the Jencks Act requires. See Baca NTM Brief at 1-2.

"The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is 'in the possession of the United States' once that witness has testified." United States v. Lujan, 530 F. Supp. 2d at 1232 (quoting 18 U.S.C. §§ 3500(a)-(b)). The Jencks Act's purpose is "not only to protect Government files from unwarranted disclosure but also to allow defendants material usable for the purposes of impeachment." United States v. Smaldone, 544 F.2d at 460 (citing Palermo v. United States, 360 U.S. at 352). As this Court has noted, "statement" under the Jencks Act applies to a broad range of materials -- from "personal notes or investigative materials that Federal Bureau of Investigation" agents "may have created regarding an interview" with a witness, United States v. Fred, No. CR 05-801 JB, Order at 1, filed November 8, 2006 (Doc. 86), to FBI agents' 302s, see United States v. Tarango, 760 F. Supp. 2d 1163, 1167 (D.N.M. 2009)(Browning, J.)(citing United States v. Nevels, 490 F.3d 800, (10th Cir. 2007)). The Jencks Act mandates disclosure only after a government witness has testified:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

18 U.S.C. § 3500(a)(emphasis added). Accordingly, to comply with the Jencks Act's provisions regarding disclosure timing, the government need disclose a government witness' statements only "[a]fter a witness called by the United States has testified on direct examination." 18 U.S.C. § 3500(b).

The United States did not violate the Jencks Act. The Court has concluded that the United States properly disclosed the March 302, which contained a summary of the March 6, 2017, interview of Urquizo, in early January, 2018, as part of its Jencks Act disclosure. The text of the Jencks Act states that the government must disclose a government witness' statements only "[a]fter

a witness called by the United States has testified on direct examination." 18 U.S.C. § 3500(b).

See United States v. Rodella, 2015 WL 711931 at *43 (D.N.M. Feb. 2, 2015)(Browning, J.)("[U]nder the Jencks Act, the government is not required to disclose pre-trial, impeachment material concerning defense witnesses even if the impeachment material is exculpatory.'" (quoting United States v. Curtis, 951 F.2d 350, No. 91-5189 (6th Cir. Dec. 19, 1991)(per curiam)(unpublished)(table opinion))). Although Brady and Giglio may impose stricter requirements on when the United States must disclose exculpatory and impeachment evidence, the Jencks Act pertains only to statements made by witnesses who testify, and it requires disclosure only after witnesses testify. Nevertheless, the Court concludes that the March 302 provided all of the relevant information within Stemo's notes pertaining to her interview with Urquizo, see March 302 at 2-4, and the United States provided D. Sanchez and Baca the March 302 before Urquizo testified. Thus, the United States' timely disclosure of the March 302 did not violate the Jencks Act. This evidence was not suppressed or intentionally disclosed with delay, and the United States did not disclose any of this information earlier because it had concluded that the evidence was not exculpatory.

    As to the late disclosure of Stemo's discovery of a box containing M. Rodriguez' property, the Court concludes that this evidence was disclosed soon after Stemo's discovery and while the trial was still proceeding. Much of the information was irrelevant to the Trial 1 Defendants or was duplicative of evidence already presented. As noted above, the only new information in the these later-disclosed notes is that M. Rodriguez first passed Urquizo a note expressing the desire that T. Martinez, Armenta, and J. Montoya "hit" Molina, and passed Urquizo a second note stating that these three men were tasked with the "hit." The Court concludes that this information does not exculpate D. Sanchez and does not contradict the United States' theory that D. Sanchez directed

Molina's homicide.  As noted above, D. Sanchez cross-examined Urquizo about the notes he received from M. Rodriguez, but D. Sanchez did not ask Urquizo what M. Rodriguez' plan was for Molina's murder, which could have led Urquizo to reveal some of the details provided in Stemo's notes.  See Feb. 5 Tr. at 151:20-154:2 (Jacks, Urquizo); March 302 at 3 ("RODRIGUEZ explained the plan and apologized to URQUIZO about moving so quickly.").  To the extent that Stemo's notes contained any material possibly impeaching Urquizo's prior testimony, the United States allowed D. Sanchez the opportunity to recall and cross-examine Urquizo; however, like with M. Rodriguez, D. Sanchez elected not to recall Urquizo.  While this information was provided after Urquizo's testimony, it was nevertheless disclosed during trial, while the Defendants could have still used the information.  Thus, the information did not significantly prejudice D. Sanchez, who had the opportunity to recall and cross-examine Urquizo and M. Rodriguez.  Accordingly, the United States' disclosure did not violate the Jencks Act.

### C.    THE JURY POOL WAS IMPARTIAL.

The Court next addresses whether the statewide pretrial publicity of the case was (i) "so pervasive and prejudicial" as to bias the entire community's pool of potential jurors and (ii) had an effect on the jury selection process that was so "substantial" that it tainted the entire jury pool. Goss v. Nelson, 439 F.3d 621, 628 (10th Cir. 2006).  There are several reasons that the Defendants' newly minted argument about publicity does not carry water.

First, the Defendants infrequently complained about publicity, but every time that the Defendants raised publicity, the Court took the issue seriously, spent all the time necessary to address the issue, and largely resolved the issue without objection from anyone, because there was not an issue.

The Court sent out an extensive nineteen-page pretrial questionnaire that attorneys for all the parties jointly put together.  See Supplemental Jury Questionnaire for Trial 1 (mailed Nov. 27, 2017), filed Jan 10. 2019 (Doc. 2486)("Questionnaire").  The parties agreed on every question except for six questions, and the Court resolved all six objections about the questionnaire in the Defendants' favor.[159]  The questionnaire was not subtle about what this case involves:

> 56. . . .
>> a. Do you think if a person is brought to trial for being a member of a prison gang allegedly involved in crimes such as murder, assault, conspiracy, there must be some truth to the charges, and it is likely that person is guilty under law?
>
> . . . .

---

[159]The six questions to which the United States objected are:

43. Do you believe that a prison inmate is entitled to be presumed innocent until proven guilty if he is being prosecuted for committing a crime while in prison?

44. Have you ever been in a situation in which you felt like you, or someone you know, were in physical danger or feared being hurt or killed?

45. Have you, or anyone close to you, ever been threatened with a weapon, including a knife or firearm?

51. Please state your personal opinion about the following:
a. Hispanc men have been unfairly discriminated against by our criminal justice system.
b. Hispanic males commit most of the violent crime in New Mexico.
c. Hispanic males commit most drug offenses in New Mexico.
d. Hispanic males are more likely to participate in violent gangs in New Mexico.
e. Prison is not enough of a deterrent for Hispanic males engaging in drug crime and gang violence.

. . . .

68. [Do you agree that] gang member should be legally responsible for the criminal actions that other members commit on orders from the gang leaders.

72(b). Will you stand up for the right of every juror to vote their decisions in the manner they feel is appropriate, even if other jurors disagree with their "vote"?

58. If the charges are proven beyond a reasonable doubt, would you have any concerns about convicting the Defendant? Would you be in fear of retaliation if, after hearing the evidence and the instructions of the court, you came to a decision to vote guilty?

. . . .

This case involves allegations that members, prospects, and associates of Sindicato de Nuevo New Mexico / Syndicato de Nuevo Mexico ("SNM") were engaged in acts of violence and other criminal activity.

. . . .

67. In such a case, where there are allegations such as conspiracy to commit murder, murder, and drug trafficking, will you have difficulty keeping an open mind until you have heard all the evidence, the arguments of attorneys for both sides and the judge's instructions?

68. [Do you think a] gang member should be legally responsible for the criminal actions that other members commit on orders from the gang leaders[?]

. . . .

70. The prosecution will likely introduce into evidence graphic photographs and video recordings of the crimes charged that, as a juror, you would be required to view.  These photographs and records will not only show the location of the crime, but the traumatic injuries that the victims suffered.
> a. Knowing your own sensibilities, do you feel it is possible you would not be able to look at such photographs and video recordings at all, if they were part of the evidence?
> b. Do you think your reaction to such graphic images could be so strong as to affect your ability to listen to all the evidence and reach a fair and impartial decision whether guilty or not guilty, based on the entirety of the evidence presented in court and the judge's instructions on the law?

71. There may be evidence that victims in this case may be gang members.

Supplemental Jury Questionnaire for Trial 1 (mailed Nov. 27, 2017), filed January 10, 2019

(Doc. 2486)("Questionnaire").   The court sent this questionnaire to approximately 1500

prospective jurors.  Based on the jurors' answers to the three questions: qualifying, standard and

special, the parties agreed, without the need for a court decision, on approximately 200 of these prospective jurors. The parties no doubt based their decisions to excuse jurors on the jurors' answers to these questions.

The more important point for this analysis is  that, when the approximately seventy prospective jurors arrived at the courthouse on Monday, January 29, 2018, they knew a lot more about the case than most jurors even know about the case to be heard before they arrive at the courthouse. Specifically, the prospective jurors knew that (i): the case involved violence and gory or scary pictures; (ii) prison gangs; (iii) prison crimes; and (iv) specifically, SNM. See Questionnaire. Thus, if a juror was afraid of retaliation against the jury, they were afraid when they came to the courthouse.

When prospective jurors came to the courthouse, the clerk's office told them that they would be identified by numbers, not their names, and the clerk's office assured them this was for safety reasons and did not scare them. See Jan. 30 Tr. at 136:3-14 (Fink)(stating that the clerks' office gave them numbers "to protect [their] anonymity"); Jan. 30 Tr. at 170:24-25 (Apodaca)(stating the clerk's office gave them a number "for safety"). The Court determines that what the clerks said to this group was comforting, and that the Defendants cannot complain seriously about what the clerks' office said. What was unsettling to the jurors was that the Court used all the jurors' names. But the Defendants cannot complain about that practice, because the United States wanted the court to use numbers, not names, and the Defendants objected to such a practice. See Transcript of Combined Motions to Suppress and Daubert Hearings, 160:13-163:10 (taken Dec. 19, 2017), filed January 1, 2018 (Doc. 1608)(Bhalla, Court, Benjamin, Cooper, Lahann). The Court ruled in the  Defendants' favor, because -- even in Las Cruces -- the Court has always used names. Numbers are impersonal, and put up a barrier between the jury and the

parties. The Court needs to make the jury feel as comfortable as possible. Using a number every time is only reminding them that they are about to sit through an organized crime trial filled with violence. The Court agreed with the Defendants and used names. They can hardly complain now, and, if there were a new trial, the Defendants would ask for the same procedure and the Court would use the same procedure; there is no reason to grant a new trial if, on this score, the old and new trials would look the same.

Hence, the parties and the Court worked diligently to reduce the venire panel of approximately seventy to eighteen, eliminating many people who did not answer the questions in a way the Defendants liked, including about pretrial publicity. As a result, many people who knew too much about the case and/or who had formed impressions about the case from the pretrial publicity never came to the courthouse. Moreover, people who were afraid did not come to the courthouse.

After introductions and an inquiry into whether the length of the trial would pose special problems for the jury, the second overall topic the Court covered with the venire panel is what they knew about the case. The Court read a statement of the case that the parties prepared, which said:

> This is a criminal case brought by the United States government. Again, I'll introduce the lawyers here in a moment. I'll sometimes refer to the United States as the prosecution. The charges against the defendants, whom we'll introduce here in a moment, as well, are contained in the second superseding indictment. I will sometimes refer to the second superseding indictment as the indictment. There are four defendants who are charged in this matter, and all four are charged with a crime which is a type of racketeering charge. Specifically, the United States alleges that the defendants were members or associates of a racketeering enterprise known as Syndicato de Nuevo Mexico, or SNM. The four defendants are all presumed innocent, and I'll be emphasizing that a lot this morning as we talk about some of the questions on your questionnaire. . . . The defendants are charged as follows. The defendants Daniel Sanchez, Anthony Ray Baca, Carlos Herrera, and Rudy Perez have been charged in the indictment in Count 6 with violent crimes in aid of racketeering for conspiring to murder J.M., Javier Molina. These defendants have also been charged in the indictment in Count 7 with violent crimes in aid of racketeering for the murder of J.M., Javier Molina.

Defendant Anthony Ray Baca has been charged in the indictment in Count 8 with violent crimes in in aid of racketeering for conspiring to murder G.M., who is Gregg Marcantel. All defendants have pled not guilty to all of the respective charges and, again, are presumed innocent.

Jan. 29 Tr. at 74:3-76:21 (Court).

The Court then asked if anyone had heard or read anything about the case. There were eight jurors who indicated that they had heard or read something about the case, but two of those jurors heard about the case only because a family member had a connection to the case and not because of publicity. See generally Voir Dire Tr. 29-106, filed July 13, 2018 (Court, Compton)("Voir Dire Tr."). The Court brought each juror who said he or she had heard or read something about the case to the bench so that the Court could explore the issue exhaustively. See Voir Dire Tr. at 28:18-29:5; id. at 36:6-39:24; 44:9-45-20. The attorneys were able to determine exactly what each juror thought about pretrial publicity and its effect on that juror. Those jurors assured the parties and the Court that fear would not keep them from doing their duty, and that they would decide the case based on the evidence presented in court and in the context of the Court's instructions on the law, and not on the basis of anything outside of the courtroom, such as pretrial publicity.[160] See generally Voir Dire Tr. 37:21 – 38:5 (Court, Compton); 48: 4-19 (Court, Besson); 59:4-10 (Court, Hassell).

The jury was selected from the first 123 jurors brought to the court. Pretrial publicity was a non-issue with the full jury. Fear was similarly a non-issue. Ms. Jacks put on the record that two members of the jury were shaking and crying when they were seated. See Jan. 31 Tr. 3:23-4:4 (Jacks). When Ms. Jacks made this record, the Court immediately disagreed. See Jan. 31 Tr.

---

[160]Only two jurors who learned about SNM through publicity stated that they would not be able to be impartial. Both jurors cited, however, the fact that the Defendants were already in jail as the reason for their biases, which would mean that these biases would exist regardless of whether they encountered publicity. See Voir Dire Tr. 45: 8-15 (Court, Tighe); 78:10-22 (Beck, Billings).

4:5-5:8 (Court).  The Court had consulted with the Courtroom Deputy Clerk ("CRD") who had helped pick the jury and met with the jury following selection, and asked the CRD how the jurors were doing after selection.  See Jan. 31 Tr. at 4:5-15 (Court).  The CRD said that they were doing fine and were "a good bunch."  Jan. 31 Tr. at 4:19 (Court).  The first trial jurors were a great American jury.  They served cheerfully, without any expression of fear, and followed the Court's instructions.

One of the fundamental flaws with the Defendants' arguments is that they display a lack of understanding about news coverage in the state of New Mexico.  New Mexico is the fifth largest state -- as far as square miles -- in the country, behind Alaska, Texas, California, and Montana.  U.S. States by Size, World Atlas, https://www.worldatlas.com/aatlas/infopage/usabysiz.htm (last visited October 17, 2019).  There are different news markets in the state.  The Albuquerque television stations do not go into Las Cruces; the El Paso stations cover Las Cruces.  See e.g. CBS 4, https://cbs4local.com/ (last visited October 17, 2019)(stating that it "provides local news [for] . . . El Paso, Texas and Las Cruces, NM").  The Albuquerque Journal -- which is the state's largest newspaper but is still primarily a local newspaper -- is sold in convenience stores in Las Cruces, but Las Cruces has its own newspaper.  The Las Cruces hotel where the Court stayed during the two seven-week trials does not provide the Albuquerque Journal, but only USA Today.  As a result, when the Albuquerque Journal ran articles on the trial, and the Albuquerque television and radio stations reported those stories, a juror in Las Cruces would have had to go to a convenience store or gas station, and buy a paper to even be exposed to this news coverage.  One of the benefits of trying the case in Las Cruces was that the jurors were less exposed to the Albuquerque news stories about the case and that the El Paso television stations' interest in this Las Cruces trial was low or non-existent.  The Las Cruces Sun-News ran some stories, but again, if a person was staying in a

hotel, he or she had to go to a convenient store and buy the local paper -- something most out-of-towners do not do -- to even be exposed to the small-town articles.

The Court also frequently gave the following instruction: "You must not read or listen to news reports of the trial. Don't get on the internet and do any research for the purposes of this case." See e.g. Feb. 23 Tr. 340:17-20 (Court). At the beginning of the trial, after the jury was sworn in, the Court gave the following special instruction: "You must not read or listen to news reports of the trial. Again, don't go home and get on the internet and do any research for purposes of this case." Jan. 30 Tr. at 320:2-5 (Court); Feb. 26 Tr. at 228:12-15 (Court); Feb. 27 Tr. at 210:23-211:1 (Court); id. At 366:6-9 (Court); Mar. 1 Tr. at 150:6-14 (Court); Mar. 2 Tr. at 80:15-18 (Court); id. at 219:3-6 (Court). In its full instruction, the Court stated that "You must make your decision based only on the evidence that you saw and hear here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way." Final Jury Instructions, No. 4 at 5, filed March 5, 2018 (Doc. 1877). In addition, minutes before the jury retired to deliberate, the Court told it not to listen to any news reports about the case, the fourth time it had given such an instruction that day. Clerk's Minutes (taken Mar. 5, 2018, to Mar. 9, 2018), filed March 13, 2018 (Doc. 1931) There is no indication that the jury did not do what the Court intended it to do.

One of the reasons that the Defendants have been all over the map on how to play the fear card is that it does not cut in the Defendants' favor. If the jurors are afraid of the Defendants and SNM, and too afraid to do their job, they are likely to acquit and not to convict. In other words, fear is unlikely to hurt the Defendants.

Finally, the Court cannot praise the jury enough. They are great Americans. They gave up seven weeks of their busy lives, did everything the Court asked them to do, were respectful,

and were great to work with during the trial. The Court is confident that they were not too scared

to do their job or that they let publicity affect their work and decision in any way.

### D.    THE UNITED STATES DID NOT VIOLATE BACA'S DUE PROCESS RIGHTS WITH RESPECT TO THE RECREATION YARD RECORDS.

Baca argues that he is entitled to a new trial under either the California v. Trombetta

standard or the Arizona v. Youngblood standard. See Baca NTM at 15. Baca asserts that the

exculpatory nature of the recreation yard records was apparent before they were destroyed,

triggering the California v. Trombetta standard. See Baca NTM at 15-17. Alternatively, Baca

argues that, even if the recreation yard records were only potentially useful, the United States acted

in bad faith, thus satisfying the Arizona v. Youngblood standard for granting a new trial. The

Court concludes that the United States did not act in bad faith. The Court further concludes that

the recreation yard records' exculpatory nature was not apparent before they were destroyed,

rendering California v. Trombetta inapplicable. Accordingly, Baca is not entitled a new trial on

these grounds.

First, the Court observes that the Arizona v. Youngblood line of cases involve pre-trial

destruction of evidence rather than post-conviction destruction. See, e.g., Arizona v. Youngblood,

488 U.S. at 53–54; Illinois v. Fischer, 540 U.S. 544, 546-47 (2004)(discussing Arizona v.

Youngblood in the context of pre-trial destruction of evidence); United States v. Bohl, 25 F.3d

904, 906 (10th Cir. 1994)(describing the right laid out in Arizona v. Youngblood as one of "pretrial

access to potentially exculpatory evidence"); Ferguson v. Roper, 400 F.3d 635, 638 (8th Cir.

2005)("Youngblood does not apply to evidence not . . . destroyed until after trial"); Reyes v. Kelly,

2012 WL 2792174, *2 (E.D. VA 2012)(Hudson, J.). There is thus a distinction between evidence

undiscovered before trial and evidence unavailable to the defense due to the destruction by the

government. See Ferguson v. Roper, 400 F.3d at 638 (noting that evidence destroyed after trial

was "evidence <u>undiscovered</u> by the defense, not evidence <u>unavailable</u> to the defense" under <u>Arizona v. Youngblood</u> (emphasis in original)).  Accordingly, Baca lacks legal grounds to seek relief under <u>Arizona v. Youngblood</u>.

Second, even if <u>Arizona v. Youngblood</u> extends to post-conviction destruction, Baca has not demonstrated that the United States acted in bad faith.  Baca notes that the Court ruled that "the New Mexico Correction's Department records . . . are under the AUSA's control." Baca NTM at 13 (quoting Memorandum Opinion and Order at 106, filed February 8, 2017 (Doc. 907)).  On April 17, 2018, Baca "requested and obtained the first batch of Level VI recreation yard records covering the time period from September 13, 2011 to September 13, 2012." Baca NTM at 13.  On May 14, 2018, Baca "requested all recreation yard records from September 14, 2012 through March 6, 2014." Baca NTM at 13.  These requests were submitted directly to the NM Corrections Department.  <u>See</u> Baca NTM at 13.  On May 16, 2018, the NM Corrections Department's Office of General Counsel responded, informing Baca that the "NMCD normally only keeps records of this nature for three years" and that the "Department no longer has any responsive documents at this point."  Baca NTM at 13 (citing Email from Catherine Earl, IPRA Paralegal, to Marc M. Lowry at 1 (sent Wednesday, May 16, 2018) filed October 16, 2018 (Doc. 2423-10)).  This response perplexed Baca, who had recently received records from more than three years prior.  <u>See</u> Baca NTM at 13.  The United States asserts, however, that the email was a result of confusion or miscommunication between the NM Corrections Department's Office of General Counsel and the NM Corrections Department: the documents were designated for destruction because of contamination from "rodent droppings and urine," which "could pose a potential health hazard for those entering the room" where the records were kept, but had not yet been destroyed.  Response at 12. Because of this confusion, the NM Corrections Department did not inquire further as to the

records' status, believing they had already been destroyed. See Response at 12. The records were ultimately destroyed on May 18, 2018, unbeknownst to the Office of General Counsel and the United States. See Response at 12.

The Court concludes the United States has made an affirmative and credible showing of an absence of bad faith. Given that the United States' decision to take the case into federal court benefits the NM Corrections Department, because the NM Corrections Department cannot control SNM, the Court deemed, for discovery purposes, that the NM Corrections Department's documents are under the United States' control. See Memorandum Opinion and Order at 106, filed February 8, 2017 (Doc. 907). The reality was, however, that the Corrections Department retained possession and control of its records. "The mere fact that the government controlled the evidence and failed to preserve it[, however,] is by itself insufficient to establish bad faith." United States v. Richard, 969 F.2d 849, 853–54 (10th Cir. 1992). The Court further acknowledges that the United States should have been on notice that Baca sought the recreation yard records, as he had already requested them from an earlier date range. Baca has not established, however, affirmative misconduct on the United States' part rising to the level of bad faith. For the first month after trial, Baca submitted no IPRA requests concerning the recreation yard records. See Baca NTM at 12. Further, there were no communications between the United States Attorney's Office and the NM Corrections Department during the period in which the IPRA requests were filed and addressed, from April, 2018, through September, 2019. See Response at 12 (citing Affidavit of Jim Brewster ¶ 8, at 4 (taken November 15, 2018), filed November 30, 2018 (Doc. 2457-5). "[M]ere negligence on the government's part in failing to preserve such evidence is inadequate for a showing of bad faith." United States v. Bohl, 25 F.3d at 912. The United States' failure to preserve the recreation

yard records is, at worst, negligent, but does not rise to the level of bad faith.  See United States v. Bohl, 25 F.3d at 912.

Arizona v. Youngblood directs that Baca must demonstrate that the NM Corrections Department acted with bad faith.  This requirement relieves courts from undertaking "the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed."  California v. Trombetta, 467 U.S. at 486.  For this reason, the Supreme Court was "unwilling[. . .] to read the 'fundamental fairness' requirement of the Due Process Clause as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution."  Arizona v. Youngblood, 488 U.S. at 58. (citation omitted).

> [R]equiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.,* those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.

Arizona v. Youngblood, 488 U.S. at 58.  The United States' and the NM Corrections Department's failure to preserve evidence "of which no more can be said than it could have been subjected to tests, the results of which might have exonerated the defendant," does not amount to a due process violation "unless a criminal defendant can show bad faith on the part of the police."  Arizona v. Youngblood, 488 U.S. at 57.

Accordingly, because Baca does not show bad faith by the United States or the NM Corrections Department, his NTM on this point turns on whether the exculpatory value of the recreational yard logs would have been immediately apparent.  See United States v. Bohl, 25 F.3d at 910.  Under California v. Trombetta, evidence is "only constitutionally material when (1) its exculpatory value was 'apparent before the evidence was destroyed' and (2) it is 'of such a nature

that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" United States v. McIntosh, 573 Fed. App'x. 760, 762 (10th Cir. 2014)(unpublished)(quoting California v. Trombetta, 467 U.S. at 489). Evidence is unlikely to be apparently exculpatory when the defendants have "alternative means of demonstrating their innocence." Arizona v. Youngblood, 488 U.S. at 55.

The Court concludes that the recreational yard records' exculpatory value would not have been immediately apparent. Baca argues that the recreation logs could potentially contradict the Urquizo, M. Rodriguez, and Martinez' testimony that they discussed and planned the murders of Marcantel, Santistevan, and Molina. See Baca NTM at 12. In the NTM, Baca argues:

> During the trial, various cooperating witnesses for the United States, like Lupe Urquizo, Mario Rodriguez, and Timothy Martinez testified that they had conversations with Defendant Baca about the criminal allegations involving the conspiracy to murder Greg Marcantel, Dwayne Santistevan as well as Javier Molina. When pressed on the details of those conversations, the cooperating witnesses claimed that those conversations happened in the recreation yard at Level VI. Another cooperating witness, David Calbert, claimed that he obtained the Molina paperwork from Anthony Baca via Joe Martinez while both men were exercising in the Level VI recreation yard.

Baca NTM at 12. Baca does not cite to the record to support these assertions. See Baca NTM at 12.

There is not, however, any indication that the recreational yard logs "might be expected to play a significant role in the suspect's defense." California v. Trombetta, 467 U.S. at 488-89. Further, Baca has not shown that the absence of the recreational yard logs and videos "is so material that he could not receive a fair trial without [them]." United States v. Wilks, 629 F.2d at 675. The recreational yard logs and videos are more akin to the lemonade can in United States v. Wilks. In United States v. Wilks, the Tenth Circuit rejected a defendant's contention that the United States violated his due process rights when it destroyed a lemonade can which had

contained the heroin for which the defendant was being prosecuted.  See 629 F.2d at 674.  The defendant argued that fingerprint testing on the lemonade can could have corroborated another inmate's confession, which in turn would have further supported the defendant's version of events. See United States v. Wilks, 629 F.2d at 674.  The Tenth Circuit concluded that, although testing the lemonade can would have been "clearly material in the ordinary legal sense," it could not have conclusively proved the defendant's innocence and so was not constitutionally material, as Arizona v. Youngblood requires.  See United States v. Wilks, 629 F.2d at 674-75.  Here, the recreation yard logs could not have conclusively proven Baca's innocence and so are not constitutionally material.

The Court first addresses Baca's destruction complaint as it regards Counts 6 and 7. Urquizo testified that he and Baca initially discussed the "hit" on Molina in the recreational yard at PNM North. Fed. 5 Tr. at 232:24-233:20 (Beck, Urquizo).  Urquizo also testified, however, that the last time he spoke with Baca about Molina, Baca was in the Q pod at PNM North, and Baca spelled out the window to Urquizo, who was outside for recreation, "[d]on't forget that message. Take care of that," and "Javier Molina."  Feb. 5 Tr. at 234:8-9, 15 (Urquizo).  See id. at 233:24- 234:234:19 (Urquizo, Beck).  Further, it is undisputed that both M. Rodriguez and Martinez were incarcerated at Southern New Mexico in the same building when they received the "paperwork" on Molina. Feb. 7 Tr. at 152:1-9 (M. Rodriguez, Armijo). Additionally, the Court heard testimony that inmates at PNM North would have had overlapping recreation time and could have spoken with each other even if they were exercising in different yards.  See December 17, 2018, Motion Hearing Transcript at 295:25-296:4 (Armijo, Sapien), filed January 4, 2019 (Doc. 2479)("Dec. 17 Tr.").  Accordingly, the recreational yard logs would not have necessarily disproven Urquizo's testimony that Baca directed him to bring the Molina "paperwork" with him to Southern New

Mexico.  Further, even if the recreation yard records show that Urquizo and Baca were exercising in different yards, they still could have communicated with each other with "hand signals; they yell; talk back and forth."  Dec. 17 Tr. at 297:8-9 (Sapien).  Further, inmates who were in the recreation yard or who were being transported there could greet and communicate with inmates who were in still in their cells.  Dec. 17 Tr. at 302:8-16 (Sapien).  This ability means that, even if the recreation yard logs show Baca was in his pod while Urquizo was in the recreation yard, the two still could have communicated.  This conclusion is consistent with Urquizo's testimony that Baca, from his cell, spelled out the window to Urquizo, who was outside for recreation, "[d]on't forget that message.  Take care of that," and "Javier Molina."  Feb. 5 Tr. at 234:8-9, 15 (Urquizo).  See id. at 233:24-234:234:19 (Urquizo, Beck).  The best that can be said of recreation yard records, then, is that they might call into question whether Baca was in the same recreation yard and at the same time as Urquizo, but they could not conclusively prove that Baca did not direct Urquizo to bring the Molina "paperwork" to PNM South.  These records only serve to further impeach Urquizo, and "a court cannot grant a new trial on the discovery of new impeachment evidence."  United States v. Rodella, 2015 WL 711931, at *33.  Accordingly, the recreation yard records are not constitutionally material with respect to Counts 6 and 7.

The Court next addresses Baca's destruction complaint as it regards Counts 9 and 10.  Acee testified that, when Baca reached out to C. Garcia about which member on the streets would complete the "hit" on Marcantel, Acee told Duran to suggest M. Montoya and told M. Montoya to present himself as a viable candidate for the job.  Jan. 31 Tr. at 116:12-117:5 (Acee).  Duran also testified that he made "a lot of recordings" of Baca while they were housed next to each other.  See Jan. 31 Tr. at 123:20-24 (Castellano, Acee).  Marcantel testified that, after the Molina murder, Marcantel spoke to Baca, because the murder risked Marcantel's reform efforts and instilled fear

into the prison system.  See Feb. 1 Tr. at 210:5-211:4 (Beck, Marcantel).  Marcantel wanted Baca to know that "[y]ou can't kill people in the prison system."  Feb. 1 Tr. at 212:9-10 (Marcantel). M. Rodriguez testified that, when Baca returned from Colorado in October, 2015, Baca was housed in the cell below M. Rodriguez at PNM North; they could speak through the vents; and they discussed the Molina murder, and the planned "hits" on Santistevan and Marcantel.  Feb. 7 Tr. at 263:16-264:24 (Armijo, M. Rodriguez).  R.P. Martinez testified that Baca told him how he wanted to flip Level 4 upside down, because Baca was frustrated with it and believed it was full of informants, and that he was upset at always being locked up.  See Feb. 16 Tr. at 95:21-96:4 (Castellano, R.P. Martinez).  R.P. Martinez said that, because of this conversation, he and Duran agreed to "get it done" if they could, and that he believed Santistevan was the target for being responsible for SNM's movement.  Feb. 16 Tr. at 96:11 (R.P. Martinez).  See id. at 96:5-18 (Castellano, R.P. Martinez).  Accordingly, ample evidence supports the jury's conclusion with respect to Counts 9 and 10.  The recreation yard records would not have even impeached M. Rodriguez' claims that he spoke with Baca through the vents connecting their adjacent cells.

Arizona v. Youngblood's use of the term "apparent" and the phrase "potentially exculpatory value" suggest something more than a mere possibility of exculpation.  Baca argues that the recreation yard logs could possibly exonerate him by contradicting the testimony regarding conversations he had with other SNM members in the recreation yard.  See Baca NTM at 12. Having not established bad faith on the United States' part, however, Baca must demonstrate that the recreation yard records were patently exculpatory.  See United States v. Bohl, 25 F.3d at 910. Ample opportunity to cross examine a witness may negate the irreplaceability of evidence that may have contradicted that witness's testimony.  See United States v. Cayatineto, 49 F. App'x. 278, 282 (10th Cir. 2002)(unpublished).  Here, Baca cross examined each of the witnesses.

Contradictory recreation yard records "would not prove his innocence." United States v. Wilks, 629 F.2d at 674. Accordingly, the recreation yard records are not constitutionally material.

Because the United States has provided an innocent explanation for the destruction of the recreation yard records, and because the recreation yard records were not apparently exculpatory at the time they were destroyed, months after Baca's conviction, Baca has not met his burden under Arizona v. Youngblood and California v. Trombetta.

### E.   HERRERA WAS NOT HINDERED IN PRESENTING A DEFENSE BECAUSE OF THE COURT'S EXCLUSION OF HEARSAY AND IMPEACHMENT EVIDENCE RELATED TO COOPERATING WITNESSES.

Herrera argues the Court's evidentiary ruling and limiting instructions to witnesses hindered his ability to present a defense. Herrera NTM at 16. Specifically, Herrera contends that the United States introduced recorded statements Herrera made to informants that tended to implicate him, but "redacted and did not intend to present other recorded statements that tended to impeach his prior statements," or "tended to show the bias and motives of cooperating witnesses." Herrera NTM at 16. According to Herrera, "[t]he Court indicated that it was not going to permit Herrera's counsel to introduce evidence about statements made by Herrera because they were barred as hearsay, even if offered for impeachment purposes." Herrera NTM at 16. Moreover, Herrera contends that, during his cross-examination of M. Rodriguez, the Court precluded Herrera from asking questions to demonstrate M. Rodriguez' bias and instructed M. Rodriguez not to answer any questions which "tended to implicate some of the other co-defendants." Herrera NTM at 16 (citing Feb. 8 Tr. at 54:16-21 (Court, M. Rodriguez)).

The Court believes that its evidentiary rulings and limiting instructions were proper statements of the law. As to Herrera's request that his own hearsay statements be introduced for impeachment purposes, the Court has already ruled on the matter. The Court is not inclined to

reverse itself and allow introduction of Herrera's statements at a subsequent trial.

As to Herrera's request that he be allowed to introduce impeachment evidence of M. Rodriguez' bias against him, the Court will not reconsider its earlier rulings. Herrera already impeached M. Rodriguez on several other grounds implicating M. Rodriguez' bias against Herrera. The Court's limiting instructions were reasonable and in accord with the Federal Rules of Evidence. For example, some of the limiting instructions protected other defendants from the introduction of additional incriminating evidence. As the Tenth Circuit has recognized, "merely limiting the scope of cross-examination is a matter well within the trial judge's discretion and such an error 'will not lead to reversal unless an abuse of discretion, clearly prejudicial to the defendant, is shown.'" United States v. Rosario Fuentez, 231 F.3d 700, 704 (10th Cir. 2000)(quoting United States v. Valentine, 706 F.2d 282, 288 (10th Cir. 1983)). In sum, Herrera has not established that justice requires granting a new trial because he has not shown prejudicial error.

### F.  TRIAL ERRORS ALLEGED BY D. SANCHEZ AND HERRERA DO NOT AMOUNT TO "CUMULATIVE ERROR."

The Court next considers whether D. Sanchez and Herrera's alleged trial errors had a "cumulative effect on the outcome of the trial [] such that collectively they can no longer be determined to be harmless." United States v. Battles, 745 F.3d at 462 (quoting United States v. Toles, 297 F.3d at 972). After aggregating all of the errors asserted by D. Sanchez and Herrera, the Court concludes that these errors did not produce a cumulative effect that affected D. Sanchez' and Herrera's substantial rights. First, D. Sanchez argues that "the cumulative effect of the trial errors, prosecutorial misconduct, and provocative media coverage on the eve of trial created a trial environment where jurors were likely to convict Mr. Sanchez, regardless of whether the government proved the truth of the charges against him beyond a reasonable doubt." Sanchez NTM Reply at 5. D. Sanchez asserts a number of errors throughout trial which the Court has

deemed individually without merit or harmless, including: (i) the admission of evidence, presented at trial by the United States, that largely relied on testimony provided by government informants in exchange for potential leniency, see Sanchez NTM at 16-21; (ii) R. Perez and Herrera's admissions, which "directly incriminated" D. Sanchez and "create[d] such a strong impression in the minds of the jurors that they [were] unable to disregard them" while considering D. Sanchez' case, Sanchez NTM at 29-34; (iii) the withholding of exculpatory evidence by the United States until after the trial commenced in violation of Brady, see Sanchez NTM at 35-39; (iv) the United States' delay in producing requested materials, see Sanchez NTM at 39-44; (v) the admission of co-defendant R. Perez' out-of-court statements in violation of D. Sanchez' Sixth Amendment right to confront and cross-examine witnesses, see Sanchez NTM at 44-47; and (vi) statewide pretrial publicity that was pervasive and prejudicial, see Sanchez NTM at 47-53.

As discussed above, the Court concludes that each of these alleged errors is either without merit or harmless, and that their cumulative effect is likewise harmless. The Court oversaw several measures to ensure that D. Sanchez' substantial rights were not impaired. For example, the Court issued limiting instructions where appropriate, the "United States agreed to redact the recordings and transcripts at trial in order to avoid a two-jury scenario," Sanchez NTM Response at 9, and the "Court took steps to keep out [] inadmissible evidence," Sanchez NTM Response at 10. The Court concludes that the sum of these alleged errors is sufficiently harmless. Accordingly, D. Sanchez' alleged trial errors do not militate in favor of granting a new trial.

Second, the Court similarly concludes that Herrera's alleged trial errors did not cumulatively impair Herrera's substantial rights. Herrera urges the Court "to look at all of [the evidence] in a totality of the circumstances" framework. Dec. 17 Tr. at 211:19-21 (Bhalla). Herrera further contends that, "[w]hen you start looking at all of the evidence withheld and how it

all works in place together, . . . it becomes obvious how the trial strategy could have been wildly different and produced a very different result." Dec. 17 Tr. at 211:21-25 (Bhalla). Herrera asserts a number of errors throughout trial which the Court has deemed individually without merit or harmless, including: (i) the late disclosure of evidence, some of it exculpatory, after trial began, see Herrera NTM at 8-12; (ii) the admission of unreliable and inadmissible evidence, presented by the United States in the form of B. Cordova's testimony, see Herrera NTM at 12-14; (iii) newly discovered evidence allegedly showing that government informants had fabricated evidence, see Herrera NTM at 15; (iv) the Court's evidentiary rulings and limiting instructions, which prevented Herrera from introducing impeachment evidence and evidence of M. Rodriguez' bias, see Herrera NTM at 16-17; and (v) comments by the clerk's office that tainted the jury before the trial began, see Herrera NTM at 17-18.

The United States contends that there's no "cumulative error . . . if none of these [alleged errors] really amounts to error." Dec. 17 Tr. at 226:7-9 (Castellano). The Court agrees with the United States. As discussed above, the Court concludes that each of these alleged errors is either without merit or harmless, and that their cumulative effect is likewise harmless. As with D. Sanchez, the Court took several measures to ensure that Herrera's substantial rights were not impaired, such as issuing limiting instructions where appropriate. Furthermore, the Court agrees with the United States that the "cross-examination of [M.] Rodriguez, and the cross-examination of each cooperator, was robust. Each cooperating witness was impeached substantially, several times," Herrera NTM Response at 13, and nevertheless, Herrera does not explain how his trial strategy would have been different. The Court concludes that the sum of these alleged errors is sufficiently harmless. Accordingly, the Court will not grant a new trial.

**IT IS ORDERED** that: (i) Defendant Daniel Sanchez's Motion to Dismiss Case for

Government's Outrageous Misconduct and Irreparable Violation of Brady v. Maryland, filed March 1, 2018 (Doc. 1841), is denied; (ii) Defendant Carlos Herrera's Motion to Dismiss, or in the Alternative, for Mistrail [sic] Based on Repeated <u>Brady</u> and <u>Giglio</u> Violations, filed March 1, 2018 (Doc. 1842), is denied; (iii) Defendant Rudy Perez's Motion to Dismiss, filed March 1, 2018 (Doc. 1844), is denied; (iv) Defendant Daniel Sanchez's Motion for Judgment of Acquittal (FRCP Rule 29) or, in the Alternative, a New Trial (FRCP Rule 33), filed October 9, 2018 (Doc. 2408), is denied; (v) Defendant Carlos Herrera's Motion for New Trial and Notice of Joinder, filed October 15, 2018 (Doc. 2413), is denied; and (vi) Defendant Anthony Ray Baca's Motion for New Trial and Notice of Joinder, filed October 15, 2018 (Doc. 2421), is denied.


_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

      *Attorneys for the Plaintiff*

Sarah M. Gorman
Law Offices of Robert D. Gorman
Albuquerque, New Mexico

--and--

Susan M. Porter
Albuquerque, New Mexico

     *Attorneys for Defendant Angel DeLeon*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

     *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

     *Attorneys for Defendant Edward Troup*

Donald R. Knight
Littleton, Colorado

--and--

Russell Dean Clark
Las Cruces, New Mexico

     *Attorneys for Defendant Leonard Lujan*

Jason Bowles
Bowles Law Firm
Albuquerque, New Mexico

--and--

Joseph Libory Green
The Law Firm of Joseph Green, L.L.C.
Chesterfield, Missouri

--and--

Kathleen Lord
Lord Law Firm, LLC
Denver, Colorado

--and--

Mario Carreon
Las Cruces, New Mexico

--and--

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

       *Attorneys for Defendant Billy Garcia*

Carlos Ibarra
Las Cruces, New Mexico

--and--

David A. Lane
Killmer, Lane & Newman, LLP
Denver, Colorado

--and--

Robert J. Gorence
Gorence & Oliveros, P.C.
Albuquerque, New Mexico

--and--

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

     *Attorneys for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

--and--

Joseph E. Shattuck
Marco & Shattuck Law Firm
Albuquerque, New Mexico

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

     *Attorneys for Defendant Allen Patterson*

Eduardo Solis
El Paso, Texas

--and--

David L. Andersen
Andersen & Zimmer
Oakland, California

--and--

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

     *Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, Attorney at Law
Denver Colorado

--and--

Noel Orquiz
Deming, New Mexico

*Attorneys for Defendant Javier Alonso*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

*Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

*Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

--and--

León Encinias
León Felipe Encinias, Attorney at Law
Albuquerque, New Mexico

*Attorneys for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

    *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

    *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

    *Attorneys for Defendant Mario Rodriguez*

Steven Lorenzo Almanza
Las Cruces, New Mexico

--and--

Jacqueline K. Walsh
Walsh & Larranaga
Seattle, Washington

--and

Ray Velarde
El Paso, Texas

    *Attorneys for Defendant Timothy Martinez*

Michael David Lindsey
David Lindsey, Attorney at Law
Engelwood, Colorado

--and--

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

     *Attorneys for Defendant Mauricio Varela*

Josh R. Lee
Denver, Colorado

--and--

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

     *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

--and--

Kimberly S. Bruselas-Benavidez
Albuquerque, New Mexico

    *Attorneys for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

    *Attorney for Defendant Conrad Villegas*

Cesar Pierce-Varela
Las Cruces, New Mexico

--and--

Jess R. Lilley
Lilley Law Office
Las Cruces, New Mexico

--and--

Theresa M. Duncan
Duncan Earnest LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli LLP
Albuquerque, New Mexico

    *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
CJM Law Firm
Las Cruces, New Mexico

    *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

    *Attorney for Defendant Roy Paul Martinez*

Marc M. Lowry
Rothstein Donatelli LLP
Albuquerque, New Mexico

--and--

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

*Attorneys for Defendant Christopher Garcia*

Michael V. Davis
Michael V. Davis, Attorney & Counselor at Law, P.C.
Corrales, New Mexico

--and--

Ryan J. Villa
Law Office of Ryan J. Villa
Albuquerque, New Mexico

--and--

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

*Attorneys for Defendant Carlos Herrera*

Donald R. West
Don West Law Group
Orlando, Florida

--and--

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Law Office of Ryan J. Villa
Albuquerque, New Mexico

     *Attorneys for Defendant Rudy Perez*

Lisa Torraco
Albuquerque, New Mexico

--and--

Donavon A. Roberts
Albuquerque, New Mexico

     *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson
Albuquerque, New Mexico

     *Attorney for Defendant Santos Gonzalez*

Keith R. Romero
Keith R. Romero, Attorney and Counselor at Law
Albuquerque, New Mexico

     *Attorney for Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

     *Attorney for Defendant Shauna Gutierrez*

Alfred D. Creecy
Albuquerque, New Mexico

--and--

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

*Attorneys for Defendant Brandy Rodriguez*